FILED

2015 Dec-02  AM 10:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| GREATER BIRMINGHAM MINISTRIES; and ALABAMA STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, <br><br>         Plaintiffs, <br><br>     v. <br><br> STATE OF ALABAMA; ROBERT J. BENTLEY, in his official capacity as Governor of Alabama; LUTHER J. STRANGE, in his official capacity as the Alabama Attorney General; JOHN MERRILL, in his official capacity as the Alabama Secretary of State; and SPENCER COLLIER, in his official capacity as the Secretary of the Alabama Law Enforcement Agency, <br><br>         Defendants. | Civil Action No. _____ |

## COMPLAINT

## **INTRODUCTION**

Since the turn of this century, approximately 22.4 million votes have been cast in Alabama elections.  In that time, there has been only one documented case where one Alabama voter sought to impersonate another.  Despite the extreme rarity of voter fraud, in June 2011, the Alabama Legislature enacted House Bill 19 ("HB 19"), a law whose purported purpose is to prevent voter fraud by requiring voters to present photographic identification to vote in-person or absentee (the "Photo ID Law").

According to the Alabama Secretary of State, the Photo ID Law was estimated to immediately disfranchise at least 280,000 registered voters.  If the Photo ID Law remains in place, hundreds of thousands more eligible and registered voters will be barred from voting in the years to come.

It is no accident that a disproportionate number of those disfranchised voters are African-American and Latino.  Indeed, the Photo ID Law is simply the latest chapter in Alabama's long and brutal history of intentional racial discrimination.  For five decades, Alabama's use of discriminatory voting schemes has necessitated repeated federal intervention.  Now, Alabama again seeks to disfranchise thousands of

African-American and Latino voters—all in the name of "curing" a voter fraud problem that does not exist.

Although the law was passed in 2011, Alabama did not immediately seek to implement it. At that time, all voting law changes in Alabama were subject to preclearance review pursuant to Section 5 of the Voting Rights Act (52 U.S.C. §10304). Under Section 5, Alabama was obligated to obtain approval from the Department of Justice or a three-judge federal court before enforcing new voting laws that might burden voters of color. But Alabama never sought preclearance review for its Photo ID Law. Instead, for two years, Alabama delayed implementation of the law, awaiting the final resolution of the *Shelby County, Alabama v. Holder* lawsuit, in which a county in Alabama sought to challenge the constitutionality of the preclearance regime.

June 25, 2013 was the day Alabama had been waiting for. On that date, the U.S. Supreme Court lifted Alabama's nearly fifty-year-old preclearance obligations. The very next day, free of its preclearance obligations, Alabama announced that it would enforce its Photo ID Law for the 2014 election cycle.

The *Shelby County* decision, however, did not block suits challenging voting restrictions that are racially discriminatory under other provisions of

the Voting Rights Act or the United States Constitution.  Alabama's Photo ID Law is just such a prohibited restriction.

Accordingly, Plaintiffs allege as follows:

## I.   SUMMARY OF VOTING RIGHTS CLAIMS

### A.   The Discriminatory Photo ID Law

1.    The Photo ID Law restricts in-person and absentee voting to individuals who are able to produce one of seven required forms of "valid" photo ID.  A prospective in-person voter without the required photo ID cannot cast a regular ballot unless two election officials present at the polling place choose to "positively identify" that person. Ala. Code § 17-9-30(e) (2011) (the "Positively Identify Provision").  All other prospective in-person voters, and nearly all other absentee voters without the required photo ID, must cast a provisional ballot that will be counted only if the prospective voter provides a designated election official with the required photo ID within a limited period of time before or after Election Day.

2.    The Photo ID Law was conceived and operates as a purposeful device to further racial discrimination, and results in Alabama's African-American and Latino (or Hispanic) voters having less opportunity than other members of the electorate to participate

effectively in the political process and to elect candidates of their choice.

3.    Recently, Defendants have significantly increased the burdens on African-American and Latino voters caused by the Photo ID Law.  For example, Defendants have greatly reduced the operating hours of certain locations where individual voters are able to obtain the principal forms of required photo ID—driver's licenses and non-driver IDs issued by the Alabama Law Enforcement Agency ("ALEA," formerly the Alabama Department of Public Safety).  This action has deepened the inequalities of opportunity that the Photo ID Law places on African-American and Latino voters.

4.    Accordingly, Plaintiffs seek to enjoin the enforcement by Defendants of the Photo ID Law for in-person and absentee voters, because the Photo ID Law was enacted with a racially discriminatory purpose and the law has had and will have a discriminatory effect, in violation of Section 2 of the Voting Rights Act ("VRA"), 52 U.S.C. § 10301 ("Section 2"), and the Fourteenth and Fifteenth Amendments of the United States Constitution, pursuant to 42 U.S.C. § 1983.  *See* U.S. Const., amends. XIV & XV, 42 U.S.C. § 1983.

**B.    The Undefined "Positively Identify" Provision Is an Unlawful Voucher Requirement.**

5.    Plaintiffs also challenge Defendants' failure to define or provide for the nondiscriminatory administration of the Positively Identify Provision of the Photo ID Law, which causes it to serve as an unlawful "voucher" requirement on registered voters who lack the required photo ID and seek to exercise their constitutional right to vote.

6.    The Positively Identify Provision provides that a registered voter who lacks the photo ID required to vote in person on Election Day may cast a regular ballot only if she or he is "positively identified by two election officials as a voter on the poll list who is eligible to vote and the [two] election official[s] . . . sign a sworn affidavit so stating."

7.    Defendants have failed to adopt final administrative rules governing the meaning or application of the Positively Identify Provision, leaving that provision undefined and placing complete discretion in the hands of election officials to decide when and how they may "positively identify" a prospective voter as eligible to cast a regular ballot.  Thus, the undefined Positively Identify Provision allows election officials to apply arbitrary and capricious

qualifications to the disproportionately African-American and Latino voters who lack the required photo ID, and to potentially apply a wholly different set of qualifications to otherwise similarly situated white voters.

8.      The undefined Positively Identify Provision therefore imposes a requirement, as a prerequisite to voting, that prospective voters without the required photo ID prove their qualifications by the voucher of two election officials, which is a test or device that is *per se* prohibited by Section 201 of the Voting Rights Act (52 U.S.C. § 10501).

## II.   JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, 1357, 2201, 52 U.S.C. §§ 10301, 10308(f), 10310(e), and 42 U.S.C. §§ 1983, 1988.

10.      Venue is proper pursuant to 28 U.S.C. §§ 124(b)(6), 1391(b).

## III.   PARTIES

### A.   Plaintiffs

11.      Organizational Plaintiff Greater Birmingham Ministries ("GBM") was founded in 1969 in response to the urgent human rights and justice needs of the residents of the greater Birmingham,

Alabama area.  GBM is a multi-faith, multi-racial organization that provides emergency services for people in need.  It engages in community efforts to create systemic change with the goal of building a strong, supportive, and politically active society that pursues justice for all people.

12.  A central goal of GBM is the pursuit of social justice in the governance of Alabama.  GBM actively opposes state laws, policies, and practices that result in the exclusion of vulnerable groups or individuals from the democratic process.  Toward that end, GBM regularly engages in efforts to register, educate, and increase turnout among African-American and Latino voters, as well as low-income voters in general.  GBM has participated in lawsuits to vindicate these democratic principles.

13.  As a result of the Photo ID Law, GBM is now required to undertake such activities as (1) assessing who, among its constituency of African-American and Latino voters, lacks the required photo IDs and/or determining which underlying documents each constituent needs in order to obtain the required photo ID; (2) helping to educate African-American and Latino voters, as well as the general public,

about the Photo ID Law; and (3) encouraging Defendants to mitigate the most egregious discriminatory effects of the Photo ID Law.

14.    Thus, the Photo ID Law is causing, and will continue to cause, GBM to divert a portion of its limited financial and other organizational resources to educating African-American and Latino voters in Alabama about the requirements of the Photo ID Law, and assisting registered voters with complying with that law in order to vote.  As a result, GBM is limited, and will continue to be limited, in the resources that it can devote to its other core organizational goals.

15.    Organizational Plaintiff Alabama State Conference of the National Association for the Advancement of Colored People ("the Alabama NAACP") is a state subsidiary of the National Association for the Advancement of Colored People, Inc.  The Alabama NAACP is the oldest and one of the most significant civil rights organizations in Alabama, and it works to ensure the political, educational, social, and economic equality of African Americans and all other Americans.

16.    Two central goals of the Alabama NAACP are to eliminate racial discrimination in the democratic process, and to enforce federal laws and constitutional provisions securing voting rights.  Toward those ends, the Alabama NAACP has participated in numerous

lawsuits to protect the right to vote, regularly engages in efforts to register and educate African-American voters, and encourages African Americans to engage in the political process by turning out to vote on Election Day.

17.     The Alabama NAACP is now, as a result of the Photo ID Law, required to undertake such activities as: (1) assessing who, among its constituency, lacks the required photo IDs and/or determining which underlying documents each constituent needs in order to obtain the required photo ID; (2) assisting and educating African Americans, and the general public, about complying with the Photo ID Law; and (3) encouraging Defendants to mitigate the most egregious discriminatory effects of the Photo ID Law.

18.     Thus, the Photo ID Law is causing, and will continue to cause, the Alabama NAACP to divert a portion of its financial and other organizational resources to educating African-American voters in Alabama about the requirements of the law, and assisting registered voters with complying with it in order to vote.  As a result, the Alabama NAACP is limited, and will continue to be limited, in the resources that it can devote to its other core organizational goals.

**B.     Defendants**

19.     Defendant State of Alabama is a State of the United States.

20.     Defendant Robert J. Bentley is being sued in his official capacity as the Governor of Alabama.  The Governor of Alabama is a constitutional officer who is vested with the supreme executive power of the State, is the chief magistrate of the State, and, as such, is charged with enforcing the Photo ID Law, and any related administrative rules.  Ala. Const., art. V, § 113.

21.     Defendant Luther J. Strange, III is being sued in his official capacity as Attorney General of Alabama.  As a constitutional officer and member of the State's executive department, the Attorney General of Alabama is the State's chief legal representative, and, as such, is charged with enforcing the Photo ID Law, and its administrative rules.  Ala. Const., art. V, § 112.

22.     Defendant John Merrill is being sued in his official capacity as the Secretary of State of Alabama.  As a constitutional officer and member of the State's executive department, the Secretary of State is Alabama's chief election official.  Ala. Const., art. V, § 112. He is charged with administering elections and the absentee voting

system, and implementing the Photo ID Law, including issuing voter photo ID cards and promulgating the administrative rules.

23.    Defendant Spencer Collier is being sued in his official capacity as the Secretary of the Alabama Law Enforcement Agency, the Alabama agency tasked with issuing a number of accepted photo IDs under the Photo ID Law.

## IV.  FACTUAL ALLEGATIONS

### A.    Alabama Demographics

24.    According to the 2010 Census, Alabama's total population is 4,779,736, with a non-Hispanic white[1] population of 3,204,402 (67.04%), an African-American alone population of 1,244,437 (26.03%), and a Latino population of 185,602 (3.88%).

25.    According to the 2009-2013 American Community Survey, eleven of Alabama's 67 counties have a majority-African-American population.  Each of these counties has a significantly higher African-American alone population than the State as a whole: Macon County (81.2%), Greene County (80.8%), Lowndes County (74.0%), Sumter County (73.1%), Wilcox County (72.9%), Bullock County (70.9%), Dallas County (68.8%), Perry County (68.3%), Hale

---

[1]    All references to "white alone" Census counts in this Complaint are to non-Hispanic whites.

County (59.1%), Montgomery County (55.2%), and Marengo County (52.1%).

26.     According to the 2009-2013 American Community Survey, none of Alabama's 67 counties has a majority Latino population.

27.     According to the 2014 American Community Survey, the voting age population ("VAP") of Alabama was 3,647,817, with a white alone VAP of 2,544,727 (69.7%), an African-American alone VAP of 954,944 (26.1%), and a Latino VAP of 67,220 (1.8%).

28.     According to the 2009-2013 American Community Survey, the VAP of the majority-African-American Alabama counties was 293,016, with a white alone VAP of 109,311 (37.3%), an African-American alone VAP of 175,711 (60.0%), and a Latino VAP of 3,424 (1.2%).

29.     According to the 2011-2013 American Community Survey, African Americans (31.7%) and Latinos (35.5%) in Alabama experience poverty at nearly three times the rate of whites (13%); and white per capita income ($27,282) is nearly double African-American per capita income ($15,516) and more than double Latino per capita income ($13,089).

30.    According to the 2011-2013 American Community Survey, 13.5% of African-American households in Alabama lack a vehicle, as compared to 4.1% of white households, and African Americans are over five times as likely as whites, and Latinos are over three times as likely as whites, to use public transportation to commute to work. According to the 2006-2010 American Community Survey, 5.69% of Latino households in Alabama lack a vehicle, as opposed to 3.87% of white households.

31.    According to the 2006-2010 American Community Survey (the most recent Census survey to tabulate vehicle ownership by race at a county level), 15.2% of African-American households in the majority-African-American counties lack a vehicle, as compared to 3.6% of white households in those counties.  And according to the 2009-2013 American Community Survey, African Americans in the majority-African-American counties in Alabama are over three times as likely as whites in those counties to use public transportation to commute to work.

32.    The lack of a vehicle is a particularly difficult burden to overcome in Alabama, which invests no state money in public transportation, and which, in 2011, ranked 48th nationwide in

intercity transit access for rural residents because 844,000 rural

residents had no access to intercity transit services.

33.    According to the 2010 Census, 30.3% of African-American

family households and 21.8% of Latino family households in Alabama

have a single parent and related child under the age of 18, compared

to 9.4% of white family households in Alabama.

34.    According to the 2014 American Community Survey,

56.0% of African-American households in Alabama have broadband

Internet access, compared to 69.3% of white households in Alabama.

**B.    The Passage of the Photo ID Law Was Motivated by a Discriminatory Purpose.**

    **1.    The History of Racial Discrimination in Voting in Alabama**

36.    In 1965, Alabama was declared a covered state under

Section 4(b) of the Voting Rights Act, based on the State's

enforcement of unconstitutional tests or devices, including voucher

requirements, as well as low voter registration and turnout rates.  *See*

*South Carolina v. Katzenbach*, 383 U.S. 301, 312-13 (1966)

("Discriminatory administration of voting qualifications has been

found in all eight Alabama cases. . . . Negroes obliged to obtain

vouchers from registered voters have found it virtually impossible to

comply . . . .").

37.    Because of its history of burdening the voting rights of people of color, Alabama remained a covered state for almost fifty years.  For example, during the reauthorization of the Voting Rights Act in 2006, Congress was presented with extensive evidence documenting the State's sustained record of unconstitutional and illegal racial discrimination in voting.  *See, e.g.*, *Renewing the Temporary Provisions of the Voting Rights Act: Legislative Options after LULAC v. Perry: Hearing Before the Subcommittee on the Constitution, Civil Rights and Property Rights of the Senate Committee on the Judiciary*, 109th Cong. 365-402 (July 13, 2006).

38.    For more than five decades, continuing to the present, Alabama's use of racially discriminatory voting schemes has necessitated federal intervention.  *See, e.g.*, *Alabama Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257 (2015) (redistricting); *City of Pleasant Grove v. United States,* 479 U.S. 462 (1987) (selective annexations); *Hunter v. Underwood*, 471 U.S. 222 (1985) (felon disfranchisement); U.S. Dep't of Justice, Civil Rights Division, Voting Section, Alabama Voting Determination Letters, http://www.justice.gov/crt/records/vot/obj_letters/state_letters.php?state=al (last visited Dec. 1, 2015) (listing all objections imposed

against Alabama under Section 5 of the Voting Rights Act, including

24 objections from 1990 to 2008, as well as pre-1990 objections to

voter re-identification and literacy requirements).

39.    In the last decade, Alabama has continued to employ

voting practices that illegally result in the denial or abridgement of

the right to vote for African-American and Latino voters and limit

their opportunity to participate equally in the political process.  For

example, in January 2014, a federal court in the Southern District of

Alabama "bailed-in" the City of Evergreen in Conecuh County for

preclearance under Section 3(c) of the Voting Rights Act because

voter registrars and election officials there continue to

unconstitutionally discriminate against African-American voters.

## 2.    The Alabama Legislature That Passed the Photo ID Law Was Elected in a Highly Racially Charged Environment.

40.    In the 2008 presidential election, African-American voter

turnout and political engagement increased significantly as compared

to prior elections.

41.    The Alabama general election in 2010 took place against a

backdrop of significant growth of the African-American and Latino

population.  The African-American population grew by 9.6% between

the 2000 and 2010 censuses, and Latino population grew by 144.8% during that same time.

42.    In the 2010 elections, the Republican Party, for the first time in over 136 years, won majorities in the Alabama Senate and House of Representatives.  The electorate was highly racially polarized, and the 2010 campaigns were characterized by overt and subtle racial appeals.

43.    For example, in order to win the 2010 elections, State Senators Scott Beason and Benjamin Lewis, along with other legislators, engaged in a deliberate strategy that was designed to "suppress black votes by manipulating what issues appeared on the 2010 ballot." *United States v. McGregor*, 824 F. Supp. 2d 1339, 1345-47 (M.D. Ala. 2011).  In recorded conversations, Senators Beason, Lewis and other legislators and their compatriots, were caught singling out African-American voters for "mockery and racist abuse." *Id.* at 1346.  These recorded conversations included references to African-American voters as "Aborigines" and "Indians," and the prediction that, if a gambling referendum appeared on the 2010 ballot, "[e]very black, every illiterate" would be "bused on HUD financed buses" to the polls.  *Id.*  Senator Ben Brooks and other

Alabama state legislators were also present for or engaged in these recorded "racist statements."  *Id.* at 1345-48.  The district court found that Senators Beason and Lewis and other legislators' plan—i.e., to stop the gambling referendum from appearing on the 2010 ballot in hopes of depressing African-American voter turnout—constituted an intentionally discriminatory "scheme" to "maintain and strengthen white control of the political system," and that "political exclusion through racism remains a real and enduring problem in this State." *Id.* at 1347.

### 3.   The Specific Sequence of Events Leading to the Passage and Implementation of the Photo ID Law

44.   In 2011, the newly elected Alabama Legislature prioritized the enactment of a bill that required photographic proof of identity to vote either in-person or absentee.

45.   The Alabama statute requiring presentation of a photo identification to vote at the polls or through an absentee ballot was introduced as HB 19 on March 1, 2011 by Alabama State Representative Kerry Rich.  On March 22, 2011, after the House majority used the cloture procedure to truncate any debate, the Alabama House of Representatives passed HB 19, the bill that became the Photo ID Law.  Representative Kerry Rich was the sole House

sponsor of HB 19.  Every single African-American representative who cast a vote on the bill voted against it.

46.    On June 9, 2011, HB 19 was approved by the Senate.  The bill was sponsored and supported by many of the same state legislators who were engaged in or present for the aforementioned recorded conversations that disparaged African-American voters.  For example, State Senators Beason, Brooks, and others of that group of legislators co-sponsored Senate Bill 86, the companion bill to HB 19.  Those same legislators also voted in favor of HB 19.   The Senate majority limited debate to only 20 minutes.  Every single African-American senator who was present voted against the bill.

47.    The Alabama Legislature knew or should have known that African-American and Latino registered voters disproportionately lack the required photo ID.  Defendants know or have reason to know that African-American and Latino eligible voters disproportionately lack the required photo ID.  Moreover, Alabama legislators opposed to photo ID requirements had specifically argued that such requirements would disfranchise African-American voters.

48.    The Alabama Legislature knew or should have known that the Photo ID Law would impose a substantial burden on many voters,

particularly African-American and Latino voters, in light of the economic and demographic factors discussed above.

49.    There is no substantial evidence of in-person voter impersonation or noncitizen voting in Alabama.  Over the 12-year period prior to the Photo ID Law's passage, there was just one documented instance of voter impersonation and one documented instance of non-citizen voting.

50.    The proponents of the Photo ID Law knew or should have known that the absentee photo ID requirement would be "futile" at preventing voter impersonation fraud since "there would be no way for the state election officials to determine whether the photo ID actually belonged to the absentee voter, since he wouldn't be presenting his face at the polling place for comparison with the photo." *Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949, 954 (7th Cir. 2007), *aff'd sub nom.* 553 U.S. 181 (2008).

51.    Defendant Bentley signed the Photo ID Law into law on June 15, 2011.  At that time, Alabama was one of nine completely "covered state[s]" under Section 5 of the Voting Rights Act, which meant that Alabama could not enforce the Photo ID Law without first

obtaining preclearance from the U.S. Department of Justice or a federal three-judge court.

52.    Although it was subject to these preclearance rules at the time the Photo ID Law was enacted, Alabama never sought or received preclearance to enforce the law or related rules.  Instead, Alabama delayed implementation of the law pretextually, so that it could implement it without the burden of preclearance.

53.    On June 25, 2013, the U.S. Supreme Court issued its opinion in *Shelby County, Alabama v. Holder*, 133 S. Ct. 2612 (2013), declaring unconstitutional Section 4(b) of the Voting Rights Act, 52 U.S.C. § 10303(b), which is the coverage provision of Section 5 of the Act.  133 S. Ct. at 2631.  Because without Section 4(b) Section 5 has no present effect, the *Shelby County* decision resulted in Alabama no longer being governed by the preclearance requirement.

54.    On June 26, 2013, one day after the Supreme Court removed the preclearance hurdle, Defendants, the Alabama Attorney General and Secretary of State, announced that the Photo ID Law would be implemented and enforced immediately.

55.    On June 29, 2013, just three days later, the Secretary of State issued proposed administrative rules for the Photo ID Law.

Until that time, the Defendant Secretary of State had claimed that the State's two-year failure to submit the Photo ID Law for preclearance was due to alleged delays in drafting such rules.

56.    On October 22, 2013, the Secretary of State issued final administrative rules for the Photo ID Law generally, and on April 16, 2014, the Secretary of State issued supplemental emergency administrative rules governing the Positively Identify Provision.  The administrative rules governing the Photo ID Law generally are now final, while the emergency administrative rules governing the Positively Identify Provision have since expired.

57.    Except as described in the Photo ID Law and implementing administrative rules, neither the Alabama Legislature nor Defendants have otherwise altered the Photo ID Law.

**4.    The Alabama Legislature's Contemporaneous Passage of Racially Discriminatory Voter Registration ID Requirements and of Discriminatory Redistricting Plans Confirm Its Discriminatory Purpose in Passing the Photo ID Law.**

58.    The Photo ID Law was passed by the same Alabama state legislature that passed an intentionally racially discriminatory voter registration ID requirement and intentionally racially discriminatory 2012 redistricting of the Alabama Senate and House.

59.    On June 2, 2011, the same Legislature that enacted HB 19 almost simultaneously passed House Bill 56 ("HB 56"), "a comprehensive and far-reaching state immigration law." *Cent. Ala. Fair Hous. Ctr. v. Magee*, 835 F. Supp. 2d 1165, 1169 (M.D. Ala. 2011), *vacated sub nom. on other grounds*, 2013 WL 2372302 (11th Cir. May 17, 2013).  The bill "attack[ed] every aspect of an illegal immigrant's life" by severely restricting undocumented immigrants' and their citizen children's access to employment, housing, and educational opportunities.  835 F. Supp. 2d at 1169-70 (quoting Rep. Micky Ray Hammon).  According to Senator Beason, a co-author of the bill, HB 56 was "designed to reduce the number of illegal aliens in the state" by the "self-deportation" of undocumented immigrants.  *Id.* at 1182 (quoting Transcript of Nov. 23, 2011 Hearing, *Cent. Ala. Fair Hous. Ctr. v. Magee,* Doc. No. 68, at 118 (Statement of Sen. Beason)).  Fourteen of the seventeen Alabama senators that cosponsored Senate Bill 256, the companion bill to HB 56, also cosponsored the Photo ID Law in the Senate (Senate Bill 86).

60.    HB 56 contains a voter registration ID requirement whereby a person must provide documentary proof of citizenship, such as a birth certificate, an ALEA-issued STAR driver's license or

non-driver ID card, a U.S. passport, a naturalization document, or various similar documentation, in order to register to vote. The documentary proof of citizenship required by HB 56 is similar to that required by the Photo ID Law in order to vote or obtain the required photo ID. Although the voter registration ID requirement in HB 56 was submitted to the United States Department of Justice for administrative preclearance, that submission was withdrawn on May 15, 2013, and HB 56 was never precleared. On December 18, 2014, the Defendant Secretary of State announced that Alabama would enforce the voter registration ID requirement in HB 56.

61.    African-American legislators voted overwhelmingly in opposition to HB 56.

62.    Senator Beason had earlier in 2011 explained this expected opposition to HB 56 in overtly racial and political terms, stating that the legislative opponents of HB 56 "do not want to solve the illegal immigration problem because they know, this is a fact, that when more illegal immigrants move into an area, when their children grow up and get the chance to vote, they vote for [the political opposition]."

63.    In December 2011, a federal district court in Alabama enjoined portions of HB 56 after finding substantial evidence of intentional racial discrimination in the 2011 legislative debates, including state legislators using "illegal immigrant as a code for Latino or Hispanic" and making "comments that reflect popular stereotypes about Mexicans and [drew] explicit distinctions along the lines of race and national origin." *Magee,* 835 F. Supp. 2d at 1192-94 & nn.20-21.

64.    The statements made by Representative Rich, the sole sponsor of the Photo ID Law and a cosponsor of HB 56, during the House debates over HB 56, were specifically cited by the district court as evidence demonstrating both the discriminatory intent behind HB 56 and "the numerous ways in which legislators frequently conflated illegal immigration and Hispanics." *Id.* at 1192-94 & n.21.

65.    In 2012, the same Alabama Legislature that enacted the racially discriminatory Photo ID Law and HB 56 also redistricted the State's House and Senate.  These redistricting plans were later challenged in federal district court by African-American legislators and voters as an unconstitutional racial gerrymander.  *Alabama Legislative Black Caucus v. Alabama*, 989 F. Supp. 2d 1227 (M.D.

Ala. 2013) (three-judge court).  In 2015, the United States Supreme Court remanded the case to the district court after determining that the Alabama Legislature had very likely engaged in intentional racial discrimination through gerrymandering that targeted African-American voters in violation of the Fourteenth Amendment. *Alabama Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257 (2015).

### 5. The Alabama Legislature's Passage of the Photo ID Law Was Motivated by a Discriminatory Purpose.

66.    As described above, the Alabama Legislature that passed the Photo ID law was the same one that: (1) included high ranking legislators who, in 2010, had sought to suppress African-American voter turnout; (2) in June 2011, almost simultaneously passed HB 56 in a highly racially charged environment that was openly hostile to Latino residents; and (3) in 2012, redistricted in a manner that the United States Supreme Court later held very likely constituted an unconstitutional racial gerrymandering that targeted African-American voters.

67.     The Photo ID Law was passed with the same discriminatory intent as the aforementioned 2010 electoral scheme, 2011 anti-immigrant law, and 2012 redistricting.

## C.     The Photo ID Law Results in African-American and Latino Voters Having Less Opportunity Than White Voters to Participate in the Political Process and Elect Candidates of Their Choice in Alabama.

68.     The Photo ID Law restricts in-person and absentee voting to individuals who possess one of seven specific forms of "valid" photo ID (the "required photo ID"): (1) a driver's license or a non-driver ID card issued by ALEA; (2) a valid Alabama photo voter identification card, which may be used for the sole purpose of voting; (3) a photo ID issued by a branch, department, agency, or entity of Alabama, another state, or the United States, including a government employee photo ID; (4) a U.S. passport; (5) a photo ID issued by an Alabama public or private college, university, or postgraduate technical or professional school; (6) a United States military photo ID; or (7) a tribal photo ID.  Ala. Code § 17-9-30(a)(1)-(7).  An ALEA-issued driver's license can be expired no longer than 60 days to be treated as an acceptable photo ID.  All other required photo IDs must be unexpired or otherwise "valid" as defined by opinion No. 2003-212 of the Alabama Attorney General.

69.    Under the Photo ID Law, there are no exemptions from the photo ID requirement for in-person voting other than the Positively Identify Provision.

70.    The photo ID requirement even applies to absentee voting.  Voters are required to include a photocopy of their photo IDs, in a separate envelope, when they mail in their absentee ballots. African-American and Latino voters are less likely than white voters to have access to the copiers, scanners, or printers required to provide such photocopies.  For absentee voting, the only exemption from the photo ID requirement is for absentee ballots submitted pursuant to federal law, such as the Uniformed and Overseas Citizens Absentee Voting Act or the Voting Accessibility for the Elderly and Handicapped Act.  *See* Ala. Code § 17-9-30(c); Ala. Admin. Code § 820-2-9-.12.  Defendants have failed to issue administrative rules that provide an exemption from the photo ID requirement for absentee ballots cast in Presidential and Vice Presidential elections, submitted pursuant to the Voting Rights Act, 52 U.S.C.A. § 10502 (d).

71.    The Photo ID Law disproportionately and substantially abridges the opportunities of African-American and Latino voters to participate equally and effectively in the political process in Alabama

29

in at least three ways:  (1) African-American and Latino voters are less likely than white voters to possess the required photo IDs; (2) African-American and Latino voters face greater obstacles than do white voters in obtaining the required photo IDs; and (3) on information and belief, the photo ID requirement has disproportionately disfranchised African-American and Latino voters.

72.    The general purpose Photo IDs available to Alabama voters are those issued by ALEA: the driver's license and the non-driver photo ID.  As set forth below, substantial obstacles prevent poor voters (who are disproportionately African-American and Latino) from obtaining those two forms of ID.  Nor does the Voter ID card made available by the Secretary of State remedy this problem, for substantial obstacles also prevent poor (and disproportionately African American and Latino) voters from obtaining the Voter ID card.

### 1.    Disproportionate Possession of the Required Photo IDs

72.    African-American and Latino voters comprise a disproportionate subset of (1) registered voters who lack the required photo IDs and (2) eligible, but unregistered prospective voters who lack the required photo IDs.

73.     ALEA-issued photo IDs are the most common forms of the required photo ID.

74.     According to a statement from the Defendant Secretary of State's office made in March 2014, a check of Alabama registered voters against the ALEA database revealed that 560,000 people, or about 20% of registered voters, lack an ALEA-issued driver's license or non-driver ID card (the "No-Match List").

75.     Based on the No-Match List, Defendant Alabama Secretary of State further estimated in March 2014 that about half of those 560,000 voters who lack ALEA-issued photo IDs possess another one of the required photo IDs.  Thus, Defendant Secretary of State concluded that approximately 280,000 registered voters lack any form of the required photo ID.

76.     Defendants know or have reason to know the self-reported race of each of those voters on the No-Match List; and, thus, Defendants know or have reason to know that African-American and Latino voters comprise a disproportionate subset of those voters who appear on the No-Match List because they disproportionately lack ALEA-issued photo IDs.

77.    Defendants have refused or otherwise failed to make the No-Match List available to Plaintiffs and others who have requested it.

## 2.    Disproportionate Obstacles to Obtaining the Required Photo IDs

78.    As described below, the strict requirements of the Photo ID Law and the implementing administrative rules place substantial travel, financial, and time burdens on large numbers of eligible voters in Alabama, a disproportionate subset of whom are African-American or Latino (including constituents of Plaintiffs), thereby burdening, denying, or abridging their right to vote.

### a)    ALEA-Issued Driver's Licenses

79.    To obtain a driver's license, a voting-age applicant must: (1) pay $36.25 to purchase the license, (2) pay a $5 test fee and pass the road test, and (3) come with an already-licensed driver, proof of car insurance, and a vehicle that will pass inspection.  This fee structure imposes a cost that is beyond the means of many impoverished voters (who are disproportionately African-American and Latino).

80.    In addition to paying a fee for the driver's license, a voter must present various forms of documentation.  In particular, the

voter must include with his or her application one or more "primary" documents, which include: (a) a certified U.S. birth certificate [$15 ] (b) a U.S. passport; (c) an Alabama identification card [$36.25]; (d) a certificate of naturalization [$345]; a certificate of citizenship [$600]; (e) a U.S. certificate of birth abroad [$50]; (f) a resident alien card [$450 for a renewal or replacement card]; or (g) a valid foreign passport with a valid U.S. immigration document.  A fee must be paid for each of these documents when used to obtain a driver's license.

81.    Moreover, even if a voter can afford a driver's license, the process of obtaining one entails substantial burdens that disproportionately impact African Americans and Latinos.  In many Alabama counties, ALEA offices are inaccessible because of their remote locations and limited hours of operation.  Such offices are generally only open during working hours and many are not open during the lunch hour.

82.    Recently, Defendants made ALEA offices disproportionately less accessible to African-American voters seeking to obtain the required Photo ID by significantly reducing the already extremely limited hours of operation of these offices in 27 largely poor, rural counties.  African-American voters make up a larger

proportion of the population in these 27 counties than in other parts of the State where ALEA office hours were not reduced.

83.   On September 30, 2015, Defendants announced that ALEA would permanently close 31 part-time ALEA offices, including offices in eight of eleven contiguous counties in the so-called "black belt"—a string of counties where more than 130,000 eligible voters reside, nearly half of whom are African-American, and where the African-American poverty rate is 41%.  These closures would have disproportionately burdened eligible African-American voters seeking to obtain the photo ID required to vote under the Photo ID Law.

84.   Defendant Bentley reported that, in 2014, 17% (1,472 out of 8,654) of the first-time ID issuances from the 31 affected ALEA offices were in the eight "black belt" counties.  Closures of the ALEA offices in these eight counties would further reinforce the disproportionate barriers to voting faced by residents of such counties, which have high rates of poverty and limited transportation options.

85.   In response to public outcry over the proposed ALEA closures, including concerns raised by Plaintiffs, Defendant Bentley announced on October 16, 2015 that, rather than close completely,

the 31 affected ALEA offices would remain open one day per month. Because the affected offices had previously been open one to two days *per week*, Defendant Bentley's revised plan for the 31 ALEA offices constitutes a significant reduction in office hours at these offices. And because the reductions affect the same counties that were previously slated for closure, the revised plan still exacerbates the difficulties faced by African-American and Latino residents of these counties in obtaining the required photo IDs.

### b) Non-driver ALEA Photo IDs

86.    Voters can also obtain a non-driver ALEA Photo ID from an ALEA office.  The fee for obtaining such an ID is also $36.25.  The regulations governing this ID indicate that Alabama will waive that fee when the ID is obtained for the purpose of voting, *see* Administrative Rule 820-2-9-.04, however, the ALEA website does not advertise this option.  In order to obtain such a fee waiver, a voter must provide an affidavit, swearing that he or she does not have any form of "valid" voting ID.  Thus, to provide the required affidavit, an individual must understand the nuances of what constitutes a legally "valid" ID, including (1) whether an expired ID counts; (2) whether the address on the ID must be current; (3) whether the name must be

an exact match; (4) whether the ID has been issued by a "branch" of the State; and (5) whether the ID remains "valid" if it has been damaged.  The answers to these questions are not clear, and vary across types of ID.[2]  This by itself constitutes a substantial impediment.

87.   Even if the voter is successful in obtaining a fee waiver for the non-driver ALEA ID itself, he or she must still have the requisite underlying documentation.  This includes certain "primary" documents, all of which can be obtained only by paying a fee, with one impractical exception.  The "exception" is an Alabama birth certificate, for which the $15 fee will be waived only if the voter can attest that he or she does not have one of the enumerated forms of voting IDs.  This creates a substantial barrier for almost all voters for the reasons set forth above.

88.   Finally, should a voter be able to afford the non-driver ALEA ID and/or navigate the substantial obstacles imposed by the affidavit requirements, then he or she is still faced with the obstacles

---

[2]   For example, an Alabama driver's license remains valid for 60 days after expiration and even if the address is no longer correct.  *See* Alabama Attorney General Opinion 2003-212 (Aug. 12, 2003), at 6-7.  Yet other IDs are apparently invalid upon expiration and may not be used to vote after a change of address.

created by the limited hours and locations of the ALEA offices, set forth above.

### c) The disproportionate burdens faced by African- American and Latino voters in obtaining ALEA IDs

89.   African-American and Latino voters in Alabama are disproportionately impoverished and have a lower rate of vehicle ownership.   Accordingly, they face a disproportionate burden in obtaining ALEA-issued "valid" photo IDs given the cost of obtaining IDs, the cost of the underlying documentation needed to acquire those IDs, and the transportation burdens associated with that endeavor.

90.   For many, transportation barriers are a severe obstacle to obtaining the requisite Photo ID.  ALEA offices are less accessible to African-American and Latino voters, particularly given (1) African-American and Latino voters' disproportionately low rates of car ownership that would facilitate transport to an ALEA office as well as to offices that issue the documentation required to obtain ALEA-issued IDs, as reinforced by (2) the reduction in hours and locations of ALEA offices described above.

91.    G.A.'s situation clearly demonstrates the magnitude of this transportation burden.  G.A. is a U.S. citizen and resident of Franklin County, Alabama.  G.A is Latina, a full-time student, and a senior in high school.  When G.A. turns eighteen in December 2015, she will be eligible to register to vote, and she intends to register to vote.  She also plans to vote in the 2016 elections.  However, G.A. does not have a driver's license or any of the other required photo IDs.  G.A. is also not personally acquainted with the election officials at her anticipated polling place.  The closest driver's license issuing office to G.A. is only open one day a month.  The next closest is located in Sheffield, an approximately 45-mile drive roundtrip, and is only open from 8 am to 4:30 pm on weekdays.  G.A. does not own a car, nor has she ever driven one.  Her parents have access to vehicles, but both parents work full-time and are unable to drive G.A. to Sheffield during that ALEA office's normal hours.  For example, her father leaves for work as early as 4:00 am and works up to twelve hours or more per day.   There is no public transportation from Franklin County to Sheffield.  It would be unduly burdensome for G.A. or her parents to take time off from work or school to go to the

ALEA offices in Sheffield or Franklin County during those offices'
limited hours of operation.

### d) Single-Purpose "Voter ID" Cards

93.    A person lacking any of the other six enumerated "valid"
categories of photo ID can obtain a Voter ID card that can only be
used for voting.  While these Voter ID cards may be obtained from the
county boards of registrars or mobile ID units (collectively, "photo
ID-issuing offices"), African-American and Latino voters
disproportionately face significant burdens in obtaining cards from
these photo ID-issuing offices due to their limited hours of operation
and their locations, which are inaccessible to public transportation.

94.    In order to obtain a Voter ID card, the voter must present
(1) a photo identity document[3] (or a non-photo identity document
showing his or her full legal name and date of birth[4]), (2)

---

[3]    Acceptable photo identity documents include: (i) a high school
student ID card; (ii) a student or employee ID card from a private
university outside Alabama; (iii) a private employee ID card; (iv) a nursing
home or hospital ID card; and (v) a wholesale club or other membership
card.

[4]    Acceptable non-photo ID documents include: (i) Birth
Certificate; (ii) Hospital or nursing home record; (iii) Marriage Record; (iv)
State or Federal Census Record; (v) Military Record; (vi) Medicare or
Medicaid document; (vii) Social Security Administration Document; (viii)
Certificate of Citizenship; and (ix) Official school record or transcript.

documentation showing his or her date of birth, (3) documentation showing that he or she is registered to vote, and (4) documentation showing his or her name and address as they appear in the voter registration records.  Ala. Code § 17-9-30(j).

95.    The documents required to obtain a Voter ID card are often costly.  The documents of broadest applicability that would confirm a voter's name and date of birth—requirements (1) and (2), set forth above—are a birth certificate and/or marriage license.  A copy of a birth certificate or marriage license—to support a name change, for example—costs $15.00 each.  Although Defendants purport to provide Alabama birth certificates for free to those persons in need of Voter ID cards, this appears to be an infrequently-used option.  For example, the mobile ID units processed only one such request in 2015.  Defendants do not provide birth certificates for individuals born out-of-state.

96.    Upon information and belief, African-American and Latino voters are less likely than white voters to possess the required documents, such as a birth certificate.  This is particularly the case for elderly African-American voters who are more likely to have been born at home and less likely to have had their births registered.

97.     Furthermore, the administrative rules implementing the Voter ID card provision of the Photo ID Law, and in particular the Instructions that accompany the application form, state that: (1) a person can apply for a Voter ID card only if he or she does not have any of the other photo IDs required to vote in Alabama; (2) a person should not complete the application if he or she has any of the other required photo IDs; (3) the application must be signed and sworn, and (4)  any falsification or fraud in making the application is a Class C felony.  Ala. Admin. Code § 820-2-9-.03.  The requirement that a person applying for a Voter ID card sign an affidavit swearing under the penalty of a Class C felony conviction that the contents of the prospective voter's application are true, discourages eligible voters from applying for the Voter ID card.  Ala. Code § 17-9-30(i).

98.     The required application also requires parsing deeply ambiguous language.  In order to determine whether one is even eligible to apply for a Voter ID card, an individual must understand the nuances of what  constitutes a legally "valid" ID, including (1) whether an expired ID counts; (2) whether the address on the ID must be current; (3) whether the name must be an exact match; (4) whether the ID has been issued by a "branch" of the State; and (5)

whether the ID remains "valid" if it has been damaged.  As noted above, the answers to these questions are not clear and vary across types of ID.

99.     Even if a voter can navigate the labyrinth of obstacles constructed by Alabama in order to obtain a truly "free" Voter ID card, he or she must still find a way to get to an office that issues such IDs.  Given the limited locations of such offices and their limited hours, this is a daunting impediment.  Boards of registrars are located at the county seat and often inside of county courthouses.  These locations are disproportionately inaccessible to African-American and Latino potential voters because—as noted above—African-American households are more than three times as likely, and Latino households are approximately one and a half times as likely, as white households to lack a vehicle.  They are particularly inaccessible to rural African-American and Latino voters seeking a Voter ID card, who necessarily lack driver's licenses.

100.   The boards of registrars' limited office hours add to their inaccessibility.  Many boards of registrars' offices are open only during regular weekday business hours, from approximately 8:30 a.m. to 4:00 or 4:30 p.m., and are closed on weekends and during the

lunch hour.  African-American and Latino voters are disproportionately burdened by the need to take time off from school or work, arrange for alternative child or family-care, and expend their limited financial, material, and other resources in order to obtain the Voter ID card.

101.   Defendant Bentley's office has stated that Alabama made "extensive" efforts to ensure "statewide availability" of photo IDs via "mobile events."  In fact, mobile ID units have failed to increase the accessibility of Voter ID cards, because they are seldom available and offer only limited and inconvenient hours.  Over the past year, most Alabama counties have received only a single one-day visit from a mobile ID unit.  When available, the units are typically only open for a two- to four-hour window during morning work hours; they are rarely open on weekends; and they are usually closed during the lunch hour. In addition, the mobile ID units are not "mobile" in any practical sense since they typically stay in a single location within a county, often near the also inaccessible office of the board of registrars.  As a result, the mobile ID units are no more accessible than the boards of registrars' offices and are disproportionately inaccessible to African-American and Latino voters for the same reasons.  Indeed, as of mid-

October 2015, mobile ID units had processed only 29 voter IDs in Alabama in 2015, with nearly half (14) of those IDs issued in the disproportionately white (81.8% of voting age citizens) county of Limestone.

102.   As a result of the barriers Defendants have imposed on the ability to obtain Voter ID cards and the burdens identified in this Complaint, an immaterial number of Voter ID cards have been issued.  Although Defendants expected to issue 12,000 Voter ID cards in advance of the November 2014 elections, only approximately 5,020 Voter ID cards were issued by that time.  As of October 2015, Defendants had issued only a total of 6,736 Voter ID cards in the last two years.

### e)      Other Categories of Valid Photo ID

103.   The remaining forms of "valid" Photo ID—U.S. passports, "other" valid state or federal photo IDs or government employee photo IDs, college and university IDs, military IDs, and tribal IDs— are not realistic options for many African-American or Latino voters to use.

104.   In order to obtain a new U.S. passport, an applicant must pay fees totaling $135 and must provide further documentation,

much of which costs money to obtain.  Because African-American and Latino people in Alabama are disproportionately burdened by poverty, and have lower per capita salaries than whites, they are disproportionately burdened by the requirements for obtaining a U.S. passport.

105.   With regard to the fourth form of "valid" photo ID, Alabama has been vague and failed to specify what forms of ID constitute a "valid identification card issued by a branch, department, agency, or entity of the State of Alabama, any other state, or the United States authorized by law to issue personal identification."  The "valid" government employee photo ID category is similarly vague. This ambiguity sows confusion and places discretion in the hands of election officials that may be used to the detriment of African-American and Latino voters.  For example, the law permits individual election officials to decide whether to treat a particular photo ID card as falling within these broad "other" categories of "valid" photo ID under the Photo ID Law.

106.   The remaining three forms of "valid" Photo ID—college and university IDs, military IDs, and tribal IDs—are available only to certain Alabama residents: students, military personnel, and

members of Native American tribes.  Because only a small minority of

voting-age Alabama citizens fall within these categories, these

categories of ID are not readily available to the great majority of

Alabama voters and do not represent a practical alternative form of

ID for Plaintiffs and other African-American and Latino voters who

lack driver's licenses and non-driver IDs.

### 3.  The Photo ID Law Disfranchised Willing Voters in Alabama in the 2014 Elections.

107.  The June 3, 2014 primary election and November 4, 2014

general election were the first two statewide elections in Alabama that

occurred after the implementation and enforcement of the Photo ID

Law.

108.  Under the Photo ID Law, in-person voters who lack the

required photo ID on Election Day or absentee voters who fail to

submit the required photo ID with their absentee ballots may cast

provisional ballots.  A provisional ballot for an in-person voter is

counted only if the voter returns to the Board of Registrars with the

required photo ID by the Friday after Election Day.  Ala. Code § 17-

10-2(a)(3).  A provisional ballot for an absentee voter is counted only

if the voter is properly notified and able to return a copy of the

required photo ID to the Board of Registrars by the Friday before

Election Day.  Ala. Code § 17-10-2(c)(1).  Voters who lack the necessary photo ID thus cannot meaningfully take advantage of such "failsafe" provisional voting.

109.   At least 629 provisional and absentee ballots (66 provisional and 563 absentee) cast in the 2014 primary and general elections by voters without the required photo ID were not counted because the voters failed to "cure" their ballots pursuant to the Photo ID Law's inadequate failsafe procedures.

110.   During the June 2014 primary, eligible registered voters were turned away at the polls because they lacked the required Photo ID.  For example, news reports described the experience of Willie Mims, a 93-year-old African-American man who had voted in every election for as long as the State kept records and was one of the people who was turned away because he lacked the required ID.  Mr. Mims did not drive or have a reason to own one of the required forms of photo ID for any purpose other than for voting.  Mr. Mims passed away in July 2015; he was denied his last opportunity in life to vote.

111.   Following the June 2014 primary, Plaintiffs sent a letter to the Secretary of State explaining that, based on the full or partial responses to information requests sent to the relevant election

officials in 49 Alabama counties, Plaintiffs had learned that at least 282 provisional and absentee ballots cast were not counted in the June 2014 primary because otherwise eligible voters had not submitted the required photo ID, and that about 40% of those ballots were from majority-African-American counties.

112.  In the November 2014 election, the first general election in which the Photo ID Law was enforced, eligible voters were again deterred from voting or turned away at the polls because they lacked the required photo ID.  Prior to the November 2014 election, for example, Plaintiff GBM spoke with several prospective voters who said that they would not vote because they lacked the required photo ID.  On Election Day, Plaintiff GBM also encountered a number of African-American voters without the required photo ID, including a fifty-seven year-old African-American woman residing in Jefferson County.  The voter was initially turned away by election officials because she lacked the required photo ID and no election official was willing to "positively identify" her.  The voter was offered a provisional ballot only after the intervention of Plaintiff GBM.  Because she could not provide the required ID, her ballot was never counted.

113.   The turnout rate in Alabama for the November 4, 2014 election was 41%, the lowest voter turnout in an Alabama general election in the last 28 years.  Upon information and belief, some of the voters who did not vote in this election were deterred from doing so due to the imposition of the Photo ID Law.

114.   Following the November 4, 2014 general election, Plaintiffs again contacted election officials in 47 counties and found that at least 347 provisional and absentee ballots cast by otherwise eligible voters were not counted in that election because those voters had failed to provide the required photo ID.  The majority of these discarded ballots came from counties with significant African-American and Latino populations, including 124 discarded ballots from Jefferson County (47% African-American and Latino), 94 ballots from Mobile County (35% African-American), 32 from Montgomery County (56% African-American), 22 from Choctaw County (43% African-American), and 13 from Perry County (68% African-American).

115.   Upon information and belief, during the 2014 elections, a significant portion of those voters who lacked the required photo ID (1) failed to appear at the polls; (2) did not cast a provisional ballot or

were not offered provisional ballots by election officials; (3) were not "positively identified" by two election workers as provided for by the Photo ID law; or (4) cast provisional ballots that went uncounted because they were unable to "cure" their ballots by obtaining and submitting the necessary photo ID within the period provided for by the Photo ID law.

116.   The problems experienced by the African-American constituents of Lee County Commissioner John A. Harris exemplify this improper burden.  Mr. Harris represents a majority-African-American district.  He met with at least two African-American constituents over the age of seventy-five whose absentee ballots were rejected in the November 2014 elections because they could not provide copies of the required photo IDs with their absentee ballots. For example, one of Mr. Harris's constituents is retired, has never possessed a driver's license, and does not own a car.  That voter mailed in an absentee ballot and a photocopy of a senior citizen photo ID card.  The voter subsequently received a letter from election officials notifying her that her ballot had been rejected because she failed to submit the required photo ID.  The second African-American constituent of Mr. Harris similarly had her absentee ballot rejected

after Defendants determined that photo IDs issued by public housing authorities are not acceptable for voting under the Photo ID Law.

### 4.   The Discriminatory Implementation of the Photo ID Law

117.   Upon information and belief, during the June 3, 2014 primary election, local election officials in two disproportionately white counties, Jackson County (89.8% white population, 3.6% African-American population) and Randolph County (75.0% white population, 20.2% African-American population), waived the Photo ID Law for absentee voters.  Given the demographics of these counties, this practice resulted in the Photo ID Law's burdens falling more heavily on African-American and Latino voters statewide than on whites.

118.   Upon information and belief, election officials in Alabama have selectively enforced and will continue to selectively enforce the Photo ID Law in unconstitutional ways that impose heavier burdens on African-American and Latino voters.

### 5.   Alabama's Photo ID Law Interacts with Historical and Social Conditions to Limit Opportunities for African-American and Latino Voters to Participate Equally in the Political Process.

119.   Race, color, and membership in a language minority group continue to be determinative factors in citizens' access to Alabama's political process, as discussed above and reflected by the following: (1) Alabama has a history of state-sponsored racial discrimination in voting; (2) Alabama elections at all levels are plagued by racially polarized voting; (3) African-American and Latino voters continue to bear the effects of racial discrimination in education, employment, health and other socioeconomic areas, including lower average household vehicle ownership, disproportionately high levels of single-parent households, and disproportionately high rates of poverty, which hinder their ability to participate effectively in the political process; (4) Defendants have engaged in electoral practices, such as severely limiting the times and places for obtaining the required photo ID, that magnify the substantial burdens that the Photo ID Law imposes on African-American and Latino voters; (5) electoral campaigns in Alabama involve racial appeals; (6) Defendants are less responsive to the concerns of African-American and Latino voters than to the concerns

of white voters; and (7) the purported rationales for the Photo ID Law, such as ensuring electoral integrity and preventing voter fraud, are tenuous at best and false in reality because there is no factual basis to support these rationales, nor can it be shown that the Photo ID Law serves these stated rationales.

120.   As described above, the process of obtaining and maintaining a valid photo ID imposes substantial and material burdens on voters, in particular the poor.  Because African Americans and Latinos in Alabama continue to bear the effects of discrimination in areas such as education, employment, housing, and criminal justice, African-American and Latino voters experience poverty at three times the rate of whites, have much lower vehicle ownership rates than white households, and disproportionately live in single-parent homes.  As a result, the significant burdens associated with obtaining and maintaining valid photo ID fall disproportionately on African-American and Latino voters.

**D.   The Photo ID Law's Positively Identify "Voucher" Provision Violates the Voting Rights Act.**

**1.   The Provision and Lack of Administrative Regulations**

121.   The Alabama Photo ID Law includes a Positively Identify Provision that requires any otherwise eligible in-person voter who

lacks the required photo ID on Election Day to be vouched for under oath by two election officials before casting a regular ballot.  The provision states:  "[A]n individual who does not have valid photo identification in his or her possession at the polls shall be permitted to vote if the individual is positively identified by two election officials as a voter on the poll list who is eligible to vote and the election officials sign a sworn affidavit so stating."  Ala. Code § 17-9-30(e).

122.   The Positively Identify Provision does not define "positively identify"; and it does not restrict, nor does it provide any guidance concerning, the methods or forms of identification that may be relied upon by an election official to "positively identify" a prospective voter under this prerequisite to voting.  Upon information and belief, African-American and Latino voters who lack driver's licenses are also less likely than white voters who lack driver's licenses to be personally acquainted with two election officials at their polling places.

123.   Because the Positively Identify Provision on its face provides election officials with the unfettered discretion to determine on a case-by-case basis what methods or forms of ID are sufficient to "personally identify" a prospective voter who lacks the required photo

ID, the Provision gives election officials the arbitrary and potentially discriminatory power to decide who is or is not permitted to cast a regular ballot.

### 2. The Undefined Provision Violates Section 201.

124. The undefined Positively Identify Provision is a "test or device" that violates Section 201 of the Voting Rights Act by imposing a requirement that a citizen without the required photo ID must prove his or her qualifications by the voucher of the election officials present at the precinct.  52 U.S.C. §§ 10501 (b)(4) (proscribing "any requirement that a person as a prerequisite for voting . . . prove his qualifications by the voucher of registered voters or *members of any other class*") (emphasis added).

125. The undefined Positively Identify Provision gives election officials in Alabama the arbitrary power to accept or reject any prospective voter without the required photo ID, and to waive the onerous Photo ID Law for personal acquaintances and/or any other prospective voters for whom the two election officials are willing to sign an oath.  This requirement is *per se* illegal under Section 201 of the Voting Rights Act and disproportionately affects Black and Latino voters who lack the required photo IDs.

126.   The statute limits the "class" of people who can vouch for a citizen to the small number of election officials who are assigned to and present at the particular precinct when the citizen seeks to vote, and requires two such persons from that small class to "positively identify" the voter; therefore, the Positively Identify Provision is even more restrictive than a requirement that a voter be vouched for by the much larger class of "registered voters," a requirement that is also expressly prohibited by Section 201 (52 U.S.C. § 10501 (b)(4)).

## E.   Defendants' Lack of Responsiveness to Plaintiffs' Concerns Regarding the Discriminatory Photo ID Law

128.   Defendants have not been responsive to the concerns and needs of African-American and Latino voters with respect to the Photo ID Law or the Positively Identify Provision.

129.   On March 3, 2014, Plaintiffs sent a letter to the Defendant Alabama Secretary of State requesting that he issue administrative rules for the Positively Identify Provision that are nondiscriminatory, uniform, and consistent with the Voting Rights Act and the United States Constitution.  That letter explained the potential effect and illegality of the undefined Positively Identify Provision, and offered reasonable suggestions for nondiscriminatory administrative rules for implementing the Positively Identify Provision.

130.   On March 24, 2014, the Secretary of State wrote to Plaintiffs to acknowledge there was "merit to [the] request that [this] office promulgate an additional administrative rule that will provide uniform guidance throughout the State as to how positive identification is to be established by election officials."

131.   On March 26, 2014, Plaintiffs again wrote to the Defendant Secretary of State to ask that he provide reasonable administrative rules for the Positively Identify Provision that would be consistent with Section 201 of the Voting Rights Act.

132.   On April 16, 2014, the Defendant Secretary of State certified two emergency administrative rules, Ala. Admin. Code §§ 820-2-9-.14, 820-2-9.15, interpreting the Positively Identify Provision to preclude election officials from positively identifying a prospective elector by any means other than "personal acquaintance" that allows the official to state "with certainty and with no doubt or reservation" that the voter is who he/she says he/she is.  2014 Ala. Reg. Text 360145, 360201.  The emergency rules remained in effect for no longer than 120 days, and thus expired no later than August 2014.

133.   On April 18, 2014, the Defendant Secretary of State proposed two administrative rules, Ala. Admin. Code §§ 820-2-9-.14,

820-2-9.15, interpreting the Positively Identify Provision in the same manner as did the emergency rules.  2014 Ala. Reg. Text 360200.

134.   On May 29, 2014, the NAACP Legal Defense & Educational Fund, Inc. provided comments on the proposed administrative rules that reiterated Plaintiffs' concerns that the proposed rules violate Section 201 of the Voting Rights Act, and the Fourteenth and Fifteenth Amendments to the Constitution.  Those comments explained that the proposed administrative rules were nearly identical to Alabama's past unconstitutional "supporting witness" requirement, and mirrored the past exemption to Alabama's poll tax, whereby white acquaintances of the poll tax collector were afforded privileges that were not equally available to African Americans.  The letter concluded by again offering specific suggestions for rules that would be nondiscriminatory, such as allowing election officials to "positively identify" an individual lacking the required photo IDs if that individual could (1) answer simple questions about identifying information in the poll book, (2) sign an affidavit confirming her or his identity, or (3) produce a form of identification that had been permissible under Alabama's past non-photo voter ID law, such as a voter registration card.

135.   On June 6, 2014, the Secretary of State issued a press release stating that, despite the criticisms of the proposed rules for the Positively Identify Provision, he had "no intention of interpreting this law" in a manner different from that provided for in the proposed rules.  Thus, the Secretary of State confirmed that he would interpret the law to mean that a prospective voter without a valid Photo ID could be positively identified by poll workers only by "personal acquaintance" and that would allow the official to state "with certainty and with no doubt or reservation that the voter is who he/she says he/she is."

136.   As of August 2014, the Positively Identify Provision's emergency rules expired, and the proposed rules did not become final rules.  Since then, including during the November 2014 election, there have been no administrative rules defining or otherwise governing the Positively Identify Provision.

137.   On September 3, 2014, Plaintiffs wrote to Defendant Secretary of State to raise concerns that (1) the Photo ID Law had disfranchised hundreds of voters in the 2014 primary election; (2) Defendant had not adequately made the required photo IDs accessible to African-American and Latino voters; and (3) election

officials in at least two counties had failed to apply the Photo ID Law to absentee ballots.

138. On September 26, 2014, Plaintiffs met in-person with the Alabama Secretary of State and his staff to again raise their various concerns about the Photo ID Law.  Both at that meeting and in correspondence thereafter, Plaintiffs requested that Defendant Secretary of State (1) utilize the No-Match List to identify and contact those voters who may lack the required photo ID; (2) improve the administration of the absentee voter photo ID requirement; and, again, (3) interpret the Positively Identify Provision consistent with Section 201, so that election officials could provide regular ballots to persons with whom election officials may not be personally acquainted.  In addition, Plaintiffs requested that photo IDs issued by public housing authorities be ruled acceptable for voting under the Photo ID Law, and that the Defendant Secretary of State operate additional mobile ID units on weekends and in the evenings at specific locations near African-American communities.

139. In response to Plaintiffs' requests, Defendant Secretary of State accepted some of Plaintiffs' suggestions for additional mobile ID unit times and locations.  However, the expanded mobile ID unit

hours and locations were insufficient to address the concerns described in this Complaint.  For example, the Defendant Secretary of State rejected Plaintiffs' suggestion of placing mobile ID units at several predominately African-American public housing locations. Moreover, prior to the November 2014 election, Defendants rejected or otherwise failed to respond to Plaintiffs' other requests.  For instance, Defendants denied Plaintiffs' request that public housing authority-issued photo IDs be ruled acceptable under the Photo ID Law.

140.  As described above, on September 30, 2015, Defendants announced that ALEA would permanently close 31 part-time ALEA photo ID-issuing offices, including offices in eight of the eleven contiguous counties in the so-called "black belt."

141.  On October 2, 2015, Plaintiffs wrote to notify Defendants that "[b]y closing the[ ] [ALEA] offices, the State will drastically reduce the number of sites where potential voters can obtain photo ID, creating a substantial and disproportionate burden on African Americans' ability to participate in the political process in Alabama." Plaintiffs also noted that Defendants' actions likely violate Section 2. On October 9, Defendants responded to Plaintiffs' letter and

produced various documents but did not, at the time, agree to reverse ALEA's closure decision.

142.   On October 8, 2015, Defendant Merrill's office issued a press release in which it stated that "Alabama does not have a photo ID concern."  In support of that assertion, the Secretary of State's office stated that "Alabama has 4,849,377 citizens," and that "2,998,969 of them are active or inactive voters."  It further stated that "as of October 1, 2015, Alabama has 3,559,235 million citizens with a driver's license and 750,063 with a non-driver ID card issued by the Department of Motor Vehicles."

143.   On November 6, 2015, Plaintiffs wrote to Defendant Merrill's office, seeking clarification of the data set forth in the October 8, 2015 press statement.  In particular, Plaintiffs sought information as to exactly how many voters with ALEA-issued IDs were registered and/or eligible to vote.  Defendant Merrill has not responded to this request.

144.   In the context of the facts and circumstances alleged in this Complaint, Defendants' refusal to adopt nondiscriminatory and reasonable administrative rules for interpreting the Positively Identify Provision demonstrates that a purpose or effect of the Photo

ID Law and the Positively Identify Provision is to deny or abridge the right to vote on account of race.

145.   In the context of the facts and circumstances alleged in this Complaint, Defendants' failure to operate the mobile ID unit program in a manner that materially addresses the burdens on African-American and Latino voters associated with obtaining the photo IDs required to vote demonstrates that a purpose or effect of the Photo ID Law is to deny or abridge the right to vote on account of race.

146.   In the context of the facts and circumstances alleged in this Complaint, Defendants' decision to significantly limit the hours of operation for ALEA offices in the "black belt" and elsewhere demonstrates that a purpose or effect of the Photo ID Law is to deny or abridge the right to vote on account of race.

147.   In the context of the facts and circumstances alleged in this Complaint, Defendants' lack of responsiveness to the expressed concerns and proposed solutions of Plaintiffs on behalf of African-American and Latino voters demonstrates that a purpose or effect of the Photo ID Law is to deny or abridge the right to vote on account of race.

**F.     The Facts Warrant Equitable Relief Under Section 3(c).**

148.   The past and ongoing record of voting discrimination in Alabama, including Defendants' implementation and enforcement of the Photo ID Law, and their enforcement of its Positively Identify Provision as a statutorily prohibited and unconstitutional test or device, demonstrates that the State has implemented and will continue to implement voting laws that limit the electoral opportunity of African-American and Latino voters.

149.   Without Section 3(c) preclearance review, Alabama is likely to persist in enforcing discriminatory laws, policies, or practices that have the purpose or effect of violating the rights of African-American and Latino voters, in violation of the Voting Rights Act of 1965 and the Fourteenth and Fifteenth Amendments of the U.S. Constitution.

**V.   CLAIMS**

**A.     Count One: The Photo ID Law Violates Section 2 of the Voting Rights Act (52 U.S.C. § 10301).**

150.   Plaintiffs reallege the facts set forth above.

151.   In violation of the rights of Plaintiffs' constituents to vote free from racial discrimination, (1) Defendants adopted and/or operate the Photo ID Law as an intentionally discriminatory device,

and, as applied, (2) the Photo ID Law results in African-American and Latino voters having less opportunity than white voters to participate effectively in the political process and to elect candidates of their choice.

152.   The Photo ID Law and its implementation result in a substantial and disproportionate number of African-American and Latino voters—who are without the required photo ID or face greater burdens in obtaining and maintaining the photo ID required to vote under the Photo ID Law—having less opportunity to participate effectively in the political process in Alabama on account of race, color, or language minority status.

## B. Count Two: The Undefined Positively Identify Provision Violates Section 201 of the Voting Rights Act (52 U.S.C. § 10501).

153.   Plaintiffs reallege the facts set forth above.

154.   The Photo ID Law's undefined Positively Identify Provision violates the prohibition on those tests or devices enumerated in Section 201 of the Voting Rights Act, 52 U.S.C.A. § 10501, by requiring, as a prerequisite to voting, that otherwise eligible registered voters who lack the required photo ID prove their qualifications by the voucher of two election officials.

## C. Count Three: The Photo ID Law Violates the Fourteenth Amendment (U.S. Const. amend. XIV, 42 U.S.C. § 1983).

155.   Plaintiffs reallege the facts set forth above.

156.   In violation of the Fourteenth Amendment to the United States Constitution, pursuant to 42 U.S.C. § 1983, the Photo ID Law was purposefully enacted or operates to deny or abridge the right to vote on account of race or color.

## D. Count Four: The Photo ID Law Violates the Fifteenth Amendment (U.S. Const. amend. XV, 42 U.S.C. § 1983).

157.   Plaintiffs reallege the facts set forth above.

158.   The Photo ID Law violates the Fifteenth Amendment to the United States Constitution, pursuant to 42 U.S.C. § 1983, because Defendants intentionally enacted or operate the law to deny or abridge the right to vote on account of race or color.

## VI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court:

159.   Issue a declaratory judgment, pursuant to 28 U.S.C. §§ 2201 and 2202 and Fed. R. Civ. P. 57, declaring that the Photo ID Law: (1) as applied, results in the denial of equal access of African-American and Latino voters to the political process on account of race, color, or membership in a language minority group, in violation of Section 2; (2) requires as a prerequisite to voting that Plaintiffs

comply with a prohibited test or device in violation of Section 201;
and (3) was conceived or operates to purposefully discriminate
against African-American and Latino voters on account of race, color,
or language minority status in violation of Section 2, and the
Fourteenth and Fifteenth Amendments to the United States
Constitution.

160.   Issue an order requiring Defendants to establish
administrative rules that provide an exemption from the Photo ID
Law for those absentee ballots, Ala. Code § 17-9-30(c), cast in
Presidential and Vice Presidential elections pursuant to 52 U.S.C.A. §
10502(d).

161.   Issue an order, pursuant to 52 U.S.C. §§ 10302 (b) and
10311, enjoining enforcement of the Photo ID Law and the undefined
Positively Identify Provision unless and until Defendants issue
binding administrative rules that require election officials to
"positively identify" and provide a regular ballot to an individual who
lacks the required photo IDs if that individual can: (1) answer simple
questions about identifying information in the poll book, or (2) sign
an affidavit confirming her or his identity, or (3) produce a secure
form of non-photo identification, such as a voter registration card.

162.   Issue a permanent injunction enjoining Defendants from enforcing or giving any effect to the requirements of the Photo ID Law, including enjoining Defendants from conducting any elections using the Photo ID Law.

163.   Issue an order pursuant to Section 3(c) of the Voting Rights Act, 52 U.S.C. § 10302 (c), retaining jurisdiction and requiring Alabama and its political subdivisions to obtain preclearance, for a necessary and appropriate period of time, from the United States Department of Justice or this Court for any and all future changes to any voting law, practice, standard, policy, or procedure unless and until Defendants can show that the proposed changes do not have the purpose and will not have the effect of denying or abridging the right to vote on account of race, color, or language minority status.

164.   Issue an order requiring Defendants to pay Plaintiffs' costs, expenses, and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and 52 U.S.C. § 10310(e).

165.   Grant other such relief as Plaintiffs request or the Court deems proper and just.

Respectfully submitted this 2nd day of December 2015.

/s/ Sherrilyn Ifill

Sherrilyn Ifill
  *Director-Counsel*
Janai Nelson
Christina Swarns*
Coty Montag*
Deuel Ross*
Liliana Zaragoza*
NAACP Legal Defense and
  Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, New York 10006
Tel: (212) 965-2200
Fax: (212) 226-7592
cswarns@naacpldf.org
cmontag@naacpldf.org
dross@naaacpldf.org
lzaragoza@naacpldf.org


/s/ Edward Still

Edward Still
Bar. No. ASB-4786-I 47W
Edward Still Law Firm LLC
429 Green Springs Hwy
STE 161-304
Birmingham, AL 35209
Tel & Fax: 205-320-2882
still@votelaw.com


/s/ Robert D. Fram

Robert D. Fram*
Nathan E. Shafroth*
Michael S. Greenberg*
Covington & Burling LLP
One Front Street
San Francisco, CA  94111-5356
Tel:  415-591-6000
Fax: 415-591-6091
rfram@cov.com
nshafroth@cov.com
mgreenberg@cov.com

Joanne B. Grossman*
Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, D.C.  20001-4956
Tel:  202-662-6000
Fax:  202662-6291
jgrossman@cov.com


*Pro Hac Vice Motions to be Filed*                    *Attorneys for Plaintiffs*