

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| GREATER BIRMINGHAM MINISTRIES; ALABAMA STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE; GIOVANA AMBROSIO; SHAMEKA HARRIS; DEBRA SILVERS; and ELIZABETH WARE,<br><br>              Plaintiffs,<br><br>        v.<br><br>STATE OF ALABAMA; ROBERT J. BENTLEY, in his official capacity as Governor of Alabama; LUTHER J. STRANGE, in his official capacity as the Alabama Attorney General; JOHN MERRILL, in his official capacity as the Alabama Secretary of State; and STAN STABLER, in his official capacity as the Secretary of the Alabama Law Enforcement Agency,<br><br>              Defendants. | Civil Action No. 2:15-cv-02193-LSC |

## SECOND AMENDED COMPLAINT

# INTRODUCTION

Since the turn of this century, approximately 22.4 million votes have been cast in Alabama elections.  In that time, there has been only one documented case where one Alabama voter sought to impersonate another.  Despite the extreme rarity of voter fraud, in June 2011, the Alabama Legislature enacted House Bill 19 ("HB 19"), a law whose purported purpose is to prevent voter fraud by requiring voters to present photographic identification to vote in-person or absentee (the "Photo ID Law").

According to the Alabama Secretary of State, the Photo ID Law was estimated to immediately disfranchise at least 280,000 registered voters.  If the Photo ID Law remains in place, hundreds of thousands more eligible and registered voters will be barred from voting in the years to come.

It is no accident that a disproportionate number of those disfranchised voters are African-American and Latino.  Indeed, the Photo ID Law is simply the latest chapter in Alabama's long and brutal history of intentional racial discrimination. For five decades, Alabama's use of discriminatory voting schemes has necessitated repeated federal intervention.  Now, Alabama again seeks to disfranchise thousands of African-American and Latino voters—all in the name of "curing" a voter fraud problem that does not exist.

It is also no accident that Alabama has sought to deflect any and all attention from the number of registered voters disfranchised by the Photo ID Law. Not only has the State distanced itself from its own estimate of the number of voters affected by the Photo ID Law, it also (pre-suit) refused to provide the actual data regarding the effect of the Photo ID Law on Alabama voters.

Although the law was passed in 2011, and it established 2014 as the first year in which it would be in effect, Alabama did not move forward right away with proposing or finalizing regulations that were necessary to implement and inform the public about the law. At that time, all voting law changes in Alabama were subject to preclearance review pursuant to Section 5 of the Voting Rights Act (52 U.S.C. §10304). Under Section 5, Alabama was obligated to obtain approval from the Department of Justice or a three-judge federal court before enforcing new voting laws that might burden voters of color. But Alabama never sought preclearance review for its Photo ID Law. Instead, for two years, Alabama delayed implementation of the law, awaiting the final resolution of the *Shelby County, Alabama v. Holder* lawsuit, in which a county in Alabama challenged the constitutionality of the preclearance regime.

June 25, 2013 was the day Alabama had been waiting for. On that date, the U.S. Supreme Court lifted Alabama's nearly fifty-year-old preclearance obligations. The very next day, free of its preclearance obligations, Alabama

announced that it would move forward with the implementation of its Photo ID Law, so that it could be enforced in Alabama's 2014 election cycle.

The *Shelby County* decision*,* however, did not block suits challenging voting restrictions that are racially discriminatory under other provisions of the Voting Rights Act or the United States Constitution.  Alabama's Photo ID Law is just such a prohibited restriction.

Accordingly, Plaintiffs allege as follows:

## I.     SUMMARY OF VOTING RIGHTS CLAIMS

### A.     The Discriminatory Photo ID Law

1.     The Photo ID Law restricts in-person and absentee voting to individuals who are able to produce one of seven required forms of "valid" photo ID.  Except in municipal elections, a prospective in-person voter without the required photo ID cannot cast a regular ballot unless two election officials present at the polling place choose to "positively identify" that person.  Ala. Code § 17-9-30(e) (2011) (the "Positively Identify Provision").  All other prospective in-person voters, and nearly all other absentee voters without the required photo ID, must cast a provisional ballot that will be counted only if the prospective voter provides a designated election official with the required photo ID within a limited period of time before or after Election Day.

3

2.      The Photo ID Law was conceived and operates as a purposeful device to further racial discrimination, and results in Alabama's African-American and Latino (or Hispanic) voters having less opportunity than other members of the electorate to participate effectively in the political process and to elect candidates of their choice.

3.      Recently, the burdens on African-American and Latino voters caused by the Photo ID Law have significantly increased.  For example, Defendants Governor and the Secretary of the Alabama Law Enforcement Agency ("ALEA," formerly the Alabama Department of Public Safety) have greatly reduced the operating hours of certain locations where individual voters are able to obtain the principal forms of required photo ID—driver's licenses and non-driver IDs issued by ALEA.  This action has deepened the inequalities of opportunity that the Photo ID Law places on African-American and Latino voters.

4.      Accordingly, Plaintiffs seek to enjoin the enforcement by Defendants of the Photo ID Law for in-person and absentee voters, because the Photo ID Law was enacted with a racially discriminatory purpose and the law has had and will have a discriminatory effect, in violation of Section 2 of the Voting Rights Act ("VRA"), 52 U.S.C. § 10301 ("Section 2"), and the Fourteenth and Fifteenth Amendments of the United States Constitution,

pursuant to 42 U.S.C. § 1983. *See* U.S. Const., amends. XIV & XV, 42 U.S.C. § 1983.

**B.    The Undefined "Positively Identify" Provision Is an Unlawful Voucher Requirement.**

5.     Plaintiffs also challenge Defendant Secretary of State's failure to define or provide for the nondiscriminatory administration of the Positively Identify Provision of the Photo ID Law, which causes it to serve as an unlawful "voucher" requirement on registered voters who lack the required photo ID and seek to exercise their constitutional right to vote.

6.     The Positively Identify Provision provides that, except in municipal elections, a registered voter who lacks the photo ID required to vote in person on Election Day may cast a regular ballot only if she or he is "positively identified by two election officials as a voter on the poll list who is eligible to vote and the [two] election official[s] . . . sign a sworn affidavit so stating."

7.     Defendant Secretary of State has failed to adopt final administrative rules governing the meaning or application of the Positively Identify Provision, leaving that provision undefined and placing complete discretion in the hands of election officials to decide when and how they may "positively identify" a prospective voter as eligible to cast a regular ballot.  Thus, the undefined Positively Identify Provision allows election

5

officials to apply arbitrary and capricious qualifications to the disproportionately African-American and Latino voters who lack the required photo ID, and to potentially apply a wholly different set of qualifications to otherwise similarly situated white voters.

8. For voters without a photo ID, and those who cannot obtain one due to the significant burdens imposed upon them by Defendants, the undefined Positively Identify Provision imposes a requirement, as a prerequisite to voting, that these prospective voters prove their qualifications by the voucher of two election officials, which is a test or device that is *per se* prohibited by Section 201 of the VRA (52 U.S.C. § 10501).

## II.   JURISDICTION AND VENUE

9. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, 1357, 2201, 52 U.S.C. §§ 10301, 10308(f), 10310(e), and 42 U.S.C. §§ 1983, 1988.

10. Venue is proper pursuant to 28 U.S.C. §§ 124(b)(6), 1391(b).

## III.   PARTIES

### A.   Plaintiffs

11. Plaintiff Greater Birmingham Ministries ("GBM") was founded in 1969 in response to the urgent human rights and justice needs of the residents of the greater Birmingham, Alabama area.  GBM is a multi-faith, multi-racial organization that provides emergency services for people in

6

need.  It engages in community efforts to create systemic change with the goal of building a strong, supportive, and politically active society that pursues justice for all people.

12.     A central goal of GBM is the pursuit of social justice in the governance of Alabama.  GBM actively opposes state laws, policies, and practices that result in the exclusion of vulnerable groups or individuals from the democratic process.  Toward that end, GBM regularly engages in efforts to register, educate, and increase turnout among African-American and Latino voters, as well as low-income voters in general.  GBM has participated in lawsuits to vindicate these democratic principles.

13.     As a result of the Photo ID Law, GBM is now required to undertake such activities as (1) assessing who, among its constituency of African-American and Latino voters, lacks the required photo IDs and/or determining which underlying documents each constituent needs in order to obtain the required photo ID; (2) helping to educate African-American and Latino voters, as well as the general public, about the Photo ID Law; and (3) encouraging Defendants to mitigate the most egregious discriminatory effects of the Photo ID Law.

14.     Thus, the Photo ID Law is causing, and will continue to cause, GBM to divert a portion of its limited financial, personnel and other

organizational resources to educating African-American and Latino voters in Alabama about the requirements of the Photo ID Law, and assisting registered voters with complying with that law in order to vote.  As a result, GBM is limited, and will continue to be limited, in the organizational resources that it can devote to its other core goals.

15.    Plaintiff Alabama State Conference of the National Association for the Advancement of Colored People ("the Alabama NAACP") is a state subsidiary of the National Association for the Advancement of Colored People, Inc.  The Alabama NAACP is the oldest and one of the most significant civil rights organizations in Alabama, and it works to ensure the political, educational, social, and economic equality of African Americans and all other Americans.

16.    Two central goals of the Alabama NAACP are to eliminate racial discrimination in the democratic process, and to enforce federal laws and constitutional provisions securing voting rights.  Toward those ends, the Alabama NAACP has participated in numerous lawsuits to protect the right to vote, regularly engages in efforts to register and educate African-American voters, and encourages African Americans to engage in the political process by turning out to vote on Election Day.

17.     The Alabama NAACP is now, as a result of the Photo ID Law, required to undertake such activities as: (1) assessing who, among its constituency, lacks the required photo IDs and/or determining which underlying documents each constituent needs in order to obtain the required photo ID; (2) assisting and educating African Americans, and the general public, about complying with the Photo ID Law; and (3) encouraging Defendants to mitigate the most egregious discriminatory effects of the Photo ID Law.

18.     Thus, the Photo ID Law is causing, and will continue to cause, the Alabama NAACP to divert a portion of its financial and other organizational resources to educating African-American voters in Alabama about the requirements of the law, and assisting registered voters with complying with it in order to vote.  As a result, the Alabama NAACP is limited, and will continue to be limited, in the organizational resources that it can devote to its other core goals.

19.     Plaintiff Giovana Ambrosio, who has a legally protectable interest in defending her right to vote free from racial discrimination, is an eighteen year-old lawfully registered Latina voter, U.S. citizen, and a lifelong resident of Franklin County, Alabama.

9

20.     Although she was registered to vote before the March 1, 2016 primary election and went to the polls because she desired to vote in that election, Ms. Ambrosio could not and did not vote because she lacked the required photo ID and was not personally acquainted with the election officials at her polling place.

21.     Because of the undue burdens placed on her by Defendants and related transportation barriers, Ms. Ambrosio did not have an ALEA-issued driver's license, or any of the other required photo IDs needed to vote in the March 1, 2016 primary election.  The closest driver's license-issuing ALEA office to Ms. Ambrosio's home is only open one day per month, during the hours that Ms. Ambrosio typically spent in classes or in school-sponsored and school-supervised extracurricular activities.  The next closest office to Ms. Ambrosio is located in Sheffield, an approximately 45-mile drive roundtrip and is only open from 8:00 am to 4:30 pm on weekdays.

22.     Ms. Ambrosio does not own a car, and although her parents have access to vehicles, both parents work full-time and were unable to drive her to Sheffield during the ALEA office's normal hours.  For example, her father leaves for work as early as 4:00 am and works up to twelve hours or more per day.  Ms. Ambrosio's mother begins her work shift at 4:00 pm and also works until late in the evening.  To the best of Ms. Ambrosio's

knowledge, there is no public transportation from Franklin County to Sheffield. Because of the burdens associated with the location and limited hours of operation of the Board of Registrars office in Franklin County, Ms. Ambrosio also could not reach that office before the 2016 primary election.

23.    As a result of the racially discriminatory Photo ID Law, Ms. Ambrosio's right to vote was denied or abridged.

24.    Plaintiff Shameka Harris, who has a legally protectable interest in defending her right to vote free from racial discrimination, is a thirty-three year-old lawfully registered African-American voter, U.S. citizen, and resident of Sumter County, Alabama.

25.    Although Ms. Harris has previously voted in-person using a photo or non-photo ID under the prior voter ID law, she could not and did not vote in the March 1, 2016 primary election because her unexpired ALEA non-driver photo ID was stolen, along with her wallet, in 2014.  Ms. Harris possesses an expired non-driver photo ID, which she cannot use to vote. Although Ms. Harris wanted to vote in the November 8, 2016 election and wants to vote in other future elections, she did not and cannot do so because of Defendants' enforcement of the Photo ID Law.

26.    Because of the undue burdens placed on her by Defendants and related financial and transportation barriers, Ms. Harris was unable to

replace her stolen non-driver photo ID or acquire another form of the required photo ID in time to exercise her right to vote in the March 1, 2016 primary or November 8, 2016 general election.

27.   Ms. Harris does not have reliable access to transportation.  Ms. Harris does not own a car, and no member of her household has access to a car.  As a result, she must pay private individuals to drive her anywhere that is not within the immediate walking distance of her home.

28.    Ms. Harris lives on a fixed income.  She does not currently possess her birth certificate.  Ms. Harris has not been able to afford the costs associated with replacing her stolen ALEA non-driver ID or acquiring a Voter ID card.  The cost of a ride to the nearest ALEA office is also beyond her limited financial means.  Because Ms. Harris moved since she last voted in 2012, she remains registered to vote in Marengo County.  Thus, she does not know whether she is required to travel to the Board of Registrars in Livingston or Linden to obtain a Voter ID card.  The cost of obtaining a ride to either Livingston or Linden is beyond her limited financial means.

29.   As a result of the racially discriminatory Photo ID Law, Ms. Harris's right to vote has been, and will continue to be, denied or abridged.

30.   Plaintiff Debra M. Silvers, who has a legally protectable interest in defending her right to vote free from racial discrimination, is a

thirty-seven year-old lawfully registered African-American voter, U.S. citizen, and a resident of Greene County, Alabama.

31.     Although Ms. Silvers has previously voted in-person using acceptable forms of ID, including her ALEA-issued non-driver photo ID, she could not and did not vote in the March 1, 2016 primary election because she lacked the required photo ID and is not personally acquainted with the election officials at her regular polling place.

32.     In September 2015, Ms. Silvers lost her ALEA-issued non-driver photo ID in a house fire, along with her home, birth certificate, social security card, other identity documents, and nearly all of her possessions.

33.     During the time between the September 2015 house fire and the March 2016 primary, Ms. Silvers did not have reliable or consistent access to transportation, did not own a vehicle, and had to pay private individuals to drive her.  There is no public transportation in Greene County.

34.     After the house fire, Ms. Silvers acquired new birth certificates and social security cards for herself and her children over the course of several months and numerous visits to the Alabama Health Department and Department of Human Resources in Eutaw, a twenty-mile roundtrip drive from her home, and the Social Security Administration office in Tuscaloosa, a ninety-mile roundtrip drive from her home.  To acquire this

documentation, she had to spend many hours and expend her scarce financial resources on fees and transportation.  Despite this significant effort, prior to March 1, 2016, Ms. Silvers was only able to obtain photocopies of her non-driver IDs.

35.     For the March 1, 2016 primary, Ms. Silvers tried to vote in-person with the photocopies of her non-driver photo IDs, but election officials turned her away because she lacked her original non-driver photo ID.  She was not offered and, therefore, did not cast a provisional ballot.

36.     Ms. Silvers had to pay a private individual to drive her to the nearest driver's license-issuing ALEA office, which is located a twenty-mile roundtrip drive from her home to obtain a replacement non-driver photo ID.

37.     As a result of the racially discriminatory Photo ID Law, Ms. Silvers's right to vote was denied in the March 1, 2016 primary, and she was required to expend her scarce resources to obtain the photo ID required to vote in the November 8, 2016 election.

38.     Plaintiff Elizabeth Ware, who has a legally protectable interest in defending her right to vote free from racial discrimination, is a sixty year-old, lawfully registered African-American voter, U.S. citizen, and resident of Mobile County, Alabama.

39.     Ms. Ware has consistently voted in-person and intended to vote in-person in the March 1, 2016 primary election and the November 8, 2016 election.  However, Ms. Ware's non-driver photo ID was lost in 2014 and she does not currently possess any of the other forms of required photo ID.

40.     Because of the undue burdens placed on her by Defendants, transportation barriers and the cost of a replacement ALEA non-driver photo ID, Ms. Ware was unable to replace her non-driver photo ID or acquire another form of required photo ID. Because she lacked the required photo ID, Ms. Ware could not and did not vote in the March 1, 2016 election.

41.     Ms. Ware lives on a fixed income and does not have reliable access to transportation. Ms. Ware does not own a vehicle.  Her health limits her ability to walk to the nearest bus stop. Although members of Ms. Ware's family can sometimes provide her with rides, their work schedules often prevent her family members from giving her rides during the day.

42.     Ms. Ware desired to vote in-person on November 8, 2016 and in other elections thereafter.  Accordingly, in October 2016, Ms. Ware secured a ride to the Mobile County Board of Registrars and attempted to obtain a Voter ID card.  County election officials turned Ms. Ware away after telling her that the Voter ID card is only for individuals who have never possessed one of the required photo IDs.

15

43.     Thus, despite her best efforts and because of the undue burdens placed on her by Defendants and related transportation and financial barriers, Ms. Ware has been unable to replace her ALEA non-driver photo ID or acquire another form of the required photo ID, such as a Voter ID card.  Because she lacked the required photo ID, Ms. Ware could not and did not vote in the November 8, 2016 general election.

44.     As a result of the racially discriminatory Photo ID Law, Ms. Ware's right to vote has been, and will continue to be, denied or abridged.

**B.     Defendants**

45.     Defendant State of Alabama ("State") is a State of the United States, and is being sued pursuant to Sections 2 and 201 because Congress has validly abrogated the State's Eleventh Amendment immunity in actions brought to enforce the rights guaranteed under the VRA.

46.     Defendant Robert J. Bentley is being sued in his official capacity as the Governor of Alabama.  The Governor of Alabama is a constitutional officer who is vested with the supreme executive power of the State, is the chief magistrate of the State, and, as such, is charged with enforcing the Photo ID Law, and any related administrative rules.  Ala. Const., art. V, § 113.

47.     Defendant Luther J. Strange, III is being sued in his official capacity as Attorney General of Alabama.  As a constitutional officer and member of the State's executive department, the Attorney General of Alabama is the State's chief legal representative, and, as such, is charged with enforcing the Photo ID Law and its administrative rules, and was previously charged with seeking Section 5 preclearance for Alabama voting laws.  Ala. Const., art. V, § 112.

48.     Defendant John Merrill is being sued in his official capacity as the Secretary of State of Alabama.  As a constitutional officer and member of the State's executive department, the Secretary of State is Alabama's chief election official.  Ala. Const., art. V, § 112.  He is charged with administering elections and the absentee voting system, and implementing the Photo ID Law, including issuing voter photo ID cards and promulgating the administrative rules governing the Photo ID Law.

49.     Defendant Stan Stabler is being sued in his official capacity as the Secretary of the Alabama Law Enforcement Agency, the Alabama agency tasked with issuing and maintaining databases regarding the most common forms of photo IDs accepted under the Photo ID Law.

## IV.  FACTUAL ALLEGATIONS

### A.  Alabama Demographics

50.    According to the 2010 Census, Alabama's total population is 4,779,736, with a non-Hispanic white[1] population of 3,204,402 (67.04%), an African-American alone population of 1,244,437 (26.03%), and a Latino population of 185,602 (3.88%).

51.    According to the 2009-2013 American Community Survey, eleven of Alabama's 67 counties have a majority-African-American population.  Each of these counties has a significantly higher African-American alone population than the State as a whole: Macon County (81.2%), Greene County (80.8%), Lowndes County (74.0%), Sumter County (73.1%), Wilcox County (72.9%), Bullock County (70.9%), Dallas County (68.8%), Perry County (68.3%), Hale County (59.1%), Montgomery County (55.2%), and Marengo County (52.1%).  According to the 2009-2013 American Community Survey, none of Alabama's 67 counties has a majority Latino population.

52.    According to the 2014 American Community Survey, the voting age population ("VAP") of Alabama was 3,647,817, with a white

---

[1]      All references to "white alone" Census counts in this Complaint are to non-Hispanic whites.

alone VAP of 2,544,727 (69.7%), an African-American alone VAP of 954,944 (26.1%), and a Latino VAP of 67,220 (1.8%).

53.     According to the 2009-2013 American Community Survey, the VAP of the majority-African-American Alabama counties was 293,016, with a white alone VAP of 109,311 (37.3%), an African-American alone VAP of 175,711 (60.0%), and a Latino VAP of 3,424 (1.2%).

54.     According to the 2011-2013 American Community Survey, African Americans (31.7%) and Latinos (35.5%) in Alabama experience poverty at nearly three times the rate of whites (13%); and white per capita income ($27,282) is nearly double African-American per capita income ($15,516) and more than double Latino per capita income ($13,089).

55.     According to the 2011-2013 American Community Survey, 13.5% of African-American households in Alabama lack a vehicle, as compared to 4.1% of white households, and African Americans are over five times as likely as whites, and Latinos are over three times as likely as whites, to use public transportation to commute to work.  According to the 2006-2010 American Community Survey, 5.69% of Latino households in Alabama lack a vehicle, as opposed to 3.87% of white households.

56.     According to the 2006-2010 American Community Survey (the most recent Census survey to tabulate vehicle ownership by race at a county

19

level), 15.2% of African-American households in the majority-African-American counties lack a vehicle, as compared to 3.6% of white households in those counties.  And according to the 2009-2013 American Community Survey, African Americans in the majority-African-American counties in Alabama are over three times as likely as whites in those counties to use public transportation to commute to work.

57.    The lack of a vehicle is a particularly difficult burden to overcome in Alabama, which invests no state money in public transportation, and which, in 2011, ranked 48th nationwide in intercity transit access for rural residents because 844,000 rural residents had no access to intercity transit services.

58.    According to the 2010 Census, 30.3% of African-American family households and 21.8% of Latino family households in Alabama have a single parent and related child under the age of 18, compared to 9.4% of white family households in Alabama.

59.    According to the 2014 American Community Survey, 56.0% of African-American households in Alabama have broadband Internet access, compared to 69.3% of white households in Alabama.

### B.     The Passage of the Photo ID Law Was Motivated by a Discriminatory Purpose.

#### 1.     The History of Racial Discrimination in Voting in Alabama

60.     In 1965, Alabama was declared a covered state under Section 4(b) of the VRA, based on the State's enforcement of unconstitutional tests or devices, including voucher requirements, as well as low voter registration and turnout rates.  *See South Carolina v. Katzenbach*, 383 U.S. 301, 312-13 (1966) ("Discriminatory administration of voting qualifications has been found in all eight Alabama cases. . . . Negroes obliged to obtain vouchers from registered voters have found it virtually impossible to comply . . . .").

61.     Because of its history of burdening the voting rights of people of color, Alabama remained a covered state for almost fifty years.  For example, during the reauthorization of the Voting Rights Act in 2006, Congress was presented with extensive evidence documenting the State's sustained record of unconstitutional and illegal racial discrimination in voting.  *See, e.g.*, *Renewing the Temporary Provisions of the Voting Rights Act: Legislative Options after LULAC v. Perry: Hearing Before the Subcommittee on the Constitution, Civil Rights and Property Rights of the Senate Committee on the Judiciary*, 109th Cong. 365-402 (July 13, 2006) (J. Blacksher, *et al*., Voting Rights in Alabama 1982-2006 (June 2006)).

62.    For more than five decades, continuing to the present,

Alabama's use of racially discriminatory voting schemes has necessitated

federal intervention.  *See, e.g.*, *Ala. Legislative Black Caucus v. Alabama*,

135 S. Ct. 1257 (2015) (redistricting); *City of Pleasant Grove v. United

States,* 479 U.S. 462 (1987) (selective annexations); *Hunter v. Underwood*,

471 U.S. 222 (1985) (felon disfranchisement); U.S. Dep't of Justice, Civil

Rights Division, Voting Section, Alabama Voting Determination Letters,

http://www.justice.gov/crt/records/vot/obj_letters/state_letters.php?state=al

(last visited Dec. 1, 2015) (listing all objections imposed against Alabama

under Section 5 of the VRA, including 24 objections from 1990 to 2008, as

well as pre-1990 objections to voter re-identification and literacy

requirements).

63.    In the last decade, Alabama has continued to employ voting

practices that illegally result in the denial or abridgement of the right to vote

for African-American and Latino voters and limit their opportunity to

participate equally in the political process.  For example, in January 2014, a

federal court in the Southern District of Alabama "bailed-in" the City of

Evergreen in Conecuh County for preclearance under Section 3(c) of the

VRA because voter registrars and election officials there continue to

unconstitutionally discriminate against African-American voters.

2.      **The Alabama Legislature That Passed the Photo ID Law Was Elected in a Highly Racially Charged Environment.**

64.      In the 2008 presidential election, African-American voter turnout and political engagement increased significantly as compared to prior elections.

65.      The Alabama general election in 2010 took place against a backdrop of significant growth of the African-American and Latino population.  The African-American population grew by 9.6% between the 2000 and 2010 censuses, and Latino population grew by 144.8% during that same time.

66.      In the 2010 elections, the Republican Party, for the first time in over 136 years, won majorities in the Alabama Senate and House of Representatives.  The electorate was highly racially polarized, and the 2010 campaigns were characterized by overt and subtle racial appeals.

67.      For example, in order to win the 2010 elections, State Senators Scott Beason and Benjamin Lewis, along with other legislators, engaged in a deliberate strategy that was designed to "suppress black votes by manipulating what issues appeared on the 2010 ballot."  *United States v. McGregor*, 824 F. Supp. 2d 1339, 1345-47 (M.D. Ala. 2011).  In recorded conversations, Senators Beason, Lewis and other legislators and their compatriots, were caught singling out African-American voters for

23

"mockery and racist abuse."  *Id*. at 1346.  These recorded conversations included references to African-American voters as "Aborigines" and "Indians," and the prediction that, if a gambling referendum appeared on the 2010 ballot, "[e]very black, every illiterate" would be "bused on HUD financed buses" to the polls.  *Id*.  Senators Ben Brooks, Larry Dixon, Rusty Glover, Jimmy Holley, Trip Pittman, Paul Sanford, and J.T. Waggoner were among the other Alabama state legislators who were also present for or offered these recorded "racist statements."  *Id*. at 1345-48.  The district court found that Senators Beason and Lewis and other legislators' plan—*i.e.*, to stop the gambling referendum from appearing on the 2010 ballot in hopes of depressing African-American voter turnout—constituted an intentionally discriminatory "scheme" to "maintain and strengthen white control of the political system," and that "political exclusion through racism remains a real and enduring problem in this State."  *Id*. at 1347.

### 3.   The Specific Sequence of Events Leading to the Passage and Implementation of the Photo ID Law

68.   In 2011, the newly-elected Alabama Legislature prioritized the enactment of a bill that required photographic proof of identity to vote either in-person or absentee.

69.   The Alabama statute requiring presentation of a photo identification to vote at the polls or through an absentee ballot was

introduced as HB 19 on March 1, 2011 by Alabama State Representative Kerry Rich.  On March 22, 2011, after the House majority used the cloture procedure to truncate any debate, the Alabama House of Representatives passed HB 19, the bill that became the Photo ID Law.  Representative Kerry Rich was the sole House sponsor of HB 19.  Every single African-American representative who cast a vote on the bill voted against it.

70.    On June 9, 2011, HB 19 was approved by the Senate.  The bill was sponsored and supported by many of the same Senators, and leaders of the Senate majority, who were caught on tape stating that they wanted to diminish African-American voting power in Alabama.  For example, State Senators Beason, Brooks, Glover, Pittman, Sanford, and Waggoner co-sponsored Senate Bill 86, the Senate's companion bill to HB 19.  These Senators, along with Senator Holley, also ultimately voted in favor of HB 19.  The Senate majority limited debate to only 20 minutes.  Every single African-American senator who was present voted against the bill.

71.    The Alabama Legislature knew or should have known that African-American and Latino registered voters disproportionately lack the required photo ID.  Defendants know or have reason to know that African-American and Latino eligible voters disproportionately lack the required photo ID.  Moreover, Alabama legislators opposed to photo ID requirements

had specifically argued that such requirements would disfranchise African-American voters.

72.     The Alabama Legislature knew or should have known that the Photo ID Law would impose a substantial burden on many voters, particularly African-American and Latino voters, in light of the economic and demographic factors discussed above.

73.     There is no substantial evidence of in-person voter impersonation or noncitizen voting in Alabama.  Over the 12-year period prior to the Photo ID Law's passage, there was just one documented instance of voter impersonation and one documented instance of non-citizen voting.

74.     The proponents of the Photo ID Law knew or should have known that the absentee photo ID requirement would not prevent voter impersonation fraud since it offers no way for the state election officials to determine whether the proffered photo ID actually belongs to the absentee voter, since that voter would not be present or available to allow her or his face to be compared to the photo ID.

75.     Defendant Governor Bentley signed the Photo ID Law into law on June 15, 2011.  At that time, Alabama was one of nine completely "covered state[s]" under Section 5 of the Voting Rights Act, which meant that Alabama could not enforce the Photo ID Law without first obtaining

preclearance from the U.S. Department of Justice or a federal three-judge court.

76.     Although it was subject to these preclearance rules at the time the Photo ID Law was enacted, Alabama never sought or received preclearance to enforce the law.

77.     By its terms, the Photo ID Law was to become operative for the first statewide primary in 2014.  However, at no time after the immediate passage of the Photo ID Law, or during the intervening two years, did Defendant Secretary of State make any attempt to pass administrative regulations implementing the Photo ID Law, including the process for the distribution of Voter ID cards.

78.     On June 25, 2013, the U.S. Supreme Court issued its opinion in *Shelby County, Alabama v. Holder*, 133 S. Ct. 2612 (2013), declaring unconstitutional Section 4(b) of the Voting Rights Act, 52 U.S.C. § 10303(b), which is the coverage provision of Section 5 of the Act.  133 S. Ct. at 2631.  Because without Section 4(b) Section 5 has no present effect, the *Shelby County* decision resulted in Alabama no longer being governed by the preclearance requirement.

79.     On June 26, 2013, one day after the Supreme Court removed the preclearance hurdle, Defendants the Alabama Attorney General and

27

Secretary of State, announced that the Photo ID Law would be implemented and enforced immediately.

80.     On June 29, 2013, just three days later, the Defendant Secretary of State issued proposed administrative rules for the Photo ID Law.  Until that time, the Defendant Secretary of State had claimed that the State's two-year failure to submit the Photo ID Law for preclearance was due to alleged delays in drafting such rules.  By delaying the promulgation of these administrative regulations for two years, and waiting until after the *Shelby* decision, Defendants avoided the preclearance process set forth in Section 5 of the VRA.  This delayed implementation significantly undermined the Defendant Secretary of State's own ability to properly and fully inform or assist voters of color and other voters in complying with the Photo ID Law.

81.     On October 22, 2013, the Defendant Secretary of State issued final administrative rules for the Photo ID Law generally, and on April 16, 2014, the Secretary of State issued supplemental emergency administrative rules governing the Positively Identify Provision.  The administrative rules governing the Photo ID Law generally are now final, while the emergency administrative rules governing the Positively Identify Provision have since expired.

82.     Except as described in the Photo ID Law and implementing administrative rules, neither the Alabama Legislature nor Defendants have otherwise altered the Photo ID Law.

**4.      The Alabama Legislature's Contemporaneous Passage of Racially Discriminatory Voter Registration ID Requirements and of Discriminatory Redistricting Plans Confirm Its Discriminatory Purpose in Passing the Photo ID Law.**

83.     The Photo ID Law was passed by the same Alabama state legislature that passed an intentionally racially discriminatory voter registration ID requirement and intentionally racially discriminatory 2012 redistricting of the Alabama Senate and House.

84.     On June 2, 2011, the same Legislature that enacted HB 19 almost simultaneously passed House Bill 56 ("HB 56"), "a comprehensive and far-reaching state immigration law." *Cent. Ala. Fair Hous. Ctr. v. Magee*, 835 F. Supp. 2d 1165, 1169 (M.D. Ala. 2011), *vacated sub nom. on other grounds*, 2013 WL 2372302 (11th Cir. May 17, 2013).  The bill "attack[ed] every aspect of an illegal immigrant's life" by severely restricting undocumented immigrants' and their citizen children's access to employment, housing, and educational opportunities.  835 F. Supp. 2d at 1169-70 (quoting Rep. Micky Ray Hammon).  According to Senator Beason, a co-author of the bill, HB 56 was "designed to reduce the number of illegal

29

aliens in the state" by the "self-deportation" of undocumented immigrants. *Id*. at 1182 (quoting Transcript of Nov. 23, 2011 Hearing, *Cent. Ala. Fair Hous. Ctr. v. Magee,* Doc. No. 68, at 118 (Statement of Sen. Beason)).

85. Fourteen of the seventeen Alabama senators that cosponsored Senate Bill 256, the companion bill to HB 56, also cosponsored the Photo ID Law in the Senate (Senate Bill 86).

86. HB 56 contains a voter registration ID requirement whereby a person must provide documentary proof of citizenship, such as a birth certificate, an ALEA-issued STAR driver's license or non-driver ID card, a U.S. passport, a naturalization document, or various similar documentation, in order to register to vote. The documentary proof of citizenship required by HB 56 is similar to that required by the Photo ID Law in order to vote or obtain the required photo ID. Although the voter registration ID requirement in HB 56 was submitted to the United States Department of Justice for administrative preclearance, the Defendant Attorney General withdrew that submission on May 15, 2013 in anticipation of the Supreme Court's decision in *Shelby County v. Holder*, and HB 56 was never precleared. On December 18, 2014, the Defendant Secretary of State announced that Alabama would enforce the voter registration ID requirement in HB 56.

87.     African-American legislators voted overwhelmingly in opposition to HB 56.

88.     Senator Beason had earlier in 2011 explained this expected opposition to HB 56 in overtly racial and political terms, stating that the legislative opponents of HB 56 "do not want to solve the illegal immigration problem because they know, this is a fact, that when more illegal immigrants move into an area, when their children grow up and get the chance to vote, they vote for [the political opposition]."

89.     Furthermore, during the 2011 legislative debates regarding HB 56, state legislators used terms like "illegals" and "illegal immigrant as a code for Latino or Hispanic" and made "comments that reflect popular stereotypes about Mexicans and [drew] explicit distinctions along the lines of race and national origin." *Magee,* 835 F. Supp. 2d at 1192-94 & nn.20-21.

90.     The statements made by Representative Rich, the sole sponsor of the Photo ID Law and a cosponsor of HB 56, during the House debates over HB 56, in particular are evidence of the discriminatory intent behind both HB 56 and HB 19 and "the numerous ways in which legislators frequently conflated illegal immigration and Hispanics." *Id*. at 1192-94 & n.21.

31

91.     Representative Rich's opening declaration that "[t]he ones[,] [Latinos,] that [he] ha[d] a problem with are the ones that come here and create all kinds of social and economic problems" was not directed at illegal immigrants, but at Latinos in general.  *Id.* at 1193.  After acknowledging the increased Latino population in Marshall County and its schools, Representative Rich accused Latino children, including U.S. citizens, of "costing our area hundreds of thousands, if not millions, of dollars to educate," and that "the taxpayers in [his] area . . . don't deserve to have to pay that bill."  *Id*. at 1192.

92.     In 2012, the same Alabama Legislature that enacted the racially discriminatory Photo ID Law and HB 56 also redistricted the State's House and Senate.  These redistricting plans were later challenged in federal district court by African-American legislators and voters as an unconstitutional racial gerrymander.  *Ala. Legislative Black Caucus v. Alabama*, 989 F. Supp. 2d 1227 (M.D. Ala. 2013) (three-judge court).  In 2015, the United States Supreme Court remanded the case to the district court after determining that the Alabama Legislature had very likely engaged in intentional racial discrimination through gerrymandering that targeted African-American voters in violation of the Fourteenth Amendment.  *Ala. Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257 (2015).

**5.     The Alabama Legislature's Passage of the Photo ID Law Was Motivated by a Discriminatory Purpose.**

93.     As described above, the Alabama Legislature that passed the Photo ID law was the same one that: (1) included high ranking legislators who, in 2010, had expressed an explicit desire and sought to suppress African-American voter turnout; (2) in June 2011, almost simultaneously passed HB 56 in a highly racially charged environment that was openly hostile to Latino residents; and (3) in 2012, redistricted in a manner that the United States Supreme Court later held very likely constituted an unconstitutional racial gerrymandering that targeted African-American voters.

94.     The Photo ID Law was passed with the same discriminatory intent as the aforementioned 2010 electoral scheme, 2011 anti-immigrant law, and 2012 redistricting.

**C.     The Photo ID Law Results in African-American and Latino Voters Having Less Opportunity Than White Voters to Participate in the Political Process and Elect Candidates of Their Choice in Alabama.**

95.     The Photo ID Law restricts in-person and absentee voting to individuals who possess one of seven specific forms of "valid" photo ID (the "required photo ID"): (1) a driver's license or a non-driver ID card issued by ALEA; (2) a valid Alabama photo voter identification card, which may be

used for the sole purpose of voting; (3) a photo ID issued by a branch,

department, agency, or entity of Alabama, another state, or the United

States, including a government employee photo ID; (4) a U.S. passport; (5) a

photo ID issued by an Alabama public or private college, university, or

postgraduate technical or professional school; (6) a United States military

photo ID; or (7) a tribal photo ID.  Ala. Code § 17-9-30(a)(1)-(7).  An

ALEA-issued driver's license can be expired no longer than 60 days to be

treated as an acceptable photo ID.  All other required photo IDs must be

unexpired or otherwise "valid" as defined by opinion No. 2003-212 of the

Alabama Attorney General.

96.     Under the Photo ID Law, there are no exemptions from the

photo ID requirement for in-person voting other than the Positively Identify

Provision.

97.     The photo ID requirement even applies to absentee voting.

Voters are required to include a photocopy of their photo IDs, in a separate

envelope, when they mail in their absentee ballots.

98.     Not only are African-American and Latino voters less likely

than white voters to possess the required photo IDs, they are also less likely

than white voters to have access to the copiers, scanners, or printers required

34

to provide the photocopies needed to comply with the Photo ID Law's absentee ID requirement.

99.   For absentee voting, the only exemption from the photo ID requirement is for absentee ballots submitted pursuant to federal law, such as the Uniformed and Overseas Citizens Absentee Voting Act or the Voting Accessibility for the Elderly and Handicapped Act. *See* Ala. Code § 17-9-30(c); Ala. Admin. Code § 820-2-9-.12.  Despite being required to do so by the Photo ID Law, Ala. Code § 17-9-30(c), and the Voting Rights Act, pursuant to 52 U.S.C.A. § 10502 (d), Defendant Secretary of State has failed to issue administrative rules that explicitly provide an exemption from the photo ID requirement for absentee ballots cast in Presidential and Vice Presidential elections.

100.   The Photo ID Law disproportionately and substantially abridges the opportunities of African-American and Latino voters to participate equally and effectively in the political process in Alabama in at least three ways: (1) African-American and Latino voters are less likely than white voters to possess the required photo IDs; (2) African-American and Latino voters face greater obstacles than do white voters in obtaining the required photo IDs; and (3) on information and belief, the photo ID requirement has disproportionately disfranchised African-American and Latino voters.

101.   The general purpose Photo IDs available to Alabama voters are those issued by ALEA: the driver's license and the non-driver photo ID.  As set forth below, substantial obstacles prevent poor voters (who are disproportionately African-American and Latino) from obtaining those two forms of ID.  Nor does the Voter ID card made available by the Secretary of State remedy this problem, for substantial obstacles also prevent poor (and disproportionately African American and Latino) voters from obtaining the Voter ID card.

### 1.   Disproportionate Possession of the Required Photo IDs

102.   African-American and Latino voters comprise a disproportionate subset of (1) registered voters who lack the required photo IDs and (2) eligible, but unregistered prospective voters who lack the required photo IDs.

103.   ALEA-issued photo IDs are the most common forms of the required photo ID.

104.   According to a statement from the Defendant Secretary of State's office made in March 2014, a check of Alabama registered voters against the ALEA database revealed that 560,000 people, or about 20% of registered voters, lacked an ALEA-issued driver's license or non-driver ID card (the "No-Match List").

105.   Based on the No-Match List, Defendant Alabama Secretary of State further estimated in March 2014 that about half of those 560,000 voters who lack ALEA-issued photo IDs possess another one of the required photo IDs.  Thus, Defendant Secretary of State concluded that, at that time, approximately 280,000 registered voters lacked any form of the required photo ID.

106.   Although Defendant Secretary of State presently denies that upwards of 280,000 voters lack ALEA-issued photo IDs, Defendants Secretary of State and Secretary of ALEA do know, or have reason to know, the self-reported race of each of the voters on the No-Match List; and, thus, Defendants Secretary of State and Secretary of ALEA know or have reason to know that African-American and Latino voters comprise a disproportionate subset of those voters who appear on the No-Match List because they disproportionately lack ALEA-issued photo IDs.

107.   While Defendant Secretary of State has contended that the initial estimate of 280,000 disfranchised voters is inaccurate, Defendant has refused or otherwise failed to provide an accurate count of such voters and/or make the No-Match List available to Plaintiffs GBM and the Alabama NAACP and others who have requested it.

37

108.   On March 28, 2014, Plaintiffs GBM and the Alabama NAACP submitted a public records request to Defendant Secretary of State, asking for the No-Match List and records related to the list and to Defendant's initial estimate that half of the voters on the No-Match List lacked another form of acceptable ID.

109.   Defendant Secretary of State acknowledged receiving the records request on April 11, 2014.

110.   On May 23, 2014, Plaintiff Alabama NAACP again wrote to Defendant Secretary of State in order to request a date by which time Plaintiffs could expect the records requested or a determination from the Defendant Secretary of State regarding the availability of said records.

111.   On May 29, 2014, Defendant Secretary of State attempted to undermine the credibility of his office's No-Match List by informing Plaintiff Alabama NAACP that: (1) the No-Match List did not fully account for holders of out-of-state driver's licenses (despite the Secretary's ability to clearly identify many of these voters based on even an initial review of this portion of the voter list); (2) at the direction of the Defendant Secretary of State, voter registrars had mangled the previous voter registration system by inputting, "for several years," driver's license numbers into the social security field of the system; and (3) information from the social security

field of the previous voter registration system (the same one with errors introduced by Defendant Secretary of State's data entry policies) was truncated when it was transferred to the current voter registration system.

112.   Despite acknowledging that his office had introduced errors into the No-Match List and voter file, Defendant of Secretary of State initially offered Plaintiff Alabama NAACP a copy of the lists.

113.   Plaintiff Alabama NAACP thereafter made an additional request for the list or a portion thereof.  However, on June 12, 2014, in order to further delay Plaintiffs' access to the No-Match List, the Defendant Secretary of State rescinded his original offer and informed Plaintiff Alabama NAACP that his office was seeking an opinion from the Defendant Attorney General on whether the No-Match List could be made available to Plaintiffs.

114.   On August 22, 2014, the Defendant Secretary of State forwarded the Defendant Attorney General's opinion that Defendant Secretary of State was under no obligation to release the list to Plaintiffs.

**2.    Disproportionate Obstacles to Obtaining the Required Photo IDs**

115.   As described below, the strict requirements of the Photo ID Law and the implementing administrative rules place substantial travel, financial, and time burdens on large numbers of eligible voters in Alabama,

a disproportionate subset of whom are African-American or Latino,
including Plaintiffs Ambrosio, Harris, Silvers, and Ware, thereby burdening,
denying, or abridging their right to vote.

### a)   ALEA-Issued Driver's Licenses

116.   To obtain a driver's license, a voting-age applicant must: (1)
pay $36.25 to purchase the license, (2) pay a $5 test fee and pass the road
test, and (3) come with an already-licensed driver, proof of car insurance,
and a vehicle that will pass inspection.  This fee structure imposes a cost that
is beyond the means of many impoverished voters (who are
disproportionately African-American and Latino).

117.   In addition to paying a fee for the driver's license, a voter must
present various forms of documentation.  In particular, the voter must
include with his or her application one or more "primary" documents, which
include: (a) a certified U.S. birth certificate [$15 ] (b) a U.S. passport; (c) an
Alabama identification card [$36.25]; (d) a certificate of naturalization
[$345]; a certificate of citizenship [$600]; (e) a U.S. certificate of birth
abroad [$50]; (f) a resident alien card [$450 for a renewal or replacement
card]; or (g) a valid foreign passport with a valid U.S. immigration
document.  A fee must be paid for each of these documents when used to
obtain a driver's license.

118.   Moreover, even if a voter can afford a driver's license, the process of obtaining one entails substantial burdens that disproportionately impact African Americans and Latinos.  In many Alabama counties, ALEA offices are inaccessible because of their remote locations and limited hours of operation.  Such offices are generally only open during working hours and many are not open during the lunch hour.

119.   Recently, in response to budget cuts required by the Alabama Legislature, Defendants the Secretary of ALEA and the Governor made ALEA offices disproportionately less accessible to African-American voters seeking to obtain the required Photo ID. They did so by significantly reducing the already extremely limited hours of operation of these offices in 27 largely poor, rural counties.  African-American voters make up a larger proportion of the population in these 27 counties than in other parts of the State where ALEA office hours were not reduced.  The Alabama Legislature knew, or had reason to know, that budget cuts to ALEA would require ALEA office closures in Black Belt and elsewhere. Moreover, the Legislature consciously rejected an alternative funding proposal that would have avoided such closures, opting instead to place a disproportionate burden on poor African American voters in rural counties.

120.   On September 30, 2015, Defendants Governor and the Secretary of ALEA announced that ALEA would permanently close 31 part-time ALEA offices, including offices in eight of eleven contiguous counties in the so-called "black belt"—a string of counties where more than 130,000 eligible voters reside, nearly half of whom are African-American, and where the African-American poverty rate is 41%.  These closures would have disproportionately burdened eligible African-American voters seeking to obtain the photo ID required to vote under the Photo ID Law.

121.   Defendant Governor Bentley reported that, in 2014, 17% (1,472 out of 8,654) of the first-time ID issuances from the 31 affected ALEA offices were in the eight "black belt" counties.  Closures of the ALEA offices in these eight counties would further reinforce the disproportionate barriers to voting faced by residents of such counties, which have high rates of poverty and limited transportation options.

122.   In response to public outcry over the proposed ALEA closures, including concerns raised by Plaintiffs GBM and Alabama NAACP, Defendant Governor Bentley announced on October 16, 2015 that, rather than close completely, the 31 affected ALEA offices would remain open one day per month.  Because the affected offices had previously been open one to two days *per week*, Governor Bentley's revised plan for the 31 ALEA

offices constitutes a significant reduction in office hours at these offices. And because the reductions affect the same counties that were previously slated for closure, the revised plan still exacerbates the difficulties faced by African-American and Latino residents of these counties in obtaining the required photo IDs.

### b) Non-driver ALEA Photo IDs

123.   Voters can also obtain a non-driver ALEA Photo ID from an ALEA office.  The fee for obtaining such an ID is also $36.25.  The regulations governing this ID indicate that Alabama will waive that fee when the ID is obtained for the purpose of voting, *see* Administrative Rule 820-2-9-.04, however, the ALEA website does not advertise this option.  In order to obtain such a fee waiver, a voter must provide an affidavit, swearing that he or she does not have any form of "valid" voting ID.  Thus, to provide the required affidavit, an individual must understand the nuances of what constitutes a legally "valid" ID, including (1) whether an expired ID counts; (2) whether the address on the ID must be current; (3) whether the name must be an exact match; (4) whether the ID has been issued by a "branch" of the State; and (5) whether the ID remains "valid" if it has been damaged.

The answers to these questions are not clear, and vary across types of ID.[2]
This by itself constitutes a substantial impediment.

124.   Even if the voter is successful in obtaining a fee waiver for the non-driver ALEA ID itself, he or she must still have the requisite underlying documentation.  This includes certain "primary" documents, all of which can be obtained only by paying a fee, with one impractical exception.  The "exception" is an Alabama birth certificate, for which the $15 fee will be waived only if the voter can attest that he or she does not have one of the enumerated forms of voting IDs.  This creates a substantial barrier for almost all voters for the reasons set forth above.

125.   Finally, should a voter be able to afford the non-driver ALEA ID and/or navigate the substantial obstacles imposed by the affidavit requirements, then he or she is still faced with the obstacles created by the limited hours and locations of the ALEA offices, set forth above.

### c)  The disproportionate burdens faced by African-American and Latino voters in obtaining ALEA IDs

126.   African-American and Latino voters in Alabama are disproportionately impoverished and have a lower rate of vehicle ownership.

---

[2]       For example, an Alabama driver's license remains valid for 60 days after expiration and even if the address is no longer correct.  *See* Alabama Attorney General Opinion 2003-212 (Aug. 12, 2003), at 6-7.  Yet other IDs are apparently invalid upon expiration and may not be used to vote after a change of address.

Accordingly, they face a disproportionate burden in obtaining ALEA-issued "valid" photo IDs given the cost of obtaining IDs, the cost of the underlying documentation needed to acquire those IDs, and the transportation burdens associated with that endeavor.

127.   For many, transportation barriers are a severe obstacle to obtaining the requisite Photo ID.  ALEA offices are less accessible to African-American and Latino voters, particularly given (1) African-American and Latino voters' disproportionately low rates of car ownership that would facilitate transport to an ALEA office as well as to offices that issue the documentation required to obtain ALEA-issued IDs, as reinforced by (2) the reduction in hours and locations of ALEA offices described above.

### d) Single-Purpose "Voter ID" Cards

128.   A person lacking any of the other six enumerated "valid" categories of photo ID can obtain a Voter ID card that can only be used for voting.  While these Voter ID cards may be obtained from the county boards of registrars or mobile ID units (collectively, "photo ID-issuing offices"), African-American and Latino voters disproportionately face significant burdens in obtaining cards from these photo ID-issuing offices due to their

limited hours of operation and their locations, which are inaccessible to public transportation.

129.   In order to obtain a Voter ID card, the voter must present (1) a photo identity document[3] (or a non-photo identity document showing his or her full legal name and date of birth[4]), (2) documentation showing his or her date of birth, (3) documentation showing that he or she is registered to vote, and (4) documentation showing his or her name and address as they appear in the voter registration records.  Ala. Code § 17-9-30(j).

130.   The documents required to obtain a Voter ID card are often costly.  The documents of broadest applicability that would confirm a voter's name and date of birth—requirements (1) and (2), set forth above— are a birth certificate and/or marriage license.  A copy of a birth certificate or marriage license—to support a name change, for example—costs $15.00 each.  Although Defendant Secretary of State purports to provide birth

---

[3]     Acceptable photo identity documents include: (i) a high school student ID card; (ii) a student or employee ID card from a private university outside Alabama; (iii) a private employee ID card; (iv) a nursing home or hospital ID card; and (v) a wholesale club or other membership card.

[4]     Acceptable non-photo ID documents include: (i) Birth Certificate; (ii) Hospital or nursing home record; (iii) Marriage Record; (iv) State or Federal Census Record; (v) Military Record; (vi) Medicare or Medicaid document; (vii) Social Security Administration Document; (viii) Certificate of Citizenship; and (ix) Official school record or transcript.

certificates for free to those persons in need of Voter ID cards, this appears to be an infrequently-used option.  For example, the mobile ID units processed only one such request in 2015.  Defendants do not provide birth certificates for individuals born out-of-state.

131.   Upon information and belief, African-American and Latino voters are less likely than white voters to possess the required documents, such as a birth certificate.  This is particularly the case for elderly African-American voters who are more likely to have been born at home and less likely to have had their births registered.

132.   Furthermore, the administrative rules implementing the Voter ID card provision of the Photo ID Law, and in particular the Instructions that accompany the application form, state that: (1) a person can apply for a Voter ID card only if he or she does not have any of the other photo IDs required to vote in Alabama; (2) a person should not complete the application if he or she has any of the other required photo IDs; (3) the application must be signed and sworn, and (4) any falsification or fraud in making the application is a Class C felony.  Ala. Admin. Code § 820-2-9-.03.  The requirement that a person applying for a Voter ID card sign an affidavit swearing under the penalty of a Class C felony conviction that the

contents of the prospective voter's application are true, discourages eligible voters from applying for the Voter ID card. Ala. Code § 17-9-30(i).

133.   The required application also requires parsing deeply ambiguous language. In order to determine whether one is even eligible to apply for a Voter ID card, an individual must understand the nuances of what constitutes a legally "valid" ID, including (1) whether an expired ID counts; (2) whether the address on the ID must be current; (3) whether the name must be an exact match; (4) whether the ID has been issued by a "branch" of the State; and (5) whether the ID remains "valid" if it has been damaged. As noted above, the answers to these questions are not clear and vary across types of ID.

134.   Even if a voter can navigate the labyrinth of obstacles constructed by Alabama in order to obtain a truly "free" Voter ID card, he or she must still find a way to get to an office that issues such IDs. Given the limited locations of such offices and their limited hours, this is a daunting impediment. Boards of registrars are located at the county seat and often inside of county courthouses. These locations are disproportionately inaccessible to African-American and Latino potential voters because—as noted above—African-American households are more than three times as likely, and Latino households are approximately one and a half times as

likely, as white households to lack a vehicle.  They are particularly

inaccessible to rural African-American and Latino voters seeking a Voter ID

card, who necessarily lack driver's licenses.

135.   The boards of registrars' limited office hours add to their

inaccessibility.  Many boards of registrars' offices are open only during

regular weekday business hours, from approximately 8:30 am to 4:00 or

4:30 pm, and are closed on weekends and during the lunch hour.  African-

American and Latino voters are disproportionately burdened by the need to

take time off from school or work, arrange for alternative child or family-

care, and expend their limited financial, material, and other resources in

order to obtain the Voter ID card.

136.   Defendant Governor Bentley's office has stated that Alabama

made "extensive" efforts to ensure "statewide availability" of photo IDs via

"mobile events."  In fact, mobile ID units have failed to increase the

accessibility of Voter ID cards, because they are seldom available and offer

only limited and inconvenient hours.  Despite the significant likelihood that

voters without the required photo ID would have a heightened interest in

obtaining the required photo ID in the two months immediately prior to the

March 1, 2016 primary, no mobile ID units were made available during that

period of time.  In the year 2015, most Alabama counties received only a

single one-day visit from a mobile ID unit.  When available, the units are typically only open for a two- to four-hour window during morning work hours; they are rarely open on weekends; and they are usually closed during the lunch hour.  In addition, the mobile ID units are not "mobile" in any practical sense since they typically stay in a single location within a county, often near the also inaccessible office of the board of registrars.  As a result, the mobile ID units are no more accessible than the boards of registrars' offices and are disproportionately inaccessible to African-American and Latino voters for the same reasons.  Indeed, as of mid-October 2015, mobile ID units had processed only 29 voter IDs in Alabama in 2015, with nearly half (14) of those IDs issued in the disproportionately white (81.8% of voting age citizens) county of Limestone.

137.   As a result of the barriers Defendant Secretary of State has imposed on voters' ability to obtain Voter ID cards, as well as the burdens identified in this Complaint, an immaterial number of Voter ID cards have been issued.  Although Defendants expected to issue 12,000 Voter ID cards in advance of the November 2014 elections, only approximately 5,020 Voter ID cards were issued by that time.  As of October 2015, Defendants had issued only a total of 6,736 Voter ID cards in the last two years.

### e)    Other Categories of Valid Photo ID

138.   The remaining forms of "valid" Photo ID—U.S. passports, "other" valid state or federal photo IDs or government employee photo IDs, college and university IDs, military IDs, and tribal IDs—are not realistic options for many African-American or Latino voters to use.

139.   In order to obtain a new U.S. passport, an applicant must pay fees totaling $135 and must provide further documentation, much of which costs money to obtain.  Because African-American and Latino people in Alabama are disproportionately burdened by poverty, and have lower per capita salaries than whites, they are disproportionately burdened by the requirements for obtaining a U.S. passport.

140.   With regard to the fourth form of "valid" photo ID, Alabama has been vague and failed to specify what forms of ID constitute a "valid identification card issued by a branch, department, agency, or entity of the State of Alabama, any other state, or the United States authorized by law to issue personal identification."  The "valid" government employee photo ID category is similarly vague.  This ambiguity sows confusion and places discretion in the hands of election officials that may be used to the detriment of African-American and Latino voters.  For example, the law permits individual election officials to decide whether to treat a particular photo ID

card as falling within these broad "other" categories of "valid" photo ID under the Photo ID Law.

141.   The remaining three forms of "valid" Photo ID—college and university IDs, military IDs, and tribal IDs—are available only to certain Alabama residents: students, military personnel, and members of Native American tribes.  Because only a small minority of voting-age Alabama citizens fall within these categories, these categories of ID are not readily available to the great majority of Alabama voters and do not represent a practical alternative form of ID for Plaintiffs and other African-American and Latino voters who lack driver's licenses and non-driver IDs.

### 3.    The Photo ID Law Disfranchised Willing Voters in Alabama in the 2014 Elections.

142.   The June 3, 2014 primary election and November 4, 2014 general election were the first two statewide elections in Alabama that occurred after the implementation and enforcement of the Photo ID Law.

143.   Under the Photo ID Law, in-person voters who lack the required photo ID on Election Day or absentee voters who fail to submit the required photo ID with their absentee ballots may cast provisional ballots.  A provisional ballot for an in-person voter is counted only if the voter returns to the Board of Registrars with the required photo ID by the Friday after Election Day.  Ala. Code § 17-10-2(a)(3).  A provisional ballot for an

absentee voter is counted only if the voter is properly notified and able to return a copy of the required photo ID to the Board of Registrars by the Friday before Election Day. Ala. Code § 17-10-2(c)(1). Voters who lack the necessary photo ID thus cannot meaningfully take advantage of such "failsafe" provisional voting.

144. At least 629 provisional and absentee ballots (66 provisional and 563 absentee) cast in the 2014 primary and general elections by voters without the required photo ID were not counted because the voters failed to "cure" their ballots pursuant to the Photo ID Law's inadequate failsafe procedures.

145. During the June 2014 primary, eligible registered voters were turned away at the polls because they lacked the required Photo ID. For example, news reports described the experience of Willie Mims, a 93-year-old African-American man who had voted in every election for as long as the State kept records and was one of the people who was turned away because he lacked the required ID. Mr. Mims did not drive or have a reason to own one of the required forms of photo ID for any purpose other than for voting. Mr. Mims passed away in July 2015; he was denied his last opportunity in life to vote.

146.   Following the June 2014 primary, Plaintiffs GBM and the Alabama NAACP sent a letter to the Secretary of State explaining that, based on the full or partial responses to information requests sent to the relevant election officials in 49 Alabama counties, Plaintiffs GBM and the Alabama NAACP had learned that at least 282 provisional and absentee ballots cast were not counted in the June 2014 primary because otherwise eligible voters had not submitted the required photo ID, and that about 40% of those ballots were from majority-African-American counties.

147.   In the November 2014 election, the first general election in which the Photo ID Law was enforced, eligible voters were again deterred from voting or turned away at the polls because they lacked the required photo ID.  Prior to the November 2014 election, for example, Plaintiff GBM spoke with several prospective voters who said that they would not vote because they lacked the required photo ID.  On Election Day, Plaintiff GBM also encountered a number of African-American voters without the required photo ID, including a fifty-seven year-old African-American woman residing in Jefferson County.  The voter was initially turned away by election officials because she lacked the required photo ID and no election official was willing to "positively identify" her.  The voter was offered a

provisional ballot only after the intervention of Plaintiff GBM.  Because she could not provide the required ID, her ballot was never counted.

148.   Plaintiff Alabama NAACP has also encountered voters without photo ID who were denied the right to vote in the 2014 and 2016 elections. For example, the Alabama NAACP was contacted by voters who, for religious reasons, lack the required photo ID and who, although able to vote under the Positively Identify Provision in the 2014 primary, were arbitrarily denied regular ballots in the 2014 general election and did not vote in the 2016 primary because those election officials who had vouched for them in 2014 capriciously refused to vouch for these voters thereafter.

149.   The turnout rate in Alabama for the November 4, 2014 election was 41%, the lowest voter turnout in an Alabama general election in the last 28 years.  Turnout in the June 2014 was a mere 21% and also the lowest in the last 16 years.  Turnout in the March 2016 Democratic primary, the primary election in which most African-American voters in Alabama participated, was also down from previous presidential election years.  Upon information and belief, some of the voters who did not vote in this election were deterred from doing so due to the imposition of the Photo ID Law.

150.   Following the November 4, 2014 general election, Plaintiffs GBM and the Alabama NAACP again contacted election officials in 47

counties and found that at least 347 provisional and absentee ballots cast by otherwise eligible voters were not counted in that election because those voters had failed to provide the required photo ID. The majority of these discarded ballots came from counties with significant African-American and Latino populations, including 124 discarded ballots from Jefferson County (47% African-American and Latino), 94 ballots from Mobile County (35% African-American), 32 from Montgomery County (56% African-American), 22 from Choctaw County (43% African-American), and 13 from Perry County (68% African-American).

151. Upon information and belief, during the 2014 elections, a significant portion of those voters who lacked the required photo ID (1) failed to appear at the polls; (2) did not cast a provisional ballot or were not offered provisional ballots by election officials; (3) were not "positively identified" by two election workers as provided for by the Photo ID Law; or (4) cast provisional ballots that went uncounted because they were unable to "cure" their ballots by obtaining and submitting the necessary photo ID within the period provided for by the Photo ID Law.

152. The problems experienced by the African-American constituents of Lee County Commissioner John A. Harris exemplify this improper burden. Mr. Harris represents a majority-African-American

district.  He met with at least two African-American constituents over the age of seventy-five whose absentee ballots were rejected in the November 2014 elections because they could not provide copies of the required photo IDs with their absentee ballots.  For example, one of Mr. Harris's constituents is retired, has never possessed a driver's license, and does not own a car.  That voter mailed in an absentee ballot and a photocopy of a senior citizen photo ID card.  The voter subsequently received a letter from election officials notifying her that her ballot had been rejected because she failed to submit the required photo ID.  The second African-American constituent of Mr. Harris similarly had her absentee ballot rejected after Defendants determined that photo IDs issued by public housing authorities are not acceptable for voting under the Photo ID Law.

### 4.    The Discriminatory Implementation of the Photo ID Law

153.   Upon information and belief, during the June 3, 2014 primary election, local election officials in two overwhelmingly white counties, Jackson County (89.8% white population, 3.6% African-American population) and Randolph County (75.0% white population, 20.2% African-American population), waived the Photo ID Law for absentee voters.  Given the demographics of these counties, this practice resulted in the Photo ID

Law's burdens falling more heavily on African-American and Latino voters statewide than on whites.

154.   Upon information and belief, election officials in Alabama have selectively enforced and will continue to selectively enforce the Photo ID Law in unconstitutional ways that impose heavier burdens on African-American and Latino voters.

> **5.** **Alabama's Photo ID Law Interacts with Historical and Social Conditions to Limit Opportunities for African-American and Latino Voters to Participate Equally in the Political Process.**

155.   Race, color, and membership in a language minority group continue to be determinative factors in citizens' access to Alabama's political process, as discussed above and reflected by the following: (1) Alabama has a history of state-sponsored racial discrimination in voting; (2) Alabama elections at all levels are plagued by racially polarized voting; (3) African-American and Latino voters continue to bear the effects of racial discrimination in education, employment, health and other socioeconomic areas, including lower average household vehicle ownership, disproportionately high levels of single-parent households, and disproportionately high rates of poverty, which hinder their ability to participate effectively in the political process; (4) Defendants have engaged in electoral practices, such as severely limiting the times and places for

obtaining the required photo ID, that magnify the substantial burdens that the Photo ID Law imposes on African-American and Latino voters; (5) electoral campaigns in Alabama involve racial appeals; (6) African-American and Latino citizens and residents are underrepresented in statewide elected office, the Alabama State Legislature, and local elected offices in Alabama; (7) Defendants are less responsive to the concerns of African-American and Latino voters than to the concerns of white voters; and (8) the purported rationales for the Photo ID Law, such as ensuring electoral integrity and preventing voter fraud, are tenuous at best and false in reality because there is no factual basis to support these rationales, nor can it be shown that the Photo ID Law serves these stated rationales.

156.   As described above, the process of obtaining and maintaining a valid photo ID imposes substantial and material burdens on voters, in particular the poor.  Because African Americans and Latinos in Alabama continue to bear the effects of discrimination, including, but not limited to state-sponsored and/or intentional discrimination, in areas such as education, employment, housing, and criminal justice, African-American and Latino voters experience poverty at three times the rate of whites, have much lower vehicle ownership rates than white households, and disproportionately live in single-parent homes.  As a result, the significant burdens associated with

obtaining and maintaining valid photo ID fall disproportionately on African-American and Latino voters.

**D.    The Photo ID Law's Positively Identify "Voucher" Provision Violates the Voting Rights Act.**

### 1.    The Provision and Lack of Administrative Regulations

157.    The Alabama Photo ID Law includes a Positively Identify Provision that requires any otherwise eligible in-person voter who lacks the required photo ID on Election Day to be vouched for under oath by two election officials before casting a regular ballot.  The provision states: "[A]n individual who does not have valid photo identification in his or her possession at the polls shall be permitted to vote if the individual is positively identified by two election officials as a voter on the poll list who is eligible to vote and the election officials sign a sworn affidavit so stating." Ala. Code § 17-9-30(e).

158.    The Positively Identify Provision does not define "positively identify"; and it does not restrict, nor does it provide any guidance concerning, the methods or forms of identification that may be relied upon by an election official to "positively identify" a prospective voter under this prerequisite to voting.  Upon information and belief, African-American and Latino voters who lack the required photo IDs are also less likely than

similarly situated white voters to be personally acquainted with two election officials at their polling places.

159.   Because the Positively Identify Provision on its face provides election officials with the unfettered discretion to determine on a case-by-case basis what methods or forms of ID are sufficient to "personally identify" a prospective voter who lacks the required photo ID, the Provision gives election officials the arbitrary and potentially discriminatory power to decide who is or is not permitted to cast a regular ballot.

### 2.    The Undefined Provision Violates Section 201.

160.   The undefined Positively Identify Provision is a "test or device" that violates Section 201 of the Voting Rights Act by imposing a requirement that citizens who lack the required photo ID, and those who cannot obtain one due to the significant burdens imposed upon them by Defendants, such as Plaintiff Giovana Ambrosio, must prove his or her qualifications by the voucher of the election officials present at the precinct. 52 U.S.C. §§ 10501 (b)(4) (proscribing "any requirement that a person as a prerequisite for voting . . . prove his qualifications by the voucher of registered voters or *members of any other class*") (emphasis added).

161.   The undefined Positively Identify Provision gives election officials in Alabama the arbitrary power to accept or reject any prospective

voter without the required photo ID, and to waive the onerous Photo ID Law for personal acquaintances and/or any other prospective voters for whom the two election officials are willing to sign an oath.  This requirement is *per se* illegal under Section 201 of the Voting Rights Act and disproportionately affects Black and Latino voters who lack the required photo IDs.

162.   The statute limits the "class" of people who can vouch for a citizen to the small number of election officials who are assigned to and present at the particular precinct when the citizen seeks to vote, and requires two such persons from that small class to "positively identify" the voter; therefore, the Positively Identify Provision is even more restrictive than a requirement that a voter be vouched for by the much larger class of "registered voters," a requirement that is also expressly prohibited by Section 201 (52 U.S.C. § 10501 (b)(4)).

**E.   Defendants' Lack of Responsiveness to Plaintiffs' Concerns Regarding the Discriminatory Photo ID Law**

163.   Defendants have not been responsive to the concerns and needs of African-American and Latino voters with respect to the Photo ID Law or the Positively Identify Provision.

164.   On March 3, 2014, Plaintiffs GBM and the Alabama NAACP sent a letter to the Defendant Alabama Secretary of State requesting that he issue administrative rules for the Positively Identify Provision that are

nondiscriminatory, uniform, and consistent with the Voting Rights Act and the United States Constitution.  That letter explained the potential effect and illegality of the undefined Positively Identify Provision, and offered reasonable suggestions for nondiscriminatory administrative rules for implementing the Positively Identify Provision.

165.   On March 24, 2014, the Secretary of State wrote to Plaintiffs GBM and the Alabama NAACP to acknowledge there was "merit to [the] request that [this] office promulgate an additional administrative rule that will provide uniform guidance throughout the State as to how positive identification is to be established by election officials."

166.   On March 26, 2014, Plaintiffs GBM and the Alabama NAACP again wrote to the Defendant Secretary of State to ask that he provide reasonable administrative rules for the Positively Identify Provision that would be consistent with Section 201 of the Voting Rights Act.

167.   On April 16, 2014, the Defendant Secretary of State certified two emergency administrative rules, Ala. Admin. Code §§ 820-2-9-.14, 820-2-9.15, interpreting the Positively Identify Provision to preclude election officials from positively identifying a prospective elector by any means other than "personal acquaintance" that allows the official to state "with certainty and with no doubt or reservation" that the voter is who he/she says

he/she is.  2014 Ala. Reg. Text 360145, 360201.  The emergency rules remained in effect for no longer than 120 days, and thus expired no later than August 2014.

168.   On April 18, 2014, the Defendant Secretary of State proposed two administrative rules, Ala. Admin. Code §§ 820-2-9-.14, 820-2-9.15, interpreting the Positively Identify Provision in the same manner as did the emergency rules.  2014 Ala. Reg. Text 360200.

169.   On May 29, 2014, the Defendant Secretary of State received comments on the proposed administrative rules that reiterated Plaintiffs' concerns that the proposed rules violate Section 201 of the Voting Rights Act, and the Fourteenth and Fifteenth Amendments to the Constitution. Those comments explained that the proposed administrative rules were nearly identical to Alabama's past unconstitutional "supporting witness" requirement, and mirrored the past exemption to Alabama's poll tax, whereby white acquaintances of the poll tax collector were afforded privileges that were not equally available to people of color.  The letter concluded by again offering specific suggestions for rules that would be nondiscriminatory, such as allowing election officials to "positively identify" an individual lacking the required photo IDs if that individual could (1) answer simple questions about identifying information in the poll

book, (2) sign an affidavit confirming her or his identity, or (3) produce a form of identification that had been permissible under Alabama's past non-photo voter ID law, such as a voter registration card.

170.   On June 6, 2014, the Defendant Secretary of State issued a press release stating that, despite the criticisms of the proposed rules for the Positively Identify Provision, he had "no intention of interpreting this law" in a manner different from that provided for in the proposed rules.  Thus, the Defendant Secretary of State confirmed that he would interpret the law to mean that a prospective voter without a valid Photo ID could be positively identified by poll workers only by "personal acquaintance" and that would allow the official to state "with certainty and with no doubt or reservation that the voter is who he/she says he/she is."

171.   As of August 2014, the Positively Identify Provision's emergency rules expired, and the proposed rules did not become final rules. Since then, including during the November 2014 election, there have been no administrative rules defining or otherwise governing the Positively Identify Provision.

172.   On September 3, 2014, Plaintiffs GBM and Alabama NAACP wrote to Defendant Secretary of State to raise concerns that (1) the Photo ID Law had disfranchised hundreds of voters in the 2014 primary election; (2)

Defendants had not adequately made the required photo IDs accessible to African-American and Latino voters; and (3) election officials in at least two counties had failed to apply the Photo ID Law to absentee ballots.

173.   On September 26, 2014, Plaintiffs GBM and the Alabama NAACP met in-person with the Alabama Secretary of State and his staff to again raise their various concerns about the Photo ID Law.  Both at that meeting and in correspondence thereafter, Plaintiffs GBM and the Alabama NAACP requested that Defendant Secretary of State (1) utilize the No-Match List to identify and contact those voters who may lack the required photo ID; (2) improve the administration of the absentee voter photo ID requirement; and, again, (3) interpret the Positively Identify Provision consistent with Section 201, so that election officials could provide regular ballots to persons with whom election officials may not be personally acquainted.  In addition, Plaintiffs GBM and the Alabama NAACP requested that photo IDs issued by public housing authorities be ruled acceptable for voting under the Photo ID Law, and that the Defendant Secretary of State operate additional mobile ID units on weekends and in the evenings at specific locations near African-American communities.

174.   In response to their requests, Defendant Secretary of State accepted some of Plaintiffs GBM and the Alabama NAACP's suggestions

for additional mobile ID unit times and locations.  However, the expanded

mobile ID unit hours and locations were insufficient to address the concerns

described in this Complaint.  For example, the Defendant Secretary of State

rejected Plaintiffs GBM and the Alabama NAACP's suggestion of placing

mobile ID units at several predominately African-American public housing

locations.  Moreover, prior to the November 2014 election, Defendants

rejected or otherwise failed to respond to Plaintiffs GBM and the Alabama

NAACP's other requests.  For instance, Defendants denied Plaintiffs GBM

and the Alabama NAACP's request that public housing authority-issued

photo IDs be ruled acceptable under the Photo ID Law.

175.   As described above, on September 30, 2015, the Defendants

Governor and Secretary of ALEA announced that ALEA would permanently

close 31 part-time ALEA photo ID-issuing offices, including offices in eight

of the eleven contiguous counties in the so-called "black belt."

176.   On October 2, 2015, Plaintiffs GBM and the Alabama NAACP

wrote to notify the Defendants Governor, Secretary of ALEA, and Secretary

of State that "[b]y closing the[ ] [ALEA] offices, the State will drastically

reduce the number of sites where potential voters can obtain photo ID,

creating a substantial and disproportionate burden on African Americans'

ability to participate in the political process in Alabama."  Plaintiffs GBM

and the Alabama NAACP also noted that Defendants' actions likely violate

Section 2.  On October 9, the Defendants Governor and Secretary of State

responded to Plaintiffs GBM and the Alabama NAACP's letter and

produced various documents but did not, at the time, agree to reverse

ALEA's closure decision.

177.   On October 8, 2015, Defendant Secretary of State's office

issued a press release in which it stated that "Alabama does not have a photo

ID concern."  In support of that assertion, the Secretary of State's office

stated that "Alabama has 4,849,377 citizens," and that "2,998,969 of them

are active or inactive voters."  It further stated that "as of October 1, 2015,

Alabama has 3,559,235 million citizens with a driver's license and 750,063

with a non-driver ID card issued by the Department of Motor Vehicles."

178.   On November 6, 2015, Plaintiffs GBM and the Alabama

NAACP wrote to Defendant Secretary of State's office, seeking clarification

of the data set forth in the October 8, 2015 press statement.  In particular,

Plaintiffs GBM and the Alabama NAACP sought information as to exactly

how many voters with ALEA-issued IDs were registered and/or eligible to

vote.  Defendant Secretary of State has not responded to this request.

179.   In the context of the facts and circumstances alleged in this

Complaint, Defendant Secretary of State's refusal to adopt

nondiscriminatory and reasonable administrative rules for interpreting the Positively Identify Provision demonstrates that a purpose or effect of the Photo ID Law and the Positively Identify Provision is to deny or abridge the right to vote on account of race.

180.   In the context of the facts and circumstances alleged in this Complaint, Defendant Secretary of State's failure to operate the mobile ID unit program in a manner that materially addresses the burdens on African-American and Latino voters associated with obtaining the photo IDs required to vote demonstrates that a purpose or effect of the Photo ID Law is to deny or abridge the right to vote on account of race.

181.   In the context of the facts and circumstances alleged in this Complaint, including paragraph 119 above, Defendants Governor and the Secretary of ALEA's decision to significantly limit the hours of operation for ALEA offices in the "black belt" and elsewhere demonstrates that the Photo ID law was enacted or operates with the purpose or effect of denying or abridging the right to vote on account of race.

182.   In the context of the facts and circumstances alleged in this Complaint, Defendants Governor, Attorney General, Secretary of State, and Secretary of ALEA's lack of responsiveness to the expressed concerns and proposed solutions of Plaintiffs GBM and the Alabama NAACP on behalf of

African-American and Latino voters demonstrates that a purpose or effect of the Photo ID Law is to deny or abridge the right to vote on account of race.

**F.      The Facts Warrant Equitable Relief Under Section 3(c).**

183.   The past and ongoing record of voting discrimination in Alabama, including Defendants' implementation and enforcement of the Photo ID Law, and their enforcement of its Positively Identify Provision as a statutorily prohibited and unconstitutional test or device, demonstrates that the State has implemented and will continue to implement voting laws that limit the electoral opportunity of African-American and Latino voters.

184.   Without Section 3(c) preclearance review, Alabama is likely to persist in enforcing discriminatory laws, policies, or practices that have the purpose or effect of violating the rights of African-American and Latino voters, in violation of the Voting Rights Act of 1965 and the Fourteenth and Fifteenth Amendments of the U.S. Constitution.

**V.      CLAIMS**

**A.      Count One: The Photo ID Law Violates Section 2 of the Voting Rights Act (52 U.S.C. § 10301) (Against All Defendants).**

185.   Plaintiffs reallege the facts set forth above, in ¶¶ 11-44 and 50-184.

186.   Plaintiffs Ambrosio, Harris, Silvers, and Ware have a right to vote free from racial discrimination. Plaintiffs GBM and the Alabama

NAACP have a right not to be burdened with the expenditure and diversion of limited organizational resources to address discriminatory restrictions on the right to vote. As alleged above, Defendants enacted and/or operate the Photo ID Law with the purpose or effect of abridging or denying the right to vote on account of race. As-applied, the Photo ID Law imposes unnecessary and discriminatory burdens on Plaintiffs in obtaining the required photo ID, including the partial closures of 31 ALEA offices.  These burdens result in African-American and Latino voters having less opportunity than white voters to participate effectively in the political process and to elect candidates of their choice.

187.   The Photo ID Law and its implementation result in a substantial and disproportionate number of African-American and Latino voters—who are without the required photo ID and/or face greater burdens in obtaining and maintaining the photo ID required to vote under the Photo ID Law— having less opportunity to participate effectively in the political process in Alabama on account of race, color, or language minority status.

**B.      Count Two: The Undefined Positively Identify Provision Violates Section 201 of the Voting Rights Act (52 U.S.C. § 10501) (Against All Defendants).**

188.   Plaintiffs reallege the facts set forth above in ¶¶ 11-44,50-59, 68, 69, 80-82, 95-182.

189.   The Photo ID Law's undefined Positively Identify Provision violates the prohibition on those tests or devices enumerated in Section 201 of the Voting Rights Act, 52 U.S.C.A. § 10501, by requiring, as a prerequisite to voting, that otherwise eligible registered voters who lack the required photo ID prove their qualifications by the voucher of two election officials.

**C.    Count Three: The Photo ID Law Violates the Fourteenth Amendment (U.S. Const. amend. XIV, 42 U.S.C. § 1983) (Against Defendants Governor, Attorney General, Secretary of State, and Secretary of ALEA).**

190.   Plaintiffs reallege the facts set forth above in ¶¶ 11-44 and 50-184.

191.   In violation of the Fourteenth Amendment to the United States Constitution, pursuant to 42 U.S.C. § 1983, the Photo ID Law was purposefully enacted or operates to deny or abridge the right to vote on account of race or color.

**D.    Count Four: The Photo ID Law Violates the Fifteenth Amendment (U.S. Const. amend. XV, 42 U.S.C. § 1983) (Against Defendants Governor, Attorney General, Secretary of State, and Secretary of ALEA).**

192.   Plaintiffs reallege the facts set forth above in ¶¶ 11-44 and 50-184.

193.   The Photo ID Law violates the Fifteenth Amendment to the United States Constitution, pursuant to 42 U.S.C. § 1983, because

Defendants intentionally enacted or operate the law to deny or abridge the right to vote on account of race or color.

## VI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court:

194.   Issue a declaratory judgment, pursuant to 28 U.S.C. §§ 2201 and 2202 and Fed. R. Civ. P. 57, declaring that the Photo ID Law: (1) as applied, results in the denial of equal access of African-American and Latino voters to the political process on account of race, color, or membership in a language minority group, in violation of Section 2; (2) requires as a prerequisite to voting that Alabama voters comply with a prohibited test or device in violation of Section 201; and (3) was conceived or operates to purposefully discriminate against African-American and Latino voters on account of race, color, or language minority status in violation of Section 2, and the Fourteenth and Fifteenth Amendments to the United States Constitution.

195.   If the Court finds that the Photo ID Law was conceived or operates to purposefully discriminate, issue a permanent injunction enjoining Defendants from enforcing or giving any effect to the requirements of the Photo ID Law, including enjoining Defendants from conducting any elections using the Photo ID Law.

196.   If the Court finds that the Photo ID Law only violates either

Section 201 or the "results test" of Section 2, issue an order pursuant to 52

U.S.C. §§ 10302 (b) and 10311, exempting voters from the requirement to

produce a photo ID if they either: (a) confirm their identity by, for example,

producing a secure form of non-photo identification, such as a voter

registration card; and/or (b) signing an affidavit identifying a "reasonable

impediment," such as a lack of financial resources, lack of transportation, or

a religious objection to photography, that prevents the individual from

obtaining one of the required forms of photo ID.

197.   Issue an order requiring the Defendants State, Governor, and

Secretary of ALEA to return the 31 partially-closed ALEA offices to their

full hours of operation prior to October 2015.

198.   Issue an order pursuant to Section 3(c) of the Voting Rights

Act, 52 U.S.C. § 10302 (c), retaining jurisdiction and requiring Alabama and

its political subdivisions to obtain preclearance, for a necessary and

appropriate period of time, from the United States Department of Justice or

this Court for any and all future changes to any voting law, practice,

standard, policy, or procedure unless and until Defendants can show that the

proposed changes do not have the purpose and will not have the effect of

denying or abridging the right to vote on account of race, color, or language minority status.

199.   Issue an order requiring Defendants to pay Plaintiffs' costs, expenses, and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and 52 U.S.C. § 10310(e).

200.   Grant other such relief as Plaintiffs request or the Court deems proper and just.

Respectfully submitted this 6th day of December 2016.

/s/ Deuel Ross
Christina Swarns*
Coty Montag*
Deuel Ross*
Natasha Merle*
NAACP Legal Defense and
    Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, New York 10006
Tel: (212) 965-2200
Fax: (212) 226-7592
cswarns@naacpldf.org
cmontag@naacpldf.org
dross@naaacpldf.org
nmerle@naacpldf.org

/s/ Robert D. Fram
Robert D. Fram*
Nathan E. Shafroth*
Michael S. Greenberg*
Covington & Burling LLP
One Front Street
San Francisco, CA  94111-5356
Tel:  415-591-6000
Fax: 415-591-6091
rfram@cov.com
nshafroth@cov.com
mgreenberg@cov.com

Joanne B. Grossman*
Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, D.C.  20001-4956
Tel:  202-662-6000
Fax:  202662-6291
jgrossman@cov.com


*Admitted Pro Hac Vice


/s/ Herman N. Johnson, Jr.
Herman N. Johnson, Jr
Bar No. ASB-3607-R50J
800 Lakeshore Drive
Birmingham, AL 35229
205-726-2723 (office)
205-726-2587 (fax)
hjohnso4@samford.edu

Attorneys for Plaintiffs

<u>CERTIFICATE OF SERVICE</u>

I certify that on the 6th of December 2016 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following attorneys:

| | |
|---|---|
| **James W Davis**<br>(jimdavis@ago.state.al.us)<br>**Misty S. Fairbanks Messick**<br>(mmessick@ago.state.al.us)<br>**Winfield J. Sinclair**<br>(wsinclair@ago.state.al.us)<br>**William G. Parker, Jr.**<br>(wparker@ago.state.al.us)<br>**Laura E. Howell**<br>(lhowell@ago.state.al.us)<br>STATE OF ALABAMA<br>OFFICE OF THE ATTORNEY<br>GENERAL<br>501 Washington Avenue<br>P O Box 300152<br>Montgomery, AL 36130-0152<br>Phone: 334-242-7300<br>Fax:     334-353-8440<br><br>**Richard J Laird , Jr**<br>(joel.lairdlaw@yahoo.com)<br>R JOEL LAIRD JR PC<br>19 West 11th Street<br>Anniston, AL 36201<br>Phone: 256-237-3080<br>Fax:     256-237-7381<br><br>*Counsel for the State of Alabama,*<br>*Secretary of State Merrill, Attorney*<br>*General Luther Strange, and Secretary*<br>*of Law Enforcement Stan Stabler* | **John C Neiman , Jr**<br>(jneiman@maynardcopper.com)<br>**Prim Formby Escalona**<br>(pescalona@maynardcooper.com)<br>MAYNARD COOPER & GALE PC<br>1901 Sixth Avenue North<br>2400 Regions Harbert Plaza<br>Birmingham, AL 35203<br>Phone: 205-254-1228<br>Fax:     205-254-9999<br><br>**David B Byrne , Jr**<br>(david.byrne@governor.alabama.gov)<br>STATE OF ALABAMA OFFICE OF<br>THE GOVERNOR<br>Chief Legal Advisor<br>600 Dexter Avenue Ste NB-05<br>Montgomery, AL 36130<br>Phone: 334-242-7120<br><br>**Carrie E McCollum**<br>(carrie.mccollum@governor.alabama.gov)<br>STATE OF ALABAMA<br>Office of the Governor<br>600 Dexter Avenue Room NB-05<br>Montgomery, AL 36130<br>Phone: 334-242-7120<br>Fax:     334-242-2335<br><br>*Counsel for Governor Bentley* |

*/s/ Deuel Ross*