FILED
2017 Mar-01  PM 01:22
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **GREATER BIRMINGHAM MINISTRIES, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **2:15-cv-02193-LSC** |
| | ) | |
| **STATE OF ALABAMA, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OF OPINION

## I.    INTRODUCTION

On December 6, 2016, Plaintiffs, Greater Birmingham Ministries, the Alabama State Conference of the National Association for the Advancement of Colored People ("the Alabama NAACP"), Giovana Ambrosio, Debra Silvers, Elizabeth Ware, and Shameka Harris, filed a Second Amended Complaint against Defendants, the State of Alabama ("the State"), Robert J. Bentley in his official capacity as Governor of Alabama ("the Governor"), Steven T. Marshall in his official capacity as Alabama's Attorney General ("the Attorney General"),[1] John Merrill in his official capacity as Alabama's Secretary of State ("the Secretary of

---

[1]     Steven T. Marshall replaced Luther Strange as Alabama's Attorney General after this suit was filed. Plaintiffs substituted Marshall for Strange. (Doc. 152).

State"), and Stan Stabler in his official capacity as the Secretary of the Alabama Law Enforcement Agency ("the ALEA Secretary").[2] (Doc. 112.)

Plaintiffs seek to invalidate all or parts of section 17–9–30 of the Alabama Code (Alabama's "Photo ID Law"), which requires voters to "provide valid photo identification to an appropriate election official prior to voting," subject to some exceptions. Ala. Code § 17–9–30(a). Plaintiffs claim that the Photo ID Law violates Section 2 of the Voting Rights Act of 1965 ("VRA"), 52 U.S.C. § 10301,[3] because it was conceived or operates to abridge or deny the right to vote on account of race,

---

[2]    Stan Stabler replaced Spencer Collier as Secretary of ALEA after this suit was filed. Plaintiffs substituted Stabler for Collier. (Doc. 37.)

[3]    Section 2 provides:

a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b).

(b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

52 U.S.C. § 10301.

color, or language minority status (Count One of the Second Amended Complaint),
and the Fourteenth and Fifteenth Amendments to the United States Constitution
pursuant to 42 U.S.C. § 1983, *see* U.S. Const., amends. XIV & XV, 42 U.S.C. §
1983, because it was purposefully enacted or operates to deny or abridge the right
to vote on account of race or color (Counts Three and Four). Plaintiffs also claim
that § 17–9–30(e) of the law, which states that a prospective in-person voter
without the required photo ID may still cast a regular ballot if two election officials
present at the polling place "positively identify" that person, violates the
prohibition on tests or devices enumerated in Section 201 of the VRA, 52 U.S.C. §
10501[4] (Count Two).

Plaintiffs request a declaratory judgment and an injunction enjoining
enforcement of the Photo ID Law. Additionally, new to their First and Second
Amended Complaints is a request that this Court require the State, the Governor,

---

[4]   Section 201 provides:

(a) No citizen shall be denied, because of his failure to comply with any test or
device, the right to vote in any Federal, State, or local election conducted in any
State or political subdivision of a State.

(b) As used in this section, the term "test or device" means any requirement that
a person as a prerequisite for voting or registration for voting (1) demonstrate the
ability to read, write, understand, or interpret any matter, (2) demonstrate any
educational achievement or his knowledge of any particular subject, (3) possess
good moral character, or (4) prove his qualifications by the voucher of registered
voters or members of any other class.

52 U.S.C. § 10501.

and the ALEA Secretary to return thirty-one partially-closed ALEA offices, where individuals may purchase driver's licenses and non-driver ID cards, to full hours of operation.

This opinion addresses the Motion to Dismiss the Second Amended Complaint jointly filed by the State, the Governor, the Attorney General, and the ALEA Secretary. (Doc. 117.) These defendants argue that they are not proper parties to this case because (1) Plaintiffs lack Article III standing to seek relief against them, and (2) they have sovereign immunity to Plaintiffs' claims and do not fall within the exception to sovereign immunity under *Ex Parte Young*, 209 U.S. 123 (1908).[5] This opinion does not address the Secretary of State's separately-filed Motion to Dismiss (doc. 124), in which he concedes that he is a proper defendant and (in large part) attacks the Second Amended Complaint on its merits.[6]

---

[5]     Under the *Ex Parte Young* exception to the Eleventh Amendment's grant of sovereign immunity to States, persons may sue state officials in their official capacities "seeking prospective equitable relief to end continuing violations of federal law." *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1336 (11th Cir. 1999) (emphasis removed).

[6]     The Secretary of State does argue that the two organizational plaintiffs, the Alabama NAACP and Greater Birmingham Ministries, and two of the four individual plaintiffs, Shameka Harris and Elizabeth Ware, lack standing to pursue claims against him. (*See* Docs. 48 & 124.) He does not appear to challenge the standing of Plaintiffs Giovana Ambrosio and Debra Silvers. According to the complaint, both of these plaintiffs are registered Alabama voters who lack the required photo ID and therefore have allegedly not been able to vote in recent elections, injuries that appear sufficient to confer their standing to seek an injunction against the Photo ID Law. This is because "[u]nlike voters who already have photo identification, [Ms. Ambrosio and Ms. Silvers] are required to obtain photo identification before they can vote, and the imposition of that burden is an injury sufficient to confer standing." *Common Cause/Ga. v. Billups*, 554 F.3d

For the reasons stated below,[7] the joint motion to dismiss will be granted and all claims against the State, the Governor, the Attorney General, and the ALEA Secretary will be dismissed.

## II.   STANDARD OF REVIEW

Both the standing and sovereign immunity arguments raised by Defendants are jurisdictional ones, so in that respect this motion is governed by Federal Rule of Civil Procedure 12(b)(1). *See Stalley v. Orlando Reg'l Healthcare Sys.*, 524 F.3d 1229, 1232 (11th Cir. 2008) (standing); *Tomberlin v. Clark*, 1 F. Supp. 3d 1213, 1222

---

1340, 1351 (11th Cir. 2009). There is authority for the proposition that if this Court finds that at least one plaintiff has standing, it can proceed to the merits without separately addressing the standing of any of the other individual or organizational plaintiffs. *See Nat'l Rifle Ass'n of Am., Inc. v. McCraw*, 719 F.3d 338, 344 n.3 (5th Cir. 2013) ("Only one of the petitioners needs to have standing to permit us to consider the petition for review."); *Hispanic Interest Coal. Of Ala. v. Governor of Ala.*, 691 F.3d 1236, 1244 n.6 (11th Cir. 2012) ("Because one plaintiff with standing is sufficient to permit our review of the constitutionality of section 28, we proceed to address the merits without regard to the standing of other individuals or organizations."). Based on this guidance and on the fact that this opinion dismisses four of the five defendants in any event, the Court is of the opinion that the question of Plaintiffs' standing in general would be better addressed in a forthcoming opinion ruling on the Secretary of State's motion to dismiss. The Court reserves the right to find that any or all of the four individual plaintiffs and the two organizational plaintiffs lack standing in that opinion. Further references to "Defendants" in this opinion will therefore not include the Secretary of State.

[7]      To the extent they are relevant to the issues addressed herein, the Court has considered numerous other filings in ruling on this motion. For example, in their Motion to Dismiss the Second Amended Complaint, Defendants adopt the arguments previously made in their Motion to Dismiss Plaintiffs' First Amended Complaint (doc. 47) and their reply in support thereof (doc. 61). Plaintiffs do the same: in their response brief in opposition to the Motion to Dismiss their Second Amended Complaint (doc. 125), they largely adopt the arguments made in previous response briefs (*see* docs. 56 & 57). Defendants have also filed a reply in support of their motion (doc. 128) and a notice of supplemental authority (doc. 145). Plaintiffs have filed a sur-reply in opposition (doc. 135-1), and several notices of supplemental authority (docs. 79, 82, & 150). Additionally, the United States has also been granted leave to file a Statement of Interest. (Doc. 75).

(N.D. Ala. 2014) (sovereign immunity). "[W]hen a defendant properly challenges subject matter jurisdiction under Rule 12(b)(1) the district court is free to independently weigh facts, and . . . . 'satisfy itself as to the existence of its power to hear the case.'" *Morrison v. Amway Corp.*, 323 F.3d 920, 925 (11th Cir. 2003) (quoting *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990)). The burden of proof on a Rule 12(b)(1) motion is on the party averring jurisdiction. *Thomson v. Gaskill*, 315 U.S. 442, 446 (1942).

Plaintiffs assert that because Defendants have launched a "facial" attack on their complaint by failing to append affidavits or other evidence to support their motion, this Court must look only to the sufficiency of the allegations in the complaint, which are presumed to be true. *See Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981).[8] The following discussion is based upon the facts alleged in Plaintiffs' Second Amended Complaint, presumed to be true. Because the Court dismisses this action based upon a lack of subject matter jurisdiction, it is not necessary to address Defendants' alternative argument that Plaintiffs' Second Amended Complaint fails to state a claim under Rule 12(b)(6). Therefore, the

---

[8]     In *Bonner v. City of Pritchard*, 661 F.2d 1206, 1209 (11th Cir. 1981), the Eleventh Circuit, sitting en banc, adopted as binding precedent all decisions rendered by the Fifth Circuit prior to the close of business on September 30, 1981.

Court's discussion is limited to those facts that are relevant to subject matter jurisdiction.

## III.    DISCUSSION

### A.    Plaintiffs Lack Article III Standing to Pursue Claims Against the Governor, the Attorney General, and the ALEA Secretary

"Standing is a doctrine that 'stems directly from Article III's "case or controversy" requirement,' and thus it 'implicates our subject matter jurisdiction.'" *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 974 (11th Cir. 2005) (quoting *Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1242 (11th Cir. 2003)). As a "threshold jurisdictional question," then, standing "must be addressed prior to and independent of the merits of a party's claims." *Id.* (quoting *Dillard v. Baldwin Cnty. Comm'rs*, 225 F.3d 1271, 1275 (11th Cir. 2000)). To establish that a case or controversy exists between a plaintiff and each defendant, the plaintiff must establish three elements as to each defendant: (1) an injury in fact—that is, an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of—in other words, the injury must be fairly traceable to the challenged action of the defendants, and not the result of the independent action of some third party not before the court; and (3) a likelihood, as opposed to a merely speculative chance,

that the injury will be redressed by a favorable decision of the court. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–62 (1992). Failure to establish any one of the three standing elements deprives the federal courts of jurisdiction to hear the suit. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998).

In suits such as this one, where "the plaintiff seeks a declaration of the unconstitutionality of a state statute and an injunction against its enforcement, a state officer, in order to be an appropriate defendant, must, at a minimum, have *some connection* with enforcement of the provision at issue." *Socialist Workers Party v. Leahy*, 145 F.3d 1240, 1248 (11th Cir. 1998) (emphasis added). This is so because only when there is a "causal connection between" an officer's "responsibilities and any injury that the plaintiffs might suffer," does an injunction against that officer "redress" the plaintiffs' asserted injuries. *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 919 (9th Cir. 2004); *accord Cressman v. Thompson*, 719 F.3d 1139, 1145 (10th Cir. 2013).[9]

---

[9]      In this context, Article III standing and Eleventh Amendment immunity involve the same inquiry. *See Cressman*, 719 F.3d at 1146 n.8 ("[T]here is a common thread between Article III standing analysis and *Ex Parte Young* [sovereign immunity] analysis.") (citing *Wasden*, 376 F.3d at 919; *see also Wasden*, 376 F.3d at 919 ("Whether [state] officials are, in their official capacities, proper defendants in [a] suit is really the common denominator of two separate inquiries: first, whether there is the requisite causal connection between their responsibilities and any injury that the plaintiffs might suffer, such that relief against the defendants would provide redress [*i.e.*, Article III standing]; and second, whether our jurisdiction over the defendants is proper under the doctrine of *Ex parte Young*, which requires 'some connection' between a named state officer and enforcement of a challenged state law.").

These principles mean that Plaintiffs have Article III standing[10] to pursue their claims against only the Secretary of State but not the other officer defendants. Plaintiffs seek an injunction prohibiting "Defendants" from "conducting any elections using the Photo ID Law." [Doc. 112 ¶ 195.] But the Governor, the Attorney General, and the ALEA Secretary do not conduct elections. It is the Secretary of State who is "the chief elections official in the state" and is required to "provide uniform guidance for election activities." Ala. Code § 17–1–3(a). The Photo ID Law makes him, and not the other officer defendants, the officer with "rule making authority for the implementation of [the Photo ID Law] under the Alabama Administrative Procedure Act." *Id.* § 17–9–30(o). The law further makes him the officer who must "inform the public regarding the requirements of [the Photo ID Law] through whatever means deemed necessary." *Id.* § 17–9–30(n).

1. **Plaintiffs Lack Article III Standing to Pursue Claims Against the Governor**

Plaintiffs maintain that the Governor is a proper defendant because he "is a constitutional officer who is vested with the supreme executive power of the State." [Doc. 112 ¶ 46.] But courts have allowed a federal claim for an injunction against a state law to proceed against *only* the official who is responsible for enforcing the law, not additional state officers who merely have a responsibility to

---

[10]     *But see* note 7, *supra.*

enforce state laws more generally.  As the Eleventh Circuit explained in addressing

these issues under the Eleventh Amendment,

> A governor's 'general executive power' is not a basis for jurisdiction
> in most circumstances. If a governor's general executive power
> provided a sufficient connection to a state law to permit jurisdiction
> over him, any state statute could be challenged simply by naming the
> governor as a defendant. Where the enforcement of a statute is the
> responsibility of parties other than the governor (the cabinet in this
> case), the governor's general executive power is insufficient to confer
> jurisdiction.

*Women's Emergency Network v. Bush*, 323 F.3d 937, 949–50 (11th Cir. 2003)

(citations omitted).[11] *Accord Snoeck v. Brussa*, 153 F.3d 984, 986 (9th Cir. 1998)

("[A] generalized duty to enforce state law or general supervisory power over the

persons responsible for enforcing the challenged provision will not subject an

official to suit.") (internal quotation marks omitted); *Shell Oil Co. v. Noel*, 608 F.2d

208, 211 (1st Cir. 1979) ("The mere fact that a governor is under a general duty to

---

[11] The Court reiterates that although this governing Eleventh Circuit authority on the proper defendants to a constitutional challenge to a state law was framed in terms of sovereign immunity, other courts have explained that the standing and sovereign immunity analyses overlap. *See Wasden*, 376 F.3d at 919; *Cressman*, 719 F.3d at 1145. Plaintiffs have offered no reason why this should not be the case. In any event, the Eleventh Circuit has also recognized, when discussing Article III justiciability doctrines, that "Under United States Supreme Court precedent, when a plaintiff challenges the constitutionality of a rule of law, it is the state official *designated to enforce that rule* who is the proper defendant, even when that party has made no attempt to enforce the rule." *Am. Civil Liberties Union v. The Fla. Bar*, 999 F.2d 1486, 1490 (11th Cir. 1993) (emphasis added) (citing *Diamond v. Charles*, 476 U.S. 54, 64 (1986) ("The conflict between state officials empowered to enforce a law and private parties subject to prosecution under that law is a classic 'case' or 'controversy' within the meaning of Art. III.")).

enforce state laws does not make him a proper defendant in every action attacking the constitutionality of a state statute.").

There are of course instances where, due to the nature of a state statute and a governor's connection with that statute, a governor is a proper defendant. For example, in *Luckey v. Harris*, 860 F.2d 1012 (11th Cir. 1988), the plaintiffs, on behalf of a class of indigent persons charged with criminal offenses in Georgia and attorneys representing those defendants, sued Georgia's Governor and state judges, requesting that they meet minimum constitutional standards in the provision of indigent criminal defense services. *Id.* at 1013. The Eleventh Circuit held that the Governor was a proper defendant because the Georgia Constitution and statutes provide that he is responsible for law enforcement, has the residual power to commence criminal prosecutions, and has the final authority to direct the Attorney General to "institute and prosecute" on behalf of the state. *Id.* at 1016. Thus, according to the court, the Governor was an appropriate party where he was sufficiently responsible for the administration of the allegedly deficient indigent defense services. *Id.*

However, the Eleventh Circuit in *Women's Emergency Network* held that *Luckey* did not mandate that Florida's Governor was a proper defendant in that case, where the plaintiffs challenged a Florida statute authorizing specialty license

plates bearing the message "Choose Life" and the State's disbursal of funds generated from the sale of the license plates to organizations that provide adoption services. 323 F.3d at 940. The court distinguished *Luckey*, stating, "Governor Bush's only connection with Fla. Stat. § 320.08058 is that he, along with six members of the cabinet, are responsible for the Department of Highway Safety and Motor Vehicles. Governor Bush's shared authority over the Department is simply too attenuated to establish that he is 'responsible for' the distribution of funds to adoption agencies." *Id.* at 949.

This case is more like *Women's Emergency Network* than *Luckey*. Alabama law provides that the Secretary of State is "the chief elections official in the state," Ala. Code § 17–1–3(a), and has various responsibilities specific to the Photo ID Law. Nowhere does the Photo ID Law assign the Governor the power to enforce it. It thus appears undeniable that that the Governor is not the official who is "responsible for the challenged action." Plaintiffs argue that the Governor signed the Photo ID Law into effect, which is true, but Plaintiffs do not and could not establish that merely signing legislation is a sufficient basis for standing under these circumstances. Indeed, the Eleventh Circuit rejected the same argument in *Women's Emergency Network*, 323 F.3d at 950 ("Appellants further contend Governor Bush is a proper party because he signed Fla. Stat. § 320.08058 into law.

This argument, too, must fail. Under the doctrine of absolute legislative immunity, a governor cannot be sued for signing a bill into law.").

In an apparent attempt to align this case with *Luckey*, Plaintiffs also point to a separate provision of the Alabama Code making it a misdemeanor for a polling official to "knowingly fail[] to require proper identification to verify the name of the prospective voter," *see* Ala. Code § 17–17–28, arguing that the Governor could theoretically play a role in the decision to prosecute, or not prosecute, election officials who, according to Plaintiffs' amended complaint, waived the Photo ID Law for absentee voters in two "overwhelmingly white counties" during the June 3, 2014, primary. [*See* doc. 112 ¶ 153.] But Plaintiffs have not challenged § 17–17–28 nor sought an injunction against it, presumably because § 17–17–28 does not criminalize any actions Plaintiffs are proposing to take, but rather the actions of poll workers. Additionally, because § 17–17–28 also explicitly exempts those poll workers from criminal responsibility for any actions they take in "good faith," even if this Court were to enjoin the Secretary of State from enforcing the Photo ID Law, a poll worker who complied with the injunction would certainly be acting in good faith and would thus be insulated from arrest and prosecution under § 17–17–28. Plaintiffs' attempt to use this separate criminal provision to establish their

standing to sue the Governor for an injunction against the Photo ID Law is not persuasive.

More than anything else, Plaintiffs emphasize that they have suffered an injury traceable to and redressable by the Governor through their new request that the Court "issue an order requiring that Defendants State, Governor, and Secretary of ALEA to return the 31 partially-closed ALEA offices to their full hours of operation prior to October 2015." [Doc. 112 ¶ 197.] ALEA is responsible for issuing driver's licenses and non-driver ID cards. *See* Ala. Code § 32–6–4. Plaintiffs' complaint alleges that in response to budget cuts required by the Alabama Legislature, the Governor and the ALEA Secretary significantly reduced the hours of operation in ALEA offices in twenty-seven largely poor, rural counties. [Doc. 112 ¶ 119.] Then on September 30, 2015, the Governor and the ALEA Secretary announced that ALEA would permanently close thirty-one part-time ALEA offices issuing driver's licenses and non-driver ID cards, including offices in eight of eleven contiguous counties in the so called "black belt"—a string of counties where nearly half of the 130,000 eligible voters are African American and where the African American poverty rate is 41 percent. [*Id.* ¶ 120.] Plaintiffs allege that in response to public outcry over the proposed ALEA closures, on October 16, 2015, the Governor announced that rather than close completely, these thirty-one

locations, which were previously open one to two days per week, would remain open one day per month. [*Id.* ¶ 122.]

For reasons stated in the next section, Plaintiffs' request for an order to return ALEA offices to full hours of operation does not confer standing on Plaintiffs to sue *any* of the defendants in this case. However, suffice it to say that even assuming for the moment that Plaintiffs have alleged facts otherwise establishing causation and redressability as to their request for a change in ALEA office hours, Plaintiffs have not shown that they would have standing to seek an order regarding ALEA office hours *from the Governor*. Again, when a particular state official has the responsibility of administering a state department, that particular state official, not the Governor, is the proper party to a suit seeking to block laws administered by that department. *See Women's Emergency Network v. Bush*, 214 F. Supp. 2d 1316, 1318 (S.D. Fla. 2002) (holding that the Eleventh Amendment barred claims against the Florida Governor because the agency's executive director had overall duty and responsibility for administering the law at issue), *aff'd*, 323 F.3d 937. The statute that created ALEA provides that the ALEA Secretary serves "as the appointing authority and executive head of the agency." Ala. Code § 41–27–2(a). So even if an injunction regarding ALEA office hours were a plausible form of relief against some state official on the theories set forth in

Plaintiffs' complaint, which it is not for the reasons set forth immediately below, an

injunction against the ALEA Secretary would be sufficient to supply Plaintiffs the

relief they seek, not an overlapping injunction against the Governor.

**2.     Plaintiffs Lack Article III Standing to Pursue Claims Against the ALEA Secretary**

ALEA is the executive-branch agency that "coordinate[s] public safety in

this state." Ala. Code § 41–27–1. The ALEA Secretary does not play any direct

role in voting or elections, and the words "election" and "voter" appear nowhere

in the statute that created ALEA. *See id.* § 41–27–1 *et seq.* The principal relief

sought by Plaintiffs is an injunction blocking election officials from requiring photo

ID from voters, and the ALEA Secretary has nothing to do with that process.

Additionally, Plaintiffs cannot use the Second Amended Complaint's

request for an extension of ALEA office hours to confer standing for their claims

against the ALEA Secretary for several reasons. First, Plaintiffs have not alleged a

cause of action challenging the decision to limit the ALEA's office hours as

unconstitutional or violative of the VRA.[12] They are claiming that *the Photo ID Law*

---

[12]     Plaintiffs likely could not challenge the driver's license office hours under the VRA because, unlike the hours of a registrar's office, the general hours of a satellite driver's license office—which predominately serves transportation-related functions having nothing to do with elections—is not a condition of voting. *Cf. Presley v. Etowah Cnty. Comm'n*, 502 U.S. 491, 502–03 (1992) (holding that Section 5 of the VRA applied to state laws relating only to "voting" or "election law"). The cases Plaintiffs rely upon for the proposition that ordering ALEA to extend its hours of operation would be an appropriate Section 2 remedy are distinguishable because all

is illegal, and if they prevail, the proper remedy will be to enjoin enforcement of the Photo ID requirement, not revise the ALEA's office hours. This is because injunctive relief should typically "be no broader than necessary to remedy" the violation of law. *Newman v. State of Ala.*, 683 F.2d 1312, 1319 (11th Cir. 1982). Here, taking Plaintiffs' allegations as true, the ALEA office hours are among many circumstances that allegedly make it more burdensome for African-American and Latino individuals to exercise their right to vote in Alabama. For example, Plaintiffs discuss the poverty rate among these groups (doc. 112 ¶ 54), the alleged disparity in vehicle ownership between white individuals and African-American and Latino individuals (*id.* ¶ 55–56), the lack of availability of public transportation (*id.*), and the alleged disparity in broadband Internet access between white individuals and African-American individuals (*id.* ¶ 59). But, as aptly stated by Defendants, "[I]f the Court finds that the Photo ID Law is illegal, it cannot remedy that by changing the background facts—by ordering the State to redistribute wealth, or to distribute

---

address changes to hours at registrar's offices or polling places. In *Ohio State Conference of the NAACP v. Husted*, 768 F.3d 524 (6th Cir. 2014), the plaintiffs challenged a law and related directive from the Ohio Secretary of State changing the hours of early in-person voting at polling places. In *Mississippi State Chapter, Operation Push, Inc. v. Mabus*, 932 F.2d 400 (5th Cir. 1991), the plaintiffs challenged as violative of Section 2 of the VRA Mississippi's requirement that voters register twice, once with the county registrar for federal, state, and county elections, and again with the municipal clerk to vote in municipal elections, as well as its elimination of satellite voter registration locations. In *United States v. Palmer*, 356 F.2d 951, 952 (5th Cir. 1966), the United States asked for an injunction requiring registrars to maintain hours as required by Louisiana law.

free vehicles, or to revamp its public transportation system, or install broadband in every household, or, critically for present purposes, ordering ALEA to extend its office hours." [Doc. 47 at 10–11.] The proper remedy, instead, would be an injunction against enforcement of the Photo ID Law.

Plaintiffs respond by insisting that they are mounting an "as-applied" challenge to the Photo ID Law, rather than a "facial" one, so that if the Court finds that the Photo ID Law only violates Section 2 of the VRA in part because of the burden imposed on African-American and Latino voters by the closing of the ALEA offices, but finds that the law is not unconstitutional, then the Court could craft a remedial scheme that includes ordering the reopening of the ALEA satellite offices. However, the question of whether the Photo ID Law violates the Constitution (either as-applied to Plaintiffs or facially) is distinct from the question of whether it violates Section 2 of the VRA. In any event, Plaintiffs have offered no authority for the proposition that when a party convinces a court that a state law violates the Constitution as applied to his particular circumstances, the proper remedy is for the Court to remedy his injury by changing those circumstances. Rather, when faced with a meritorious as-applied challenge, the proper remedy is for a court to issue an injunction *against the unconstitutional application of the law to the plaintiffs. See, e.g., Ayotte v. Planned Parenthood of N. New England*, 546 U.S.

320, 328–29 (2006). Indeed, Plaintiffs' request that the Court overturn an agency decision that it has not even challenged as unconstitutional seems antithetical to remedying a constitutional injury through a narrower, "as-applied" solution. *See id.* ("Generally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem. We prefer, for example, to enjoin only the unconstitutional applications of a statute while leaving other applications in force.") (emphasis added); *United States v. Nat. Treas. Emp. Union*, 513 U.S. 454, 478 (1995) ("[W]e neither want nor need to provide relief to nonparties when a narrower remedy will fully protect the litigants.").

However, even assuming for the purpose of argument that Plaintiffs could establish that reopening satellite driver's license offices is an appropriate remedy under Section 2 of the VRA despite the fact that they have not even challenged that decision, Plaintiffs have still failed to establish the causation and redressability elements of the standing inquiry relative to their request for a change in ALEA office hours. First, Plaintiffs have not alleged facts showing that the current ALEA office hours have caused them harm. Alabama's Photo ID Law allows a voter to use multiple forms of photo ID,[13] including a free voter photo ID card issued by the

---

[13] The forms of acceptable photo ID include (1) a valid Alabama driver's license or non-driver ID card issued by the appropriate state or county department, (2) a valid Alabama photo voter ID card, (3) a valid United States passport, (4) a valid employee ID card with a photograph issued by a federal, state, or local government entity, (5) a valid student or employee photo ID

Secretary of State through Board of Registrars' offices. *See* Ala. Code § 17-9-30(f). As Plaintiffs concede, there is a registrar's office located inside the county courthouses in every county, and they are generally open "during regular weekday business hours." [Doc. 112 ¶¶ 134–35.] The operating hours of the ALEA offices— which simply govern when a party may obtain a new driver's license or non-driver ID—have no impact on a voter's ability to obtain the free voter ID card from the county registrar. Plaintiffs respond that these registrar-issued voter photo ID cards are also burdensome to obtain. But even if that were true, Plaintiffs have not alleged that it is more burdensome to obtain a registrar-issued voter photo ID card than it is to obtain an ALEA-issued driver's license or non-driver ID. To the contrary, they allege that it costs over $40 for an ALEA-issued driver's license and additional fees for the underlying documentation needed to obtain one,[14] while there is no fee for a registrar-issued voter photo ID card. Plaintiffs acknowledge that the Secretary of

---

card issued by a private or public college, university, or postgraduate technical school in Alabama, (6) a valid United States military photo ID card, and (7) a valid tribal ID card with a photograph. *See* Ala. Code § 17–9–30(a).

[14]     To obtain a driver's license, a voting-age applicant must: (1) pay $36.25 to purchase the license, (2) pay a $5 test fee and pass the road test, and (3) come with an already-licensed driver, proof of car insurance, and a vehicle that will pass inspection. In addition to paying a fee for the driver's license, a voter must must include with his or her application one or more "primary" documents, which include: (a) a certified U.S. birth certificate [$15 ] (b) a U.S. passport; (c) an Alabama identification card [$36.25]; (d) a certificate of naturalization [$345]; a certificate of citizenship [$600]; (e) a U.S. certificate of birth abroad [$50]; (f) a resident alien card [$450 for a renewal or replacement card]; or (g) a valid foreign passport with a valid U.S. immigration document. [Doc. 112 ¶¶ 116–17.]

State will waive the fee to obtain the underlying documentation, such as a Birth Certificate, although they allege that "this appears to be an infrequently-used option." [*Id.* ¶ 130.][15] Moreover, while driver's licenses and non-driver ID cards are initially issued only by ALEA, renewals and duplicates can be secured in each county at the offices of the judge of probate or a license or revenue commissioner. *See* Ala. Code § 32-6-4(a)(2). Plaintiffs have made no persuasive allegation that the ALEA office hours are a meaningful factor in this case.

Nor have Plaintiffs alleged plausible facts showing that an order changing the hours of operation of ALEA offices would redress the injuries they claim the Photo ID Law itself causes. Plaintiffs allege that the reduced hours "exacerbate[] the difficulties faced by African-American and Latino residents of these counties in obtaining the required photo IDs." [Doc. 112 ¶ 122]. However, they do not allege that the Photo ID Law would be constitutional if the ALEA offices were open longer. Rather, they allege that, regardless of how short or long ALEA's office

---

[15] In order to obtain a photo voter ID card, the voter must present either (1) a photo identity document, which includes (i) a high school student ID card; (ii) a student or employee ID card from a private university outside Alabama; (iii) a private employee ID card; (iv) a nursing home or hospital ID card; and (v) a wholesale club or other membership card, or (2) a non-photo identity document showing his or her full legal name and date of birth, which includes (i) Birth Certificate; (ii) Hospital or nursing home record; (iii) Marriage Record; (iv) State or Federal Census Record; (v) Military Record; (vi) Medicare or Medicaid document; (vii) Social Security Administration Document; (viii) Certificate of Citizenship; and (ix) Official school record or transcript. One must also provide documentation showing his or her date of birth, that he or she is registered to vote, and his or her name and address as they appear in the voter registration records. Ala. Code § 17-9-30(j). A copy of a birth certificate or marriage license normally costs $15.00 each. [Doc. 112 ¶¶ 129–30 & n.3, 4.]

hours, the Photo ID Law "results in Alabama's African-American and Latino (or Hispanic) voters having less opportunity than other members of the electorate to participate effectively in the political process and to elect candidates of their choice." [*Id.* ¶ 2.] That is, under Plaintiffs' view, if this Court orders extended hours for driver's license offices, the Photo ID Law would still cause injury to Plaintiffs. "Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement." *Steel Co.*, 523 U.S. at 107.

In sum, it is not just a matter of the wrong defendant when it comes to Plaintiffs' request that this Court order ALEA offices to return to normal hours of operation.[16] In any event, because Plaintiffs' request for an order restoring ALEA driver's license office hours is not plausible, Plaintiffs have not established that an Article III case or controversy exists between themselves and the ALEA Secretary.

---

[16]   The Court notes that ALEA's office hours in these counties will soon be increasing substantially, if they have not already. The United States Department of Transportation ("DOT") initiated an investigation into the closures and "concluded that African Americans residing in the Black Belt region of Alabama are disproportionately underserved by ALEA's driver licensing services, causing a disparate and adverse impact on the basis of race." [*See* Doc. 128 at 2 n.* (quoting Memorandum of Agreement Between the U.S. Department of Transportation and the Alabama Law Enforcement Agency at 1 (Dec. 22, 2016)).] DOT and ALEA agreed to a Memorandum of Agreement, which includes increased office hours in the Black Belt within 90 days. [*See* Doc. 128–1]. The DOT's conclusion was that ALEA office closures violated Title VI of the Civil Rights Act of 1964 because they limited African-Americans' access to driver's licensing offices and thus transportation. [Doc. 128–1 at 4.] No finding was made regarding whether the closures violate the VRA.

### 3.     Plaintiffs Lack Article III Standing to Pursue Claims Against the Attorney General

Plaintiffs likewise have failed to plead facts establishing standing as to the Attorney General. As they did with respect to the Governor, Plaintiffs largely rely on the Attorney General's generalized law-enforcement powers, alleging that he is a proper defendant because he "is the State's chief legal representative." [Doc. 112 ¶ 47.] However, the Supreme Court has held that a state's attorney general cannot be made a party to actions of this sort merely because he "might represent the State in litigation involving the enforcement of its statutes." *Fitts v. McGhee*, 172 U.S. 516, 530 (1899) (Eleventh Amendment case). All the considerations explaining why the Governor's general law-enforcement powers are insufficient for these purposes apply equally to the Attorney General. Plaintiffs rely upon *Georgia Latino Alliance for Human Rights v. Governor of Georgia*, where the court found that its earlier decision in *Luckey* foreclosed the Georgia Governor and Attorney General's argument that they were not proper defendants to the suit. 691 F.3d 1250, 1260–61 & n.5 (11th Cir. 2012). This conclusion is not surprising given that the *Georgia Latino Alliance* court considered a challenge to a state law that codified various crimes for interactions with illegal aliens. *Id.* at 1256. Simply put, the line of cases holding that a governor and attorney general (by virtue of their criminal law enforcement responsibilities) are proper defendants in challenges to laws *defining*

*crimes* or the administration of *criminal justice* do not overrule the separate holding that when another state official has express responsibility for enforcing a civil statute, neither a governor's general executive authority nor an attorney general's general law enforcement authority will suffice to confer standing upon them. *See Women's Emergency Network*, 323 F.3d at 949-50; *see also Shell Oil Co.*, 608 F.2d at 211 ("Nor is the fact that an attorney general has a duty to prosecute all actions in which the state is interested enough to make him a proper defendant in every such action.").

The other mentions of the Attorney General in the Second Amended Complaint make no colorable connection between him and Plaintiffs' requested injunction against the Photo ID Law. The complaint does allege that the Attorney General "was previously charged with seeking Section 5 preclearance for Alabama voting laws." [Doc. 112 ¶ 47.][17] But Plaintiffs do not seek, and could not plausibly seek, an order compelling the Attorney General to submit the Photo ID Law for

---

[17]     The complaint discusses the fact that in June 2011, when the Alabama Legislature approved, and the Governor signed, the Photo ID Law, Alabama was one of nine completely "covered state[s]" under Section 5 of the VRA, 52 U.S.C. § 10304, which meant that Alabama could not enforce any new voting law that might burden voters of color without first obtaining preclearance from the U.S. Department of Justice or a federal three-judge court. Alabama did not seek preclearance for the Photo ID Law. On June 25, 2013, the Supreme Court decided *Shelby County, Ala. v. Holder*, 133 S. Ct. 2612 (2013), which ruled unconstitutional the preclearance provision in the VRA. The next day, the Attorney General and the Secretary of State announced that implementation of the Photo ID Law would begin immediately, so that it could be enforced in Alabama's 2014 election cycle.

preclearance now that the Supreme Court has nullified that requirement. Likewise, Plaintiffs mention that the Attorney General announced that the Photo ID Law "would be implemented and enforced immediately" in the wake of the Supreme Court's decision in *Shelby County*. [*Id.* ¶ 79]. But Plaintiffs are not seeking to enjoin the Attorney General from informing the public about his understanding of what various Supreme Court decisions mean, and indeed they could not plausibly do so.

The complaint also discusses a separate bill from the Alabama House of Representatives dealing with various aspects of immigration and voter registration that Plaintiffs allege the Attorney General withdrew from the United States Department of Justice preclearance "in anticipation of the Supreme Court's decision in *Shelby County*." [*Id.* ¶ 86.] However, any causal link between failure to submit for preclearance a bill not even challenged by Plaintiffs in this lawsuit and their alleged injuries is too speculative to support standing against the Attorney General.

Plaintiffs also observe that the Attorney General issued an advisory opinion interpreting the Photo ID Law's use of the word "valid" in describing various forms of photo ID. [*Id.* ¶¶ 95, 123.] However, Plaintiffs are not seeking an order requiring the Attorney General to withdraw or revise that advisory opinion. Advisory opinions simply offer the Attorney General's interpretation of Alabama

law; they do not enforce or implement the law; and while they are persuasive, advisory opinions are not binding. *See Ala.-Tenn. Nat. Gas Co. v. S. Nat. Gas Co.*, 694 So. 2d 1344, 1346 (Ala. 1997).

Plaintiffs additionally allege that in August 2014, the Attorney General advised the Secretary of State that he was under no obligation to make a document available to Plaintiff Alabama NAACP that would purportedly show how many individuals in Alabama were registered to vote yet did not have an ALEA-issued photo ID. [Doc. 112 ¶ 114.] Yet Plaintiffs do not request this document in their complaint, nor do they indicate that receiving this document would obviate their request for an injunction of the Photo ID Law.

Finally, Plaintiffs make no argument that the Attorney General is connected in any way to the ALEA office closures, as they do with the Governor and the ALEA Secretary. In sum, peppering the complaint with mentions of things the Attorney General has done that may be tangentially related to the Photo ID Law does not fix the flaw in Plaintiffs' standing argument, which is that the Photo ID Law will be in force regardless of any action this Court could order the Attorney General (or the Governor, or the ALEA Secretary) to undertake. *See Doe v. Pryor*, 344 F.3d 1282, 1286 (11th Cir. 2003) ("Nothing the Attorney General could be

ordered to do or refrain from doing would redress the injuries [Plaintiffs] allege[
].'").

### B.    The Eleventh Amendment Bars Plaintiffs' Claims Against the State of Alabama

The Eleventh Amendment grants States and state officials sued in their official capacities immunity from suits brought by private citizens. *See* U.S. Const. amend. XI; *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 101 (1984). States can waive sovereign immunity on their own, which Alabama has not done. *See College Savings Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 670 (1999); Ala. Const. art. I, § 14 ('[T]he State of Alabama shall never be made a defendant in any court of law or equity."). Furthermore, Congress can abrogate sovereign immunity in certain situations. "In order to determine whether Congress has abrogated the States' sovereign immunity, we ask two questions: first whether Congress has 'unequivocally expresse[d] its intent to abrogate the immunity,' . . . and second, whether Congress has acted pursuant to a valid exercise of power." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 55 (1996) (quoting *Green v. Mansour*, 474 U.S. 64, 68 (1985)) (internal citations omitted).

"Congress' intent to abrogate the States' immunity from suit must be obvious from a 'clear legislative statement.'" *Id.* (quoting *Blatchford v. Native Village of Noatak & Circle Village*, 501 U.S. 775, 786 (1991)). "A general

authorization for suit in federal court is not the kind of unequivocal statutory language sufficient to abrogate the Eleventh Amendment. When Congress chooses to subject the States to federal jurisdiction, it must do so specifically." *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 246 (1985), *superseded by statute*, 42 U.S.C. § 2000d–7; *see Dellmuth v. Muth*, 491 U.S. 223, 230 (1989) ("[E]vidence of congressional intent must be both unequivocal and textual."). In cases where the Supreme Court has found that Congress has unequivocally intended to abrogate the States' sovereign immunity, the text of the statutes has been especially clear.

For example, in the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and in the Patent and Plant Variety Protection Remedy Clarification Act ("Patent Remedy Act"), 35 U.S.C. §§ 271(h), 296(a), Congress specifically stated that States were not immune from suit. *See Tennessee v. Lane*, 541 U.S. 509, 518 (2004) (quoting § 12202 of the ADA as stating, "A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this chapter."); *Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. at 635 (quoting § 296(a) of the Patent Remedy Act as stating, "Any State . . . shall not be immune, under the eleventh amendment of the Constitution of the United States or under

any other doctrine of sovereign immunity, from suit in Federal court . . . for infringement of a patent.").

Additionally, in the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and in the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, Congress specifically authorized private actions against public agencies and defined "public agencies" as States or subdivisions of States. *See Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 73–74 (2000) ("That provision [of the ADEA] authorizes employees to maintain actions for backpay 'against any employer (including a public agency) in any Federal or State court of competent jurisdiction . . .' Any doubt concerning the identity of the 'public agency' defendant named in § 216(b) is dispelled by looking to § 203(x), which defines the term to include 'the government of a State or political subdivision thereof,' and 'any agency of . . . a State, or a political subdivision of a State.'"); *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 726 (2003) ("The [FMLA] enables employees to seek damages 'against any employer (including a public agency) in any federal or State court of competent jurisdiction' and Congress has defined 'public agency' to include both 'the government of a State or political subdivision thereof' and 'any agency of . . . a State, or a political subdivision of a State.'") (citations omitted).

Here, Plaintiffs have amended their complaint to exclude the State from Counts Three and Four, which arise under 42 U.S.C. § 1983. Indeed, the State cannot be a defendant to the section 1983 claims because, as the Eleventh Circuit has held, "Congress has not abrogated eleventh amendment immunity in section 1983 cases." *Carr v. City of Florence, Ala.*, 916 F.2d 1521, 1525 (11th Cir. 1990).

The State is equally immune from the remaining two counts arising under Sections 2 and 201 of the VRA. Neither section expressly (or even impliedly) abrogates the sovereign immunity of States. While there are portions of the VRA that create express rights of action specifically against States, those provisions address actions when the United States itself, not an individual, is the plaintiff. For example, for alleged violations of Section 2, the VRA authorizes the Attorney General to "institute for the United States, or in the name of the United States, an action for preventative relief," including "an order directed to the State and State or local election officials." 52 U.S.C. § 10308(d). And the pertinent part of Section 201 of the VRA states:

> Whenever the Attorney General has reason to believe that a State or political subdivision (a) has enacted or is seeking to administer any test or device as a prerequisite to voting in violation of the prohibition contained in section 10501 of this title . . . he may institute for the United States, or in the name of the United States, an action in a district court of the United States . . . .

*Id.* § 10504. The State has no sovereign immunity to the types of suits discussed in these provisions because it has no sovereign immunity to *any* suit brought by the United States. *See United States v. Mississippi*, 380 U.S. 128, 140 (1965).

Plaintiffs emphasize that because it is now established that private individuals may bring suit to enforce Section 2 of the VRA, then a state can be a proper defendant to such a suit. Plaintiffs are correct that while Congress did not establish express rights of action for private plaintiffs under Section 2 of the VRA when the VRA was enacted in 1965, courts held, and Congress later agreed, that their private enforcement comes through implied rights of action. *See Morse v. Republican Party of Va.*, 517 U.S. 186, 232 (1996) (opinion of Stevens, J., joined by Ginsburg, J., announcing judgment of Court) ("Although § 2, like § 5, provides no right to sue on its face, 'the existence of the private right of action under Section 2 . . . has been clearly intended by Congress since 1965.'") (quoting S. Rep. No. 97 417, at 30)). However, because Section 2 of the VRA's actual text is silent as to whether it creates a private right of action, it is also necessarily silent as to the parameters of such a right, including whether sovereign immunity is abrogated. And when the text is ambiguous as to abrogation, abrogation will not be found. *See Seminole Tribe*, 517 U.S. at 55 (requiring a "clear legislative statement"); *accord Williams v. Poarch Band of Creek Indians*, 839 F.3d 1312, 1321 (11th Cir. 2016)

("'To be effective the expression of Congressional intent [to abrogate sovereign immunity of Indian tribes] must be a clarion call of clarity. Ambiguity is the enemy of abrogation.'") (quoting *Freemanville Water Sys. v. Poarch Band of Creek Indians*, 563 F.3d 1205, 1206 (11th Cir. 2009)); *accord Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 95 (1990) (holding, in the context of federal sovereign immunity, "A waiver of sovereign immunity 'cannot be implied but must be unequivocally expressed.'") (quoting *United States v. Mitchell*, 445 U.S. 535, 538 (1980)); *Dorsey v. U.S. Dep't of Labor*, 41 F.3d 1551, 1554–55 (D.C.C. 1994) (holding that "[e]ven if there is an implied right of action for damages under Title VI," a plaintiff cannot proceed against the federal government under that implied right of action because "[a] waiver of sovereign immunity cannot be implied" (internal quotation marks omitted)).[18]

The Court acknowledges that the Sixth Circuit in *Mixon v. State of Ohio* held that Section 2 of the VRA abrogates the Eleventh Amendment. 193 F.3d 389, 398

---

[18]     It is for this reason that the Court is not persuaded by Plaintiffs' argument that the Supreme Court's discussion in *Morse* controls. The Court stated that Congress's 1975 Amendments to Section 3 of the VRA to create an express private right of action "provide[d] the same remedies to private parties as had formerly been available to the [U.S.] Attorney General alone." 517 U.S. at 233. Although the implication is that after the 1975 amendments, individuals may name States as defendants in suing under Section 3, it is just that: an implication, and not even one regarding Section 2. Regardless of what the Court said in *Morse* about Section 3, the bottom line is that while the VRA provides for private plaintiff suits, either expressly or impliedly depending on the section, the VRA still does *not* provide that a nonconsenting state can be the defendant to those suits.

(6th Cir. 1999). However, that decision did not analyze the language of the VRA in depth. Instead, the court concluded that because Section 2 "specifically prohibits 'any State or political subdivision' from discriminating against voters on the basis of race," it necessarily abrogated state sovereign immunity. *Id.* (quoting 52 U.S.C. § 10301). The Sixth Circuit did not address the fact that the plaintiffs were proceeding under an implied right of action. Moreover, in *Mixon*, "the Ohio Attorney General ha[d] not [even] pressed the immunity question on appeal." 193 F.3d at 397. The decision is simply incompatible with the Supreme Court's holding that Congress must make its intention to abrogate sovereign immunity "unmistakably clear in the language of the statute." *Seminole Tribe*, 517 U.S. at 56.

Lastly, Plaintiffs point to several cases in which States, and state officials, have been sued under the VRA by private citizens, including a VRA decision of the Supreme Court in which Alabama was a party. *See, e.g., Ala. Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257 (2015)). These opinions did not confront the question before the Court: whether nonconsenting States have sovereign immunity to these implied private rights of action under Sections 2 and 201 of the VRA. To take the mere inclusion of a state or state official as a defendant in a case to mean that the deciding court ruled that Congress intended for the VRA to abrogate the Eleventh Amendment would violate the long-held principle that decisions that fail

to address an issue have no precedential value as to that issue. *See Pennhurst*, 465 U.S. at 119 ("[W]hen questions of jurisdiction have been passed on in prior decisions *sub silentio*, this Court has never considered itself bound when a subsequent case finally brings the jurisdictional issue before us."). Indeed, the most likely implication is that the State did not raise sovereign immunity as a defense in those cases, and the courts in those cases thus had no reason to address it. *See Wisconsin Dep't of Corr. v. Schacht*, 524 U.S. 381, 389 (1998) ("The Eleventh Amendment . . . does not automatically destroy jurisdiction. . . . Unless the State raises the matter, a court can ignore it.").

Because a State cannot be an unwilling defendant to the implied private rights of action under Sections 2 and 201 of the VRA, the State of Alabama is thus due to be dismissed from this action.

## C. The Eleventh Amendment Bars Plaintiffs' Claims Against the Governor, Attorney General, and ALEA Secretary

In order for the *Ex parte Young* doctrine to circumvent sovereign immunity with regard to a state official sued in his official capacity, the official must have a "special relation to the particular statute" being challenged and must have been "expressly directed to see to its enforcement." *Fitts*, 172 U.S. at 530. In accordance with that decision and the law in other circuits, the Eleventh Circuit has long held that the defendant must have at least a "connection to the enforcement of the

challenged law" beyond his or her duty to enforce state law as a general matter. *Summit Med. Assocs., P.C.*, 180 F.3d at 1341; *accord Women's Emergency Network*, 323 F.3d at 949-50; *Wasden*, 376 F.3d at 919; *Cressman*, 719 F.3d at 1146 n.8. As previously noted, the inquiry is largely the same as the one that governs standing. *See Cressman*, 719 F.3d at 1146 n.8. Sovereign immunity thus bars Plaintiffs from asserting claims against the Governor, Attorney General, and ALEA Secretary for all the reasons Plaintiffs do not have Article III standing to sue those Defendants. *See supra*, Section III.A.

## IV.   CONCLUSION

Plaintiffs' controversy in this case is with the Secretary of State, who is especially designated to implement all aspects of the Photo ID Law, which Plaintiffs challenge, and who has not contested that he is a proper defendant. Plaintiffs do not have standing to sue the Governor, the Attorney General, and the ALEA Secretary. Further, these Defendants and the State of Alabama are protected by Eleventh Amendment sovereign immunity. Therefore, Defendants' motion to dismiss will be granted and all claims against the State, the Governor, the Attorney General, and the ALEA Secretary will be dismissed. A separate closing order as to these defendants will be entered.

**DONE** AND **ORDERED** ON MARCH 1, 2017.

L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE

160704