FILED

2017 Mar-13  AM 11:39
U.S. DISTRICT COURT
N.D. OF ALABAMA



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

GREATER BIRMINGHAM
MINISTRIES, *et al.*,

     Plaintiffs,

  vs.

JOHN MERRILL, *in his official
capacity as the Alabama Secretary of
State*,

     Defendant.

)
)
)
)
)
)
)
)
)
)
)
)

2:15-cv-02193-LSC

## MEMORANDUM OF OPINION AND ORDER

## I.    Introduction

This matter is before the Court on a "Motion to Quash Subpoenas Directed to Representatives Micky Hammon, Reed Ingram, and Kerry Rich" (doc. 80) and a "Motion to Quash Subpoena Directed to Senator Gerald Allen" (doc. 151). Plaintiffs have served subpoenas *duces tecum* on several nonparty current members of the Alabama House of Representatives and Alabama Senate (hereinafter, the "Nonparty Legislators"). Through these subpoenas, Plaintiffs seek to compel the Nonparty Legislators to produce documents and communications between themselves and various other persons related to the passage of section 17–9–30 of

the Alabama Code (the "Photo ID Law"), other Alabama voter identification legislation including Senate Bill 86 of 2011, House Bill 56 of 2011, Senate Bill 256 of 2011, House Bill 293 of 2015, and any other legislation, laws, or proposals related to voter identification requirements. The Nonparty Legislators refused to produce these documents and communications, arguing that they are protected by legislative privilege.

Having reviewed the submissions by Plaintiffs and the Nonparty Legislators, and for the reasons discussed herein, the Court finds that the motions to quash are due to be granted.

## II.    Background

Greater Birmingham Ministries, the Alabama State Conference of the National Association for the Advancement of Colored People, Giovana Ambrosio, Debra Silvers, Elizabeth Ware, and Shameka Harris ("Plaintiffs") brought this suit against John Merrill in his official capacity as Alabama's Secretary of State,[1] claiming that Alabama's Photo ID Law violates the Fourteenth and Fifteenth Amendments to the U.S. Constitution, Section 2 of the Voting Rights Act of 1965 ("VRA"), 52 U.S.C. § 10301, and Section 201 of the VRA, 52 U.S.C. § 10501.

---

[1]      Plaintiffs also named as Defendants the State of Alabama, Robert J. Bentley in his official capacity as Governor of Alabama, Steven T. Marshall in his official capacity as Alabama's Attorney General, and Stan Stabler in his official capacity as the Secretary of the Alabama Law Enforcement Agency, but this Court has since dismissed those defendants.

Plaintiffs request a declaratory judgment and an injunction enjoining enforcement of the Photo ID Law.

Plaintiffs acknowledge that they issued these subpoenas to the Nonparty Legislators to support their claims of purposeful discrimination under the Fourteenth and Fifteenth Amendments and to a lesser extent their VRA claims. The Fourteenth Amendment subjects all racial classifications to strict scrutiny, and the Fifteenth Amendment prohibits abridgments of the right to vote based on race. Claims under either Amendment require proof that the law "has a discriminatory effect and that it was motivated by a discriminatory purpose" before it is considered a suspect racial classification. *United States v. Armstrong*, 517 U.S. 456, 465 (1996). To subject the Photo ID Law to strict scrutiny, Plaintiffs thus must allege and prove both elements. Moreover, they must demonstrate discriminatory motive for the entire Alabama Legislature. *See Hunter v. Underwood*, 771 U.S. 222, 228 (1985). Evidence of discriminatory motive may also bolster their VRA claims, although such violations only require discriminatory results and not proof of discriminatory motive. *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1564 (11th Cir. 1984). Plaintiffs' Second Amended Complaint contains numerous discriminatory-purpose allegations. For example, they assert that legislators made various statements that demonstrate that the Photo ID Law is the product of overt

racial animus and a deliberate strategy to suppress African-American voter turn-out. [Doc. 112 at ¶¶ 61-67, 70-72, 83-84, 88-94.] Indeed, the second heading in the "Factual Allegations" of Plaintiffs' Second Amended Complaint plainly states: "The passage of the Photo ID Law was motivated by a discriminatory purpose." [*Id.* at 22.]

The documents Plaintiffs seek from the Nonparty Legislators can generally be divided into two overlapping categories: documents relating to (1) acts that occurred during the regular legislative process and (2) the motivation for those acts. For example, documents requested that concern the regular legislative process include:

> "Documents regarding legislative procedures of drafting, introducing, debating, considering, deliberating, enacting and enforcing [the Photo ID Law], Senate Bill 86, House Bill 56, Senate Bill 256, House Bill 293 and other voter identification-related bills."

> "Documents concerning the legislative and procedural powers, responsibilities and role of House Majority Leader Hammon in drafting, deliberation, debate, consideration, passage, enactment or enforcement of [the Photo ID Law], Senate Bill 86, House Bill 56, Senate Bill 256, House Bill 293 and other voter identification legislation since January 1, 2010."

> "Documents considered by the legislators to review, analyze, or research the administration or integrity of Alabama elections."

> "Documents concerning impact of voter identification laws on voter turnout, registration, and provisional ballot usage and potential impact

on African-Americans, Latinos, racial minorities, low-income people and political groups."

"Studies, memoranda, research reports, drafts, communications or correspondence between legislators, Defendants, advisors, consultants or others, including documents related to [the Photo ID Law], Senate Bill 86, House Bill 56, Senate Bill 256, House Bill 29."

"Documents related to the number of eligible voters or registered voters who have or lack photo identification required to vote under [the Photo ID Law]."

"Communications regarding the purpose, effect or impact of [the Alabama Law Enforcement Agency] office closures."

"Documents regarding legislative agendas (e.g., Republican Handshake with Alabama)."

"Documents related to decision making concerning the schedule for implementing [the Photo ID Law]."

[*See* docs. 80-1, 80-2, 80-3, 151-1.] Similarly, the subpoenas request the following

documents concerning the underlying motivation for legislative acts:

"Statements, opinions and judgments of legislators and their offices in support of and/or opposition to, and voting histories regarding [the Photo ID Law], Senate Bill 86, House Bill 56, Senate Bill 256, House Bill 293 and legislator voting histories."

"Documents concerning communications with other legislators, constituents, lobbyists, consultants, employees, and members of the public."

"Communications related to the necessity and likelihood of passage of House Bill 293, its impact on voters or its ability to prevent alleged voter fraud."

"Documents relating to efforts to obtain or avoid preclearance of voter identification legislation."

[*See id.*]

## III.   Discussion

A party may serve a subpoena under Rule 45 of the Federal Rules of Civil Procedure to obtain "documents, electronically stored information, or tangible things." Fed. R. Civ. P. 45(a)(1)(C). The recipient of the subpoena may move to quash or modify a subpoena for four specific reasons, one of which is that the subpoena "requires disclosure of privileged or other protected matter." *In re Hubbard*, 803 F. 3d 1298, 1307 (11th Cir. 2015) (citing Fed. R. Civ. P. 45(d)(3)(A)(iii)). "The federal courts have the authority and duty to recognize claims of privilege that are valid under federal common law." *Id.* (citing Fed. R. Evid. 501). As the parties asserting a privilege claim, the Nonparty Legislators "must: (i) expressly make the claim; and (ii) describe the nature of the withheld documents . . . in a manner that . . . will enable the parties to assess the claim." *Id.* (citing Fed. R. Civ. P. 45(e)(2)(A)).

Here, the Nonparty Legislators have met their burden under Rule 45 with regard to the assertion of privilege in support of their motion to quash because they have asserted the privilege and described the nature of the documents they seek to withhold. Considering the nature of Plaintiffs' constitutional claims, which require

proof of discriminatory motive, as well as Plaintiffs' admission that they seek discovery to find discriminatory purpose or motive evidence, the Court has sufficient information pursuant to Rule 45 to assess the Nonparty Legislators' claim of privilege.

"Legislative privilege clearly falls within the category of accepted evidentiary privileges." *E.E.O.C. v. Wash. Suburban Sanitary Comm'n*, 631 F.3d 174, 180 (4th Cir. 2011). The privilege is rooted in the absolute immunity granted to federal legislators by the Speech or Debate Clause of the Constitution and exists to safeguard that immunity. *Id.* at 180–81. In *Tenney v. Brandhove*, the Supreme Court found that the Speech or Debate Clause was part of a broader common law "tradition [of legislative privilege] . . . well grounded in history" and extended the benefit of that tradition (though not the Speech or Debate Clause itself) to state legislators. 341 U.S. 367, 372–76 (1951).

In *In re Hubbard*, the Eleventh Circuit recently reaffirmed the principles that compel a vigorous application of the legislative privilege, as follows:

> The legislative privilege is important. It has deep roots in federal common law. *See Tenney v. Brandhove*, 341 U.S. 367, 372, 71 S. Ct. 783, 786, 95 L. Ed. 1019 (1951) (recognizing "[t]he privilege of legislators to be free from arrest or civil process for what they do or say in legislative proceedings"); *see also United States v. Gillock*, 445 U.S. 360, 372 n. 10, 100 S. Ct. 1185, 1193 n. 10, 63 L. Ed. 2d 454 (1980) (noting that *Tenney* "was grounded on its interpretation of federal common law"). The privilege protects the legislative process itself,

and therefore covers both governors' and legislators' actions in the proposal, formulation, and passage of legislation. *See Tenney*, 341 U.S. at 372, 376, 71 S. Ct. at 786, 788 (recognizing a legislative privilege for state legislators when acting "in the sphere of legitimate legislative activity"); *Reeder v. Madigan*, 780 F.3d 799, 800, 805 (7th Cir. 2015) (affirming the legislative privilege of state representatives and senators); *see also Women's Emergency Network v. Bush*, 323 F.3d 937, 950 (11th Cir. 2003) (holding that Florida's governor was protected by legislative immunity when signing a bill into law); *Baraka v. McGreevey*, 481 F.3d 187, 196–97 (3d Cir. 2007) (holding that a governor falls within the sphere of legislative activity when "advocating and promoting legislation"). And it does not matter to the existence of the legislative privilege that the four lawmakers were not parties to AEA's lawsuit. The privilege "applies whether or not the legislators themselves have been sued." *EEOC v. Wash. Suburban Sanitary Comm'n*, 631 F.3d 174, 181 (4th Cir. 2011); *see MINPECO, S.A. v. Conticommodity Servs., Inc.*, 844 F.2d 856, 859 (D.C. Cir. 1988).

. . .

The legislative privilege "protects against inquiry into acts that occur in the regular course of the legislative process and into the motivation for those acts." *United States v. Brewster*, 408 U.S. 501, 525, 92 S. Ct. 2531, 2544, 33 L. Ed. 2d 507 (1972) (emphasis added); *see Tenney*, 341 U.S. at 377, 71 S. Ct. at 788 (declaring "that it [i]s not consonant with our scheme of government for a court to inquire into the motives of legislators"). One of the privilege's principle purposes is to ensure that lawmakers are allowed to "focus on their public duties." *Wash. Suburban Sanitary Comm'n*, 631 F.3d at 181; *cf. Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 503, 95 S. Ct. 1813, 1821, 44 L. Ed. 2d 324 (1975) (explaining that the Speech or Debate Clause ensures that civil litigation will not "create[ ] a distraction and force[ ] Members to divert their time, energy, and attention from their legislative tasks to defend the litigation"). That is why the privilege extends to discovery requests, even when the lawmaker is not a named party in the suit: complying with such requests detracts from the performance of official duties. *See Wash. Suburban Sanitary Comm'n*, 631 F.3d at 181; *MINPECO*, 844 F.2d at 859 ("A litigant does not have to name members or their staffs as parties to a suit in order to

distract them from their legislative work. Discovery procedures can prove just as intrusive."). The privilege applies with full force against requests for information about the motives for legislative votes and legislative enactments.

803 F.3d at 1307-08, 1310. Thus, this Court's analysis begins with the premise that state lawmakers' legislative privilege is important, that it shields lawmakers from inquiries into acts that occurred during the regular course of the legislative process and from inquiries into the underlying motivations for those acts, and that one of the primary purposes of the privilege is to ensure that lawmakers are allowed to focus on their public duties without distraction and diversion.

Plaintiffs argue that these principles do not control in this particular case for several reasons. First, relying upon the Supreme Court's decision in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, Plaintiffs claim that the legislative privilege is not absolute, but qualified, and that it therefore must yield when confronted with the magnitude of the federal interest in uncovering intentional racial discrimination in voting. *Arlington Heights* set forth principles governing the analysis to undertake when a claim is made that a facially neutral law masks an invidiously discriminatory purpose on the part of the drafters of the law. 429 U.S. 252, 265 (1977). The Supreme Court instructed that in evaluating such a claim, courts must engage in a "sensitive inquiry" into whatever "circumstantial and direct evidence of intent as may be available." *Id.* at 266. According to the

Court, this evidence might include the following *non-privileged* information (1) "the historical background of the decision . . . particularly if it reveals a series of official actions taken for invidious purposes"; (2) "the specific sequence of events leading up to the challenged decision"; (3) "[d]epartures from the normal procedural sequence"; (4) "[s]ubstantive departures [as when] factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached"; and (5) "[t]the legislative or administrative history . . . especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." *Id.* at 267-68. However, the Court did *not* say that a litigant may depose a legislator to obtain information of such unlawful discriminatory motive. On the contrary, the Court made clear that utilizing a legislator to prove intent would rarely if ever be available. Given that "[p]lacing a decisionmaker on the stand is . . . usually to be avoided," it is only "[i]n some extraordinary instances [that] the members might be called to the stand at trial to testify concerning the purpose of the official action, [and] even then such testimony frequently will be barred by privilege." *Id.* at 268 & n. 18. *Arlington Heights* thus appears to require both extraordinary circumstances and an exception to the privilege in order to question a legislator concerning intent.

Plaintiffs say that a claim of racial discrimination in voting is one of those "extraordinary circumstances" mentioned in *Arlington Heights* that warrants a yield of the legislative privilege. It is true that the Supreme Court has recognized that a state lawmaker's legislative privilege must yield in some circumstances where necessary to vindicate important federal interests such as "the enforcement of federal criminal statutes." *United States v. Gillock*, 445 U.S. 360, 373 (1980). In that case, the Court held that a state legislator could not invoke legislative privilege in a case wherein he was being prosecuted for violation of a federal criminal statute. *Id.* at 374. According to the Court,

> [A]lthough principles of comity command careful consideration, our cases disclose that where important federal interests are at stake, as in the enforcement of federal criminal statutes, comity yields. . . . Here, we believe that recognition of an evidentiary privilege for state legislators for their legislative acts would impair the legitimate interest of the Federal Government in enforcing its criminal statutes with only speculative benefit to the state legislative process.

*Id.* at 373 (footnote omitted). The Court noted that a similar result had been reached in *United States v. Nixon*, 418 U.S. 683 (1974), where the President's claim of executive privilege was subordinated to the need to enforce the federal criminal laws. In reaching its decision, the Supreme Court distinguished its prior holding in *Tenney*, explaining that legislators enjoy immunity in civil cases, but that legislators cannot utilize the "judicially fashioned doctrine of official immunity . . . to

immunize criminal conduct proscribed by an Act of Congress." *Id*. at 372 (quoting

*O'Shea v. Littleton*, 414 U.S. 488, 503 (1974)). Plaintiffs have offered no support for

extending *Gillock*'s exception to the legislative privilege in criminal prosecutions to

the instant case. To the contrary, the Court explained that, for purposes of the

legislative privilege, there is a fundamental difference between civil actions by

private plaintiffs and criminal prosecutions by the federal government. *See id*. at

372–73 ("[I]n protecting the independence of state legislators, *Tenney* and

subsequent cases on official immunity have drawn the line at civil actions.").

It is also true that some district courts have found a limited exception to

legislative   privilege   in   cases   involving   legislative   redistricting,   i.e.,

"gerrymandering." This makes sense because in contrast to the case at bar, the

subjective decision-making process of the legislature in redistricting is the very

issue and crux of the constitutional challenge:

> Legislative redistricting is a *sui generis* process. While it is an exercise
> of legislative power, it is not a routine exercise of that power. The
> enactment of statutes ordinarily involves the implementation of public
> policy by a duly constituted legislative body. Redistricting involves the
> establishment of the electoral structure by which the legislative body
> becomes duly constituted. Inevitably, it directly involves the self-
> interest of the legislators themselves.

*Marylanders for Fair Representation Inc. v. Schaefer*, 144 F.R.D. 292, 304 (D. Md.

1992) (Murnaghan & Motz, JJ., concurring); *see also See Bethune-Hill v. Virginia*

*State Bd. of Elections*, 114 F. Supp. 3d 323, 337 (E.D. Va. 2015) (the reason redistricting cases are "extraordinary" as contemplated by *Arlington Heights* is because the "natural corrective mechanisms built into our republic system of government offer little check upon the very real threat of legislative self-entrenchment") (internal quotation marks omitted). If legislative privilege is raised in opposition to a discovery request in these types of cases, courts often use a balancing test to determine whether and to what extent the privilege should be honored. *See, e.g., Rodriguez v. Pataki*, 280 F. Supp. 2d 89, 100 (S.D.N.Y. 2003). Among the considerations are (1) the relevance of the evidence sought to be protected; (2) the availability of other evidence; (3) the seriousness of the litigation and the issues involved; (4) the role of the government in the litigation; and (5) the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable. *See id.* 100–01.

However one characterizes the legislative privilege, Plaintiffs offer no support for applying this balancing test in anything other than redistricting cases. Indeed, virtually all of the cases Plaintiffs cite in support concern redistricting litigation. *See Bethune-Hill*, 114 F. Supp. 3d at (Virginia redistricting case concerning state house districts); *Page v. Va. State Bd. of Elections*, 15 F. Supp. 3d 657 (E.D. Va. 2014) (Virginia redistricting case concerning congressional district);

*Favors v. Cuomo*, 285 F.R.D. 187, 219 (E.D.N.Y. 2012) (New York redistricting case concerning general assembly districts); *Baldus v. Brennan*, 2011 WL 6122542 (E.D. Wis. Dec. 8, 2011) (Wisconsin redistricting challenge); *Committee for a Fair and Balanced Map v. Ill. State Bd. of Educ.*, 2011 WL 4837508 (N.D. Ill. Oct. 12, 2011) (Illinois redistricting challenge to state congressional district boundaries); *United States v. Irwin*, 127 F.R.D. 169 (C.D. Cal. 1989) (challenge to California county redistricting plan). Even then, many courts applying a balancing test in redistricting challenges have upheld the application of legislative privilege in whole or in part. *See, e.g., Bethune-Hill*, 114 F. Supp. at 342-43 (redistricting case holding that legislative privilege does not extend to commentary or analysis following legislation's enactment, but still extends to protect "integral steps" in the legislative process); *Hall v. Louisiana*, 2014 WL 1652791, at *10 (M.D. La. April 23, 2014) (judicial redistricting case holding the privilege applies to any documents or information that contain or involve opinions or motives, including any procedures used by lawmakers in the legislative process as well as the identification of any specific legislators that were involved in any particular step in the process); *Committee for a Fair and Balanced Map*, 2011 WL 4837508, at *10 (redistricting decision holding that "the legislative privilege shields from disclosure predecisional, non-factual communications that contain opinions,

recommendations or advice about public policies or possible legislation");
*Rodriguez*, 293 F. Supp. 2d at 304 (redistricting case holding that although legislative privilege did not shield information regarding an advisory task force, it did protect information concerning deliberations of the Legislature).

In contrast, district courts have refused to abrogate the legislative privilege in cases dealing with Section 2 VRA challenges. *See, e.g., Lee v. Va. State Bd. of Elections*, 2015 WL 9461505, at *6 (E.D. Va. Dec. 23, 2015) (VRA case granting motion to quash subpoenas requesting communications between the non-party legislators and legislative employees regarding voter identification bills and related topics discussed in the Virginia Senate, and specifically rejecting the "flexible approach" applied in redistricting cases); *Marylanders for Fair Representation, Inc.*, 144 F.R.D. at 297 n.12 (rejecting NAACP's argument that inquiring into the motive behind alleged violations of Section 2 of the VRA constitutes an "extraordinary instance" described by *Arlington Heights*); *Simpson v. City of Hampton, Va.*, 166 F.R.D. 16, 18-19 (E.D. Va. 1996) (denying motion to compel production of city council documents because it found legislative privilege protected them in a Section 2 VRA challenge to the city's electoral plan as intentionally discriminatory).

In sum, this Court is not persuaded that decisions in criminal prosecutions or inapposite redistricting cases compel the broad production of documents sought in the instant case, especially in light of binding Eleventh Circuit principles with regard to the legislative privilege espoused in *In re Hubbard*.

Plaintiffs also argue that *In re Hubbard* is distinguishable because there, the Eleventh Circuit held that because the First Amendment claim at issue was non-cognizable, the subjective views of the legislators were irrelevant, while here, Plaintiffs are raising a different constitutional claim in which "inquiry into intent is necessary." *Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 485 (1982). In *In re Hubbard*, a public-sector union sought to use subpoenas directed at legislators to uncover evidence that the entire legislature had purposefully conspired to retaliate against it for past political activity in alleged violation of the First Amendment. 803 F.3d at 1301-02. The Eleventh Circuit held that the lawmakers' legislative privilege did not have to yield to the plaintiff union's subpoenas because, "as a matter of law, the First Amendment does not support the kind of claim [the union] makes here: a challenge to an otherwise constitutional statute based on the subjective motivations of the lawmakers who passed it." *Id.* at 1312. The union therefore had "no valid federal claim to justify intruding upon the lawmakers' legislative privileges." *Id.* at 1314-15. The court also cautioned that its holding was limited to

the facts before it. *Id.* at 1312 n.3. None of this alters the well-established principles underpinning the legislative privilege.

The Court recognizes that enforcing rights under the Constitution and the VRA is an important federal interest and acknowledges that evidence of discriminatory intent is essential to establish Plaintiffs' constitutional claims, albeit less relevant to their VRA claims. But Plaintiffs' own complaint reveals that they can develop evidence of motive through many of the alternative, non-privileged sources the Supreme Court identified in *Arlington Heights*. For example, Plaintiffs set forth detailed allegations regarding the history of racial discrimination in voting in Alabama; the alleged sequence of events leading to the passage and implementation of the Photo ID Law; the alleged racially charged environment in which the Alabama Legislature passed the Photo ID Law; the contemporaneous passage of the Photo ID Law and an allegedly discriminatory redistricting plan; and the alleged discriminatory statements by lawmakers. [Doc. 112 at ¶¶ 61-67, 70-72, 83-84, 88-94.] Plaintiffs are free to further delve into these sources of evidence that do not violate the privilege. *See, e.g., Simpson v. City of Hampton*, 166 F.R.D. 16, 19 (E.D. Va. 1996) ("[T]he plaintiffs in the case at bar may undertake to prove the council intended to discriminate, but their undertaking may not include the use of councils' personal notes and files.").

Nor is the Court persuaded by Plaintiffs' argument that two recent voter identification decisions with the most analogous claims to those presented here validate the importance of the type of privileged information they seek. Plaintiffs emphasize that the *en banc* Fifth Circuit in *Veasey v. Abbott* relied heavily on the deposition testimony of several Texas Senators in the context of motive evidence presented before the district court in addressing an equal protection challenge to Texas's voter identification law. 830 F.3d 216, 236-37 (5th Cir. 2016) (en banc). However, the majority opinion from the Fifth Circuit nowhere addresses legislative privilege. While the court *en banc* reversed and remanded the district court's decision striking down the law for additional consideration of other possible discriminatory motive evidence, *id.* at 272, the parties did not raise on appeal the district court's handling of the legislative privilege issue. There is thus no context provided, for example, whether the legislators chose to waive the privilege, which is their right, *see, e.g., Alexander v. Holden*, 66 F.3d 62, 68 n.4 (4th Cir. 1999). In fact, as set out in the district court's opinion, 54 of the Texas legislators either actively waived the privilege or passively waived the privilege by failing to assert it in response to inquiries directed to that question. *See Veasey v. Perry*, 2014 WL 1340077, at *2 (S.D. Tex. Apr. 3, 2014). This waiver resulted in both the trial court and the appellate court having significant deposition testimony before it. And while

the district court—in this Court's opinion erroneously—relied upon inapposite decisions such as *Gillock* and *Rodriquez*, *supra*, to conclude that on balance, disclosure of legislative documents was warranted, it still ordered that the production be done under seal and specifically reserved the issue of whether the legislative privilege should be pierced until the time of trial. *Id.* at *2-4 & n.3 (stating that "[g]iven the sensitive nature of the documents sought and the importance of preserving confidential communication among legislators, the Court is not inclined to fully pierce the legislative privilege at this point by authorizing complete and public disclosure of the documents and ESI at issue").

Although the parties did not raise the issue on appeal, the dissenters in *Veasey* nonetheless expressed concern with the district court's permitting "wide-ranging and invasive discovery into legislators' internal correspondence." *Id.* at 326 (Elrod, J., dissenting, joined by Smith, J.). Judge Edith Jones discussed the fact that legislative privilege typically precludes such invasive discovery and cited *In re Hubbard* as contrary to the district court's approach:

> In *Arlington Heights*, the Supreme Court cautioned that "judicial inquiries into legislative or executive motivation represent a substantial intrusion into the workings of other branches of government" and that "[p]lacing a decisionmaker on the stand is therefore 'usually to be avoided.'" 429 U.S. at 268 n.18, 97 S. Ct. at 565 n.18. "In some extraordinary instances . . . members might be called to the stand at trial to testify concerning the purpose of the

official action, although even then such testimony frequently will be barred by privilege." *Id.* at 268.

Since *Arlington Heights*, courts frequently rely on the legislative privilege to repel attempts by plaintiffs to subject legislators to the burdens of civil litigation. *See In re Hubbard*, 803 F.3d 1298, 1307–08 (11th Cir. 2015) (quashing subpoenas for the production of documents served on legislators and a Governor in a First Amendment retaliation case); *Reeder v. Madigan*, 780 F.3d 799, 806 (7th Cir. 2015) (dismissing, based on legislative immunity, plaintiff's claim that the Illinois Senate violated his First Amendment rights by denying him media credentials); *Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408 (D.C. Cir. 1995) (quashing subpoenas for disclosure of subcommittee documents served on members of a Congressional subcommittee by private defendants in an unrelated civil lawsuit); *MINPECO, S.A. v. Conticommodity Servs., Inc.*, 844 F.2d 856 (D.C. Cir. 1988) (same). *In this case, however, the district court disregarded this authority and opted to take a piecemeal, balancing approach to the legislators' legislative privilege.*

*Id.* at 232 n. 14 (Jones, J. dissenting, joined by Jolly, J., Smith, J., Clement, J., and Owen, J.) (emphasis added). Thus, the Fifth Circuit majority's opinion in *Veasey* provides no support for Plaintiffs' position, and the only portion of the appellate court's decision relevant to the issue before the Court is the dissent, which supports recognition of the legislative privilege in this type of case.

Similarly, while Plaintiffs point out that in *North Carolina State Conference of NAACP v. McCrory*, the Fourth Circuit's decision rested in part on record evidence produced to the plaintiffs showing that state legislators had received data from the Board of Elections and Department of Motor Vehicles on the racially

disparate impact of the challenged photo ID law, there was no statement by that court on whether privilege was asserted by the legislators with regard to this specific information. 831 F.3d 204, 230 (4th Cir. 2016). The Fourth Circuit did hold that legislative privilege barred legislators' testimony as to the purpose of the challenged law: "And, as the Supreme Court has recognized, testimony as to the purpose of challenged legislation 'frequently will be barred by [legislative] privilege.' That is the case here." *Id.* at 229 (quoting *Arlington Heights*, 429 U.S. at 268). And while the Fourth Circuit ultimately enjoined North Carolina's enforcement of its omnibus voter law, including its voter identification requirements, it did so without violating the legislative privilege to obtain evidence to establish discriminatory motive. Instead, the Court looked to other non-privileged evidence of discriminatory motive identified in *Arlington Heights*, such as the historical background of the challenged decision; the specific sequence of events leading up to the challenged decision; departures from normal procedural sequence; the legislative history of the decision; and the disproportionate impact of the official action—whether it bears more heavily on one race than another. *Id.* at 220.

A few final points remain to be made. First, the subpoenas request documents, not testimony, but the Court declines to make a distinction between

testimony and document production in the context of legislative privilege, and notes that document requests could actually pose more of a threat to the free flow of legislator communication than seeking a lawmaker's testimony. Unlike testimony, document production requires a legislator to hand over communications, such as emails, shorn of all context. *See, e.g., United States v. Rayburn House Office Bldg.*, 497 F.3d 654, 660 (D.C. Cir. 2007) ("[d]ocumentary evidence can certainly be as revealing as oral communications").

Second, the subpoenas also request that the Nonparty Legislators produce documents that they may have shared with third parties such as lobbyists, constituents, experts, or interest groups, or communications between the Nonparty Legislators and such third parties. The Eleventh Circuit has not directly addressed the issue of whether the legislative privilege extends to protect legislators from having to produce their communications with third parties. However, it has unequivocally held that "legislators' actions in the proposal, formulation, and passage of legislation" are protected by the privilege. *In re Hubbard*, 803 F.3d at 1308. The Court is of the opinion that the privilege should be applied to protect legislators from having to produce documents shared with third parties or communications between themselves and third parties where they engaged in such sharing or communications *for the purpose of exploring and formulating legislation.*

Indeed, such discussions aid legislators in the discharge of their legislative duty. *See Dyas v. City of Fairhope*, 2009 WL 3151879, at *8 (S.D. Ala. Sept. 24, 2009) ("A privilege that prohibits a plaintiff from asking a legislator what was said in the decisive meeting but allows questions concerning any potential influences on his or her decision—such as conversations with constituents, review of documents and other information-gathering, as well as potential bias—offers a legislator no protection worth having."); *Arizona v. Arpaio*, 314 F.R.D. 664, 670 (D. Az. 2016) (communications with constituents for purpose of "[o]btaining information pertinent to potential legislation or investigation" is a legitimate legislative activity protected by the federal legislative privilege); *Jewish War Veterans of the U.S. of Am., Inc. v. Gates*, 506 F. Supp. 2d 30, 57 (D.D.C. 2007) (communications with executive branch, constituents, interested organizations, and members of the public are protected by federal legislative privilege if these communications "constitute information gathering in connection with or in aid of . . . legislative acts").

Third, Plaintiffs insist that to the extent some of the requested documents and information pertain to *public* statements made by the Nonparty Legislators about the Photo ID Law or other voter legislation, surely such documents are not privileged. But Plaintiffs misunderstand that the legislative privilege protects the *process* that legislators must go through in opposing or responding to such requests

and is not simply based upon the substance of the requests. *See In re Hubbard*, 803 F.3d at 1310 (holding that one of the privilege's principle purposes is to ensure that lawmakers are allowed to focus on their public duties free from the distraction of complying with discovery requests). Legislators, and their staff members, must divert substantial time, energy, and attention from their legislative work to oppose discovery requests. Such actions deprive the legislators of the time and freedom to carry out the duties the public has entrusted to them. Plaintiffs are free to obtain any public statements made by the Nonparty Legislators from other, non-privileged, sources.

Finally, the Court declines Plaintiffs' invitation to draw an adverse inference from the Nonparty Legislators' mere assertion of the legislative privilege, as to do so would render the privilege meaningless.

## IV.   Conclusion

Because the legislative privilege protects the Nonparty Legislators from having to produce the documents requested in Plaintiffs' subpoenas, the motions to quash (docs. 80 and 151) are hereby **GRANTED**.

**DONE** AND **ORDERED** ON MARCH 13, 2017.

L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE

160704