FILED
2017 Nov-03  PM 09:54
U.S. DISTRICT COURT
N.D. OF ALABAMA

# PXO-I

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| GREATER BIRMINGHAM MINISTRIES, et al.,<br><br>  Plaintiffs,<br><br>  v.<br><br>JOHN MERRILL, in his official capacity as the Alabama Secretary of State,<br><br>  Defendant. | Civil Case No.: 2:15-cv-02193-LSC |

I declare and state the following:

1.     Attached as Exhibit 1 is a true and correct copy of the expert report that I wrote and submitted on behalf of the Plaintiffs in the above action.

2.     If called at trial, I will testify as to the facts, opinions, sources, and other information contained in my report.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my information and belief.

Executed on November 3, 2017.

J. MORGAN KOUSSER

# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

GREATER BIRMINGHAM MINISTRIES; *et al*.,

                Plaintiffs,

            v.

JOHN MERRILL, in his official capacity as the
Alabama Secretary of State,

                Defendant.

C.A. No. 2:15-cv-02193-LSC

**EXPERT REPORT OF**
**J. MORGAN KOUSSER**
**ON BEHALF OF PLAINTIFFS**

**Table of Contents**

I.      Purpose and Organization of This Report................................... p. 4
II.     Credentials.............................. ................................. ............. p. 4
III.    Summary
        A.   An Overview of the Intent of the Legislature....................... p. 6
        B.   Ten Intent Factors................................................... p. 9
        C.   A Note on Sources................................................... p. 13
IV.     The Issue of Voter ID Before 2011
        A.   Introduction......................................................... p. 15
        B.   The Voter ID Issue in the Legislature from 1995 Through 2003
             1.   1995  A Racial Split from the Start................................ p. 15
             2.   Absentee Voting Issues.................................... p. 16
             3.   1996: A Bipartisan White Push for Voter ID
                  Foiled and Foiled Again by Black Legislators................ p. 20
                  a.    Regular Session Filibuster......................... p. 20
                  b.    Special Session:  The Contrast Between Absentee
                        Ballot Reform and Voter ID...................................... p. 26
                        1)   Where There Was Some Evidence of Fraud,
                             A Bill Passed:  The Absentee Ballot Law.......... p. 26
                        2)   Partisanship, Discriminatory Intent, and the
                             Failure to Pass Voter ID...................................... p. 29
                  c.    The Lessons of '96 .................................... p. 34
             4.   The Issue of Felon Disfranchisement............................... p. 35
             5.   1997: Temporary Cease-Fire.............................................. p. 37
             6.   1998:  A Compromise Collapses in a "Racial Huff"...... p. 37
             7.   1999:  Strict Photo ID Strategy Flops...................... p. 41
             8.   2000:  The Georgia Plan, The Louisiana Plan, and
                  a Failed Logroll…………………………………….. p. 44
             9.   2001: A Rerun of 2000.................................... p. 45
             10.  2002:  Another Log-jammed Logroll Again Demonstrates
                  How Racial the Voter ID Issue Was.................................. p. 48
             11.  2003: Last-Minute Logroll, Then Veto Shows
                  Partisan and Racial Nature of Election Issues................ p. 49
        C.   The Lull from 2003 Until 2011........................................... p. 60
             1.   What Did Not Happen................................... p. 60
             2.   Revealing Referenda on Constitutional Amendments… p. 60
             3.   An Intensive Search for Fraud Turns Up Only
                  Absentee Irregularities.................................... p. 61
             4.   Inaction on Photo ID Because of Opposition from

       African-American Legislators....................................... p. 63

V.     Photo ID in the 2011 Legislature

    A.  Alabama's Second "Redemption" Fully Aligned
        Party and Race...................................................... p. 65

    B.  The Stealth Photo ID Bill in the 2011 Legislature................ p. 70

    C.  H.B. 56: "Emptying the Clip" on "Illegal Immigrants"......... p. 73

    D.  Other Actions by the Legislature and Statements
        By Key Leaders…………………........................................ p. 80

VI.    What Light Do Post-2011 Events Shed on Discriminatory Intent?

    A.  Harder to Vote………………………………………… p. 83

    B.  No More Evidence of Impersonation Fraud.................... p. 88

    C.  No "Reasonable Impediment" Exception........................ p. 88

VII.   Was H.B. 19 Passed with a Discriminatory Intent?

    A.  Models of Human Behavior………………………………. p. 90

    B.  Historical Context………………………………………... p. 93

    C.  Text of Law…………………………………………… p. 95

    D.  Basic Demographic Facts…………………………………. p. 99

    E.  Racial Climate………………………………………... p. 102

    F.  Background of Key Decisionmakers……………………….. p. 103

    G.  Other Actions of Key Decisionmakers……………………. p. 104

    H.  Statements by Important Decisionmakers…………………. p. 105

    I.   State Policies and Institutional Rules……………………... p. 108

    J.   Impact and Anticipated Impact…………………………… p. 108

    K.  Evaluation of Other Hypotheses…………………….......... p. 109

       1.  The Fraud Hypothesis…………………………… p. 109

       2.  The Partisanship Hypothesis……………………… p. 111

VIII.  Senate Factors

    A.  Modifications in the Senate Factors for this case…………… p. 112

    B.  History of Official Discrimination…………………………. p. 113

    C.  Racially Polarized Voting………………………………….. p. 116

    D.  Enhancing Provisions……………………………………… p. 116

    E.  Candidate Slating Processes……………………………... p. 117

    F.  Current Effects of Past Discrimination…………………... p. 117

    G.  Racial Appeals……………………………………………. p. 122

    H.  Election of Minority Group Members…………………….. p. 122

    I.   Unresponsiveness………………………………………… p. 123

    J.   Tenuous Policy……………………………………………. p. 126

Appendix……………………………………………………………... p. 128

# I.     Purpose and Organization of This Report

1. I have been asked by the plaintiffs in *Greater Birmingham Ministries, et al. v. John Merrill* to examine evidence related to the question of whether the photo identification law passed by the Alabama state legislature in 2011 (hereinafter referred to by its legislative designation as "H.B.19") was adopted with a racially discriminatory purpose and to write a paper summarizing that evidence, pro and con.  To do so, I have reviewed the sorts of sources conventionally used by historians in such inquiries:  legislative records, judicial opinions, depositions, scholarly papers and books, unpublished reports related to the issues in the case, and newspaper and other reports of the activities and expressions of participants in the debates over the issues.  If other materials become available in the course of discovery, I will either include them in a revised form of this paper or write a supplementary report.  As is conventional in academic papers, I will phrase the inquiry as a hypothesis to be tested and offer my judgment as to the weight of the evidence.  Presumably, other experts will examine evidence and offer conclusions, and they may differ from mine.  This report, as well as theirs, will then be considered by the judge, along with testimony and legal arguments, in order to reach a decision on the ultimate legal matter.  This report is meant to assist the judge in determining whether the H.B. 19 was adopted with a racially discriminatory purpose and whether there is evidence of a discriminatory effect.

2.  Because the evidence I will present is plentiful, complicated, and covers a long period of time, it will be useful to outline the report and to include a table of contents for easy reference.  I will begin by introducing my qualifications, followed by a relatively brief summary of the evidence.  Next, I will turn to a more intensive and detailed examination of the evidence, which will form the core of the report.  I will then, much less extensively, reorganize that evidence under ten rubrics, drawn largely from federal court opinions, that are relevant to the larger question of determining the intent of H.B.19.  I will also analyze information relevant to the "Senate Factors" to support my findings on intent and to determine whether H.B. 19 violates the "results test" under Section 2 of the Voting Rights Act.

# II.     Credentials

3.  I am a professor of history and social science at the California Institute of Technology.  Educated at Princeton and Yale, I have been a visiting professor at Michigan, Harvard, Claremont, and the Hong Kong University of Science and Technology.  In 1984-85, I was Harmsworth Professor of American History at Oxford.  As my curriculum vitae, attached, shows, I've published three books and edited another, in addition to 47 scholarly articles, 84 book reviews, and 26 entries in reference works.   I have given 79 talks at universities and 49 at scholarly conventions.  My work has focused on minority voting rights, educational

discrimination, race relations, the legal history of all of the foregoing subjects, political history, and quantitative methods.  I was editor of the journal *Historical Methods*, which specializes in interdisciplinary and quantitative history, from 2000 through 2012.  My doctoral dissertation and first book, *The Shaping of Southern Politics:  Suffrage Restriction and the Establishment of the One-Party South, 1880-1910* (1974), was the first comprehensive study of the subject.  Termed "the definitive monograph on the establishment of the one-party system in the postwar South" by the late David Donald of Harvard, and more recently, in the *Harvard Law Review*, as "still magisterial,"[1]  *Shaping* concerned the connection between party politics and the disfranchisement of African-Americans and poor whites in the late 19th and early 20th century South.  Index entries on Alabama in *Shaping* take up four and a half column inches.  My 1999 book, *Colorblind Injustice: Minority Voting Rights and the Undoing of the Second Reconstruction*, was co-winner of the annual Lillian Smith Award of the Southern Regional Council for the best book on the South and co-winner of the annual Ralph J. Bunche Award of the American Political Science Association for the best scholarly work in political science which explores the phenomenon of ethnic and cultural pluralism.  One of my most recent articles, "The Strange, Ironic Career of Section Five of the Voting Rights Act, 1965-2007," published in the *Texas Law Review*, is the first comprehensive history of the Act's first 42 years.  Another, "Do the Facts of Voting Rights Support Chief Justice Roberts's Opinion in *Shelby County*?" introduced the largest data base of voting rights and administrative actions ever compiled, covering the U.S. from 1957 through 2006.  Among my forthcoming articles is a 9000-word entry on "Voting Rights" for the *Oxford Handbook of American Political History*.

4.  I am being compensated at $400 per hour for my work on this case. My compensation is not contingent on or affected by the substance of my opinions or the outcome of this litigation. I am attaching a copy of my C.V. I have previously testified or consulted in 37 federal voting rights or redistricting cases and 15 state cases (in Alaska and California).  Many, such as the key case of *City of Mobile v. Bolden,*[2] concerned whether at-large systems of voting were adopted or maintained with a racially discriminatory intent or whether they had discriminatory effects. Others, such as *Garza v. County of Los Angeles Board of Supervisors*,[3] involved questions of "racial gerrymandering."  In some cases, such as the 2003 Texas "re-redistricting" case, *LULAC v. Perry*,[4] the sources of my testimony were primarily qualitative.  In others, such as the 2002 California state redistricting case, *Cano v. Davis*,[5] the sources of my testimony were primarily

---

[1] Richard H. Pildes, "Foreword:  The Constitutionalization of Democratic Politics - The Supreme Court 2003 Term," 118 *Harvard LR* 28 (2004), 60, n. 139.
[2] 446 U.S. 55 (1980), on remand 542 F.Supp. 1050 (S.D. Ala. 1982).
[3] 918 F. 2d 763 (9th Cir. 1990).
[4] 548 U.S. 399 (2006).
[5] 211 F. Supp. 2d 1208 (C.D. Ca. 2002).

quantitative.  My most recent testimony includes the Section 2[6] and Section 5[7] Texas redistricting cases and the 2012 Texas voter identification case,[8] and the 2014 North Carolina photo identification and election law case.[9]  I testified about both the intent and the effect of the laws in both the Texas voter ID case and the North Carolina election law case.  I have testified or consulted, often producing written reports on racially polarized voting, in at-large election cases under the California Voting Rights Act in Modesto, Hanford, Tulare County, Compton, Palmdale, Santa Clarita, the Santa Clarita Community College District, Santa Barbara, Highland, Rancho Cucamonga, Fullerton, the Fullerton School Board, and Banning.

5.  More particularly in regard to Alabama, I have served as an expert witness in four federal voting rights cases in the state: *Hunter* v. *Underwood*, 471 U.S. 222 (1985); *Mobile* v. *Bolden*, 542 F. Supp. 1050 (S.D.Ala. 1982); *Brown v. Board of School Commissioners*, 542 F. Supp. 1078 (S.D. Ala. 1982), *aff'd*, 706 F.2d 1103 (11th Cir.), *aff'd*, 464 U.S. 1005 (1983); and *United States* v. *Dallas County Commission*, 739 F.2d 1529 (11th Cir. 1984).[10]

# III.   Summary

## A.  An Overview of the Intent of the Legislature

6. When the Republicans who controlled the Alabama legislature in 2011, for the first time since Reconstruction, passed a bill requiring voters to present a photo ID before being allowed to vote, they held no public hearings, took no testimony, allowed no amendments to be offered, and engaged in only the briefest of debates.  The photo ID bill, H.B.19, "zipped through the House on a largely party line vote" on March 27 and was jammed through the Senate on the last day of the 2011 legislative session after a cloture motion cut off discussion, pro or con.[11]  There were no public forums held to justify the law, and no stage was afforded for any public criticisms.  The legislature apparently keeps no transcripts of its sessions.  Submitting the law to the U.S. Justice Department under Section 5 of the Voting Rights Act might well have stimulated debate on the purposes of the state's photo ID law.  However, Alabama did not offer up the law to federal scrutiny for more than two years, until Section 5 was rendered toothless by the Supreme Court decision in an Alabama case, *Shelby County v. Holder*, 133 S.Ct. 2612 (2013).  Thus, evidence

---

[6] *Perez v. Abbott*, No. 5:11-cv-360, 2017 WL 962947 (W.D. Tex. Mar. 10, 2017) (three-judge court).

[7] *Texas v. United States*, 887 F. Supp. 2d 133 (D.D.C. 2012) (three-judge court), *vacated*, 133 S. Ct. 2885 (2013).

[8] *Texas v. Holder*, 888 F. Supp. 2d 113 (D.D.C. 2012) (three-judge court), *vacated*, 133 S. Ct. 2886 (2013).

[9] *N. Carolina State Conference of NAACP v. McCrory*, 831 F.3d 204 (4th Cir. 2016).

[10] In addition, although I did not serve as an expert witness, my book, *The Shaping of Southern Politics*, was one of the "principal" treatises relied on by the court in *Harris v. Siegelman*, 695 F. Supp. 517, 522 n.5 (M.D. Ala. 1988).

[11] No byline, "State Legislature halfway to passing photo ID law," Albertville, AL *Sand Mountain Reporter*, March 28, 2011; No byline, "Republican-run Legislature races clock to pass agenda," *Anniston Star*, June 10, 2011.

of the intent of the law dating from 2011 is scanty, consisting primarily of other actions taken at the same legislative session.

7.  Fortunately for the inquiry into the intent of the framers of the photo ID law, its passage came as the final act in a 16-year struggle in which the debate was much more extensive and the evidence fully adequate to expose the intentions behind H.B. 19.  In broad outline, that struggle showed

  1.  that the battle over the various voter ID proposals was always primarily a racial battle;
  2.  that support for voter ID laws was common among white Democratic legislators, as well as Republicans, until in the 2010 election white Democrats were reduced to minorities of the Democratic members of both houses of the legislature – i.e., voter ID was not principally a partisan issue; and
  3.  that there was never any evidence offered of voter impersonation fraud[12] or the inadequacy of identification procedures that would lend credence to the anti-fraud justification for the voter ID proposals.

8.  The argument that the voter ID struggle primarily concerned race is based on several types of evidence:  First, black legislators always and almost uniformly opposed voter ID bills, and they continually referred to the racially discriminatory intent and effects of these bills, making it impossible for anyone to be unaware of charges that the bills were discriminatory.  Newspapers widely reported such charges and often echoed the African-American legislators.  Passing a bill that was widely thought to be discriminatory was a conscious act.  Second, only the most vehement resistance by African-American legislators, which had bipartisan support, stopped the bills from passing from 1995 until 2003.  If the bills were expected to have no racial effects, why would black legislators fight so long and so hard to defeat them?  Third, white proponents of the measures very often acknowledged the racial nature of the conflict and at times, openly acknowledged the racial intent of the bills. This record contains "smoking gun" evidence. Fourth, from 1996 through 2003, African-American legislators floated and finally succeeded in negotiating a logroll in which they offered to let a non-photo voter ID bill pass if Republicans would support a bill making it easier for those convicted of crimes of "moral turpitude" to regain their voting rights.  Since everyone in the legislature and perhaps in the State recognized that African-Americans were disproportionately likely to have been convicted of such crimes and

---

[12]  According to a study by News21, there was only one conviction for voter impersonation fraud in Alabama during the period 2000 through 2012.  In 2002, Shasta Nicole Crayton used her sister's name to vote illegally. <http://votingrights.news21.com/interactive/election-fraud-database/>.  In 2012, a man was convicted Social Security fraud and theft of government funds over his nearly 40 years of living in the U.S. under an assumed identity.  As a non-citizen, he may have been also guilty of voter fraud, but since he had identification documents, a photo ID law would presumably not have caught him.  Brendan Kirby, "Baldwin man convicted of fraud voted regularly under name of U.S. citizen, records show," *al.com*, March 6, 2012.

therefore would disproportionately benefit from a loosening of the rules for reenfranchisement, legislators implicitly and often explicitly recognized that this logroll swapped a bill that disproportionately helped black voters (felon reenfranchisement) for one that disproportionately hurt them (voter ID).

9.  Although key white Democratic leaders provided crucial opposition, particularly in refusing to schedule floor votes on the issue late in the legislative sessions in the Senate, most white Democratic legislators voted in favor of laws that allowed non-photo as well as photo IDs from 1995 through 2003.  Black legislators often stood alone or with a few white Democratic allies against all Republicans and almost all white Democrats on the measures until after 2003.  Even though Republicans were always much more strongly in favor of pure photo ID laws than white Democrats were, the issue of requiring IDs of some sort divided the legislature by race much more than by party.

10.  Proponents of voter ID laws often discuss fraud in vague, general terms.  But if we cut through the fog and concentrate on the sorts of electoral fraud that might be inhibited by a voter ID law, the discussions of the issue in Alabama over the 16-year period make clear that demonstrated fraud played no role whatsoever in the adoption of H.B. 19.

11.  First, neither the legislature nor any of the executive officers who were particularly concerned with election matters –any governor, attorney general, or secretary of state during the period – ever made public any evidence of voter impersonation fraud in the state, except for the one 2002 conviction.  Although Republican attorneys general and secretaries of state, who strongly favored photo ID laws, set up "hot-lines" for the reporting of election fraud and launched investigations into any situations that even hinted of such fraud, they never publicly announced that they had found any impersonation fraud.  In 2010, Secretary of State Beth Chapman offered a $5000 reward for reports of voter fraud that led to a felony conviction.  No one collected.[13]  In the years before (2012) and after (2014) the enforcement of the photo ID law, the Alabama Republican Party also offered a $1,000 bounty for proof of voter fraud.[14] It was never paid out.[15] Given their vociferous backing of the measures and the popularity of the issue among Republican voters and legislators, the executive officers and politicians surely had strong incentives to trumpet any evidence of impersonation fraud at full blast.  Their silence is informative.

---

[13] Rachel Slajda, "AL Secretary Of State Offers Reward For Voter Fraud Reports," *TPM Muckraker*, Nov. 1, 2010, http://talkingpointsmemo.com/muckraker/al-secretary-of-state-offers-reward-for-voter-fraud-reports.
[14] Zachary Roth, "Alabama GOP struggles to find voter fraud despite $1,000 reward," *MSNBC*, June 13, 2014 http://www.msnbc.com/msnbc/alabama-gop-struggles-find-voter-fraud-despite-1000-reward/.
[15] Document Request No. 6, Response to Subpoena to Alabama Republican Party, *Greater Birmingham Ministries v. State of Alabama*, at p. 6; Fifth Supplemental Response To Subpoena to Alabama Republican Party, *Greater Birmingham Ministries v. State of Alabama*, at p. 7.

12.  Second, although there was circumstantial and some direct evidence of "fraud" or irregulatities involving absentee ballots, that was quickly remedied by the legislature in 1996 in a bill that Republican Governor Fob James declared would cut such fraud "to a point where it should no longer be a factor."  The contrast between the legislature's decisive action on the only kind of fraud for which there was the least factual evidence and its long and bitter struggle over voter ID laws suggests that something other than a response to fraud led to the passage of H.B. 19.

13.  Third, in Texas and North Carolina before the adoption of photo ID laws, there were at least hearings at which people were allowed to testify pro and con on the issue and where general discussions of ballot fraud took place.  Nothing like this happened in Alabama for H.B. 19, though there had often been public hearings on other bills in the past.  The opponents were not able to present alternative version of the facts; rather, there were no facts presented.

14.  Fourth, Jim Bennett, the secretary of state who pushed voter ID laws from the time when he was in the state senate through his two-plus terms as secretary of state, declared during the debate that voter ID was aimed not at current, but as possible future problems – i.e., that the need for such a law was based on speculation.  And Don Siegelman, successively Secretary of State, Lieutenant Governor, and Governor, denied the need for a voter ID law because there was no evidence of voter impersonation and because, under his interpretation of the pre-2003 laws, polling place officials who doubted the identity of a potential voter could demand identification.

15.  Fifth, during the period after the passage of an ID law in 2003 that allowed a voter to use any of over 20 different IDs, only 7 of which contained photos, there was no evidence of any voter impersonation fraud or of the inadequacy of the law in preventing fraud.  The 2011 legislature made no pretense of responding to any failure of the 2003 law; it just disregarded the lack of evidence of a need for a new law and passed a Republican platform plank.

## B. Ten Intent Factors

16.  To organize and systematize inquiries into the intent of the framers of a law or redistricting plan, I set out nine "intent factors" in a law review article in 1991, basing them on Supreme Court and lower federal court opinions, as well as on law journal articles and my experience in analyzing such questions in normal scholarship and for trials.[16]  While in the central U.S. Supreme Court case on such matters, *Arlington Heights*, Justice Powell did not spend much time explaining the rationale for each factor, I tried to do so, drawing on fuller discussions in lower

---

[16] "How to Determine Intent:  Lessons from L.A.," The Journal of Law and Politics, 7 (1991), 591-732, at 704-14.

8

courts, law reviews, and historical research.[17], In my later book, *Colorblind Injustice*, I increased the number of factors to ten and expanded the discussion and examples.[18]  Because it may help the reader of this report to consider the framework before actually beginning to review the evidence in detail, I will lay out the factors and brief rationales for them here.  Further discussion and many more references to legal cases and historical examples are available in the indicated pages of *Colorblind Injustice.*

17.  The **first factor**, which underlies every causal explanation in history, is an implicit or explicit **model of human behavior**, a theory, often inchoate, of how people typically act in certain kinds of situations.  Sometimes based on empirical generalizations, sometimes, on rough analogies, sometimes, on common sense, these frameworks should not mechanically determine conclusions -- if they do, why bother about the evidence?  But they do establish baselines of initial plausibility for different possible interpretations.  On the basis of scholarly literature or other historical examples, should we, for instance, expect politicians to take their own or their party's interests into account when they shape election laws?  Should we take calls to combat "election fraud" at face value?  Should we trust that members of dominant groups will protect the interests of traditionally subordinated groups when they change election laws?

18.  The **second factor** is the **historical context**, especially the sequence of events, which is important for what it reveals about the general attitudes and interests of decisionmakers. Laws passed during periods of racial turmoil, such as the First Reconstruction or its aftermath, or the Civil Rights Era, or after an upsurge in minority voting or minority candidate success, must be viewed with suspicion.  On the other hand, "reforms" are often passed in the wake of some scandal or series of troubling events, such as a very close election.[19]  But calling something a reform does not make it so, and one should be alert to attempts to take advantage of particular situations to pass discriminatory laws.[20]  In a federal system, states may copy each other's laws, or recently, national organizations may seek to coordinate the passage of similar laws in many states.[21]  Where this takes place, a study of the intentions of the framers in one state may inform

---

[17] *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977)

[18] *Colorblind Injustice:  Minority Voting Rights and the Undoing of the Second Reconstruction* (Chapel Hill, N.C.: Univ. of North Carolina Press, 1999), at 347-58.

[19] The "Help America Vote Act," passed in the wake of the very close 2000 presidential election, is an example.

[20] The 1893 Sayre Registration and Secret Ballot Law in Alabama, on the surface part of the wave of "Australian ballot" laws passed after scandals during the 1888 presidential election, really aimed to disfranchise African-Americans and disadvantage Populists and Republicans.  As Sayre remarked to the House, his bill "would restore the [D]emocratic party in Alabama. . . . It el[i]minates  the Negro from politics, and in a perfectly legal way."  See Kousser, *The Shaping of Southern Politics:  Suffrage Restriction and the Establishment of the One-Party South, 1880-1910* (New Haven, Connecticut:  Yale University Press, 1974), 134-38.

[21] According to the non-profit investigative organization News21, more than half of the 62 voter ID laws introduced in 37 states in the 2011 and 2012 legislative sessions were sponsored by attendees at conferences of the American Legislative Exchange Council (ALEC), and many followed the organization's model law.  Ethan Magoc, "Flurry of Voter ID laws tied to conservative group ALEC," NBC News, Aug. 21, 2012, available at

the analysis of the intentions of the framers in another state. Just as important is a historical context in which there seems to be no particular reason for a regulation, a change in the electoral rules that does not result from any crisis or inadequacy in the laws.  In such a case, as with H.B. 19 in 2011, it is only prudent for an observer to be skeptical of the proffered justifications for the law.

19.  The **third factor** should be the **text** or provisions of the law or regulation, or, in the case of alleged racial gerrymandering, the pattern of the lines, compared to ethnic geography.  An example with particular resonance in Alabama was the addition of some, but not other misdemeanors to the list of felonies for which men were disfranchised by section 182 of the 1901 Alabama constitution.  This selectivity was taken to be an indication of racially discriminatory intent by the Supreme Court in *Hunter* v. *Underwood*, especially since one of the misdemeanors appended was miscegenation, a racist "crime" for which white men were rarely convicted in the South.[22]  The choice of which identification cards to require voters to produce in H.B. 19 would also fall under this rubric.

20.  The **fourth** variety of evidence is **basic demographic facts.**  A rising and/or concentrated minority population, or populations whose depressed educational and economic levels reflect the vestiges of past and present racial and ethnic discrimination are facts that politicians can be expected to observe, and that, therefore, should be assumed to affect their design of electoral rules and structures.  The universally-known fact that African-Americans in Alabama have always been poorer than whites and that they have less access to automobiles should be taken into account in any assessment of the intention of the legislature in making it necessary to travel long distances to obtain photo IDs.  The associated and easily-verified fact that African-Americans are less likely than whites to have the most common form of photo identification, a driver's license, sheds light on the motivation for a law that makes a photo ID necessary to vote.

21.  The **fifth factor** is the **climate of racial politics**, which is usually indicated by two basic political facts, the number of minority candidates elected and the approximate extent of racial polarization among voters.  Such facts must be assumed to condition the expectations of officials who frame or maintain electoral arrangements. Blacks and their white allies dominated offices in the Alabama Black Belt during Reconstruction.  Although little direct evidence survives about the reasons for moves to substitute appointive for elective local governments in Dallas and other counties, historians have never doubted that racially discriminatory purposes underlay such laws. That all of the officers appointed were white -- a dramatically disproportionate racial effect -- is, of course, what primarily convinced historians of the racist intent of the provisions.[23]  The

---

<http://investigations.nbcnews.com/_news/2012/08/21/13392560-flurry-of-voter-id-laws-tied-to-conservative-group-alec> .

[22] *Hunter* v. *Underwood*, 471 U.S. 222 (1985), at 226-28.

[23] As one Alabama legislator later remarked, "Dallas asked us to strike down the officials they had elected in that county, one of them a Negro that had the right to try a white man for his life, liberty, and property. . . when we saw

extreme racial polarization in voting in Alabama during the Obama years casts a shadow over the motives for the passage of electoral laws.

22.  A **sixth factor** is the **background of key decisionmakers**, because it may reflect on their motives in particular instances. The principal framer of section 182 of the 1901 Alabama constitution, John Fielding Burns, was a planter and longtime magistrate in then-80 percent-black Dallas County, who presided over a local court where most defendants were black. Burns's experiences reduced the plausibility of the argument of the defendants in *Hunter v. Underwood* that the section was aimed principally at poor whites.

23.  Like their backgrounds, the **seventh factor**, **other actions of decisionmakers,** may be indirect indicators of their general attitudes toward minority groups.  The actions of the same body or of significant members of it on racially-tinged legislation, such as H.B. 56, the 2011 Alabama bill aimed at primarily Latino "illegal immigrants," casts light on the intentions with which the legislators acted generally.  In this instance, the open ethnic antipathy surrounding H.B. 56 makes it more difficult to credit claims of non-racial motives for H.B. 19.

24.  The **eighth factor**, **statements by important participants**, which are referred to as "smoking gun" evidence if they are sufficiently incriminating, are difficult to come by, especially for laws passed in the very recent past.  Given the care with which litigation-conscious legislators typically speak these days, those few statements that admit racial motives attract and should attract extraordinary attention.  On the other hand, all statements by participants in events must be interpreted with due caution and skepticism, because they may be misleading in three ways.  First, they may simply forget, or say they forget, why they acted.  Second, people may have, or say they have, several motives for acting, and they may retrospectively weigh one sort of intention differently than they actually did when they acted.  Third, people may try to appear to be lambs, when they are, or were actually, wolves.  There is generally much less reason to trust sworn statements made after the events, which are generated as part of a judicial process aimed at discovering whether people acted with racially discriminatory purposes or not, than there is to trust statements and evidence of behavior gathered at the time when the events took place, which are often recorded only in newspapers.

25.  **State policies and** formal and informal **institutional rules** constitute the **ninth** general category of relevance.  If every city or county in a particular state has exactly the same electoral structure, it is difficult to argue that one locality adopted that structure for a different purpose than the rest did.  Formal rules and less formal legislative norms also help to shape explanations. If a legislature changes a long-standing rule on the number of votes in a body that is necessary to take up a bill, as Texas did in 2009, or if repeated cloture motions prohibit any debate on controversial bills at all, as in Alabama in 2011, observers may conclude that they need to look beneath bland, civics-textbook justifications of the laws.

---

the life, liberty and property of the Caucasians were at stake, we struck down in Dallas county the Negro and his cohorts.  We put men of the Caucasian race there to try them."  Quoted in Kousser, *Colorblind Injustice*, at 33.

26.  Whether or not elections have been held under the system being evaluated, there is a **tenth factor**, the **impact** of the adopted rule, that overlaps with several of the previous nine.  This may be prospective, concerned with the expected impact of a proposed law, even before it goes into effect or even if it initially fails. The rationale for using effect as a measure of intent is that, especially with electoral rules, framers may be assumed to be aware of and calculate the consequences of their actions carefully and to be quite good at such calculations.  Often, the legislative record, official or unofficial, will make clear that the impact in question was fully foreseen, at least by opponents of the measure.  That was certainly the case with H.B. 19.

## C. A Note on Sources

27.  Much of the detailed discussion in this report is based on articles that appeared in newspapers, documents that historians usually must rely on in researching what happened in legislatures or Congress, and which I have used extensively in my academic research and in previous expert witness reports in legal cases.  At times, lawyers for the opposing side have challenged such documents as unsworn and second-hand "hearsay."  They would confine the evidence in cases about discriminatory intent to transcripts of official proceedings or hearings and to depositions of important parties, though it is my understanding that defendants and several state legislators in this case have claimed that "legislative privilege" prevents plaintiffs from questioning or obtaining private documents from those parties.

28.  I have relied so much on newspapers for three reasons.  First, they represent standard evidence in my academic field, and to fail to consult them would undermine any claim to the expert nature of a report.  A forensic scientist called as an expert in a legal case would be expected to employ the usual tools of her trade in reaching conclusions.  A chemist could hardly be barred from conducting and reporting on experiments in a similar circumstance.  An engineer examining the reasons for a bridge collapse or an automobile crash would draw on the tools and methods of his field.  If newspapers are approached skeptically and used carefully, they fill the same purpose as sources and methods in other fields, and if they are quoted and cited explicitly, as they are in this report, they may be checked in exactly the same way as reports by forensic scientists, chemists, or engineers can be.

29.  Second, people forget details. Extensive contemporaneous reports of legislative or extra-legislative actions provide much more detail and are likely to be much more reliable than fallible memories allow years afterwards.  Can someone be expected to remember exactly what he and every other legislator said about a bill in 1995, what identification documents qualified one to vote in a bill in 1998, whether a bill in 1999 failed because of a filibuster or the refusal of a Rules Committee to schedule floor debate, or what the nature was of negotiations over an ex-felon voting bill and a voter ID bill in 2002?  Without contemporary newspapers, such knowledge would be almost entirely inaccessible.  For example, in the current litigation, Senator Hank

Sanders and Senator Scott Beason, central players in the long struggle over voter ID laws in Alabama, could not precisely recall many details of the struggle during his deposition without examining newspapers to jog their memories.[24]

30.  Third, witnesses have an incentive to distort or claim forgetfulness in the midst of litigation. If the central question in a matter of litigation is whether some legislative act had a discriminatory purpose, is any statement by a participant really credible or even informative, however large the stack of *Bible*s it is sworn upon?  In a deposition in the Texas voter ID case, then-Sen. Dan Patrick, now the Texas Lieutenant Governor, was asked about the intent of the voter ID law, SB 14.  Here are some of the questions and responses from that deposition, with the comments and cautions of attorneys omitted:

> Q. And what was the purpose of SB 14? . . . A. To ensure the integrity of the ballot box.
> Q. And in your opinion, would the integrity of the ballot box be ensured by presenting a
> photo ID before receiving a ballot? . . . A. The purpose of the bill is to ensure the integrity of the voting process, of the ballot box. . . .
> Q. Was any part of the purpose of SB 14 to decrease the number of Hispanics voters? . . .
> A. The specific purpose of the bill was to protect the integrity of the ballot box.
> Q. Was any part of the purpose of  SB 14 to decrease the number of any other group of
> minority voters from voting?
> A. The purpose of the bill was to protect the integrity of the ballot box.
> Q. Was any part of the purpose of SB 14 to discriminate in any way against any group of minority voters?
> A. The purpose of the bill was to protect the integrity of the ballot box.
> Q. Was any part of the purpose of SB 14 for partisan purposes?
> A. The purpose of the bill was to protect the integrity of the ballot box.[25]

31.  Fourth, many of the most important events and statements in the struggle over the Alabama voter ID laws, photo and non-photo, took place away from the legislative floor or the courtroom, and even those actions that played out in committee hearings or on the floor were very seldom officially reported or, apparently, preserved in any form.  Without newspaper sources, the evidentiary record in this case would be thin gruel, indeed, and judgments would be almost entirely speculative and uncheckable.

32.  The conclusion must be that the use of newspapers as a source for this and similar reports in this case is not only absolutely necessary, but desirable.  While of course specific newspaper articles or my interpretation of them are subject to the ultimate interpretation of a judge acting as

---

[24] This is not meant to be a criticism of Senators Sanders or Beason, both extremely busy men.  Using documents to refresh memories is a common practice in depositions.
[25] Deposition of Sen. Dan Patrick in *Texas v. Holder*, at 158-62, in possession of the author.

a fact-finder, any general attempt to dismiss newspaper articles as sources of information is neither intellectually sound nor consistent with the best practices of historians.

# IV.    The Issue of Voter ID Before 2011

## A.  Introduction

33.  In every legislative session from 1995 through 2003, the Alabama legislature fought bitter and often very close battles over the issue of voter ID.  In 1996, in fact, it was one of two topics of a special session of the legislature.  During these eight years, African-American legislators fought against the efforts of white legislators, both Democrats and Republicans, to pass both photo and non-photo ID laws.  While there was a dearth of statements about and actions on the voter ID question in 2011, there was a plethora on the same issue in previous years, sometimes involving key actors from the 2011 session.  Although there were no amendments allowed to the photo ID bill in 2011 in either committee or floor sessions, the deviations from a strict photo ID requirement in previous bills and amendments, as well as the 2003 law, which allowed 14 different non-photo means of identification, help to illuminate the purposes of H.B.19.  The connections of the voter ID issue in the years before 2011 to the racially-linked question of easing restrictions on voting by ex-felons, a measure pushed strongly by African-American legislators, and the much easier resolution of efforts to regulate absentee ballots, also strengthen the case for a racially discriminatory intent of the Photo ID law.  It will therefore be worthwhile to pay careful attention to the years before 2011, for the issues were the same, some of the major players were the same, and the evidence about intent is much more plentiful.

## B.  The Voter ID Issue in the Legislature from 1995 Through 2003

### 1.  1995: A Racial Split from the Start

34.  Although bills requiring Alabama voters to present some form of identification before casting ballots were introduced by white Birmingham Republican Rep. George G. Seibels, Jr. in 1986 and white Birmingham Democratic Sen. Jim Bennett in 1988, the issue did not attract major attention and support until 1995.[26]  The spur, according to Bennett, who by then had been elected Secretary of State, was the passage of the National Voter Registration Act (NVRA, better known as "Motor Voter") in 1993.[27]  When it went into effect in 1995, the NVRA allowed people to register not only at motor vehicle, welfare, and other departments in each state, but also by submitting easily-available applications by mail.[28]  The Bennett-sponsored bill, which the *Birmingham* News said required only "some form of identification,"[29] was unanimously

---

[26] Jim Carns, "The case for a voter ID law," *Huntsville Times*, Feb. 22, 2001; Stan Bailey, "Leaders Push Photo ID for Voting," *Birmingham News*, Jan. 10, 1998.

[27] No byline, "Legislature in Brief, *Birmingham News*, May 5, 1995.

[28] For provisions and explanations of the NVRA, see https://www.justice.gov/crt/national-voter-registration-act-1993-nvra.

[29] Editorial, "Show ID, Then Vote:  Secretary of State Bennett's Plan Will Make Voter Fraud Harder to Pull Off," *Birmingham News*, May 21, 1995.

approved by the Senate Constitution, Campaign Finance, Ethics and Elections Committee on May 4 by an 8-0 vote, as well as by the relevant House committee.[30]

35.  At the end of May, the same Senate committee split 4-3 in endorsing a stricter ID bill by white Republican Senator Larry Dixon of Montgomery.  Dixon and three white Democrats favored Dixon's bill.  In the first of many racial divisions on the issue, the three African-Americans on the committee, Democrats Rodger Smitherman of Birmingham, Charles Steele of Tuscaloosa, and Michael Figures of Mobile, all voted nay.  "It's going to keep legitimate people from voting," claimed Smitherman.[31]  Any historian seeking to determine whether a voter ID law had a racially discriminatory intent would find quite instructive the fact that the first time such a measure was seriously considered by the Alabama legislature, it completely polarized legislators by race.

36.  But neither form of the requirement came to a vote on the floor of either house of the legislature, instead dying "a quiet death" at the end of the session.[32]  While it is unclear whether it was a filibuster or a refusal of the legislative leadership to bring the bill to the floor that led to its demise, it was certain that, as the *Birmingham News* later summarized events, "The bill died after running into opposition from Democratic legislators who felt it was an attempt to keep poor blacks from voting."[33]

## 2. Absentee Voting Issues

37.  Because the issue of regulating absentee voting was considered alongside of the voter ID issue in two 1996 legislative sessions, it is necessary to provide some background before treating those sessions.

38.  What forced the legislature to deal with its absentee voting regulations was an extremely close election for Chief Justice of the Alabama Supreme Court between Democrat Sonny Hornsby and Republican Perry O. Hooper, Sr. in 1994.  Although the state election code required absentee ballots to be notarized or signed by two witnesses,[34] the Alabama Supreme Court had for many years liberally construed provisions of the law, as that court put it in 1995, "to accomplish the purpose for which they were adopted: to protect and further a citizen's right to vote. [citation omitted] Alabama's law has long been that 'a voter should not be disfranchised by a rejection of his ballot, in whole or in part, when it is clear that he made an honest effort to comply with the law and has *substantially complied* with its mandatory requirements.'"[35]  Thus,

---

[30] No byline, "Legislature in Brief, *Birmingham News*, May 5, 1995.
[31] Associated Press, "Panel OKs voter ID bill," *Huntsville Times*, June 1, 1995.
[32] Editorial, "Voter ID:  Legislature Decides Showing Identification Is Too Much To Ask of a Voter," *Birmingham News*, July 27, 1995.
[33] No byline, "James to Introduce Voter ID Law," *Birmingham News*, Dec. 5, 1995.
[34] Ala.Code Section 17-10-7 (1980), quoted in *Roe v. State of Alabama I*, 43 F.3d 574, 577 (1995).
[35] *Roe v. Mobile County Appointment Board*, 676 So.2d 1206, 1221 (1995), quoting *Campbell v. Jefferson County*, 216 Ala. 251, 251 (1927).

when Hooper sought to enjoin the counting of 1700 unwitnessed, un-notarized absentee ballots in the Montgomery County Circuit Court, that court refused the request, citing Alabama Supreme Court opinions as recent as the 1993 case of *Williams v. Lide*.[36]  Instead of appealing to the state supreme court or using the state's contest procedures, Hooper and the Republicans filed for an injunction against counting the 1700 ballots in federal district court and won a series of district and Eleventh Circuit court decisions.[37]  Even though the ballots were never counted and Hooper was declared the winner, the series of contradictory judicial decisions demanded legislative clarification:  Exactly what validation was necessary for an absentee ballot to count?

39.  It should be noted that the Hornsby-Hooper controversy did not involve voter impersonation or any other kind of election fraud.  As the Alabama Supreme Court put it, "There was no evidence that any uncounted vote was tainted in any way.  There was no evidence of voter fraud.  There was no evidence that any irregularities in any uncounted ballot affected the sanctity of the ballots in any way.  There was no evidence that the integrity of the election would be affected by the counting of these ballots."[38]

40.  But there had for some years been controversies over possible absentee ballot fraud, especially involving African-American voters in a set of small, poverty-stricken Black Belt counties,[39] and the necessity of legislative action to avoid the possibility of a repeat of the Hornsby-Hooper chaos inevitably opened up issues of fraud, as well.

41.  Beginning in 1982, allegations of absentee ballot fraud in the rural Black Belt counties took on explicit racial overtones.[40]  To black and white civil rights activists and black legislators, the unusually large percentage of absentee votes cast in overwhelmingly black, rural counties such as Bullock, Greene, Hale, Lowndes, Perry, Sumter, and Wilcox reflected the facts that many older, very poor, sometimes illiterate, and often sick or disabled persons with no access to public transportation lived far from voting places.  Only a few years removed from an era when no or very few blacks had been allowed to register to vote in these counties,[41] African-Americans in

---

[36] 628 So.2d 531 (Ala. 1993).

[37] *Roe v. State of Alabama I*, 43 F.3d 574 (1995); *Roe v. State of Alabama II*, 52 F.3d 300 (1995); *Roe v. State of Alabama III*, 68 F. 3d 404 (1995).

[38] *Roe v. Mobile County Appointment Board*, 676 So.2d 1206, 1212 (1995).

[39] The "Black Belt" of Alabama is a region of 18-23 counties stretching from east to west across the southern part of the state.  Originally named because of the color of its fertile soil, it became the center of cotton production and therefore slavery during the antebellum period. After the Civil War, its population remained heavily black. Eventually, cotton left, but many African-Americans stayed, and the term came to refer to the region's demographic composition, rather than to its topsoil type.

[40] Michelle Ye Hee Lee, "The facts about the voter fraud case that sank Jeff Sessions's bid for a judgeship," *Washington Post*, Nov. 28, 2016.

[41] Before the passage of the Voting Rights Act in 1965, the number of African-Americans registered to vote in these seven counties amounted to 6.1% of the black voting age population in 1960.  Probably because of failure to purge the rolls of people who had died or moved away, the number of whites registered in those counties amounted to 111.6% of the white voting age population in 1960.  In two counties, Lowndes and Wilcox, no blacks at all had

this area put their trust in political/social organizations begun in the civil rights era and often still headed by leaders who had emerged in the 1950s and 1960s.

42.  Like civic-conscious, largely white political clubs from the Progressive Era through the 1970s,[42] the Perry County Civic League and similar, largely black groups in other counties endorsed slates of candidates and circulated slating cards to encourage bloc votes for their endorsees.  People who followed the lead of the clubs often accepted the help of leaders in voting absentee if they could meet the state's very stiff qualifications to vote before election day, which required applicants to swear that they would be out of the county on election day, had a physical illness or infirmity, would be working a shift during the time polls were open, were a student resident elsewhere, or were connected with the armed forces and stationed outside of the county.[43]  As competition heated up between established leaders of both races and other black factions in these counties, both sides strained for every vote and each side questioned the other's methods.  Unfortunately for the activists, their opponents had the ears of state and federal prosecutors.[44]

43.  To critics, the black activists were "ballot brokers"[45] who applied for absentee ballots on behalf of others, then told them how to vote or actually marked the ballots for them, and finally, collected the ballots and delivered them to local post offices.  Sometimes, it was charged, activists applied for and voted absentee ballots without the knowledge of the voters.

44.  In the 1980s, these controversies led to a series of racially-tinged state and federal prosecutions of civil rights activists.  In 1982, the State prosecuted Maggie Bozeman, the president of the Pickens County NAACP, and Julia Wilder, the president of the Pickens County Voters League.  Bozeman and Wilder were convicted by all-white juries for their alleged

---

managed to register.  See U.S. Commission on Civil Rights, *Political Participation* (Washington:  U.S. Government Printing Office, 1968), 224-26.

[42] On "reformist" civic political clubs during the Progressive Era, see the classic article by Samuel P. Hays, "The Politics of Reform in Municipal Government in the Progressive Era," *Pacific Northwest Quarterly*, 55 (1964), 159-69; on competing slating groups in Dallas, Texas, institutions which played a large role in the central voting rights case of *White v. Regester*, 412 U.S. 755 (1973), see Amy Bridges, *Morning Glories:  Municipal Reform in the Southwest* (Princeton, N.J.:  Princeton University Press, 1997), 176-80.  The point is that the Perry County Civic League was following a well-established and generally celebrated pattern in American political life.

[43] Ala. Code 1975, Section 17-11-3.  According to the 1980 U.S. Census, 31% of the working population in Perry County worked outside the county, and 15% of the residents of the county were over 65 years old.  Allen Tullos, "Crackdown in the Black Belt," *Southern Changes*, 7, #1 (1985), 1-5, available at http://southernchanges.digitalscholarship.emory.edu/sc07-1_1204/sc07-1_008/Southern Changes.

[44] Peggy Sanford, "Witnesses:  Voter Probe Race-Tainted," *Birmingham News*, June 28, 1997.

[45] Bill Poovey, "James' election bills easily pass House.  Package touted as way to ensure 'honest elections' faces tougher road in Senate," *Mobile Press-Register*, July 20, 1996.

"solicitation of 39 absentee ballots among elderly and illiterate blacks."[46]  On the day of their conviction, according to the *New York Times*,

> The largely black crowd of nearly 300 courtroom spectators was visibly upset with the judge's decision to jail the women, and their angry outburst drowned out Judge Clatus Junkins's call that the court had not yet recessed. The crowd rose from benches and began chanting the old civil rights movement song, "We Shall Not Be Moved." They were immediately separated from the women and court officers by Alabama state troopers sent here to back up the local police.[47]

A federal court overturned their convictions in 1984 after it found that the two had been unconstitutionally "tried for offenses for which they were never charged."[48]

45.  When, later, the U.S. Department of Justice indicted, but failed to convict three African-American activists (the "Marion Three") for absentee ballot fraud, the issue was seen through racial lenses.[49]  It was the first prosecution of civil rights activists for voter fraud since the passage of the Voting Rights Act in 1965.  Ironically, it used provisions of that Act not to protect African-American voting rights, but to prosecute them, and it was widely expected to be the first of many such prosecutions in at least five Black Belt counties.[50]  The most prominent of the "Marion Three" was Albert Turner, who was clubbed by Alabama State Troopers at the Edmund Pettus bridge on "Bloody Sunday" in Selma in 1965, a former aide to Martin Luther King, Jr., and state director of the Southern Christian Leadership Conference (SCLC) until 1972.[51]  After the Justice Department failed to convict him, Turner and others filed a federal lawsuit against the U.S. Attorney General, charging that the Department had selectively prosecuted black activists for assisting black absentee voters, while ignoring similar efforts by others to assist white absentee voters.  Although a federal district court dismissed the lawsuit, the Eleventh Circuit reinstated the complaint in 1987.[52]  In the same year, the Eleventh Circuit overturned the conviction of another SCLC activist, Spiver Gordon, on charges of mail fraud and providing

---

[46] Reginald Stuart, "2 Alabama Rights Workers are Jailed for Voting Fraud," *New York Times*, Jan. 11, 1982; Art Harris, "Pickens County Flare-Up:  The Story of 2 Blacks Found Guilty, *Washington Post*, Feb. 6, 1982.

[47] Reginald Stuart, "2 Alabama Rights Workers are Jailed for Voting Fraud," *New York Times*, Jan. 11, 1982.

[48] "Alabama civil rights activist Maggie Bozeman dies," *Tuscaloosa News*, Aug. 29, 2004; *Bozeman v. Lambert*, 487 F.Supp. 1021 (M.D. Ala. 1984), aff'd 762 F.2d 1022 (11th Cir. 1985).

[49] For the background of politics in the Black Belt in the 1970s and 1980s and a detailed treatment of the trial of the "Marion Three" by a shrewd participant-observer, see Lani Guinier, *Lift Every Voice:  Turning a Civil Rights Setback into a New Vision of Social Justice* (New York:  Simon and Schuster, 1998), 183-219.  Much of the material in this paragraph draws on information in Guinier's account.

[50] Allen Tullos, "Crackdown in the Black Belt," *Southern Changes*, 7, #1 (1985), 1-5, available at http://southernchanges.digitalscholarship.emory.edu/sc07-1_1204/sc07-1_008/Southern Changes.

[51] Ellen Nakashima and Sari Horwitz, "Trump's pick for attorney general is shadowed by race and history," *Washington Post*, Dec. 24, 2016.

[52] See *Smith v. Meese*, 821 F.2d 1484, 1486 (11th Cir. 1987); Laughlin McDonald and Daniel Levitas, *Vote:  The Case For Extending And Amending The Voting Rights Act* (Atlanta, ACLU Voting Rights Project, 2006), 40-45.

false information to election officials, and it remanded the case to the district court to consider Gordon's claim of selective prosecution.  In a chilling echo of the deeper Jim Crow Era, the Circuit Court opinion took note of a statement by a U.S. Justice Department spokesperson that the investigations of black activists in Alabama were occasioned by "arrogance on the part of blacks."[53]

46.  Eventually, the Justice Department decided to drop its case against Gordon, and Turner and the others let their selective prosecution suit against the Attorney General go, as well.[54]

47.  Although such prosecutions dwindled for a decade, they did not entirely cease.  After an extensive federal/state investigation, two African-American officials in Greene County were convicted in federal court in 1997 of a series of absentee ballot offenses, and even though there was evidence that they were singled out for prosecution, when black and white members of an opposing political faction had also engaged in possibly illegal practices in the hotly-contested local elections, the Eleventh Circuit Court of Appeals affirmed their convictions on most counts.[55]  Later, nine more members of  the black Alabama New South Coalition pled guilty to absentee ballot offenses, while no members of the opposing, integrated faction, Citizens for a Better Greene County, were indicted.[56]

48.  Even before anyone was convicted of absentee ballot fraud, many felt that the frequent pattern of unusually high percentages of absentee voting in some Black Belt counties was damning enough by itself to require the legislature to stiffen regulations for absentee voting.[57]

### 3.  1996:  A Bipartisan White Push for Voter ID Foiled and Foiled Again by Black Legislators

#### a.  Regular Session Filibuster

49.  Fob James, Democratic governor from 1978 through 1982, then Republican governor from 1994 through 1998, and throughout, in the words of political scientist Patrick Cotter, "controversial and unpopular,"[58] had failed to provide much support to the voter ID bill in

---

[53] *U.S. v. Gordon*, 817 F.2d 1538, 1540 (11th Cir. 1987), *vacated in part on other grounds* 836 F.2d 1312 (11th Cir. 1988); see also *U.S. v. Hogue*, 812 F.2d 1568 (11th Cir. 1987).

[54] Laughlin McDonald and Daniel Levitas, *Vote:  The Case For Extending And Amending The Voting Rights Act* (Atlanta, ACLU Voting Rights Project, 2006), 40-45.

[55] See *U.S. v. Smith*, 231 F.3d 800 (11th Cir. 2000).

[56] Hans A. von Spakovsky, "Absentee Ballot Fraud:  A Stolen Election in Greene County, Alabama," *Heritage Foundation Legal Memorandum*, No. 31 (Sept. 5, 2008), 7.

[57] Editorial, "Banana Republic:  Civic-Minded Alabama Citizens Have Been Victimized by a Well-Oiled System of Voting Fraud," *Birmingham News*, July 14, 1996.

[58] Patrick R. Cotter, "Alabama:  From One Party to Competition and Back Again," in Charles S. Bullock III and Mark J. Rozell, *The New Politics of the Old South*, 5th ed. (Lanham, Maryland:  Rowman & Littlefield, 2014), 78.

1995.[59]  Along with Secretary of State Jim Bennett, Gov. James paid more attention to voter ID in 1996.  That year's bill, sponsored by white Democratic Rep. Jack Venable of Tallassee, allowed anyone to vote if they presented one of at least nine forms of identification, including not only a driver's license or other form of photo identification, but also a library card, a Social Security card, a food stamp card, or a voter registration card. (Table 1, below, collects information on the forms of identification authorized under voter ID bills in legislative sessions from 1996 through 2001.  Table 2, later in this report, summarizes similar information on voter ID bills from 2002 through 2011.)  The voter ID bill passed the House on April 11, 57-34, with support from 32 white Republicans and 25 white Democrats.  Ten white Democrats and 24 black Democrats constituted the opposition.  Ten white and three black Democrats did not vote. [60]

50.  But the voter ID bill ran into trouble in the senate from black members and from former state attorney general and secretary of state Don Siegelman, who presided over the senate as holder of the extremely powerful office of Lt. Gov.  African-American senators, in the summary of a reporter from the *Birmingham News*[61], "say they fear the bills would create a new hurdle for the less-educated and elderly in the voting process."  Siegelman was just skeptical that in-person voting was a problem:  "I've never heard one complaint from election officials of somebody trying to vote that shouldn't vote," he said.[62]  As the state's former chief election official, Siegelman could speak with some authority on the issue.  Although Siegelman later said that senators were working on a compromise on the voter ID law at the last moment, the session expired without any progress on the bill,[63] which in any case would have had to return to the House for further action in the very tail-end of the session.

51.  The absentee voter bill, which reaffirmed the previous law's requirement of two witnesses or a notary stamp and specifically rejected the state supreme court's "substantial compliance" standard, passed the House even more overwhelmingly than the voter ID did.  No black House member voted for the bill, though five did not vote.  White legislators split 70-4 in favor of the

---

[59] Editorial, "ID Makes Sense with Bennett and James Pushing, Voter ID May Pass This Time Around," *Birmingham News*, Dec. 6, 1995.
[60] Associated Press, "House votes to reinstate absentee rules," *Mobile Press-Register*, April 12, 1996; David White, "House Approves Bill to Require Witnesses for Absentee Ballots," *Birmingham News*, April 12, 1996.  Because I could not find copies of bills that failed to become law, and because some original bills were amended during a legislative session, I have had to rely on sometimes incomplete reports in newspapers for the documents that were allowed as identifying in each of the numerous bills considered over the years.  Though not optimal, these sources are adequate to demonstrate the major point at issue – that before the final bill in 2011, a much larger range of documents qualified for identification.  Severely narrowing the range of documents, as the legislature did in 2011, is an important fact bearing on the legislature's purpose.
[61] Since there are no transcripts of floor debates in Alabama, reports in the newspapers, used carefully and cross-checked when possible, are the only source for most legislative debates, and historians have long employed them for that purpose.
[62] Michael Sznajderman, "Outlook Poor for Voter ID, Better on Absentee Fix," *Birmingham News*, May 13, 1996.
[63] Michael Sznajderman, "Session Ends Without Action on Absentee Voter Law," *Birmingham News*, May 21, 1996.

bill, and three did not vote.  Since there were only 32 Republicans, all white, in the House,[64] 38 white Democrats must have supported the bill.  Black legislators promised to prevent preclearance of the bill by the Justice Department.[65]

52.  Black senators tried unsuccessfully to negotiate a compromise.  Michael Figures, D-Mobile, the President Pro-Tem of the Senate, proposed to leave the two-signature or notary requirement intact, but require election officials to check with voters who sent in incomplete absentee ballots to confirm their votes if an election was challenged and if there were enough incomplete absentee votes to determine the outcome.[66]  Under this scheme, the law would have been clarified, but unintentional mistakes would not have negated the voter's intention.  But the compromise silently failed, and Gov. James, who had not put much emphasis on the absentee ballot and voter ID laws during the legislature's regular session, decided to call a special session focusing only on those two issues.

---

[64] The party composition of the Alabama state legislature is given in U.S. Census 2000, Table 469, available at http://www.allcountries.org/uscensus/469_composition_of_state_legislatures_by_political.html.
[65] AP, "House votes to reinstate absentee rules," *Mobile Press-Register*, April 12, 1996; David White, "House Approves Bill to Require Witnesses for Absentee Ballots," *Birmingham News*, April 12, 1996.
[66] Michael Sznajderman, "Outlook Poor for Voter ID, Better on Absentee Fix," *Birmingham News*, May 13, 1996.

# Table 1:

# Forms of Identification Required in Particular Bills, 1996-2001

| ID | Year | | | | | |
|---|---|---|---|---|---|---|
| | 1996[67] | 1996 Special Session[68] | 1998[69] | 1999[70] | 2000[71] | 2001[72] |
| **Driver's License** | x | x | x | x | x | x |
| **Passport** | x | | x | x | x | x |
| **Free ID from Dept. Public Safety** | | | x | x | x | x |
| **Government Photo ID from U.S. or any State** | | | | | | |
| **Employee Photo ID from Any Agency of U.S., AL, or any AL Local Jurisdiction** | | | | | | |
| **AL College Student Photo ID** | | | x | x | x | x |

---

[67] David White, "House Approves Bill To Require Witnesses For Absentee Ballots," *Birmingham News*, April 12, 1996.

[68] John Peck, "Senators threaten filibuster of session over voter ID plan," *Huntsville Times*, July 17, 1996.

[69] Stan Bailey, "Leaders Push Photo ID For Voting," *Birmingham News*, Jan. 10, 1998; no byline, "State Senate Oks voter ID bill," *Anniston Star*, Feb. 13, 1998, no byline, "A sham voter ID bill," *Huntsville Times*, Feb. 15, 1998.

[70] John Peck, "Bill would make voters use photo ID," *Huntsville Times*, April 8, 1999.

[71] No byline, "Acceptable identification," *Mobile Press-Register*, April 19, 2000.

[72] David White, "State Voter ID Plan Passes House, *Birmingham News*, Feb. 14, 2001; Alan Choate, "House Oks bill giving felons vote," *Mobile Press-Register*, Feb. 14, 2001.

23

| Military Photo ID |  |  |  |  | x | x |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |

| ID | Year |  |  |  |  |  |
|---|---|---|---|---|---|---|
|  | **1996** | **1996 Special Session** | **1998** | **1999** | **2000** | **2001** |
| **Tribal Photo ID** |  |  |  |  |  |  |
| **Recognition by 2 Election Officials** |  |  |  |  |  |  |
| **Challenged or Provisional Ballot** |  | x |  |  |  |  |
| **Employee Photo ID** |  |  |  |  | x | x |
| **Other Photo ID** |  |  | x |  |  |  |
| **State or U.S. Government ID (photo or non-photo)** |  |  |  |  | x | x |
| **Birth Certificate, Certified** | x | x |  |  | x | x |
| **Court Records Showing Adoption or Name Change** |  |  |  |  | x | x |
| **Naturalization Papers** |  |  |  |  | x | x |
| **Government Check Listing** |  |  |  |  |  |  |

| Name, Current Address | | | | | | |
|---|---|---|---|---|---|---|
| **Work ID** | | x | | | | |
| **Voter Registration Card** | x | x | x | | | |
| | | | | | | |
| **ID** | **Year** | | | | | |
| | **1996** | **1996 Special Session** | **1998** | **1999** | **2000** | **2001** |
| **Medicare Card** | | | x | | | |
| **Social Security Card** | x | x | x | | x | x |
| **Food Stamp Card** | x | x | | | | |
| **Medicaid Card** | | x | x | | | x |
| **Welfare ID** | | x | x | | | |
| **Marriage License** | | x | | | | |
| **Credit Card** | x | x | x | | | |
| **Check-Cashing Card** | | | x | x | x | x |
| **Bank Statement** | | | | | | |
| **Electronic Benefits Transfer Card** | | | | | | |
| **Current Utility Bill** | | | | | | |

25

| | | | | | |
|---|---|---|---|---|---|
| **Hunting or Fishing Licence** | | | | | x | x |
| **Pistol Permit** | | | | | x | x |
| **Pilot's Licence** | | | | | x | x |
| **Other Form of ID** | x | | | x (set by SOS) | | |
| **Affidavit and birthdate, address, or other info.** | | | x | x | x | x |
| **Library Card** | x | x | x | | | |

### b.  Special Session:  The Contrast Between Absentee Ballot Reform and Voter ID

### 1)  Where There Was Some Evidence of Fraud, A Bill Passed:  The Absentee Ballot Law

53.  To guide the special session, Gov. James appointed a former legislator, Kerry Rich, as his new legislative liaison.  Rich's assumption of this position at this time insures that he was not only especially concerned with the issue of voter ID, but also that he was familiar with all of the positions of all of the players, the tactics they used, and the arguments they made, because it was a very hard-fought, close battle, and he was hired specifically to oversee the Governor's effort to pass these two bills.  It was an important background for Rich, the author of H.B. 19 in 2011, and understanding it is crucial for anyone seeking to evaluate the intent behind that piece of legislation.

54.  Democrats, especially white Democrats, were even more likely than in the regular session to vote for absentee ballot and voter ID bills, because they worried that James and Rich would use the special session to cast Democrats as defenders of election corruption and Republicans as civic-minded reformers.  As the (white) Democratic Party State Chairman, Joe Turnham, wrote in a memo to Democratic House and Senate members, which was leaked to the press, "It is of urgent importance that Democrats be the champions of election reform debate and not allow Republican operatives to steal public opinion from us on a subject we should own. . . .Bottom line, Democrats must emerge from this special session as the public champion for election integrity. To allow ourselves to be negatively defined and maneuvered in this session could prove politically damaging to candidates in November."[73]

---

[73] John Peck, "Voting reforms surrounded by politics," *Huntsville Times*, July 21, 1996.

55.  During the 12-day special session, Gov. James, Lt. Gov. Siegelman, and Secretary of State Bennett split over the absentee ballot law.  James pushed not only for clarification of the witness/notary standard, but also to require any voter who was going to be out of the county on election day to cast their ballot on only two days, the Saturday 10 days before election day or the Tuesday 7 days before.  Under the law then current, such voters could deposit their absentee ballots any business day over the 40 days before the election.[74]  Since in 1994, about 70% of people casting absentee ballots did so because they were going to be out of the county on election day,[75] this provision would have made it significantly harder to vote.

56.  By contrast, Siegelman and Bennett favored a bill by Sen. Dewayne Freeman, D-Huntsville, which would have required each county to keep at least one polling place open for a period from 20 days before through 5 days before an election to allow people to vote.  Drawn up by the Secretary of State's office and a committee of county probate judges, this "early voting" measure, Bennett declared, would both increase turnout and cut down on the use and abuse of absentee ballots, and therefore on the opportunity for vote fraud.[76]  Contradicting his Secretary of State, James opposed the bill on the grounds that keeping polling places open for such a long time might boost the potential for tampering with ballot boxes.[77]  While the governor ignored the potential impact of early voting and the other bills on voting participation, African-American Sen. Hank Sanders, D-Selma, noting that only 16% of the state's registered voters had cast ballots in the most recent primary runoff election, contended that "The major problem is the voters aren't going in at all."[78] Although Sanders, Siegelman, and most other Democrats favored early voting, Republicans filibustered the bill in the senate, and a cloture motion on Freeman's bill fell 4 votes short of the needed 21 (of a total of 35 senators) to cut off debate.  The bill died, as a similar bill strongly backed by Bennett had in 1995.[79]

57.  Fearing that the overloaded James-backed absentee voting bill would arouse too much opposition to pass, Jack Venable, D-Tallassee, re-introduced his no-frills absentee voting bill, which had failed in the regular session.  Venable's bill simply reaffirmed the witness/notary

---

[74] David White and Michael Sznajderman, "Election Session Following Two Paths," *Birmingham News*, July 19, 1996.

[75] Philip Rawls, "Democrats question James' bills," *Huntsville Times*, July 18, 1996.

[76] John Peck, "James urged to push 'early voting'," *Huntsville Times*, July 1, 1996; Jim Bennett, "Early Voting:  It's Most Important Election Reform During Special Session," *Birmingham News*, July 21, 1996.

[77] No byline, "Other Bills Facing Special Session," *Birmingham News*, July 18, 1996.

[78] Bill Poovey, "Black lawmakers oppose voter identification proposal.  Selma's Sanders, others say some voters will be intimidated by change," *Mobile Press-Register*, June 30, 1996.

[79] AP, "Early voting bill stalls in Senate," *Huntsville Times*, July 23,1996; Editorial, "Early Voting?  Bennett's Plan Will Reduce Absentee Voting Abuse, But There Are Concerns," *Birmingham News*, March 2, 1995; Tom Gordon, "Bennett Still Favors Early Voting as Absentee Ballot Cure," *Birmingham News*, Aug. 14, 1995.

standard of existing law.[80]  After Gov. James personally lobbied wavering Democrats, Venable's bill failed in the House by one vote, 48-47.[81]  The House then passed James's absentee ballot bill, which was sponsored by white Democrat Richard Laird of Roanoke, by a 76-21 margin, with 43 Democrats and 33 Republicans in favor and 21 Democrats opposed.[82]  The Democratic leader in the House, Mike Box, D-Mobile, told a reporter that the governor's strategist, Kerry Rich, had informed Box that James wanted his bills to pass the House largely unchanged because "they expected to be forced to compromise in the Senate."[83]

58.  Rich was well-informed.  The Senate Elections Committee even went so far as to invite as a witness Ms. Sarah Duncan of Eutaw, vice chair of the Greene County Racing Commission, whose graphic testimony defended both the current absentee voting law and practices under it. Claiming that she had been investigated by the FBI five times in 20 years and never charged with an offense, Ms. Duncan said, in a reporter's summary, that

> "in a typical election she helps hundreds of people, many of them elderly, sick or illiterate, cast absentee ballots." Absentee ballots aren't so easy to get. People have to know you and trust you, she said.
>
> Ms. Duncan said she'll remind some people when it's voting time again, while others contact her and ask her to come by again and help them vote. Ms. Duncan said she often tells people the candidates she supports, but often doesn't have to do it. "They'll tell me they want to vote exactly the way I vote: "I've trusted you all these years. However you want, that's the way I want to vote,' Ms. Duncan said."[84]

Black Sen. Charles Steele, D-Tuscaloosa told a reporter that many African-Americans preferred to vote absentee because they remembered that even when they could finally register to vote, white officials tried to scare them away from the polls.  "You have people in the district I represent who are fearful to walk into the polls by themselves because they are afraid someone is going to beat up on them."[85]  Duncan's and Steele's comments make clear how important African-American political leaders thought absentee voting was to their communities.  The fact that they were willing to compromise on absentee voting, but not on voter ID emphasizes just how much greater they believed the effect on black voting of a voter ID bill would be.

---

[80] David White, "James:  Deal Only with Election Bills at Special Session," *Birmingham News*, July 17, 1996; David White, "Election Bill Battle Brewing; Key Lawmakers Say James May Get Only One Plan Passed," *Birmingham News*, July 18, 1996.

[81] David White, "House Leader Says Senate Likely to Alter Election Bills," *Birmingham News*, July 21, 1996.

[82] Bill Poovey, "James' election bills easily pass House.  Package touted as way to ensure 'honest elections' faces tougher road in Senate," *Mobile Press-Register*, July 20, 1996.  Though newspaper sources that I have examined do not give a racial breakdown, it is likely that the 21 votes in opposition were cast by black legislators.

[83] David White, "Governor Urges Senate to Pass 2 Election Bills House Has Ok'd," *Birmingham News*, July 20, 1996.

[84] David White, "Senate May Vote on Voter Bills," *Birmingham News*, July 23, 1996.

[85] Phillip Rawls, "Senate Oks amended ballot bill," *Huntsville Times*, July 24, 1996.

59.  Despite a black filibuster led by Sen. Hank Sanders, proponents of James's absentee ballot bill gained two votes in excess of the 21 needed for cloture, and James was able to declare at least a partial victory in the session.[86]  Guessing imprecisely that the number of fraudulent absentee ballots in a typical election ranged from 1000 to 10,000, the governor announced that the absentee fraud problem had been solved.  "[I]t should be cut to a point where it should no longer be a factor," he said.[87]  Combined with the fear or caution induced by state and federal investigations, the new law's prohibition of the practice of allowing people to apply for absentee ballots for other voters or for a voter to apply for an absentee ballot for more than one election at a time drastically reduced the number of absentee voters.  In Greene County, for example, 30% of the votes cast in the 1994 general election had been absentee ballots; in 1996, only 5%.  In Hale County, the totals were 20% and 4%, in 1994 and 1996; in Bullock County, 19% and 5%; in Lowndes County, 16% and 7%; in Wilcox County, 18% and 5%; and all-white Winston County, 15% and 6%.[88]  Whatever the nature of what was perceived as absentee ballot fraud, the Democratic-majority legislature had dealt with it, and the only type of vote fraud that had been documented in this period of Alabama history had been virtually eliminated.

### 2)  Partisanship, Discriminatory Intent, and the Failure to Pass Voter ID

60.  The struggle over the voter ID was much more complicated.  The fact that white Democrats overwhelmingly backed some type of absentee ballot legal change, but finally would not provide enough votes in the senate to shut down the black filibuster[89] indicates that skepticism about the existence of voter impersonation fraud overcame their desire to appear to be on the right side of "election reform."

61.  While Republicans in general preferred a strict photo ID requirement, they knew that it would be fruitless to propose such a law, because Louisiana's photo ID law had been refused preclearance by the Justice Department in 1994 under Section 5 of the Voting Rights Act on the grounds that it was "likely to have a disproportionately adverse impact on black voters in the state. . ."[90]  To have adopted the law in the face of the objection to their sister state's statute would have indicated an intention to establish a practice recognized as discriminatory by the federal agency charged with enforcing the Act.  Had Alabama passed the law at this time, it

---

[86] Since there were 8 black senators during this session, and the bill finally passed by 28-5, at least 1 African-American senator must have supported the absentee ballot law.

[87] Philip Rawls, "James won't call for another special session," Huntsville Times, July 27, 1996.

[88] Tom Gordon, "Absentee Ballot Use Falls From '94 to '96," Birmingham News, Feb. 1, 1997.

[89] Since all Republicans in the legislature favored Gov. James's voter ID bill, only 6 of 22 Democrats in the Senate must have been willing to vote for cloture on the measure.  For the cloture vote, see AP, "Fob loses his fight for voter ID bill.  Lawmakers give up and end special session," Mobile Press-Register, July 26, 1996.

[90] For the Alabama legislature's awareness of the objection to the Louisiana law, see AP, "Black lawmakers oppose voter identification proposal.  Selma's Sanders, others say some voters will be intimidated by change," Mobile Press-Register, June 30, 1996.  The Department of Justice objection letter is available at https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/LA-2250.pdf.

would no doubt have had to divulge the fact, published in a 1991 law review article based on information from the Alabama Department of Public Safety, that 90% of white eligible voters, but only 74% of black eligible voters, currently possessed Alabama driver's licenses.[91]   That racial contrast would have raised additional flags at the Justice Department.

62.   What propelled the Republicans to action, senate sponsor Larry Dixon, R-Montgomery, remarked, was the fact that the NVRA allowed voters to register by mail.  The voter ID bill, according to Dixon, "is a measure that is definitely being used to make sure the motor voter law is not used to fill up the voter rolls with people registered under more than one name."[92]   More revealingly, the Chairman of the Republican State Committee, Roger McConnell of Mobile, said Republicans were uneasy about the types of people who registered under the NVRA because "**Those people have not been voting with us.**"[93]   Expanding on McConnell's statement, the political editor of the *Mobile Press-Register* explained that

>      "When you cut to the chase, Gov. Fob James' special legislative session on voting reform is all about poor folks and whether they should be voting in Alabama.
>      About 180,000 Alabamians have joined the ranks of registered voters for this fall's election, and the Alabama Republican Party would rather most of them stay home Nov. 5. The Democratic Party would be happy if all of them voted. . . .
>      The bulk of these new voters are presumed to be black and poor, and therefore likely to vote Democratic. That's what the Democrats are counting on. That's what the Republicans fear."

63.   In addition to the open expression of partisan motives for voter ID, the session also produced two exceptionally important statements about the intentions of two central champions of voter ID laws, Secretary of State Jim Bennett, who had been pushing for such a law since 1988 and who continued to do so until his retirement as Secretary of State in 2002,[94] and State Senator Larry Dixon, the chief Republican sponsor of voter ID bills in the senate in every session from 1995 through 2003.[95]   Like Lt. Gov. Siegelman, Secretary of State Bennett was not aware of any instances of voter impersonation.   "**It is in the area of absentee voting - voting done out of sight - where most of our problems originate,**" Bennett wrote in an op-ed in the Birmingham News,   "**not in voting at the polls.**"[96]   As Bennett's spokesman Steve Prince told a reporter in

---

[91] Dayna Cunningham, "Who are to be the Electors," 9 *Yale Law and Policy Review*, 370, 390, n. 118 (1991), citing telephone interview with Mary Holt, Asst. Manager for Data Information, Alabama Dept. of Public Safety.
[92] John Peck, "Senators threaten filibuster of session over voter ID plan," *Huntsville Times*, July 17, 1996.
[93] Gene Owens, "Poor GOP's plan aims to limit poor voters," Mobile Press-Register, July 17, 1996.  Emphasis added.
[94] Matthew Korade, "State lawmakers award 'the Shroud'," *Anniston Star*, April 21, 2002.
[95] Phillip Rawls, "Feds must approve law on voter ID," *Huntsville Times*, June 23, 2003.
[96] Jim Bennett, "Early Voting:  It's Most Important Election Reform During Special Session," Birmingham News, July 21, 1996.

1996, a voter ID law was "**more to cover a potential loophole in the future**."[97]  Dixon, who declared again and again that he favored a pure photo ID law,[98] accused Democrats of blocking absentee voter and voter ID bills for partisan reasons, but he added an explicit racial component. "The way the absentee ballot situation is now and **the fact you don't have to show an ID is very beneficial to the black power structure** and the rest of the Democrats,"[99] Dixon told a reporter, in as close to a "smoking gun" statement of a racially discriminatory intent as one is likely to find in the post-Civil Rights Movement era.

64.  As in 1995 and in every subsequent consideration of a voter ID measure through 2011, African-American legislators charged that the principal purpose behind each bill was racial discrimination, and that each would have a racially discriminatory impact.  For example, Rep. Alvin Holmes, D-Montgomery, "said the voter identification measure is a thinly veiled effort to discourage and turn back blacks from the polls."[100]  Senate President Pro-Tem Michael Figures, the highest ranking African-American in the legislature, "predicted some form of James' absentee ballot bill will pass, but he said he and others will fight the ID bill because it harkens back to the days of poll taxes and literacy tests."[101]  Sen. Hank Sanders, D-Selma, who led the successful black filibuster against the voter ID law, described the bill as a throwback to the days when nearly all Alabama blacks were disfranchised.  "It will discourage people who have been hassled half their lives and don't want any more hassle, with the perception of the state of Alabama being what it is."[102]  White proponents of voter ID rarely addressed the black criticisms directly, contenting themselves with statements like that of Gov. James, when he promised to bring up the measure again:  "Voter ID will strengthen the integrity of the voting process."[103]

65.  While charges of racial or any other intent by opponents of a bill do not by themselves prove the intent of proponents of the measure, their constant repetition – the statements here or paraphrases of them could be multiplied almost endlessly – do show that proponents had to have been aware of these glosses on their intentions.  The facts that the only consistent opponents of the bills were black, and that they were so adamant for so long against attempts to pass the bills not only by Republicans, but also by white Democrats, strengthens the case that the African-American legislators' opinions are relevant to whether Alabama adopted voter ID for a racially discriminatory purpose.

---

[97] AP, "Black lawmakers oppose voter identification proposal.  Selma's Sanders, others say some voters will be intimidated by change," *Mobile Press-Register*, June 30, 1996.  Emphasis added.

[98] For instance, in 2000, he declared that "Photo ID is a must . . . I'm not prepared to water down that provision." John Peck, "Panel sends voter ID measure to Senate," Huntsville *Times*, Feb. 16, 2000.

[99] John Peck, "GOP senators advise delay of session," *Huntsville Times*, July 4, 1996.  Emphasis added.

[100] John Peck, "Senators threaten filibuster of session over voter ID plan," *Huntsville Times*, July 17, 1996.

[101] AP, "James urges passage of voting bills.  Governor says his aim is to prevent a repeat of 1994 'fiasco'," *Mobile Press-Register*, July 18, 1996.

[102] AP, "Fob loses his fight for voter ID bill.  Lawmakers give up and end special session," *Mobile Press-Register*, July 26, 1996.

[103] David White, "James Lauds Session Despite ID Failure," *Birmingham News*, July 26, 1996.

66.  In other instances, charges about the intent and effect of a voting law by those who opposed it have helped to illuminate the proponents' intentions.  When the Democratic Party of Alabama sought to call a constitutional convention in 1901, the Party's platform pledged "not to deprive any white man in Alabama of the right to vote."[104]  Nevertheless, Populist and Republican delegates to that convention, such as Newman H. Freeman of the traditionally Republican county of Winston, charged again and again that the constitution would disfranchise many whites.[105]  These charges must be assessed in light of a suffrage article containing a cumulative poll tax, which was designed to discourage every poor person from voting and a "fighting grandfather clause" that was set to expire after the first few years, which would leave future poor whites at the mercy of a literacy or property test.  Together, the opposition rhetoric and the provisions of the law support the proposition that the framers of the 1901 constitution wished to disfranchise some whites, along with the vast majority of African-Americans.  The parallel to the struggle over voter ID bills from 1995 to 2011 is close.

67.  One other comment from a principal in the 1996 debates on voter ID needs to be spotlighted.  Lt. Gov. Siegelman, who as a former Secretary of State was in a position to know, declared that a voter ID law was unnecessary because, in the summary of an Associated Press reporter, "He said election officials have the power now to require someone to produce an ID if they believe the person is not the one listed on voting records."[106]  Given that this was true under the law in 1996,[107] then even Bennett's "potential loophole" had never had any prospect of being open, the specter of new NVRA mail registrants was a chimaera, and the purposes of passing such a law other than a desire to counteract fraud in the present or future gain plausibility.  The chimaera became even more of a fantastical animal after the passage of the Help America Vote Act in 2002, which required mail-in registrants to provide a Photo Id or a copy of a current utility bill,

---

[104] Quoted in Malcom C. McMillan, *Constitutional Development in Alabama, 1798-1901:  A Study in Politics, the Negro, and Sectionalism* (Chapel Hill, N.C.:  University of North Carolina Press, 1955), 254-55.

[105] See, for instance, *Official proceedings of the Constitutional Convention of the State of Alabama, May 21st, 1901, to September 3rd, 1901* (Wetumpka, Ala.:  Wetumpka Printing Co., 1941), III, 2809-11.

[106] Philip Rawls, "Siegelman wants changes in proposed voting bills.  James plans special session to address absentee ballots, voter identification; moves target date up to 'September or late August'," *Mobile Press-Register*, June 1, 1996.

[107] Under a 1978 law, Ala. Code 1975, Section 17-4-127 (1978), a voter challenged by election officials because her name did not appear in the poll book in the beat could be required to show a voter registration certificate:

> It shall be unlawful for any elector to cast his or her ballot during any general election, primary election, municipal election or special election in any precinct, any district, any ward or any other subdivision where his or her name does not duly appear upon the official list of such precinct, district, ward or subdivision.  All ballots cast in any election contrary to the provisions of this section are hereby declared illegal and, upon a contest duly instituted, such ballots shall be excluded in determining the final result of any election; provided, *that nothing in this section shall prevent any qualified elector residing in said precinct, ward or voting district from voting after presenting a proper certificate from the board of registrars*, or from voting a challenge ballot with the proper officials of said box or voting place.  (emphasis added)

The procedure for challenging and identifying voters was laid out in detail in *Hawkins v. Persons*, 484 So. 2d 1072, 1072-73 (Ala. 1986) ("If a challenged elector refuses to take the oath or fails to properly identify himself, his vote should be rejected and not counted.")

bank statement, government check, or other government document containing their name and address.[108]

68. Like James's absentee voter bill, the voter ID bill that James put forward was studded with provisions that multiplied opposition. One promised one to ten years in jail for any election official who failed to ask a voter for identification – a sure way to make volunteers for the underpaid job more difficult to recruit. Another allowed voters from any part of the county to serve as polling place officials, rather than requiring them to live in the precinct, which would likely have placed white officials in many black precincts in the still-segregated state. To Jack Venable, chair of the House Elections Committee, these provisions were needless: "I have a fear that he's put so many things in them, you're just waving a red flag and creating more opposition," Venable remarked.[109] Secretary of State Bennett, the longtime sponsor of voter ID laws, agreed with Venable, saying that James's absentee ballot and voter ID bills "go beyond what's necessary to effect clean-cut reform."[110]

69. As with the absentee voting bill, James's voter ID measure nearly lost in the House, which rejected Venable's simpler bill by only 46-43. Even then, House members amended James's proposal by allowing someone who did not present one of the numerous forms of identification documents to vote if a polling official knew the person.[111] With this amendment, the House approved the voter ID bill by 68-29 – a margin 8 votes less than that for the absentee voting bill. The 29 nay votes were all from Democrats, while 35 Democrats and 33 Republicans voted yea.[112] (For the provisions of the James-backed measure, see Table 1, above.)

70. The first senate action on the voter ID bill in the special session reflected bipartisan white support and black opposition, as 11 white members of the Senate Elections Committee voted in favor and the 2 black members opposed, charging that the bill was "designed to intimidate black voters."[113] Faced with a limited time for the session and by an all-out filibuster by the senate's 8 black members, Kerry Rich and Gov. James threw out a series of possible compromises and entered into semi-public negotiations with senators and with Joe Reed, the Vice-Chair of the Democratic State Committee and a longtime black political leader in the state. One proposal that the Administration offered would have made presentation of an ID necessary only if polling officials doubted the voter's identity and would have authorized a broad range of acceptable documents, including "food stamp cards, Medicare cards, a driver's license, social

---

[108] See  the Alabama law bringing the state into compliance with HAVA, Act 2003-313, Section 17-20-4.

[109] David White, "James:  Deal Only with Election Bills at Special Session," *Birmingham News*, July 17, 1996.

[110] David White and Michael Sznajderman, "Election Session Following Two Paths," *Birmingham News*, July 19, 1996.

[111] David White, "Governor Urges Senate to Pass 2 Election Bills House Has Ok'd," *Birmingham News*, July 20, 1996.

[112] Bill Poovey, "James' election bills easily pass House.  Package touted as way to ensure 'honest elections' faces tougher road in Senate," *Mobile Press-Register*, July 20, 1996.

[113] David White, "Senate May Vote on Voter Bills," *Birmingham News*, July 23, 1996.

security cards and others," according to a *Huntsville Times* report.  Another would have limited the ID requirement to first-time voters.[114]  A third would have forced initial registrants, but not voters, to present some form of identification.  A fourth would have delayed implementation of any identification requirements until after the November, 1996 election.  In an attempt to corral the necessary 21 votes for cloture, James sent a state plane to bring one senator back to Montgomery and "twisted arms, promised roads and they still don't have the votes," said Sen. Jack Biddle, R-Gardendale.[115]

71.  After a full day of filibustering in public and negotiating in private, the Administration went so far as to propose an amendment that would have restored voting rights automatically to all convicted felons who finished their prison terms and paid all fines.  But Republican senators strongly opposed the felon voting compromise, and James quickly disavowed it.[116]  When James insisted on a provision that would have required every polling place to have a paid member of each political party present as poll watchers, instead of having each party pay for poll watchers, if they wanted them present at a particular polling place, the negotiations broke down, and the senate ended the session without formally acting on voter ID at all.[117]  Larry Dixon, Alfred Sawyer, the director of information for Gov. James, and other Republicans announced after the legislature adjourned that the provision for the representation of both parties at each polling place had been the most important provision of James's voter ID bill.  Since most county officials who appointed polling place officers were then Democrats, the sponsor of the voter ID bill in the House, Jim Carns, R-Mountain Brook, acknowledged that the bill would primarily benefit Republicans.[118]  The poll watcher amendment may have provided a reason for white Democrats who generally favored a voter ID, to oppose this particular bill.

### c.   The Lessons of '96

72.  1996 witnessed the first sustained battles in Alabama's 25-year war over voter ID. Nearly all of the issues and tactics that would roil the legislature in every session until 2003, when a fairly unrestrictive voter ID law would pass, were bruited in 1996.  The legislature dealt with the only practice for which there was any evidence of fraud, absentee voting, not by authorizing early voting, as Tennessee and Texas had, and as the state's probate judges, Secretary of State, Lt. Governor, and majorities in both houses desired, but by putting more constraints on the existing law.  Those constraints solved the problem, in Gov. James's view, and the 1996 election returns appeared to validate that judgment.

73.  But voter ID failed to overcome filibusters by black senators in both the regular and special sessions, despite frantic efforts to negotiate a last-minute compromise by the governor and his

---

[114] John Peck, "Voter ID bill deserves Senate vote, James says," *Huntsville Times*, July 25, 1996.
[115] Philip Rawls, "Governor's bills go 1-1 in special session," *Huntsville Times*, July 26, 1996; AP, "Fob loses his fight for voter ID bill.  Lawmakers give up and end special session," *Mobile Press-Register*, July 26, 1996.
[116] David White, "James Lauds Session Despite ID Failure," *Birmingham News*, July 26, 1996.
[117] Phillip Rawls, "Governor's bills go 1-1 in special session," *Huntsville Times*, July 26, 1996.
[118] David White, "More GOP Poll Workers Aim of Bill," Birmingham News, July 27, 1996.

legislative liaison, the sponsor of the 2011 voter ID bill, Kerry Rich.  Not only did African-American members of both houses charge that the intent and effect of the bill was racially discriminatory, but the bill's chief sponsor in the senate for 7 years, Larry Dixon, essentially admitted as much, and the chair of the Republican State Committee openly admitted its partisan purposes.  As for fraud as the chief reason for passing a voter ID bill, the Lt. Gov., Don Siegelman, who had formerly held the offices of Attorney General and Secretary of State, said he saw no reason for the bill because there was no evidence that voter impersonation had taken place, and a spokesman for the current Secretary of State, Jim Bennett, said the purpose of the bill was to prevent "potential" problems, not current ones.

74.  There were two more indications of the racial nature of issues surrounding voter ID. First, Republican legislators did not press their preferred pure photo ID bill because they were aware that the U.S. Department of Justice had refused to preclear a Louisiana photo ID law, and an Alabama "copycat" bill would almost certainly have met the same fate.  Second, the final negotiations about voter ID in the senate during the special session involved the trade of a bill that everyone knew would disproportionately enfranchise black voters, one to make it easier for felons who had completed their prison terms or probation to vote, for a voter ID bill that at least all black legislators believed would disproportionately disfranchise black voters.  It is instructive that such a trade was proposed, presumably by African-American senators, and that Gov. James and liaison Rich considered that ex-felon enfranchisement might be bait for a deal on voter ID.[119]

#### 4.  The Issue of Felon Disfranchisement

75.  Criminal disfranchisement has a long, continuing legal history in Alabama.  As part of its openly proclaimed intention "to establish white supremacy in this State," the 1901 constitutional convention passed Section 182, which disfranchised men for committing certain misdemeanors and crimes of "moral turpitude," among them "assault and battery on the wife" and "miscegenation."  The only "smoking gun" evidence of the discriminatory purpose behind that specific provision introduced in the case, in which I testified, was a statement by the framer of Section 182, John Fielding Burns, that "the crime of wife-beating alone would disqualify sixty percent of the Negroes."[120] Challenged in a lawsuit, Section 182 was upheld by the district court, but deemed to violate the equal protection clause by the Eleventh Circuit Court of Appeals.  The U.S. Supreme Court unanimously sustained the appeals court in an opinion by then-Associate Justice William Rehnquist that Section 182 had a discriminatory purpose.[121]

76.  After a constitutional amendment eliminated reenacted the felon, but not the misdemeanant parts of the disfranchisement law, the question remained how or even whether persons who had

---

[119] Hank Sanders was the chief negotiator for opponents of the voter ID bill.  AP, "Fob loses his fight for voter ID bill.  Lawmakers give up and end special session," *Mobile Press-Register*, July 26, 1996.
[120] *Underwood v. Hunter*, 730 F.2d 614, 615, 618-20 (5th Cir. 1984).
[121] *Underwood v. Hunter*, CV 78-M-704 (N.D. Ala. 1981), rev'd 730 F.2d 614 (5th Cir. 1984), aff'd sub nom. *Hunter v. Underwood*, 471 U.S. 222 (1985).

been convicted of crimes of "moral turpitude" could regain their rights, once released from prison.  This was a patently racial issue, for as newspaper accounts made clear, and as had been recognized since the Civil War, the proportion of African-Americans in the state's jails and prisons was vastly greater than their percentage in the population as a whole.  In 1999, according to the *Anniston Star*, blacks made up about 62% of the prison population, compared to 26% of the state's total population.[122]  In 2014, the incarceration rate for black males and females in Alabama was 3.33 times as large as for whites.[123]  A 1998 study by The Sentencing Project and Human Rights Watch cited by the *Birmingham News* "suggested that almost one in three Alabama black men have lost their right to vote because of felony convictions."[124]  Altogether, Alabama's prison population doubled twice from 1980 to 2000, and Alabama disfranchised 241,000 ex-offenders of all races in 1998.[125]

77.  To recover their rights, including the right to vote, after being released from custody, Alabamians had to receive a pardon from the Alabama Board of Pardons and Paroles, after either serving their prison or probation sentences or waiting for three years after they have been paroled.  Alabama was one of only 9 states that required a pardon before an ex-felon could vote.  The elaborate process required an examination by Board personnel, a trip to Montgomery to appear before the Board, and sometimes a DNA test.  It often took more than a year to complete.  In 1998, only 242 of 193,500 ex-felons in the state managed to navigate the process of restoring their rights.[126]

78.  Beginning in 1996 and continuing through 2003, Rep. Yvonne Kennedy, D-Mobile, sponsored bills that would eliminate the pardon requirement for re-enfranchisement and would either automatically register ex-felons or would inform counties of the names of ex-felons who were eligible to vote.  It was Kennedy's bill that became the bargaining chip for voter ID in the 1996 special session and that continued to be the other half of a series of proposed logrolls with voter ID in every year from 1998 through 2003.  As the head of the House Republican Caucus, Rep. Mike Rogers, R-Saks, remarked in 1999, Republicans wouldn't support Dr. Kennedy's felon re-enfranchisement bill until House Democrats supported voter ID.  "It's the only way we're going to get Voter ID passed," Rogers said.[127]

---

[122] Tim Pryor, "Ex-felons rarely have their voting rights restored," *Anniston Star*, Nov. 14, 1999.

[123] Sentencing Project, *The Color of Justice:  Racial and Ethnic Disparity in State Prisons* (2016), available at http://www.sentencingproject.org/publications/color-of-justice-racial-and-ethnic-disparity-in-state-prisons/ (p.5).

[124] Michael Sznajderman, "House Rejects Bills to Register Ex-Cons, Show Photo ID to Vote," *Birmingham News*, April 23, 1999.  The study was *Losing the Vote:  The Impact of Felony Disenfranchisement Laws in the United States*, available at http://www.sentencingproject.org/publications/losing-the-vote-the-impact-of-felony-disenfranchisement-laws-in-the-united-states/.  The study estimated that 7.5% of the adult population of Alabama were felons in 1998.  The rate for black males was estimated to be 31.5%. (p.9)

[125] Tim Pryor, "Ex-felons rarely have their voting rights restored," *Anniston Star*, Nov. 14, 1999.

[126] Tim Pryor, "Ex-felons rarely have their voting rights restored," *Anniston Star*, Nov. 14, 1999.

[127] Tim Pryor, "Ex-felons rarely have their voting rights restored," *Anniston Star*, Nov. 14, 1999.

## 5. 1997: Temporary Cease-Fire

79. After the battles of 1996, the voter ID campaign faded in 1997. The Senate Constitution, Campaign Finance, Ethics and Elections Committee approved two ID bills. One, sponsored by Democrats, required ID documents only when a voter first registered or went to the polls. The second, by Larry Dixon, required ID with every attempt to vote. Newspaper reports do not detail what documents were deemed sufficient.[128] Neither bill appears to have come to a vote in either House, because of opposition from black legislators. As the *Anniston Star* put it, the bill "died because black legislators were concerned that it would disenfranchise black or poor voters by making it more difficult to vote." [129]

80. Related to the alleged possibility of voter impersonation was a major purge of the voting rolls by Secretary of State Bennett, who also switched from the Democratic to the Republican Party in 1997. Bennett's office mailed out address-verification postcards to all 2.6 million registered voters and planned to mail additional cards with a forwarding permit to all who failed to respond to the first mailing and to put those who did not respond to either mailing on an inactive list. If those on that list did not vote in two consecutive federal elections, they would be purged from the rolls.[130] As the rolls were brought up to date, suspicions of impersonating those who had died or moved ought to have abated.

## 6. 1998: A Compromise Collapses in a "Racial Huff"

81. In 1998, Republican Gov. James, Republican Secretary of State Bennett, and Republican Attorney General Bill Pryor pushed a new voter ID bill based on an amended law in Louisiana which the Justice Department had precleared because it contained two liberalizing provisions. One made it possible for a person with a voter registration card to get a free non-driver ID card at the county driver's license office. The other allowed people without any photo ID to vote after signing affidavits saying that they had no photo ID and then presenting their voter registration cards and dates of birth or other identifying information to polling place officials. The Alabama bill also contained the 1996 bill's provision providing for state-paid poll watchers from both political parties at each polling place.[131]

82. As the *Birmingham News* noted in an editorial, "voter ID has been high on James' agenda for several sessions," and his staff told a reporter for the *Anniston Star* that voter ID would be one of

---

[128] AP, "Senate committee kills open primary bill," *Huntsville Times*, Feb. 20, 1997.
[129] Richard Coe, "Voter ID gets feds' blessing," *Anniston Star*, Jan. 10, 1998. For a similar statement on the reason for the lack of consideration of the bills in 1997, see David White, "James Outlines Priorities for Upcoming Session," *Birmingham News*, Jan. 6, 1998.
[130] David Holden, "Bennett vows to clean up voter lists," *Huntsville Times*, Feb. 19, 1997.
[131] David White, "Governor to Attempt Voter-ID Bill Again," *Birmingham News*, Nov. 26, 1997. For the amended Louisiana law, see 1997 La. Sess. Law Serv. Act 779 (H.B. 635) (WEST).

James's "top priorities in the upcoming session" of the legislature.[132]  While an Associated Press survey of legislators found 62% in favor, 20% opposed, and 17% undecided, a strong white Democratic supporter (who would later switch to the Republican Party), Sen. Gerald Dial, said "It's not going to pass.  The minorities are not going to let it pass."

83.  Why were African-Americans so opposed?  According to Rep. Alvin Holmes, D-Montgomery, there were mixed partisan and racial purposes for voter ID: "This is a method to intimidate black voters.  They [Republican proponents] assume most of the black voters in the state are going to vote Democratic."[133]  Jerome Gray, field director of the Alabama Democratic Conference, the most prominent statewide African-American political group, denounced the bill as "just another political stunt."

> "It's not necessary," Gray said. "There has been no evidence that people are showing up at the polls as impostors."
> People convicted recently of voter fraud in Wilcox and Greene counties were charged with tampering with absentee ballots, not with pretending to be other people at the polls, he said.
> "This is another barrier or test that white officials are putting in, even though they may think it's good government, just like they thought literacy tests were good government," said Gray.[134]

Attorney General Pryor, who had vigorously investigated and prosecuted absentee voter fraud cases, but had apparently found no voter impersonation cases worthy of prosecution, agreed with Gray that there was more abuse of absentee ballots than of voter impersonation.  "But," he continued, "a small percentage in a close election can make a difference."[135]  This was an argument that cut both ways, for if the law discouraged even a few from voting, it could decide an election.

84.  When the bill, with the affidavit exception, passed the House Committee in the second week of the 15-week session by 10-2 and the Senate Constitution, Campaign Finance, Ethics and Election Committee by 10-0, there was some hope among supporters that black senators would not be able to block the bill again with a last-minute filibuster.  The governor's liaison, Kerry Rich, was not very sanguine, though, because he believed that the House would not take up the bill until late in the session, after it had worked through the always-thorny issue of the state budget.[136]  A seasoned reporter agreed with Rich, cataloguing tactics to delay and defeat bills:

---

[132] Editorial, "Election Agenda.  Easy to Tell Gov. James Is Off and Running," *Birmingham News*, Jan. 7, 1998; Richard Coe, "Voter ID gets feds' blessing," *Anniston Star*, Jan. 10, 1998.
[133] Philip Rawls, "James to push voter ID bill," *Huntsville Times*, Jan. 13, 1998.
[134] David White, "Governor to Attempt Voter-ID Bill Again," *Birmingham News*, Nov. 26, 1997.
[135] Philip Rawls, "James to push voter ID bill," *Huntsville Times*, Jan. 13, 1998.
[136] Stan Bailey, "Voter ID Bill Clears House Committee," *Birmingham News*, Jan. 22, 1998; Philip Rawls, "James' vote ID bills see action," *Huntsville Times*, Jan. 23, 1998.

"Legislators have an array of tricks they can pull to hide their opposition to a bill. They can openly support an issue but pressure colleagues to kill it. They can press for consideration early, then hide behind the requirement for a super-majority vote on all issues before budgets are passed. They can work the agenda-setting rules committees to keep the issue from coming up for debate, kill time by refusing to sign petitions cutting off debate, or load a bill down with amendments that provoke opposition from other quarters."[137]

85.  Aware of the obstacles, Sen. Larry Dixon, liaison Rich, and other officials in the James Administration negotiated with Lt. Gov. Siegelman and black senators for two weeks.  The result was a compromise that allowed 14 different forms of identification, including credit cards, library cards, and welfare cards, and a delay in putting the law into effect until after the 1998 election.  (See Table 1, above, for the forms of ID allowed.)  Dixon, the bill's senate sponsor, as in earlier years, was most concerned with a new provision to allow poll watchers appointed by candidates or political parties to observe the counting of votes.  "We have reason to believe that most of the votes that are being stolen are stolen after the polls close," Dixon said.  Although dubious about the existence of any impersonation problem, the black state senators were apparently sufficiently satisfied by the compromise that they agreed not to filibuster the bill, and it passed the senate 28-7, with the white Democrats and Republicans united in its favor and every black senator except one in opposition.  Because of the breadth of acceptable IDs, even Sen. Hank Sanders, the Selma black leader, thought that the Justice Department would preclear the law.[138]

86.  But the senate compromises angered Republicans.  State Republican Party Chairman Roger McConnell and other Republican leaders held a rally after the compromise passed the senate to urge the House to insist on a straight photo ID, to let poll workers be appointed to precincts anywhere in a county, instead of just in the precinct in which they lived, and to put the law into force for the 1998 elections.  "We'd be better off with no bill than this bill," said Danny Patterson, a candidate for the Republican nomination for Secretary of State.[139]

87.  Under pressure from his own party, Gov. James first expressed opposition to the compromise on his radio program, apparently promising McConnell and Bettye Fine Collins, a member of the Republican National Committee, that he would veto a bill like the senate's; then denied that he had said that; and eventually sent his legislative liaison, Kerry Rich, to urge the House committee to pass the senate compromise.  The committee then approved the bill as it had come over from the senate, 14-1, with all four black members in the majority.  Passing the same

[137] John Peck, "Lawmakers will try again to pass a voter ID law," *Huntsville Times*, Jan. 25, 1998.
[138] Buster Kantrow, "Gov. James favors lethal injection for death row," *Mobile Press-Register*, Feb. 12, 1998; AP, "Senate passes compromise voter-ID bill," *Huntsville Times*, Feb. 13, 1998; No byline, "State Senate Oks voter ID bill," *Anniston Star*, Feb. 13, 1998; No byline, "A sham voter ID bill," *Huntsville Times*, Feb. 15, 1998.
[139] Buster Kantrow and Sean Reilly, "Voter ID bill has soft bite, GOP grumbles.  James, McConnell to lead the charge at a rally today to urge the House to adopt a tougher measure, *Mobile Press-Register*, Feb. 17, 1998; Phillip Rawls, "GOP chief doesn't like Senate's voter ID bill," *Huntsville Times*, Feb. 17, 1998.

bill, leaders explained, would avoid having to send the measure to a House/Senate conference committee and having to return whatever the conference committee agreed upon to further votes in both houses – moves that would invite a filibuster or other delaying tactics.  Sen. Dixon and State Chairman McConnell unveiled a Republican stratagem:  to have the House pass the Senate bill and then have Gov. James propose amendments to it, which according to legislative rules would have to be voted up or down with no possibility of further amendment or reference to a conference committee. [140]  The amendments would put the law into effect immediately and require ballots cast by someone without an ID to be kept separate from other ballots, in case there was a contested election.  And State Chairman McConnell and others still favored amending the bill to require only a photo ID.[141]

88.  But the Republican strategizing backfired, as black Democrats in the House convinced House Rules Committee Chairman Tommy Carter, D-Limestone, to refrain from putting the bill on the House calendar and House Speaker Jimmy Clark, D-Eufaula, not to pressure Carter to do so.  To try to force consideration of the voter ID bill on the last night of the legislative session, Republicans held hostage $4.3 million in appropriations for the state's oldest partially-state-supported historically-black university, Tuskegee, and other monies for children's programs in the Black Belt, which primarily benefited poor black children.  Highlighting the racial split over voter ID, the Republican move evoked bitter charges of "a racial vote" from African-American House members without achieving the GOP objective, for the procedural motion to put the bill on the legislative calendar at the last moment required an 80% majority of the 105 House members.  The 27 black House members and 4 white Democrats prevented consideration of the bill, although the motion received 68 "yea" votes.  Even white Democratic leaders Carter, Clark, and Speaker Pro-Tem Seth Hammett, D-Andalusia, voted in favor of considering the bill, making the crucial procedural motion an almost entirely racial split.  Once it was clear that voter ID was dead for the session, the legislature relented and Tuskegee and the Black Belt children got their scheduled appropriations.  Gov. James took another tack, threatening to call another special session of the legislature to deal with voter ID and two other issues.[142]  The Associated Press report on the session's last day remarked

---

[140]Buster Kantrow and Sean Reilly, "Voter ID bill has soft bite, GOP grumbles.  James, McConnell to lead the charge at a rally today to urge the House to adopt a tougher measure, *Mobile Press-Register*, Feb. 17, 1998; Buster Kantrow, "GOP at odds over voter ID.  Prominent members say James promised to veto 'unacceptable' bill, but aide says governor made no such vow," *Mobile Press-Register*, Feb. 18, 1998; Tom Gordon, "Father's '94 Election Woes Spur Hooper to Call for Voter ID in '98," *Birmingham News*, March 2, 1998; Philip Rawls, "Governor Pushing Voter-ID Passage," Birmingham News, March 11, 1998; AP, "Senate panel Oks 24-hour wait to get abortion," *Huntsville Times*, March 11, 1998; AP, "Blacks on House Panel Back Bill Requiring State Voter ID," *Birmingham News*, March 12, 1998.

[141] No byline, "James will return voter ID measure with amendments," *Huntsville Times*, March 12, 1998.

[142] No byline, "Legislature in brief," *Huntsville Times*, April 28, 1998; David White, "James May Call July Session on Voter ID, Highways, Parks," *Birmingham News*, April 29, 1998; No byline, "Overheard," *Mobile Press-Register*, April 30, 1998; Editorial, "Voter ID loses to posturing," Mobile Press-Register, May 3, 1998.

> "While it is not unprecedented in the Alabama House to hear shrill comments
> about race, the final hours of the just finished session provided an extraordinary,
> racially charged display.
> "'It was the worst I have seen,' said Paul Hubbert, executive secretary of the
> Alabama Education Association and a prominent figure in legislative sessions for
> three decades. "I think it was an unfortunate occurrence. The people of Alabama
> are not well served when we begin to split along racial lines on public policy
> questions.'"[143]

Even a compromised voter ID bill provoked harsh racial clashes in a state with a history like
Alabama's.

89.  A symbolic event that took place the day the legislature adjourned may explain why
African-American legislators still insisted on vetoing a voter ID bill that allowed 14 different
forms of identification, including several that did not require photos, and that allowed people
without any ID at all with them to cast a vote by affidavit by providing only the slightest
identifying information.  In 1979, a funeral-home director established an award for the Alabama
legislator who sponsored a bill with the least chance of passing, which he termed "the Shroud
Award."  Each year, past recipients of the award would decide which lawmaker was most
deserving, and the person would receive an actual shroud donated by the funeral-home director.
In 1998, the award went to Rep. Yvonne Kennedy, D-Mobile, for again introducing a bill to
enfranchise felons who had been released from prison.[144]

90.  If black legislators believed, as Sen. Hank Sanders remarked after the compromise passed
the Senate, that voter ID was "part of a multifaceted attack on black voting rights,"[145] what
incentive did they have to vote for it?  Yet the failure during the session of both Kennedy's felon
voting bill and the voter ID measure suggested a trade, a legislative logroll that might
enfranchise blacks who had been convicted of crimes while having the effect of disfranchising
others through voter ID.  It was exactly that swap, first discussed during the 1996 special session,
that would dominate the legislative battles over voter ID for the next four years.  A bill which
demonstrated the depth of racial sentiment in a Democratic-majority legislature by being named
the least likely bill to pass became, in the next four years, the linchpin of a deal that would
finally bring about the passage of a relatively unrestricted voter ID law.

### 7. 1999: Strict Photo ID Strategy Flops

91.  Joining a group of Republican legislators after the failure of the voter ID bill in the 1998
regular session, Gov. James "said even though Republicans are leading the push for the measure
opposed primarily by black Democratic lawmakers, it is not a partisan issue."[146]  Given the

[143] AP, "Session ends in racial huff," *Mobile Press-Register*, May 3, 1998.
[144] No byline, "Overheard," *Mobile Press-Register*, April 30, 1998.
[145] Phillip Rawls, "James hopes for shot at modifying voter ID bill," *Huntsville Times*, March 11, 1998.
[146] No byline, "Legislature in brief," *Huntsville Times*, April 28, 1998.

overwhelming support of white Democrats for different voter ID bills in 1996 and 1998, James's statement may have revealed more than he realized, for it implied that voter ID was a racial issue. In any event, James's promise that "the Legislature will see it again"[147] proved true.

92. In the summer of 1998, voter ID became the chief issue in the Republican primaries for both Secretary of State and Lieutenant Governor. In the Republican primary for Secretary of State, former political director of the Alabama Republican Party Danny Patterson claimed that incumbent Jim Bennett, who had been pushing voter ID bills for a decade, had not pushed hard enough.[148] In the contest for Lieutenant Governor, "Steve Windom said he won the Republican primary for lieutenant governor because voters liked his pledge that he would force the state Senate to debate voter ID, caps on punitive damages and other issues."[149] During the general election, Attorney General Pryor, Secretary of State Bennett, and Lieutenant Governor nominee Windom traveled across West Alabama in an "Honest Elections Caravan" campaigning for voter ID.[150] Windom promised, if elected, to make voter ID "the number one order of business of the 1999 Legislature."[151] After the 1998 election, the Republican State Executive Committee endorsed a strict photo ID bill.[152] The prominence of the issue in Republican election campaigns was a sign of how firmly voter ID had taken its place in the party's orthodoxy 13 years before a photo ID bill actually passed.

93. At the same time as he campaigned for a voter ID law, Secretary of State Bennett boasted that suspicious absentee ballot activity had declined markedly from 1994 to 1996 and in the 1998 primaries,[153] and that he had purged voting rolls in every county in order to guard against any possible vote fraud using the names of voters who had died or moved. "There are 2.3 million registered voters in this state," Bennett told voters in Selma. "We have now identified 440,000 of them as either being dead or not living where they say they live. That's roughly 17 percent of our entire electorate. That's a very dangerous situation when you have dead people that someone else can vote in the name of . . ." Notably, Bennett did not claim to have found any evidence that anyone actually <u>had</u> voted in someone else's name, only that a thorough check on the poll list had been carried out. According to Attorney General Pryor, Alabama had "the cleanest voter rolls this state has ever seen."[154] Neither the Secretary of State nor the Attorney General drew the logical conclusion that after the "cleansing," there was even less chance of voter impersonation than before, and therefore, less need for a voter ID law. It was a difficult political trapeze act: If Bennett, the state's chief elections officer, contended that election fraud was rampant, voters might question whether he deserved reelection. If he claimed to have

[147] No byline, "Legislature in brief," *Huntsville Times*, April 28, 1998.

[148] Jenna Halvatgis, "Voter ID tops debate for secretary of state," *Huntsville Times*, May 19, 1998.

[149] David White, "GOP's Windom, Demos' Freeman Commence Jabs," *Birmingham News*, June 4, 1998.

[150] Tom Gordon, "GOP Candidates' Caravan to Push Voter ID," *Birmingham News*, Oct. 28, 1998.

[151] Stan Bailey, "Bennett, Pryor Join for Hard Penalties in Election Fraud," *Birmingham News*, Oct. 30, 1998.

[152] Tom Gordon, "Republicans Decline to Criticize Jean Brown," *Birmingham News*, Jan. 10, 1999.

[153] Jenna Halvatgis, "Voter ID tops debate for secretary of state," *Huntsville Times*, May 19, 1998; Stan Bailey, "Pryor Vows Equal Vigil on Voter Fraud," *Birmingham News*, June 26, 1998.

[154] Stan Bailey, "Bennett, Pryor Join for Hard Penalties in Election Fraud," *Birmingham News*, Oct. 30, 1998.

vanquished it, voters might wonder whether someone who stressed other priorities, such as increasing voter turnout, ought to take his place.  Bennett's Democratic opponent in 1998, Nancy Worley, offered voters exactly that choice.[155]

94.  Although Bennett, Pryor, and Windom won their races in 1998, Gov. James did not, falling to the Democratic nominee, Lt. Gov. Don Siegelman, by 57-42%.[156]  While many thought Siegelman's election would doom voter ID for the next four years, the new governor declared himself in favor of a photo ID law before the 1999 legislative session.[157]  As the session began, Rep. Jim Carns, R-Mountain Brook, who had carried the bill in the House in 1998, introduced a photo ID bill with the same affidavit alternative as in the previous bill, and Secretary of State Bennett declared himself open to non-photo cards.  Black legislators indicated that while they would fight against a strict photo ID bill, they, too, would consider a bill with other forms of ID.[158]  After the House Elections Committee voted 11-3 in favor of Carns's bill, its prospects again looked promising.[159]  (See Table 1, above, for the identification documents it authorized.)

95.  Instead of amending Carns's strict photo ID bill to provide for further forms of identification, as they had in 1998, supporters in 1999 seem to have tried to tie it to Kennedy's felon voting bill.  But both bills failed on procedural votes in the House on the same day, voter ID being rejected quickly after Kennedy's bill died. "It was tit for tat," said Rep. George Perdue, D-Birmingham.[160]  With African-American legislators continuing to charge that, as Rep. Alvin Holmes, D-Montgomery, put it, "You Republicans want some kind of mechanism to retard the black vote," each bill proved an anchor to the other, and both sank.  An effort to refloat the photo ID bill in the Senate finally passed the Constitution, Campaign Finance, Ethics and Election Committee, but went no further.[161]

96.  In an editorial, the *Anniston Star* pointed to two reasons why the voter ID bill, which it termed "a darling issue of the Republicans in the Legislature for years now," continued to fail. The first was that there was no evidence of voter impersonation fraud.  "No one denies that voter fraud has occurred with absentee ballots," the editorialist asserted, "but that is a different issue. This has nothing to do with people going to the polls."  The second was that even under current law, "If a poll worker feels a voter is not who he says he is, then that poll worker can challenge the voter."[162]

[155] AP, "Experience vs. a fresh voice is choice in secretary of state," *Huntsville Times*, Oct. 18, 1998.
[156] Patrick R. Cotter, "Alabama:  From One Party to Competition and Back Again," in Charles S. Bullock III and Mark J. Rozell, *The New Politics of the Old South*, 5th ed. (Lanham, Colorado:  Rowman & Littlefield, 2014), 78.
[157] Buster Kantrow, "Bennett set to try again on voter ID," *Mobile Press-Register*, Feb. 26, 1999; John Ehinger, "Siegelman & voter ID:  elevating the bar?" *Huntsville Times*, Feb. 28, 1999.
[158] AP, "Black lawmakers push lottery, eye compromise on voter ID," *Huntsville Times*, March 7, 1999.
[159] John Peck, "Bill would make voters use photo ID," *Huntsville Times*, April 8, 1999.
[160] Michael Sznajderman, "House Rejects Bills to Register Ex-Cons, Show Photo ID to Vote," *Birmingham News*, April 23, 1999.
[161] Buster Kantrow, "Senator wants to push campaigners back from polls," *Mobile Press-Register*, May 13, 1999.
[162] Editorial, "Voter ID:  Swiftly to its grave," *Anniston Star*, May 3, 1999.

97.  The *Star*'s editorial statements were statements of fact.  As for fraud, in October, 1999, there was a hotly-contested referendum on establishing a lottery, changing the state pension system, and amending local education laws.  At 53%, turnout in that election exceeded participation in many even-numbered-year elections.  In preparation for the election, both the Secretary of State and the State Attorney-General established "voter fraud" telephone hotlines.  Although they received 220 calls, most concerned complaints about polling place hours and other procedural matters.  Attorney-General Pryor, a strong proponent of a voter ID law who would surely have broadcast any evidence of voter impersonation fraud, "said only a few of the calls received by his office involved allegations of possible wrongdoing."[163]

98.  The *Star*'s assertion about election officials already being able to ask for identification was also echoed by local election officials.  In Alabama, the probate judge is the chief election officer in each county.[164]  Discussing a voter ID bill in 1998, Randolph County Probate Judge Mack Diamond noted, in a reporter's summary, that "State law already permits poll workers to ask for identification if they believe someone is trying to vote under someone else's name."[165]  Two years later, Diane Ward, a polling inspector in Madison, Alabama, a rapidly-growing, 75% white city near Huntsville, said she favored a photo ID requirement because it would simplify matters at polling places. "Ward said her poll workers often ask for identification mainly because the precinct is constantly getting new voters. 'If people would have to have it out, it might make things move quicker,' she said."[166]

### 8.  2000:  The Georgia Plan, The Louisiana Plan, and a Failed Logroll

99.  After the Louisiana-type strict photo ID bill with an affidavit lost in 1999, Secretary of State Bennett suggested that the state adopt a law based on the 1998 Georgia statute that the Justice Department had precleared.  This allowed 14 identification cards or documents, plus an affidavit for any voter who appeared at the polls without any of the 14.[167]  Bennett persuaded Jim Carns, House sponsor of the 1999 strict photo ID bill, to carry his bill in the House.[168]  As Table 1 shows, the 14 documents were not the same as the 14 documents allowed in the 1998 Alabama bill.  But Bennett's willingness to expand the number of documents suggested a willingness to compromise with African-American legislators and some white Democrats.

---

[163] John Peck, "Officials tout state voter ID law," *Huntsville Times*, Oct. 28, 1999.

[164] Local Government Records Commission, "County Probate Offices:  Functional Analysis & Records Disposition Authority (Oct. 24, 2012), at 1-2, available at http://www.archives.alabama.gov/officials/rdas/local/ProbRDA.pdf.

[165] Richard Coe, "Not-so-bright ID? – Voter identification bill specifics come under question by officials," *Anniston Star*, Feb. 18, 1998.

[166] John Peck, "Panel sends voter ID measure to Senate," Huntsville Times, Feb. 16, 2000.

[167] John Peck, "Officials tout state voter ID law," *Huntsville Times*, Oct. 28, 1999.

[168] Editorial, "Voter ID Important to Properly Identify People Casting Ballots," *Birmingham News*, April 6, 2000.

100.  Larry Dixon and many other Republicans, however, were apparently not as willing to compromise, as Dixon's bill, a strict photo ID bill similar to that which had lost in 1999, cleared the Senate Constitution, Campaign Finance, Ethics, and Elections Committee by 8-2 early in the legislative session.  "Photo ID is a must . . . I'm not prepared to water down that provision," Dixon said.[169]

101.  It was Carns's bill that became the focus of attention and of a more explicit attempted logroll than ever before.  Previous legislative sessions had convinced white legislators that black legislators would not support voter ID without some re-enfranchisement of ex-felons, a majority of whom were black.  In this session, Kennedy further compromised her bill, granting ex-prisoners certificates that could be presented to local registrars to allow them to register to vote, instead of automatically registering them when they were released from parole and had paid fines and other penalties.[170]

102.  In 1999, both the ex-felon voting bill and the voter ID bill had died in the House on the same day, in quick succession.  In 2000, both passed on the same day, Carns's voter ID bill by 80-20, which indicates that it picked up some black votes, and Kennedy's ex-felon voting bill by 95-3, a stark reversal from the previous year's "Shroud Award."[171]  With Kennedy contending that the ex-felon voting bill might affect up to 100,000 people,[172] it seemed a good swap for African-American legislators.  A few days later, the House voter ID bill passed the Senate Constitution, Campaign Finance, Ethics and Elections Committee unanimously.[173]

103.  But Senate Republicans, who had filibustered Kennedy's bill in previous sessions, were apparently not on board.  When the Senate did not take up Kennedy's bill, black senators filibustered the voter ID bill, and it died almost unmentioned in news reports.[174]

### 9.  2001: A Rerun of 2000

104.  By 2001, the legislators were so familiar with the issues that only the tactics, not the rhetoric, seemed new.  A new chair of the Alabama Republican Party, Marty Connors, touted the push for photo ID as his most important legislative objective, and the State Republican Executive Committee called on the legislature to approve a "Republican Honest Election Reform package,

---

[169] John Peck, "Panel sends voter ID measure to Senate," Huntsville Times, Feb. 16, 2000.
[170] Alan Choate, "Some criminals may regain right to vote," *Mobile Press-Register*, April 7, 2000.
[171] Kim Chandler, "House Oks Felon Voting, Voter ID," *Birmingham News*, April 7, 2000.
[172] John Peck, "House passes voter ID bill and measure letting ex-felons vote," *Huntsville Times*, April 7, 2000.
[173] AP, "Senate panel Oks voter ID bill; 'This could be year,' backer says," *Huntsville Times*, April 19, 2000.
[174] No byline, "Legislative leftovers," *Huntsville Times*, May 17, 2000.

45

with Voter ID as the centerpiece."[175]  Lt. Gov. Steve Windom, a Republican, "has promised an all-out effort to get some kind of voter ID bill passed that would require people to have some proof of identification when they go to the polls."[176]

105.  Why were the Republicans so opposed to the status quo?  Again, the "smoking gun" answer came from the long-time chief sponsor of photo ID measures in the Senate, Montgomery's Larry Dixon.  **Voting without photo IDs "benefits black elected leaders**, and that's why they're opposed to it."[177]

106.  When asked for evidence of a problem that needed to be addressed, however, the justifications offered by proponents publicly were still very weak.  Secretary of State Bennett, for instance, admitted that "Voting fraud at the polls is not rampant," though he asserted without providing any examples that "it does happen."  As the *Huntsville Times* pointed out, there were no prosecutions for in-person voting fraud "even when Republicans filled the attorney general's and U.S. attorneys' offices."[178]  More extreme Republicans made more serious charges, again without any evidence:  Senate Minority Leader J.T. "Jabo" Waggoner, R-Vestavia Hills, told the Madison County Republican Men's Club that the state needed voter ID "to cut out the stealing of elections in Alabama by Democrats."[179]  The responses from opponents of voter ID had been repeated so often that newspapers summarized them as if by rote:  "[O]pponents say requiring identification is intimidating to black voters and smacks of the Jim Crow days of the old South.  The hard-line version, requiring voters to show picture identification, would also disenfranchise the poor, many of whom do not have cars, much less driver's licenses, opponents say."[180]

107.  An Associated Press poll of legislators found that 74% of House members and 83% of the Senate supported some kind of voter ID bill.  Among supporters, 52% of the House members and 64% of the senators favored a strict photo ID law.[181]  Since there were 27 African-Americans in the 105-member House and 8 in the 35-member Senate, and virtually all black legislators had always opposed any voter ID bill, the poll indicates that almost all white legislators, Democratic or Republican, supported voter ID in principle.

108.  Rep. Jim Carns and Sen. Larry Dixon submitted bills identical to their 2000 bills,[182] and Rep. Yvonne Kennedy's ex-felon enfranchisement bill was linked even more explicitly to Carns's bill in a very public logroll.  In the House Election Committee, Carns's bill passed by

---

[175] Tom Gordon, "Veteran GOP Figure Connors Wins Alabama Party Chairman Post," *Birmingham News*, Jan. 14, 2001.

[176] Alan Choate, "Money issues await Legislature," *Mobile Press-Register*, Feb. 4, 2001.

[177] No byline, "Voter ID bill has support," *Montgomery Advertiser*, Feb. 11, 2001.

[178] Phillip Rawls, "Most legislators see need for voter ID bill," *Huntsville Times*, Feb. 1, 2001; John Ehinger, "State Republicans seem determined to crusade for an unneeded law," *Huntsville Times*, Feb. 4, 2001.

[179] Phillip Rawls, "Lawmakers avoid usual last-minute budget push," *Huntsville Times*, May 20, 2001.

[180] Matthew Korade, "Lawmakers gear up for another round," *Anniston Star*, Feb. 4, 2001.

[181] Phillip Rawls, "Most legislators see need for voter ID bill," *Huntsville Times*, Feb. 1, 2001.

[182] No byline, "A Look at Some High-Profile Issues," *Birmingham News*, Feb. 4, 2001.

12-1 and Kennedy's, the same day, by 8-5.[183]  Carns's bill allowed people without IDs to vote by signing an affidavit swearing to their identity.[184]  A week later, after an often tense three-hour debate, both bills passed the House, the Carns bill by 78-17.  All 17 of the opponents of Carns's bill were black, and 10 House members did not vote, so the racial split on the bill may have been complete.  Kennedy's bill passed by the much closer margin of 60-37, which hinted at trouble for the bargain in the Senate.[185]

109.  As an alternative to a voter ID law, the Senate Democratic Caucus proposed a bill based on a New York law that would provide electronic scanners at each polling place to check voters' signatures as soon as they signed in at the polls.  Republicans scorned it as too expensive.[186]  Instead, the Senate Constitution, Campaign Finance, Ethics and Elections Committee unanimously approved both Carns's 14-ID bill and Dixon's strict photo ID bill.  It also voted 6-4 for a bill by Sen. Roger Smitherman, a black Democrat from Birmingham, which combined a Carns-like variety of IDs with automatic restoration of voting rights to nonviolent felons after they completed their sentences.  On the same day, the committee voted 7-2 to kill Kennedy's ex-felon voting bill.[187]

110.  Two weeks later, the Senate Committee reversed itself on Kennedy's bill, 5 Democrats voting for it, led by Committee chair Jeff Enfinger, D-Huntsville, who "said he was willing to move Kennedy's measure along in exchange for a chance to get voter identification passed. 'As long as they're coupled, we think there's enough support in the House and Senate to get voter ID,' Enfinger said. 'It's easy for me to support the package.' Most Republicans reject the coupling," the *Mobile Press-Register*'s report went on, "and many GOP legislators aren't happy with the version of voter ID it's hooked to, a bill that allows some forms of identification without pictures."[188]  Two months later, on the last day of the regular session, the Senate had still not acted, and the chair of the Rules Committee, Sen. Jim Preuitt, D-Talladega, refused to put the bill on the calendar, apparently responding to pressure from black senators, who opposed the passage of any voter ID legislation unless it was tied to Kennedy's ex-felon voting bill.[189]  Both bills died in the senate for one more year.  The Senate also failed to act on a no-excuse absentee voting bill

---

[183] Jeff Amy, "Voter ID bill clears House committee," *Mobile Press-Register*, Feb. 8, 2001.

[184] No byline, "Voter ID bill has support," *Montgomery Advertiser*, Feb. 11, 2001.

[185] David White, "State Voter ID Plan Passes House," *Birmingham News*, Feb. 14, 2001; Alan Choate, "House Oks bill giving felons vote," *Mobile Press-Register*, Feb. 14, 2001; John Peck, "House approves voter ID legislation," *Huntsville Times*, Feb. 14, 2001.

[186] Phillip Rawls, "GOP opens with elderly drug plan," *Huntsville Times*, Feb. 7, 2001.

[187] AP, "Legislature Briefs," *Birmingham News*, March 7, 2001.

[188] No byline, "Felon voting bill revived," *Mobile Press-Register*, March 21, 2001.

[189] No byline, "Legislature's last day unique without last-minute budgets," *Jasper Daily Mountain Eagle*, May 20, 2001; Editorial, "Voter ID Now – Today Last Day That Senate Can Do Right Thing," *Birmingham News*, May 21, 2001.

backed again by Secretary of State Bennett that the House had passed by 83-3 three months before the session ended.[190]

### 10.  2002:  Another Log-jammed Logroll Again Demonstrates How Racial the Voter ID Issue Was

111.  Alabama's legislative leaders in 2002 predicted that this year, finally, voter ID and Kennedy's ex-felon voting bill would pass.  As House Speaker Seth Hammett, D-Andalusia, and Senate Majority Leader Lowell Barron, D-Fyffe, noted, "Many lawmakers, especially black Democrats, will try to block voter ID from passing unless this measure [Kennedy's bill] passes too."[191]  The annual Associated Press survey of legislators' preferences showed that 67% of House members and 66% of senators favored the Carns voter ID bill, and another 22% of House members and 28% of senators said they would vote for it "if it were linked to a bill to restore voting rights for former felons."[192]  Again, early in the legislative session, the House voted for both bills on the same day, the Carns voter ID bill by 77-17 and the Kennedy ex-felon voting bill by 65-34.  But in a danger sign, Republicans balked at enfranchising ex-felons.  "These folks have done something wrong," said Rep. Allen Sanderson, R-Mountain Brook. "I don't think we should baby criminals."[193]

112.  Once more, the Carns measure passed the senate committee.[194]  As before, a newspaper pronounced that "The Alabama Legislature has never been as close to passing a decent voter identification bill as it is this year."[195]  Even in the last week of the legislative session, Majority Leader Barron tried to push both the voter ID and ex-felon voting bills onto the body's agenda, saying he favored both.[196]  But with two days to go, Barron recognized that what he described as the "two-bill package" would not pass.[197]  Why not?  As in the two previous years, many Republican senators opposed Carns's voter ID bill because it allowed identification documents that did not contain photos, and African-American senators opposed it because they feared it would disfranchise too many black voters.  Although they were seemingly more willing to bargain than Republican senators were, "Sen. George Clay, D-Tuskegee, said he and other black

[190] David White, "Social Security Numbers Required by New Vote Plan," *Birmingham News*, Feb. 16, 2001.  In December, 2001, the legislature repealed the law that had provided for onsite absentee voting on the Saturday before the normal election day for voters who were going to be absent on the Tuesday as too costly and rarely used. Editorial, "Honest Elections – Legislature Must Do More to Make Sure Votes Count," *Birmingham News*, Dec. 24, 2001.  This was the only law that provided even a very limited "early voting" option.

[191] David White, "Lawmakers Returning with Budgets on Mind," *Birmingham News*, Jan. 6, 2002.

[192] AP, "Constitution big issue at Capitol," *Huntsville Times*, Jan. 7, 2002.

[193] Kim Chandler, "House Oks Watered-Down Bills for Voter ID, Voting by Felons," *Birmingham News*, Jan. 16, 2002.

[194] No byline, "Much work still undone," *Huntsville Times*, March 4, 2002.

[195] Editorial, "Honest Elections – Push from Feds May Help voter ID Pass," *Birmingham News*, April 14, 2002.

[196] David White, "Lawmakers Down to Last Two Days – Smoking, Voting, Background Checks Awaiting Action," *Birmingham News*, April 15, 2002.

[197] Phillip Rawls, "Legislature to end session quietly for a change," *Huntsville Times*, April 16, 2002.

senators don't intend to let the voter ID bill pass unless the felons' voting rights bill passes first."[198]  One newspaper that favored voter ID and opposed ex-felon voting said the linkage inevitably doomed both:  "The House insisted the two bills be treated as one, effectively discouraging passage of the Voter ID bill, since most of the senators did not support the felon voting rights bill."[199]  Another paper revealed the racial and partisan pressures explicitly: "Republicans favor the former [voter ID] and the House legislative black caucus the latter [ex-felon voting]. Each group opposes the other's bill. The two groups secured an agreement a few years ago to link the bills for passage. They're still trying to push them through."[200]  In 2002, they failed again.

### 11.  2003:  Last-Minute Logroll, Then Veto Shows
### Partisan and Racial Nature of Election Issues

113.  During the 2002 campaigns for the legislature and statewide offices, voter ID and ex-felon voting again became major issues, and the partisan and racial splits were open.  With Secretary of State and longtime proponent of voter ID Jim Bennett retiring, voter ID became the "major dividing point" between Republican candidate Dave Thomas, and the 1998 Democratic candidate, Nancy Worley.  Thomas, an 8-year veteran of the legislature from Shelby County, promised to "do all I can do to make sure we have voter ID . . . and I'll work hard to make sure felons don't have automatic restoration of voting rights."  Worley countered with a support for a broad voter ID law, but she did "not want to see restrictions that would keep people away from the polls."  Her "chief priority" was "to address voter apathy."[201]  Demonstrating the talismanic nature of the issue, even a candidate for State Auditor, Beth Chapman, touted her support for voter ID in her come-from-behind runoff victory for the Republican nomination.[202]  The Auditor had no responsibility over elections.[203]

114.  A candidate for an office that did have such a responsibility, three-term incumbent Rep. Jim Carns, R-Mountain Brook, stressed his previous sponsorship of voter ID laws, but, revealingly, echoed an earlier statement that they were necessary to deal only with a future, not a present problem.  In the *Birmingham News* reporter's paraphrase, "Carns said he doesn't think voter fraud is an epidemic, but too many elections are decided by close margins to allow it to continue. Having the law on the books will discourage people from trying to commit voter fraud,

---

[198] David White, "Lawmakers Head for Showdown Today," *Birmingham News*, April 17, 2002; David White, "Informed Abortion, Teacher Bills Pass – Commandment Display, Felons' Voting Bills Killed," *Birmingham News*, April 18, 2002.
[199] No byline, "The good, the pitiful and those that didn't matter," *Jasper Daily Mountain Eagle*, April 18, 2002.
[200] Matthew Korade, "State lawmakers award 'the Shroud'," *Anniston Star*, April 21, 2002.
[201] Editorial, "For secretary of state Worley, King top choices," *Talladega Daily Home*, May 30, 2002; Amy Sieckmann, "Secretary of State contenders favor voter ID," *Anniston Star*, June 19, 2002; No byline, "Thomas talks fair elections with county Republicans," *Jasper Daily Mountain Eagle*, Aug. 24, 2002.
[202] Chris Sanders, "Chapman, Zeigler Plan Wasteful Spending Fights," *Birmingham News*, June 19, 2002.
[203] Chapman later ran successfully for Secretary of State.

he said."[204]  Other candidates for Republican and Democratic nominations for the legislature split along partisan and racial lines, Republicans, including 2011 voter ID sponsor Scott Beason, uniformly favoring voter ID, and most, photo ID only.  Democrats split, with some white Democrats joining black aspirants for office against voter ID and some favoring a broad statute. Black candidates were harsh critics.  A voter ID would "be used to intimidate low-income people," said one; another declared that voters saw it "as another way to deter people from the polls;" a third likened it "to levying a poll tax to discourage black voters."[205]

115.  The election results were mixed.  In something of an upset, Republican Bob Riley beat incumbent Democrat Don Siegelman by 3120 votes (0.23%), a margin produced by a shift of 6000 votes from the initial returns to a corrected total – corrected after Democratic officials had gone home for the night -- in Baldwin County.[206]  (It should be noted that Republicans did not protest the apparent manipulation of voting returns by authorities in that county, [207] which were in their party's favor.)  But Democrat Lucy Baxley won the race for Lieutenant Governor, which made her the presiding officer in the state senate, and Democrat Nancy Worley became Secretary of State, an office that worked closely with the legislature on election legislation.  Despite strong opposition to ex-felon voting and non-photo ID among Republicans, Jim Carns expected an agreement to move voter ID and ex-felon voting "in tandem through the legislative process again this year."[208]  With a Republican governor, even with Democrats in the next two top offices, the prospects of some kind of voter ID bill passing improved.

116.  Fearing that "the Justice Department would not approve the requirement for a photo" ID to vote, [209] Gov. Riley backed a bill containing 18 different forms of documents.  (See Table 2, below.)  In early March, the House Constitution and Elections Committee approved both a broad voter ID and an ex-felon voting bill.  On the same day, the Senate Constitution, Campaign Finance, Ethics and Elections Committee approved a similar broad photo ID measure. [210]  According to House Majority Leader Ken Guin, the legislature was under pressure to pass a comprehensive elections bill in 2003 in order to qualify for $41 million in federal funds under the 2002 Help America Vote Act.[211]  But by April Fools' Day, an agreement between Republicans and black Democrats to link voter ID and ex-felon voting had broken down again.

---

[204] Michael Q. Guffey, "Education Funding Gets Top Priority for Carns," *Birmingham News*, May 15, 2002.
[205] No byline, "Office Seekers Split on Whether Voters Need to Show a Photo ID," *Birmingham News*, May 31, 2002.
[206] "Baldwin in Eye of Ballot Storm," *Birmingham News*, Nov. 7, 2002.
[207] See James H. Gundlach, "A Statistical Analysis of Possible Electronic Ballot Box Stuffing, The Case of Baldwin County Alabama Governor's Race in 2002," paper presented at Alabama Political Science Association, April 11, 2003.
[208] Kim Chandler, "Jeffco Taxes, Automatic Recounts, Security at Issue," *Birmingham News*, March 2, 2003.
[209] Editorial, "ID bill is a start, anyway," *Mobile Press-Register*, March 10, 2003; Phillip Rawls, "Feds must approve law on voter ID," *Huntsville Times*, June 23, 2003.
[210] No byline, "Legislature Briefs," *Birmingham News*, March 13, 2003.
[211] No byline, "Guin:  Election reforms expected," *Jasper Daily Mountain Eagle*, March 31, 2003.

Neither side had the votes of two-thirds of the House necessary to shut down a filibuster.[212]  A few weeks later, House Republicans filibustered for nearly 5 hours against the ex-felon voting bill.  The House Democratic leadership refused to allow a vote on the voter ID bill until ex-felon voting was acted upon.[213]

117.  Why were the Republicans so adamantly opposed to, and Democrats, so strongly in favor of, ex-felon voting?  The *Huntsville Times* caught the partisan and racial stakes succinctly: "Democrats want felons' voting rights restored because they believe those former felons - many of whom are black - would generally vote for Democratic candidates. Republicans don't want the voting rights restored because they are afraid those former felons would do just what the Democrats hope."[214]  This was not simply one newspaper's opinion.  Republican State Chairman Marty Connors was quoted in three newspapers as saying that he opposed the ex-felon voting bill because "There is no more anti-Republican [Party] bill than this. **As frank as I can be, we're opposed to it because felons don't tend to vote Republican**."[215]  Which Democratic voters did Connors have in mind?  Larry Dixon, R-Montgomery, long the chief sponsor of photo ID in the Senate, and an opponent of ex-felon voting, commented that Kennedy's bill was "a very big Black Caucus issue, primarily because so many of the black voters in the state would be benefited."[216]

118.  In May, the House passed Carns's broad voter ID bill, adding a provision that allowed anyone to vote without identification if at least two poll workers could vouch for the person's identity.  The vote was 81-17, with blacks in the minority and 7 legislators not recorded.[217]  Only Democrats supported ex-felon voting in the House.[218]  But the senate was locked in a power struggle between the Conservative Caucus of 6 Democrats and 10 Republicans and 19 Democrats who backed Pro Tem Lowell Barron, and it was not clear what legislation would move during the rest of the session.[219]  Only on the last day of the regular session did the senate

---

[212] Bill Barrow, "Sides negotiate voting bills," *Mobile Press-Register*, April 2, 2003.

[213] Kim Chandler, "GOP Filibusters on Felon Voting Bill," *Birmingham News*, April 25, 2003.

[214] Editorial, "Misleading arguments," *Huntsville Times*, April 27, 2003.

[215] Quoted in Editorial, "A political pickle," Anniston Star, June 24, 2003; Editorial, "Restoring Rights – Gov. Riley Must Ignore Partisans and Sign Voting Bill," *Birmingham News*, June 24, 2003.  My bold.

[216] Quoted in Editorial, "What's best," *Anniston Star*, June 26, 2003; Bill Barrow, "Voting bills could threaten tax plan STATE POLITICS FRACTURED DEAL?  The bills passed under an arrangement to end a decade-long dispute between white Republicans who support voter ID but oppose felon voting rights and black Democrats who hold the opposite view in both cases.  Voting bills split parties, with Riley in the middle," *Mobile Press-Register*, June 20, 2003.

[217] Bob Johnson, "House OKs bill requiring ID to vote," *Mobile Press-Register*, May 9, 2003.

[218] Bill Barrow, "Voting bills could threaten tax plan STATE POLITICS FRACTURED DEAL?  The bills passed under an arrangement to end a decade-long dispute between white Republicans who support voter ID but oppose felon voting rights and black Democrats who hold the opposite view in both cases.  Voting bills split parties, with Riley in the middle," *Mobile Press-Register*, June 20, 2003.

[219] Editorial, "Magic & Tragic," *Birmingham News*, May 10, 2003.

finally move to pass both an amended version of Kennedy's ex-felon voting bill and Carns's broad voter ID.[220]

119.  Kennedy's bill passed by 21-9, and voter ID passed by 32-0 after both sides, at the last possible minute, agreed to and abided by pledges not to filibuster either the ex-felon voting bill or the Carns voter ID bill.  Kennedy exulted:  "It says all of our citizens are valuable to our state," and she hoped it would make it much easier for up to 200,000 former inmates to regain the right to vote.[221]  Former Secretary of State Jim Bennett was equally jubilant about the passage of the voter ID bill:  "I am thrilled that finally, after 15 years of all those failed attempts, we have brought this most worthwhile issue to closure."[222]  The legislature also passed a bill to authorize a referendum on whether to remove language from the state constitution that authorized segregated schools and required poll taxes and another referendum, sponsored by Republican Gov. Bob Riley, to raise taxes and make them less regressive.[223]

120.  But Gov. Riley had not explicitly signed off on the ex-felon voting/voter ID deal, and he delayed 8 days before deciding whether to sign one or both bills.  Both sides tried to influence the governor.  State Republican Chair Marty Connors lobbied him to remember the partisan stakes for the GOP.   Democratic leaders in both houses reminded the governor that voter ID would not have passed except for the linkage with ex-felon voting.  African-American legislators were adamant.  Rep. John Rogers, D-Birmingham, warned that if Riley did not sign the ex-felon voting bill, "It will destroy his relationship with black legislators."  Rep. Alvin Holmes, D-Montgomery, put it in his usual blunt manner:  "If he doesn't sign it, his tax package is dead."  This was a real threat, because Riley's package not only increased taxes, it made them less regressive, and African-American voters were part of its natural support base. [224]

121.  Nonetheless, Gov. Riley signed the voter ID bill, but pocket-vetoed Kennedy's ex-felon voting measure, claiming that he had never been a party to any linkage agreement.  Larry Dixon, who had again carried the voter ID bill in the Senate, denied that there had been any deal to allow Kennedy's bill to become law.  Although before the governor acted, Dixon had declared

---

[220] Phillip Rawls, "Legislature moves fast on last day," *Huntsville Times*, June 17, 2003.

[221] Kim Chandler and David White, "Session Comes to a Close – Emergency Funds for Prisons OK'd – Ex-Felon Vote Bill, Smoking Limits Pass," *Birmingham News*, June 17, 2003; Bill Barrow, "Voting bills could threaten tax plan STATE POLITICS FRACTURED DEAL?  The bills passed under an arrangement to end a decade-long dispute between white Republicans who support voter ID but oppose felon voting rights and black Democrats who hold the opposite view in both cases.  Voting bills split parties, with Riley in the middle," *Mobile Press-Register*, June 20, 2003.

[222] Phillip Rawls, "Legislature moves fast on last day," *Huntsville Times*, June 17, 2003.

[223] Phillip Rawls, "Session ends with image-changing laws," *Mobile Press-Register*, June 18, 2003.

[224] Editorial, "A political pickle," *Anniston Star*, June 24, 2003; Bill Barrow, "Voting bills could threaten tax plan STATE POLITICS FRACTURED DEAL?  The bills passed under an arrangement to end a decade-long dispute between white Republicans who support voter ID but oppose felon voting rights and black Democrats who hold the opposite view in both cases.  Voting bills split parties, with Riley in the middle," *Mobile Press-Register*, June 20, 2003.

that he would be "very surprised" if Riley vetoed the ex-felon voting bill, after the veto, Dixon changed his stance, asserting that "There was never a Senate Republican that agreed to any kind of linkage.  The only thing I agreed to was that I would not filibuster felon voting rights."[225] According to the *Anniston Star*, the stances of Riley and Dixon were disingenuous, because "Everyone in Montgomery has known for more than a decade that a voter ID bill and felon voting legislation were companion pieces, to be passed and signed together."[226]

122.  None of the black legislators was more outraged than Alvin Holmes, who called Gov. Riley a "snake in the grass" who had "violated every trust."  Holmes promised to organize a march on the state Capitol to "dramatize to the nation what a racist we have as governor of Alabama." [227] Rep. Yvonne Kennedy declared that Riley's "veto has brought another national scar on Alabama's image."[228]  And Black Sen. E.B. McClain, D-Midfield, went so far as to threaten that if an ex-felon voting bill did not pass by the next year, African-American legislators would filibuster all other bills to bring about "a lockdown of the entire system."[229]  Pointing out that 62% of current prison inmates (compared to 26% of the state's population) were black, African-American lawmakers planned a "voter restoration summit" and a march on the Capitol in the torrid days of late July.[230]  About 800-1500 people marched, including Rev. Jesse Jackson and Rev. Joseph Lowery, carrying signs favoring ex-felon voting.[231]  The state NAACP planned to seek an emergency boycott of Alabama at the national NAACP convention in Miami.[232]

123.  Even though the Legislative Black Caucus endorsed Gov. Riley's tax package,[233] Rep. Kennedy and many of the Mobile-area black leaders did not.  According to Jerome Gray, spokesman for the Alabama Democratic Conference, the oldest black wing of the state party, a female representative with whom he'd talked recently said of Riley's tax plan "Let the crackers

---

[225] Bob Johnson, "Riley undecided on felon voting rights bill," Huntsville Times, June 18, 2003; Dave Bryan, "Riley nixes bill to give vote back to ex-cons," *Huntsville Times*, June 25, 2003; Bill Barrow and Sallie Owen, "Riley says he never agreed to sign felon bill.  Felon voting bill vetoed, voter ID signed into law," *Mobile Press-Register*, June 25, 2003.

[226] Editorial, "What's best," *Anniston Star*, June 26, 2003.

[227] Bill Barrow and Sallie Owen, "Riley says he never agreed to sign felon bill.  Felon voting bill vetoed, voter ID signed into law," *Mobile Press-Register*, June 25, 2003.

[228] Phillip Rawls, "Black legislators say governor's veto of felon voting rights another scar on Alabama," Associated Press, Montgomery Metro Area, June 26, 2003.

[229] David White, "Riley Rejects Felon Voting Bill – Black Lawmakers Cry Foul as Governor Gives Approval to Voter ID," *Birmingham News*, June 25, 2003.

[230] David White, "Riley Blasted on Felon Voting Bill – Black Lawmakers Plan March, Voting Restoration Summit," *Birmingham News*, June 27, 2003.

[231] Jon Krawczynski, "Jackson, protesters blast Riley on felon bill," *Huntsville Times*, July 19, 2003; Rhoda A. Pickett, "Jackson joins Montgomery protest.  Hundreds protest veto of felons voting rights," *Mobile Press-Register*, July 19, 2003.

[232] Editorial, "Boycotts and progress," *Huntsville Times*, July 1, 2003.

[233] Phillip Rawls, "Black legislators say governor's veto of felon voting rights another scar on Alabama," Associated Press, Montgomery Metro Area, June 26, 2003.

pass it."[234]  But with two weeks to go before the September tax referendum, the Republican party badly split on the issue, and polls showing Riley's plan 20 points behind, the governor met with Kennedy and local Mobile black leaders and promised to support an ex-felon voting bill in a special legislative session to be held after the tax vote. Two days later, Kennedy and Riley appeared together before a crowd at the University of South Alabama to campaign for Riley's plan.  It was a sign of how important the ex-felon voting issue was to the black community that Kennedy and others had withheld support from a tax plan that would exempt about half of all black households from paying any income tax and reduce cuts in education spending.[235]

124.  After the tax plan failed and the legislature met in special session to deal with the resulting budget catastrophe and ex-felon voting, wary black legislators promised to force Gov. Riley to sign Kennedy's bill before they would deal with the fiscal disaster.  Rep. Scott Beason, R-Gardendale, a senate sponsor of the 2011 photo ID bill, demurred, opposing even consideration of an ex-felon voting measure.[236]  What emerged from the House Government Finance and Appropriations Committee was a compromise that still required each ex-felon to apply to the Parole Board, but promised action on each petition in 60 days, rather than the then-current several years.  Hiring 100 new parole officers would speed up the process.  Kennedy somewhat reluctantly accepted the amended plan.[237]  Still, House Republicans balked at the deal and filibustered the bill, in what must have been an excruciating series of 10-minute speeches, for 6 hours.  Finally, after 2 more hours of debate (in stark contrast to the extremely truncated discussion of the 2011 voter ID bill), the ex-felon voting bill passed the House on a 47-42 vote, with 39 of the body's 42 Republicans in opposition, 2 in favor, and 1 not voting.  Forty-five of the 63 House Democrats favored the bill, 3 opposed, and 15 were absent or not voting.[238]  After barely defeating an amendment by Larry Dixon, which would have required another House vote and possibly entirely derailed the bill, the Senate approved the measure by 21-11. Democrats backed the plan by 21-2, with 2 not voting; 9 of the 10 Senate Republicans voted nay, while one did not vote.[239]

---

[234] No byline, "Political Skinny:  Felon vote not necessarily a sure thing.  Davis a rising star on Capitol Hill," *Mobile Press-Register*, June 30, 2003.  "Cracker" is a derogatory term for poor whites.

[235] Bill Barrow, "Spokesman:  Plans in flux.  State GOP committee likely to reject Riley plan," *Mobile Press-Register*, Aug. 22, 2003; Steve Myers and Sallie Owen, "Some black leaders now back Riley plan," *Mobile Press-Register*, Aug. 24, 2003; Jeff Amy, "Riley urges 'yes' vote on tax plan.  Kennedy endorses Riley's tax plan," *Mobile Press-Register*, Aug. 26, 2003.

[236] Kim Chandler, "Battle for Felon Vote Bill Brews – Won't Be 'Tricked Again,' Demo Says," *Birmingham News*, Sept. 17, 2003.

[237] Bob Johnson, "Felon voting rights included in parole bill," *Huntsville Times*, Sept. 18, 2003.

[238]Shelley F. Smith, "session halts on filibuster," *Albertville Sand Mountain Reporter*, Sept. 20, 2003;  David White, "Felon Bill May Hold Up Budgets – Backers, Foes See Prospect House Will Miss Deadline," *Birmingham News*, Sept. 21, 2003; Bill Barrow and Sallie Owen, "House ends standoff on felon voting rights bill," *Mobile Press-Register*, Sept. 23, 2003; David White, "House Oks Revised Felons Voting Bill," *Birmingham News*, Sept. 23, 2003.

[239] Phillip Rawls, "Alabama Legislature approves early release of inmates to reduce costs in prison system," Associated Press Montgomery Metro Area, Sept. 25, 2003; David White, "Lawmakers Approve Felon Voting Rights Bill.  Parole Board Expansion Aims to Trim Prison Rolls," *Birmingham News*, Sept. 25, 2003.

125.  The long, bitter, and manifestly partisan and racial struggle over ex-felon voting, and the repeated linkage of that issue with voter ID in Alabama goes a long way toward undermining any contention that voter ID was adopted without any racial purpose.

## Table 2: Forms of Identification in Particular Bills, 2002-11

| ID | Year | | | |
|---|---|---|---|---|
| | 2002[240] | 2003[241] | 2011a[242] | 2011 as passed[243] |
| **Driver's License** | x | x | x | x |
| **Passport** | x | x | x | x |
| **Free ID from Dept. Public Safety** | x | | x | x |
| **Government Photo ID, U.S. or any state** | x | x | | x |
| **Employee Photo ID from any Agency of U.S., AL, or any AL Local Jurisdiction** | | x | | x |
| **AL College Student Photo ID** | x | x | x | x |
| **Military Photo ID** | x | x | x | x |
| **Tribal Photo ID** | | | | x |

---

[240] Kim Chandler, "House Oks Watered-Down Bills for Voter ID, Voting by Felons," *Birmingham News*, Jan. 16, 2002.

[241] Bill Barrow, "Sides negotiate voting bills," *Mobile Press-Register*, April 2, 2003; Bob Johnson, "House Oks bill requiring ID to vote," *Mobile Press-Register*, May 9, 2003.

[242] Bob Lowry, "Some get early start with bills," *Huntsville Times*, Feb. 28, 2011

[243]Act No. 203-381, a document filed in U.S. District Court, N.D. of Alabama, Jan. 29, 2016; Section 5 Submission, July 2, 2003, a document filed in U.S. District Court, N.D. of Alabama, Jan. 29, 2016.

| | | | |
|---|---|---|---|
| **Recognition by 2 Election Officials** | | x | | x |

| ID | Year | | | |
|---|---|---|---|---|
| | **2002** | **2003** | **2011a** | **2011 as passed** |
| **Challenged or Provisional Ballot** | | x | | x |
| **Employee Photo ID** | x | x | x | |
| **Other Photo ID** | | | | |
| **State or U.S. Government ID (photo or non-photo)** | | x | | |
| **Birth Certificate (certified)** | x | x | x | |
| **Court Records Showing Adoption or Name Change** | x | x | x | |
| **Naturalization Papers** | x | x | | |
| **Government Check Listing Name, Current Address** | | x | | |
| **Work ID** | | | | |

| Voter Registration Card | | x | | |
|---|---|---|---|---|
| Medicare Card | x | x | | |
| Social Security Card | x | x | x | |
| Food Stamp Card | x | | x | |
| Medicaid Card | x | x | x | |
| **ID** | **Year** | | | |
| | **2002** | **2003** | **2011a** | **2011 as passed** |
| Welfare ID | | | | |
| Marriage License | | | | |
| Credit Card | | | | |
| Check-Cashing Card | | | | |
| Bank Statement | | x | | |
| Electronic Benefits Transfer Card | | x | | |
| Current Utility Bill | | x | | |
| Hunting or Fishing License | x | x | x | |
| Pistol Permit | x | x | x | |
| Pilot's License | x | x | x | |
| Other Form of ID | | | | |
| Affidavit and Birthdate, | x | | | |

| | | | | |
|---|---|---|---|---|
| **Address, or Other Info.** | | | | |
| **Library Card** | | | | |

# C. The Lull from 2003 Until 2011

## 1.  What Did Not Happen

126.  The most important facet of the next seven years was what did <u>not</u> happen:  despite many investigations by Alabama Republican Attorneys General and Secretaries of State, there was no evidence of, much less a prosecution for in-person voting fraud, and despite the efforts of Republican governors and legislators, there was no consideration on the floor of either house of the legislature of a photo ID bill.

## 2.  Revealing Referenda on Constitutional Amendments

127.  Alabama could not escape its past, and attempts to do so in 2000 and 2004 cast an interesting light on white public opinion.  The majority of white voters were unwilling to explicitly overturn state constitutional provisions that had long been rendered inoperative by judicial decisions.  The state's extremely detailed 1901 constitution, which has never been comprehensively revised, contained many vestiges of the days of explicit, formal racial discrimination.  In 2000, 60% of the voters in a referendum endorsed removing from the state's constitution a ban on interracial marriage,[244] but a political scientist estimated that only 44% of whites voted for the proposition.[245]

128.  In 2004, the administration of Gov. Bob Riley proposed to replace the unenforceable sections mandating segregated schools and authorizing the use of a poll tax as a suffrage requirement.  In the legislature, black and white Democratic leaders added to the proposal a repeal of a 1956 state constitutional amendment that had obviously been meant to circumvent the Supreme Court decision in *Brown v. Board of Education*.  One section of the 1956 amendment, for example, stated that

> To avoid confusion and disorder and to promote effective and economical planning for education, the legislature may authorize the parents or guardians of minors, who desire that such minors shall attend schools provided for their own race, to make election to that end, such election to be effective for such period and to such extent as the legislature may provide.[246]

Because the 1956 amendment stated that "nothing in the constitution shall be construed ... [as] recognizing any right to education or training at public expense," Roy Moore, not then on the State Supreme Court,[247] charged that a repeal might be used in a school equity lawsuit to force an

---

[244] The U.S. Supreme Court, of course, had outlawed such bans in *Loving v. Virginia*, 388 U.S. 1 (1967).
[245] Bob Blalock, "What's The Real Hidden Agenda on Amendment?" *Birmingham News*, Oct. 13, 2004.
[246] Steven Stiefel, "Critics fighting proposal," *Albertville, AL Sand Mountain Reporter*, Oct. 21, 2004.
[247] Moore had been removed from the State Supreme Court by the State Judicial Inquiry Commission in 2003 for violating six canons of ethics for disobeying a federal court order to remove a monument to the Ten Commandments

increase in taxes to pay for educating children in poor school districts.[248]  Considering this largely "a symbolic vote," the *Birmingham News* declared that "The consequences [of its rejection] would be awful. The national media would descend on Alabama and have a field day recounting this state's racist defiance, reinforcing all the stereotypes. State leaders and industrial recruiters would have a tough time explaining to companies considering locating in Alabama exactly why its citizens prefer racist language in the state constitution. Tourism would suffer."[249] Encouraging voters to vote "yes" in the referendum, the spokesman for Gov. Riley declared that "The defeat of Amendment Two would send a horrible message to the rest of the nation."[250] Even though Amendment Two passed both houses of the legislature unanimously,[251] the state's voters rejected it, prompting editorial condemnation across the country, including in other southern states.  "Alabama is still wrestling with ghosts other parts of the South exorcised decades ago," declared the *Pittsburgh Post-Gazette*.[252]

129.  Importantly for this case, one legislator who loudly opposed Amendment Two in the referendum phase was then-Rep. Scott Beason, R-Gardendale, one of the chief senate sponsors of H.B.19 and of 2011's H.B.56, the attempt to crack down on "illegal immigrants." Beason defended the 1956 amendment as an effort, as a conservative newspaper paraphrased his views, "to stave off any communist influences in Alabama public schools."  In 1956, a contention by a white Alabama politician that a measure authorizing a continuation of school segregation, in obvious defiance of *Brown v. Board of Education*, was the result of "communist influences" would have been deplorable, but common.  But to make such a statement nearly 50 years later marks a politician as dramatically out of the mainstream, and it undermines the credibility of any denial by Beason that H.B.19 or H.B.56 had a racially discriminatory purpose.

### 3.   An Intensive Search for Fraud Turns Up Only Absentee Irregularities

130.   During her 2006 campaign, Republican nominee for Secretary of State, Beth Chapman offered money to whistleblowers who would expose election fraud in 59% black Hale County.[253] Apparently, no one took Chapman up on her offer, and the only proven fraud in elections in Hale

---

from the Alabama Supreme Court building.  No author, "A Roy Moore timeline:  From Ten Commandments to Gay Marriage," *al.com*, Sept. 30, 2016, www.al.com/news/birmingham/indes.ssf/2016/05/a_roy_moore_timeline_from_ten.html.

[248] Phillip Rawls, "Moore says vote on Jim Crow law is 'fraud,'" *Huntsville Times*, Oct. 11, 2004.  Moore's interpretation did not take into account the fact that as a result of earlier litigation on school equity, a 1996 state constitutional amendment banned state courts from ordering the legislature to expend funds.  Philip Rawls, "Amendment Two foes fear school-spending order.  Amendment Two gains two more anti-tax foes," *Mobile Press-Register*, Oct. 16, 2004; David White, "Governor Supports Amendment 2," *Birmingham News*, Oct. 21, 2004.
[249]Bob Blalock, "What's The Real Hidden Agenda on Amendment?" *Birmingham News*, Oct. 13, 2004.
[250]Philip Rawls, "Amendment Two foes fear school-spending order.  Amendment Two gains two more anti-tax foes," *Mobile Press-Register*, Oct. 16, 2004.
[251] Jeff Amy, "Vote on Amendment 2 set for Nov. 2.  Alabama constitution could get new look*," Mobile Press-Register*, Oct. 23, 2004.
[252] Quoted in Bob Blalock, "Passing 'clean' amendment may be messy," *Birmingham News*, Nov. 24, 2004.
[253] Roy Hoffman, "Worley faces Chapman for secretary of state," *Mobile Press-Register*, June 7, 2006.

County during this period involved a runoff election for mayor in 2004. Those irregularities, like all other proven irregularities in Alabama during this period, involved absentee ballots.[254] During her term as Secretary of State from 2003 to 2007, Nancy Worley received no reports of voter impersonation fraud.[255]

131.   Although there were few convictions for absentee ballot fraud after the 1990s, there were many investigations by the Alabama Secretary of State and Attorney General, as well as by the U.S. Department of Justice, such as in the 2008 primary election in Bullock, Lowndes, Perry, and Randolph counties, where investigators never filed charges.[256]   During the 2008 general election, Republicans led by state party chairman (and 2011 House Speaker) Mike Hubbard organized a "ballot security initiative" that placed an attorney in every Alabama county to prevent ballot fraud.[257]   Republican Party Communications Director Philip Bryan said the Party had run similar programs in past election years.[258]   Attorney General Troy King set up a toll-free hotline in 2008 so that citizens could easily report alleged voter fraud.[259]   In 2010, Secretary of State Chapman set up a "Voter Fraud Task Force."[260]   Touting her searches for fraud in a meeting with the editorial board of the *Anniston* Star, Chapman focused only on what the paper called "counties that were heavily Democratic and black."[261]   Newspapers carried no reports of any fraud detected by any of these programs, which casts doubt on contentions that there was any fraud at the polls that would be inhibited by a photo ID requirement.

132.   As Secretary of State Beth Chapman, a staunch proponent of photo ID laws, remarked in 2009, "**The voter fraud that has been proven (in Alabama) has all come through absentee ballots.**"   An editorialist for the *Huntsville Times* made explicit the implication for photo ID laws:   "Alabama's history of voter fraud involving absentee ballots is not mirrored by any documentation of voter fraud involving people voting in other people's names.   Even the staunchest proponents of a photo ID can provide no evidence to justify the measure."[262]

---

[254] Editorial, "Toughen law with photo ID," *Mobile Press-Register,* Dec. 24, 2006.

[255] Nancy Worley Deposition, Feb. 21, 2017, at 61-62.

[256] No byline, "State AG's office seizes Perry voting records," *Birmingham News*, June 6, 2008; Bob Johnson, "DA seeks federal probe of Perry County primary," *Mobile Press-Register*, June 9, 2008; Phillip Rawls, "Alabama AG says Justice Dept. obstacle in probe," *Opelika-Auburn News*, June 24, 2008; Mike Faulk, "3 month later, Randolph County election controversy still lingers," *Anniston Star*, Sept. 3, 2008; Phillip Rawls, "Absentee voting interest heavy across state," *Anniston Star*, Oct. 17, 2008..

[257] Kim Chandler, "Registration closes with record numbers.  Lawyers to check for shenanigans," *Birmingham News*, Oct. 25, 2008.

[258] Amy Weaver, "State parties step up efforts to fight voter fraud," *Opelika-Auburn News*, Oct. 26, 2008.

[259] Thomas Allen, "AG King announces election fraud hotline," NBC – 13 WVTM (Birmingham, AL), Oct. 29, 2008.

[260] Bob Lowery, "Candidates focus on voter fraud, victims' rights," *Birmingham News*, Oct. 24, 2010.

[261] Editorial, "Chapman a flawed candidate, but best choice for secretary of state," *Anniston Star*, Oct. 29, 2010.

[262] John Ehinger, "Clean, open elections," *Huntsville Times*, Feb. 10,2009.  Chapman is quoted to this effect repeatedly:  "'. . . the voter fraud that has been proven, and indictments (that) have come in the past, have all come from absentee ballots,' Chapman said."  Kim Chandler, "House panel approves measure on early voting.  If enacted, anyone could vote absentee." *Birmingham News*, Feb. 6, 2009.  Chapman acknowledged in a speech to a Republican

### 4. Inaction on Photo ID Because of Opposition from African-American Legislators

133.  With the adoption of the 2003 voter ID bill, the struggle largely quieted down until after the 2010 elections.  The desirability of requiring a photo ID to vote, however, remained an article of faith within the Republican Party.[263]  When she announced her candidacy for Secretary of State, over a year before the 2006 elections, for example, State Auditor Beth Chapman emphasized that, if elected, she would push for a photo ID bill.[264]  Although the only voter ID bill that newspapers noted for several years died in committee, interest spiked after the U.S. Supreme Court's opinion in *Crawford v. Marion County, Indiana*.[265]  Alabama Republicans interpreted *Crawford* to mean that any photo ID bill was constitutional and might well pass muster under Sections 2 and 5 of the Voting Rights Act.[266]  In the 2009 legislative session, Attorney General Troy King cooperated with Rep. Greg Canfield and Sen. Larry Dixon to introduce a photo ID bill.[267]  The *Huntsville Times* speculated that King's sponsorship of a photo ID measure represented an effort to win the Republican nomination for governor in 2010.[268]

134.  African-American state legislators fumed.  Rep. Alvin Holmes, D-Montgomery, declared that the Legislative Black Caucus would "use every method known to human ingenuity to block this," decrying photo ID laws as a way "to keep black people oppressed in this country." Proponents never answered the charges of Holmes or other black legislators directly, and when they cited the necessity of identification in daily activities, they listed only middle-class activities and neglected the fact that private photo ID requirements usually allowed a much greater range of cards than photo ID laws did.  "If you go to your own bank they demand a photo ID," said Secretary of State Beth Chapman.  (Many poor people do not have checking accounts.)   Then-House Minority Leader and Republican State Chairman Mike Hubbard, R-Auburn, remarked that "For the life of me, I don't see how it can be intimidating for you to have to prove you are who you say you are and that you are alive." [269]  (In many small towns and rural areas, people have known each other all of their lives.)  Apparently oblivious to the fact that some Alabamians

Women of Huntsville meeting that "those against photo voter identification claim it's a financial burden, particularly on poor minority voters."  She promised to organize private fundraising meetings to allay the costs.  Victoria Cumbow, "Top voting official touts overseas plan," *Huntsville Times*, April 8, 2009.  There is no record of such fundraising after the photo ID bill went into effect in 2013.

[263] "State Republicans, for instance, continue to push for a stronger voter ID law, one that would require voters to show a picture ID. This is despite the fact that voter fraud involving someone voting in someone else's name is either nonexistent or so rare as to make it irrelevant." John Ehinger, "Voting Rights Act relief," *Huntsville Times*, July 1, 2009.

[264] Bob Johnson, "Beth Chapman to run for secretary of state," *Huntsville Times*, Aug. 9, 2005.  As pointed out above, Chapman had credited the issue with enabling her to win the Republican nomination for Auditor in 2002, even though the Auditor had no responsibility for elections.

[265] 553 U.S. 181 (2008).

[266] Bob Johnson, "GOP to push for stronger voter ID law in Alabama," AP, April 30, 2008; editorial, "Court clears way for strong voter ID law," *Mobile Press-Register*, May 2, 2008.

[267] Dewayne Patterson, "AG announces legislative crime package," *Scottsboro, AL Daily Sentinel*, Jan. 6, 2009.

[268] John Ehinger, "King's shopping list," *Huntsville Times*, Jan. 7, 2009.

[269] Bob Johnson, "GOP to push for stronger voter ID law in Alabama," AP, April 30, 2008.

lacked internet connections and did not frequent movie theaters, Attorney General Troy King justified a photo ID law by saying "My goodness . . . To pick up movie tickets you ordered online you have to show identification."[270]

135.  An Associated Press survey of legislators at the beginning of the 2009 legislative session found photo ID favored in the House by 45% - 38%, and in the senate, by 47% - 37%, margins that suggested that any bill could easily be defeated by a filibuster.[271]  Rep. Alvin Holmes charged that a combination of racial and partisan purposes were behind the campaign for photo ID: "A lot of older people do not have photo IDs.  This issue is being pushed by Republicans who think they can cut down on as many black voters as possible."  The sponsor of one bill, Rep. Greg Canfield, R-Vestavia Hills, did not deny the contentions of Holmes and other African-American legislators about the intent of photo ID laws, and he dismissed the lack of evidence of in-person voting fraud: "Whether or not voter fraud occurred is not as important as people having faith and confidence in the system itself.  When confidence is eroded, people tend to not participate in the process."[272]

136.  Nor did Canfield or any other proponent of a photo ID bill answer the argument of the *Birmingham News*, which had long favored voter ID in principle, that

> Alabama has a voter ID law that appears to be doing a fine job. . . . If [Attorney General Troy] King could point out some particular problem with the current law, that would be worth considering. . . . But we don't see a compelling, have-to reason why a voter must show a photo ID, either, as long as there are other provisions that require voters to prove their identities.  Alabama's law already does that.[273]

After several members argued that a photo ID bill by Rep. Gerald Allen, R-Cottondale, the lead senate sponsor of H.B. 19 in 2011, might "discourage some poor and elderly people from voting," the House Constitution and Elections Committee voted 7-4, along straight party lines, not to report the bill to the floor.[274]  When Allen promised to amend the bill to try to attract more

[270] Bob Johnson, "Survey:  State bill to require voters to show ID not certain to pass," *Anniston Star*, Jan. 26, 2009.
[271] Bob Johnson, "Survey:  State bill to require voters to show ID not certain to pass," *Anniston Star*, Jan. 26, 2009.
[272] Whitney McHugh, "Alabama voter photo ID no lock for passage," *Dothan Eagle*, Jan. 26, 2009.  **Error! Main Document Only.**In a national survey published before Canfield's statement and widely reported, Stephen Ansolabehere and Nathaniel Persily, "Vote Fraud in the Eye of the Beholder: The Role of Public Opinion in the Challenge to Voter Identification **Error! Main Document Only.**Requirements,"121 Harvard L.R. 1737 (2008), at 1751-58, found no correlation whatsoever between citizens' beliefs about the existence of voter fraud in general or voter impersonation fraud in particular and their turnout rates in the 2006 general election.  They also found no evidence that living in a state with a voter ID law or being asked individually to present a photo id at the polls decreased a respondent's belief that elections were characterized by fraud or theft.  In other words, requiring a photo ID did not lead survey respondents to express more confidence in the honesty of elections.
[273] Editorial, "Voter ID law fine as is," *Birmingham News*, Feb. 5, 2009.
[274] Bob Johnson, "House panel delays state voter identification bill," *Anniston Star*, Feb. 12, 2009.

support and asked that a hearing on the bill be rescheduled, Rep. Jack Page, D-Gadsden, suggested that the committee reschedule it for "the second coming of Jesus."[275]   When Allen nevertheless a slightly amended bill in 2010, it passed the same House committee by 8-3, garnering the votes of at least 6 white Democrats.[276]   But the bill apparently never made it to the floor of either house of the legislature.

# V.   Photo ID in the 2011 Legislature

## A. Alabama's Second "Redemption" Fully Aligned Party and Race

137.   Reconstruction after the Civil War was not fully overturned until the 1901 constitutional convention legally disfranchised African-Americans, but it was considerably undermined by what white supremacists called the "Redemption" of the state from Republican control in the 1874 election.  That Redemption drove the vast majority of whites out of the Republican party and largely aligned the partisan and racial divisions in the state for the next 90 years, with the exception of the Populist/Democratic contests of the 1890s.  If you were a white Alabamian, you were almost certainly a Democrat; if African-American, a Republican.    The Republican Party did not regain majorities in both houses of the state legislature for 136 years.

138.   Even though the "Second Reconstruction" from the 1960s on was much more muted in Alabama than its counterpart a century earlier, the "Second Redemption" of the state in 2010 announced a radical shift in rhetoric and policy.  Partly because George Wallace, unlike Strom Thurmond and other conservative southern Democratic leaders, never shifted to the Republican party, Alabama's post-Civil Rights realignment was delayed.  Reliably Republican in presidential elections from 1980 on, the state continued to vote for Democratic state legislators and at times, for Democratic state officeholders until 2010, and white Democrats maintained considerable power in both houses of the legislature.

139.   Over the years, Republicans convinced white Democratic legislators and members of Congress to switch parties. But according to declarations from white and black Democratic legislators in the case of *Alabama Legislative Black Caucus v.* Alabama and Sen. Hank Sanders in this case, they never approached black legislators to switch.[277]  As Senator Joe Hubbard, a

---

[275] David White, "Panel votes on party lines to delay bill to require voter ID," *Birmingham News*, Feb. 12, 2009.
[276] Editorial, "No need for photo finish," *Birmingham News*, Feb. 6, 2010; David White, "Panel approves photo-voter cards under most situations," *Birmingham News*, Feb. 18, 2010; editorial, "Alabama, Mississippi need stronger voter ID," *Mobile Press-Register*, Feb. 22, 2010.  The committee had a majority of 9 Democrats.
[277] Sanders deposition, at 72-74.  According to the direct testimony in that case by Dr. Theodore S. Arrington, at paragraph 31, there were declarations supporting this statement in that case by white Democratic legislators Roger Bedford, Joe Hubbard, Jonny Morrow, and Craig Ford and black Democratic legislators Henry Sanders, Bobby Singleton, Linda Coleman, Rodger Smitherman, Quinton Ross, James E. Buskey, Darrio Melton, John Knight, Lawrence McAdory, Merika Coleman, Pebblin Warren, Laura Hall, Mary A. Moore, John W. Rogers, Thad McClammy, Napoleon Bracy, and Oliver Robinson.

white Democrat, put it, "I was told that I needed to switch from the Democratic Party to the Republican Party because, in the future, the Democratic Party would be virtually a black party."[278]  One prominent Alabama Democrat who switched shortly before the 2010 election contests began was North Alabama Congressman Parker Griffith, a freshman congressman who had in 2008 taken over a seat long held by Democrats after Congressman Bud Cramer retired.[279] According to Secretary Worley, the Democrats who switched were "closet Republicans" and she believed that race played a part in their decision to change parties.[280]

140.  Those white Democratic legislators who had not switched by 2010 were especially targeted by Republicans.  Then-chair of the Republican State Republican Committee and subsequently Speaker of the House (until his conviction) Mike Hubbard wrote in his 2012 memoir that "I commissioned an in-depth study of voting patterns in various districts represented by white Democratic legislators across the state. We looked at past results in presidential elections, gubernatorial contests, and other statewide offices and pinpointed the areas that cast the most Republican ballots yet continued to send [white] Democratic lawmakers to Montgomery."[281] Both conversions and targeting had the same goal:  polarizing the parties racially in order to guarantee Republican victories in a majority-white polity.

141.  Like the 19th century events, the 2010 election not only expelled the party that had been in power, but it also brought race and party into alignment, this time with Democrats becoming the "black party" and Republicans, the "white party."  Although no exit polls from the 2010 general election appear to be available for Alabama, Barack Obama received the votes of only 10% of whites in the state in 2008 and 15% in 2012, the second lowest proportion of the non-Hispanic white vote that he gained in any state.  In 2008, 98% of African-Americans in Alabama voted for the first black presidential candidate of a major political party.[282]  No doubt the gubernatorial and state legislative elections were less racially polarized, but the tendency toward racial polarization in state elections was, by 2010, surely in the same dramatic direction as in presidential elections.

142.  The legislative shift was sudden and dramatic.  Figure 1 shows how weak Republicans were in the legislature in 1990, holding only 23 (of 105) seats in the House and 7 (of 35) in the Senate.  (All Republican legislators were white from 1990 on.)  By 2000, white Democrats still outnumbered Republicans, but both Republicans and black Democrats had expanded their numbers.  By the 2008 election, Republicans had barely surpassed white Democrats, but whites still safely controlled the Democratic party in the legislature.  The 2010 Redemption election

---

[278] Hubbard declaration, quoted in Arrington testimony, paragraph 31.

[279] Patrik Jonsson, "Parker Griffith party switch: Will other Democrats follow suit?; Rep. Parker Griffith of Alabama announced Tuesday he is switching parties. That could put pressure on other conservative Democrats, especially in the Deep South, to jump ship." *Christian Science Monitor*, Dec. 22, 2009.

[280] Worley Deposition, at 231-33.

[281] Hubbard, *Storming the State House* (Montgomery:  New South Books, 2012), 116.  Emphasis added.

[282] See http://www.cnn.com/ELECTION/2008/results/polls/#val=ALP00p1; http://www.amren.com/features/2012/11/race-and-the-2012-election/.

ousted white Democrats.  In the 2011 session, not only were 63% of the legislators Republicans, but within the Democratic party, 67% of the legislators were African-American.

143.  The new legislators were also unusually inexperienced, and thus, unusually likely to be subject to direction from more veteran leaders.  A "tidal wave" wiped out long-time white Democratic incumbents in both houses.[283]  In the 2011 House, 78% had never before held a public office of any kind before coming to the legislature; in the Senate, 46%.[284]  And in the view of the state's leading political columnist, a 16-year veteran legislator who had shifted from the Democratic to the Republican Party late in his career, the 2011 Alabama legislators were "far to the right of the national Tea Party movement."[285]  Thus, the ideology of key leaders on racial issues in the 2011 Alabama legislature deserves even more attention in any account of the purpose of racially-tinged laws than in a more typical legislature.

---

[283] Steve Flowers, "History will be made on Goat Hill next week," *Jacksonville News*, Jan. 4, 2011; Steve Flowers, "GOP enjoys filibuster-proof House majority," *Lanett Valley Times-News*, Jan. 12, 2011.
[284] David White, "Legislators have a lot in common Most married, male and in GOP," *Birmingham News*, March 20, 2011.
[285] Steve Flowers, "King Hubbert dethroned by Republicans," *Lanett Valley Times-News*, April 13, 2011.  On Flowers, see Malcomb Daniels, "Erwin, Murphy Bearing Down as Runoff Nears," *Birmingham News*, June 19, 2002; Steve Flowers, "Popular attack has been illegal immigration," *Leeds News*, Aug. 6, 2008; Steve Flowers, "First legislative regular session of quadrennium," *Talladega Daily Home*, Feb. 13, 2011.

67

**Figure 1:  Party and Race in the Alabama Legislature, 1990-2011**

**A.  The House**



**B.  The Senate**



144.  To achieve the Second Redemption, Republican leaders stressed racial issues in two ways. First, according to one of the premier historians of Alabama, Auburn Professor Emeritus Wayne Flynt, the mastermind of the 2010 Alabama Republican campaign for legislative seats, Rep. Mike Hubbard, designed the campaign so that Republicans were "basically running against Barack Obama."  Even though open race-baiting was no longer acceptable, "What you can do is you use Obama as a metaphor and everybody understands what that's about.  It's not about Obama and it's not about race in Washington and it's not about race in America.  But it's about race in Alabama."[286] Flynt was not alone in his judgment about the Republicans' campaign strategy.  Senator Sanders testified that, in 2010, "you had people even with school board -- local school board election people running against President Obama. He became a symbol for black people and they didn't have to say, you know, vote against blacks. They could just say vote against Obama."[287]  The *Decatur Daily* declared editorially that in 2010 Alabama Republicans decided to "make the [state] House and Senate races a referendum on President Barack Obama."[288]  Second, in their platform, the "Republican Handshake with Alabama," Republicans stressed their intention to pass a bill to drive "illegal immigrants" out of the state, patterning it on Arizona's S.B. 1070, which had already been successfully challenged in federal court.  Likening undocumented persons to terrorists who "threaten[] our homeland security," Republicans charged that "illegal immigrants and their allies are working to gather political power and influence" and promised to charge "any illegal immigrant who registers to vote, or attempts to, or casts a ballot," and anyone who assisted them, with a felony.[289]  Inflammatory and un-evidenced, these charges were, nonetheless, effective.  Republicans, who spotlighted the issue in their "Handshake with Alabama,"[290] won their largest partisan victory in the Alabama state legislature since 1872.[291]

145.  The 2010 election had two consequences that were critical for this report:  First, Republicans had such overwhelming majorities in the legislature that they could push through any policies that they wished; Democrats could not even carry off a successful filibuster.[292]  Second, any partisan action by Republicans in the legislature was by definition also a racial action.  In particular, because of the overlap between racial and partisan divisions, any

---

[286] Paul Gattis, "6 opinions from Wayne Flynt on Alabama politics, the Democratic Party, Mike Hubbard, Parker Griffith and Robert Bentley," *AL.com*, May 15, 2014.

[287] Hank Sanders Deposition, at 81-82; see also Nancy Worley Deposition, at 233-34.

[288] Editorial, "Majority will like Republican agenda," *Decatur Daily*, Aug. 18, 2010.

[289] Press release, "Republican Handshake with Alabama," Aug. 16, 2010, in possession of the author.

[290] "Republican Handshake with Alabama," <allhousegop.com/handshake-with-alabama/>.

[291] No author, "Republicans claim majority in Alabama House and Senate for 1st time in 136 years," *al.com*, Nov. 2, 2010 <blog.al.com/live/2010/11/republicans_historic_alabama_majority.html>.

[292] The state's most widely published political commentator, former legislator Steve Flowers, referred to the 2010 election as a "tidal wave . . . sea change." Steve Flowers, "History will be made on Goat Hill next week," *Jacksonville News*, Jan. 4, 2011.  See also Steve Flowers, "GOP enjoys filibuster-proof House majority," *Lanett Valley Times-News*, Jan. 12, 2011.

contention that the Photo ID law, HB 19, was motivated by a partisan purpose is tantamount to saying that it was motivated by a racial purpose.

## B. The Stealth Photo ID Bill in the 2011 Legislature

146.  There were no public hearings on HB 19, no open committee meetings, no transcripts of debates, no amendments allowed.  This was a much less open procedure than those that other southern states used in considering Photo ID bills and a departure from the hearings and substantial debates on voter ID bills in Alabama from 1995 through 2003, and departures from conventional institutional procedures are potential indicators of discriminatory intent under the *Arlington Heights* standard.[293]  When the Texas and North Carolina legislatures considered Photo ID bills in the 2011 and 2013 legislatures, respectively, they held fairly extensive public hearings and allowed Democrats to present amendments, although they voted almost all of the amendments down.[294]  Both the hearings and the amendments in those states provided insights into the purposes behind the legislatures' actions, and they gave opponents opportunities to raise objections to what they considered the racial intentions and likely racially discriminatory effects of the bills.  The rejections of those amendments and adoptions of new, more restrictive amendments, provided important evidence about racial intent in the subsequent litigation, evidence that judges in the resulting cases found telling.[295]

147.  For Alabama, the extensive and very instructive pre-2003 debates and battles, discussed in detail above, and the 2003 law itself must largely stand in for the sparse 2011 record.  Every provision of the 2003 law – all forms of identification that were not allowed by the HB 19 – represents, in effect, an amendment that was rejected by the 2011 legislature.  These 15, including voter registration certificates, Medicaid and Electronic Benefits Transfer cards, Social Security and Medicare cards, naturalization records and certified birth certificates, should play the same role in an analysis of the law's intent as proposed amendments in Texas or narrowing amendments in North Carolina did.  By in effect rejecting so many alternatives that would obviously have allowed more poor and black people to have identification documents that would qualify them to vote, the Alabama legislature was making a revealing choice.

---

[293] See *Village of Arlington Heights v. Metro Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977).

[294] Texas House of Representatives, 82nd Legislature, Select Committee on Voter Identification and Voter Fraud Hearing, March 1, 2011 (transcript); Texas House of Representatives, "Re:  Adoption of Conference Committee Report on SB14-Voter ID #123308686" (transcript); North Carolina House Committee on Elections, "Public Hearing on Voter Identification, March 12, 2013" (transcript); North Carolina House Committee on Elections, "Proceedings, March 13, 2013" (transcript); North Carolina House Committee on Elections, "Proceedings, April 3, 2013" (transcript); North Carolina House Committee on Elections, "Proceedings, April 10, 2013" (transcript); North Carolina House Committee on Elections, "Public Hearing on Voter Identification, April 10, 2013" (transcript); North Carolina House Elections Committee, "Proceedings, April 17, 2013" (transcript).  All in possession of author. There are also transcripts of floor debates and roll calls on amendments in the legislatures of both states.

[295] See *Texas v. Holder*, 888 F.Supp. 2d 113, 144 (D.D.C. 2012) (detailing some of the rejected amendments); *N. Carolina State Conference of NAACP v. McCrory*, 831 F.3d 204, 227-28 (4th Cir. 2016) (noting amendments that restricted the eligible forms of Photo IDs to those less likely to be possessed by African-Americans).

148.  And there is one other very instructive piece of information about amendments to the bill. When Rep. Kerry Rich, R-Albertville, the chief sponsor of HB 19 in the House, first "prefiled" the bill, it had many non-official Photo options:  employer IDs, pistol permits, a hunting or fishing license, a pilot's license, a certified birth certificate, a Social Security card, court records showing an adoption or name change, and perhaps most instructively, Medicaid or food stamp cards.[296] (See Table 2, above.)  These 10 forms of identification would have made the bill nearly as unrestrictive as the 2003 law.  In addition, Rich "said he is working with Secretary of State Beth Chapman on a possible compromise bill."[297]  Because the Republican Party had long been committed to a Photo ID law, any compromise would have had to have been with Democrats, thus relaxing the bill still further.  But the bill as it emerged from the House Elections Constitution, Campaigns and Election Committee on a 7-2 vote, just five days after the prefiling, did not contain any of the 10 forms that were in the original Rich bill.[298]

149.  Without the numbers to sustain a filibuster or sufficient influence over the rules committees in either house to stop a bill from appearing on the legislative calendar, or a measure like Gov. Riley's tax referendum to bargain about, African-American legislators were for the first time since 1995 helpless to prevent consideration and passage of a voter ID bill.

150.  Thus, twenty days after HB 19 emerged from the Election Committee, the state House passed HB 19 by "a largely party-line vote of 64-31."  Newspaper reports of the debate were brief.  African-American legislators "predicted it would suppress voting by seniors and poor people who don't have easy access to transportation" and decried it as "a step back to the days of poll taxes and literacy tests."  Responding to the black legislators in a manner that seemed not only to acknowledge, but to admit their criticisms, the chief sponsor of the bill, Rep. Kerry Rich, R-Albertville, noted that under Section 5 of the Voting Rights Act, the U.S. Department of Justice could refuse to preclear the bill if (in a reporter's summary) "the department determined it would limit the right to vote on account of race."  Without referring to any evidence of in-person voting fraud or the inadequacy of the 2003 voter ID law, Rich promised that the bill "will help to ensure that there will be less voter fraud."  Other legislators denied any knowledge of voter fraud that would justify imposing a new restriction on the electorate.  Thus, during his deposition, Sen. Scott Beason could not recall any investigations or convictions for voter impersonation fraud between 2003 and 2011.[299]  Beason testified that "the only voter fraud [he] could ever think of" involved Republicans in South Alabama, and that he did "not know of anybody convicted" of voter fraud after 2003.[300] He claimed to be unaware of alleged voter fraud

---

[296] Bob Lowry, "Some get early start with bills," *Huntsville Times*, Feb. 28, 2011.
[297] Bob Lowry, "Some get early start with bills," *Huntsville Times*, Feb. 28, 2011.
[298] David White, "Panel passes bill to cap increases in ed spending," *Birmingham News*, March 3, 2011.
[299] Scott Beason, Deposition, at 58-60 (Dec. 12, 2016).
[300] Beason Deposition, 73-74.

in the Black Belt.[301]  Secretary of State Beth Chapman promised to make free Photo IDs available at every county courthouse. [302]

151.  A week later, the Senate Constitution, Campaign Finance, Ethics and Elections Committee waved HB 19 through by a 5-1 vote along party lines.  Committee Chairman Bryan Taylor expected the bill, which he said had been part of the Republican Party's 2010 campaign platform, the "Handshake with Alabama," to be approved by the whole Senate on a party-line vote.  Senate approval, the *Huntsville Times* agreed, "can be considered a formality."  There was no attempt to compromise with Democrats, even the few white Democrats left in the legislature, much less the African-American members, and there were no recorded votes on amendments.[303]  Even the *Birmingham News*, which had previously supported a Photo ID requirement, opposed HB 19 in 2011 as unnecessary because "we've had no reports of voter fraud at the polls that would have been stopped had the law required photo ID only."[304]

152.  Neither house took any other action on HB 19 until the last day of the session, more than two months later, when the Senate imposed cloture and jammed the bill through on a straight party-line vote.  The same day, it also passed several anti-abortion bills, a bill that sought to deny Alabamians coverage under Obamacare, a bill increasing the contributions that public employees had to make to their pensions, a bill finally setting out a budget for the state, and a revised congressional redistricting plan, drawn by Scott Beason, that was voted on three minutes after it was made public.[305]  When Democrats had controlled the legislature, Republicans had demanded that issues be fully debated.  In 2006, Rep. Gerald Allen, the chief senate sponsor of H.B. 19, stated that, rather than "slam dunk[ing] an issue down [Republican] throats," Democrats had "to understand the importance of having a healthy debate" and that it was important for Republicans to "put [their] two cents in," despite a Democratic majority.[306]  Yet in 2011, according to the chairman of the state's Democratic party, Mark Kennedy, Republicans broke the record for the number of cloture votes during a legislative session. "When you're not allowing a debate on the merits of legislation - when you're not allowing the voices of minority lawmakers to be heard on an issue - that's not good government. That's not even a democracy," Kennedy remarked.[307]  An article in *The New Republic* made Kennedy's comment more precise:

---

[301] Beason Deposition, 191.

[302] David White, "Bill requiring photo ID at polls passes House," *Birmingham News*, March 23, 2011; AP, "State Legislature halfway to passing photo ID law," *Albertville Sand Mountain Reporter*, March 28, 2011.

[303] No byline, "State Legislative Briefs," *Mobile Press-Register*, March 30, 2011; Lance Griffin, "Local legislative summary," *Dothan Eagle*, March 31, 2011; Mike Hollis, "Editorial:  GOP set to pass voter ID law," *Huntsville Times*, March 31, 2011.

[304] Editorial, "Solution without problem on way," *Birmingham News*, April 2, 2011.

[305] David White, "Big votes on final day for Legislators.  Both state budgets, employee pensions to be decided," *Birmingham News*, June 9, 2011; No byline, "Senate Republican Super Majority Ignores the People of Alabama and passes Three-Minute Plan for Congressional Redistricting," Birmingham *Times*, June 9, 2011; David White, "State legislators approve budgets.  Health care, ID among bills," *Birmingham News*, June 10, 2011.

[306] Bob Johnson, "Republicans have power to stop any bill in the House," *Mobile Press-Register*, Jan. 15, 2006.

[307] George Talbot, "Cheers, jeers as session winds down," *Mobile Press-Register*, June 8, 2011.

"Between 1999 and 2010, the Democratic Senate majority moved to shut down debate 26 times; in the past four years [2011-14], the Republican majority invoked cloture on 121 occasions."[308] On average, that is, the Republican majority imposed cloture nearly 13 times as often as the Democratic majority had.  In the few minutes on the session's last day that the Senate Republican majority allowed Democrats to debate, "Democrats often spent their time speaking to a nearly empty room, with GOP legislators stepping out of the chamber or gathering around tables to confer with one another."[309]

## C. HB 56: "Emptying the Clip" on "Illegal Immigrants"

153.  In early February, 2011, Sen. Scott Beason (R-Gardendale) spoke to the Cullman County Republican Party breakfast about "illegal immigration."  After declaring that Democrats would never take action because they hoped to obtain the votes of the American-born children of immigrants and angering local officials by saying that immigration had "destroy[ed]" the communities of Arab and Albertville,[310] Beason ended his speech by advising Republicans to "empty the clip, and do what has to be done."[311]  Flooded with phone calls and interview requests, Beason lashed out at critics, declaring that "It was a metaphor and anyone who thinks that advocates violence, their sanity probably needs to be questioned."[312] Even accepting that Beason's "empty clip" statement had been taken out of context, the *Anniston Star* condemned his speech as a whole, calling it "the sort of unsightly rhetoric that fuels inhumane legislation and, at its core, demonizes a race of people. . . . Those words aren't impetus for change.  They're tinder for discrimination and prejudice."[313]

154.  Beason was not the only Alabama legislator who had attempted to build a career on the issue.  Rep. Micky Hammon (R-Decatur) introduced his first bill to crack down on undocumented persons in 2003; Beason, in 2005.[314]  Although Democrats had blocked consideration of their bills for years, in June 2007, the Legislature created the Joint Interim Patriotic Immigration Commission. Rep. Hammon was appointed as a member of the Commission, and Sen. Beason served as its Vice Chairman. The Commission was tasked with addressing the "unprecedented influx of non-English speaking immigrants" and "outlining

---

[308] Jason Zengerle, "The New Racism:  This is how the civil rights movement ends," *The New Republic*, Aug. 10, 2014, https://newrepublic.com/article/119019/civil-rights-movement-going-reverse-alabama.

[309] No byline, "Republican-run Legislature races clock to pass agenda," *Anniston Star*, June 10, 2011.

[310] Kerry Rich, the chief House sponsor of H.B. 19, was from Albertville.

[311] Sam Rolley, "Beason:  Dems don't want to solve illegal immigration problem," *Cullman Times*, Feb. 6, 2011.

[312] AP, "Legislator defends immigration comment about 'empty the clip,'" *Lanett Valley Times-News*, Feb. 9, 2011. The response to the speech was heightened because, as nearly every news article on it remarked, the speech was delivered less than a month after an assassination attempt on Arizona Congresswoman Gabrielle Giffords killed six people and wounded thirteen.

[313] Editorial, "Rising GOP star's low moment," *Anniston Star*, Feb. 10, 2011.

[314] AP, "Alabama lawmakers closest ever to immigration law," *Albertville Sand Mountain Reporter*, May 2, 2011.

suggestions and proposals to address the issues of illegal and legal immigration in Alabama."[315] It was widely understood that the target of the Commission and the subsequent bill was Latinos. According to a recent study by the Pew Research Center, 52% of the unauthorized immigrants in Alabama, as in the nation as a whole, were Mexicans.[316]  When during the debate in the Alabama legislature, a reporter questioned Rep. Hammon about statistics on "illegal immigration" in the State, Hammon responded to her with a link to another study by the Pew Research Center that showed not "illegal immigration," but the growth in the Hispanic population, legal and illegal, the State.[317]

155.  In February 2008, the Commission issued its report, which made numerous recommendations to the Legislature, including the suggestion that "the Legislature should work with the Secretary of State to ensure that illegal immigrants are not able to vote" and endorsing the ultimate goal that "illegal immigrants be discouraged from coming to Alabama."[318]  When Hammon introduced H.B. 56, he explained that "much of what is in this legislation" came from the Commission's report.

156.  Building on this report, Republicans included in their 2010 platform, the "Handshake with Alabama," a plank promising to pass an Arizona-type law. Going beyond Arizona's S.B. 1070, the Alabama Republican platform called for a photo ID law, a documentary proof of citizenship requirement, and increasing criminal penalties for non-citizen voting:

> Proof of citizenship or legal residency in order to access government services will also be required, and, because **illegal immigrants and their allies are working to gather political power and influence**, any illegal immigrant who registers to vote, or attempts to, or casts a ballot will be convicted of a Class C felony as will anyone aiding in those efforts.[319]

157.  This conjoining of racial and partisan concerns was made even more explicit in Beason's "empty the clip" speech.  "Democrats," Beason claimed, "do not want to solve the illegal immigration problem because they know, this is a fact, that when more illegal immigrants move into an area, when their children grow up and get the chance to vote, they vote for Democrats."[320]

---

[315] S.J. Res. 22, Reg. Sess. 2007 (Ala. 2007).

[316] No author, "U.S. unauthorized immigration population estimates" (2014; report dated Nov. 3, 2016) <www.pewhispanic.org/interactives/unauthorized-immigrants/>.

[317] Julie Magee, "Hammon doesn't know difference between 'Hispanic' and 'illegal immigrant," *Bamafactcheck*, June 23, 2011 http://www.bamafactcheck.com/pages/goathill.  Similarly, see Hammon Testimony, Transcript, *Central Ala. Fair Housing Ctr. v. Magee*, No. 2:11-cv-982 (M.D. Ala. Nov. 23, 2011), ECF No. 68, at 31.

[318] A copy of the Commission's report is in *Hispanic Interest Coalition of Alabama v. Bentley*, Exhibit I to Exhibit 42, Exhibits in Support of Plaintiffs' Motion For Preliminary Injunction and Memorandum In Support.  The quoted recommendations are on p. 11.

[319] Press  Release, "Republican Handshake with Alabama," Aug. 16, 2010.  Emphasis added.

[320] Sam Rolley, "Beason:  Dems don't want to solve illegal immigration problem," *Cullman Times*, Feb. 6, 2011.

When testifying in the H.B. 56 case, Beason was even more explicit: "Q. . . . But when you talk about the Democrats seeing these [immigrants] as potential voters, you're talking about Latino voters, are you not? A. I would think it would go across the board, since they seem to be a little more soft on illegal immigration. But I think that's -- I think the Democrat Party does target that group. They made that very clear. Q. They target Latino voters. A. Yes."[321]

158.   The co-sponsors of the bill, referred to as "H.B. 56," were Rep. Hammon in the House and Sen. Beason in the Senate, and Rep. Kerry Rich was one of the most prominent co-sponsors.[322]. The House treated immigration as a terrorism issue by referring it to the Hammon-chaired House Public Safety and Homeland Security Committee, which approved it without public hearings or any serious debate on the very first day of the legislative session.  The bill prohibited the knowing hiring or transportation of undocumented aliens, made it a crime to rent property to them, prevented them from receiving many public benefits, required state and local officials to enforce federal immigration laws, immediately transferred custody of an undocumented person who broke any state or local law to the federal government, and made it a felony for an undocumented person to register to vote.[323]  It also mandated that public schools determine the legal status of each enrollee and submit that information to the State Department of Education, directed the parents of foreign-born students to report their own immigration status to school officials, and banned undocumented students from the state's public colleges.[324]  It required police to demand proof of citizenship from any person whom they stopped for a traffic or other legal violation if they had a "reasonable suspicion" that the person might be in the country illegally, which Democratic opponents in the legislature charged was an invitation to racial profiling.

159.   Hammon believed H.B. 56 stronger than the Arizona S.B. 1070 – H.B. 56 was more than four times as long as S.B. 1070 -- saying his goal was to force undocumented persons to "deport themselves" from the State.  In a campaign video, Hammon claimed that Alabama paid $200 million per year to educate noncitizen *and* U.S. citizen children of immigrants.[325]  He did not there distinguish undocumented immigrants from U.S. citizens.  Rich, who said, in a reporter's

---

[321] Transcript, *Central Ala. Fair Housing Ctr. v. Magee*, No. 2:11-cv-982 (M.D. Ala. Nov. 23, 2011), ECF No. 68, at 128-29 (testimony of Sen. Beason).

[322] Lionel Green, "Rich expects major immigration bill to surface next week," *Albertville Sand Mountain Reporter*, March 25, 2011.  See also Hammon testimony, Transcript, *Central Ala. Fair Housing Ctr. v. Magee*, No. 2:11-cv-982 (M.D. Ala. Nov. 23, 2011), ECF No. 68, at 14; *id.* at 45-46 (testimony of Rep. Rich).

[323] No byline, "Alabama House passes Ariz.-style immigration bill," *Anniston Star*, March 9, 2011; David White, "GOP starts working on Handshake Immigration, health care on agenda," *Birmingham News*, March 2, 2011.

[324] Mike Hollis, "A law, mostly for Hispanics," *Huntsville Times*, June 7, 2011.

[325] Hammon, testimony, Transcript, *Central Ala. Fair Housing Ctr. v. Magee*, No. 2:11-cv-982 (M.D. Ala. Nov. 23, 2011), ECF No. 68, at 34-35 ("Q. Okay. Thank you. Now, is it also -- did you also say in the -- during your campaign video prior to the passage of HB 56 that it's costing $200 million a year to educate the children of illegal immigrants? A. Yes. Q. And that many children of illegal immigrants are U.S. citizens, correct? A. Yes.").

summary, that his legislative district was "inundated with illegal immigrants," declared that "The illegals in this country are ripping us off."[326]  In court, Rich acknowledged his view that "[t]he major problem with illegals in [his] area is with Hispanics" and added that he considered Hispanic U.S. citizens whose parents are undocumented to be a "drain on the taxpayers." [327]  In a statement posted on his personal website, Rich expressed a concern that "[i]t is impossible for an area to assimilate the number of people that we have had forced on us," saying that he was "primarily" concerned about the assimilation of "Hispanic" immigrants and their alleged inability "to speak English."  The only groups of "illegal immigrants" that his constituents had expressed concerns about, Rich testified, were Hispanics.[328] While Beason asserted that "illegal immigrants" were taking "thousands of jobs Alabamians could be holding,"[329] the *Huntsville Times* doubted that many American citizens would sign up to "lay concrete blocks, clean up restrooms and cut up chickens."[330]

160.  African-American legislators joined Latino activists at a State House rally opposing H.B. 56 as a measure that Rep. Napoleon Bracy, Jr. of Mobile told the crowd would "force the local police departments to go out and racially profile you and harass you."  Rep. Merika Coleman of Birmingham connected the struggle to the civil rights movement of the 1960s and led the crowd in chants.  "Stop Juan Crow," a sign in the rally read.  Former Montgomery judge Samuel Masdon called the bill "absolutely pure racism.  If all the folks here illegal[ly] were six feet tall and had blond hair and blue eyes from Sweden, you think we'd be having this problem?"[331]

161.  But rallies were fruitless without enough legislative seats.  The House debated the bill for five hours, shut off a filibuster, and voted for H.B. 56 by 73-28.[332]  Since there were only 65 Republicans in the House, the final vote was less than a pure party split.

162.  In the House debate, Rep. Hammon stated that the purpose of H.B. 56 was to "reduce the number of illegal aliens in the state" through "self deportation."[333] Beason was aware that such "self-deportation" would also result in Hispanic citizens in families with mixed-immigration

---

[326] Kim Chandler, "House Oks tough immigration bill," *Birmingham News*, April 6, 2011; Editorial, "Your papers, please E- Alabama's immigration bill creates more problems than solutions," *Anniston Star*, June 9, 2011.
[327] Rich testimony, Transcript, *Central Ala. Fair Housing Ctr. v. Magee*, No. 2:11-cv-982 (M.D. Ala. Nov. 23, 2011), ECF No. 68, at 52, 54-57.
[328] Rich testimony, *Central Ala. Fair Housing Ctr. v. Magee*, No. 2:11-cv-982 (M.D. Ala. Nov. 23, 2011), ECF No. 68, at 52.
[329] Kim Chandler, "State Senate passes immigration bill [which] Targets suspects of illegal status," *Huntsville Times*, April 22, 2011.
[330] Mike Hollis, "A law Alabama doesn't need," *Huntsville Times*, May 9, 2011.
[331] Bob Lowry, "Lawmakers rally against immigration bill," *Mobile Press-Register*, March 11, 2011.
[332] Kim Chandler, "House Oks tough immigration bill," *Birmingham News*, April 6, 2011.
[333] Quoted in *Central Ala. Fair Hous. Ctr.*, 835 F. Supp. 2d 1165 (2011), at 1183.

status leaving Alabama.[334]  Asserting that the reduction in the number of Latinos had a political purpose, African-American Rep. Alvin Holmes stated that "[t]he purpose of this bill is that these Mexican[s] . . . in the state of Alabama, you-all[,] [Republicans,] are trying to get as many in here out and trying to stop as many coming in because you think, if they become registered voters, and they join up with the blacks in Alabama, they can control Alabama politics."[335] While Rep. Hammon was present and interrupted Rep. Holmes elsewhere in the same speech, neither Hammon, nor any other legislators denied or protested Holmes' allegations.

163.  Rather, Rep. Rich's own opening statement to the Legislature repeatedly conflated "illegal immigrants" and "Hispanics" when discussing the "kinds of social and economic problems" that H.B. 56 purportedly sought to address:

> Representative Hammon, I want to thank you for bringing this bill to address an issue that is a huge issue in the State of Alabama. But it is especially a huge issue on Sand Mountain. I want to say to my colleagues here in the House that I realize, and I realize completely, that God loves Hispanics just as much as he loves me, anybody in this chamber, and I understand that. I don't question that one second.

> But I tell you what I do have a problem with. First of all, if Hispanics come to this country and they come to this country legally, and there is about 20 percent of them that we are told, in our area, that have come here legally, I have no problem with them whatsoever. As a matter of fact, I like the Hispanic people. Most of the Hispanic people are hard workers. Most of them have good family values. Most of them are good Christian, church-going people. The ones that I have a problem with are the ones that come here and create all kinds of social and economic problems. And those problems are rampant in our area.

> The population of Marshall County increased by about 11 thousand in this last census from 2000 to 2010. And according to estimates from the Census Bureau, there is about 11 thousand Hispanics in Marshall County now. And there is even more in other parts of Sand Mountain. I will give you two quick examples. 95 percent of the children that are in the elementary school at Crosswell Elementary School are Hispanic, 95 percent of them. 52 percent of the children that attend Albertville Elementary and Primary School are Hispanic, and the biggest part of them are illegal.

---

[334] Beason testimony, *Central Ala. Fair Housing Ctr. v. Magee*, No. 2:11-cv-982 (M.D. Ala. Nov. 23, 2011), ECF No. 68, at 118, 127.
[335] Exhibit G in Support of Plaintiffs' Motion For Preliminary Injunction and Memorandum In Support, *Central Ala. Fair Housing Ctr. v. Magee*, No. 2:11-cv-982 (M.D. Ala. Nov. 23, 2011), ECF No. 14-3, at 72-73 (2011 General Legislative Session, Ala. House General Assembly Session Transcript, pp. 54:1-4 (April 5, 2011)).

It is costing our area hundreds of thousands, if not millions, of dollars to educate these children. And the taxpayers in my area — they don't deserve to have to pay that bill.

       They don't deserve that.

Let me give you just one example. And I want to make this clear as to what happens in our area. Illegals come to our area, and they have children just as soon as they can. Now, this is real[ly] what I am talking about. They have children just as soon as they can. And then when they start them into school, they go and register them and most of the time they register their children, if they were born here, they register them in their real name. But then — and they — and the parents give the school their real name. But what happens is they tell them that if you call my workplace, wherever that is, poultry plant, whatever, if you call my workplace, then don't ask for me under this name, ask for me under this other name.[336]

164.  Rich also relied on Census Bureau figures for Hispanics, <u>not</u> the figures for non-citizens or undocumented immigrants, to argue that "[i]t is costing our area hundreds of thousands, if not millions, of dollars to educate these [Hispanic] children. And the taxpayers in my area — they don't deserve to have to pay that bill."[337] H.B. 56 itself proclaimed that "the costs incurred by school districts for the public elementary and secondary education of children who are aliens not lawfully present in the United States can adversely affect the availability of public education resources to students who are United States citizens or are aliens lawfully present in the United States."[338] H.B. 56 addressed this "problem" by requiring schools to determine the legal status of students and parents. When the Eleventh Circuit found this requirement unconstitutional, it noted that a purported "interest in preservation of resources for the state's lawful residents was no more than 'a concise expression of an intention to discriminate.'"[339]

165.  In the Senate, Beason rewrote the bill before it passed, so that the two versions went to a conference committee, which included Rich.  Rich told his local newspaper that he was also working on a bill that would allow police to arrest and charge someone if they <u>appeared</u> to be

---

[336] *Central Ala. Fair Housing Ctr. v. Magee*, 835 F.Supp.2d 1165, 1192-93 (M.D. Ala. 2011); Exhibit G in Support of Plaintiffs' Motion For Preliminary Injunction and Memorandum In Support, *Central Ala. Fair Housing Ctr. v. Magee*, No. 2:11-cv-982 (M.D. Ala. Nov. 23, 2011), ECF No. 14-3, at 33-34.

[337] *Central Ala. Fair Housing Ctr. v. Magee*, *Central Ala. Fair Housing Ctr. v. Magee*, 835 F.Supp.2d 1165, 1192-93 (M.D. Ala. 2011); Exhibit G in Support of Plaintiffs' Motion For Preliminary Injunction and Memorandum In Support, *Central Ala. Fair Housing Ctr. v. Magee*, No. 2:11-cv-982 (M.D. Ala. Nov. 23, 2011), ECF No. 14-3, at 33-34.

[338] Ala. Code § 31-13-2.

[339] *Hispanic Interest Coal. of Ala. v. Governor of Ala.*, 691 F.3d 1236, 1246 (11th Cir. 2012) (quoting *Plyler v. Doe*, 457 U.S. 202, 227 (1982))).

driving without a valid driver's license.[340]  He did not explain how a law enforcement officer would determine just by looking at someone whether the person had a valid driver's license. When the conference committee bill finally passed both houses, Rich expressed his regret that the compromise included a provision that allowed women and children to receive supplemental nutrition (WIC), a provision that had to be included to comply with federal law.[341]

166.  The final bill, enacted into law, contained a requirement that all who registered to vote in the future had to provide a proof of citizenship by showing a birth certificate, an ALEA-issued STAR driver's license or non-driver ID card, a U.S. passport, a naturalization document, or similar documents.[342]  Previous registrants – nearly two-thirds of black and white Alabamians  -- were, in effect, "grandfathered in," but the 59% of Alabama's Latino citizens of voting age who were not then registered to vote had to meet a new, more difficult requirement.[343]   This was reminiscent of the grandfather clauses adopted by Alabama and other southern states in the early 20th century.[344]  As Sen. Beason predicted, H.B. 56 also reduced the percentage of non-whites in the Alabama electorate by forcing Hispanic registered voters and eligible U.S. citizens in "mixed status" families to flee through "self-deportation."[345]

167.  Although passed in 2011 and submitted to the U.S. Department of Justice for preclearance under Section 5 of the Voting Rights Act, the Alabama Attorney General withdrew that submission on May 15, 2013 in anticipation of the Supreme Court's decision in *Shelby County v. Holder*.[346] H.B. 56 was never precleared. On December 18, 2014, Secretary of State Jim Bennett announced that he would seek to enforce the voter ID requirement in H.B. 56 by requesting that the Election Assistance Commission (EAC) modify the federal voter registration form

---

[340] No byline, "Illegal immigration bill making its way through State Legislature," *Albertville Sand Mountain Reporter*, May 27, 2011.

[341] No byline, "Illegal immigration passes Legislature," *Albertville Sand Mountain Reporter*, June 3, 2011.

[342] Ala. Code § 31-13-28(k).

[343] Ala. Code § 31-13-28(d) ("Any person who is registered in this state on September 1, 2011, is deemed to have provided satisfactory evidence of United States citizenship and shall not be required to submit evidence of citizenship."). In November, 2014, in Alabama as a whole, 41.5% of Hispanic citizens of voting age reported that they were registered to vote, compared to 64.6% of African-Americans and 65.8% of whites.  U.S. Census, "Voting and Registration in the Election of November 2014," Report Number P20-577, Table 4b, "Reported Voting and Registration by Sex, Race and Hispanic Origin, for States:  November 2014."  https://census.gov/data/tables/time-series/demo/voting-and-registration/p20-577.html.

[344] In an act of startling unselfconsciousness, Alabama itself referred to this exception as a "grandfather clause" in its preclearance submission to the U.S. Department of Justice. Letter Winfield J. Sinclair, Ala. Assist. Atty. General, to J. Christian Herren, Jr., Chief, Voting Section, U.S. Dept. of Justice (Jan. 25, 2013), at 6.

[345] Sarai Portillo, Exec. Dir. Alabama Coalition for Immigrant Justice, Deposition, at 82-84 (Mar. 23, 2017).

[346] Letter Winfield J. Sinclair, Ala. Assist. Atty. General, to J. Christian Herren, Jr., Chief, Voting Section, U.S. Dept. of Justice (May 15, 2013).

instructions to include Alabama's documentary proof of citizenship requirement.[347] In January 2016, that request was granted by the EAC executive director without sufficient approval from the commission.

168.   In *League of Women Voters v. Newby* (2016), however, the U.S. Court of Appeals for the D.C. Circuit reversed this decision and blocked the requests of Alabama and three other states to enforce documentary proof of citizenship requirements for federal voters.[348] The D.C. Circuit found that there was "precious little record evidence" that an injunction would undermine the states' interests in preventing "fraudulent registration by noncitizens."[349]

169.   While much of H.B. 56 was found unconstitutional, preempted by federal law,[350] or amended in response to litigation and public pressure, parts of H.B. 56 remain in place today.

## D. Other Actions by the Legislature and Statements by Key Leaders

170.   Republicans pushed two statewide redistricting plans through the legislature on the last day of the session, with only a few minutes of debate.  That for the state's eight statewide school board seats passed in "the closing seconds of the 2011 regular session," and another, for the state's seven congressional districts, was unveiled with a full three minutes for discussion.[351] Both the redistricting plans were strongly attacked at the time for packing African-Americans into a few districts to minimize their influence, and shifting them from district to create safer districts for Republicans.[352]   In particular, the congressional plan, according to an AP story, achieved "a Republican Party goal of reducing the percentage of black voters in Republican Mike Rogers' 3rd District from 32 percent during the last decade to 25 percent."[353]  To pack even more African-Americans into the district of the only black – and only Democratic – member of the congressional delegation, Terri Sewell, the plan split Montgomery County between three congressional districts.  To insure that African-Americans could influence no more than 2 of the

---

[347] Brendan Kirby, "One of last vestiges of gutted immigration law, Alabama pushes voters for citizenship proof," *al.com*, Dec. 23, 2014 http://www.al.com/news/indes.ssf/2014/12/one_of_last_vestiges_of_gutted.html; https://www.eac.gov/assets/1/Documents/Alabama%20Acknowledgement%20letter%20122314%20signed.pdf.
[348] 838 F.3d 1, 9-10 (D.C. Cir. 2016).
[349] 838 F.3d 1, 13-14 (D.C. Cir. 2016).
[350] See *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012).
[351] No byline, "State Briefs," *Mobile Press-Register*, June 11, 2011.
[352] Bob Johnson, "House Oks plan to redraw state congressional districts," *Mobile Press-Register*, June 2, 2011; Mary Orndorff, "New Alabama congressional map friendly to incumbents," *al.com*, June 8, 2011.
[353] AP, "Montgomery split three ways in congressional redistricting," *Lanett Valley Times-News*, June 3, 2011

8 school board seats, the school board redistricting plan, over the strong objections of black legislators, packed as many black voters as possible into 2 districts.[354]

171.   In a later legislative session in 2012, the legislature also packed African-Americans into a minimal number of state legislative districts, "prioritizing mechanical racial targets above all other redistricting criteria" and misusing Section 5 of the Voting Rights Act as a justification, according to the U.S. Supreme Court in *Alabama Legislative Black Caucus v. Alabama*.[355]

172.   In an almost perfect party split, the House voted for a state constitutional amendment allowing employers to opt out of "Obamacare" (the Affordable Care Act), a measure that provided health insurance at affordable rates to poorer Alabamians, especially African-Americans.[356]   The bill was designed to facilitate a legal challenge to Obamacare.[357]   Another bill cut payments to lawyers for indigent defendants by eliminating reimbursement for overhead, such as utilities in their office space.[358]   Since African-Americans were more likely than non-Hispanic whites to be indigent defendants, such a law disproportionately affected them.

173.   Although the legislature voted for a bill to schedule a referendum vote on striking Jim Crow language on schools and poll taxes from the State constitution, that bill, unlike its 2004 counterpart, failed to remove the 1956 provision that declared that there was no right to a public education.   African-American legislators denounced the bill, citing continuing disparities in the State's schools.   What was represented as a modernization, the black legislators denounced as "a farce . . . . a smokescreen. . . . a con game."[359]   Instead of recognizing a right to education, the 2011 session of the legislature cut more than 1100 teaching jobs, reduced teacher pay, required a higher teacher contribution to health insurance, made it easier to fire teachers, and stopped the state from deducting dues for political action from teacher salaries.[360]   Any reductions in

---

[354] AP, "Senate approves redistricting," *Lanett Valley Times-News*, May 27, 2011; AP, "Redistricting plan passes," *Mobile Press-Register*, May 27, 2011; David White, "6th, 7th districts intact in House plan.  Committee map up for debate," *Birmingham News*, June 1, 2011.

[355] 135 S. Ct. 1257, 1267 (2015), on remand 2017 WL 378674 (M.D. Ala. Jan. 20, 2017) (three-judge court).

[356] Nationally, the decline in the percentage without health insurance from 2013, when Obamacare began to be in effect, to 2015 was larger for African-Americans and especially for Latinos than for non-Hispanic whites. Samantha Artiga, Petry Ubri, Julia foutz, and Anthony Damico, "Health Coverage by Race and Ethnicity:  Examining Changes Under the ACA and the Remaining Uninsured," Kaiser Family Foundation, Nov. 4, 2016, available at http://kff.org/report-section/health-coverage-by-race-and-ethnicity-examining-changes-under-the-aca-and-the-remaining-uninsured-issue-brief/.

[357] David White, "Challenge to health care law passes House[.] Votes along party lines," *Huntsville Times*, April 6, 2011.

[358] Bob Johnson, "Lawmakers work on budgets as session closes," *Mobile Press-Register*, May 22, 2011; Editorial, "Paying for the poor's defense – The $70 an hour limit," *Anniston Star*, June 6, 2011.

[359] Kim Chandler, "Senate votes to ax racist language; blacks see 'farce'," *Birmingham News*, April 28, 2011; Bob Lowry, "Bill would cut Constitution's bad language," *Huntsville Times*, June 3, 2011.

[360] Steve Flowers, "First legislative regular session of quadrennium," *Talladega Daily Home*, Feb. 13, 2011; Bob Johnson, "Lawmakers work on budgets as session closes," *Mobile Press-Register*, May 22, 2011; Mike Hollis, "A new tenure law, yet again," *Huntsville Times*, May 29, 2011; George Talbot, "Cheers, jeers as session winds down," *Mobile Press-Register*, June 8, 2011.

educational services and in the power of black allies like the Alabama Education Association disproportionately damaged African-Americans.

174. Damaged by what did pass, African-Americans also suffered from what Scott Beason blocked.  His actions on the Jefferson County tax measure show how powerful he was in the legislature and how much other legislators deferred to him.  Beason was not a marginal legislator.  As Rules Committee chair and a senate sponsor of H.B. 19, Beason was a central player in the legislature's activities in 2011.  Thus, Beason's extreme racial statements reflect not just on his own intent, but on the intent of the entire legislature.  The State's largest county was in trouble because the state Supreme Court had overturned a county occupational and business license fee levied by the Jefferson County Commission, a decision that left a $74 million hole in the County's budget.  In response, five of the eight Senators from the county, Republicans as well as Democrats, and a majority of the House supported a bill to grant the JeffCo Commission the power to levy a sales or other tax to raise $50 million.  Failure to do so, the Commission leadership warned, would cause "the near-shutdown of government in the state's most populous county."  Yet even though an apparent majority of both houses of the legislature stood ready to vote for the bill, which did not involve legislators themselves in the distasteful task of raising taxes, Senate Rules Committee Chair Beason refused to schedule a vote on the measure on the grounds that spending was "completely out of control" at every level of government.[361]  Later that year, Jefferson County declared bankruptcy.  In 2010, the county's population was 42% black,[362] which was much higher than the state average of 26%, so the bankruptcy disproportionately affected African-Americans.

175. Before he pushed Jefferson County toward bankruptcy, before he became a senate sponsor of H.B. 19, before he "emptied the clip" on undocumented immigrants, Scott Beason assisted in the electronic surveillance that helped convict Milton McGregor, Ronald Gilley, and others in the sensational electronic bingo/ legislative bribery scandal.  But while wearing a "wire," Sen. Beason recorded himself making statements that the judge presiding in the trial, Myron Thompson, found to establish what Thompson called Beason and State Sen. Benjamin Lewis's "purposeful, racist intent."  Judge Thompson's summary of the evidence is worth quoting at length:

> Beason, Lewis, and their political allies sought to defeat SB380 partly because they believed the absence of the referendum on the ballot would lower African-American voter turnout during the 2010 elections. One of the government's recordings captured Beason and Lewis discussing political strategy with other

[361] David White and Barnett Wright, "Home rule plan appears defeated [.] Beason says he won't allow vote," *Birmingham News*, June 10, 2011; Barnett Wright, "Jeffco closer to bankruptch [.] Tax bill's defeat means layoffs, reduced services," *Birmingham News*, June 11, 2011; Larry Powell, "The Do-Something Legislature [.] Republicans act like they make a difference," *Huntsville Times*, June 12, 2011.
[362] https://www.census.gov/quickfacts/table/PST045216/01073,00.; https://www.census.gov/quickfacts/table/PST045216/01.

82

influential Republican legislative allies. [1] A confederate warned: "Just keep in mind if [a pro-gambling] bill passes and we have a referendum in November, every black in this state will be bused to the polls. And that ain't gonna help." Trial Transcript, Doc. No. 1298, at 80. The participants predicted: "Every black, every illiterate" would be "bused on HUD financed buses." Id. Beason agreed: "That's right. This will be busing extra. . . . Because you gotta have somebody to pay for those buses." Id. at 81 . . . . In a separate conversation, during which Lewis asked whether the predominantly black residents of Greene County were "y'all's Indians?," id. at 86, Beason responded by derisively referring to blacks as "Aborigines." Id. at 87.[363]

Beason's racial views and his willingness to use alleged racial traits for brutal partisan ends are surely relevant to assessing his intentions in sponsoring and, as Rules Committee chairman, guiding H.B. 19 to Senate passage.

# VI.   What Light Do Post-2011 Events Shed on Discriminatory Intent?

## A. Harder to Vote

176.  In a significant non-action, the State did not even attempt to preclear H.B. 19 for two years. This was apparently unprecedented.  Ed Packard, the Director of Elections at the Alabama Secretary of State's office for three years and an employee in the Secretary of State's office for 20 years, could not think of any other election law that the State had held back from submitting for preclearance for so long.[364]  The Alabama Attorney General refused to submit H.B. 19 for preclearance, despite requests from the Black Caucus to do so.[365] In early June 2013, Kerry Rich "said he was surprised to learn the election change hadn't been submitted for preclearance," but Attorney General Strange's spokeswoman claimed that the failure to submit H.B. 19 was because of the Secretary of State's delays in drafting the administrative rules.[366]  However,

---

[363] *U.S. v. McGregor*, 824 F.Supp. 2d 1339 (M.D. Ala. 2011), at 1345.  S.B. 380 would have authorized a referendum on electronic bingo.

[364] Ed Packard Deposition, at 30-33, 786-87.  Former Secretary of State Worley stated that preclearance usually took less than six months, that she could not recall an instance where preclearance took two years, and that, if she had been Secretary of State in 2011, she would have wanted to use the entire three years to educate voters about H.B. 19. Worley Deposition, at 59-60, 244-45; *see also* Hank Sanders Deposition, at 96 ("Q In your experience, have you ever seen -- has it ever been the case that Alabama has waited several years to submit a law for preclearance? A I don't recall them doing that before.").

[365] Sanders Deposition, at 91-92.

[366] Kim Chandler, "State has yet to seek preclearance of photo voter ID law approved in 2011," a*l.com*, June 12, 2013.

within days of the Supreme Court's June 25, 2013 ruling in *Shelby County v. Holder*, Chapman stated that "Photo voter ID [would be] the first process" to go forward without preclearance,[367] and, on June 28, she issued the fully drafted administrative rules for public comment.[368] Further, while passed in 2011, H.B. 19, by its own terms, did not go into effect until the first primary in 2016. Senator Beason testified that this delayed effective date was unusual.[369] These departures from normal procedures are an indication of intent.[370]

177.   As noted above, Secretary of State Beth Chapman promised in 2011 that if H.B. 19 passed, free IDs would be available at every county courthouse.[371]   After Chapman resigned and Jim Bennett resumed the office he had held for two previous terms, Bennett reaffirmed the pledge, and he promised to add traveling vans visiting all of the state's 67 counties in time for the first election in which the photo ID law would be in force, the primary election in 2014.[372]  But in September, 2015, ALEA, the Alabama Law Enforcement Agency, which issued driver's licenses, the most common form of photo ID, announced the closure of offices in 29 counties, from 12 to 15 of which were in the Black Belt, depending on which counties one defines as "Black Belt."[373]  These closures were foreseen before the legislature cut the ALEA's budget, and members of the Black Legislative Caucus and white Democrats warned the ALEA Secretary, Spencer Collier, that the actions "would be harmful and they would do anything they could to help" ALEA keep the offices open.  The legislators characterized the closures as "just unacceptable."[374]

178.  The correlation between the closures and the demographic composition of the counties bothered Secretary Collier, who reported the fact to the Attorney General because he was worried that it might be a violation of the Voting Rights Act.[375]  They were so egregious that they attracted national attention.  Noting that 8 of the state's 10 majority-minority counties would be without an ALEA office, ACLU State Director Susan Watson declared that "It's

---

[367] Kim Chandler, "Alabama photo voter ID law to be used in 2014, state officials say," a*l.com*, June 25, 2013.

[368] Kim Chandler, "State announces plan for free IDs under new photo voter ID law," a*l.com*, June 28, 2013.

[369] Scott Beason Deposition, at 56-57. Shelby County filed its lawsuit challenging the constitutionality of Section 5 of the Voting Rights Act on April 27, 2010, i.e., over a year before the passage of H.B. 19. The hearing on the motions for summary judgment was held on February 2, 2011. *Shelby County, Ala. v. Holder*, 811 F. Supp. 2d 424, 444 (D. D.C. 2011). Some state officials and Alabama legislators were no doubt aware of this fact.

[370] See above, paragraph 25.

[371] AP, "State Legislature halfway to passing photo ID law," *Albertville Sand Mountain Reporter*, March 28, 2011.

[372] AP, "New photo voter IDs to be available at county registrars' offices and from traveling van," *al.com*, March 10, 2014 http://blog.al.com/wire/2014/03/new_photo_voter_ids_to_be_avai.html.

[373] Kyle Whitmire, "Voter ID and driver's license office closures black-out Alabama's Black Belt," al.com, Sept. 30, 2015 http://www.al.com/opinion/index.ssf/2015/09/voter_id_and_drivers_license_o.html**.**

[374] Spencer Collier Deposition, 64-65.

[375] Alabama House Judiciary Committee, "The Impeachment Investigationof Governor Robert Bentley:  Pre-Hearing Submission of Special Counsel," April 7, 2017, at 68-69 <bentleyinvestigation.com/report.pdf>.

discriminatory and it's wrong."[376]  Invoking the Selma March, Democratic presidential candidate Hillary Clinton wrote a column on the state's leading newspaper website, *al.com*, denouncing the ALEA closures that "would make getting driver's licenses and personal identification cards much harder for many African Americans."[377]  In December, 2016, the U.S. Department of Transportation found that the license office closures violated the 1964 Civil Rights Act by discriminating against African-Americans.  But earlier in 2016, Gov. Bentley pocket-vetoed a bill by Sen. Hank Sanders, passed with overwhelming bipartisan support in the legislature, that would have restored ALEA services for at least two days a week in every county.  Sanders was trying to reverse a policy that, in his view, had "a disproportionate impact on African-Americans in general."[378]  Although in the face of criticism, the State restored some ALEA offices and hours of service, the concentration of service withdrawal in the poorest, most rural, most heavily African-American counties suggests that H.B. 19 was administered in a racially discriminatory fashion.[379]  In 2015, Secretary of State Merrill told the state NAACP convention that the license office closures had saved no money, and he admitted that the Justice Department had warned that Alabama had not complied with the 1993 National Voter Registration Act.[380]

179.  The state and the sponsors of H.B. 19 were fully aware, as well, of how widespread the lack of a photo ID was.  According to the Secretary of State's office, in 2014, a matching of voting records with driver's license records showed that about 20% of Alabama's registered voters did not have either a driver's license or a non-driver ID.  Without indicating the basis for his estimate, Secretary of State Bennett asserted that perhaps half of that 20% had some other form of photo ID.[381]  Emails and deposition testimony from the Secretary of State's office confirm that this data was available by county and race.[382]  Rep. Kerry Rich also twice implicitly acknowledged the discriminatory impact of a photo ID law.  First, after H.B. 19 passed the House, "Rich anticipate[d] a lengthy court battle and review by the U.S. Justice Department to see if the legislation complies with the 1965 Voting Rights Act. He said his bill wouldn't take effect until 2014, which is when legislators will be up for election again."[383]  Thus, Rich knew

---

[376] Tim Lockette, "License office closures raise voting concerns," *Anniston Star*, Oct. 1, 2015.

[377] Hillary Clinton, "Alabama remains front line of voting rights battle," *al.com*, Oct. 17, 2015 http://www.al.com/opinion/ndex.ssf/2015/10/hillary_clinton_alabama_remain.html.

[378] Hank Sanders Deposition, Jan. 26, 2017, 154-60.

[379] Editorial, "In  Alabama, federal intervention protects minority rights," *Washington Post*, Jan. 7, 2017. <https://www.washingtonpost.com/opinions/in-alabama-federal-intervention-protects-minority-rights/2017/01/07/7286ce48-d217-11e6-a783-cd3fa950f2fd_story.html?utm_term=.b61e7829d3b2>.

[380] John Sharp, "Voting rights highlighted during NAACP," *al.com*, Oct. 23, 2015 http://www.al.com/news/mobile/index.ssf/2015/10/voting_rights_highlighted_duri.html.

[381] AP, "New photo voter IDs to be available at county registrars' offices and from traveling van," *al.com*, March 10, 2014 http://blog.al.com/wire/2014/03/new_photo_voter_ids_to_be_avai.html.

[382] Emily Marsal, former Deputy Secretary of State, Deposition, at 118-22 (Feb. 15, 2017); see also DEF_00064900 (Email from Emily Marsal (née Thompson), Deputy Secretary of State, to Ed Packard, Jan. 3, 2014).

[383] AP, "Alabama legislature halfway to passing photo ID law," Mar. 27, 2011. [GOV03078 - GOV03080]

about preclearance and that H.B. 19's strictness would likely result in prolonged litigation. This may also suggest that his expectation of litigation inspired H.B. 19's three-year roll out period. Second, Rich testified at a hearing on H.B. 56 that Latinos were particularly unlikely to have driver's licenses.  When asked for the basis of his testimony that "the biggest part of the illegals [in his district] are Hispanic," Rich answered that Hispanic people "don't have driver's license[s]."  The colloquy continued:  "Q. . . . "how do you know that a large percentage of the Hispanics in that community have no driver's licenses?  A.  Well, I had – I had one hit me in the rear end, and that person didn't have a driver's license.  My sister was sideswiped by someone, and that person . . . didn't have a driver's license.  Q.  And in both those incidents you described, the drivers involved were Hispanic?  A.  Yes, they were."  Rich did not say why, or even whether, he thought that these two unlicensed Hispanic drivers were "illegal immigrants." [384]

180.  Despite the argument that a photo ID, instead of a non-photo form, was necessary so that polling place officials could match the picture to the individual's face, Alabama also applied the law to absentee ballots and even considered a bill requiring a photo ID both to request and to send in an absentee ballot.  In 2015, Alabama was one of only two states to require facsimiles of photo IDs with every absentee ballot returned.  The sponsor of the request amendment, Rep. Reed Ingram, R-Montgomery, acknowledged that his amendment discriminated against the poor: "Anytime you tighten up a law it seems like it may be harder on the people that are on the have nots. I understand that it may be harder to get to the polls than it is to (vote) absentee. Voting absentee may be cheaper because of gas. "[385]

181.  A (white) retired professor of American History at Birmingham Southern College, housebound with cancer, had to go to so much trouble trying to vote in 2016 that a radio station did a feature story on him.  As his state representative commented, "He's a real hero for doing what he did."[386]  Apparently, the necessity of a heroic quest to be able to vote did not bother the Secretary of State, John Merrill, who succeeded Bennett.  Asked his opinion of a proposal to make voter registration automatic for people who filled out forms at government offices, such as motor vehicle departments, Merrill declared that such a law would defame the memory of such civil rights leaders as John Lewis, Martin Luther King, Jr. and Rosa Parks:

> These people fought—some of them were beaten, some of them were *killed*—because of their desire to ensure that everybody that wanted to had the right to register to vote and participate in the process. I'm not going to cheapen the work that they did. I'm not going to embarrass them by allowing somebody that's too

[384] Rich testimony, Transcript, *Central Ala. Fair Housing Ctr. v. Magee*, No. 2:11-cv-982 (M.D. Ala. Nov. 23, 2011), ECF No. 68, at 51:4-52:6.

[385] Erin Edgemon, "Divisive absentee voter legislation set to come before Alabama House," *al.com*, May 2, 2015 http://www.al.com/news/index.ssf/2015/05/divisive_absentee_voter_legisl.html.

[386] Shaina Shealy, "Voter ID Law Creates Hurdles for Homebound Man," Feb. 22, 2016 https://news.wbhm.org/feature/2016/voter-id-law-creates-hurdles-for-homebound-man/.

> sorry to get up off of their rear end to go register to vote … because they think they deserve the right because they've turned 18. . . . To me, that's no different than giving them a trophy because they've played on the ball team. . . . I'm not attracted to lazy people or sorry people or people who don't want to get involved."[387]

Secretary Merrill has also does not provide Spanish translations of the voter registration form, the voter ID card application, or the Alabama Photo Voter ID Guide.[388] When asked about this policy in October 2015, he said that "The official language of the United States is English. When you come to the United States, you are coming here to improve your life. I'm not saying that learning English will improve your life, but it will help you become a (better) citizen when you get here."[389] Of course, there is no "official language of the United States" and, in certain circumstances, the Voting Rights Act itself requires states to offer voting materials in Spanish.

182.  Responding to complaints of (white) Mennonites and Amish who had religious objections to having their photos taken, Rep. Kerry Rich in March, 2017 introduced an amendment to the law he had sponsored six years earlier, exempting people with such religious objections to present a special voter ID card to vote.  He assured Alabamians, however, that even though "Some people have said this might apply to Muslims," that was false. "It would not apply to Muslims."[390]  In Alabama and throughout the United States, Muslims are more likely to be, and to be perceived of, as black than as white.  According to former Secretary of State Nancy Worley, "when you talk about people's religion, it tends to be associated with race.  If you refer to the Muslim religion, people in Alabama associate that with blacks."[391]  One estimate puts the black percentage of Muslim converts in the United States at 60%, peaking after 1975, when Nation of Islam founder Elijah Muhammad died and his son Warith Muhammad led the conversion of the black separatist movement into mainstream Islam, turning more than 400 Nation of Islam temples into mosques.  There were 31 mosques in Alabama in 2012.[392] Nationally, 28% of American Muslims identified as black in 2014,[393] more than double the percentage who tell the U.S. Census they are black or African-American.  In 2011, 59% of the

---

[387] Mark Joseph Stern, "Alabama Secretary of State:  Helping More People Vote Would 'Cheapen the Work' of Civil Rights Heroes," *Slate*, Nov. 2, 2016
http://www.slate.com/blogs/the_statest/2016/11/02alabama)secretary_of_state_says_more_voting_would_cheapen_the_work_of_civil.html.  U.S. Rep. John Lewis (D-Ga.) strongly supports automatic voter registration.
[388] Ed Packard Deposition, at 327-28.
[389] John Sharp, "Voting rights highlighted during NAACP convention in Mobile," *al.com*, Oct. 23, 2015. See also Sarai Portillo Deposition, at 48.
[390] Stephen McLamb, "AL lawmaker proposes voter photo ID law amendment for religious objections," *WAFF*, March 8, 2017 http://www.waff.com/story/34701545/al-lawmaker-proposes-voter-photo-id-law-amendment-for-religious-objections/.
[391] Nancy Worley Deposition, Feb. 21, 2017, at 98.
[392] Casey Toner, "Life as a Muslim convert in Alabama," *al.com*, Feb. 23, 2016.
[393] No author, "Religious Landscape Study," PewResearchCenter  www.pewforum.org/relgious-landscape-study/religious-tradition/muslim/.

Muslims who were born in the U.S. identified as black.[394]  Because the stated purpose of the proposed amendment is to avoid potential lawsuits and ameliorate the effect of H.B. 19 on certain (mostly white) religious groups, the proposed amendment would likely deepen the discriminatory impact of H.B. 19 by reducing the number of adversely affected white voters.  In light of such facts and perceptions, Rich's amendment to H.B. 19 ought to be considered to have racial overtones.

## B.  No More Evidence of Impersonation Fraud

183.  When the Alabama Republican Party set up a hotline to report voting irregularities in the 2014 primary, offering a $1000 reward for information leading to convictions for voter fraud, it did not have to pay.[395]  And although Secretary of State Merrill said his office has "pursued" four voter fraud incidents in 2014-15, none of them apparently involved impersonation fraud.[396]  Interviewed for a documentary on the State's photo ID law, Merrill could not produce a single actual instance of voter impersonation fraud.[397]

## C. No "Reasonable Impediment" Exception

184.  On the second day of the 2012 South Carolina photo ID trial, the state's Elections Director, Marci Andino, dropped a bombshell.  According to her interpretation of the state's 2011 voter ID, which the State was asking the District Court of the District of Columbia to preclear under Section 5 of the Voting Rights Act, any voter without one of the requisite identification cards could sign an affidavit attesting that she had a "reasonable impediment" to obtaining such an ID.  Most important, the reasonableness of the impediment was left wholly up to the voter; the State, Andino declared, would take the voter's word for it.[398]  After peppering the State's attorneys with demands for clarification about the definition of the "reasonable impediment" requirement,[399] the three-judge panel ordered Act R54 precleared, with a striking warning:  "If South Carolina were to alter its interpretation of the reasonable impediment provision, or any other

---

[394] No author, "Muslim Americans:  No Signs of Growth in Alienation or Support for Extremism," PewResearchCenter, Aug. 30, 2011 www.people-press.org/2011/08/30/muslim-americans-no-signs-of-growth-in-alienation-or-support-for-extremism/.
[395] Zachary Roth, "Alabama GOP struggles to find voter fraud despite $1,000 reward," *MSNBC*, June 13, 2014 http://www.msnbc.com/msnbc/alabama-gop-struggles-find-voter-fraud-despite-1000-reward/.
[396] John Sharp, "Voting rights highlighted during NAACP," *al.com*, Oct. 23, 2015 http://www.al.com/news/mobile/index.ssf/2015/10/voting_rights_highlighted_duri.html.

[397] Howard Koplowitz, "Merrill can't come up with proof of fraud in documentary on Alabama voter ID law," *al.com*, May 2, 2016.  http://www.al.com/news/indes.ssf/2016/05/merrill_cant_come_up_with_proo.html.
[398] Rebecca Cohen, "S. Carolina lawmaker admits positive response to racist email on voter ID bill," *Miami Herald*, Aug. 28, 2012, <http://www.miamiherald.com/2012/08/28/2972807/s-carolina-lawmaker-admits-positive.html>.
[399] Ryan J. Reilly, "Judges Question Whether South Carolina's Voter ID Law Is Ready For Primetime," *TPMMuckraker*, Aug. 30, 2012, http://tpmmuckraker.talkingpointsmemo.com/2012/08/voter_id_reasonable_impediment.php.

relevant provision of Act R54 -- as the law has been interpreted by the responsible state officials and described and adopted in this opinion -- as the State would have to obtain pre-clearance of that change before applying that new interpretation."[400]

185.  Three weeks before a federal trial on a challenge to the comprehensive H.B. 589 election law passed by North Carolina was slated to begin, the state's legislature suddenly and unexpectedly amended the photo ID section of that law to provide for a "reasonable impediment" exception.[401]  The change was especially unexpected because during House Appropriations Committee consideration of the bill in 2012, Rep. Rick Glazier had specifically offered a "reasonable impediment" amendment based on the South Carolina law, only to have it rejected by the bill's sponsors and defeated by the Committee.[402]  In response to the 2015 amendment, Judge Thomas Schroeder bifurcated the trial, separating out the photo ID provision for a separate trial in January, 2016, six months after the rest of the trial.  As in the South Carolina case, the judge in the North Carolina case cited the "reasonable impediment" exception in his opinion as undermining the view that the law would have a discriminatory effect.[403]

186.  After losing federal court challenges to its photo ID law on Section 5, Section 2, and constitutional grounds,[404] the State of Texas, facing another trial in 2017 on whether its S.B. 14 had been adopted in 2011 with a discriminatory purpose, followed South Carolina and North Carolina and adopted a "reasonable impediment" amendment.  The law made more permanent a temporary order by the federal district court that had been put into force for the 2016 election while the case was pending.[405]

187.  However transparently opportunistic the actions of the three states were, and however confusing the provision might be to voters and poll workers, the reasonable impediment amendments did make voting possible for at least some people who had difficulty an official ID.[406]  It is striking that Alabama has not, so far, followed suit, that the State's leaders have been so unwilling to soften the law, even to increase their chances in court, that they have, in effect, rejected the widely-discussed reasonable impediment amendment.  Such an omission, which

---

[400] *South Carolina v. U.S.*, 898 F.Supp. 2d 30 (D.D.C. 2012), at 51.

[401] Anne Blythe and Colin Campbell, "NC Legislature votes to soften voter ID requirement," *Raleigh News and Observer*, June 19, 2015 < http://www.newsobserver.com/news/politics-government/article24877873.html >.

[402] Transcript of House Appropriations Committee Hearing, April 23, 2013, at 50-51, in possession of the author.

[403] *N. Carolina State Conference of the NAACP v. McCrory*, 182 F. Supp. 3d 320, 440-45 (M.D. N.C. 2016). Of course, the Fourth Circuit disagreed, and reversed the district court. *N. Carolina State Conference of the NAACP v. McCrory*, 831 F. 3d 204, 240 (4th Cir. 2016).

[404] *Texas v. Holder*, 888 F. Supp. 2d 113 (D.D.C. 2012); *Veasey v. Perry*, 71 F.Supp. 3d 627 (S.D. Tex. 2014), 769 F. 3d 890 (5 Cir. 2014), 135 S. Ct. 9 (2014); *Veasey v. Abbott*, 796 F. 3d 487 (5 Cir. 2015), 830 F. 3d 216 (5 Cir. 2016).

[405] Jim Malewitz, "Texas Republicans pitch new voter ID law," *Texas Tribune*, Feb. 21, 2017 https://www.texastribune.org/2017/02/21/texas-republicans-pitch-new-voter-id-law/.

[406] In Texas in 2016, more than 16,400 people voted under the "reasonable impediment" provision. Jim Malewitz, "Texas Republicans pitch new voter ID law," *Texas Tribune*, Feb. 21, 2017 https://www.texastribune.org/2017/02/21/texas-republicans-pitch-new-voter-id-law/

must be considered deliberate because of the publicity that the other states' actions have received, should be taken into account in any evaluation of Alabama's intent in passing H.B.19.

# VII.  Was H.B. 19 Passed with a Discriminatory Intent?

## A Review of Ten Intent Factors

### A. Models of Human Behavior

188.  When African-American political leaders in Alabama discussed voter ID laws, they often likened them to poll taxes, literacy tests, or "Jim Crow days."[407]  They seemed aware that previous "reforms" in election laws had been advertised as civic-conscious attacks on "fraud," but that they had actually had the intent and effect of discriminating against blacks.  As Jerome Gray of the Alabama Democratic Conference put it, white officials "thought literacy tests were good government."[408]  And the African-American leaders were quite correct, as examples from the history of Alabama show.  While in some states, particularly in the North, the models of human behavior with which legislators or observers approached voter ID laws might be drawn from abstractions or the experiences of other states, Alabama's history of electoral discrimination is so rich, so generally familiar to citizens who follow politics, so particularly relevant, that we may confine our discussion of the first factor to the state's history.

189.  Like the Republican 2010 "Handshake with Alabama," the state's Democratic platform in 1892 promised a new election law.  On the surface, it appeared to be a non-partisan, non-racial reform measure:  "We favor the passage of such election laws as will better secure the government of the State in the hands of the intelligent and the virtuous, and will enable every elector to cast his ballot secretly and without fear of restraint."[409]  On the first day of the legislative session, the state's leading newspaper, the *Birmingham Age-Herald*, declared that "THE SUPREME ISSUE before the people of Alabama today is a new election law. . . . The man is blind who does not see and feel and know that the moral sense of the whole people is in rebellion against the present [election law] system and demands a change."[410]  Nearly a month later, the paper was more explicit about the fraud issue:  "Prior to this time the practice of piling up fictitious majorities, of stuffing ballot boxes, had made little or no impression on the public mind because it was exercised against the negroes [*sic*] of a few counties and against an opposition that was too weak to arrest attention. . . .  Public attention is roused and will not much

---

[407] See above, paragraphs 64, 83, 106, 114, 150.
[408] Quoted in paragraph 83, above.
[409] No author, *Official Proceedings of the Democratic State Convention, June 8, 1892* (n.p., n.d.,), at 10.
[410] *Birmingham Age-Herald*, Nov. 15, 1892.  Full-caps in original.

longer submit to election frauds on such a scale as they are practiced in Alabama."[411]  The *Age-Herald* and the *Mobile Register* feared that the nascent Populist Party would use the issue of election fraud to overturn the Democratic Party's control.  As the *Register* put it:  "We doubt whether there is one more governor and one more legislature [left] in the stuffed ballot box."[412]

190.  In that less cautious era, proponents admitted racial motives.  The chief sponsor of the bill, Montgomery's Anthony Dickinson Sayre, declared that his bill "would restore the [D]emocratic party in Alabama; it would mean the permanent rule, not of any party, but of the white people." Requiring registration three months before the election and allowing only election officers, all of whom he assumed would be white, to assist illiterates to vote would "operate to deter the negro [*sic*]."[413]  Although a poll tax provision was eliminated from the Sayre Law before passage,[414] the act as passed required each voter to register during May of election years, did not guarantee minority party representation on election boards, and mandated a secret ballot without party names to identify candidates.[415]  As was widely understood, a secret ballot, when coupled with restrictions on assistance by trustworthy friends, amounted to a literacy test.[416]  In a parallel to the passage of H.B. 19, the Sayre bill passed the Senate in the last throes of the legislative session, aided by the fact that the presiding officer ruled all Populist amendments and motions out of order.[417]  In another parallel to H.B. 19, every proto-Populist in the legislature opposed the Sayre Law, and almost every Democrat favored it.[418]

191.  Seven years later, with the Populist threat finally decisively put down, the Democrats called a constitutional convention to write literacy and property tests, as well as poll taxes, into the State's fundamental document.  Along with open calls to use the convention to cement white supremacy forever came bitter criticism of fraud and demands for honest elections.  Future Governor Emmet O'Neal declared that the convention should "make permanent and secure honest and efficient government in Alabama."  To defeat African-Americans, whites had had to commit frauds "which have debased and lowered our moral tone."[419]  Former Governor William C. Oates asserted that the purpose of the convention was to reclaim the state from "dishonest elections."[420]  Delegate J.T. Heflin[421] joined reform to discrimination:  "We are tired of frauds;

---

[411] *Birmingham Age-Herald*, Dec. 11, 1892.

[412] *Mobile Register*, quoted in *Age-Herald*, Jan. 26, 1893.

[413] Quoted in *Birmingham Age-Herald*, Feb. 14, 1893.

[414] *Birmingham Age-Herald*, Feb. 7, 1893.

[415] *Acts of the General Assembly of Alabama, 1892-93* (Montgomery:  Brown Printing Co., 1893), 837-51.

[416] A.E. Caffell, letter to the editor, *Birmingham Age-Herald*, Dec. 21, 1892.

[417] *Birmingham Age-Herald*, Feb. 19, 1993.

[418] *Shaping of Southern Politics*, at 136.

[419] *Official Proceedings of the Constitutional Convention of the State of Alabama, 1901* (Wetumka, Alabama: Wetumpka Printing Co., 1940), vol. III, p. 2780.

[420] *Official Proceedings*, vol III, p. 2786.

[421] Not future U.S. Senator Tom Heflin.

we are tired of ballot box stuffing; we are tired of buying negro [*sic*] votes, but the fraud will never cease until this vote is eliminated."[422]  Tennent Lomax of Montgomery announced millennial hopes.  He was not "here to disfranchise the Negro race alone.  We are here for a higher purpose, a nobler end.  That purpose and that end is to establish pure elections in Alabama.  When this Constitution shall have been ratified by the people . . . we will have stricken down forever fraud and corruption in elections…."[423]

192.  Moreover, until 1966, Alabama continued to argue that the poll tax "keeps out those 'too inert to pay'" and indicated the "voters' interest in protecting the ballot."[424] Through the late 1970s and mid-1980s, purposefully discriminatory Alabama state laws, which governed the methods of conducting local elections, were justified or defended based on their alleged purpose of addressing "widespread voter fraud,"[425] "[r]umors of voter fraud,"[426] and the fraudulent registration "en masse" of applicants who "ordinarily cannot qualify because of their criminal records."[427]

193.  The quotations could easily be multiplied.  The point is that there has been a long history in Alabama (and other states) of tying election "reforms" that had the intent and effect of discriminating against African-Americans to charges of fraud and promises of cleaner elections. There were good reasons for black and white state legislators, newspaper editors, and reporters in all media from 1995 through 2011 to be skeptical of the intentions of those claiming fraud, and the same reasons suggest that those concerned with legal challenges to such laws ought to share in that skepticism.

194.  There is other, more recent evidence about racial purposes in election laws in Alabama that buttresses the point.  Since 2009, I have been compiling a database of every voting rights "event" in the U.S. since 1957 – every case, published or unpublished, brought under the national Voting Rights Act (VRA) or the California Voting Rights Act (CVRA), every objection or "more information request" under the now-invalidated Section 5 of the Voting Rights Act, every settlement of a VRA or CVRA case, and every case involving racial issues brought under the 14th or 15th amendments.[428]  It is the largest database on voting rights cases ever compiled.  Of the voting rights events in which minorities were successful, Alabama had the second highest number, trailing only Texas.  If the number of events is divided by the 2017 population of each state, Alabama again places second, this time to Mississippi.  Over the period, there were 150

---

[422] *Official Proceedings*, vol. III, p. 2820.

[423] Quoted in Joseph H. Taylor, "Populism and Disfranchisement in Alabama," *Journal of Negro History*, 24 (1949), 410-27, at 424.

[424] *United States v. Alabama*, 252 F. Supp. 95, 100, 107 (M.D. Ala. 1966).

[425] *Bolden v. City of Mobile*, 542 F. Supp. 1050, 1061 (S.D. Ala. 1982).

[426] *Hendrix v. McKinney*, 460 F. Supp. 626, 628-29 (M.D. Ala. 1978).

[427] *Dillard v. Crenshaw Cty.*, 640 F. Supp. 1347, 1357-58 (M.D. Ala. 1986).

[428] The database is described and its sources listed in Kousser, "Do the Facts of Voting Rights Support Chief Justice Roberts's Opinion in *Shelby County*?" *Transatlantica*, I (2015), available at http://transatlantica.revues.org/7462/.

Section 5 objections in Alabama, in addition to 123 "more information requests" that resulted in election law changes favorable to minorities.  There were 296 Section 2 lawsuits that resulted, through settlement or decision, in changes that minority plaintiffs desired, as well as 49 victories in cases filed under the 14th or 15th amendments or both (including some that overlapped with Section 2 victories).  Alabama is a state with a very long and well-documented history of voting discrimination, outstanding even in the Deep South.  Any model of human behavior must take into account that history, as well as the repeated connection in the State between claims of fraud, calls for election "reform," and discriminatory outcomes.

## B. Historical Context

195. This drama did not start in 2011, and we will never understand how it took place or what motivated each side if we begin with H.B. 19 as it emerged from the House Committee.  The struggle over a voter ID law was an issue, often a central issue, over ten sessions of the Alabama legislature from 1995 through 2003, when a version of the law allowing 20 forms of photo and non-photo identification finally passed.[429]  Throughout, whether the governor, lieutenant governor, or secretary of state was Republican or Democratic, the issues were the same and the divisions were the same.  Republicans and a large majority of white Democrats contended that the mere possibility of fraud required that voters present some form of identification, although knowledgeable officeholders admitted that under current law, polling place officials could demand identifying documents if in doubt about a voter.  African-American legislators, always unified and active on this issue, kept calling for evidence of impersonation fraud and kept emphasizing that a voter ID law would have a discriminatory effect on black voters.  Only their repeated delaying tactics and filibusters kept a voter ID from passing until 2003.  Despite repeated investigations by Attorneys General and Secretaries of State, and despite significant cash rewards offered by officials and the Republican Party for evidence of voter impersonation fraud, it was never forthcoming.

196.  From the very first committee vote on a strong voter ID bill in 1995, there was a straight racial split on the issue.[430]  In 1996, concern over the unsettled state of case law concerning absentee voting and disputed, largely circumstantial evidence of absentee ballot fraud in rural Black Belt counties led the legislature to amend the sections of the election code concerning absentee voting.  Black legislators, responding to a series of selective prosecutions against black activists in rural areas, fought against the amendments, but the legislature eventually passed the legal changes in a special session.  That African-American legislators struggled even harder against a voter ID bill, preventing it from coming to a vote in the 1996 special session, is an

---

[429] 1995, 1996, 1996 special, 1997, 1998, 1999, 2000, 2001, 2002, 2003.
[430] See paragraphs 35-36 and below, Section VII.K.2.

indication of how much more serious they considered the consequences for black political participation of a voter ID law than a restriction on absentee ballots.[431]

197.  The 1996 special session introduced a potential logroll whose obvious racial nature provides very strong evidence of the racially discriminatory intent and effect of the various voter ID bills.  In negotiations between black state senators and the Fob James Administration, presumably including the special assistant he recruited to oversee the only two bills considered during the special session, Kerry Rich, the senators floated a proposal to restore the voting rights of felons once they were released from prison and paid all of their fines.  In return, the senators said they would not filibuster the voter ID bill.  Since it was widely understood that twice as high a proportion of the beneficiaries of a felon re-enfranchisement bill would be black as white, the implication of making this a trade for a voter ID bill was that a voter ID bill would disproportionately hurt African-Americans.[432]

198.  Despite Gov. James's very temporary agreement to the trade, Republicans were so opposed to letting people who had been convicted of crimes of "moral turpitude" vote that a re-enfranchisement bill by Rep. Yvonne Kennedy was considered the least likely bill introduced into the legislature in 1998.[433]  Nevertheless, the potential logroll involving Kennedy's bill and various voter ID bills became one of the central foci of the legislature for six consecutive legislative sessions, finally succeeding in 2003, only to be pocket-vetoed.  The manoeuver, always discussed in racial terms, provides strong behavioral evidence of the racial intent of the voter ID measures.

199.  In any event, after 2003, the State had a voter ID law, and attempts to strengthen it by constricting the ID documents recognized as valid failed repeatedly until the landslide victory of the Republican party in 2010.  As late as 2009, a white Democratic committee chair had advised a Republican who wanted to bring up a photo ID bill that a hearing would be scheduled at the time of "the second coming of Jesus."[434]  Nonetheless, within two years, H.B. 19 became law.

200.  Two facets of the immediate historical context of the 2011 photo ID law seem particularly important.  First, there was what had not happened:  there was no election contest or scandal, no evidence of major or even minor voter impersonation fraud that might have served as a plausible reason for adopting H.B. 19.  The largest change in ballot laws in American history, the rapid state-by-state adoption of the publicly-printed "Australian" ballot, quickly followed the uproar over paying people to vote in the extremely close 1888 election.  This made at least plausible the contention that the secret ballot was a rational, necessary reform.[435]  Similarly, the cliff-hanger

---

[431] See paragraphs 37-74.
[432] See paragraphs 71,75-78.
[433] See paragraph 89.
[434] See paragraph 136.
[435] See Kousser, *Shaping of Southern Politics*, 51-56, and sources cited there.

2000 election, with its disputed "hanging chads," gave rise to the Help America Vote Act (HAVA).[436]  But although the initial consideration of a voter ID law in Alabama may have been stimulated by suspicions of the new voters registering under the National Voter Registration Act, which became effective in 1995, any fear that unqualified people might be using it to register and then vote should have been alleviated by the 2002 HAVA amendment that required people who registered by mail under NVRA to submit identifying information at the polls when they first voted.[437]  And concerns about the possibilities of "voting the dead" ought to have been alleviated by the repeated and thorough purging of the voter rolls by Republican secretaries of state.[438]

201.  Second is something that did happen.  In the 2010 election, race and party finally became fully aligned in Alabama, as Figure 1, above, shows dramatically.  No longer would African-American legislators be able to count on being able to pressure some white Democratic leaders to delay or derail voter ID bills.  No longer would Republican governors have to bargain with black and white Democrats to try to get voter ID bills passed.  No longer would any other Republican objective get in the way of a strict photo ID bill.  A Republican party based solely on white votes had every partisan and racial incentive to insist on a photo ID law without any necessity whatsoever to compromise.

## C. Text of the Law

202.  The facet of the text of the law that is most revealing of intent is the comparison of the identification documents authorized under H.B. 19 as passed with the documents allowed in the 2003 law – the status quo when the 2011 law was passed – and with those in other bills considered from 1996 through 2003.  Table 3, which compresses Tables 1 and 2 into three columns, reduces the comparisons to their essentials and illuminates the 2011 legislature's purposes.  Especially apposite is the fact that cards connected with age or poverty – a Medicare card, a Social Security Card, a Food Stamp Card, A Medicaid Card, and a Welfare ID, all cards strictly policed, because they are necessary to claim benefits – were eliminated as ID cards by H.B. 19.  In various bills from 1996 through 2002, 29 different forms of identification were deemed sufficient; in 2003, 20; in 2011, only 9.  The exclusions are clearly correlated with poverty, which in Alabama, as elsewhere, is strongly correlated with race.

---

[436] Kele Williams, "Key Provisions of the Help America Vote Act," Brennan Center for Justice, available at https://www.brennancenter.org/analysis/key-provisions-help-america-vote-act.
[437] See U.S. Department of Justice, "The National Voter Registration Act of 1993 (NVRA), Questions and Answers, question 11, available at https://www.justice.gov/crt/national-voter-registration-act-1993-nvra.
[438] See paragraphs 80, 93.

**Table 3:**

**Forms of Identification Required in Bills, 1996-2002, Compared to 2003 Law and H.B. 19**

| ID | Year | | |
|---|---|---|---|
| | **1996-2002 Bills** | **2003 Law** | **H.B. 19, as passed** |
| **Driver's License** | x | x | x |
| **Passport** | x | x | x |
| **Free ID from Dept. Public Safety** | x | | x |
| **Government Photo ID from U.S. or any State** | x | x | x |
| **Employee Photo ID from Any Agency of U.S., AL, or any AL Local Jurisdiction** | | x | x |
| **AL College Student Photo ID** | x | x | x |
| **Military Photo ID** | x | x | x |
| **Tribal Photo ID** | | | x |
| **Recognition by 2 Election Officials** | | x | x |

96

| | | | |
|---|---|---|---|
| **Challenged or Provisional Ballot** | x | x | |
| **Employee Photo ID** | x | x | |
| **Other Photo ID** | x | | |
| **State or U.S. Government ID (photo or non-photo)** | x | x | |
| **Birth Certificate, Certified** | x | x | |
| **Court Records Showing Adoption or Name Change** | x | x | |
| **Naturalization Papers** | x | x | |
| **Government Check Listing Name, Current Address** | | x | |
| **Work ID** | x | | |
| **Voter Registration Card** | x | x | |
| **Medicare Card** | x | x | |
| **Social Security Card** | x | x | |
| **Food Stamp Card** | x | | |

| | | | |
|---|---|---|---|
| **Medicaid Card** | x | x | |
| **Welfare ID** | x | | |
| **Marriage License** | x | | |
| **Credit Card** | x | | |
| **Check-Cashing Card** | x | | |
| **Bank Statement** | | x | |
| **Electronic Benefits Transfer Card** | | x | |
| **Current Utility Bill** | | x | |
| **Hunting or Fishing License** | x | x | |
| **Pistol Permit** | x | x | |
| **Pilot's License** | x | x | |
| **Other Form of ID** | x | | |
| **Affidavit and birthdate, address, or other info.** | x | | |
| **Library Card** | x | | |

98

## D. Basic Demographic Facts

203.  The economic and social legacy of slavery and segregation persists in Alabama. The five-year American Community Study for 2006-10, which reflected the facts of the time when H.B. 19 was passed, shows that 12.1% of whites in the state had incomes below the poverty level, but that nearly three times as high a percentage of African-Americans (30.1%) did, as well.[439]  White median family income at $59,845 was 1.77 times as high as black median family income, at $33,902.[440]  While 77.3% of whites owned the dwellings they lived in, only 54.9% of African-Americans did.[441]  Among whites, 15.2% were college graduates, compared to just 9.4% among blacks.[442]

204.  Particularly important for the impact of photo ID laws, only 4% of white households lacked a vehicle, compared to 13.9% of African-Americans -- over three times as high a percentage.[443]  The most common form of photo ID is a driver's license, and people who have no access to a vehicle have little incentive to obtain a driver's license.  Moreover, those proportions probably underestimate the percentages of adult citizens without licenses, because not every adult in a household with access to a vehicle will have a license to drive.  For those without licenses, obtaining a non-driver photo ID would require a trip to a governmental office, sometimes one out of the prospective voter's home county, which would be difficult when no one in a household has access to a vehicle.  As a consequence, a photo ID law would likely have a disproportionately large impact on African-American voting.

205.  The income and vehicle-availability disparities between Non-Hispanic whites and African-Americans were particularly glaring in a group of largely rural Black Belt counties where the racial discrimination of the Jim Crow era had stimulated a particularly strong Civil Rights Movement.  It was in such counties as the nine in Tables 4 and 5 in which H.B. 19 could be expected to have the largest effect, because African-Americans were so much poorer than whites and had so much less access to vehicles.  Eight of the nine were also among the counties in which driver's license offices were closed in 2015.[444]  Although legislators might not have looked at these exact figures, anyone generally knowledgeable about social and economic conditions in Alabama would not have been surprised by them.  As the political editor of the

---

[439] Table B17001, 2006-10 American Community Survey.
[440] Table B19113, 2006-10 American Community Survey.
[441] Table B25003, 2006-10 American Community Survey.
[442] Table B15002, 2006-10 American Community Survey.
[443] Table B25044, 2006-10 American Community Survey.
[444] Kyle Whitmire, "Voter ID and driver's license office closures black-out Alabama's Black Belt," *al.com*, Sept. 30, 2015 http://www.al.com/opinion/indes.ssf/2015/09/voter_id_and_rivers_license_o.html.  Dallas County is included because of the historic significance of Selma.

*Mobile Press*-Register remarked about the special legislative session in 1996, "When you cut to the chase, Gov. Fob James' special legislative session on voting reform is all about poor folks and whether they should be voting in Alabama. . . . The bulk of these new voters are presumed to be black and poor, and therefore likely to vote Democratic. . . . As Roger McConnell of Mobile, state GOP chairman, put it last month:  'Those people have not been voting with us.'  Joe Turnham, state Democratic Party chairman, charged that the Republican attitude is 'We're going to want everybody in Mountain Brook to vote, but not everybody in the Black Belt.'  Mountain Brook is an affluent suburb of Birmingham, while the Black Belt is rural and poor."[445]  The demographic facts in paragraphs 203 and 204 and Tables 4 and 5 made the effects of H.B. 19 entirely predictable.

---

[445] Gene Owens, "Poor GOP's plan aims to limit poor voters," *Mobile Press-Register*, July 17, 1996.

**Table 4:  The Racial Gap in Poverty in Selected Black Belt Counties**

| County | % Below Poverty Level, 2011-15 | | |
|---|---|---|---|
| | Non-Hispanic White | Black | Racial Gap |
| Bullock | 7.0 | 30.5 | 23.5 |
| Dallas | 14.5 | 43.3 | 28.8 |
| Greene | 20.9 | 45.3 | 24.4 |
| Hale | 13.4 | 36.3 | 22.9 |
| Lowndes | 3.4 | 37.0 | 33.6 |
| Macon | 16.0 | 28.3 | 12.3 |
| Perry | 17.9 | 44.2 | 26.3 |
| Sumter | 20.2 | 50.5 | 30.3 |
| Wilcox | 11.2 | 47.1 | 35.9 |

Source: Table S1701, 2011-15 American Community Survey

**Table 5:  The Racial Gap in Households with No Vehicle Available in Selected Black Belt Counties**

| County | % of Households with No Vehicle Available | | |
|---|---|---|---|
| | Non-Hispanic White | Black | Racial Gap |
| Bullock | 6.1 | 21.6 | 15.5 |
| Dallas | 5.9 | 23.2 | 17.3 |
| Greene | 3.4 | 20.1 | 16.7 |
| Hale | 2.9 | 25.1 | 22.2 |
| Lowndes | 4.3 | 20.0 | 15.7 |
| Macon | 5.5 | 21.4 | 15.9 |
| Perry | 3.7 | 23.4 | 19.7 |
| Sumter | 5.6 | 25.3 | 19.7 |
| Wilcox | 3.4 | 20.1 | 16.7 |

Source:  Table HCT033, 2000 Census[446]

---

[446] The 2000 Census provided the most recent data available for this variable at the county level in Alabama.

206.  There is another relevant demographic fact, this one mentioned in Alabama newspapers and especially significant in connection with H.B. 56.  The Latino population of Alabama, though still small, doubled in percentage terms between the 2000 and 2010 censuses, going from 1.7% to 4%.  The African-American percentage remained about the same at 26%.[447]  In closing its report on the passage of H.B. 56 in the Senate, the *Birmingham News* noted that the Pew Hispanic Center had recently estimated that the number of unauthorized immigrants (of all nationalities) in Alabama had doubled between 2005 and 2010.[448]  Such a sudden rise in a non-European ethnic group produced a backlash.

## E. Racial Climate

207.  Alabama's politics has long been racially polarized and has recently grown more so.  In 1981, 44% of whites in the state still identified themselves in surveys as Democrats, but 82% of blacks did.  By 1986, the figures were 39% and 85%.[449]  According to exit polls, 25-30% of white Alabamians supported the Democratic candidate in the 1988-2000 presidential elections, but by 2004-12, that percentage had dropped to less than 20%.  Using aggregate county-level data, the correlation between the white percentage and the support for Republicans was 0.77 for elections between 1984 and 1996, but 0.94 for the 2004-12 presidential elections.[450]  In the 2008 Democratic primary election in Alabama, Barack Obama received 25% of the white vote and 84% of the black vote.[451]  In the 2008 presidential election, Obama won 92% of non-white Alabamians regardless of party, and John McCain won white Alabamians regardless of party.  While President Obama won only 47% of white Democrats in Alabama, Senator McCain won 51% of white Democrats; 82% of white independents; and 98% of white Republicans.[452]  In the 2008 U.S. Senate race, African-American Democratic candidate State Sen. Vivian Figures won 90% of the black vote and Republican U.S. Sen. Jeff Sessions won 89% of the white vote. Sen.

---

[447] Steve Flowers, "Some interesting data from the 2010 census," *Piedmont Journal*, April 20, 2011.

[448] Kim Chandler, "State Senate passes immigration bill.  Targets suspects of illegal status," *Birmingham News*, April 22, 2011.

[449] Patrick R. Cotter and James Glen Stovall, "Party Identification and Political Change in Alabama," in Robert H. Swansbrough and David M. Brodsky, eds., *The South's New Politics:  Realignment and Dealignment* (Columbia, S.C.:  University of South Carolina Press, 1988), 142-57.

[450] Patrick R. Cotter, "Alabama:  From One Party to Competition and Back Again," in Charles S. Bullock III and Mark J. Rozell, *The New Politics of the Old South: An Introduction to Southern Politics*, 5th ed. (Lanham, MD: Rowman & Litterfield, 2014)71-88.

[451] http://www.cnn.com/ELECTION/2008/primaries/results/epolls/#ALDEM; Kristen Clarke, "The Obama Factor: The Impact of the 2008 Presidential Election on Future Voting Rights Act Litigation,"3 Harv. L. & Pol'y Rev. 59, 74 (2009). "In Alabama, Mississippi, and Louisiana, for example, Obama received only 10%, 11%, and 14% of the white vote respectively, which was nine, three, and ten percentage points less than Kerry received from whites in that state. Despite very favorable conditions for the "out-party" candidate in 2008, Obama did not improve on Kerry's average performance among whites in the covered states and dropped significantly in several of them." Stephen Ansolabehere, Nathaniel Persily & Charles Stewart III, *Regional Differences in Racial Polarization in the 2012 Presidential Election*, 126 Harv. L. Rev. F.  205, 214 (2013).

[452] http://www.cnn.com/ELECTION/2008/results/polls/#val=ALP00p1

Sessions won the majorities of white voters regardless of party affiliation: 58% of white Democrats, 88% of white independents, and 96% of white Republicans. State Sen. Figures won 84% of non-white voters of any party. [453]  In the 2012 presidential election, 15% of whites and 95% of African-Americans voted for Barack Obama.[454]  The percentage of Latinos in Alabama is too small to obtain reliable estimates of partisan preferences.  Black turnout also increased in 2008 in response to Obama's presidential candidacy.[455]  In the 2010 Democratic primary, black turnout in the Black Belt may also have *risen higher* than in the 2008 presidential primary.[456]

208.  The general polarization by race and party was heightened in the 2010 election and the 2011 legislative session by the defeat of so many longtime white Democratic legislators, leaving the Democratic party in both houses dominated by African-Americans, while there was not a single black Republican.  Republicans had nothing to gain anymore by even opportunistic, temporary alliances with African-American legislators in the state, and after the landslide of 2010, they had no need of support from any black voter or legislator.[457]

209.  The racial climate was also reflected in the central place in the Republicans' triumphant 2010 campaign of the "illegal immigrant" issue and their proud boast when the legislative session was over of having passed the nation's toughest law on the undocumented.  The alliance of most African-American legislators with advocates of immigrants, opposed by a solid white Republican phalanx, split the legislature strictly on lines of color, except for a few white Democrats.[458]

## F.  Background of Key Decisionmakers

210.  The most important background fact about a decisionmaker in this case is that Gov. Fob James hired Kerry Rich, later the chief sponsor of H.B. 19, to be his legislative liaison for the special session in 1996, a session concerned with only two issues – an absentee voting bill and a voter ID bill.  Short, but intense, full of bargaining between the Republican Administration and African-American legislators, especially senators, the session touched on all of the issues involved in the voter ID debate for the next 15 years.  In particular, we can be sure that Rich heard black legislators' view that many African-American voters would be disfranchised by the non-photo ID bill then being negotiated about, and even more disadvantaged by a strict photo ID

---

[453] http://www.cnn.com/ELECTION/2008/results/polls/#ALS01p1.
[454] www.cnn.com/election/2012/results/state/AL/president/.There were no exit polls for Alabama in 2016.  Steven Shepard, "Exit polls will skip 22 states this year," *Poliico*, Nov. 7, 2016 www.politico.com/story/2016/11/2016-exit-polls-used-in-which-states-230892/.
[455] Sam Roberts, "2008 Surge in Black Voters Nearly Erased Racial Gap," *New York Times*, July 20, 2009. www.nytimes.com/2009/07/21/us/plitics/21vote.html.
[456] Jeremy Weinrib, "Alabama Turnout Analysis," FiveThirtyEight, Jun. 2, 2010, https://fivethirtyeight.com/features/alabama-turnout-analysis/.
[457] See paragraphs 137-42.
[458] See paragraphs 153-69.

measure that had also been proposed by that time.  And we can also be certain that Rich was aware of the proposed trade of black acquiescence to a voter ID measure in return for Republican support for a bill making it easier for those mostly black adults who had been convicted of crimes of "moral turpitude" to regain the ability to vote.[459]  This proposed trade made the racial stakes of a voter ID bill unmistakable to all concerned.

211.  Again in 1998, liaison Rich was at the center of another fraught, failed negotiation with African-American legislators over a voter ID bill, one in which the distinction between non-photo and photo ID measures was one of the chief sticking points.[460]  His presence during these debates makes it absolutely certain that Rich knew how much more intense African-American legislators' opposition to a photo ID bill like H.B. 19 was than to a law that allowed non-photo documents, like the 2003 law.  While a back-bench legislator might have ignored discussion of these issues, someone in Rich's position as a negotiator could not have.  His background establishes foreknowledge beyond a shadow of a doubt.

212.  Indicating his understanding of the black concern with the discriminatory effects of a photo ID law, Rich in 2011 responded to criticisms of H.B. 19 by black legislators by noting that the bill would have to be precleared by the Justice Department under Section 5 before it went into effect.[461]  And during the debate over H.B. 56, Rich implicitly acknowledged that H.B. 19 would have a discriminatory effect on Latino voters by asserting that Latinos "don't have driver's licenses."[462]

## G. Other Actions of Key Decisionmakers

213.  Actions on four other bills are particularly important to consider in evaluating the purpose of H.B. 19:  the absentee voting bill in 1996, the various felon reenfranchisement bills from 1996 through 2003, and H.B. 56 in 2011.  First, black politicians were firmly convinced that former civil rights activists had been selectively prosecuted during the 1980s for activities that did not differ from those of other politicians of both races in the Black Belt.  That the same legislators were reluctantly willing to allow the absentee voting amendments to pass in 1996 indicates how much more harmful those legislators believed voter ID laws would be to black voters.[463]  Second, the logroll of a bill that obviously disproportionately benefitted African-Americans, the various forms of Rep. Yvonne Kennedy's felon reenfranchisement bill, and iterations of voter ID bills from 1996 through 2003 strongly implies that everyone in the legislature expected a voter

---

[459] See paragraphs 53-74.
[460] See paragraphs 84-88.
[461] See paragraph 150.
[462] See paragraph 179.
[463] See paragraphs 37-48, 51-52, 57-59.

ID law to diminish black turnout.  Those who voted for it, knowing the trade-off, must have desired that effect.[464]

214.  H.B. 56, which shared a place with a photo ID law on the Republican's 2010 "Handshake" platform, was clearly intended to discriminate against Latinos, as both its provisions and many statements by its proponents and opponents indicate, and as courts have found.   The bill began in a commission that was tasked with investigating the legal, as well the illegal immigration of "non-English speaking" people to Alabama.  The law required police to check for citizenship papers if they had a "reasonable suspicion" that a driver who committed some infraction was in the country illegally and sought to drive out of schools U.S. citizens whose parents were undocumented.  Openly worried that Latinos might vote Democratic, proponents inserted a provision that future voting registrants had to prove their citizenship in order to vote.  Previous registrants, the State asserted in an astoundingly inapt phrase coming from the birthplace of the "fighting grandfather clause," were "grandfathered in."   In discussing the bill, prominent proponents of H.B. 56, especially Kerry Rich, the chief sponsor of H.B. 19, repeatedly cited statistics on all Latinos, not on undocumented Latinos or all undocumented persons of whatever nationality.  The stereotyping, especially by Rich, and the barely veiled threat of violence by Sen. Scott Beason, the chief sponsor of H.B. 56 in the senate, appear to reflect ethnic hostility, not only hostility to law-breakers.[465]

215.  The legislature elected in 2010 also passed a series of redistricting bills that packed African-Americans into a minimum number of districts and shifted lines around to protect incumbent white Republicans and insure that minority voters could not elect candidates of choice.[466]  The passage of H.B. 56, H.B. 19, and the redistricting plans for the legislature, Congress, and the State Board of Education by the same legislative majority with the same opponents in the same legislature casts light on the general intentions of the legislators and contributes to the conclusion that racial purposes underlay H.B. 19.

## H. Statements by Important Decisionmakers

216.  It is rare in voting rights cases concerning events since the 1960s to find "smoking gun" statements of discriminatory racial intent.[467]  But the present case has two such statements by the chief sponsor of photo ID bills in the legislature from 1995 through his retirement after the 2010 legislative session,[468] Larry Dixon.  Although Dixon was not in the legislature in 2011, when the

---

[464] See paragraphs 71, 75-78, 89, 95, 102-03, 110-12, 116-25, 197-98.
[465] See paragraphs 153-69.
[466] See paragraphs 170-71.
[467] The most famous example, *Busbee v. Smith*, 549 F.Supp. 494 (D.D.C. 1982), shows why.  When deposition evidence quoted Reapportionment Committee Chair Joe Mack Wilson as saying "I'm not for drawing a nigger district," (at p. 512, finding 102), the case was practically over.
[468] See paragraphs 35, 63, 133.

photo ID bill finally passed, he had been its constant proponent for 15 years, many people who continued serving in 2011 had cosponsored his photo ID bills earlier, and he had evidently influenced Republicans to scrap the non-photo identifications available under the 2003 law and, as he so often recommended, adopt a strict photo ID law.[469]  In 1996, Dixon remarked that "The way the absentee ballot situation is now and the fact you don't have to show an ID is very beneficial to **the black power structure** and the rest of the Democrats."[470]  In 2001, he repeated the same thought with a slightly different twist:  Voting without photo IDs, Dixon said**, "**benefits **black** elected leaders, and that's why they're opposed to it."[471]  Unless there was proof of an organized African-American conspiracy to commit mass voter impersonation fraud -- and there was never the slightest evidence of such a plot – Dixon's statements must be taken to imply that the effect of not having a photo ID requirement made it too easy for African-Americans to vote and support black leaders.  It followed that imposing a photo ID would make it differentially more difficult for African-Americans to vote.  And since Dixon was the most unrelenting supporter of a photo ID requirement in legislative session after session, that must mean that he favored making it more difficult for blacks to vote.

217.  Dixon's forthrightness was also on display in his comment on Rep. Yvonne Kennedy's efforts to make it easier for persons convicted of crimes of "moral turpitude" to regain the franchise.  Dixon was frank about the racial nature of what became the key trade-off in getting a voter ID bill passed.  An opponent of ex-felon voting, Dixon told a reporter that Kennedy's bill was "a very big Black Caucus issue, primarily because so many of the black voters in the state would be benefited."[472]  Again, almost as a mathematical proposition, if Dixon knew that African-American voters would benefit from Kennedy's measure, and he opposed it, Dixon must have opposed benefitting black voters.  And if a bill that benefitted black voters was the price of a voter ID bill, then he must have believed that voter ID would make black voters worse off.

218.  Dixon's were not the only statements by proponents that indicated a racially discriminatory intent, though they were the most direct.  Worried that the easing of rules on registering to vote introduced by the National Voter Registration Act ("Motor Voter") would expand the electorate, the Chairman of the Republican State Committee, Roger McConnell of Mobile, said Republicans were uneasy about the types of people who registered under the NVRA because "Those people

---

[469] John Peck, "Panel sends voter ID measure to Senate," *Huntsville Times*, Feb. 16, 2000, in which Dixon is quoted as saying "Photo ID is a must . . . I'm not prepared to water down that provision."  No author, "A Look At Some High-Profile Issues," *Birmingham News*, Feb. 4, 2001; Dewayne Patterson, "AG announces legislative crime package," *Scottsboro Daily Sentinel*, Jan. 6, 2009.
[470] John Peck, "GOP senators advise delay of session," *Huntsville Times*, July 4, 1996.  Emphasis added.
[471] No byline, "Voter ID bill has support," *Montgomery Advertiser*, Feb. 11, 2001.
[472] Quoted in Editorial, "What's best," *Anniston Star*, June 26, 2003; Bill Barrow, "Voting bills could threaten tax plan STATE POLITICS FRACTURED DEAL?  The bills passed under an arrangement to end a decade-long dispute between white Republicans who support voter ID but oppose felon voting rights and black Democrats who hold the opposite view in both cases.  Voting bills split parties, with Riley in the middle," *Mobile Press-Register*, June 20, 2003.

106

have not been voting with us."[473]  Note that he did not say that people were registering fraudulently.  What kinds of people was McConnell talking about?  According to the political editor of the *Mobile Press-Register* "The bulk of these new voters are presumed to be black and poor, and therefore likely to vote Democratic."[474]

219.  Statements by African-American opponents of voter ID bills should also be counted in an evaluation of whether such bills were adopted with a racially discriminatory intent for two reasons.  First, they demonstrate that proponents had to be aware of the contention that the laws would have a racially discriminatory effect.  Such an effect could not possibly have been an unintended consequence if proponents were repeatedly and shrilly warned of the consequence.  Second, if the mechanics of the laws logically had the effect that the opponents claimed, then their charges of a discriminatory intent gain credibility.

220.  It is easy to multiply examples of African-American legislators charging that voter ID laws had a discriminatory intent.  Here are three from 1996:  Rep. Alvin Holmes, D-Montgomery, "said the voter identification measure is a thinly veiled effort to discourage and turn back blacks from the polls."[475]  Senate President Pro-Tem Michael Figures, the highest ranking African-American in the legislature, "said he and others will fight the ID bill because it harkens back to the days of poll taxes and literacy tests."[476]  Sen. Hank Sanders, D-Selma, who led the successful black filibuster against the voter ID law, described the bill as a throwback to the days when nearly all Alabama blacks were disfranchised.  "It will discourage people who have been hassled half their lives and don't want any more hassle, with the perception of the state of Alabama being what it is."[477]  Here is Alvin Holmes in 1998: "This is a method to intimidate black voters."[478]  Here is a newspaper summary of opponents' contentions in 2001: "[O]pponents say requiring identification is intimidating to black voters and smacks of the Jim Crow days of the old South.  The hard-line version, requiring voters to show picture identification, would also disenfranchise the poor, many of whom do not have cars, much less driver's licenses, opponents say."[479]  Sen. Beason, and likely others, knew that the Black Caucus opposed photo ID laws because "[t]hey say black voters are not able to obtain a photo ID" and that black voters were less likely to have IDs.[480]

---

[473] Gene Owens, "Poor GOP's plan aims to limit poor voters," Mobile Press-Register, July 17, 1996.  Emphasis added.
[474] See paragraph 62.
[475] John Peck, "Senators threaten filibuster of session over voter ID plan," *Huntsville Times*, July 17, 1996.
[476] AP, "James urges passage of voting bills.  Governor says his aim is to prevent a repeat of 1994 'fiasco'," *Mobile Press-Register*, July 18, 1996.
[477] AP, "Fob loses his fight for voter ID bill.  Lawmakers give up and end special session," *Mobile Press-Register*, July 26, 1996.
[478] Philip Rawls, "James to push voter ID bill," *Huntsville Times*, Jan. 13, 1998.
[479] Matthew Korade, "Lawmakers gear up for another round," *Anniston Star*, Feb. 4, 2001.
[480] Scott Beason deposition, at 168-69.

221.  As the *Anniston Star*'s summary points out, there was an obvious connection between opponents' contentions and the predictable effects of the law, a connection that was repeatedly pointed out during debates in the legislature and the press.  If the most common form of identification, particularly of photo ID, was a drivers' license, if poor people were less likely than richer people to have driver's licenses, and if African-Americans were more likely than whites to be poor, then a photo ID law was almost certain to have a comparatively large depressive effect on black political participation.  Such an effect was magnified by the ALEA office closures in 2015, as was widely noticed.[481]  The connection of awareness and predictable effect suggests that some attention should be paid, in this instance, to the statements of opponents, as well as proponents of the law.

## I.  State Policies and Institutional Rules

222.  The Alabama legislature did not hold committee hearings on every bill, and it sometimes invoked cloture to shut off debate.  But it had held some open hearings on voter ID bills from 1995 through 2003, and it allowed several hours of debate on voter ID bills from 1995-2003.[482]  Even on H.B. 56 in 2011, it held five hours of debate in the House.[483]  But on H.B. 19, there were no hearings and almost no debate allowed before cloture was invoked.  As a study showed, Republicans from 2011 to 2014 invoked cloture in the Senate thirteen times as frequently as Democrats had when they controlled the legislature from 1999 to 2010.[484]

## J.  Impact and Anticipated Impact

223.  Statements by African-American legislators, quoted in paragraph 220 and at other places in this report, anticipated that a voter ID law, especially a photo ID law, would have a disparate impact on black voters.  Although there do not seem to have been studies published in Alabama before 2014 that matched the names of voters to databases containing the names of holders of driver's licenses and other eligible photo IDs, the Department of Public Safety (the predecessor of ALEA) definitely had such data.  A 1991 study based on that data showed that 90% of white eligible voters, but only 74% of black eligible voters had Alabama driver's licenses.[485]  So any legislator who wanted to go beyond the commonsense observation that fewer poor than middle-class people owned cars or the census finding to the same effect could have inquired of the DPS or ALEA.  Whether the impact was anticipated on commonsense principles or based on more precise statistics, it was foreseeable.

---

[481] See paragraphs 177-79.
[482] See paragraphs 58, 71.
[483] See paragraph 161.
[484] See paragraphs 146-52.
[485] See paragraph 61.

# K. Evaluation of Other Hypotheses

224.  Hypotheses cannot be considered in isolation.  Since in human endeavors, there is always more than one potential explanation for an event or a condition, accepting one hypothesis involves rejecting others, or at least weighing others and finding that the evidence more strongly supports one particular hypothesis.  In this instance, there are two obvious hypotheses that compete with the proposition that the framers of H.B. 19 intended it to be racially discriminatory.  First, they were simply trying to guarantee clean elections and combat fraud.  A variant of this hypothesis is that they were responding to a popular view, however inadequately supported as a matter of fact, that elections were filled with fraud.  A second hypothesis is that the reasons were not racial, but partisan – that Republicans imposed H.B. 19 to gain an advantage over Democrats.

## 1.  The Fraud Hypothesis

225.  Three overwhelming facts contradict this thesis.  First, despite repeated efforts to turn up fraud in Alabama from the 1980s to the present, proponents of voter ID laws could present only one minor incidence of voter impersonation fraud in 2002.  Second, by contrast, they convicted some people of absentee ballot fraud, and the record above contains many statements about absentee fraud, often adding that it is the only kind of election fraud that takes place in Alabama currently.  Third, proponents of voter ID did not even claim with any specificity that there was current voter impersonation fraud, and they very rarely fell back on the argument, used, for instance, in North Carolina, that a public perception of fraud, whatever the reality, justified passing a voter ID law.[486]

226.  Early in the voter ID debate, Don Siegelman, then Lieutenant Governor, but formally Secretary of State and subsequently Governor expressed skepticism about the existence of voter impersonation fraud:  "I've never heard one complaint from election officials of somebody trying to vote that shouldn't vote," he said.[487]  In 1999, before a hotly-contested referendum on establishing a state lottery, both Attorney General William Pryor and Secretary of State Jim Bennett established "hot lines" to report election irregularities.  According to Pryor, "only a few of the calls received by his office involved allegations of possible wrongdoing."[488]  In 2001, Bennett told a newspaper that "Voting fraud at the polls is not rampant," though he asserted

---

[486] See paragraph 135.  The argument was much more prominent in North Carolina.  In a statement to MSNBC about the voter ID bill (joined, after *Shelby County*, with a much longer and more comprehensive election bill), Speaker Thom Tillis said the primary justification of the bill was that there were "a lot of people who are just concerned with the potential risk of fraud."  "North Carolina Dems: Thom Tilis:  Wrong Priorities for North Carolina," *Targeted News Service*, March 19, 2013.

[487] Michael Sznajderman, "Outlook Poor for Voter ID, Better on Absentee Fix," *Birmingham News*, May 13, 1996.

[488] See paragraph 97.

without providing any examples that "it does happen."[489]  The chief House sponsor of voter ID bills for several years, Jim Carns, R-Mountain Brook, agreed with Bennett.  "In the *Birmingham News* reporter's paraphrase, "Carns said he doesn't think voter fraud is an epidemic, but too many elections are decided by close margins to allow it to continue. Having the law on the books will discourage people from trying to commit voter fraud, he said."[490]

227.  During the 2008 general election, Republicans led by state party chairman (and 2011 House Speaker) Mike Hubbard organized a "ballot security initiative" that placed an attorney in every Alabama county to prevent ballot fraud.[491]  Republican Party Communications Director Philip Bryan said the Party had run similar programs in past election years.[492]  Attorney General Troy King set up a toll-free hotline in 2008 so that citizens could easily report alleged voter fraud.[493]  In 2010, Secretary of State Chapman set up a "Voter Fraud Task Force."[494]  Touting her searches for fraud in a meeting with the editorial board of the *Anniston* Star, Chapman focused only on what the paper called "counties that were heavily Democratic and black."[495]  Newspapers carried no reports of any fraud detected by any of these programs.  When the Alabama Republican Party set up a hotline to report voting irregularities in the 2014 primary, offering a $1000 reward for information leading to convictions for voter fraud, it did not have to pay.[496]

228.  The mentions of absentee ballot fraud (often not validated when the alleged perpetrators were actually tried) and the contrast to the lack of proven impersonation fraud are repeated in the record above.  Perhaps the most striking came from Bennett, one of the first sponsors of a voter ID bill in the state and the longtime Secretary of State.  It deserves quoting again in full:  "It is in the area of absentee voting - voting done out of sight - where most of our problems originate," Bennett wrote in an op-ed in the *Birmingham News*,  "not in voting at the polls."[497]  As Bennett's spokesman Steve Prince told a reporter in 1996, a voter ID law was "more to cover a potential loophole in the future."[498]  Two years later, Attorney General Pryor agreed, saying, in a reporter's summary, that "there is more abuse of absentee ballots in Alabama than there is with

---

[489] See paragraph 106.

[490] Michael Q. Guffey, "Education Funding Gets Top Priority for Carns," *Birmingham News*, May 15, 2002.

[491] Kim Chandler, "Registration closes with record numbers.  Lawyers to check for shenanigans," *Birmingham News*, Oct. 25, 2008.

[492] Amy Weaver, "State parties step up efforts to fight voter fraud," *Opelika-Auburn News*, Oct. 26, 2008.

[493] Thomas Allen, "AG King announces election fraud hotline," NBC – 13 WVTM (Birmingham, AL), Oct. 29, 2008.

[494] Bob Lowery, "Candidates focus on voter fraud, victims' rights," *Birmingham News*, Oct. 24, 2010.

[495] Editorial, "Chapman a flawed candidate, but best choice for secretary of state," *Anniston Star*, Oct. 29, 2010.

[496] See paragraph 183.

[497] Jim Bennett, "Early Voting:  It's Most Important Election Reform During Special Session," Birmingham News, July 21, 1996.

[498] AP, "Black lawmakers oppose voter identification proposal.  Selma's Sanders, others say some voters will be intimidated by change," *Mobile Press-Register*, June 30, 1996.  Emphasis added.

people voting in someone else's name."[499]  In 2009, Secretary of State Beth Chapman, a staunch proponent of photo ID laws, remarked that "The voter fraud that has been proven (in Alabama) has all come through absentee ballots."  It was an assessment that she repeated in speeches across the state: ". . . the voter fraud that has been proven, and indictments (that) have come in the past, have all come from absentee ballots."[500]

229.  Compared with the plentiful evidence of a racially discriminatory intent in statements, actions, and all of the ten intent factors above, the evidence for, or even claims of voter impersonation fraud as a justification for H.B. 19 seem extremely weak.

## 2.  The Partisanship Hypothesis

230.  There are two obvious difficulties with the view that it was party, and not race, that explained support for voter ID laws in Alabama.  First, from 1995 through 2003, white Democrats, who were still in control of the legislature, voted in favor of various voter ID laws. Second, when the 2011 photo ID law succeeded the 2003 law, white Democrats in the legislature had been decimated. Among officeholders and, increasingly, the voting public, the Democratic Party in Alabama had become "the black party," as the Republican Party had been "the black party" during and after the First Reconstruction.  So by 2011, party and race had become so highly correlated that they could not be distinguished.  A partisan motive amounted to a racial motive.  As Democrats had done in 1901, Republicans in 2011 sought to damage their partisan and racial opponents at a time when those opponents were at least temporarily very weak.

231.  During the 1996 House session, all (white) Republicans favored a voter ID bill, but so did nearly three-fourths of white Democrats who voted.  All African-American House members who voted opposed it.[501]  In the special session, too, all House Republicans and the vast majority of white Democrats favored a voter ID bill, with African-American legislators opposed.[502]  In 1997, neither of two voter ID bills emerged from committee because of the opposition of black legislators.[503]  In the 1998 House, only 4 white Democrats could be found in the House to ally with all 27 black House members against the rest of the white Democrats and Republicans, though that was enough to defeat a procedural motion to take up a voter ID bill.[504]

232.  By 1999, the issue of voter ID had become twinned with that of making it easier to vote for people who had been released after having been convicted of crimes of "moral turpitude," who were predominantly black.  That year, when whites, Democratic, as well as Republican, blocked the felon enfranchisement bill on a House procedural vote, blacks immediately blocked a voter

---

[499] Phillip Rawls, "James to push voter ID bill," *Huntsville Times*, Jan. 13, 1998.
[500] See paragraph 132.
[501] See paragraph 49.
[502] See paragraph 69.
[503] See paragraph 79.
[504] See paragraph 88.

ID bill, and both bills died.[505]  In 2000, that year's voter ID bill passed the House by 80-20, which indicates that all or nearly all white Democrats joined the Republicans in favor of the bill. But because Senate Republicans refused to take up the felon enfranchisement bill, the logroll failed, and African-American senators successfully filibustered the voter ID bill.[506]  Again in 2001, the House passed a voter ID bill, this time by 78-17.  Since all 17 opponents were black, all white Democrats who voted must have joined the Republicans in favoring it.[507]  As in 2000, Senate Republicans refused to take up the felon enfranchisement bill, African-Americans filibustered in response, and both bills failed.[508]  In 2002, action on the twinned bills followed exactly the same pattern as in the two previous sessions, and this time, the House passed the voter ID bill by 77-17, with blacks in opposition and white Democrats and Republicans in favor.[509]  Finally, in 2003, the logroll between felon re-enfranchisement and a photo and non-photo ID bill went through, though Gov. Riley vetoed the re-enfranchisement bill, only to agree to back it in a special session.  In the House, the vote was nearly exactly the same as in the three previous years, 81-17, with white Democrats and Republicans in favor and 17 African-Americans opposed.[510]

233.  When the legislature adopted H.B. 19 in 2011, 27 of 39 Democrats in the House were black, along with 7 of 12 in the Senate.[511]  While support for voter ID was no longer bipartisan among whites, partisanship had become effectively racialized.

234.  In sum, up to 2003, the legislature divided on voter ID bills by race, not by party.  In 2011, race so overlapped with party that a partisan intent was indistinguishable from a racial intent.  Therefore, a partisanship explanation for the adoption of H.B. 19 is not a viable alternative to a racial explanation.

## VIII.  Senate Factors

### A. Modifications in the Senate Factors for this case

235.  Senate Report 97-417 sets out seven "typical factors" and two "additional factors" that might be used to prove a violation of Section 2 of the Voting Rights Act.  As the Report notes at p. 28, n. 113, "These factors are derived from the analytical framework used by the Supreme Court in *White* [*v. Regester*, 412 U.S. 755 (1973)], as articulated in *Zimmer* [*v. McKeithen*, 485 F.2d 1297 (5th Cir. 1973)]."  Because *White v. Regester* concerned at-large elections in Dallas and

---

[505] See paragraph 95.
[506] See paragraphs 101-03.
[507] See paragraph 108.
[508] See paragraph 110.
[509] See paragraph 111.
[510] See paragraph 118.
[511] Steve Flowers, "History will be made on Goat Hill next week," *Jacksonville News*, Jan. 4, 2011; David White, "Legislators have a lot in common.  Most married, male and in GOP," *Birmingham News*, March 20, 2011.

San Antonio, these factors are not entirely congruent with the particulars of state-wide election laws. Moreover, political conditions have changed a great deal since 1973 – the Latino population has grown markedly in many states, more minorities have been elected to office, and the Republican party has replaced the Democratic party as the dominant one in the South. As a consequence, some of the "Senate factors," such as factor #4 on slating processes, may be ignored in this case, while others, such as factor #1, must be slightly reinterpreted.

## B.  History of Official Discrimination

236.  The first Senate factor is "the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process."[512]  Much of that history has already been briefly summarized.[513]  Alabama's experience of discrimination against African-American voting rights was so central to the nation's history that it was the subject of a book with the revealing subtitle *The Alabama Origins of the 1965 Voting Rights Act*.[514]  Even after the passage of the VRA, the Fifth Circuit in *Dent v. Duncan* (1966)[515] and *Gilmore v. Greene County Democratic Party* (1970)[516] found discrimination against illiterate black voters in Alabama. Section 5 objections also blocked state literacy tests for absentee voters (1970)[517] and limits on voter assistance (1972).[518]  In *Harris v. Siegelman* (1988), a district court found that two provisions of Alabama state law — "(a) requiring that a voter seeking assistance swear an oath to the inspectors that he or she is unable to write the English language, and (b) limiting to five minutes the time that a voter may remain inside the voting booth" — "continue[d] today to have substantial adverse effects on the black citizens of this state."[519]  For Latinos, a form of a literacy test for voting persists, since the State currently offers no Spanish translations of voter registration or voter ID application forms.[520]  For the 37.1% of Latinos in Alabama who speak English "not well" or "not at all,"[521] this amounts to a literacy test.

---

[512] S.R. 97-417, p. 28.  The rest of the Senate factors appear on p. 29. I will quote them without further citation.

[513] See paragraphs 75-77, 189-94.

[514] Brian K. Landsberg, *Free at last to Vote:  The Alabama Origins of the 1965 Voting Rights Act* (Lawrence, Kansas:  University Press of Kansas, 2007).  Landsberg litigated many Alabama cases as an attorney for the U.S. Department of Justice.

[515] 360 F. 2d 333, 334 (5th Cir. 1966).

[516] 435 F.2d 487 (5th Cir. 1970).

[517] Letter, U. S. Dept. of Justice, Civil Rights Div., to MacDonald Gallion, Ala. Atty. General (March 18, 1970), available at https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/AL-1100.pdf.

[518] Letter, David L. Norman, Asst. Atty. General, U. S. Dept. of Justice, Civil Rights Div., to Leslie Hall, Ala. Asst. Atty. General (April 4, 1972), available at https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/AL-1150.pdf.

[519] 695 F. Supp. 517, 528 (M.D. Ala. 1988).

[520] John Sharp, "Merrill Comfortable with Voter Outreach: Convention Attendees Ask About Driver's License Offices," *Mobile Press-Register*, Oct. 25, 2015.

[521] Table S0201, 2015 American Community Survey 1-year estimate.

237.  After the felon disfranchisement law was reenacted in the wake of *Hunter v. Underwood*,[522] the law continued to affect black citizens disproportionately, disfranchising 15% of the black voting age population, but only 7% of the white.[523]  The law was also applied arbitrarily, in some instances, to all felons, rather than just to those who had committed crimes of "moral turpitude."[524]  When an African-American minister attempted to register people who were incarcerated for crimes other than ones of "moral turpitude," the Alabama Department of Corrections approved, because officials considered it part of a program to reform and rehabilitate prisoners.  But after State Republican Party Chairman (and 2011 House Speaker) Mike Hubbard objected and raised the possibility of voter fraud, the program was brought to a quick halt.  When the NAACP-LDF sued, the minister was allowed at least to put up flyers on "Voting While Incarcerated" on prison bulletin boards.[525]

238.  Federal courts repeatedly found that at-large elections, especially those requiring election by "numbered posts," had been adopt and/or used to disadvantage minority voters in Alabama, and they forced the State or local jurisdictions to replace them with district elections.[526]  The landmark *Dillard v. Crenshaw County*[527] litigation, which found Section 2 violations in the standard Alabama local government scheme of at-large elections with numbered posts, forced settlements replacing such systems all over the State.  My database shows that *Dillard* was the most successful litigation ever brought under the VRA, overturning discriminatory arrangements in 17 county commissions, 28 county school boards, and 144 cities across Alabama.

239.  Redistricting plans adopted by the State have also been repeatedly overturned by courts as racially discriminatory.  Following the 1960 and 1970 reapportionments, the courts in *Sims v.*

---

[522] 471 U.S. 222 (1985).

[523] Jeff Manza, "State-Level Estimates of Felon Disenfranchisement in the United States, 2010," *The Sentencing Project,* July 2012, available at http://www.sentencingproject.org/wp-content/uploads/2016/01/State-Level-Estimates-of-Felon-Disenfranchisement-in-the-United-States-2010.pdf.

[524] *Chapman v. Gooden*, 974 So. 2d 972 (Ala. 2007).

[525] No author, "NAACP fights for prison registration," *Birmingham* News, Oct. 1, 2008; Desiree Hunter, "Pastor, state prisons settle suit on inmate voting," Anniston Star, Oct. 22, 2008.

[526] See *Hendrix v. McKinney*, 460 F. Supp. 626 (M.D. Ala. 1978); *Hale Cty. v. United States*, 496 F.Supp. 1206, 1218-19 (D.D.C. 1980); *Bolden v. City of Mobile*, 542 F. Supp. 1050, 1062 (S.D. Ala. 1982); *Brown v. Bd. of Sch. Com'rs of Mobile Cty.*, 542 F.Supp. 1078, 1107 (S.D. Ala. 1982), 706 F.2d 1103 (11th Cir.), *aff'd*, 464 U.S. 1005 (1983); *Clark v. Marengo County*, 623 F.Supp. 33 (S.D. Ala. 1985); *U.S. v. Dallas County*, 850 F.2d 1430 (11th Cir. 1988); 850 F.2d 1433 (11th Cir. 1988). In *Medders v. Autauga County,* the Section 2 challenge to multi-member elections settled in favor of black voters. 858 F. Supp. 1118 (M.D. Ala. 1994).  I testified in *Bolden, Brown, and Dallas County*.

[527] 640 F.Supp. 1347 (M.D. Ala. 1986).  Numbered post laws require an at-large candidate to "run for a numbered post or separate place. Each commissioner position carries a separate number, and each candidate qualifies for a specific number and place, with each voter allowed to vote for only one candidate in each place." *Dillard*, 640 F.Supp. at 1352.

*Baggett* (1965)[528] and *Sims v. Amos* (1972)[529] found that state legislative plans were racially discriminatory. In 1982, the U.S. Attorney General objected twice under Section 5 to state legislative plans as retrogressive and purposefully discriminatory.[530] In *Burton v. Hobbie* (1983), a three-judge court agreed with the Attorney General.[531] In 1992, the U.S. Attorney General again objected under Section 5 to Alabama's Congressional redistricting plan, validating concerns that the plan's "underlying principle . . . was a predisposition on the part of the state political leadership to limit black voting potential to a single district."[532] At the same time, Alabama settled voting cases where black voters challenged Congressional and state districts in *Wesch v. Hunt* (1992)[533] and *Brooks v. Hobbie* (1993).[534]  After the 2012 reapportionment, black voters in *Alabama Legislative Black Caucus v. Alabama* (2017) successfully challenged it as an unconstitutional racial gerrymander, which "packed" 12 majority-black state districts.[535]

240.  The U.S. Department of Justice also refused to preclear "re-identification" laws in 5 counties in the 1980s and 90s that seemed to prefigure the voter ID laws by requiring voters who had already registered to vote to complete a second identification process.  The counties, largely in the rural Black Belt, were Perry, Sumter, Wilcox, Baldwin, and Dallas.[536]

---

[528] 247 F. Supp. 96, 109-10 (M.D. Ala. 1965)

[529] 336 F. Supp. 924, 936 (M.D. Ala. 1972).

[530] Letter, Wm. Bradford Reynolds, Asst. Atty. General, U. S. Dept. of Justice, Civil Rights Div., to Charles A. Graddick, Ala. Atty. General (May 6, 1982), available at https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/AL-1520.pdf; Letter, Wm. Bradford Reynolds, Asst. Atty. General, U. S. Dept. of Justice, Civil Rights Div., to Charles A. Graddick, Ala. Atty. General (August 2, 1982), available at https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/AL-1560.pdf.

[531] 561 F. Supp. 1029, 1035 (M.D. Ala. 1983).

[532] Letter, John R. Dunne, Asst. Atty. General, U. S. Dept. of Justice, Civil Rights Div., to Jimmy Evans, Ala. Atty. General (March 27, 1992), available at https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/AL-1880.pdf.

[533] 785 F. Supp. 1491, 1498-99 (SD Ala. 1992), *aff'd* 6 F. 3d 1465, 1468 (11th Cir. 1993).

[534] 631 So.2d 883 (Ala. 1993)

[535] Mike Cason, "Federal judges rule Alabama must redraw legislative districts," *Al.com,* January 20, 2017, available at http://www.al.com/news/birmingham/index.ssf/2017/01/federal_judges_rule_alabama_mu.html.

[536] Letter, Wm. Bradford Reynolds, Asst. Atty. General, U. S. Dept. of Justice, Civil Rights Div., to Floyd R. Cook, Chairman, Perry County Commission (Sept. 25, 1981), available at https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/AL-1450.pdf; Letter, Wm. Bradford Reynolds, Asst. Atty. General, U. S. Dept. of Justice, Civil Rights Div., to I. Drayton Pruitt, Jr., (Oct. 2, 1981), available at https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/AL-1460.pdf; Letter, Wm. Bradford Reynolds, Asst. Atty. General, U. S. Dept. of Justice, Civil Rights Div., to F.R. Albritton, JR., Probate Judge, Wilcox County, (Oct. 26, 1981), available at https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/AL-1480.pdf; Letter, Wm. Bradford Reynolds, Asst. Atty. General, U. S. Dept. of Justice, Civil Rights Div., to Lynda K. Oswald, Ala. Asst. Atty. General, (Dec. 11, 1984), available at https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/AL-1640.pdf; Letter, John R. Dunne, Asst. Atty. General, U. S. Dept. of Justice, Civil Rights Div., to Debbie Barnes, Chairperson, Dallas Cty. Board of Registrars, (June 22, 1990), available at https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/AL-1800.pdf.

241.  In very recent history, Alabama settled two separate NVRA lawsuits with the Alabama NAACP,[537] and the U.S. Department of Justice.[538]  In 2016, the D.C. Circuit blocked the requests of Secretary Merrill to the federal Election Assistance Commission for permission to enforce HB 56's documentary proof of citizenship requirement for federal voters.[539]

## C. Racially Polarized Voting

242.  Factor 2 is "the extent to which voting in the elections of the state or political subdivision is racially polarized."  The extent of racial bloc voting is relevant to the intent prong of Section 2.[540]  If Republicans crafted changes in election laws to do the maximum damage to Democrats, then they necessarily must have aimed them at that party's most loyal supporters.  If a majority of African-Americans in 1893 or 1901 had been Democrats, Democrats would have had no interest in disfranchising them.  If a majority of African-Americans in 2011 had been Republicans, Republicans would have had no interest in restricting the opportunities to vote that blacks differentially exercised.  This factor has been treated above in paragraph 207.

## D. Enhancing Provisions

243.  Factor 3 is "the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group."  These specific types of laws pertain largely to local elections or to an era in which winning the Democratic primary virtually guaranteed a candidate the election.  The implicit lawsuit to which they pertain is one attempting to overturn an at-large election in a system containing other provisions that add to the difficulty of electing minority candidates of choice.

244.  The best analogy in this case is the "Positively Identify" provision that allows two poll workers to vouch for a person's identity, allowing the person to vote without a photo ID.  Like the discretion allowed voting registrars during the Jim Crow period, this is an invitation to arbitrary and discriminatory enforcement.  It is reminiscent of the provision of Alabama law before the passage of the VRA that required applicants for registration to prove their identities and "good moral character" by obtaining vouchers from friends or election officials.[541]  I

---

[537] Demos, "Alabama and Alabama NAACP Agree to Procedures to Ensure Voter Registration Opportunities at Public Assistance Agencies," January 8, 2014, available at http://www.demos.org/press-release/alabama-and-alabama-naacp-agree-procedures-ensure-voter-registration-opportunities-p-0. The State settled before the Alabama NAACP filed its lawsuit.

[538] United States Department of Justice, Civil Rights Division, "State of Alabama Agrees to Resolve Claims of National Voter Registration Act Violations," November 13, 2015, available at https://www.justice.gov/opa/pr/state-alabama-agrees-resolve-claims-national-voter-registration-act-violations.

[539] *League of Women Voters v. Newby*, 838 F.3d 1, 9-10 (D.C. Cir. 2016).

[540] For example, in *Rogers v. Lodge*, 458 U.S. 613, 623 (1982), the Court declared that "bloc voting along racial lines" and the failure to elect blacks "bear heavily on the issue of purposeful discrimination."

[541] *United States v. Logue*, 344 F. 2d 290, 291 (5th Cir. 1965); *United States v. State of Alabama*, 252 F. Supp. 95, 104 (M.D. Ala. 1966).

understand that another expert in this case is analyzing this facet of H.B. 19, and I may later incorporate facts and conclusions from that expert's analysis.

## E.  Candidate Slating Processes

245.  This factor relates only to local elections and is not relevant to this case.

## F.  Current Effects of Past Discrimination

246.  The fifth factor is "the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process."  Congress assumed in its statement of this factor a fact long recognized by social scientists -- that in the post-World War II U.S., political participation is strongly correlated with education and income. As Raymond E.Wolfinger and Steven J. Rosenstone put it in *Who Votes* in 1980, "Probably the best-known finding about turnout is that 'citizens of higher social and economic status participate more in politics.'"[542]  Poorer people are less likely to own cars or have internet connections.  Less educated people may make more errors following complicated instructions that are necessary to register, to vote, and/or to obtain a photo ID.

247.  In addition to the poverty and vehicle ownership statistics already detailed,[543] which are particularly relevant to the predictable effects of a photo ID law, educational contrasts between black and white Alabamians demonstrate another legacy of discrimination that hinders African-American political participation.  According to the 2015 American Community Survey 1-Year Estimates (2015 ACS), African-American and Latino Alabamians over 25 years old are more likely than whites to have completed less than a high school education (42.6% of Latinos; 18.5% of blacks; and 12.7% of non-Hispanic whites). At the other end of the educational continuum, only 12.9% of Latino and 16.4% of black Alabamians, but 26.9% of whites, have received a bachelor's degree or higher. Finally, as H.B. 19 permits the use of college or university student photo IDs, the 2015 ACS reported disparities in college or graduate school enrollment for the Alabama population suggest racial disparities in student ID ownership: 25.0% of black people, 14.0% of Latinos, and 26.5% of white people in Alabama are enrolled in college or

---

[542] (New Haven:  Yale University Press, 1980), 13, quoting Sidney Verba and Norman H. Nie, *Participation in America:  Political Democracy and Social* Equality (New York:  Harper and Row, 1972), 125.  The most recent treatment of the subject, which reaches the same conclusion about differential turnout by education and income as the earlier works did, is Jan E. Leighley and Jonathan Nagler, *Who Votes Now?  Demographics, Issues, Inequality, and Turnout in the United States* (Princeton, New Jersey:  Princeton University Press, 2014).
[543] See paragraphs 203-05.

graduate school. Nationally, for Americans aged 18-29 years old, fewer blacks (24.9%) and Latinos (28.6%) report possessing student IDs than whites (30.9%).[544]

248.  There are similar disparities in employment, housing, and health.  In employment, according to the 2015 ACS, Black and Latino workers are nearly twice as likely as whites to hold lower paying service jobs (23.3% blacks; 23.9% Latinos; 13.2% whites), and consistently suffer higher rates of unemployment (11.5% blacks; Latinos 5.2%; 5.6% whites).  In housing, blacks and Latinos are twice as likely as whites in Alabama to be renters rather than owners of their homes -- 50.2% of blacks, and 51.0% of Latinos rent, compared to 24.2% of whites. The Resident Characteristic Report from the U.S. Department of Housing and Urban Development shows that, while black people are just a quarter of Alabama's population, black people comprise 71% and white people 28% of public housing residents in Alabama.[545] Therefore, any decision to exclude public housing photo IDs from H.B. 19 had a substantial and foreseeable racially disparate impact. Black and Latino homeowners also occupy less valuable real estate than whites do.  In the 2015 ACS, the most recent year for which median home value is listed by race in the U.S. Census, the average white home ($147,500) in Alabama was worth 163% as much as the average black ($90,000) or Latino ($89,700) home.[546]    In matters of health, the infant mortality rate (a standard health measure) in 2014 was more than twice as high for non-whites (13.9)[547] than for whites (6.0).[548] In 2013, the infant mortality rate was 12.6 for black and 6.9 for white people.[549] In 2008, the most recent year for which data for Latinos alone is available, the Latino (8.9) infant mortality rate was also higher than for whites (7.6).[550] In addition, black (70.5%) and Latino (44%) women were less likely than whites (76.5%) to receive adequate prenatal care.[551] And the death rate per 100,000

[544] John C. Rogowski and Cathy J. Cohen, "Black and Latino Youth Disproportionately Affected by Voter Identification Laws in the 2012 Election," *Democracy Remixed: Black Youth and the Future of American Politics,* available at http://blackyouthproject.com/wp-content/uploads/2015/11/voter_id_effect_2012.pdf.
[545] U.S. Department of Housing and Urban Development, Resident Characteristic Report, Alabama, Race/Ethnicity, Distribution by Head of Household's Race, https://pic.hud.gov/pic/RCRPublic/rcrmain.asp.
[546] Table S0201, 2015 American Community Survey 1-year estimates.
[547] Alabama Department of Public Health Department, "Black and Other Resident Infant Deaths and Infant Mortality Rates by County: Alabama, 2012, 2013, 2014, and 2012-2014 Combined," available at http://www.adph.org/healthstats/assets/INF_MOR_12_14B_O.pdf.
[548] Alabama Department of Public Health, "White Resident Infant Deaths and Infant Mortality Rates by County: Alabama, 2012, 2013, 2014, and 2012-2014 Combined," available at http://www.adph.org/healthstats/assets/INF_MOR_12_14W.pdf.
[549] Mike Cason, "Rate of infant deaths in Alabama remains well above national average," *Al.com,* December 16, 2015, available at http://www.al.com/news/index.ssf/2015/12/rate_of_infant_deaths_in_alaba.html; Alabama Department of Public Health Center for Health Statistics, "Infant Mortality: Alabama 2013," available at https://www.adph.org/healthstats/assets/INF_MOR_13.pdf.
[550] Alabama Department of Public Health Center for Health Statistics, "Infant Mortality: Alabama 2008," available at http://www.adph.org/healthstats/assets/infantmort08.pdf.
[551] Alabama Department of Public Health Center for Health Statistics, "Infant Mortality: Alabama 2008," available at http://www.adph.org/healthstats/assets/infantmort08.pdf.

people is higher for Black people (979.5) than for whites (897.7),[552] and life-expectancy of Black Alabamians (72.9 years) is shorter than is that of whites (76 years).[553]

249. These disparities in income, education, employment, housing, and health are largely the result of past and current discrimination in Alabama.  Long suffering from segregated and radically unequal schools, Alabama dragged its feet after *Brown v. Board of Education*.[554]  Not until the 1970s, after a three-judge federal court found that the State was deliberately hindering desegregation and ordered an end to segregation statewide did Alabama even begin the process.[555]  Thirty years later, another federal court found that the State had still "fail[ed] to live up to [its] obligations" to desegregate its schools.[556]  Throughout the 1980s and 90s, and continuing through at least 2014, k-12 school districts have offered inferior education to African-Americans even in nominally integrated schools[557] and continued to resist desegregation.  A December 2014 report found that 54 Alabama school districts remain under active desegregation orders.[558]  Alabama ranked second only to Mississippi for the number of open desegregation cases. In Jefferson County, for instance, the State's second largest district, a federal judge is presently deciding whether the all-white City of Gardendale school board's attempt to secede from the county is borne of intentional discrimination and opposition to integration.[559]  In 2015, a court found that "the tenacious vestiges of *de jure* segregation" persist in the Huntsville City school system, the State's sixth largest district, and ordered further desegregation of the city's schools and reform of the district's racially discriminatory student discipline policies.[560]

250.  In fact, school segregation is becoming worse in Alabama.  Since 1980, Alabama has seen a 10 point increase in the percentage of black students experiencing intense segregation. Nearly 42% of black students in 2011-2012[561] and 7% of Latino students in 2009-2010[562] attended Alabama

[552] Kaiser Family Foundation, "Number of Deaths per 100,000 Population by Race/Ethnicity," available at http://kff.org/other/state-indicator/death-rate-by-raceethnicity/.

[553] Kaiser Family Foundation, "Life Expectancy at Birth (in years) by Race/Ethnicity," available at http://kff.org/other/state-indicator/life-expectancy-by-re/.

[554] 347 U.S. 483 (1954).

[555] *Lee v. Macon Cnty. Bd. of Educ.*, 267 F. Supp. 458, 472-73, 489-90 (M.D. Ala.) (three-judge court), *aff'd sub nom. Wallace v. United States*, 389 U.S. 215 (1967).

[556] *Lee v. Lee Cty. Bd. of Educ.*, 963 F. Supp. 1122, 1129-30 (M.D. Ala. 1997).

[557] *Lee v. Lee Cty. Bd. of Educ.*, 476 F. Supp. 2d 1356, 1366-67 (M.D. Ala. 2007).

[558] Yue Qui and Nikole Hannah-Jones, A National Survey of School Desegregation Orders, Dec. 23, 2014, available at http://projects.propublica.org/graphics/desegregation-orders.

[559] Emma Brown, A Southern city wants to seced from its school district, raising concerns about segregation, Aug. 26, 2016, available at https://www.washingtonpost.com/local/education/a-southern-city-wants-to-secede-from-its-school-district-raising-concerns-about-segregation/2016/08/25/13ce5398-694f-11e6-99bf-f0cf3a6449a6_story.html.

[560] *Hereford v. Huntsville*, No. 5:63-cv-00109, 2015 U.S. Dist. Lexis 52068 (N.D. Ala. Apr. 21, 2015).

[561] Table 9, Gary Orfield and Erica Frankenberg, Brown at 60, Great Progress, a Long Retreat and an Uncertain Future, May 15, 2014, available at https://civilrightsproject.ucla.edu/research/k-12-education/integration-and-diversity/brown-at-60-great-progress-a-long-retreat-and-an-uncertain-future/Brown-at-60-051814.pdf.

[562] Table 20, in Gary Orfield, John Kucsera and Gevevieve Siegel-Hawley, *E Pluribus* …Separation, Deeping double Segregation for More Students, Sept. 2012, available at https://civilrightsproject.ucla.edu/research/k-12-

schools with 90-100% minority enrollment. One-race schools tend to suffer academically and to offer fewer opportunities than integrated ones. In 2016, all 76 of the schools labeled "failing" by Alabama were majority-black and black students constituted 91% of those Alabama students who were enrolled in those "failing" public schools.[563]

251.  H.B. 56 moved beyond segregation to try to drive Latino citizen and noncitizen children out of the schools by requiring that their parents disclose their citizenship status.  The Eleventh Circuit found that this aspect of the law violated the constitutional rights of the citizen and non-citizen children of undocumented immigrants by discouraging their enrollment in public schools. The Legislature's asserted interest in preserving resources for lawful residents was recognized "as no more than 'a concise expression of an intention to discriminate.'" [564]

252.  In employment, State agencies such as the State Department of Transportation,[565] State Board of Education,[566] Alabama State University,[567] Jefferson County[568] and the City of Birmingham,[569] were found to have engaged in discriminatory practices or agreed to settle claims of discrimination even as late as the 2010s.  Recent court decisions also reveal racial discrimination by private employers.[570] According to statistics from the Equal Employment Opportunity Commission for fiscal year 2014, Alabama accounts for 4.9% of all color-based, 3.2% of all race-based, and 1.7% of all national origin-based filed charges of employment discrimination in the nation.[571]  Yet in 2015, Alabama comprised only 1.5% of the total U.S. population.[572]  Moreover, 50.9% of all employment discrimination charges in Alabama are race-based allegations, placing Alabama first in the nation in this regard.[573]

---

education/integration-and-diversity/mlk-national/e-pluribus...separation-deepening-double-segregation-for-more-students/orfield_epluribus_revised_omplete_2012.pdf.

[563] Challen Stephens, "Alabama places 'failing' label on majority black schools only," *al.com*, Feb. 16, 2016.

[564] *Hispanic Interest Coal. of Ala. v. Governor of Ala.*, 691 F.3d 1236, 1244-49 (11th Cir. 2012).

[565]*Brown v. Alabama Dept. of Transp.*, 597 F. 3d 1160 (11th Cir. 2010); *Reynolds v. Ala. Dep't of Transport.*, 4 F. Supp. 2d 1068 (M.D. Ala. 1998).

[566] *Allen v. Alabama State Bd. of Educ.*, 816 F.2d 575 (11th Cir.1987); *Shuford v. Ala. State Bd. of Educ.*, 897 F. Supp. 1535 (1995); *Allen v. Ala. State Bd. of Educ.*, 976 F.Supp. 1410, 1431 (M.D.Ala.1997); *Allen v. Ala. State Bd. of Educ.*, 190 F.R.D. 602, 604 (M.D. Ala. 2000).

[567] *Weatherly v. Alabama State University*, 728 F.3d 1263 (11th Cir. 2013).

[568] *United States v. Jefferson County*, 2013 WL 4482970 (N.D. Ala. Aug. 20, 2013).

[569] *Ensley Branch, NAACP v. Seibels*, 31 F.3d 1548 (11th Cir. 1994); *Birmingham Fire Fighters Ass'n 117 v. City of Birmingham,* 603 F.3d 1248, 1252-54 (11th Cir. 2010).

[570] *Adams v. Austal, USA, LLC*, 754 F.3d 1240 (11th Cir. 2014); *Ferrill v. The Parker Group, Inc*., 168 F.3d 468 (11th Cir. 1999).

[571] EEOC Charge Receipts by State (includes U.S. Territories) and Basis for 2014, available at https://www1.eeoc.gov/eeoc/statistics/enforcement/state_14.cfm.

[572] United States Census Bureau, Quick Facts, available at http://www.census.gov/quickfacts/table/PST045215/00,01.

[573] EEOC Charge Receipts by State (includes U.S. Territories) and Basis for 2014, available at https://www1.eeoc.gov/eeoc/statistics/enforcement/state_14.cfm.

253. In health, before the Civil Rights Act of 1964 and the Medicare Act of 1965, hospitals and other facilities were segregated and those for blacks were vastly inferior.[574] Particularly relevant to the proof of citizenship requirement that the State has been pushing for in its voting registration laws, a disproportionate number of African-Americans in the state were not born in hospitals, and many do not have birth certificates.  A 2012 report from the Brennan Center for Justice at the New York University School of Law estimated that 240,000 (7%) of the 3.43 million citizen voting age population in Alabama do not have documentary proof of citizenship, such as a birth certificate.[575] National data suggests that blacks and Latinos are overrepresented in that group. In 1950, about 25% of minority births in the rural United States, as opposed to 10% of whites, went unregistered.[576] This strongly suggests that the many rural minorities over age 65 in Alabama are less likely than rural whites to possess birth certificates or even birth records. In addition, a 2012 national survey by the Black Youth Project found that, even for people age 18-29 years old, just 73.3% of African Americans and 55.1% of Latino Americans, as opposed to 84.3% of whites, reported possessing their birth certificates.[577]

254.  In housing, three studies found that Birmingham is one of America's most highly racially segregated metropolitan areas. First, a review of segregation in 50 cities found that the Birmingham-Hoover area had a "black-white isolation" score of 65.2 and is America's 13th most racially isolated city.[578] A second study of 102 American cities found that the Birmingham-Hoover area had a 65.9 "black-white" segregation rate and was America's 16th most segregated city. That study found that Birmingham-Hoover's "white-Hispanic" segregation rate was 44.5 in 2010 (increasing from 28.8 in 1990).[579] A third study used the less reliable measure of "black-nonblack" segregation, but gave the Birmingham area a 64.1 score—ranking it between and comparable to the highly-segregated metropolises of New York (64.7) and Baltimore (62.2).[580]

---

[574] Thomas J. Ward, Jr., "Black Hospital Movement in Alabama," *The Encyclopedia of Alabama*, http://www.encyclopediaofalabama.org/article/h-2410.  For other examples of racial discrimination affecting African Americans' health and welfare, see *Smith v. King*, 277 F.Supp. 31, 37 n. 7 (M.D.Ala., 1967), *aff'd on other grounds*, 392 U.S. 309 (1968); *Whitfield v. Oliver*, 399 F. Supp. 348, 350-54 (M.D. Ala. 1975).

[575] Wendy Weiser and Lawrence Norden, Voting Law Changes in 2012, Brennan Center for Justice, at 18 & n.1 http://www.brennancenter.org/sites/default/files/legacy/Democracy/VRE/Brennan_Voting_Law_V10.pdf; see also Brennan Center for Justice, Citizens without Proof: A survey of Americans' Possession of Documentary Proof of Citizenship and Photo Identification, http://www.brennancenter.org/sites/default/files/legacy/d/download_file_39242.pdf.

[576] S. Shapiro, "Development of Birth Registration and Birth Statistics in the United States," 4:1 *Population Studies* 86, 98-99 (1950).

[577] Jon Rogowski and Cathy Cohen, Black and Latino Youth Disproportionally Affected by Voter Identification Laws in the 2012 Election, available at http://blackyouthproject.com/wp-content/uploads/2015/11/voter_id_effect_2012.pdf.

[578] John Logan and Brian Stults, The Persistance of Segregation in the Metropolis: New Findings from the 2010 Census, March 24, 2011, available at http://www.s4.brown.edu/us2010/Data/Report/report2.pdf.

[579] Population Studies Center Institute for Social Research, Hispanic-White Segregation Indices for Metro Areas, available at http://www.psc.isr.umich.edu/dis/census/segregation2010.html.

[580] Edward Glaeser and Jacob Vigdor, The End of the Segregated Century: Racial Separation in America's Neighborhoods, 1890-2010, available at http://www.manhattan-institute.org/pdf/cr_66.pdf.

255.  In transportation, in addition to the differential vehicle availability noted earlier,[581] public transportation has been rapidly deteriorating, especially in rural areas.[582] A 2011 report by the U.S. Department of Transportation found that, between 2005 and 2010, 700,000 people in rural Alabama lost access to intercity transit services. Those 700,000 are 29% of the 2.4 million people in rural Alabama.[583]  Without vehicles, driver's licenses, or buses, a photo ID requirement becomes a very high barrier to voting.

## G. Racial Appeals

256.  The sixth factor is "whether political campaigns have been characterized by overt or subtle racial appeals."  The 2010 Republican campaign and the agitation inside and outside the legislature for H.B. 56 were suffused with racial appeals.[584]  In the Republican gubernatorial primary, Tim James ran campaign ads that chastised the state for offering driver's license testing in 12 different languages: "This is Alabama," James said in his commercial. "We speak English. If you want to live here, learn it."[585]  Although criticized in the national media, James went on to survive the initial primary, and to take a very close second place in the runoff.

## H. Election of Minority Group Members

257. The seventh factor is "the extent to which members of the minority group have been elected to public office in the jurisdiction."  With the *Gingles* case in 1986, it became much more difficult to retain at-large systems of electing candidates to local and legislative offices, and the resulting district elections sent many more African-Americans to city halls and state legislative chambers.  In Alabama, the extensive *Dillard*[586] litigation shifted 183 local jurisdictions from at-large to single-member districts, not only markedly increasing the responsiveness of local governments to African-American voters, but also creating a "deep bench" of experienced, knowledgeable, and visible officeholders who were well positioned to run for higher office.  The redistricting of the 1990s, as a direct result nationally of *Gingles*, greatly increased the number of districts where blacks could elect candidates of their choice.  The growth of black officeholding, in other words, was the result of the enforcement of the Voting Rights Act.

---

[581] See paragraph 204.

[582] Jeremy Gray, "Rural Alabamians Access to Public Transportation Hits Dead End," *Birmingham News*, Feb. 17, 2011.

[583] Theresa Firestine, "The U.S. Rural Population and Scheduled Intercity Transportation in 2010: A Five-Year Decline in Transportation Access," U.S. Dep't of Transp (2011), available at https://www.rita.dot.gov/bts/sites/rita.dot.gov.bts/files/publications/scheduled_intercity_transportation_and_the_us_rural_population/2010/pdf/entire.pdf.

[584] See paragraphs 144, 153-65.

[585] Patricia C. McCarter, "Tim James defends his 'this-is-alabama-we-speak-English' commercial," *al.com*, April 29, 2010.

[586] *Dillard v. Crenshaw County*, 640 F.Supp. 1347 (M.D. Ala. 1986).

258.  Nevertheless, African-Americans have still not achieved proportional representation in local governments.  Since 1989, the number of Black elected officials has consistently remained around 700.[587] As of 2015, there were 757 Black elected officials in Alabama, making up only 16.7% of elected offices, despite African Americans representing a quarter of the state population. [588]

259.  No African American has ever been elected to the U.S. Senate[589] or to the statewide constitutional offices of Governor, Attorney General, or Secretary of State.[590] Only two African Americans have *ever* been elected to statewide office:[591] the late Alabama Supreme Court Justice Oscar Adams, who was appointed in 1980 and won re-election 1982 and 1988, and Justice Ralph Cook, who was appointed to replace Justice Adams upon his retirement in 1993 and was re-elected in 1994. Another African-American Justice, John England, Jr., was appointed in 1999, but both Justices England and Cook were defeated by white challengers in the 2000 election.[592] In the last fifteen years, no other African American has won statewide office — despite African-Americans running for Secretary of State, Lieutenant Governor, and State Auditor in 2014, and for Governor in the Democratic primary in 2010, and for U.S. Senate in 2008.[593]

260.  Latino voters and elected officials fair far worse. As of 2008, there were no Latino local elected officials in Alabama.[594] No Latino has ever held statewide elected office, and there are no Latino Senators or Representatives in the Alabama Legislature.

## I.  Unresponsiveness

261.  The eighth factor, which the Senate Report calls "not an essential part of plaintiff's case," is particularly relevant in this one because it is unusually easy to measure.  The Report defines the factor as "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group."

---

[587] Charles S. Bullock III and Ronald Keith Gaddie, *The Triumph of Voting Rights in the South* (Norman, Okla.: University of Oklahoma Press, 2009), at 65, fig.2.1.

[588] Khalilah Brown-Dean et al., "50 Years of the Voting Rights Act: The State of Race in Politics" (Joint Center for Political and Economic Studies, Mar. 2015) http://jointcenter.org/sites/default/files/VRA%20report%2C%203.5.15%20%281130%20am%29%28updated%29.pdf.

[589] Brown-Dean et al., at 27.

[590] Bullock and Gaddie, *Triumph of Voting Rights in the South*, at 70.

[591] James Blacksher et al., "Voting Rights in Alabama: 1982-2006," at 26, *available at* http://www.protectcivilrights.org/pdf/voting/AlabamaVRA.pdf.

[592] Bullock and Gaddie, at 70.

[593] Brendan Kirby, "Blacks running in record numbers, but is that progress or white abandonment of Dems?" *al.com*, Oct 1, 2014.

[594] U.S. Census Bureau, "Table 421. Hispanic Public Elected Officials by Office and State (2008)," available at ftp://ftp.census.gov/library/publications/2011/compendia/statab/131ed/tables/12s0421.pdf.

262.  Perhaps the most prominent recent example has been the State's refusal to expand Medicaid under the Affordable Care Act, a refusal that particularly affects African-Americans and Latinos, because they are disproportionately poor.  As of 2016, this decision resulted in a "coverage gap" for the 139,000 Alabamians who make too much to qualify for regular Medicaid, but too little to qualify for the Affordable Care Act's marketplace subsidies. The racial impact of the policy is dramatic: 46% of those 139,000 Alabamians stuck in the coverage gap are minorities, though minorities represent only 29% of the general population of the State.[595] In pushing for more Medicaid coverage, Plaintiffs, the Alabama Legislative Black Caucus, and other civil rights groups have objected to this discriminatory effect.[596] In 2014, civil rights activists were arrested at the State Capitol in protest,[597] but the Governor has refused to reverse his decision.

263.  But the longstanding and ongoing problem of discrimination in the criminal justice system should also not be ignored.  Over 40 state and federal cases from the last 30 years reveal that Alabama state prosecutors are still intentionally discriminating against African Americans in jury selection.[598] A number of cases found that the state prosecutors in Chilton, Dallas, Jefferson,

---

[595] Rachel Garfield and Anthony Damico, "The Coverage Gap: Uninsured Poor Adults in States that Do Not Expand Medicaid," *Kaiser Family Foundation,* October 19, 2016, available at http://kff.org/health-reform/issue-brief/the-coverage-gap-uninsured-poor-adults-in-states-that-do-not-expand-medicaid-an-update/.

[596] Mike Cason, "Advocates say Bentley opposition to Medicaid expansion endangering lives," *al.com,* May 26, 2015.

[597] Mike Cason, "Sen. Hank Sanders says protesters arrested at Alabama Capitol were taking moral stand," *al.com,* Aug. 29, 2014.

[598] *Adkins v. Warden, Holman CF*, 710 F.3d 1241, 1258 (11th Cir. 2013); *McGahee v. Ala. Dep't of Corrections*, 560 F.3d 1252, 1257 1268, 1270 & nn.4, 5 (11th Cir. 2009); *Bui v. Haley*, 321 F.3d 1304, 1317-18 (11th Cir. 2003); *Cochran v. Herring*, 43 F.3d 1404, 1412 (11th Cir. 1995); *Jackson v. Herring*, 42 F.3d 1350, 1357 (11th Cir. 1995); *Love v. Jones*, 923 F.2d 816, 820 (11th Cir. 1991); *Hollis v. Davis*, 941 F.2d 1471, 1482 (11th Cir. 1991); *Jones v. Davis*, 906 F.2d 552, 554-55 (11th Cir. 1990); *Hall v. Thomas*, 977 F. Supp. 2d 1129, 1163 (S.D. Ala. 2013); *Stephens v. Haley*, 823 F. Supp. 2d 1254, 1278 (S.D. Ala. 2011);*Bell v. Haley*, No. 95-T-913-N, 2001 WL 1772140, at *17-18 (M.D. Ala. Dec. 5, 2001); *Morrison v. Jones*, 952 F. Supp. 729, 733 (M.D. Ala. 1996); *Ex parte Bankhead*, 625 So. 2d 1146, 1148 (Ala. 1993); *Ex parte Yelder*, 630 So.2d 107, 110 (Ala.1992); *Ex parte Bird*, 594 So.2d 676, 684-85 (Ala. 1991); *Yancey v. State*, 813 So. 2d 1, 8 (Ala. Crim. App. 2001); *Giles v. State*, 815 So.2d 585, 588 (Ala. Crim. App. 2000); *Pace v. State*, 714 So. 2d 332, 336-37 (Ala. 1997) (plurality opinion), remanded to 714 So. 2d 340 (Ala. Crim. App. 1998); *Freeman v. State*, 651 So. 2d 576, 597 (Ala. Crim. App. 1994); *Kynard v. State*, 631 So. 2d 257, 270 (Ala. Crim. App. 1993); *Williams v. State*, 620 So. 2d 82, 86 (Ala. Crim. App. 1992); *Neal v. State*, 612 So. 2d 1347, 1352 (Ala. Crim. App. 1992); *Duncan v. State*, 612 So. 2d 1304, 1311 (Ala. Crim. App. 1992); *Walker v. State*, 611 So. 2d 1133, 1143 (Ala. Crim. App. 1992); *Carter v. State*, 603 So.2d 1137, 1140(Ala. Crim. App. 1992); *Sims v. State*, 587 So.2d 1271, 1278 (Ala. Crim. App. 1991); *Guthrie v. State*, 598 So. 2d 1013, 1020 (Ala. Crim. App. 1991); *Jackson v. State*, 557 So.2d 855, 856-57 (Ala. Crim. App. 1990); *Marks v. State*, 581 So. 2d 1182, 1186-87 (Ala. Crim. App. 1990); *Harrell v. State*, 571 So.2d 1269, 1270 (Ala. Crim. App. 1990); *Parker v. State*, 568 So.2d 335, 338 (Ala. Crim. App. 1990); *Powell v. State*, 548 So. 2d 590, 593-94 (Ala. Crim. App. 1988); *Williams v. State*, 548 So.2d 501, 507-08 (Ala. Crim. App. 1988); *Henderson v. State*, 549 So. 2d 105 (Ala. Crim. App. 1987); *Acres v. State*, 548 So. 2d 459, 474 (Ala. Crim. App. 1987); *Madison v. State*, 545 So. 2d 94, 99-100 (Ala. Crim. App. 1987); *Owens v. State*, 531 So. 2d 22, 26 (Ala. Crim. App. 1987); *White v. State*, 522 So.2d 323, 324-25 (Ala. Crim. App. 1987); *Turner v. State*, 521 So. 2d 93, 97 (Ala. Crim. App. 1987); *Jackson v. State*, 516 So. 2d 774, 775 (Ala. Crim. App. 1987); *Raines v. State*, 515 So. 2d 82, 85 (Ala. Crim. App. 1987); *Williams v. State*, 507 So.2d 566, 568 (Ala. Crim. App. 1987).

Madison, Mobile, Montgomery and Tuscaloosa counties had "systematically" removed black people from juries.[599]

264. This unconstitutional racial discrimination against black jurors in the criminal justice system has serious and dire consequences. Indeed, "[t]he systematic exclusion of blacks from jury eligibility has been recognized as skewing the judicial process against black defendants."[600] For instance, research shows that, as compared to more diverse juries, all-white or nearly all-white juries tend to spend less time deliberating, make more errors, and consider fewer perspectives.[601] A non-diverse jury is also unlikely to recognize how racial bias affects its own decision-making.[602]

265. A similar lack of racial diversity exists amongst state prosecutors (97.5% white in 2010),[603] trial judges (92.6% white in 2009),[604] and the now all-white appellate courts and Supreme Court.[605] In 1995, Alabama tried to settle a voting rights lawsuit that alleged that the at-large methods of electing judges to the state appellate courts resulted in the near total exclusion of black candidates. The district court judge made extensive findings that confirmed the discriminatory nature of the at-large voting for appellate judges, but the case was eventually voluntarily dismissed.[606] In 2016, however, the Alabama NAACP filed a new voting rights case again attacking Alabama's at-large elections for appellate judges as racially discriminatory.[607]

266. Further, the police forces in many communities are also often overwhelming white even in majority-minority areas. For example, in Houston County (27% black) nearly 94% of police officers are white.[608] In the City of Dothan, the Houston County seat and its largest city, there has

---

[599] See, e.g., *McGahee*, 560 F.3d at 1257); *Cochran*, 43 F.3d at 1412 *Jackson*, 42 F.3d at 1357; *Love,* 923 F.2d at 820; *Jones*, 906 F.2d at 553; *Bell*, 2001 WL 1772140, at *17; *Pace*, 714 So. 2d at 336; *Bankhead*, 625 So. 2d at 1147; *Bird*, 594 So. 2d at 681.

[600] *Hollis*, 941 F.2d at 1480.

[601] Samuel R. Sommers, "On Racial Diversity and Group Decision Making: Identifying Multiple Effects of Racial Composition in Jury Deliberation," 90 *Journal of Personality and Soc. Psychol.* 597 (2006), at 609.

[602] *See* William J. Bowers et. al, "Crossing Racial Boundaries: A Closer Look at the Roots of Racial Bias in Capital Sentencing When the Defendant is Black and the Victim is White," 53 *DePaul L. Rev*. 1497, at 1531 (2004).

[603] Equal Justice Initiative, *Illegal Racial Discrimination in Jury Selection: A Continuing Legacy* at 41 (2010), http://www.eji.org/files/EJI Race and Jury Report.pdf.

[604] Reddick et al., "Racial and Gender Diversity on State Courts," *American Judicature Society*, at 3 (2009), http://www.judicialselection.us/uploads/documents/Racial_and_Gender_Diversity_on_Stat_8F60B84D96CC2.pdf.

[605] Alabama Judicial System, "Alabama Court of Criminal Appeals: About the Court," available at http://judicial.alabama.gov/criminal.cfm; Alabama Judicial System, "Alabama Supreme Court: About the Court," available at http://judicial.alabama.gov/supreme.cfm.

[606] *White v. Alabama*, 867 F. Supp. 1519, 1550-57 (M.D. Ala. 1994), *rev'd* 74 F. 3d 1058 (11th Cir. 1996).

[607] Mary Troyan, "Lawsuit targets statewide judicial elections," *Montgomery Advertiser*, Sept. 7, 2016.

[608] Equal Justice Initiative, "Illegal Racial Discrimination in Jury Selection: A Continuing Legacy," 42, August 2010, available at https://eji.org/sites/default/files/illegal-racial-discrimination-in-jury-selection.pdf (citing U.S. Dep't of Justice, "Bureau of Justice Statistics, Local Police Departments, 2003," 7, available at http://bjs.ojp.usdoj.gov/content/pub/pdf/lpd03.pdf.)).

been just one black police lieutenant who has been required to repeatedly initiate successful civil rights suits.[609] Litigation was needed to integrate other state and local police forces in Alabama.[610]

267.  Discrimination in jury selection, a lack of diversity among key decision-makers, and the lower socioeconomic status of minorities feeds into minorities' perception of racial bias in the justice system.[611] These factors can also contribute to minorities' overrepresentation in Alabama's prisons: 58.5% of state prisoners are black, but blacks are just 26.3% of the State's population.[612] Because of the felon disfranchisement law, this racial disparity directly affects minority voting.

## J.  Tenuous Policy

268.  The ninth factor is "whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous," and the sentence has a footnote which begins "If the procedure markedly departs from past practices or from practices elsewhere in the jurisdiction, that bears on the fairness of its impact." While the factor was obviously framed primarily to apply to sub-jurisdictions of a state, it does have an application here.  The photo ID policy was new, based on no findings about election fraud, so out of line with national policy on voting rights at the time it was passed that the State did not dare to submit it for Section 5 preclearance for two years, knowing that it would be denied the Justice Department's approval.  As has been noted repeatedly in this report, after 2002, the State never uncovered any evidence of voter impersonation fraud to justify the imposition of a voter ID requirement,[613] it repeatedly engaged in racialized prosecutions for alleged absentee ballot offenses,[614] and it had a long tradition of using charges of "election fraud" as a justification for laws that disadvantaged the poor in general and ethnic minorities in particular.[615]  With such a record and such evidence, the State in effect made a bet with fairly long odds that a law, the Voting Rights Act, that had been repeatedly held constitutional by the U.S. Supreme Court, would be invalidated.[616]  As it happened, the State got lucky.

---

[609] *Gray v. City of Dothan*, No. 1:14CV592-MHT, 2015 WL 3849576, at *2 (M.D. Ala. June 22, 2015). This case was later settled. 2016 WL 4231706, at *7 (M.D. Ala. Aug. 9, 2016), *judgment entered* 2016 WL 4254116 (M.D. Ala. Aug. 9, 2016).

[610] See the litigation history discussed in *United States v. Paradise*, 480 U.S. 149, 154-166 (1987), and *Ensley Branch of the NAACP v. Seibels*, 31 F.3d 1548, 1566-67 (1994).

[611] Associated Press, "3 out of 5 blacks say they were treated unfairly by police, poll finds," *al.com*, Aug. 5, 2015.

[612] Ashley Nellis, "The Color of Justice: Racial and Ethnic Disparity in State Prisons," *The Sentencing Project,* June 14, 2018, available at http://www.sentencingproject.org/publications/color-of-justice-racial-and-ethnic-disparity-in-state-prisons/.

[613] See, e.g., paragraphs 11, 63, 67, 183, 225-28.

[614] See paragraphs 37-48.

[615] See paragraphs 188-93.

[616] See Kousser, "The Strange, Ironic Career of Section 5 of the Voting Rights Act, 1965-2007," *Texas L.R.*, 86 (2008), 667-775, at 763-75.

Respectfully submitted and executed this April 12, 2017:

J. Morgan Kousser

# CURRICULUM  VITAE

## J. MORGAN KOUSSER

### GENERAL INFORMATION

| | |
|---|---|
| Address: | 1818 North Craig Avenue |
| | Altadena, California  91101 |
| Telephone: | (626) 395-4080 (O); (626) 794-5840 (H); (626) 405-9841 (Fax) |
| E-Mail: | Kousser@HSS.Caltech.Edu |
| Website: | hss.caltech.edu/~kousser/Kousser.html |
| Place of Birth: | Lewisburg, Tennessee |

### EDUCATION AND HONORS

Ph.D., Yale University, 1971, History
M.Phil., Yale University, 1968, History
M.A., Oxford University, 1984 (honorary)
A.B., Princeton University, 1965 (*summa cum laude*, Phi Beta Kappa), History
Woodrow Wilson Fellow, 1965-66

### EMPLOYMENT

**California Institute of Technology**
Professor of History and Social Science, 1980-
Professor of History, 1979-80
Associate Professor of History, 1974-79
Assistant Professor of History, 1971-74
Instructor in History, 1969-71

**Visiting and Adjunct Appointments:**
University of Michigan
Visiting Instructor, summer, 1980
Harvard University
Visiting Professor, fall, 1981
Oxford University
Harold Vyvyan Harmsworth Professor of American History, 1984-85
Claremont Graduate School
Adjunct Professor of History, 1993

Hong Kong Institute of Science and Technology, 2014

**PUBLICATIONS**

**Books**

*Colorblind Injustice: Minority Voting Rights and the Undoing of the Second Reconstruction* (University of North Carolina Press, 1999).

*Dead End:  The Development of Litigation on Racial Discrimination in Schools in 19th Century America* (Fair Lawn, N.J.:  Oxford University Press, 1986).

*Region, Race, and Reconstruction:  Essays in Honor of  C. Vann Woodward* (New York:  Oxford University Press, 1982), co-edited with James M. McPherson.

*The Shaping of Southern Politics:  Suffrage Restriction and the Establishment of the One-Party South, 1880-1910* (Yale University Press, 1974; Paperback, 1976).

**Articles**

"Do the Facts of Voting Rights Support Chief Justice Roberts's Opinion in *Shelby County*?" *Trans-Atlantica*, 1 | 2015, available at https://transatlantica.revues.org/7462 .

"*Strange Career* and the Need for a Second Reconstruction of the History of Race Relations," in Raymond Arsenault and Vernon Burton, eds., *Dixie Redux: Essays in Honor of Sheldon Hackney* (New South Books, 2013), 423-53.

"Why Were You Editor for 12 Years?", *Historical Methods*, 46 (2013), 1-4.

"The Strange, Ironic Career of Section Five of the Voting Rights Act, 1965-2007" *Texas Law Review*, 86 (2008), 667-775 and "Prof. Kousser Responds to Prof. Bickerstaff's Comments," *Texas Law Review*, 86 (2008), in *See Also: An Online Companion to the Texas Law Review*, at <http://www.texaslrev.com/seealso/volume-86/issue-4/prof.-kousser-responds-to-prof.-bickerstaffs-comments.html>.

"Has California Gone Colorblind?", in Frederick Douzet, Thad Kousser, and Kenneth P. Miller, eds., *The New Political Geography of California* (Berkeley: Institute of Governmental Studies, 2008), 267-90.

"'The Onward March of Right Principles': State Legislative Actions on Racial Discrimination in Schools in 19th Century America," *Historical Methods* 35 (2002), 177-204.

"Introduction" to special issue on "Evaluating Ecological Inference" and paper, "Ecological Inference from Goodman to King," *Historical Methods* 34 (2001), 100-126.

"Injustice and Scholarship" and "Responses to Commentaries," in *Social Science History* 24 (2000), 415-21, 443-50.   (symposium on *Colorblind Injustice*)

"What Light Does the Civil Rights Act of 1875 Shed on the Civil Rights Act of 1964?" in Bernard Grofman, ed., *Legacies of the 1964 Civil Rights Act* (Charlottesville, VA: University Press of Virginia, 2000), 33-40.

 "Reapportionment Wars: Party, Race, and Redistricting in California, 1971-1992," in Bernard Grofman, ed.,  *Race and Redistricting in the 1990's* (New York: Agathon Press, 1998), 134-90.

"Ironies of California Redistricting, 1971-2001," in Jerry Lubenow and Bruce E. Cain, *Governing the Golden State:  Politics, Government, and Public Policy in California* (Berkeley, CA: IGS Press, 1997), 137-55.

 "Estimating the Partisan Consequences of Redistricting Plans -- Simply,"  *Legislative Studies Quarterly* 21 (1996), 521-41.

"*Shaw* v. *Reno* and the Real World of Redistricting and Representation," in  *Rutgers Law Journal* 26 (1995), 625-710.

Comments, in "The Supreme Court, Racial Politics, and the Right to Vote:  *Shaw* v. *Reno* and the Future of the Voting Rights Act," *American University Law Review*, 44 (1994), 1, at 36-38, 50-51, 60-63.

"Ignoble Intentions and Noble Dreams: On Relativism and History with a Purpose," in  *The Public Historian* 15 (Summer, 1993), 15-28.

"Beyond *Gingles*:  Influence Districts and the Pragmatic Tradition in Voting Rights Law," in *University of San Francisco Law Review*, 27 (Spring, 1993), 551-92.

"Common Sense or Commonwealth?  The Fence Laws and Institutional Change in the Postbellum South" and "Two Visions of History," (both with Shawn Kantor)  *Journal of Southern History*, 59 (May, 1993), 201-42, 259-66.

"The Voting Rights Act and the Two Reconstructions," in Chandler Davidson and Bernard Grofman, eds., *Controversies in Minority Voting:  A Twenty-Five Year Perspective on the Voting Rights Act of 1965* (Washington:  Brookings Institution, 1992), 135-76.

"How to Determine Intent: Lessons from L.A.," *Journal of Law & Politics*, 7 (1991), 591-732.

"Toward 'Total Political History':  A Rational Choice Research Program,"  *Journal of Interdisciplinary History*, 20 (Spring, 1990), 521-60.

"Before *Plessy*, Before *Brown*: The Development of the Law of Racial Integration in Louisiana and Kansas," in Paul Finkelman and Stephen C. Gottlieb, eds.,  *Toward A Usable Past: Liberty Under State Governments* (Athens, GA:  University of Georgia Press, 1991), 213-70.

"The State of Social Science History in the Late 1980s,"  *Historical Methods*, 22 (1989), 13-20.  Shorter version in  *OAH Newsletter*, 17:4 (November, 1989), 4-5.

"Expert Witnesses, Rational Choice, and the Search for Intent,"  *Constitutional Commentary*, 5 (1988), 349-73.  Reprinted in Jack N. Raklove, ed.,  *Interpreting the Constitution: The Debate Over Original Intent* (Boston: Northeastern Univ. Press, 1990), 313-35.

"'The Supremacy of Equal Rights':  The Struggle Against Racial Discrimination in Antebellum Massachusetts and The Foundations of The Fourteenth Amendment,"  *Northwestern University Law Review*, 82 (1988), 941-1010.  Reprinted in Paul Finkelman, ed.,  *Race, Law, and American History, 1700-1900* (Hamden, CT: Garland, 1992).

"Specification or Speculation?  A Note on Flanigan and Zingale,"  *Social Science History*, 10 (1986), 71-84.

"Must Historians Regress?  An Answer to Lee Benson,"  *Historical Methods*, 19 (1986), 62-81.

"Origins of the Run-Off Primary,"  *The Black Scholar*, 15 (September/October, 1984), 23-26.

"Are Political Acts Unnatural?," *The Journal of Interdisciplinary History*, 15 (1985), 467-80.

"Are Expert Witnesses Whores?," *The Public Historian*, 6 (1984), 5-19.  Reprinted in Theodore J. Karamanski, ed.,  *Ethics & Public History: An Anthology* (Malabar, FL: Krieger, 1990), 31-44.

"The Revivalism of Narrative:  A Response to Recent Criticisms of Quantitative History," *Social Science History*, 8 (1984), 133-49.

"'New Political History:'  Some Statistical Questions Answered," ( with Allan J. Lichtman), *Social Science History*, 7 (1983), 321-44.

"Log-Linear Analysis of Contingency Tables:  An Introduction for Historians" (with Gary W. Cox and David W. Galenson),  *Historical Methods*, 15 (1982), 152-69.

"C. Vann Woodward:  An Assessment of His Work and Influence" (with James M. McPherson), in Kousser and McPherson, eds.,  *Region, Race, and Reconstruction:  Essays in Honor of C. Vann Woodward*, xv-xxxix.

"The Undermining of the First Reconstruction:  Lessons for the Second," in  *Extension of the Voting Rights Act:  Hearings Before the Subcommittee on Civil and Constitutional Rights of the Committee on the Judiciary, House of Representatives*, 97th Cong., l Sess. (Washington:  G.P.O., 1982), 2009-2022.  Revised version published in Chandler Davidson, ed.,  *Minority Vote Dilution* (Washington, D. C.:  Howard University Press, 1984), 27-46.

"Restoring Politics to Political History" *Journal of Interdisciplinary History*, 12 (Spring   1982), 569-95, reprinted in Robert I. Rotberg, ed., *Politics and Political Change* (Cambridge, Mass.: MIT Press, 2001), 19-46.

"History as Past Sociology in the Work of Samuel P. Hays:  A Review Essay," *Historical Methods*, 14 (Fall, 1981), 181-86.

"Turnout and Rural Corruption:  New York as a Test Case," (with Gary W. Cox), *American Journal of Political Science*, 25 (November 1981), 646-63.

 "History QUASSHed, 1957-1980,"  *American Behavioral Scientist*, 23 (1980), 885-904.

"Making Separate Equal:  The Integration of Black and White School Funds in Kentucky," *Journal of Interdisciplinary History*, 10 (1979), 399-428 and *ibid*., 12 (1982), 509-13.

"Quantitative Social Scientific History," in Michael Kammen, ed.,  *The Past Before Us: Contemporary Historical Writing in the U.S.* (Ithaca: Cornell University Press, 1980), 433-56.

"Progressivism for Middle-Class Whites Only:  The Distribution of Taxation and Expenditures for Education in North Carolina, 1880-1910," *Journal of Southern History*, 46 (1980), 169-94.

"Separate But *Not* Equal:  The First Supreme Court Case on Racial Discrimination in Education," *Journal of Southern History*, 46 (1980), 17-44.  Reprinted in Kermit L. Hall, *Civil Rights in American History* (Garland Pub. Co., 1989); in Paul Finkelman, Race,   Law, and American History, 1700-1900 (Hamden, CT: Garland, 1992)..

"The Agenda for 'Social Science History'," *Social Science History*, 1 (1977), 383-91.

"The `New Political History':  A Methodological Critique," *Reviews in American History*, 4 (March 1976), 1-14.

"A Black Protest in the `Era of Accommodation'," *Arkansas Historical Quarterly*, 34 (1975), 149-178.

"Post-Reconstruction Suffrage Restrictions in Tennessee:  A New Look at the V. O. Key Thesis," *Political Science Quarterly*, 88:4 (December 1973), 655-683.  Reprinted in Paul Finkelman, ed., *Race, Law, and American History, 1700-1900* (Garland Pub. Co., 1992), and Robert F. Himmelberg, *Business and Government in America Since 1870* (Garland Pub. Co.).

"Ecological Regression and the Analysis of Past Politics," *The Journal of Interdisciplinary History*, 4:2 (Autumn 1973), 237-262.


**Contributions to Reference Works**

"Voting Rights," in Paula Baker and Donald Critchlow, eds., *The Oxford Handbook of American Political History* (New York:  Oxford University Press, forthcoming)

"Election Law," in Donald T. Critchlow and Phil Vandermeer, eds., *The Oxford Encyclopedia of American Political and Legal History*," (New York: Oxford University Press, 2012)

"Voting Rights," in Paul J. Quirk and William Cunion, eds., *Governing America: Major Policies and Decisions of Federal, State, and Local Government* (New York: Facts on File, Inc., 2011), III: 1010-25.

"Race and Politics, 1860-1933," in *Princeton Encyclopedia of U.S. Political History* (Princeton, Princeton University Press, 2009), 635-43.

"Disfranchisement," "Election Laws," "Grandfather Clause," "Jim Crow," *"Plessy v. Ferguson,"* *"Reitman v. Mulkey,"* "Voter Registration," "Voter Residency Requirements," and "Voting," in *New Dictionary of American History* (New York:  Charles Scribner's Sons, , 2002)

133

"Enclosure/Fence Laws," in *Encyclopedia of Appalachia* (Knoxville: University of Tennessee Press, 2006).

"Voting Districts and Minority Representation," in *Encarta Africana* (2nd ed., Microsoft Corp., 2000).

"Reapportionment" and "Voting Rights," in *Encyclopedia of the American Constitution*, Supplement II (New York:  Macmillan, 2000).

"Reconstruction," in *The Oxford Companion to United States History* (New York: Oxford University Press, 2001).

"Poll Tax," in *The International Encyclopedia of Elections* (Washington, D.C.: Congressional Quarterly, Inc., 1999), 208-09.

"*Cumming* v. *Richmond County*," "Grandfather Clause," and " *Guinn* v. *U.S.*," in *Oxford Companion to the Supreme Court of the United States* (New York: Oxford University Press, 1992).

"Voting" in  *Encyclopedia of Southern Culture*, (Chapel Hill: University of North Carolina Press, 1989), 1179-81.

"Suffrage," in Jack P. Greene, ed.,  *Encyclopedia of American Political History* (NewYork: Charles Scribner's Sons, 1984), III, 1236-58.

"Disfranchisement," "Grandfather Clause," and "*Williams* v. *Mississippi*," in David C. Roller and Robert W. Twyman, eds.,  *Encyclopedia of Southern History* (Baton Rouge:  L.S.U. Press, 1979).

## Reviews and Review Essays

Howard Bodenhorn, *The Color Factor:  The Economics of African-American Well-Being in the Nineteenth Century South*, *Journal of Southern History*, forthcoming, 2017.

Ari Berman, *Give Us the Ballot:  The Modern Struggle for Voting Rights in America*, in *Election Law Journal*, 2016.

Gavin Wright, *Sharing the Prize: The Economics of the Civil Rights Revolution in the American South*, in *Journal of Southern History*, 80 (2014), 768-70.

Angie Maxwell and Todd G. Shields, *Unlocking V.O. Key. Jr.: Southern Politics for the Twenty-First Century*, in *Journal of American History*, 99 (2012), 970-71.

"The Immutability of Categories and the Reshaping of Southern Politics," *Annual Reviews of Political Science* (online at

<http://arjournals.annualreviews.org/eprint/NUV9MahREcFAzpPdT172/full/10.1146/ann urev.polisci.033008.091519>)      13 (2010), 365-83.

Simon Topping, *Lincoln's Lost Legacy: The Republican Party and the African American Vote, 1928-1952*, in *American Review of Politics*, 29 (Fall and Winter, 2008-2009), 400-02.

Brian K. Landsberg, *Free at Last to Vote: The Alabama Origins of the 1965 Voting Rights Act*, in *Law and Politics Book Review*, available at: http://www.bsos.umd.edu/gvpt/lpbr/subpages/reviews/landsberg0108.htm.

Ron Hayduk.  *Democracy for All: Restoring Immigrant Voting Rights in the United States*, in *Political Science Quarterly* 121(2006-07), 724-26.

Jeff Manza and Christopher Uggen.  *Locked Out: Felon Disenfranchisement and American Democracy*, and Sasha Abramsky, *Conned: How Millions Went to Prison, Lost the Vote, and Helped Send George W. Bush to the White House*, in *Election Law Journal*, 6 (2007), 104-12.

Peter F. Lau, Editor, *From the Grassroots to the Supreme Court*: *Brown v. Board of Education and American Democracy*, in *American Historical Review* 111 (2006), 231-32.

Glenn Feldman, *The Disfranchisement Myth: Poor Whites and Suffrage Restriction in Alabama*, in *The Journal of Interdisciplinary History*, 37 (2007), 646-47.

John B. Boles and Bethany L. Johnson, eds., *Origins of the New South Fifty Years Later: The Continuing Influence of a Historical Classic*, in *The Historian*, 67 (2005), 307-09.

Charles H. Feinstein and Mark Thomas, *Making History Count: A primer in quantitative methods for historians*, in *Journal of Interdisciplinary History*, 35 (2005), 622-23.

John D. Skrentny, *The Minority Rights Revolution*, in *Journal of American History* 90 (2004), 1546-47.

Jane Dailey, Glenda Elizabeth Gilmore, and Bryant Simon, eds., *Jumpin' Jim Crow: Southern Politics from Civil War to Civil Rights*, in *Georgia Historical Quarterly* 87 (2003), 427-48.

Laughlin McDonald, *A Voting Rights Odyssey: Black Enfranchisement in Georgia*, in *Election Law Journal* 3 (2003), 53-62.

Michael Perman, *Struggle for Mastery: Disfranchisement in the South, 1888-1908*, *Journal of Interdisciplinary History* 34 (2003), 109-10.

Robert M. Goldman, *Reconstruction and Black Suffrage: Losing the Vote in Reese and Cruikshank*," on H-POL, H-NET Reviews, March, 2003.  URL: <http://www2.h-net.msu.edu/reviews/showrev.cqi?path=179141046324369>

Alexander Keyssar, *The Right to Vote: The Contested History of Democracy in the United States* and Mark Lawrence Kornbluh, *Why America Stopped Voting: The Decline of Participatory Democracy and the Emergence of Modern American Politics*, *Journal of American History* 88 (2001), 1044-46.

Miles Fairburn, *Social History: Problems, Strategies and Methods*, in *Journal of Interdisciplinary History* 31 (2000), 247-48.

Kenneth C. Barnes, *Who Killed John Clayton? Political Violence and the Emergence of the New South, 1861-1893*, on H-Pol, H-Net Reviews, July, 1999. URL:http: //www.h-net.msu.edu/reviews/showrev.cgi?path=31368931374241.

Lee J. Alston and Joseph P. Ferrie, *Southern Paternalism and the American Welfare State: Economics, Politics, and Institutions in the South, 1865-1965*, in *The Independent Review*, 4 (Winter, 2000).

Keith J. Bybee, *Mistaken Identity: The Supreme Court and the Politics of Minority Representation*, in *American Political Science Review* 93 (1999), 968-69.

Ward M. McAfee, *Religion, Race, and Reconstruction: The Public School in the Politics of the 1870s*, in *American Historical Review* 104 (1999), 1677-78.

Samuel L. Webb, *Two-Party Politics in the One-Party South: Alabama's Hill Country, 1874-1920*, in *Journal of Economic History*, 59 (1999), 234-35.

Stewart E. Tolnay and E.M. Beck, *A Festival of Violence: An Analysis of Southern Lynchings, 1882-1930*, in *Historical Methods* 31 (1998), 171-75.

Alex Lichtenstein, *Twice the Work of Free Labor: The Political Economy of Convict Labor in the New South* in *Journal of Interdisciplinary History* 28 (1998), 484-85.

Stephen Cresswell, *Multi-Party Politics in Mississippi, 1877-1902*, in *Journal of American History*, 83 (1996), 642-43.

Nancy MacLean, *Behind the Mask of Chivalry: The Making of the Second Ku Klux Klan*, in *Journal of the History of the Behavioral Sciences*, 32 (1996), 229-32.

Daniel I. Greenstein, *A Historian's Guide to Computing*, in *Journal of Interdisciplinary History*, 27 (1996), 103-05.

Howard N. Rabinowitz, *Race, Ethnicity and Urbanization*, in *Slavery and Abolition* 16 (1995), 267-69.

Michael C. Dawson, *Behind the Mule: Race and Class in African-American Politics*, in *North Carolina Historical Review* 72 (1995), 376-77.

James Goodman, *Stories of Scottsboro*, in *Princeton Alumni Weekly* 95, #9 (Feb. 8, 1995), 20-21.

Robert R. Dykstra, *Bright Radical Star: Black Freedom and White Supremacy on the Hawkeye Frontier*, in *Reviews in American History*, 22 (1994), 442-48.

Robert C. McMath, Jr., *American Populism: A Social History, 1877-1898*, in *Georgia Historical Quarterly* 77 (1993), 634-6.

Michael F. Holt, *Political Parties and American Political Development from the Age of Jackson to the Age of Lincoln*, in *Reviews in American History* 21 (1993), 207-12.

William Cohen, *At Freedom's Edge: Black Mobility and the Southern White Quest for Racial Control, 1861-1915*, in *Slavery & Abolition* 13 (1992), 239-41.

Loren Haskins and Kirk Jeffrey, *Understanding Quantitative History*, and Konrad H. Jarausch and Kenneth A. Hardy, *Quantitative Methods for Historians*, in *Journal of Interdisciplinary History* 23 (1992), 139-40.

Donald G. Nieman, *Promises to Keep: African-Americans and the Constitutional Order, 1776 to the Present*, in *Journal of Southern History* 58 (1992), 704-05.

William E. Nelson, *The Fourteenth Amendment: From Political Principle to Judicial Doctrine*, in *Slavery and Abolition* 11 (1990), 414-16.

Kermit L. Hall and James W. Ely, Jr., *An Uncertain Tradition: Constitutionalism and the History of the South*, in *Georgia Historical Quarterly*, 73 (1989), 843-44.

James D. Anderson, *The Education of Blacks in the South, 1860 - 1935*, in *Slavery and Abolition* 10 (1989), 144-6.

Lacy K. Ford, Jr., *Origins of Southern Radicalism: The South Carolina Upcountry, 1800 - 1860*, in *Journal of Economic History*, 49 (1989), 767-9.

Peter Wallenstein, *From Slave South to New South: Public Policy in 19th Century Georgia*, in *Maryland Historical Magazine*, 83 (1988), 184-85.

Charles A. Lofgren, *The Plessy Case: A Legal-Historical Interpretation*, in *Georgia Historical Quarterly*, 71 (1987), 742-4.

Richard L. McCormick, *The Party Period and Public Policy*, in *Journal of American History*, 74 (1987), 169-70.

Gail Williams O'Brien, *The Legal Fraternity and The Making of a New South Community, 1843-1882*, in *North Carolina Historical Review*, 64 (1987), 219-20.

Theodore M. Porter,  *The Rise of Statistical Thinking, 1820-1900*; Stephen M.  Stigler,  *The History of Statistics:  The Measurement of Uncertainty Before 1900*, in *Wilson Quarterly*, XI (Spring 1987) 2, 161-62.

C. Vann Woodward,  *Thinking Back:  The Perils of Writing History*, in *Journal of Economic History*, 48 (June 1987), 591-92.

Dan T. Carter,  *When The War Was Over:  The Failure of Self-Reconstruction in the South, 1865-1867*; Ted Tunnell, *Crucible of Reconstruction: War, Radicalism, and Race in Louisiana, 1862-1877*, in *Slavery and Abolition*, 7 (1986), 290-98.

Olivier Zunz, ed.,  *Reliving the Past:  The Worlds of Social History*, in *Reviews in American History*, 14 (1986), 342-47.

Robert F. Durden,  *The Self-Inflicted Wound:  Southern Politics in the 19th Century*, in *Journal of American History*, 73 (1986), 189-90.

Alexander M. Bickel and Benno C. Schmidt, Jr.,  *History of the Supreme Court*, Vol. X, in *Journal of Southern History*, 52 (1986), 479-81.

Eric Foner,  *Nothing But Freedom*, in *Slavery and Abolition*, 7 (1986), 77-79.

Alexander P. Lamis,  *A Two-Party South*, in *Times Literary Supplement* (October 10, 1985).

Steven F. Lawson,  *In Pursuit of Power*, in *Georgia Historical Quarterly*, 69 (1985), 441-43.

David B. Davis,  *Progress and Human Slavery*, in *Times Literary Supplement* (1 February 1985), 123-24.

Michael Perman,  *The Road to Redemption:  Southern Politics, 1869-1879*, in *Political Science Quarterly*, 100 (1985), 350-51.

Catherine A. Barnes,  *Journey From Jim Crow:  The Desegregation of Southern Transit in Constitutional Commentary*, 2 (1984), 197-202.

Raymond Arsenault,  *The Wild Ass of the Ozarks:  Jeff Davis and the Social Bases of Southern Politics*, in *American Historical Review*, 90 (1985), 228-29.

Walter J. Fraser, Jr. and Winfred B. Moore, Jr.,  *The Southern Enigma:  Essays on Race, Class, and Folk Culture*, in *Virginia Magazine of History and Biography*, 92 (1984), 475-76.

Stephen Hahn,  *The Roots of Southern Populism*, in *American Historical Review*, 89 (1984), 854-55.

Paul Kleppner,  *Who Voted?* and W. Dean Burnham,  *The Current Crisis in American Politics*, in *Social Science History*, 9 (1985), 215-28.

Patricia C. Cohen, *A Calculating People: The Spread of Numeracy in Early America*, in *American Historical Review*, 89 (1984), 203-04.

John W. Cell, *The Highest Stage of White Supremacy*, in *Journal of American History*, 70 (September, 1983), 424-25.

David L. Kirp, *Just Schools: The Idea of Racial Equality in American Education*, in *The Public Historian*, 5, #3 (1983), 119-22.

Anthony P. Dunbar, *Against the Grain: Southern Radicals and Prophets 1929-1959*, in *Business History Review*, 54 (1982), 608-09.

Jody Carlson, *George C. Wallace and the Politics of Powerlessness*, in *American Historical Review*, 87 (1982), 884.

Eric Anderson, *Race and Politics in North Carolina, 1872-1901: The Black Second*, in *Journal of Southern History*, 48 (1982), 123-25.

William Gillette, *Retreat From Reconstruction, 1869-1879*, in *Register of the Kentucky Historical Society*, 79 (1981), 191-94; and 80 (1982), 214-16.

Bruce A. Campbell and Richard J. Trilling, eds., *Realignment in American Politics*, in *Reviews in American History*, 9 (1981), 23-28.

Paul Kleppner, *The Third Electoral Era*, in *Journal of American History* (December 1979), 670-1.

Jonathan M. Wiener, *Social Origins of the New South: Alabama, 1865-1885* in *American Historical Review* (December 1979), 1482-3.

Joel Silbey et al., *The History of American Electoral Behavior* in *Reviews in American History*, 7 (1979), 157-62.

Jack Bass and Walter DeVries, *The Transformation of Southern Politics*, in *American Historical Review* (December, 1978), 1368-69.

Michael P. Johnson, *Toward a Patriarchal Republic: The Secession of Georgia* in *Journal of Interdisciplinary History*, 9 (Autumn, 1978), 374-76.

Michael Schwartz, *Radical Protest and Social Structure: The Southern Farmers' Alliance and Cotton Tenancy, 1880-1890*, in *Journal of American History* (December 1977), 811-812.

Hugh D. Graham and Numan V. Bartley, *Southern Politics and the Second Reconstruction*, in *American Historical Review* 82 (1977), 217.

139

Lawrence Grossman, *The Democratic Party and The Negro:  Northern and National Politics, 1868-92*, in *Journal of Ethnic Studies*, 4 (1977), 114-117.

John Shelton Reed,  *The Enduring South*, in *Red River Valley Historical Review*, 4 (1979), 98-99.

Louis Galambos,  *The Public Image of Big Business in America, 1880-1940* in  *Journal of American History* (September 1975), 437-38.

Monroe Lee Billington,  *The Political South in the Twentieth Century*, in  *Political Science Quarterly*, 90 (1975), 561-562.

Roger L. Hart,  *Redeemers, Bourbons, and Populists:  Tennessee, 1870-1896*, in  *Journal of American History* (March 1976), 1005-06.

James B. Murphy,  L.Q.C. Lamar:  Pragmatic Patriot, in  *Mississippi Quarterly*, 27 (1974-75), 109-114.

Charles M. Dollar and Richard J. Jensen,  *Historian's Guide to Statistics:  Quantitative Analysis and Historical Research*, in  *Journal of the American Statistical Association*, 67 (1972), 493.

**Unpublished Works**

"Tennessee Politics and The Negro, 1948-1964" (A.B. thesis, Princeton University, 1965).

**POST-DOCTORAL GRANTS AND AWARDS**

National Endowment for the Humanities Grant #R-9980-140, "Political Outputs in the South: Who Got What, When, Where, and Why?"  January 1, 1974--May 31, 1975, $23,641.

Graves Foundation Award, Summer, 1976

Howard Foundation Fellowship, 1979-80

National Endowment for the Humanities Grant #RO-20225-82, 1981-83, "Separate But Not Equal:  A Social History of School Racial Discrimination Law in the Nineteenth Century," $74,860.

Guggenheim Fellowship, 1985-86

Woodrow Wilson Center Fellowship, 1985-86

Haynes Foundation Grant, 1989-90

Lillian Smith Award, Southern Regional Council, 1999 (co-winner)

Ralph J. Bunche Award, American Political Science Assn., 2000 (co-winner)

Richard P. Feynman Prize for Excellence in Teaching, Caltech, 2011

Associated Students of Caltech Teaching Award, 1988-89, 2012-13

## TEACHING

**Undergraduate**
U.S. History, Colonial - Present (many courses)
Why Were We in Vietnam?
Nuclear Weapons Policy and Star Wars
The Supreme Court
Race Relations in History and Social Science

**Graduate**
American Electoral Behavior
American Political Development
Race Relations in U.S. History
Social Science History
Topics in Econometrics
Writing for Social Scientists

**Ph.D. Theses Directed**

Gary W. Cox, "Party and Constituency in Victorian Britain" (1982)
Shawn Everett Kantor, "Politics and Property Rights: The Closing of the Open Range in the
        Postbellum South" (1991)
Micah Altman, "Districting Principles and Democratic Representation" (1998)

## PAPERS AND LECTURES

**Popular Writings:**

"Voting Rights:  Yes ___ No ___ Maybe ___ Obstructionists Threaten to Undo 16 Years of
        Effort," *Los Angeles Times*, February 7, 1982.

"Jim Crow in the Voting Booth," *Los Angeles Times*, June 24, 1984.

"The District that Stretched Almost Anywhere but East," *Los Angeles Times*, June 12, 1990.

"The Open Primary Will Ruin California Politics," *Public Affairs Report*, May 1996, 7.
                (Institute of Governmental Studies, UCB)
"Charges of bias way off target," *Sacramento Bee*, Oct. 9, 1998, B9.

141

"How the Supreme Court Feeds a Rumor," *Los Angeles Times*, Oct. 10, 1999, M2.

"Revamping the Doctrine of Separate and Equal," *Los Angeles Times*, March 26, 2000, M2.

Remarks at Lillian Smith Award Ceremony, *Southern Changes* 21, #4 (Winter, 1999), 8-11.

"The Duties of Historians," debate on review of *Colorblind Injustice*, H-POL.

"The Supreme Court and the Undoing of the Second Reconstruction," *National Forum*, 80, # 2 (Spring, 2000), 25-31.

"Proposition 77: How It Would Really Work," *San Diego Union-Tribune*, Oct. 31, 2005, p. B7.

"Are we better off redistricting by citizen panel?" *San Francisco Chronicle*, Nov. 13, 2011.

"The Strong Case for Keeping Section 5," http://blogs.reuters.com/great-debate/2013/02/15/the-strong-case-for-keeping-section-5/

"Gutting the landmark civil rights legislation", http://blogs.reuters.com/great-debate/2013/06/26/gutting-the-landmark-civil-rights-legislation/

**INVITED LECTURES**

**Universities (American):**

University of Pennsylvania (1976)
California State University at Los Angeles (1977)
Harvard University (1978)
Duke University Law School (1979)
Michigan State University (1980)
University of California, Santa Barbara (1980, 1984)
University of Chicago (1980, 1984)
University of Michigan (1980)
University of California, Irvine (1981)
University of Alabama at Birmingham (1981)
Brandeis University (1981)
California State University, Fullerton (1982)
University of California, Los Angeles (1981, 1983, 1988, 1993)
University of Miami (1983)
Claremont-McKenna College (1984)
University of Maryland, College Park (1985)
University of Maryland, Baltimore County (1985)
New School for Social Research (1986)
University of Dayton (1986)
Ohio State University (1987)
Albany Law School (1988)

University of Texas, Austin (1988)
Stanford University (1990, 1999, 2016)
Univ. of CA, Berkeley (1991, 1999)
Univ. of CA, San Diego (1991, 2000, 2016)
Claremont Graduate School (1993)
Northwestern University Law School (1993)
Rutgers Law School, Camden (1993)
Georgetown Law Center (1994)
C. Vann Woodward Lecture, Henderson State College (1994)
Yale University (1994)
American U. Law School (1994)
Univ. of Michigan Law School (1996, 1998)
Univ. of Southern California Law School (1996)
Univ. of CA, Los Angeles School of Law (1994, 1996, 1999)
CA State Univ., San Bernardino (1999)
Harvard Univ., Du Bois Center (1999, 2000, 2001)
Augusta State University (1999)
Paine College (1999)
University of Kansas (2015)
University of LaVerne (2000)
University of Montana (2004)
University of Texas, Austin, Law School (2004)
University of Texas, San Antonio (2004, 2005)
University of North Carolina, Chapel Hill, Law School (2006)
University of Texas, Austin (2006)
Duke University (2006)
Whittier Law School (2006)
Indiana University School of Law (2009)
U.C.L.A. School of Law (2010)
Hong Kong University of Science and Technology (2014)
Kansas University (2015)
Caltech (2016)

**Universities (English):**
Oxford University (1984, 1985)
Cambridge University (1984, 2009)
University of Leeds (1985)
University of East Anglia (1985)
East Anglia University (1985)
Southampton University (1985)
Warwick (1985)
Sussex, Keele (1985)

143

**CONVENTIONS:**
**Papers Delivered**:

American Historical Association (1974, 1976, 1988, 2015, 2017)
Social Science History Association (1976, 1978, 1980, 1981, 1983, 1987,
        1989, 1991, 1993, 1994, 1995, 1996, 1997, 2000, 2004)
Southern Historical Association (1978, 1980, 1992, 2005, 2012)
Organization of American Historians (1981, 1984, 1986, 1990)
International Conference on Quantitative History (1982)
Association of American Law Schools (1983)
Joint Center for Political Studies Forum on Run-Off Primaries (1984)
16th International Congress of Historical Sciences, Stuttgart, Germany (1985)
Brookings Institution Conference on the 25th Anniversary of the Voting
        Rights Act (1990)
Continuing Legal Education Conference, Los Angeles (1990)
Voting Rights Symposium, University of San Francisco Law School (1992)
California Studies Association Convention (1994)
Midwest Political Science Association (1997, 2004)
USC/Caltech Conference, "Election Reform: 2000 and Beyond" (2001)
NAACP/MALDEF/APLAC Conference, "Making Our Communities Count: United for a Fair
        Redistricting Process" (2001)
AALS/APSA Conference on Constitutional Law (2002)
"The Future of the Voting Rights Act" (Columbia University Law School, 2003)
American Society of Legal History (2003)
American Political Science Association (2004)
"Who Draws the Lines: The Consequences of Redistricting Reform for Minority Voters"
(University of North Carolina, 2006)
"Whither the Voting Rights Act?  Agreements and Contestations in the Debate over its Renewal"
(Duke University, 2006)

**Discussant on Convention Panels**:

American Historical Association (1983, 1989)
American Political Science Association (1977, 1988, 1989, 1995, 2000, 2007)
Pomona College Conference on Voting Rights (1983)
California Institute of Technology Conference on Political Institutions (1984)
Organization of American Historians (1988, 2002)
Conference on The Future of African-American State Universities (1990)
UCLA Conference on American Politics in Historical Perspective (1990)
Federal Judicial Center, Conference on Civil Rights Act of 1964 (1994)
American Historical Association, Pacific Coast Branch (1996)
Southern Historical Association (1997, 2000, 2002)
Social Science History Assn. (1998, 1999, 2001, 2003, 2006, 2008, 2011)
Southern Sociological Society (1999, 2007)
Western Political Science Assn. (2001, 2002, 2004)

144

The Historical Society (2010)

**Other:**
Rand Corporation (1978)
Town Hall of Los Angeles (1979)
Severance Club of Los Angeles (1979)
NAACP Legal Defense Fund Conference on Voting Rights, New Orleans (1982)
Constitutional Rights Foundation of L.A. (1990)
Caltech, Martin Luther King Day Speaker (1990, 1992, 1999, 2010)
All Saints Church Issues Forum (1992)
Church of the Good Shepherd Issues Forum (1995)
Pasadena Jewish Temple (1996)
The Field Institute, San Francisco (1997)
"Beyond 2007: Voting Rights in the 20th Century," (Washington D.C., 1997)
Augusta-Richmond County Museum (1999
Princeton University Reunion Forum, "Fifty Years of the Voting Rights Act" (2015)
Pasadena-Foothills Democratic Club (2016)


**ORGANIZATIONS AND PROFESSIONAL SERVICE**

**Committees**
Chairman, Methodology Network, Social Science History Association, 1976-80
Program Committee, Social Science History Assn., 1981, 1983
Membership Committee, Southern Historical Association, 1976-77, 1983, 1991-2
American Historical Association Committee on Quantitative Methods, 1983-86
Anglo-American Historical Committee, 1984-85
Committee on Harmsworth Professorship, American Historical Assn., 1985-88
Executive Committee, Social Science History Assn., 1989-1993

**Editorial Boards**

*Journal of American History*, 1977-1980
*Historical Methods,* 1983-86
*Social Science History*, 1987-92
*Journal of Interdisciplinary History*, 1989-
Co-Editor, *Historical Methods*, 2000-05
Editor, *Historical Methods*, 2005-13

## EXPERT WITNESS TESTIMONY

*Hunter* v. *Underwood*, 471 U.S. 222 (1985).

*Mobile* v. *Bolden*, 542 F. Supp. 1050 (S.D.Ala. 1982).

*Moore* v. *Brown*, 542 F. Supp. 1078 (S.D.Ala. 1982).

*United States* v. *Dallas County Commission*, 548 F. Supp. 875 (S.D.Ala. 1981).

*Taylor* v. *Haywood County, Tenn. Commission*, 544 F. Supp. 1122 (W.D.Tenn. 1982).

*Sumter County Council* v. U.S., 444 F. Supp. 694 (D.D.C. 1983).

*Brown* v. *Board of Commissioners of the City of Chattanooga, Tenn.* 722 F. Supp. 380 (E.D. Tenn., 1989).

*Garza* v. *Los Angeles County Board of Supervisors*, 756 F. Supp. 1298 (C.D. Cal., 1990), aff'd, 918 F.2d 763 (9th Cir. 1990), *cert. denied*, 111 S. Ct. 681(1991).

*Brooks* v. *Harris* (N.D. GA., Civ. Action No. 1: 90-CV-1001-RCF, July, 1990), preliminary injunction refused to plaintiffs.

*U.S.* v. *City of Memphis* (W.D. Tenn., 1991).

*Gonzales* v. *Monterey County, CA* (N.D. Cal., Civ. No. C-91 20736 WAI (DVT), 1992).

*Members of the California Democratic Congressional Delegation* v. *Eu*, summary judgment granted to defendants.

*DeBaca* v. *San Diego County Board of Supervisors* (S.D. Cal., Civ. No. 91-1282-R(M), May 11, 1992), summary judgment granted to defendants.

*Cousin* v. *McWherter* (E.D. Tenn., 1993), No. CIV-I-90-339 (Jan. 19, 1994).

*Rural West Tennessee African-American Affairs Council* v. *McWherter* 836 F. Supp. 453 (W.D. Tenn. 1993), *cert. denied,* --S.Ct.--(1995).

*Shaw* v. *Hunt*, 861 F.Supp. 408 (E.D. N.C. 1994).

*Vera* v. *Richards*, 861 F.Supp. 1304 (S.D. Tx. 1994).

*Georgia* v. *Reno*, 881 F. Supp. 7 (D.D.C. 1995).

*Lopez* v. *Monterey County*.

*In Re 2001 Redistricting Cases v. Redistricting Board* (Alaska, 2002).

*Cano v. Davis*, 191 F.Supp. 2d 1135 (C.D. Cal. 2002)

*Sessions v. Perry*, 298 F.Supp. 2d 451 (2004).

*Farrahkan v. Locke*, (Federal District Court, Washington State, D.C. No. CV-96-0076-RHW (2005); reversed by 9th Cir. Ct. of Appeals, No. 06-35669 (Jan. 5, 2010)).

*U.S. v. Osceola County, FL*, 475 F.Supp. 2d 1220 (2006), later proceedings at 474 F. Supp. 2d 1254 (2006).

*American Civil Rights Foundation v. Los Angeles Unified School District* (Los Angeles County Super. Ct. No. BC341363) summary judgment granted to defendants and affirmed by Court of Appeal, Second Appellate District, Division 5, in B205943.

*Sanchez v. City of Modesto*, settled before trial.

*Gomez v. Hanford* Joint Union School District, settled before trial.

*Avitia v. Tulare County Local Healthcare District*, settled before trial.

*Gonzalez v. City of Compton, CA.* (Case No. BC 450494, Superior Court, Los Angeles County), settled before trial.

*Perez v. Perry,* 835 F. Supp. 2d 209 (W.D.Tx., San Antonio Div. 2012).

*Texas v. U.S.*, (C.A. No. 1:11-cv-01303, D.D.C.), decided Aug. 28, 2012.

*Texas v. Holder*, (C.A. No. 1:12-cv-00128-RMC-DST-RLW, D.D.C.), decided Aug. 30, 2012.

*Jauregui v. City of Palmdale, California* (Case No. BC483039), decided July 23, 2013.

*Soliz v. City of Santa Clarita* (LASC Case No. BC512735), settled before trial.

*Soliz v. Santa Clarita Community College District* (LASC Case No. BC512736), settled before trial.

*Banales v. City of Santa Barbara* (Case No. 1468167, Superior Court, Santa Barbara County), settled before trial, 2014.

*League of Women Voters v. McCrory* (Case No. 1:13CV658, M.D. N.C., decided as *N.C. State Conf. of the NAACP v. McCrory*, 2016 WL 1650774 (M.D.N.C. Apr. 25, 2016), rev'd July 29, 2016.

*Georgia State Conference of the NAACP v. Fayette County [Georgia] Board of Commissioners*

(CA No. 3:11-CV-123-TCB), settled before trial, 2015.

*Garrett v. City of Highland* (Case No. CIVDS 1410696, Superior Court, San Bernardino County),
> Decided Jan. 19, 2016.

*Jaramillo v. City of Fullerton*, settled before trial, 2015.

*Burgess v. City of Banning*, RIC 1603770 (Riverside Superior Court, 2016), settled before trial.

*SVREP v. City of Rancho Cucamonga*, pending, 2016.

*Greater Birmingham Ministries v. State of Alabama*, pending.

**Testimony at Hearings**

Subcommittee on Civil and Constitutional Rights, Committee on the Judiciary, U.S. House of Representatives, *Extension of the Voting Rights Act*, 97 Cong, 1st Sess. (1981), pp. 2005-28.
California State Assembly, District Representation Committee, April 14, 2005.
California State Assembly, Elections and Redistricting Committee and Senate, Reapportionment and Constitutional Amendments Committee, Sept. 26, 2005.
National Commission on the Voting Rights Act, Los Angeles, Sept. 27, 2005.
National Commission on Voting Rights, San Francisco, Jan. 30, 2014

**CONSULTING**

Philadelphia Social History Project, for The National Endowment for the Humanities, 1976.

History Review Panel, Research Grants Division, National Endowment for the Humanities, Spring, 1978, Winter, 1979.

U.S. Department of Justice, *U.S.* v. *South Carolina*, U.S. District Court, South Carolina, 1980 (State Senate; case withdrawn).

Lawyers' Committee for Civil Rights, *Harris* v. *Hopewell*, U.S. District Court, 1982 (CA 82-0036-R, Eastern District of Virginia), settled before trial.

U. S. Department of Justice, *Bladen County, North Carolina* v. *United States*, No. 87-2974 (D.D.C., 1988), settled before trial.

NAACP, *NAACP* v. *City of Tulsa*, Oklahoma, 1990: (N.D. OK.), settled before trial.

Alabama State University, *Knight* v. *James*, No. CV83-M-1676-S (N.D.Ala. 1991).

City of Santa Monica, California, Charter Revision Commission, 1992.

148

MALDEF, *Bonilla* v. *Chicago Board of Election Commissioners*, 1993.

Private Plaintiffs, *Reyes* v. *City of Dinuba, Ca.*, 1993, settled before trial.

MALDEF, *Valadez* v. *City of Santa Maria*, 1994.

MALDEF, 2001 California redistricting.

City of Salinas, California, 2001 redistricting of County Board of Supervisors.

City of Chino, California, California Voting Rights Act, 2003.

Leadership Conference on Civil Rights, on Hanford Unified School District and Modesto City Council, 2004

Democratic State Central Committee of California, Comment for the U.S. Department of Justice on scheduling of election in State Senate District 15, 2010.

City of Lancaster, California, California Voting Rights Act, 2014.

Fullerton School Board case, settled before trial.

## CURRENT RESEARCH

*Separate But Not Equal: The* Cumming *Case and Race Relations in America* (University of Kansas Press, under contract)

*"The Supremacy of Equal Rights": School Desegregation in Nineteenth Century America* (Cambridge University Press, under contract), a collection of three of my revised essays.

*"The Onward March of Right Principles": School Segregation and Race Relations in the 19th Century United States* (book) is an investigation of late nineteenth century state and federal court cases and the adoption of state laws on racial discrimination in schools in 22 states.  The purposes are to throw new light upon black political power and the black social structure; to discover the identities and motivations of white supporters and opponents of black civil rights; to illuminate the murky history of the lower courts; and to integrate legislative and judicial history into a broader socio-political history.

*Politics and the Distribution of Public Goods* (book) is a primarily quantitative study of the effect of changes in institutional political rules on the incidence of taxation and the distribution of public schooling in the South from 1880 to 1910.

October 2016

149