FILED
2017 Nov-03  PM 10:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

# PXO-DD

Page 1

1        UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF ALABAMA
2              SOUTHERN DIVISION

3

4   GREATER BIRMINGHAM
    MINISTRIES, et al.,
5

6     Plaintiffs,

7     V.        C.A. No. 2:15-cv-02193-LSC

8   STATE OF ALABAMA, et al.,

9     Defendants.

10

11        * * * * * * * * * * * * * * *

12

13   THE VIDEO DEPOSITION OF SENATOR HANK SANDERS

14   was taken pursuant to stipulation and

15   agreement before Shannon P. Yost, Certified

16   Court Reporter and Commissioner for the State

17   of Alabama at Large, at the law offices of

18   Chestnut, Sanders, Sanders & Pettway, One

19   Union Street, Selma, Alabama, on the 26th day

20   of January, 2017, commencing at 9:41 a.m.,

21   Central.

22

23        * * * * * * * * * * * * * * *

---

Page 2

1     APPEARANCES:

2   FOR THE PLAINTIFFS:

3   Deuel Ross, Esquire
    Natasha C. Merle, Esquire
4   Elizabeth A. Reese, Esquire
    NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.
5   40 Rector Street, 5th Floor
    New York, New York  10006
6

7   FOR THE DEFENDANTS:

8   Misty S. Fairbanks Messick, Esquire
    STATE OF ALABAMA OFFICE OF THE ATTORNEY
9   GENERAL
    501 Washington Avenue
10  Montgomery, Alabama  36130

11  John Neiman, Esquire
    MAYNARD, COOPER & GALE
12  1901 6th Avenue North, Suite 2400
    Birmingham, Alabama  35203

13

14  ALSO PRESENT:

15  John Badgley, Videographer
    Jean Brown
16

17        INDEX

18  Examination by Mr. Ross * * * * 8, 327

19  Examination by Ms. Messick *  175, 354

20  Examination by Mr. NEIMAN * * * * 297

21

22

23

---

Page 3

1        EXHIBIT INDEX

2   Plaintiff's Exhibits          Page

3   Exhibit 1   6/30/96 Westlaw Article        21

4   Exhibit 2   7/26/96 Westlaw Article        37

5   Exhibit 3   3/11/98 Westlaw Article        52

6   Exhibit 4   3/12/98 Westlaw Article        57

7   Exhibit 5   DEF_56537-56541        132

8   Exhibit 6   DEF_61298-61301        135

9   Exhibit 7   DEF_54842-54844        141

10  Exhibit 8   10/6/15 Westlaw Article        150

11  Exhibit 9   1/26/17 Alabama Political        214

12      Reporter Article

13  Exhibit 10  1/26/17 WSFA Article        335

14  Exhibit 11  Free Photo ID Locations        343

15  Exhibit 12  Application for Free ID        345

16  Defendant's Exhibits          Page

17  Exhibit 1   DEF_219738-219739        196

18  Exhibit 2   DEF_219717        206

19  Exhibit 3   DEF_219713-219714        206

20  Exhibit 4   1/24/17 Dothan Eagle Article  208

21  Exhibit 5   DEF_219733-219736        210

22  Exhibit 6   DEF_219737        210

23  Exhibit 7   Capital City Free Press        212

---

Page 4

1   Exhibit 8   DEF 6949-6950        213

2   Exhibit 9   DEF 6944-6948        214

3   Exhibit 10  Voting History Report        216

4   Exhibit 11  DEF_219719-219721        219

5   Exhibit 12  DEF_219729-219730        220

6   Exhibit 13  DEF_219927-219928        221

7   Exhibit 14  DEF_219989-219991        221

8   Exhibit 15  Selma Times Journal Article  223

9   Exhibit 16  DEF 137-139        233

10  Exhibit 17  DEF_219704-219705        238

11  Exhibit 18  DEF_219779-219780        239

12  Exhibit 19  Ala.Code 1975 SS 17-9-30        246

13  Exhibit 20  DEF_23386-23387        273

14  Exhibit 21  SB172        278

15  Exhibit 22  SB23        279

16  Exhibit 23  2011 Alabama Senate        284

17  Exhibit 24  HB19 Vote 1063 Roll        285

18

19

20

21

22

23

---

Page 5

1      STIPULATIONS

2

3      It is hereby stipulated and agreed by and

4  between counsel representing the parties that

5  the video deposition of

6      SENATOR HANK SANDERS

7  is taken pursuant to the Federal Rules of

8  Civil Procedure and that said video deposition

9  may be taken before Shannon P. Yost, Certified

10 Shorthand Reporter, and Commissioner for the

11 State of Alabama at Large, without the

12 formality of a commission; that objections to

13 questions other than objections as to the form

14 of the question need not be made at this time

15 but may be reserved for a ruling at such time

16 as the said video deposition may be offered in

17 evidence or used for any other purpose, by

18 either party, provided for by the Statute.

19     It is further stipulated and agreed by

20 and between counsel representing the parties

21 in this case that the filing of said video

22 deposition is hereby waived and that said

23 video deposition may be introduced at the

Page 6

1  trial of this case or used in any other manner

2  by either party hereto provided for by the

3  Statute, regardless of the waiving of the

4  filing of the same.

5      It is further stipulated and agreed by

6  and between the parties hereto and the witness

7  that the signature of the witness to this

8  video deposition is hereby waived.

9

10     * * * * * * * * * * * * * * * *

11

12

13

14

15

16

17

18

19

20

21

22

23

Page 7

1      VIDEOGRAPHER:  This begins

2  disk one in the deposition of

3  Senator Hank Sanders in the

4  matter of Greater Birmingham

5  Ministries, et al., versus

6  State of Alabama, Case Number

7  2:15-CV-2193-LSC, in the United

8  States District Court for the

9  Northern District of Alabama,

10 Southern Division.

11     We're on the record at

12 9:41, 26th day of January,

13 2017.  This deposition is

14 taking place in Selma, Alabama.

15     My name is John Badgley

16 representing Freedom Court

17 Reporting.

18     Would counsel identify

19 yourself and state whom you

20 represent.

21     MR. ROSS:  My name is

22 Deule Ross.  I represent the

23 plaintiffs in this case.

Page 8

1      MS. MERLE:  Natasha Merle

2  from the NAACP Legal Defense

3  Fund for the plaintiffs as

4  well.

5      MS. REESE:  Elizabeth

6  Reese, also from the NAACP

7  Legal Defense Fund for the

8  plaintiffs.

9      MS. MESSICK:  Misty S.

10 Fairbanks Messick from the

11 Alabama Attorney General's

12 Office representing all

13 defendants except the governor.

14     MR. SINCLAIR:  Winfield

15 Sinclair representing all

16 defendants except the governor.

17     MS. BROWN:  Jean Brown.

18 I'm here as a representative of

19 the Secretary of State's

20 Office.

21     MR. NEIMAN:  I am John

22 Neiman.  I represent the

23 defendant governor.

Page 9

1      VIDEOGRAPHER:  Will the
2  court reporter please swear in
3  the witness.
4      REPORTER:  Usual
5  stipulations under the federal
6  rules?
7      MR. NEIMAN:  Yes.
8      MS. MESSICK:  Yes.
9      MR. ROSS:  Yes.
10
11      SENATOR HANK SANDERS
12  The witness, after having first been duly
13  sworn to speak the truth, the whole truth, and
14  nothing but the truth, testified as follows:
15
16      EXAMINATION
17  BY MR. ROSS:
18  Q   Good morning, Senator Sanders.
19  A   Good morning.
20  Q   My name is Deuel Ross as I just said.  I
21  am the attorney representing the
22  plaintiffs.  The other individuals in the
23  courtroom have already -- or the room

Page 10

1  have already identified themselves.
2      Can you please state and spell your
3  full name for the record?
4  A   My full name is Henry Sanders, H-E-N-R-Y
5  S-A-N-D-E-R-S, but nobody knows me by
6  Henry except my father.  My mother even
7  calls me Hank.
8  Q   Okay.  Thank you, Senator.  And you're an
9  attorney, is that correct, Senator
10  Sanders?
11  A   I am.
12  Q   And how long have you been practicing?
13  A   Forty-six years.
14  Q   Okay.  And so you're familiar with
15  testifying in a deposition and that
16  you're under oath; correct?
17  A   I'm more familiar with taking depositions
18  than being deposed.
19  Q   Exactly.  So, Senator Sanders, I'll just
20  remind you a few ground rules.  I know
21  that you already know them, but, you
22  know, if you need a break at any time,
23  please just let us know.  During the

Page 11

1  course of the deposition I'm going to be
2  asking you questions.  If you can just
3  please answer yes or no and to the best
4  of your ability.  You know, please don't
5  nod or shake your head or anything like
6  that.  Even us lawyers forget sometimes.
7  It will allow the court reporter to write
8  down everything you say.
9      If you need me to rephrase my
10  question or to ask it again, just please
11  let me know.  My goal is not to trick
12  you.  It's just to get answers to the
13  questions.
14      Is there any reason why you are
15  unable to testify today, Senator?
16  A   No.
17  Q   Not on any medication or anything like
18  that that would affect your testimony?
19  A   No.
20  Q   Okay.  Are you represented by counsel
21  here today?
22  A   No.
23  Q   Okay.  Have you been deposed in other

Page 12

1  cases before?
2  A   Yes.
3  Q   Okay.  Do you recall what those cases
4  were?
5  A   I only recall being deposed once and that
6  was in a case after my law partner died.
7  Some family members filed some litigation
8  against the firm.
9  Q   Do you recall any -- any depositions
10  about voting cases or anything like that?
11  A   I don't recall any.
12  Q   Okay.  Senator Sanders, when did you
13  become a senator?
14  A   In 19 -- November 1983.
15  Q   Okay.  And did you hold any public office
16  before that?
17  A   No.
18  Q   Okay.  When you were first elected to the
19  Alabama State Senate, what district did
20  you represent?
21  A   23.
22  Q   Okay.  What area does that district 23
23  include?

Page 13

1  A    At that time, when I was first elected,
2       it included Dallas County, Perry County,
3       Hale County, Green County, Sumter County,
4       Choctaw County, Marengo County, and
5       Lowndes and Wilcox, I think.
6  Q    Okay.  And those counties, are they a
7       part of what's known -- well, do you know
8       what the black belt is in Alabama?
9  A    Yes, I do.
10 Q    Are those -- what is the black belt?
11 A    The black belt is a group of counties
12      that stretch across the middle of Alabama
13      and they're called the black belt because
14      the soil was black.  However, many people
15      identify as it -- as black belt because
16      it's majority black.  Cotton was a very
17      powerful factor here and so enslaved
18      people were out -- outnumber other
19      people.
20 Q    So you're saying the reason why the black
21      belt is majority black is because of --
22      African-Americans were brought here as
23      slaves in the antebellum period?

Page 14

1  A    Yes.
2  Q    Okay.  And do you still represent
3       district 23?
4  A    I still represent district 23, but it's a
5       different configuration.
6  Q    Okay.  And what's the configuration now?
7  A    Okay.  It's Dallas, Perry, part of
8       Marengo, all of Wilcox, all of Lowndes,
9       all of Butler, part of Conecuh, part of
10      Monroe, and part of Clarke.
11 Q    And is that still largely the black belt
12      region?
13 A    Yes.  There's -- all except two of those
14      would generally be considered black belt.
15 Q    Okay.  And is it a majority black
16      district that you represent?
17 A    It is.
18 Q    Okay.  And when you were first elected in
19      1983, was it a majority black district?
20 A    It was.
21 Q    Okay.  And -- okay.  Prior to your
22      election in 1983, Senator, did Senate
23      district 23 ever have a black senator?

Page 15

1  A    No.
2  Q    Okay.  Do you know why not?
3  A    Yes.
4  Q    Okay.  Can you explain to us why that is?
5  A    My law partner, J.L. Chestnut, who is now
6       deceased, ran for Senate district 23 on
7       two occasions and he was unable to -- to
8       be elected and it -- it -- it had -- it
9       may have had a -- slight majority of
10      African-Americans but it didn't have a
11      majority voting -- a majority
12      African-American voting population, as I
13      recall.  I think it was majority
14      African-American, majority black.  And in
15      1983, the district was reconfigured
16      and -- and -- and I was elected.
17 Q    Okay.  Do you remember why the district
18      was reconfigured in 1983?
19 A    Yes.  The -- a district -- a
20      redistricting plan was passed, I think,
21      in 1982 or maybe 1981, but I think it
22      might have been 1981 and it was
23      litigated.  And that district was set

Page 16

1       aside in 19 -- sometime in 1982 or '83
2       and the federal district court required a
3       new election.
4  Q    Okay.  And when you mention litigation,
5       was that litigation under the Voting
6       Rights Act?
7  A    It was.
8  Q    Okay.  Do you know what the Voting Rights
9       Act is, Senator?
10 A    I do.
11 Q    Can you explain to us what that is.
12 A    The 1965 Voting Rights Act is legislation
13      that essentially gave African-Americans
14      and some additional people the right to
15      vote.  It has several major components
16      and the two most critical ones were
17      section 2 and section 5.  And it
18      protected the -- right of
19      African-Americans to vote.
20 Q    Okay.  And, Senator, you mentioned
21      section 5 of the Voting Rights Act.  Do
22      you recall what that section required?
23 A    Yes.  It required preclearance of voting

Page 17

1    changes, of voting laws, voting
2    regulations, voting rules, voting
3    procedures and -- yes.  That's right.
4  Q    Okay.  And did it require preclearance
5    for every state or only particular
6    states?
7  A    No.  It required preclearance for certain
8    states that it in effect had a history of
9    discriminating against African-Americans
10   and the right to vote.
11 Q    Was Alabama one of those covered states?
12 A    Yes.
13 Q    Okay.  Do you know why Alabama was a
14   covered state?
15 A    It was a covered state because
16   African-Americans were denied the right
17   to vote up until 1965.  I was a grown
18   person and in college and I could not
19   vote.
20 Q    Do you remember why you couldn't vote
21   prior to the passage of the Voting Rights
22   Act?
23 A    They -- they simply wouldn't --

Page 18

1    wouldn't -- wouldn't allow us to register
2    to vote.
3  Q    And by "us," you mean African-Americans?
4  A    African-Americans, yeah.
5  Q    Okay.  After 1965, was there other -- did
6    racial discrimination in voting continue
7    in Alabama?
8  A    Yes.  It -- it continued.  Well, yes, it
9    continued.
10 Q    Okay.  And I may ask you about some
11   examples.  Have you -- later on.  But
12   have you ever litigated under the Voting
13   Rights Act, any cases, that you recall?
14 A    I've been part of some litigation under
15   the Voting Rights Act, yes.
16 Q    Okay.  Okay.  Stepping back a little bit,
17   Senator.  So you've been a senator for --
18   since 1983.  Did you hold any leadership
19   positions in the Senate in all that time?
20 A    Yes, I did.
21 Q    Okay.  What positions did you hold?
22 A    I was chair of the finance and taxation
23   education committee, which handled the

Page 19

1    education budget for Alabama for 16
2    years.
3  Q    For 16 years.  So from -- from about --
4    when did you stop being --
5  A    From probably about '95 to -- to November
6    of 2010.
7  Q    Okay.  And why did you stop being the
8    chair of the finance committee in 2010?
9  A    Republicans elected a majority in the
10   Alabama Senate in November of 2010.
11 Q    Okay.  Are you a Democrat, Senator?
12 A    I am.
13 Q    Okay.  And is it correct that prior to
14   2010 the Democrats controlled the state
15   legislature?
16 A    Yes.
17 Q    Okay.  Do you know if any point prior to
18   2010 Republicans controlled the -- the
19   last time the Republicans controlled the
20   legislature?
21 A    No.  It -- it -- if it -- no, I don't.
22   It may have been -- it might have been
23   possible in the late 1860s or early

Page 20

1    1870s, but I don't know of anything
2    beyond that.
3  Q    Okay.  Senator, are you on any committees
4    now?
5  A    Yes.
6  Q    What committees are you on?
7  A    I'm on the finance and taxation
8    education.  I'm on judiciary.  I'm on
9    education.  I'm on -- I can't pull up the
10   name now, but it's the case with -- the
11   deal with utilities and those kinds of
12   things.
13 Q    Okay.  So, Senator, you've been in office
14   now for approximately 33 years.  Is it
15   correct -- is it fair to say that you're
16   familiar with the normal procedures of
17   the Senate in passing legislation or
18   sending things through a committee?
19 A    Yes.
20 Q    Okay.  I'll move on.
21       Senator, do you -- you know that
22   this case that you're testifying about
23   today is about voter ID; correct?

Page 21

1  A   Yes.
2  Q   Do you recall when Alabama legislators
3  started talking about the possibility of
4  passing a voter identification bill?
5  A   Yes.  I -- I don't recall the year, but
6  it was a number of years before 2010.
7  Q   Okay.
8  A   And we actually passed a voter
9  identification bill.
10 Q   Okay.  Do you remember talk about voter
11 identification bills in the approximately
12 1996, 1998?
13 A   I don't recall.
14 Q   Okay.
15 A   1996 or 1998.
16 Q   Senator, I'm going to hand you what I
17 will mark as plaintiff's first exhibit.
18 Let's see if this --
19        (Plaintiff's Exhibit 1 was
20         marked for
21         identification.)
22 A   My memory is refreshed.
23 Q   Okay.  So this refreshes your

Page 22

1  recollection, Senator?
2  A   It does.
3  Q   Okay.  Senator, do you see yourself
4  quoted in this article?
5  A   I do.
6  Q   Okay.  And I'll represent that this
7  article as discussed is from June 30th,
8  1996, from the "Mobile Register."  It's a
9  news article pulled off of Westlaw.  And
10 it mentions -- it has some quotes from
11 you about a voter ID bill that's being
12 considered in a special session being
13 called by Governor Fob James.
14      Who is Governor Fob James?
15 A   Governor Fob James was the governor of
16 Alabama from 19 -- 1994 -- well, really
17 1995 until 2000.
18 Q   Okay.  And was he a Democrat or a
19 Republican?
20 A   He was a Republican.
21 Q   Okay.  And it says here that he was
22 calling a special session to deal with
23 voter ID, as I mentioned.  And it quotes

Page 23

1  you as saying that:  "Governor James is
2  trying to create an image that there's a
3  lot of fraud out there."  Is that right?
4  A   Yes.
5  Q   Do you recall how he was trying to create
6  that image at all reading this article?
7  Do you remember?
8  A   Well, I don't necessarily recall about
9  him.
10 Q   Uh-huh.
11 A   But -- but I remember it had started in
12 1986.
13 Q   Uh-huh.
14 A   And not by Governor James.  Give me a
15 moment just to read it.
16 Q   Okay.
17 A   Because I just looked at it.
18 Q   I'll give you a few moments, Senator.
19        (At which time, the
20         witness reviews the
21         exhibit.)
22 A   Okay.
23 Q   Okay.  Thank you, Senator.  So you

Page 24

1  mentioned that there was an effort after
2  19 -- or since about the 1980s, 1986, to
3  create an image of voter fraud.  And I
4  may come back with some follow-up
5  questions about that.  But let's move
6  onto your other quote.  You said -- you
7  mentioned in this -- in this news article
8  that the requirement to show
9  identification would intimidate poor and
10 elderly voters?
11 A   Yes.
12 Q   Okay.  Do you recall why you felt that
13 way?
14 A   Well, yes, I do.  I -- I was in the end
15 of the Selma Montgomery march and I had
16 thought when Dr. King said how long and
17 not long, I thought that voting rights
18 would have been fully implemented
19 immediately.  I came -- I was in
20 Talladega College.  I came down to
21 Lowndes County in 1966 and spent time
22 helping to try to get African-Americans
23 mobilized to vote and the county was, I

Page 25

1   don't know, 70-something percent
2   African-American.  We didn't win a single
3   office in 1966.
4       So -- and I moved back here in 19 --
5   moved here in 1971.  I'm originally from
6   Baldwin County.  And I had seen people
7   over and over.  Before I ran for the
8   Senate myself, I chaired a number of
9   voter registration committees.  I chaired
10   some voter registration efforts.  When my
11   law partner ran for the Senate, I was his
12   campaign chair.  So I had seen over and
13   over how people were still afraid.  We
14   had generations of -- of intimidation,
15   not just -- not just denial of the right
16   to vote but intimidation.  So I had
17   experienced that first overhand.
18       And I had seen how around election
19   time the rumors would start flying that
20   if you were on food stamps, you were
21   going to lose them or if you were on
22   welfare, you were going to lose it.  And
23   I would see how that would impact voting

Page 26

1   and how much effort it would take to
2   overcome that.  And I -- when I started
3   voting, you'd simply go in, they ask you
4   your name, and you give the name and then
5   you -- they would cross it out and so
6   that -- that system had worked.
7       I didn't know of anybody -- the
8   problem wasn't getting folks to go vote
9   twice.  The problem was to get folks to
10   go vote once.  And so I knew it didn't
11   take much to intimidate people and just
12   the requirement that you've got to have
13   ID when all these years you didn't have
14   to have -- have to have ID was going to
15   be another factor in intimidating black
16   folks.
17 Q   Okay.  Thank you, Senator.  You mentioned
18   in this article also that people were
19   killed for trying to vote.  When
20   you're -- when you're talking about that,
21   are you talking about African-Americans
22   were killed for trying to vote in
23   Alabama?

Page 27

1 A   Yes.
2 Q   Okay.
3 A   Or at least trying to get the right to
4   vote.
5 Q   Okay.  Senator, if you want to turn to
6   the second page of this article.  If you
7   look at the top, there's a -- starting in
8   the second paragraph that says "but
9   James."  Can you just read that paragraph
10   to yourself -- I guess the -- those first
11   three paragraphs, actually.
12           (At which time, the
13           witness reviews the
14           exhibit.)
15 A   Okay.
16 Q   Is it correct that Governor James and
17   Secretary of State Jim Bennett were
18   quoted as saying that voter ID
19   requirement was a safeguard against fraud
20   although they are not aware of people
21   identifying themselves as other voters;
22   is that right?
23 A   Yes.

Page 28

1 Q   Senator Sanders, is it safe to say you --
2   well, are you familiar with any kind of
3   voter impersonation fraud where one
4   person is going to the polls to say that,
5   you know, me going to the polls and
6   saying, I'm Hank Sanders and trying to
7   vote or something like that?
8 A   I'm not familiar with that at all and --
9   and I've been involved in elections since
10   1966.  That simply does not happen.
11 Q   Okay.
12 A   I mean, you may have one -- one chance
13   out of a million of something.  That just
14   does not happen.
15 Q   And why do you think it doesn't happen,
16   Senator?
17         MR. NEIMAN:  Objection.
18         Speculation.
19 A   It doesn't happen, one, because even if
20   somebody wanted to commit fraud, that
21   would take too much effort to get people
22   to do it.  I mean, there -- there would
23   probably be other ways to commit fraud

Page 29

1  that would be -- involve more people.
2  First, it would take too much effort.
3      The second, the people would know
4  that they were violating the law.
5      Third, most of these voting places,
6  particularly in rural areas and probably
7  in other areas, many of the voting people
8  literally know the people.  So it's just
9  simply -- it does not happen.
10 Q   Okay.  So is it fair to say that you
11 agree with at least this article's
12 representations of what Governor James
13 and Secretary of State Bennett said; is
14 that correct?
15 A   That I agree with it?
16 Q   That there -- that there's no evidence of
17 voter impersonation fraud in Alabama?
18 A   Yes, I -- I -- I agree with that.
19 Q   Okay.  It's consistent with your
20 understanding; correct?
21 A   Yeah.
22 Q   Okay.  Senator, can you look down at
23 those next three or four article --

Page 30

1  paragraphs there on that second page.
2  A   Yes.  Okay.
3  Q   Senator, do you know what the motor voter
4  law is?
5  A   I do.
6  Q   Can you explain to me -- is that also
7  known as the National Voter Registration
8  Act?
9  A   It was.
10 Q   Okay.  Can you explain to me what that
11 was?
12 A   Basically, the motor voter law was passed
13 by the U.S. Congress and it basically
14 said that whenever you get certain
15 federal services then they should provide
16 the right to register to vote.  And --
17 and I think it was called the motor voter
18 because a lot of that had to do with
19 driver's license, but they were not the
20 only offices that was impacted, state
21 offices that were impacted.
22 Q   Would it also be at -- so is it your
23 understanding that if you go to the DMV

Page 31

1  in Alabama you're supposed to be offered
2  an opportunity to register to vote under
3  the National Voter Registration Act?
4  A   Yes.
5  Q   Okay.  And is it your understanding that
6  when you say "other offices," is it true
7  that offices like public benefits offices
8  are also supposed to offer people
9  opportunities to register to vote?
10 A   Yes.
11 Q   Okay.  And so this article mentions that
12 Republicans -- paraphrasing it --
13 Republicans fear that 180,000 Alabamians
14 are going to be registered under the
15 federal motor voter law and that they're
16 mostly Democrats and that there was a
17 concern -- that that was part of the
18 concern for why Republicans wanted to
19 pass a photo ID requirement?
20      MS. MESSICK:  Object to
21      the form.
22 Q   Is that an accurate sort of paraphrasing
23 of what this says?

Page 32

1  A   Yes.
2  Q   Do you recall anything about that at the
3  time that Republicans having that kind of
4  concern?
5  A   It's just coming -- it's just coming back
6  to me.  That this effort to get voter ID
7  was a reaction to the voter motor law.
8  And I had forgotten about all that, but I
9  remember it now.
10 Q   Senator, this article also mentions that
11 the United States Department of Justice
12 had objected to Louisiana's photo
13 identification requirement.  Do you think
14 that the legislature in 1996 would have
15 been aware of that Louisiana -- the
16 objection to Louisiana's photo
17 identification bill?
18      MS. MESSICK:  Object to
19      the form.
20 A   Yes.
21 Q   Okay.  Do you think that that objection
22 may have deterred Alabama from passing a
23 photo identification law?

Page 33

1          MS. MESSICK:  Objection.
2          MR. NEIMAN:  Objection.
3     Calls for speculation.
4  A   Well, I recall -- I recall us telling
5     them -- not necessarily about Louisiana
6     but we told them that this was going to
7     be rejected by the U.S. Justice
8     Department.
9  Q   Because Alabama was a covered
10    jurisdiction --
11 A   Yes.
12 Q   -- under section 5?
13 A   That's right.
14 Q   Okay.  And why do you think the
15    Department of Justice would have objected
16    to a photo identification requirement?
17         MS. MESSICK:  Objection.
18         MR. NEIMAN:  Objection.
19    Calls for speculation.  Calls
20         for a legal conclusion.
21 A   Well, I had been a part of a number of
22    efforts over the years to have the
23    Justice Department object to various

Page 34

1     kinds of laws that were passed and so --
2     I had gone to Washington, I was familiar
3     with it.  And I knew that -- that this
4     was another attempt to reduce voter
5     participation and I knew that it fell
6     under the kinds of things that the U.S.
7     Justice Department would not preclear and
8     if they decided to go ahead and get a
9     three-judge court, I did not think that
10    they would be able to do it.  So I knew
11    from experience that the Justice
12    Department would object.
13         MS. MESSICK:  Object to
14         the form of the answer.
15 Q   Senator, you said that you were familiar,
16    you had experience with section 5
17    objections; is that right?
18 A   Yes.
19 Q   And so you have -- you have personally
20    been a part of efforts to get the
21    Department of Justice to object to
22    certain legislation; is that correct?
23 A   I have.

Page 35

1  Q   Okay.  So then you are familiar with that
2     process; is that correct?
3  A   I am.
4  Q   Okay.  And, Senator, do you know what
5     retrogression under section 5 of the
6     Voting Rights Act is?
7  A   I do.
8  Q   Okay.  So is it your understanding when
9     you say that the Department of Justice
10    would have objected, your belief based on
11    your experience at that time and now, is
12    that -- well, let me strike that.
13         Is it your understanding that the
14    law requiring photo ID in Alabama would
15    have been retrogressive under the Voting
16    Rights Act?
17         MS. MESSICK:  Object to
18         the form.
19         MR. NEIMAN:  Objection.
20 A   Yes.
21 Q   Senator, you mentioned earlier -- and
22    you're quoted in this article as saying
23    there's a major problem -- a major

Page 36

1     problem in Alabama is that not enough
2     people are going to the polls; is that
3     correct?
4  A   Yes.
5  Q   Okay.  Do you recall if the legislature
6     at this time in '96 passed any
7     legislation to address that problem?
8  A   No, they -- we did not.
9  Q   Okay.  Do you recall if Alabama at that
10    time considered an early voting bill?
11 A   I don't recall whether there was a bill.
12    I do recall that there was discussion
13    about it.
14 Q   Uh-huh.  And do you recall if that bill
15    is in effect today?
16 A   No.  I know it's not in effect today.
17 Q   Okay.  There's no early voting in Alabama
18    today; is that correct?
19 A   Unless you consider absentee voting.
20 Q   Okay.  And what is absentee voting,
21    Senator?
22 A   Absentee voting is a way to vote when
23    someone is unable to go to the polls on

Page 37

1  election day either because of a handicap
2  or because of -- because of -- because of
3  being out of the county on that
4  particular day.
5 Q  So they have to have an excuse; is that
6  correct?
7 A  Yes.
8 Q  Okay.  Another article about the 19 --
9  another article about the 1996 session.
10  I'll give you a moment to review it.
11      (Plaintiff's Exhibit 2 was
12          marked for
13          identification.)
14 Q  Plaintiff's Exhibit 2.
15      (At which time, the
16          witness reviews the
17          exhibit.)
18 A  Okay.
19 Q  Senator, does that refresh your
20  recollection about what happened to the
21  1996 Alabama voter ID bill?
22 A  Yeah, yeah.
23 Q  Okay.  Senator Sanders, this article --

Page 38

1  what happened to the 1996 voter ID bill
2  according to your memory?
3 A  It did not pass.  There was a filibuster
4  or something, extended debate, commonly
5  known as filibuster.
6 Q  Okay.  And do you recall who led that
7  filibuster in 1996?
8 A  I don't recall who led it.  I recall
9  being a part of it.
10 Q  Okay.  Would it have been -- would other
11  members of the black legislative caucus
12  have been a part of that filibuster?
13 A  Absolutely.
14 Q  Okay.  Do you recall why you were a part
15  of that filibuster in 1996?
16 A  Yes.  I felt like there -- there was no
17  need for this legislation, that this
18  legislation would reduce the
19  participation of African-American and --
20  and -- and poor people in the process and
21  I just did what I could to stop it.
22 Q  Okay.  Senator, this article also
23  mentions that there was an absentee bill

Page 39

1  passed that required people to put
2  additional restrictions on absentee
3  voting.  Do you recall that bill?
4 A  I don't.
5 Q  Okay.  Do you recall if there were
6  concerns about voter fraud and absentee
7  voting in the 1990s?
8      MS. MESSICK:  Object to
9      the --
10 A  Yes.
11      MS. MESSICK:  -- form.
12 Q  Okay.  Do you recall what those concerns
13  were?
14      MS. MESSICK:  Object to
15      the form.
16 A  Well, I have been a part of the Marion
17  Three case, in fact, I was -- before it
18  was ever a case.  African-Americans
19  had -- in Perry County had complained
20  about it and we even sent Albert Turner
21  and I believe his brother Robert Turner
22  up to Washington, DC, to meet with the
23  Attorney General up there because whites

Page 40

1  were clearly doing things that was
2  illegal and we had complained and nothing
3  had happened.  And they went up to
4  Washington, DC, and they were simply told
5  there's nothing we can do, you're going
6  to have to learn how to use absentee.
7      So when they came back, I gave them
8  classes on how to use absentees legally
9  and -- and when African-Americans
10  officials became successful, then whites
11  began to complain about blacks using
12  absentee ballots.  And that's when the
13  FBI and the U.S. attorney swooped in and
14  they ended up bringing cases against
15  Albert and Evelyn Turner and Spencer
16  Hogue and they were all exonerated on
17  those charges.
18 Q  Okay.  Senator, I'm going to take a step
19  back a little bit.  When you say you gave
20  classes to people in Alabama on absentee
21  voting, were those African-Americans?
22 A  Yes.
23 Q  Okay.  And you mentioned Albert Turner.

Page 41

1   Who was Albert Turner?

2 A   Albert Turner was a resident of Perry

3   County.  He had been deeply involved in

4   the Civil Rights movement.  He was the

5   state director for SCLC under Dr. King

6   during the 19 -- mid 1960s.

7 Q   Okay.  And SCLC is that the Southern

8   Christian Leadership Conference?

9 A   Yes.

10 Q   And that's a civil rights organization?

11 A   Yes.

12 Q   So you also mentioned the Marion Three.

13   Can you tell me who are -- were the

14   Marion Three, Senator?

15 A   Well, they were three who was charged

16   with, if I recall, 70-some charges of

17   voter fraud.  And they were part of what

18   was called the Black Belt Eight.  But

19   there was five from Green County and

20   three from Perry County.  And some

21   referred to them as the Perry County

22   Three and some referred to them as the

23   Marion Three.

Page 42

1 Q   Okay.

2 A   And -- and Evelyn Turner was the wife of

3   Albert Turner.

4 Q   And is Ms. Turner still alive?

5 A   She is.

6 Q   Okay.  And do you recall -- you mentioned

7   that there were some 70 charges against

8   them or indict- -- 70 counts against

9   them?

10 A   Seventy counts.

11 Q   And what were the charges --

12 A   70-some counts.

13 Q   70-some counts.  And what were the

14   charges that were brought against them?

15 A   I don't remember the details of them now,

16   but it was essentially voter fraud.  They

17   were saying that they had committed fraud

18   in the voting fraud in the absentee

19   process.  That was like 30-some years

20   ago.

21 Q   Uh-huh.  And do you recall what happened

22   when those black voters were indicted for

23   alleged voter fraud?

Page 43

1 A   Yes.

2 Q   Do you recall if they -- if there were

3   witnesses brought to testify against

4   them?

5 A   Yes.  I -- I recall because I was a part

6   of it.  In fact, I was the only attorney

7   in the case during that time.  Later on,

8   we brought in some other attorneys.  But

9   I recall that they went over to -- that

10   the U.S. attorney office and the --

11   arranged for two buses, as I recall, and

12   they took the buses and they located them

13   there where Jimmy Lee Jackson had been

14   shot, which is very symbolic.  It sends

15   the idea that you may be shot; you may be

16   killed.

17   And they had law enforcement, a

18   bunch of law enforcement, with their guns

19   all around, and they loaded people on

20   those buses and took them 168 miles to

21   Mobile and kept them overnight.  The

22   federal courthouse is right here in

23   Selma.  They could have brought the grand

Page 44

1   jury up there and people could have gone

2   back and forth.

3   We considered that an effort to

4   intimidate them, get them out of their

5   comfort zone so they could say whatever

6   they want to.

7 Q   And you mean the -- "they," to intimidate

8   the black witnesses?

9 A   The U.S. attorney, yes.

10 Q   Okay.  And when you say they trans- --

11   the people who forced the witnesses to go

12   to the federal courthouse in Mobile, who

13   were they?

14 A   U.S. attorney office.  That was

15   essentially the U.S. attorney's office.

16 Q   Okay.  Do you know if they may have

17   worked in cooperation with Alabama state

18   officials?

19 A   I don't -- I don't recall.

20 Q   Okay.  Okay.  Senator, you also mentioned

21   Jimmy Lee Jackson.  Who was he?

22 A   Jimmy Lee Jackson was a -- a citizen of

23   Perry County and his mother and

Page 45

1   grandfather had participated in a night
2   march.  They rarely had night marches
3   because they were very dangerous, but on
4   this occasion they had a night march
5   because they had put Reverend James
6   Orange in jail and we had received word
7   that they were going to kill him.  So
8   they -- that night they were going to
9   come to the jail and kill him.  So they
10  held the night march to make sure he
11  didn't die.
12       So when they left the church, they
13  were heading over to the jail and all of
14  the lights were cut off and people were
15  beat up and Jimmy Lee Jackson was
16  insisting that his father be -- his
17  grandfather be taken to the -- to the
18  hospital he -- and the state troopers
19  shot him.
20 Q   Okay.  Was this in 1965?
21 A   '65 in Marion.  He died about a week
22  later.
23 Q   Okay.  Excuse me.  Senator, I think you

Page 46

1   already said this but just to go back,
2   what happened to the charges against the
3   Marion Three?
4 A   They were found not guilty by a jury of
5   both blacks and whites.
6 Q   Okay.  Senator, do you recall a case
7   United States versus Gordon?
8 A   Not by the name.
9 Q   Okay.  Do you recall being involved at
10  all in a case called Smith versus Meese,
11  who was the former Attorney General for
12  the United States?
13 A   That was --
14 Q   Okay.
15 A   When you get to 74, that doesn't come
16  back to you that easy.
17 Q   That's fine, Senator.  I may have some
18  documents to refresh your recollection
19  later.  But so, Senator, are you aware of
20  any voter fraud -- other voter fraud
21  prosecutions.  You mentioned they were a
22  few of the Black Belt Eight.  Do you
23  recall an investigation in Pickens County

Page 47

1   also in the 1980s?
2 A   Yes.
3 Q   Do you remember if those were
4   prosecutions against Maggie Bozeman
5   and --
6 A   And Julia Wilder.  But Maggie Bozeman and
7   Julia Wilder, yes, I recall those.
8 Q   Okay.  Do you recall what those
9   prosecutions were about exactly?
10 A   I don't recall the details.  I recall
11  that we started out to march from Pickens
12  County to Washington, DC.  I was a part
13  of -- of that march and I don't remember
14  the details but I do recall it.
15 Q   Those were -- were those also
16  prosecutions involving alleged voter
17  fraud?
18 A   Yes.
19 Q   Okay.  Do you remember if Ms. Bozeman and
20  Ms. Wilder were convicted for voter
21  fraud?
22 A   Yes.
23 Q   Okay.  Do you know if they were -- if

Page 48

1   those convictions were overturned?
2 A   I think so.
3 Q   Okay.  Do you recall if after their
4   convictions were overturned if they were
5   ever prosecuted again?
6 A   I don't recall.
7 Q   Okay.  So, Senator, the prosecutions that
8   you were just talking about, you called
9   them the Black Belt Eight, is -- do you
10  believe that those prosecutions were
11  racially motivated?
12       MS. MESSICK:  Object to
13       the form.
14       MR. NEIMAN:  Objection.
15       Calls for speculation.
16 A   Yes, yes, I believe that they were
17  racially motivated.  When blacks
18  complained about it against whites,
19  nothing was done.  When whites complained
20  about it against blacks, they went all
21  out after -- after the African-American.
22       VIDEOGRAPHER:
23       Mr. Sanders, your mike fell.

Page 49

1    THE WITNESS:  I guess it
2    got too hot for the mike.
3 Q   Senator, in your experience as someone
4    who represented people in voter fraud
5    prosecutions and who's been a
6    representative of the black belt for a
7    long time, when politicians discuss voter
8    fraud in Alabama, is it thought of as an
9    issue affecting the black belt in
10    particular?
11    MS. MESSICK:  Object to
12    the form.
13 A   It's -- it's my strong impression that
14    whenever they're talking about voter
15    fraud, they're nearly always talking
16    about black people.  And that --
17    MS. MESSICK:  Object to
18    the form --
19 A   -- they are -- and quite often in
20    particular the black belt.
21 Q   Okay.
22    MS. MESSICK:  Object to
23    the form of the answer.

Page 50

1 Q   Senator, and what's your basis for
2    believing that?
3 A   Well, I've -- I've had -- been part of
4    those efforts of trying to get them to
5    investigate white people.  We couldn't
6    get them to investigate them but when
7    whites complained about blacks, blacks
8    were -- the investigations were
9    extensive.  And so I've -- I've had --
10    been -- been involved in that.
11 Q   Okay.  Thank you, Senator.  Do you know
12    if the Alabama legislature has ever used
13    voter fraud to justify racially
14    discriminatory laws?
15    MS. MESSICK:  Object to
16    the form.
17 A   I don't understand.
18 Q   Well, let me try again, Senator.
19    Senator, are you familiar with the poll
20    tax in Alabama?
21 A   I am.
22 Q   Do you -- if you don't know, it's fine,
23    Senator.  But do you recall what the

Page 51

1    justification for the poll tax in
2    Alabama -- well, let me start over.
3    What was the poll tax?
4 A   The poll tax were -- and I believe it was
5    in the constitution -- requiring in order
6    to be able to vote you had to pay and
7    pay -- pay a certain tax.  And the way
8    that tax was set up, that you didn't have
9    just pay for that year but you had to go
10    back and pay from the time that you were
11    able to vote.  And so if you had not
12    voted for 10 years, you couldn't pay just
13    that one year and start voting.  You had
14    to pay it back.  So it had a strong
15    impact on poor people and
16    African-Americans in particular.  In that
17    it was not enforced against white people,
18    but it was enforced against black people.
19 Q   Okay.  Senator -- and, again, if you
20    don't know, it's fine.  But do you recall
21    what the justification for laws like the
22    poll tax were?
23    MS. MESSICK:  Object to

Page 52

1    the form.
2 A   Well, the poll tax and literacy tests,
3    none of them mentioned race but they
4    were, again, ways to prevent
5    African-Americans from registering and
6    voting and that's -- that's -- that's
7    what it was about.
8 Q   Thank you, Senator.  Senator, I'd like to
9    draw your attention back to the 1990s and
10    voter ID bills.  Do you recall other
11    efforts in the 1990s to pass voter ID
12    bills after the 1996 legislation?
13 A   I don't recall.
14 Q   Would it help if I refreshed your
15    recollection?
16 A   It would.
17 Q   For the record, this is Plaintiff's
18    Exhibit 3.  It's an article from Westlaw
19    of "Governor Pushing Voter ID Bills" from
20    "Birmingham News," March 11, 1998.
21    (Plaintiff's Exhibit 3 was
22    marked for
23    identification.)

Page 53

1   (At which time, the
2   witness reviews the
3   exhibit.)
4  A   Yes, sir, I recall it now.
5  Q   Thank you, Senator.  Do you see some
6   quotes from yourself in that article?
7  A   I do.
8  Q   And it says that in 1998, you said that:
9   "I would do everything I can to see we
10   don't have voter ID."  Do you recall
11   that, Senator?
12  A   I do now.
13  Q   Okay.  Do you -- do you think that was
14   consistent with your position in 1998?
15  A   It was.
16  Q   Okay.  And it also says that you
17   considered the voter identification bill
18   part of a multifaceted attack on black
19   voting rights?
20  A   Yes.
21  Q   Is that consistent with your views at the
22   time?
23  A   Yes.

Page 54

1  Q   Okay.  Do you recall why you felt that
2   way?
3  A   Well, I had been part of the Black Belt
4   Eight, the Marion Three.  Over the years
5   I had fought against efforts for -- they
6   call them re-identification bills where
7   everybody would have to -- everybody
8   would be taking off the rolls and
9   everybody would have to register again.
10   They just called them re-identification
11   bills.  We fought over those.  So over
12   the years, there had been one effort
13   after another to suppress voting rights.
14   So...
15  Q   Take a step back.  You mentioned
16   re-identification bills in Alabama.
17  A   Yes.  They were local bills, so they
18   would affect particular counties.
19  Q   But were they passed by the Alabama
20   legislature?
21  A   Yes.
22  Q   Do you know if there were any section 5
23   objections to re-identification bills?

Page 55

1  A   Yes.
2  Q   Okay.  Do you recall if there were any
3   section 5 objections to re-identification
4   bills in Dallas County?
5  A   I don't -- I don't remember them passing
6   in Dallas County, but I remember Perry
7   County and Sumter County.
8  Q   Okay.  But would it surprise you if there
9   were other objections to
10   re-identification bills that you don't
11   recall?
12   MS. MESSICK:  Objection.
13  A   It would not surprise me.  When you're
14   going back 30 and 40 years...
15  Q   Yes, Senator, I understand.  Okay.  So
16   getting back to this article.  So you
17   mentioned this was a multifaceted attack
18   on black voting rights.  Well, I guess.
19   Sorry.
20   And your testimony was that you --
21   well, can you explain again -- sorry --
22   why you felt that way?
23  A   Yes.  From the time I came here, came to

Page 56

1   Lowndes County in 1966 thinking that in
2   no time at all black voting rights would
3   be fully implemented, over the years
4   there were always one effort of another
5   to try to prevent African-Americans from
6   voting freely and fully and so it -- it
7   has been a long history of it.  So from
8   the time I came in 1971 on up, at every
9   election there was some kind of effort.
10   So this is -- once the motor voter
11   act passed, this was just a continuing
12   of -- of those long history of efforts.
13  Q   Thank you, Senator.  Do you recall what
14   happened to the bill in 1998?
15  A   It didn't -- it seemed to me like it
16   passed the Senate but didn't pass the
17   House.
18  Q   Senator, can I hand you --
19  A   And I think the one in '96 passed the
20   House, but didn't pass the Senate.
21  Q   Okay.  But neither the '96 or '98 bill
22   passed to your recollection?
23  A   As I recall.

Page 57

1 Q   Okay.  Would it help if I refreshed your
2    recollection, Senator?
3 A   Please do.
4 Q   I'll hand you what's marked as
5    Plaintiff's 4.  It's an article, again,
6    off of Westlaw from the "Birmingham
7    News," March 12th, 1998.  I'll give you a
8    moment to review.
9 A   Okay.
10           (Plaintiff's Exhibit 4 was
11           marked for
12           identification.)
13           (At which time, the
14           witness reviews the
15           exhibit.)
16 A   Okay.
17 Q   Does that refresh your recollection,
18    Senator?
19 A   It -- it doesn't re- -- I -- I -- I don't
20    remember anymore than I did, that it
21    passed the Senate and didn't pass the
22    House, but maybe it did pass the House.
23    This doesn't tell me one way or the

Page 58

1    other.
2 Q   Okay.  Fair enough.  Senator, do you see
3    paragraph 4 there -- or the fourth
4    paragraph in this article --
5 A   Yeah.
6 Q   -- there that begins "the committee
7    approved"?
8 A   Yeah.  The committee approved, yeah.
9 Q   Uh-huh.  Can you just review that
10    paragraph for me where -- and it also
11    says, "Every white senator voted for the
12    bill and every black senator, except
13    George Clay of Tuskegee voted against
14    it."
15 A   Yeah.
16 Q   Does that sound like an accurate
17    representation of what happened in 1998?
18 A   Yes.
19           MS. MESSICK:  Object to
20           the form.
21 Q   Okay.  Senator, who controlled the Senate
22    in 1998?
23 A   Democrats.

Page 59

1 Q   Okay.  So would it have been white
2    Democrats who voted for the bill in 1998?
3 A   Yes.  In 1998, I don't -- I don't
4    remember it being a whole lot of
5    Republicans, so it would have been
6    white -- whites and -- white Republicans
7    and white Democrats, but it would have
8    been whites.
9 Q   So when it says that whites voted for the
10    bill, the bipartisan white voters [sic]
11    voted for the bill but every black
12    senator voted against the bill; is that
13    correct?
14 A   Except George Clay.
15 Q   Except George Clay; right?
16 A   Yes.
17 Q   Okay.  And your recollection is that the
18    bill did not pass; is that right?
19 A   That's my recollection, but...
20 Q   Okay.  Senator, do you recall if there
21    was -- a voter ID bill was passed prior
22    to 2003 at all?
23 A   I don't recall one being passed.

Page 60

1 Q   Okay.  Senator, is it correct that there
2    was a voter ID bill passed in 2003?
3 A   I don't remember the exact year, but 2003
4    might be correct.
5 Q   Okay.  Do you recall if that voter
6    identification bill allowed people to
7    vote with non-photo ID, like with utility
8    bills or things like that?
9 A   Yes, I do.
10 Q   Okay.  Do you recall whether the passage
11    of the 2003 bill was in anyway tied to
12    felon disenfranchisement legislation?
13           MS. MESSICK:  Object to
14           the form.
15 A   Yes.  We were very concerned about people
16    with criminal records not being able to
17    vote and we worked out an agreement that
18    both bills were going to -- to pass and
19    both bills would be enacted.  And then
20    after the bills passed -- well, first,
21    the whole thing concerning -- as I
22    recall, the bill had 13, 14 different
23    kinds of ID, including utility bills and

Page 61

1  other kinds of things.  So people could
2  easily -- they didn't have to go
3  anywhere.  They didn't do anything.  They
4  just get a utility bill or a light bill
5  or gas bill.  And so -- and we agreed
6  that if -- if both bills passed we would
7  let the voter ID pass and they would let
8  the felony disenfranchisement bill pass.
9      And I recall that when it got over
10 there, the governor vetoed the felony
11 disenfranchisement bill and he signed the
12 voter ID bill.
13 Q   Okay.  So, Senator, let me take you a
14 couple of steps back.  You said we had
15 worked out a deal.  Is that -- who is
16 "we"?
17 A   By we, I mean the -- the --
18 leadership of the Senate and -- and
19 leadership of the House that included
20 African-Americans.
21 Q   Okay.  So would it have included the
22 Alabama legislative black caucus?
23 A   Yes.

Page 62

1  Q   And you mentioned that a lot of different
2  bills or identifications were acceptable
3  under the 2003 bill.
4  A   Yes.
5  Q   Is that one of the reasons why the
6  Alabama legislative black caucus
7  supported the bill?
8          MS. MESSICK:  Object to
9          the form.
10 A   Well, first, we really didn't want any ID
11 bill, but it became more acceptable if
12 you had ID that people didn't have to
13 go -- a social security card.  They
14 didn't have to go anywhere, didn't have
15 to do anything.  But even then, it was
16 tied to a felony disenfranchisement.  A
17 high percentage of -- of
18 African-Americans have criminal records
19 that was preventing them from voting.  So
20 every conviction became a life sentence
21 because you had that and you -- you just
22 wasn't able to vote unless you jumped
23 through a whole lot of hoops to get

Page 63

1  either a pardon or get a voter
2  restoration.  So it was the combination.
3  I think we still would have opposed it if
4  it wasn't tied to the felony
5  disenfranchisement bill.
6  Q   So, Senator, you talked a little bit --
7  let me also take step back a little bit.
8  So you mentioned felon disenfranchisement
9  in Alabama.  Is it right that someone who
10 is disenfranchised under that law is not
11 allowed to vote for the rest of their
12 life unless certain -- you know, they
13 get -- sorry.  They get, you know, some
14 kind of relief from that provided by the
15 state?
16 A   Yes.  It's -- it's something that I
17 strongly oppose.  It -- it -- what --
18 what it in effect becomes is kind of a
19 life sentence that it doesn't end when
20 you -- if you have time and you go serve.
21 It doesn't end if you're on probation.
22 It doesn't end if you're on parole.  It
23 continues to haunt you.

Page 64

1          MS. MESSICK:  Objection.
2  A   And -- and it's -- it's -- it has a -- a
3  disproportionate impact on
4  African-Americans.
5          MS. MESSICK:  Object to
6          the form of the answer.
7  Q   Senator, do you know -- is it only
8  certain kinds of felonies that people are
9  disenfranchised for under Alabama's law,
10 if you know?
11 A   It's supposed to be.  It's supposed to be
12 those that have moral turpitude.  But
13 moral turpitude has never been generally
14 clearly defined.
15 Q   Okay.
16 A   And if you go to one voter place to --
17 to -- one place to vote, it may be
18 considered -- a particular crime might be
19 considered voter -- to have moral
20 turpitude and you go to another and it
21 may just be different.  It's never been
22 clearly defined.
23         MS. MESSICK:  Object to

Page 65

1  the form of the answer.

2  Q  Okay.  Do you know where the term moral

3  turpitude comes from?

4  A  I think that it came from the 1901

5  constitution, but I'm not sure.  I can't

6  recall exactly, but I think it came from

7  the 1901 constitution.

8  Q  Senator, do you recall if the felon

9  disenfranchisement provision of the 1901

10  constitution was ever struck down by the

11  Supreme Court or any other court?

12  A  I don't recall.  I do recall that the

13  moral turpitude provision was very

14  limited.  It involved things like treason

15  and that kind of thing.  It didn't -- it

16  didn't include nearly what all they later

17  read into it.

18  Q  Okay.

19          MS. MESSICK:  Object to

20          the form of the answer.

21  Q  Senator, could it be -- it's possible

22  that you just don't recall -- well,

23  you've said you don't recall exactly what

Page 66

1  happened to the 1901 provision of the

2  felony disenfranchisement?

3  A  I don't recall.

4  Q  Okay.  So going back, you mentioned that

5  the bills -- both the voter ID bill and

6  the bill that would have assisted people

7  with former or people with felony

8  convictions voting, both of them passed

9  the legislature; is that correct?

10  A  Yes.

11  Q  But the voter ID bill was signed by the

12  governor; is that right?

13  A  Yes.

14  Q  And the re-enfranchisement bill for

15  felons, that was vetoed by the governor;

16  is that correct?

17  A  That's correct.

18  Q  Do you recall who the governor was at the

19  time?

20  A  It was Governor Riley.

21  Q  Okay.

22  A  Bob Riley.

23  Q  Okay.  And do you recall if Governor

Page 67

1  Riley was a Democrat or Republican?

2  A  Republican.

3  Q  Do you recall what the legislative black

4  caucus' response was to that veto?

5  A  I don't recall in particular.

6  Q  Okay.

7  A  I know we felt strongly about it and I

8  recall writing an article about it.

9  Q  Okay.  And when you say "felt strongly,"

10  can you elaborate on what you mean by

11  that?

12          MS. MESSICK:  Object to

13          the form of the question.

14  A  Well, we felt like we had been betrayed

15  and we felt like we had been tricked.

16  And that what we had all agreed upon, as

17  I recall, including him, was not followed

18  through.

19  Q  Okay.  But that voter ID bill did become

20  law; is that correct?

21  A  It did.

22  Q  Okay.  So, Senator, earlier you mentioned

23  that in 2010 Democrats lost control of

Page 68

1  the party; is that right -- or lost

2  control of the legislature; is that

3  right?

4  A  That's correct.

5  Q  Okay.  Senator, just taking a little bit

6  of a step back, when you were first

7  elected in 1983, do you recall who the

8  governor of Alabama was?

9  A  I believe it was judge -- Governor George

10  Wallace.

11  Q  How long did Governor Wallace serve?

12  A  I think he served through 1986.

13  Q  Okay.  And do you recall what Governor

14  Wallace's party was?

15  A  He was Democrat.

16  Q  Okay.  Senator, how long have you been a

17  Democrat?

18  A  Well, I guess sense 1983.

19  Q  Okay.

20  A  I -- I'm -- I'm not -- you don't do party

21  registration in Alabama, so -- so once

22  I -- I ran as a Democrat -- I ran in

23  1982, so I guess it's fair to say I've

Page 69

1   been officially a Democrat since 1982.
2 Q   Okay.  And who was -- well, let me start
3   over.
4       Governor Wallace, was he governor in
5   1965 during the Selma march?
6 A   Yes.
7 Q   Okay.  Governor Wallace's political
8   views, would you describe them as
9   consistent with the Democratic party
10  today?
11       MS. MESSICK:  Object to
12       the form.
13 A   Governor -- Governor Wallace political
14  views in the 1960s was very different
15  from the Democratic party of today.
16 Q   Okay.  And how were -- were they
17  different?
18       MS. MESSICK:  Object to
19       the form.
20 A   Governor Wallace was very much against
21  African-Americans having virtually any
22  constitutional rights.  He not only stood
23  in the schoolhouse door but he said

Page 70

1   "Segregation now, segregation tomorrow."
2   He was -- he just strongly opposed the
3   rights of African-Americans to be full
4   citizens.  And today the Democratic party
5   is certainly more open to a fuller
6   citizenship role for African-Americans.
7 Q   Okay.  Senator, have you ever heard the
8   term Dixiecrat?
9 A   Yes.
10 Q   What does that term mean to you?
11 A   That was a -- I believe that that might
12  have started in 1948 when a civil rights
13  plank was put in the National Democratic
14  Party and certain Democrats broke away.
15  And I believe that Strom Thurmond was the
16  candidate for sort of a breakaway party.
17  And I think that Dixiecrat was a form of
18  saying, we may be Democrats but we're not
19  their kind of Democrats.  We're -- we're
20  Democrats that represent the old South.
21 Q   Okay.  So Dixiecrats are those -- they
22  were primarily Southern Democrats; is
23  that fair to say?

Page 71

1 A   Yes.
2 Q   Would you describe them as conservative
3   Democrats?
4       MR. NEIMAN:  Object to the
5       form.
6 A   I would describe them certainly as
7   conservative, but I would describe them
8   as reactionary more than conservative.
9 Q   Okay.  Senator Sanders, so talking about
10  Democrats, they were -- that were in
11  control of the party -- excuse me -- of
12  the legislature until 2010, do you think
13  that they were sort of factions of the
14  Democratic party even within during that
15  time that you were in the legislature?
16 A   Yes.
17 Q   Okay.  Were there perhaps more liberal
18  and more conservative factions of the
19  Democratic party; is that right?
20       MR. NEIMAN:  Object to the
21       form.
22 A   Yes.  I think Democrats ran the spectrum
23  run from conservative to progressive.

Page 72

1 Q   And do you know if any of the more
2   conservative Democrats ever switched
3   parties?
4 A   Yes.
5 Q   Okay.  Do you recall -- do you --
6   Secretary of State Jim Bennett, do you
7   know him?
8 A   Yes, I know him well.  I served with him
9   in the Senate.
10 Q   Okay.  Do you recall what party he was a
11  part of when you first met him?
12 A   He was a Democrat.
13 Q   Do you recall if he ever switched
14  parties?
15 A   He did.
16 Q   And what party did he switch to?
17 A   Republican.
18 Q   Do you recall -- do you know Senator
19  Shelby?
20 A   Yes, I know him.
21 Q   Do you recall if he was ever a Democrat?
22 A   Yes.
23 Q   And what party is he a party of now?

Page 73

1  A   Republican.

2  Q   Are there other Democrats who have
3      switched to becoming Republicans in the
4      legislature?

5  A   Yes.  Let me --

6  Q   Let me limit it, Senator.

7  A   Okay.

8  Q   Do you recall if there were any Democrats
9      who -- former Democrats, who serve in the
10     legislature now with you in the Senate?

11 A   It's hard for me to pull it up.  I'm
12     convinced there are, but it's just kind
13     of hard for me to pull it up.

14 Q   That's fine, Senator.  To your knowledge,
15     since being elected in 1983, have there
16     ever been any black Republicans in the
17     state legislature with you?

18 A   No.

19 Q   Okay.  But it is your understanding there
20     are whites in the legislature who used to
21     be Democrats and are now Republicans?

22 A   Yes.

23 Q   Do you recall if any African-Americans

Page 74

1      ever switched from being a Democrat to a
2      Republican?

3  A   Not to my knowledge.

4  Q   In the legislature?

5  A   Not to my knowledge.

6  Q   Okay.

7  A   I can't quite pull it up, but there was
8      something with Johnny Ford once.  But I
9      can't -- I don't remember the details.

10 Q   Okay.  Senator, I think we need to take a
11     break for the tape and you probably need
12     a break too.  Is that fair?

13 A   I'd appreciate one.

14 Q   Thank you, sir.  We'll take a break, 10,
15     15-minute break.

16         VIDEOGRAPHER:  This ends
17     disk one.  Going off the record
18     at 10:56.

19         (At which time, a break
20         was held.)

21         VIDEOGRAPHER:  This begins
22     disk two.  Going back on the
23     record at 11:15.

Page 75

1  BY MR. ROSS:

2  Q   Senator, do you know what racially
3      polarized voting is?

4  A   Yes.

5  Q   Can you describe that for me?

6  A   Racial polarized voting, it's when
7      African-Americans as a group vote for one
8      candidate and whites as a group vote for
9      another candidate.

10 Q   Okay.  Do you believe that there's racial
11     polarized voting in Alabama?

12 A   Yes.

13 Q   Okay.  What's your basis for that belief?

14 A   Well, I've seen it down through the years
15     and if a white is running and a black is
16     running, then the whites more often than
17     not vote for the whites and blacks more
18     often than not vote for the black.

19         MS. MESSICK:  I'm sorry.
20     Senator, can I ask you to pause
21     for a second before you answer
22     so I have time to object.

23 Q   Okay.  Senator, so you -- it's your

Page 76

1      testimony that racially polarized voting
2      exists in Alabama today?

3  A   Yes.

4  Q   Senator, do you believe that racially
5      polarized voting existed in Alabama in
6      2010?

7          MS. MESSICK:  Object to
8      the form.

9  A   Yes.

10 Q   Okay.  Do you believe that racially
11     polarized voting in Alabama is related to
12     the history of racial discrimination that
13     you described?

14         MS. MESSICK:  Object to
15     the form.

16         MR. NEIMAN:  Object to the
17     form.

18 A   Yes.

19 Q   How so?

20 A   Well, to -- to truly understand
21     segregation, you have to go back well
22     before, and you have to go back to 1857
23     which the Dred Scott decision where the

Page 77

1   Supreme Court of the United States said
2   that no black person had any rights that
3   a white person was bound to respect.  And
4   in that same decision, it said that
5   blacks were considered not just a lower
6   class but as subhuman.  And, in my
7   opinion, that's why even after the Civil
8   War ended and slavery officially ended
9   with the 13th Amendment and you had the
10  14th and the 15th Amendment and in no
11  time at all rights were being taken away.
12  So at the bottom of it was that black
13  people were not considered as -- as
14  human.  We were subhuman and that's why
15  you couldn't eat in a restaurant with
16  whites.  That's why you couldn't use the
17  same bathroom, why you couldn't drink
18  from the same water fountain.  That's why
19  you couldn't go to school together.
20  That's why you couldn't sleep in the same
21  hotels together.
22       We have a long, deep history of that
23  and it's -- it's -- it's very deep and --

Page 78

1   and slavery had long arms and it has
2   reached in to the -- to the present day.
3   And so I don't -- in Alabama as far as I
4   know, I can't recall of a single
5   situation where there's a majority white
6   district that has elected an
7   African-American.  There are some
8   majority black districts that
9   African-Americans have elected white.  So
10  on top of that, nearly all
11  African-Americans are in the Democratic
12  Party and nearly all whites are in the
13  Republican Party.
14       So if you -- if you're white and you
15  vote Republican, it's going to be
16  polarized.  If you're black and you vote
17  Democrat, it's going to be polarized, and
18  you just see it in virtually all
19  elections.
20 Q   Do you think there is racially polarized
21      voting in Democratic primary elections?
22       MS. MESSICK:  Object to
23       the form of the question.

Page 79

1  A   I don't think now -- I don't think that
2      there's racially polarized voting.  Let
3      me -- let me think about that.
4          Certainly -- certainly in the past
5      there has been racial polarizing --
6      polarized voting in the Democratic party.
7      I was -- I can't call up an instance in
8      the last two or three elections where
9      there was -- where that was the case.
10 Q   Senator, let me give you -- see if I can
11     maybe help see if there's an example.
12         Do you know who Artur Davis is?
13 A   I do.
14 Q   Do you recall if he ran in the Democratic
15     primary in 2010 for governor?
16 A   Yes.
17 Q   Is he an African-American?
18 A   He is.
19 Q   Do you know who Ron Sparks is?
20 A   Yes.
21 Q   Did he run in the Democratic primary in
22     2010?
23 A   He did.

Page 80

1  Q   Is he a white candidate?
2  A   He is.
3  Q   Do you recall who won that primary
4      election?
5  A   Ron Sparks.
6  Q   Okay.  Do you think that that may have
7      been an instance of racially polarized
8      voting in the Democratic primary?
9          MS. MESSICK:  Object --
10         MR. NEIMAN:  Object to the
11         form.
12         MS. MESSICK:  -- object to
13         the form.
14 A   Not really, because African -- the
15     majority of African-Americans voted for
16     Ron Sparks and -- and -- and I assume the
17     majority of whites voted for Ron Sparks
18     as well.
19         MS. MESSICK:  Object to
20         the form of the answer.
21 Q   Senator, would it surprise you if there
22     was racially -- would it surprise if
23     there was racial polorization in that

Page 81

1   election?
2        MS. MESSICK:  Object to
3    the form of the question.
4        MR. NEIMAN:  Objection to
5    form.
6   A   It would.
7   Q   Senator, do you know what racial appeals
8    are?
9   A   Yes.
10  Q   Can you describe them?
11  A   Racial appeals are designed to appeal a
12   particular persons on race.  They can be
13   overt or they can be covert and sometimes
14   people have code words that they can do
15   racial appeals with.
16  Q   Okay.  Senator, do you think that there
17   have been instances of racial appeals
18   using campaigns in Alabama over the last
19   10 years or so?
20  A   Yes.
21  Q   Can you think of any examples?
22  A   President Obama was one certainly in the
23   last -- since 2010 and -- and if -- if

Page 82

1    you -- and so you had people even with
2    school board -- local school board
3    election people running against President
4    Obama.  He became a symbol for black
5    people and they didn't have to say, you
6    know, vote against blacks.  They could
7    just say vote against Obama.  That's --
8    that's certainly one incident.
9   Q   And you believe that that was a racial
10   appeal for people in something like a
11   local election to use the president of
12   the United States as something to sort of
13   vote for or against?
14       MR. NEIMAN:  Objection to
15       form.
16  A   Yes.  On a state level as well.
17  Q   Senator, do you remember -- do you know
18   who Tim James was, the gubernatorial
19   candidate in 2010?
20  A   Yes.
21  Q   Do you r3call if he used racial appeals
22   in his 2010 election?
23  A   I can't remember.

Page 83

1   Q   Okay.  Do you think the use of racial
2    appeals in Alabama, would you say that's
3    related to the history of discrimination
4    you've described?
5   A   Yes.
6        MR. NEIMAN:  Objection.
7   A   Yes.
8   Q   Why would you say that, Senator?
9   A   Race is still very powerful in Alabama
10   and people don't even have to decide to
11   say, well, this is about race.  It
12   infuses so many things and that -- that
13   long history that reaches from slavery
14   through segregation up to now is
15   powerful.
16       One of the things that I think we
17   have to keep in mind is that for nearly a
18   hundred years, we had state sanction
19   terrorism against black people.  Every
20   lynching was a terrorist act.  The local
21   didn't do anything about it.  The state
22   government didn't anything about it.  The
23   United States government didn't do

Page 84

1    anything about it.  And every lynching
2    was an act of terrorism and they were
3    done publicly and nothing happened as a
4    result of it.  That's -- that's a very
5    strong statement, I think.
6   Q   Senator, what year were you born?
7   A   1942.
8   Q   1942.  And so when you talk about
9    Alabama's history of racial segregation,
10   is that something that you personally
11   experienced?
12  A   Oh, yes, yes.  I grew up -- I grew up in
13   it.  I -- I -- part of -- part of what
14   happened was -- to me -- well, first,
15   we -- we went to segregated schools and
16   the books and the buses and any material
17   we got, we only got what they -- whites
18   had already used.  I grew up where you
19   couldn't go to the -- use the -- drink
20   from the same water fountain or use the
21   same bathroom.
22       I grew up where -- where a man
23   threatened me.  I was sitting in the car.

Page 85

1   I was a terrible child.  So I am one of
2   13 children.  My mother -- but she would
3   sometimes take me with her so I wouldn't
4   be there to fight with the other children
5   and I was sitting in the car and --
6   and -- with the door open.  It was in the
7   summer and -- on the passenger side and a
8   white woman came by an she was in short
9   shorts, which was unusual then.  I looked
10  up and then less than five seconds looked
11  immediately down because I know that
12  society say I couldn't even look at her.
13       But a white man saw me so -- just
14  look up and look down.  And he came over.
15  And when he came over to get at me, I
16  pulled the door closed, and he was -- the
17  window was down but he was trying to get
18  me out of the car and my mother came out
19  of the store and told him to get away
20  from me.
21       And he said that he was going to
22  teach me a lesson never to look at a
23  white woman and my mother told him to get

Page 86

1   away from me and she used some other
2   choice words and eventually he -- he
3   pulled away.  This -- this is growing up
4   in that kind of atmosphere where just to
5   look up and look down, you know, and --
6   and he was going to teach me a lesson.
7 Q   Uh-huh.  That's sort of indicative of how
8   African-Americans grew up in Alabama; is
9   that right, Senator?
10       MS. MESSICK:  Object to
11       the form.
12       MR. NEIMAN:  Object to the
13       form.
14 A   Yes.  That was a common practice.  Let me
15  just say, when I grew up, they had the
16  6-ounce Coke bottles and the 12-ounce
17  Coke bottles and if you go to a store and
18  you were African-American and asked for
19  the 6-ounce Coke bottles, that was enough
20  to get you beaten or whatever.  That's
21  how oppressive it was.  Black people were
22  not supposed to have the 6-ounce Coke
23  bottles.  You could have the 12-ounce

Page 87

1   Coke bottles, but not the 6-ounce Coke
2   bottles.
3 Q   And do you think that given that history
4   that African-Americans your age or even
5   younger sort of continue to maybe sort
6   of -- African-Americans who went through
7   that, in your experience, do they
8   remember that kind of feeling of
9   intimidation and that Alabama state law
10  required and that society sort of
11  condoned?
12       MS. MESSICK:  Objection to
13       the form.
14       MR. NEIMAN:  Object to the
15       form.  Calls for speculation.
16 A   Yes.  I know personally it still affects
17  me all these years later.  I know many of
18  other people who it impact.  I know
19  people who were born well after me that
20  that intimidation factor is still there.
21 Q   Thank you, Senator.  So, Senator, moving
22  a little bit off topic.  I'm sorry for
23  the abrupt switch in topics there.  I

Page 88

1   appreciate your testimony.
2       Alabama now has a photo ID law; is
3   that correct?
4 A   Yes.
5 Q   Okay.  Do you recall when that bill was
6   passed?
7 A   In 2011.
8 Q   Okay.  Do you recall if there was any
9   debate over that bill?
10 A   There was no debate.  As I recall it, the
11  Republican leadership brought the bill up
12  and immediately filed a petition to cut
13  off debate and they held a microphone for
14  those 20 minutes.  We didn't get a chance
15  to say a word.
16 Q   So there was 20 minutes of debate in
17  which you were not -- no -- no one except
18  Republicans were allowed to testify -- or
19  to speak?  Excuse me.
20 A   Well, the rule requires that when a
21  petition to cut off debate is called you
22  have to wait 20 minutes before you can
23  actually vote.  But if they continue to

Page 89

1   hold the microphone, they are the only
2   one who talked.  I don't remember anybody
3   talking other than the person who was at
4   the microphone and the sponsor of the
5   bill at that time.  And so
6   African-Americans did not get a chance to
7   say one single word in the passage of
8   this bill.
9   Q   In your experience as a legislator, is
10  that unusual?
11  A   Yes, that's unusual.
12  Q   Have you ever seen that with other bills
13  prior to 2011?
14  A   Not -- not prior to 2011.  I don't recall
15  that happening.  It may have happened one
16  or two times, but in 2011 it happened a
17  lot.
18  Q   Okay.  So in 2011 it was -- Republicans
19  did this a lot, is that what you're
20  saying, Senator?
21  A   Yes.  The Republicans were in control of
22  the a Alabama Senate and they routinely
23  cut off debate without any opportunity

Page 90

1   for African-Americans or other Democrats
2   to -- to debate.
3   Q   But pre-2011, when Democrats controlled
4   the legislature, were Republicans allowed
5   to provide, you know -- to debate an
6   issue on the floor of the Senate?
7   A   There were almost never situations where
8   debate did not occur.
9   Q   Okay.  In 2011 when you were in the
10  Senate, most of the Democrats, were they
11  African-American?
12  A   Yes.  I -- I think in 2011, as I recall,
13  there were two white Democrats and there
14  were seven black Democrats.
15  Q   And that means there were about 25 or so
16  Republicans; is that right?
17  A   I can't recall whether -- yes, yes.
18  Q   Okay.
19  A   I know Harri Anne Smith -- I'm not sure
20  what year it was, but she was a
21  Republican and they denied her the right
22  to run as a Republican and she ran as an
23  independent.

Page 91

1   Q   What race was she?
2   A   She's white.
3   Q   She's white.  Okay.  But she is -- excuse
4   me -- so at that time all of the
5   Republicans in the legislature in 2011
6   were white?
7   A   All the Republicans in the 2011 session
8   of the legislature were white.
9   Q   Okay.
10  A   And male.
11  Q   Okay.  Are you aware of any -- in 2011,
12  was Alabama still subject to
13  preclearance --
14  A   Yes.
15  Q   -- under the Voting Rights Act?
16  A   Yes.
17  Q   Are you aware of any analysis done to
18  determine whether the law would have, you
19  know, passed preclearance in 2011?
20  A   What I am aware of is that we tried to
21  get them to submit the law for
22  preclearance and the attorney general
23  wouldn't submit it.  And I am aware that

Page 92

1   we then contacted the U.S. Justice
2   Department to try to get them to some
3   kind of way make Alabama submit the law
4   for preclearance and we were unsuccessful
5   in all of our attempts.
6   Q   And you say "we," Who do you mean?
7   A   I mean me in particular and Dr. Joe Reed
8   in particular.  We -- we both discussed
9   it.  We both went up to the Justice
10  Department on some other matters and
11  talked with people about it.
12  Q   And who is Joe Reed?
13  A   Joe Reed is the head of the Alabama
14  Democratic Conference commonly known as
15  ADC.
16  Q   And what is ADC?
17  A   It's an arm of the Democratic Party.
18  It's the minority caucus in the Alabama
19  Democratic Party.
20  Q   Is it safe to say that the ADC is a
21  representative of black Democrats or at
22  least one wing of the black Democratic --
23  excuse me -- of the Democratic party and

Page 93

1     black voters in the Democratic party?

2 A   Yes.

3 Q   Are there other groups of black Democrats

4     other than the ADC?

5 A   There are other groups.  I'm associated

6     with Alabama New South, but it's not

7     limited to black people and is not

8     limited to Democrats.

9 Q   Okay.

10 A   There are Republicans and independents

11     and there's whites as well.  But it's

12     certainly majority African-American.  And

13     then you have groups like the Jefferson

14     County Citizen Coalition up in Birmingham

15     and some others.

16 Q   Okay.  So you mentioned that you and

17     Mr. Reed went to the Department of

18     Justice and had requested that they --

19     strike that --

20     You mentioned that you went to the

21     attorney general of Alabama and asked him

22     to submit the photo ID law for

23     preclearance; is that right?

Page 94

1     MS. MESSICK:  Object to

2     the form.

3 A   I don't -- I recall us trying to get them

4     to do it.  I don't remember going to him.

5 Q   Okay.

6 A   We tried to get the department to submit

7     it.

8 Q   Okay.  Do you recall how you tried to get

9     the department -- the Alabama attorney

10     general to submit it?

11 A   I -- I -- I recall some telephone calls

12     asking him to submit it.  I didn't talk

13     directly with the attorney general.  I

14     don't remember the details.

15 Q   Okay.

16 A   But I do recall that they wouldn't submit

17     it and I do recall we -- we actually, I

18     think, on two occasions we was up at the

19     justice department and we asked them

20     wasn't there some kind of way to ask them

21     to go ahead and submit it.  Their

22     response was that they -- they couldn't

23     make them submit it.  They couldn't --

Page 95

1     they couldn't put it into effect without

2     it being submitted.

3 Q   Okay.  Do you know why Alabama refused to

4     submit the law for preclearance?

5     MS. MESSICK:  Object to

6     the form.

7 A   They were -- my understanding is that

8     they were waiting on the Shelby versus

9     Holder case.

10 Q   What's your basis for that belief,

11     Senator?

12 A   Well, as I recall the law, it -- it --

13     well, as I recall the law, it -- it would

14     have required preclearance.  It wasn't

15     submitted and the day after the Shelby

16     versus Holder case was submitted, either

17     the day of or the day after, there was an

18     announcement from the secretary of state

19     that it would be implemented.

20 Q   Do you recall if the secretary of state

21     issued rules after Shelby County for the

22     implementation of the voter ID bill?

23 A   I recall there being a problem of trying

Page 96

1     to get them to do that.  So I don't

2     recall it being done right away.  I

3     recall some -- some -- a range of efforts

4     of trying to get them to submit the

5     rules.

6 Q   Okay.  But to your knowledge Alabama did

7     not attempt to enforce the photo ID law

8     until after Shelby County; is that

9     correct?

10 A   That's correct.

11 Q   Okay.  Senator, why were you trying to

12     get Alabama to submit the bill for

13     preclearance under section 5?

14 A   Because I -- I was convinced that it

15     would not meet the -- the requirements of

16     section 5 and it would be rejected and we

17     didn't want it just hanging out there.

18 Q   In your experience, have you ever seen --

19     has it ever been the case that Alabama

20     has waited several years to submit a law

21     for preclearance?

22 A   I don't recall them doing that before.

23 Q   Okay.  And you said that you didn't

Page 97

1    believe that the bill would have been --
2  A   Precleared.
3  Q   -- that it wouldn't have been precleared.
4    What -- why did you believe that?
5         MR. NEIMAN:  Object to the
6       form.
7         MS. MESSICK:  Objection to
8       form.
9  A   I believe that the way the bill was
10    constructed, that from my experience with
11    the Justice Department over -- over many
12    years that it would not have been
13    precleared.
14  Q   So let's talk a little bit about the
15    bill, Senator.  Is it your understanding
16    that the 2011 voter ID bill required
17    people to show a photo ID in order to
18    vote?
19  A   Yes.
20  Q   Okay.  And when you talked a little bit
21    about the sort of procedures leading to
22    the passage of the bill, were you allowed
23    to offer any amendments to the photo ID

Page 98

1    bill as it was introduced?
2  A   No.
3  Q   Okay.  Were any members of the Alabama
4    legislative black caucus allowed to offer
5    any amendments to the bill?
6  A   No.
7  Q   After -- okay.
8      Do you believe that there could have
9    been -- well, strike that.
10     So you mentioned that the bill as
11    constructed you don't believe would have
12    passed preclearance and it's right that
13    the bill required photo ID to vote.  Is
14    it -- strike that.
15     Do you believe that
16    African-Americans are less likely to have
17    photo ID than our white voters --
18         MS. MESSICK:  Object to
19       the form.
20  Q   -- in Alabama?
21         MS. MESSICK:  Object to
22       the form.
23  A   Yes.

Page 99

1  Q   Do you believe that was true in 2011?
2         MS. MESSICK:  Object to
3       the form.
4  A   Yes.
5  Q   You -- let me strike that.
6      So in 2011 you believe think that
7    African-Americans were also less likely
8    to have photo ID?
9         MR. NEIMAN:  Object to the
10       form.
11         MS. MESSICK:  Object.
12  A   Yes.
13  Q   Okay.  What's the basis for that belief?
14  A   Well, photo ID, the most common form of
15    photo ID is driver's license and -- and
16    there's a much higher percentage of -- of
17    white people who have cars and drive and,
18    therefore, have photo ID or some kind of
19    government ID.
20     And if you are black and poor, then
21    you're less likely to have a car and less
22    likely to have a driver's license.  And
23    so there's a higher percentage of

Page 100

1    African-Americans who do not have that
2    kind of ID.  And so you would have to
3    get -- go and get photo ID and -- and
4    from talking to black people over the
5    years, since -- since it's been
6    implemented, black people are very
7    reluctant to go get photo ID.
8      And they -- they say, well, if
9    you've got a photo ID to vote, you don't
10    use it but once every couple of years and
11    that means you've got to keep up with it.
12    It's not like a driver's license that you
13    keep all the time and use for all kinds
14    of other things.
15     And -- and people said that if you
16    have two photo IDs, that you may have
17    committed a crime just having them, and
18    not trying to use them and you could end
19    going to jail.  So it was all kinds of
20    problems about that.
21  Q   Do you -- so it's your understanding,
22    Senator, that under the photo ID law, you
23    can be prosecuted for having a voter ID

Page 101

1  when you also have another form of photo
2  ID; is that correct?
3  A   That's correct.
4  Q   Okay.  Do you believe that that
5  requirement in the bill is intimidating
6  for African-American voters?
7        MS. MESSICK:  Objection to
8        form.
9        MR. NEIMAN:  Objection to
10       form.
11 A   I know it's intimidating.  I've talked to
12  people about it.  They said they can't
13  risk having it.  If they have a photo ID
14  and they come along and get a driver's
15  license, they've already committed a
16  crime.  That's very intimidating.
17 Q   Do you think that that intimidation is
18  more true for African-Americans than it
19  may be for other groups?
20       MS. MESSICK:  Objection to
21       form.
22       MR. NEIMAN:  Objection to
23       form.

Page 102

1  A   Yes.  It's more intimidating because we
2  have a history of being intimidated
3  around voting.  All kinds of actions were
4  taken to prevent us from voting, so
5  that's -- that's a part of that history.
6  And also there was a provision in the
7  photo ID law that says if you provide
8  some wrong information you could even
9  provide it accidentally, and you'd end up
10  committing a crime.  So there was a great
11  reluctance among African-Americans even
12  when we made efforts to try to get black
13  folks to go and do it, we didn't have
14  much success on that at all.  So we were
15  also concerned.
16 Q   Okay.  Thank you, Senator.
17       So you mentioned that
18  African-Americans were less likely to
19  have things like driver's license or
20  other government-issued IDs; is that
21  correct?
22 A   Yes.
23 Q   Do you believe that African-Americans are

Page 103

1  also less likely to have a birth
2  certificate?
3        MS. MESSICK:  Object to
4        form.
5        MR. NEIMAN:  Object to
6        form.
7  A   Yes.
8  Q   Why is that?
9  A   Because more of us were delivered by
10  midwives and I -- I run into people all
11  the time, African-Americans all the time,
12  who don't -- don't really know the date
13  of their birth.  They -- because of even
14  if they weren't delivered by a midwife,
15  they may very well have been delivered by
16  a doctor, but that was done in a
17  situation where there were not proper
18  records kept.
19       So just definitely a higher
20  percentage of African-Americans and --
21  and there was a time when the whole thing
22  with hospitals and segregation and all of
23  that came into play.

Page 104

1  Q   So you mentioned hospitals and
2  segregation.  Why do you think that's
3  connected to the birth certificate issue?
4        MR. NEIMAN:  Objection to
5        form?
6  A   Because if you went to a hospital, you
7  were more likely to have all those kinds
8  of records because they had more people
9  to hand -- to handle that.  But if you
10  was delivered midwife or even delivered
11  by a doctor not at a midwife, not at a
12  hospital, then the chances of your birth
13  certificate getting -- the whole process
14  getting completed was reduced.
15 Q   Is it your understanding that there were
16  fewer black hospitals at -- during this
17  segregation -- the era of segregation
18  that black hospitals?
19 A   Yes.
20 Q   Okay.  And do you think that contributed
21  to what you're describing here, the lack
22  of black people being born in hospitals?
23       MR. NEIMAN:  Objection to

Page 105

1       form.

2   A   Yes.

3   Q   Senator, you also -- you were testifying

4       earlier about sort of African-American

5       access to things like vehicles and that

6       being related to their access of driver's

7       license and other kinds of photo

8       identification.  Why do you think

9       African-Americans are less likely to have

10      vehicles?

11          MS. MESSICK:  Objection.

12          MR. NEIMAN:  Objection to

13          form.

14  A   Well, I grew up poor.  I had firsthand,

15      experience, nine children, a mother and

16      father.  The rate of poverty is higher

17      among African-Americans and also some of

18      those who poverty may not be it, but

19      being able to read and write and all of

20      those kinds of things impact it.  So the

21      key thing, though, is that if you --

22      if -- if you own a car, then you are

23      likely -- much more likely to have it.

Page 106

1       But it also affects some young people and

2       some old people but African-Americans it

3       had a high disproportionate impact.

4   Q   Why are African-Americans more likely to

5       be poor?

6           MR. NEIMAN:  Object to the

7           form?

8           MS. MESSICK:  Object to

9           the form?

10  A   Well, I -- I grew up poor.  I had

11      firsthand experience.  Nine children, a

12      mother, and father lived in a three room

13      house and I don't mean a three bedroom

14      house.  I mean a three-room house.  We

15      didn't have electricity.  We didn't have

16      an indoor toilet.  In fact, we didn't

17      even have an outdoor toilet.  We had a

18      china berry tree that you go behind and

19      that was directly connected to racial

20      segregation and wasn't just true for me.

21      It was true for a lot of other

22      African-Americans.  So out of that also

23      sprung the lesser education.  So every

Page 107

1       aspect of society.  There were jobs that

2       we couldn't get.  I mean, we literately

3       had to pro test to be able to get jobs in

4       stores and various kinds of things.  So

5       it's -- segregation -- the brooks of

6       segregation has a great deal to do with

7       that poverty and the driver's license and

8       owning a car and owning other things.

9   Q   Thank you, Senator.

10          Thank you, Senator.  Do you believe

11      that other legislators were aware of this

12      history that you're describing at the

13      time that the photo ID law was passed?

14          MS. MESSICK:  Objection to

15          form.

16          MR. NEIMAN:  Object to the

17          form.

18  A   Other legislatures were aware of it.  We

19      were virtually united in opposition to it

20      and -- and we knew that this was just a

21      way to suppress the African-American vote

22      to reduce the number of African-Americans

23      who might vote.

Page 108

1   Q   Why do you think the legislature wanted

2       to reduce the number of African-Americans

3       that were able to vote?

4           MR. NEIMAN:  Object to the

5           form?

6           MS. MESSICK:  Object to

7           the form?

8   A   It was -- it was -- it was -- it was a

9       matter of race.  It was a matter of -- at

10      that time, Republicans in Alabama were

11      becoming more competitive in the 90s.  In

12      the '80s, there had not been a lot of

13      competitive situations between

14      African-Americans -- I mean between

15      Republicans and Democrats.  And

16      Republicans were -- Democrats were --

17      well, African-Americans were basically in

18      the Democratic party and so I -- to me it

19      wasn't anything different.  It was a

20      continuation of an effort to try to deny

21      African-Americans the right to vote, to

22      try to suppress it, to try to reduce it,

23      to try to intimidate it.  I had seen it

Page 109

1    during the -- even after the 1965 Voting
2    Rights Act passed, I had seen it
3    continuously over and over again.  So it
4    was part of the pattern.
5  Q    Do you believe it benefited Republicans
6    to have fewer African-Americans voting?
7              MS. MESSICK:  Germany nee
8       objection to form?
9  A    Yes.
10 Q    Whiny nee objection to form.
11 A    Because there were almost no
12   African-Americans who were Republicans.
13   The huge majority of African-Americans
14   were Democrats and so the less
15   African-Americans that voted, the more --
16   the greater their chances of winning.
17   And -- and this continued even after
18   Republicans already held every -- every
19   statewide office from the judiciary to
20   attorney general to the governor to all
21   of these.  The effort was continued.  So
22   sometimes it wasn't just a matter of
23   winning.  It went beyond that.  It tied

Page 110

1    into this long history of enslavement and
2    segregation.
3  Q    You testified that African-Americans were
4    aware that legislatures were aware of the
5    fact that African -- or at least --
6    strike that.
7         You testified that African-American
8    legislatures were more -- sorry.
9         You testified that African-American
10   legislators believed that blacks were
11   less likely than whites to have photo ID;
12   is that right.
13 A    Yes.
14             MR. NEIMAN:  Objection.
15             MS. MESSICK:  Object to
16       the form.
17 Q    Did African-American legislatures make
18   white legislatures aware of that?
19 A    We certainly did in individual
20   discussions.  We couldn't do it when the
21   bill came up because we didn't get a
22   chance to talk.  We didn't get a chance
23   to debate.

Page 111

1  Q    Did you notify them of this before the
2    passage -- did you notify Republicans
3    before the pass and of the photo ID bill
4    in 2011?
5  A    We didn't do any formal notification.  In
6    any discussion, we would say that this is
7    unacceptable and this is why.
8  Q    And you would have this individual
9    discussions with Republican legislatures;
10   is that right?
11 A    Yes.  Or when bills would come up like
12   this in the community -- in the committee
13   there was a chance to say something about
14   it.  But there was no opportunity on the
15   floor of the Alabama Senate.
16 Q    Okay.
17             MR. ROSS:  Take a
18       five-minute break.
19             MS. MESSICK:  Sure.
20             VIDEOGRAPHER:  Going off
21       the record at 11:58.
22             (At which time, a break
23             was held.)

Page 112

1              VIDEOGRAPHER:  This begins
2    disk three.  Going back on the
3    record at 1:31.
4              MR. ROSS:  Senator
5       Sanders, when we were -- before
6       we went off the record we were
7       talking a little bit about the
8       photo ID law that was passed in
9       2011; is that right.
10 A    Yes.
11 Q    And you mentioned a decision, Shelby
12   County?
13 A    Shelby County versus Holder, yeah.
14 Q    Do you remember what that decision was?
15 A    Yes.  Shelby struck down, I think,
16   article -- no -- section 4B which
17   immobilized section 5 in the Voting
18   Rights Act.
19 Q    So did that suspended preclearance?
20 A    Yes.
21 Q    Okay.  And so is it your understanding
22   that Alabama no longer has to seek
23   preclearance for its voting laws?

Page 113

¹ A    That's my understanding.

² Q    Okay.  Do you recall when that decision

³    came out?

⁴ A    I think it was in June of 2013.

⁵ Q    Okay.

⁶ A    And it might have been June the 25th.

⁷    But I am not exactly.

⁸ Q    And based on your experience, what's been

⁹    the effect of the Shelby County decision

¹⁰    here in Alabama?

¹¹         MS. MESSICK:  Objection to

¹²         the form.

¹³ A    First, voter ID is certainly one -- one

¹⁴    impact on it.  Second, the way the

¹⁵    changes in how criminal cases -- I mean,

¹⁶    not criminal cases -- former imprisoned

¹⁷    persons are handled and -- and there's

¹⁸    also -- no.  That was before.  In the

¹⁹    legislature when discriminatory laws

²⁰    would come up, we would we remind them

²¹    that those would not be precleared by the

²²    U.S. Justice Department and now that's no

²³    longer the case.  And a lot of the ones

Page 114

¹    that they would bring up, they would fall

²    by the wayside not necessarily because

³    the votes wasn't there but because they

⁴    would not be precleared.  That's not

⁵    the -- the case now.  There's nothing to

⁶    stop those who would change the laws in

⁷    various ways to oppress -- to suppress

⁸    the right to vote for African-Americans.

⁹         MS. MESSICK:  Object to

¹⁰         the form of the answer.

¹¹ Q    Senator, am I correct that the Alabama

¹²    legislature sits for four years once the

¹³    senators and representatives have been

¹⁴    elected?

¹⁵ A    Yes.

¹⁶ Q    So --

¹⁷ A    Generally speaking unless federal court

¹⁸    intercedes.

¹⁹ Q    Okay.  And it has been the case that

²⁰    Alabama has been required to have, you

²¹    know, special elections and things like

²²    that for its legislature because of

²³    federal court intervention?

Page 115

¹ A    Yeah.  I know 1982 would have been the

²    regular election.  In 1983 that was one

³    of those times.

⁴ Q    Okay.  Senator, so the legislature, the

⁵    state senators and state representatives,

⁶    that are elected in 2010, they would have

⁷    sat from about -- the same legislature

⁸    would have sat from about 2010 -- early

⁹    2011 until 2014, early 2015; is that

¹⁰    right?

¹¹ A    It would have sat from November of 2010

¹²    to November of 2014.

¹³ Q    Okay.  And that would have been the same

¹⁴    legislature that passed the photo ID

¹⁵    bill; is that right?

¹⁶ A    That's correct.

¹⁷ Q    Okay.  Do you recall a 2011 bill called

¹⁸    House Bill 56?

¹⁹ A    Yes.

²⁰ Q    Is it commonly referred to as HB 56?

²¹ A    Yes.

²² Q    Do you recall what the purpose of that --

²³    or what that bill was?

Page 116

¹ A    It was a bill that supposedly was

²    directed at -- at immigrants who were

³    undocumented but it ended up going a lot

⁴    further than that.  In fact, it had

⁵    provisions in there like on voting that

⁶    will end up impacting not just immigrants

⁷    but -- so, yes, HB 56 was directed at

⁸    undocumented immigrants but it impacted a

⁹    lot more than that.

¹⁰ Q    Do you recall what the stated purpose of

¹¹    HB -- well, is it right that you're

¹²    stating the purpose of HB 56 was to

¹³    undocumented immigrants?

¹⁴ A    Yes.

¹⁵ Q    Do you believe the bill may have had

¹⁶    other purposes?

¹⁷         MS. MESSICK:  Object to

¹⁸         the form.

¹⁹         MR. NEIMAN:  Object to the

²⁰         form.

²¹ A    Well, the bill had other purposes and had

²²    other impacts.  The bill ended up

²³    impacting the average person even going

Page 117

1  to get a tag and things like that and it
2  had the voting provision in there where
3  they had to have different kinds of
4  documents.  People who were -- if
5  somebody decided that you were -- you
6  might be an undocumented person, then you
7  had to have proof of it.  You had to have
8  some cards.  That means anybody could be
9  stopped.  I could be stopped and asked
10  for my papers, which I wouldn't have.  I
11  wouldn't have proof of citizenship.  I
12  may have a driver's license, but I
13  wouldn't have proof of citizenship on me.
14 Q  Is it your understanding -- does Alabama
15  driver's license indicate citizenship on
16  it?
17 A  It does not.
18 Q  Okay.  And it's your recollection that HB
19  56 contained a documentary citizenship
20  requirement for voting -- for registering
21  to vote?
22 A  Yes.
23 Q  Okay.  Do you recall whether you opposed

Page 118

1  HB 56?
2 A  Yes.  But as I recall, HB 56 was also one
3  of those that they passed without any
4  opportunity for the debate.  Again --
5      MS. MESSICK:  Object to
6      the form of the answer.
7 A  Again, they brought it up and filed a
8  petition for closure.  And they held the
9  microphone, so we didn't get a chance to
10  say a word.
11      MS. MESSICK:  Object to
12      the form of the answer.
13 Q  And when you say we didn't get to say a
14  word?
15 A  African-Americans.
16 Q  Do you recall if other African-American
17  legislators opposed HB 56?
18 A  Yes.
19 Q  Okay.  So let me rephrase it.  It's your
20  understanding that other African-American
21  legislators opposed HB 56?
22 A  Yes.
23 Q  Okay.  You described the use of closure

Page 119

1  for HB 56 as well as the photo ID bill in
2  2011 and -- well, strike that.
3      Are there any Latino representatives
4  in the Alabama legislature?
5 A  Not that I know of.
6 Q  Okay.
7 A  They might be passing.
8 Q  Okay.  Do you know if there is a Latino
9  community in Alabama?
10 A  Yes.  There are some Latinos in Alabama.
11 Q  Okay.  Did you -- were you aware of
12  Latino sort of the community opposition
13  to HB 56?
14 A  Yes.  I've worked with some people who
15  were opposed with it, some Latinos and
16  some others who were opposed to it, yes.
17 Q  Okay.  Latino organizations?
18 A  Yes.
19 Q  Okay.  Have you heard of the Hispanic
20  Interest Coalition of Alabama?
21 A  HICA, yes.
22 Q  Do you know if they were opposed to HB
23  56?

Page 120

1 A  They were definitely opposed to it.
2 Q  Okay.  And there may have been other
3  Latino organizations in Alabama that were
4  opposed?
5 A  Yes.
6 Q  Okay.  Do you recall why they were
7  opposed to HB 56?
8      MS. MESSICK:  Object to
9      the form.
10 A  I do recall why they said they were.
11  They were opposed to it because it was
12  oppressive to not just people who were
13  undocumented, it was oppressive to
14  Hispanic people in general.  It had --
15  one provision I recall them simply
16  talking about is that how it not only how
17  it affected them but affected others.  If
18  somebody was on the road or the highway
19  and they had broken down, their car had
20  broken down, if you picked them up and
21  took them somewhere to get some help, you
22  could be arrested for that and I believe
23  that was a felony.  You might be -- if it

Page 121

1    wasn't a felony, it might have been a
2    third-class misdemeanor.  I don't
3    remember.
4         But they were -- churches was
5    against it because it would impact them
6    if somebody would simply go and visit the
7    church and they tried to do the
8    humanitarian thing by giving them food.
9    They would -- it would impact them
10   adversely.  And next they felt like it
11   was going to drive Latinos out of
12   Alabama, not just undocumented but other
13   Latinos, that they would end up leaving,
14   having to leave their home or leave their
15   property just to get out, leave their
16   jobs and leave their families.
17 Q   Senator, were you present for the
18   legislative debates about HB 56 in the
19   Senate?
20 A   I was present in the Senate, but there
21   was no debate on HB 56.
22 Q   Do you recall if any legislators used
23   terms like anchor babies when describing

Page 122

1    their support for HB 56?
2  A   I don't specifically recall that.
3  Q   Do you recall legislators talking about
4    Latinos when specifically discussing HB
5    56 rather than immigrants more broadly?
6  A   Well, not on HB 56 because there wasn't
7    any discussion.  They just brought it up
8    in passing but a -- a prior version of
9    that had been introduced, I believe,
10   two -- two sessions -- the two -- two
11   prior sessions in maybe '9 and '10 when
12   Democrats were in control and there was
13   certainly discussion around that at that
14   time.
15 Q   Around Latinos?
16 A   Yes.
17 Q   Okay.  Do you know whether HB 56 was
18   enacted?
19 A   Yes.
20 Q   It was?
21 A   It was.
22 Q   Okay.  Do you recall if there was any
23   litigation to stop HB 56 from being

Page 123

1    enforced?
2  A   Yes.  I think -- as I recall, there might
3    have been -- I know there were two pieces
4    of litigation, might have been three
5    different pieces of litigation that was
6    filed, and I recall that many of the
7    provisions were -- were either declared
8    unconstitutional or some kind of
9    resolution was brought that removed them
10   or limited their impact.
11 Q   Do you know if the documentary proof of
12   citizenship requirement for voting was
13   ever enforced?
14 A   I don't recall it being enforced because
15   it, again, wasn't precleared.  So when
16   the issue came up, it would have been
17   after June in 2013.
18 Q   The bill was passed in 2011; correct?
19 A   Yes.
20 Q   And Alabama was still subject to
21   preclearance at that time?
22 A   Correct.
23 Q   Is it your testimony, as far as you know,

Page 124

1    HB 56 was not submitted for preclearance?
2         MR. NEIMAN:  Objection to
3      form.
4         MS. MESSICK:  Objection to
5      form.
6  A   Okay.  It was not submitted for
7    preclearance.  That was also one of the
8    issues we raised with the Justice
9    Department.
10 Q   As far as you know, the bill was never
11   precleared; is that correct?
12 A   As far as I know, yes.
13 Q   Okay.  Senator, did -- during the
14   2010-2014 legislative session, did the
15   Alabama legislature also do its, you
16   know, every 10-year reapportionment?
17       MS. MESSICK:  Objection to
18     the form of the question.
19 A   Yes.
20 Q   Okay.  Do you recall when the legislature
21   passed it reapportionment bills?
22 A   I -- I don't recall.  For some reason it
23   seemed to me that it might have been

Page 125

1    2012, but I don't recall the exact year
2    but I do recall that -- that one was
3    passed.
4  Q  Okay.  I'll represent to you 2012 was
5    when the bill was passed.  So do you
6    recall whether there was any litigation
7    challenging the 2012 reapportionment?
8  A  Yes.
9           MS. MESSICK:  Object to
10          the form of the question.
11  Q  Do you recall -- do you know the name of
12    that litigation?
13  A  It was -- I don't recall the exact name
14    but I know it was brought by the Alabama
15    legislative black caucus, one lawsuit,
16    and another one was brought by the
17    Alabama Democratic Conference and I know
18    that they were combined and litigated
19    together.
20  Q  Do you recall what the claims were in
21    that litigation?
22  A  Yes.  Essentially that the districts were
23    configured in a way to reduce the

Page 126

1    black -- the voting power of
2    African-Americans, that they packed some
3    districts and they kind of reduced the
4    percentage of African-Americans in what
5    would have been called the influence
6    districts.  The vote, I think that was
7    the heart of it.
8  Q  Do you recall if the Alabama black caucus
9    was successful in that litigation?
10  A  Yes.  The case, as I recall, was tried
11    before a three-judge panel and that it
12    went all the way to the Supreme Court and
13    the Supreme Court, as I recall, said they
14    have used the wrong standard and sent it
15    back and -- and in the last couple of
16    weeks, the panel found that maybe three
17    Senate districts and nine House districts
18    were wrongly district and that was in
19    violation of the constitution in the
20    drawing of the district.
21  Q  Okay.  Thank you, Senator.
22          Senator, so the photo ID -- going
23    back to the photo ID bill, when it was

Page 127

1    passed in 2011, do you recall if there
2    was a provision that allowed people to
3    vote without showing photo ID in the law?
4  A  Yes.  The -- what the provision I think
5    simply said that if there were two people
6    in the polls that -- that knew somebody
7    then they would -- they would -- they
8    would be able to vote.  They could sign
9    something and be able to vote and I was
10    extremely concerned about that provision
11    because I had had an experience here in
12    Dallas County.
13          I went to the polls to vote and they
14    told me my name was not on the ballot and
15    so the people at the polls say, well, we
16    know you.  Let us call the voter
17    registrar's office.  So they call them
18    and I knew the people at the voter
19    registrar's office.  They said my name
20    wasn't on the list, that I must have
21    moved.  And I told them that I had been
22    in the same place for -- since 1978 in
23    the same house, hadn't moved a thing.  I

Page 128

1    had voted in every election.  I had run
2    in at least 10 different elections.  And
3    so then they put me on the phone with the
4    voter registrar and said -- and I talked
5    to them and they said, no, you're --
6    you're not on there, you're going to --
7    you can vote in -- not an absent -- not a
8    challenge ballot.  You can vote a
9    provisional ballot and then I decided I
10    wasn't going to vote a provisional
11    ballot.
12          But then the issue that was before
13    us, then I started thinking what if loses
14    by one vote?  So I went and decided go
15    ahead and vote on a provisional ballot.
16    I was the state senator.  They knew me.
17    I had voted in every election.  They knew
18    that.  In addition for running for
19    Senate, I ran for Congress.  I also ran
20    for delegates for the Democratic party.
21    So -- but they simply wouldn't let me
22    vote.
23          That's why I was very concerned

Page 129

1   about that provision and I knew how
2   they -- because here in Dallas County,
3   they had literally stacked the election
4   officials.  So that -- that provision
5   concerned me greatly.
6           MS. MESSICK:  Object to
7       the form of the answer.
8   Q   When you say "they had stacked the
9   election officials," who are they?
10  A   Well, the probate judge essentially made
11  those decisions.
12  Q   And is your concern then, to summarize
13  what you said, that the election
14  officials are the ones who get to decide
15  who is allowed to vote or not; is that
16  correct?
17  A   Yes.
18          MR. NEIMAN:  Object to the
19      form.
20  A   Yes, and I'm concerned about that.  But
21  I'm concerned that -- that most of the
22  election officials are white throughout
23  the state.  I'm concerned that they will

Page 130

1   decide that whites can -- they know them
2   and they will let them do it and they
3   will decide that blacks cannot vote,
4   whether they know them or not.  So I'm
5   concerned that that provision will add to
6   the discriminatory impact of the bill.
7   Q   Senator, do you recall ever raising this
8   issue with the Alabama Secretary of
9   State's office?
10  A   Yes.  I -- I -- I do recall raising it.
11  Q   Okay.  Did you ever meet with the
12  secretary of state about that issue?
13  A   Yes.
14  Q   Do you remember approximately when that
15  was?
16  A   It might have been in 2014.  I can't
17  remember precisely, but I think it might
18  have been in 2014.
19  Q   And do you recall whether the Secretary
20  of State addressed your concerns about
21  the positively identified provision?
22  A   What I recall is that my concerns were
23  not -- not addressed to any satisfaction

Page 131

1   at all.
2   Q   Okay.  Senator Sanders, have you ever
3   heard of mobile ID units?
4   A   Yes.
5   Q   What are those?
6   A   The secretary of state would send out a
7   mobile unit to do voter ID -- to be able
8   to give voter ID, but I -- I considered
9   that was just a public relation mechanism
10  because very few were actually
11  registered.
12      And when they would set a time,
13  there was very little public notice of
14  it.  They may spend two hours there and
15  then go ahead.  And if you count all of
16  the ones that they did, it was just
17  several thousands across the entire
18  state.  So I was familiar with them, but
19  I was also familiar with it as being most
20  ineffective.
21  Q   Senator, I'm going to introduce
22  Plaintiff's Exhibit Number 5.  It's an
23  e-mail from the defendants' production,

Page 132

1       DEF 00056537.
2           (Plaintiff's Exhibit 5 was
3           marked for
4           identification.)
5   Q   I'll get you a copy, sir.  Take a moment
6   to review.
7           (At which time, the
8           witness reviews the
9           exhibit.)
10  A   All right.
11  Q   Senator Sanders, is your name on this
12  e-mail -- this chain of e-mails, I should
13  say?
14  A   Let me look again.  Yes.  I was cc'ed a
15  copy along with Benard Simelton, and
16  Brandon Fountain, Scott Douglas, and
17  Brian Haygood.
18  Q   Senator, do you know who those gentlemen
19  are that you just listed?
20  A   Yes.
21  Q   Who are they?
22  A   Benard Simelton is the state president of
23  the NAACP.  Scott Douglas is the

Page 133

1    executive director of the Greater
2    Birmingham Ministry.  Brian Haygood was
3    formerly with the Legal Defense Fund and
4    he -- and he is now with another
5    organization, I believe, in New Jersey.
6    And Brandon Fountain, I can't pull it up
7    right now but I do know him.
8    Q    Okay.  Senator, looking at the second
9    page of this document, there's an e-mail
10   from myself to Justice Brown cc'ing you
11   and the gentlemen you just named.  The
12   subject line is "Mobile Unit
13   Suggestions."  Is it right -- it lists
14   here -- it says "Justice Brown, the
15   Alabama NAACP, Greater Birmingham
16   Ministries, Save Ourselves Coalition, and
17   the NAACP Legal Defense fund.  Thank you
18   for being with us on Friday."
19       Is it -- does that refresh your
20   recollection of when there was a meeting
21   with the Secretary of State's Office?
22   A    Yes.
23   Q    Okay.  So that would have been

Page 134

1    approximately September of 2014?
2    A    Yes.
3    Q    Senator, what is the Save Ourselves
4    Coalition?
5    A    Save Ourselves Coalition is really save
6    ourselves movement for justice and
7    democracy.  It is a coalition of 40-some
8    organizations that's interested in
9    justice issues and in democracy.  And
10   it's been in active Alabama for several
11   years, maybe six years or so.
12   Q    Does this e-mail suggest mobile unit
13   locations for the secretary of state?
14   A    Well, it's -- it -- it states particular
15   locations and it states the counties and
16   some of them, like in Birmingham it gives
17   specific locations, not just -- not just
18   a county or a city.
19   Q    Do you know whether the secretary of
20   state ever responded to all of these
21   suggestions, in your recollection,
22   Senator?
23   A    I don't recall.  I see -- I think Justice

Page 135

1    Brown -- I see a cc where -- but I
2    don't -- from my recollection, I don't
3    recall.
4    Q    Okay.  Thank you, Senator.
5        So is it correct, then, that you
6    have suggested mobile unit locations to
7    the Alabama Secretary of State?
8    A    I was a part of trying to determine some
9    places to make those suggestions, yes.
10   Q    Senator Sanders, do you know whether
11   anyone ever tried to -- from the
12   Secretary of State's Office tried to
13   determine how many voters do not have
14   photo ID?
15   A    No, I don't recall them making a
16   determination of that.  I recall some
17   discussion about trying to get that done,
18   but I don't recall them doing it.
19   Q    Let me hand you Plaintiff's 6 again from
20   the defendant's production 000-2698.
21           (Plaintiff's Exhibit 6 was
22            marked for
23            identification.)

Page 136

1            (At which time, the
2             witness reviews the
3             exhibit.)
4    A    Okay.
5    Q    Does that refresh your recollection about
6    any efforts by the Secretary of State's
7    Office about how many voters don't have
8    photo ID?
9    A    Not really.  I see -- I see in here where
10   they suggested the 500,000-dollar --
11   500,000 number that had been raised that
12   they suggested that they estimate that
13   half of them did possess adequate forms
14   of photo ID.
15   Q    Senator, looking at the second page of
16   the document, there's a list of citizens
17   and residents of Alabama who are
18   requesting this information.  Were you
19   and your wife some of the folks
20   requesting this information about how
21   many voters didn't have ID?
22   A    Yes.
23   Q    To your knowledge did the Secretary of

Page 137

1    State's Office ever provide this
2    information about --
3  A   Not to my knowledge.
4  Q   Senator, do you remember what the first
5    general election was when Alabama's photo
6    ID law went into effect?
7  A   I think it was 2014, the general election
8    of 2014.
9  Q   Do you recall --
10  A   Well, I think it was the election -- I
11    believe the election was in 2014.
12  Q   I'm going to -- do you recall discussions
13    about the impact of the photo ID law on
14    the 2014 elections?
15  A   Yes.
16  Q   Okay.  What do you recall those
17    discussions being?
18  A   Well, as -- as I recall, we had the
19    lowest turnout that we had had in -- in
20    30-some years.
21  Q   And do you believe the photo ID law
22    contributed to that?
23       MR. NEIMAN:  Objection.

Page 138

1       MS. MESSICK:  Object to
2    the form.
3  A   Yes.  I'm absolutely convinced that the
4    photo ID law contributed to it.
5  Q   Why do you believe that, Senator?
6  A   Well, in discussion, out in the community
7    and stuff, a lot of people, one, were
8    reluctant to vote at all.  They thought
9    the ID -- voter ID was designed to -- for
10    some other purposes.  So they decided
11    that even if they had ID, they weren't
12    going to vote.  And others didn't try to
13    get the ID because they were concerned
14    that somebody had other purposes.  It
15    definitely had an adverse impact.  It
16    definitely suppressed the vote of
17    African-Americans.
18  Q   When you say "other purposes," what do
19    you mean?
20  A   Well, some people felt like it was
21    designed to try to snag them in something
22    in one way or the other, whether they had
23    done anything or not.  It was -- the

Page 139

1    feeling was that this was a way just to
2    try to get them.
3  Q   When you say "get them," do you mean
4    African-Americans?
5  A   Yes.  Get typically African-American
6    voters.
7  Q   Senator Sanders, do you know what the
8    cost of a driver's license in Alabama is?
9  A   As I recall, it's about $54 or something
10    like that.
11  Q   Do you recall if the cost has gone up in
12    the last five years or so?
13  A   Yes.  It might be $52.  I forget.  Maybe
14    it was a 52 percent increase.  I've -- it
15    seems to me like it -- it went up about
16    50-something percent.  I don't recall.  I
17    think it went up 52 percent and I can't
18    remember the exact cost of it, but it --
19    it may have gone up from 20-some to
20    $40-some.  I don't remember the exact
21    amount, but I remember there was a huge
22    increase.
23  Q   Okay.  And that was after the photo ID

Page 140

1    law was passed; is that correct?
2  A   Yes.
3  Q   Okay.  Do you think that that cost
4    increase had an impact on people's
5    ability to get a photo ID needed to vote?
6       MR. NEIMAN:  Objection.
7       MS. MESSICK:  Object to
8    the form.
9  A   Yes.  And I think -- I think that -- as I
10    said it earlier, people were concerned
11    about getting a photo ID anyway and they
12    preferred a driver's license so they
13    could use it for all kinds of things and
14    they could carry it at all times and the
15    increase in the driver's license cost
16    would make it harder.  Some people can't
17    hardly imagine that $40-some, or whatever
18    amount it is, stopping anybody from
19    getting a driver's license, but when
20    you're living hand to mouth, it has a
21    profound impact.  So...
22  Q   Thank you, Senator.
23       Senator, do you recall in 2015 --

Page 141

1    well, let me start over.

2       Do you know what the Alabama Law

3    Enforcement Agency is?

4 A   Yes.

5 Q   What is it?

6 A   It's a -- a chief law enforcement agency

7    that now covers ABI, state troopers, and

8    other law enforcement agencies. Also,

9    driver's license fall up under it.

10 Q   So would you understand what I meant if I

11    called the Alabama Law Enforcement

12    Agency, ALEA?

13 A   Yes.

14 Q   Okay. So is ALEA also responsible for

15    issuing driver's licenses; is that

16    correct?

17 A   Yes.

18 Q   Okay. Do you recall -- strike that.

19       I'm going to hand you what's marked

20    as Plaintiff's 7 from defendant's

21    production, 00054842.

22       (Plaintiff's Exhibit 7 was

23       marked for

Page 142

1       identification.)

2       (At which time, the

3       witness reviews the

4       exhibit.)

5 Q   You reviewed it, Senator?

6 A   Huh?

7 Q   You reviewed it?

8 A   I have.

9 Q   Have you seen this document before?

10 A   No, I haven't.

11 Q   Okay. Do you see who this document was

12    from and to?

13 A   I see that it was addressed to me and it

14    was from John Hamm at the Alabama Law

15    Enforcement Agent. I've never seen this.

16 Q   Is it possible that you -- okay.

17       Was this -- this letter is dated

18    October 1st, 2015; is that right?

19 A   Yes.

20 Q   And I know you just reviewed it and you

21    haven't seen it. You're saying you

22    haven't seen it before, but do you recall

23    the letter talks about the closure of 31

Page 143

1    part-time satellite ALEA offices, at

2    least the way ALEA is describing it. Do

3    you recall when you first learned about

4    these closures of these offices?

5 A   Yes.

6 Q   Was it through this letter?

7 A   No.

8 Q   When did you first learn about it?

9 A   From the newspaper.

10 Q   Okay.

11 A   Or from the media, I should say.

12 Q   Okay. Was that before October 2015?

13 A   It -- as I recall, the announcement was

14    only made a couple of days before --

15    before October the 1st and so I would

16    think it would -- I learned from the

17    media a couple of days before.

18 Q   Okay. Senator, this e-mail was sent to

19    Hank Sanders@ALSenate.gov. Is that the

20    primary e-mail that you use as a senator?

21 A   I don't use that e-mail at all.

22 Q   Okay. What -- you have another e-mail

23    account; is that correct?

Page 144

1 A   Yes. The e-mail account I use is

2    ███████████████████

3 Q   Okay. And you use that for your

4    legislative e-mails as well; correct?

5 A   Yes.

6 Q   Okay. Senator, so the -- you learned

7    about the closures around this time; is

8    that fair to say?

9 A   Yes.

10 Q   Okay. The 31 offices, do you recall

11    where those 31 offices that were being

12    closed were located?

13 A   I don't recall where all 31 of them were,

14    but I know that out of 13 black belt

15    counties, what I consider black belt

16    county, 11 of them, as I recall, were in

17    the black belt.

18 Q   And were those counties in your district?

19 A   Quite a few of those counties was in the

20    district. Butler and Lowndes and Wilcox

21    and Perry and -- let's see. Dallas and

22    Marengo, they stayed open. I just recall

23    that a number of them was in the

Page 145

1    district.

2  Q    And those counties that you listed, are

3    they majority African-American counties?

4  A    All except Butler and Butler has a high

5    percentage of African-Americans but not a

6    majority.

7  Q    Okay.  Given that the closures, as you've

8    described it, were in 11 of the 13 black

9    belt counties, who did you think that

10    these closures were more likely to

11    affect?

12          MS. MESSICK:  Object to

13          the form.

14  A    I was very concerned that it was going to

15    disproportionately impact

16    African-Americans.

17  Q    Why?

18  A    Because it affected so many of the black

19    belt counties.  I know how difficult it

20    is for people, even within the county

21    where there's no public transportation to

22    speak of, to get from their homes to

23    get -- just from their homes to get to

Page 146

1    the county seat and so when they hardly

2    have -- already have very little money,

3    if any, just to get from the county seat,

4    from home to the county seat.  But to

5    then have to get to another county.  And

6    even if they were working, that means

7    they have to take a day off.  They have

8    to get somebody else to take them to

9    another county, to pay for it, that it

10    was just going to have a tremendously

11    adverse impact on there.  I thought a lot

12    of people would end up not getting

13    license.  They might end up driving

14    without them.  That it would also impact

15    people whether they were able to vote or

16    not.  I thought it was just going to have

17    a very strong impact on

18    African-Americans.

19          And even in counties that were not

20    majority African-American or had a high

21    percentage, I still thought it would have

22    a disproportionate impact because we are

23    poor and as a group, we generally have

Page 147

1    lesser resources.  And so I just thought

2    it was going to have a great adverse

3    impact on African-Americans even outside

4    of the black belt.

5  Q    Senator, you mentioned effect of the

6    closures on voting.  Why did you think

7    that the ALEA closures were relevant to

8    voting?

9  A    Well, they were very relevant because in

10    talking with black people, they didn't

11    want to even try to get a voter -- photo

12    ID.  They wanted a driver's license,

13    something that they could use in other

14    ways.  And they were scared that the

15    photo ID was going to end up getting them

16    in trouble.  So a driver's license became

17    even more important within the context of

18    this.  And so, that meant that it was

19    going to be so much harder to get -- get

20    driver's license and, therefore, it was

21    going to be so much more difficult to be

22    in a position to vote.

23  Q    Senator Sanders, do you recall if there

Page 148

1    were any protests around the ALEA

2    closures?

3  A    Yes.

4  Q    What kind of protests?

5  A    We -- we are -- we had a number of -- of

6    press conferences.  I wrote a number of

7    articles.  We had a -- a dramatization on

8    the steps of the capitol.  And as I

9    recall, it was called not -- not just --

10    "Give us the ballot, not just a bottle."

11    The reason it was called that is because

12    at the time they were closing driver's

13    license office, they kept open liquor

14    stores that was losing money and one

15    person stated in the administration

16    stated that it wasn't fair to have people

17    travel from -- have to travel to another

18    county to get a bottle.  And we were

19    highly disturbed because they'd have to

20    travel for a driver's license and a

21    driver's license was necessary to life

22    and for most people the bottle is not

23    necessary to life.  So they were putting

Page 149

1   the bottle over the -- over the -- over
2   the driver's license, which could be used
3   for the voting.  So we had the theme:
4   "Give us the ballot, not just the
5   bottle."
6         MS. MESSICK:  Object to
7         the --
8   A   We also --
9   Q   Go ahead.
10         MS. MESSICK:  I'm sorry.
11         I thought you were done.  I'll
12         object when you're done.
13   A   So also -- we had a caravan that started
14   over in Bullock County and then traveled
15   to Macon County and then to Montgomery.
16   Each place we would stop with local
17   people and have an event.  The Montgomery
18   County then to Lowndes County to Butler
19   County to Wilcox County and that was one
20   day.  And then the next day we started in
21   Pickens County, Sumter County, Green
22   County, Hale County, Perry County, and
23   into Dallas County at the bridge.

Page 150

1         MS. MESSICK:  Object to
2         the form of the answer.
3   Q   Senator Sanders, you mentioned that
4   you've written articles.  I'm going to
5   hand you Plaintiff's Exhibit 8, which is
6   an article, again, from Westlaw, an
7   opinion article.
8         (Plaintiff's Exhibit 8 was
9         marked for
10         identification.)
11   Q   I'll give you a moment to review.
12         (At which time, the
13         witness reviews the
14         exhibit.)
15   A   Okay.
16   Q   Senator, do you recognize this document,
17   not this exact document but the text of
18   it?
19   A   Yes, I do.
20   Q   What is it?
21   A   It was -- I did a senate sketches and it
22   was turned into an opinion, editorial
23   opinion.

Page 151

1   Q   And does that accurately reflect your
2   views at the time of the ALEA office
3   closures?
4   A   Yes.
5   Q   Okay.  So -- and talking about protests,
6   do you recall if there were other
7   organizations that joined you in
8   protesting the ALEA closures?
9   A   Yes.  It was a number of organizations,
10   but SOS and organizations that's involved
11   in SOS.
12   Q   Do you recall if the Alabama NAACP
13   participated?
14   A   Yes.
15   Q   Okay.  Do you recall if Greater
16   Birmingham Ministries participated?
17   A   Yes.
18   Q   Okay.  Senator, did the governor of
19   Alabama, Robert Bentley, respond at all
20   to these protests at the time.
21   A   First, I remember something being said
22   but I don't remember what he said.  I
23   remember eventually they said in those

Page 152

1   counties that they would make driver's
2   license available, they would open the
3   office once a month.  That was the
4   eventual response.
5   Q   And do you believe that that was -- that
6   adequately addressed the concerns that
7   you raised?
8   A   Absolutely not.
9   Q   Why not?
10   A   First, when an office this critical is
11   open once a month, you may have to wait
12   30 days and if for some reason you can't
13   get off from work or you can't get there
14   because of transportation or something
15   else, then you end up waiting another 30
16   days.  That's 60 days.  Driver's license
17   are critical, not just for voting, but
18   they're -- they're critical for -- to be
19   able to get on an airplane.  They're
20   critical to be able to handle various
21   kinds of commercial transactions.
22   They're critical for identification.
23   They're critical for driving.  They're

Page 153

1   critical in so many ways and something
2   that critical to have a situation where
3   you can -- where -- where it's just open
4   one day a week and something not as
5   critical, like liquor, they make sure
6   it's open six days a week.  There's
7   something wrong with that picture.
8 Q   Senator, do you recall if the United
9   States Department of Transportation did
10   anything about these closures?
11 A   Yes.  When they sent a representative
12   down, I met with them and some other -- I
13   forget who was with me when we met with
14   them and eventually an agreement worked
15   out between ALEA and the Department of
16   Transportation where a number of these
17   were required to go back to the status
18   that they had prior to this closing on
19   October the 1st, 2015.
20 Q   Do you recall when that agreement was
21   entered into?
22 A   It's -- it's been -- certainly it's been
23   in the last 45 days, certainly within the

Page 154

1   last 60 days.  It may have been or less,
2   but somewhere between a month and two
3   months, I would say.
4 Q   Do you recall if that was before or after
5   the 2016 -- November 2016 presidential
6   election?
7 A   It was -- it was afterwards.  As I
8   recall, I learned about it the day after
9   Christmas, I think, the day after
10   Christmas because I remember saying that
11   this is the Christmas present I didn't
12   already have.
13 Q   Senator, in light of the agreement
14   between ALEA and the U.S. department
15   of -- well, strike that.  Let me go --
16        Senator, did you introduce any
17   legislation to address the DMV closings?
18 A   Yes.  I introduced a bill to require that
19   the offices be open at least two days a
20   week in every county in Alabama.
21 Q   And do you recall -- did that bill --
22   when did you introduce that bill?
23 A   It was in the regular session of 2016.

Page 155

1 Q   And did that bill pass?
2 A   Yes.  It passed the Senate and then it
3   passed the House and went to the
4   governor, and the governor did what we
5   call a pocket veto.  He just let it lay
6   there and didn't sign it and after a
7   certain number of days, it's
8   automatically vetoed.
9 Q   Do you know why the governor pocket
10   vetoed the bill?
11        MS. MESSICK:  Object to
12        the form of the question.
13 A   One of -- I was interacting with one of
14   the governor's representative -- the
15   Senate representative.  I can't pull his
16   name up right now.  I told him -- there
17   was a concern -- when the bill was going
18   through, we offered a compromise.  We
19   reached a compromise that it would be one
20   day instead of two days, one day a week
21   instead of two days.  But the bill didn't
22   come up in the House for consideration
23   until it was the last moment.  There was

Page 156

1   no time to -- to -- to -- to amend it.
2        It passed the Senate with two days
3   and in the House we were willing to cut
4   it down to one day.  And so -- and I
5   talked with him -- I told him that we
6   would work with them in the next session
7   of the legislature to reduce it to --
8   from two days to one day, but that didn't
9   matter.  They vetoed it anyway.
10 Q   Okay.  The bill that you pass -- that
11   passed the legislature, did Republicans
12   vote for it?
13 A   Yes.  Republicans voted for it,
14   Democrats.  I think -- I don't remember
15   the exact vote, but I remember only three
16   people voted against it in the Senate.
17   It might have been 26 to 3 or
18   20-something to 3.  And in the House,
19   very few voted against it.  So
20   Republicans as well as Democratic voted
21   against [sic] it but he vetoed it anyway.
22 Q   Republicans voted for the bill; is that
23   right?

Page 157

1  A   Yes.

2  Q   Okay.  Did the governor ever offer you

3  any explanation why he vetoed the bill

4  other than wanting your offer maybe to go

5  down to one day instead of two days a

6  week?

7  A   No, I've never had a discussion directly

8  with the governor about it.

9  Q   Anyone from his office call to say why he

10  was pocket vetoing the bill?

11  A   Well, his Senate representative called

12  and told me that they had a -- I don't

13  remember whether he said -- he said

14  several hours of debate about it and they

15  decided to go ahead and do it.  I

16  don't -- I don't remember precisely what

17  he said about it.  I -- I just remember

18  being terribly disappointed.

19  Q   Why were you disappointed, Senator?

20  A   Well, I was disappointed on three levels.

21  First, I was disappointed for people in

22  general, how much more difficult it was

23  for them to be able to get a driver's

Page 158

1  license.  I just thought that that was a

2  terrible disservice and while they stated

3  that it was budgetary, I did not think it

4  was budgetary because that first analysis

5  said it was a -- they -- they would lose

6  a hundred thousand dollars.  Later they

7  came back with -- months later with some

8  more kind of analysis.  So I didn't think

9  it was budgetary in the first place.

10        Second, I thought it was going to

11  have a disproportionate impact on

12  African-Americans in general.

13        And, third, I thought it was going

14  to have a disproportionate on counties I

15  used to represent and still has a lot of

16  ties to.  So when you put the counties

17  that I currently represent and counties

18  that I used to represent out of that 11

19  counties, you know, more than half were

20  counties either I represented or used to

21  represent and still had a lot of ties to.

22  Q   Did you convey those concerns to the

23  governor's office before he vetoed the

Page 159

1  bill?

2  A   I didn't convey to the governor's office

3  about the particular concern about the

4  district.  I did convey the problems

5  about the impact it was having on the

6  citizens and the impact it would have on

7  African-Americans in a disproportionate

8  way.  I even used the concept that I used

9  in this article about how when certain

10  parts of the community get a cold, other

11  parts get pneumonia.

12        So it's important to understand the

13  impact of this.  For some people, it may

14  have a little impact.  You know, if

15  you -- if you got decent resources and go

16  into another county and you have

17  flexibility on your work schedule and you

18  have the money to get the gas to drive

19  your own car then the impact is minimal.

20  But on the other hand, if you don't have

21  any money in the first place, you don't

22  have a car, you don't have anybody to be

23  able to take your to the next one, then

Page 160

1  that becomes prohibitive, so you end up

2  with pneumonia in that case where

3  somebody else it's an inconvenience like

4  a cold.  So...

5  Q   Thank you, Senator.

6        Going back, you mentioned that ALEA

7  settled the issue with the United States

8  Department of Transportation and agreed

9  to reopen the -- several of the ALEA

10  offices in the black belt; is that

11  correct?

12        MS. MESSICK:  Object to

13        the form.

14  A   Yes.  They -- they agreed to -- to return

15  them to -- for whatever number of days

16  and hours they had prior to the -- the

17  closing of the offices on December the

18  15th and that varied.  Now, one county

19  was not a black belt county.  It's Bibb

20  County.  Some people may throw Bibb

21  County in, but I have never considered

22  Bibb County as a black belt county.

23  Q   Okay.  Does Bibb County have a large

Page 161

1    African-American population?
2  A   No.
3  Q   Is it close to the black belt?
4  A   Well, it joins Hale County and joins
5    Perry County.
6  Q   So it's nearby counties that you would
7    consider the black belt; is that correct?
8  A   It adjoins, yeah.
9  Q   All right.  Senator, did this settlement
10    require any action by the state
11    legislature as far as you know?
12  A   No.
13  Q   No, it did not require action by the
14    state legislature?
15  A   No, it did not require action by the
16    state legislature to my knowledge.
17  Q   Okay.  Did it require appropriation of
18    new funds by the state legislature for
19    ALEA?
20  A   I don't recall it requiring -- I don't
21    know.
22  Q   Okay.  Given that, do you believe it was
23    within the govern's power to reopen these

Page 162

1    ALEA offices prior to the settlement
2    agreement?
3  A   There's no doubt in my mind that the
4    governor could have -- could have
5    reopened those offices within the
6    budgetary constraints of the state.
7    He -- he -- he was -- yes, he could have
8    reopened them.
9  Q   And why do you think the governor waited
10    until there was an agreement with the
11    U.S. Department of Transportation before
12    reopening the offices?
13          MR. NEIMAN:  Object to the
14      form.
15          MS. MESSICK:  Object to
16      the form of the question.
17  A   I don't know why the governor waited, but
18    I -- I was always concerned that this
19    wasn't about budgets; this was about
20    politics.
21  Q   And what do you mean by that?
22  A   That there were political reasons for
23    this and not financial reasons.

Page 163

1  Q   Do you have any sense of what those
2    political reasons might have been?
3          MR. NEIMAN:  Object to the
4      form.
5  A   I --
6          MS. MESSICK:  Object to
7      the form.
8  A   I certainly thought that one of them had
9    to do with the ongoing efforts to
10    suppress the black belt.
11  Q   Take a short break.
12          VIDEOGRAPHER:  This ends
13      disk three.  Going off the
14      record at 2:43.
15          (At which time, a break
16      was held.)
17          VIDEOGRAPHER:  Going back
18      on the record at 3 o'clock.
19  BY MR. ROSS:
20  Q   Senator, I just have a few more
21    questions.
22      I'm sorry.
23  A   No.  I'm fine.

Page 164

1  Q   Sorry.  Didn't realize you weren't ready.
2    The bill to reopen the ALEA offices for
3    at least two days a week, was that Senate
4    Bill 172?  Does that sound correct?
5  A   I don't remember numbers well on that,
6    but I think it's 172.
7  Q   Okay.
8  A   Senate Bill 172.
9  Q   Okay.  Senator, can you think of other
10    instances in which the governor has
11    failed to respond to the concerns of
12    African-Americans in the last four or
13    five years?
14          MS. MESSICK:  Object to
15      the form of the question.
16  Q   Let me give you an example, Senator.  Was
17    there an opportunity to expand Medicaid
18    in Alabama.
19          MR. NEIMAN:  Objection to
20      from.
21          MS. MESSICK:  Object to
22      the form of the question.
23  A   Yes.

Page 165

1  Q    And do you know whether or not the
2      governor supported that expansion?
3            MS. MESSICK:  Object to
4            the form.
5  A    No.  I know that he did not support it.
6  Q    Do you know why he did not support the
7      Medicaid expansion?
8            MR. NEIMAN:  Objection to
9            form.
10           MS. MESSICK:  Object to
11           the form.
12  A    I met with him on several occasions
13      concerning Medicaid and he always
14      expressed concern about people's health,
15      but he never did anything about it.  So
16      we explained to him that up to 700 people
17      in Alabama per year died for lack of
18      Medicaid expansion and we talked to him
19      about all of those people who may not
20      have died but whose illness was worse
21      than it ought to be.
22           At one point I think it was 11 or 12
23      of us that met.  At other times it was a

Page 166

1      smaller number.  I even wrote him a
2      public letter and wrote him a private
3      letter concerning all of this, but we
4      could never move him.
5  Q    And when you mentioned the groups who met
6      with him, did that include groups that
7      were representative of African-Americans?
8  A    Yes.  SOS met with them and that
9      certainly was representative of
10      African-Americans although there were
11      other groups that were in there that were
12      in addition to African-Americans.
13  Q    Do you recall if the issue was raised
14      that African-Americans may
15      disproportionately benefit from a
16      Medicaid expansion?
17  A    Well, I -- I recall that we tried to
18      assure him that that there were -- that
19      there were plenty of white people who
20      were not getting the service and should
21      get them and this ought not to be about
22      African-Americans.
23           MS. MESSICK:  Object to

Page 167

1            the form of the answer.
2  Q    Senator, do you recall -- when I refer
3      to -- when I say "confederate flag," do
4      you know what the confederate flag is?
5  A    Yes.
6  Q    What is it?
7  A    The confederate flag -- there are several
8      different confederate flags and one of
9      them is the flag of the Confederate
10      States of America.  That happened during
11      the -- the war -- the Civil War and
12      another one is the battle flag and the
13      battle flag also was the symbol and used
14      quite often by the Ku Klux Klan and other
15      groups that were oppressive of
16      African-Americans.  And so the
17      confederate flag, that's the flag, as I
18      recall, that's often used rather than the
19      flag of the Confederate States of
20      America.
21  Q    The battle flag?
22  A    Yeah.
23  Q    And do you recall if the battle flag --

Page 168

1      the confederate battle flag was ever
2      flown over the State Capitol of Alabama?
3  A    Yes.
4  Q    When was it flown over the state capitol?
5  A    Well, as best I can recall, the
6      confederate flag started being flown in
7      general in the South when the issue of
8      civil rights and human rights were --
9      became very active.  And I can't recall
10      exactly when it was put up, but I was one
11      of those who were arrested in an effort
12      to take it down.
13           I was arrested and Representative
14      Albert Holmes and Senator Michael Wiggins
15      was living at that time and there was a
16      tremendous effort to try to take it down.
17      And -- and eventually there was a lawsuit
18      to -- to have it removed.
19  Q    Was that lawsuit successful?
20  A    Yes.  As I recall, there was a ruling by
21      a state judge and -- and it wasn't
22      appealed.  I think Governor Folsom was in
23      office at the time.  He had filled out

Page 169

1    the term for a previous governor.
2  Q   Do you recall if the flag was still flown
3    on the grounds of the state capitol after
4    that?
5  A   Yes.
6  Q   Okay.  Was it -- has it since been
7    removed?
8  A   Yes, it -- it was removed as I -- as I
9    recall either in 2015 or 2016.  I think
10   2015.  It may have been removed in 2015,
11   I think.
12 Q   Senator, I'm going to hand you a news
13   article from the "Alabama Political
14   Reporter" from January 26, 2017.
15            (Plaintiff's Exhibit P9
16            was marked for
17            identification.)
18 Q   Sorry.  I misspoke when I said what date
19   the article was.
20            MR. ROSS:  Do you want to
21       go off the record for a second?
22            MS. MESSICK:  Yeah.  Can
23       we go off the record a second?

Page 170

1            VIDEOGRAPHER:  Going off
2       the record at 3:10.
3            (At which time, a break
4            was held.)
5            VIDEOGRAPHER:  Back on the
6       record at 3:12.
7  BY MR. ROSS:
8  Q   Senator, I misspoke earlier when I said
9    that this article was from today's date.
10   It appears that it was from around
11   March 2016.  Did this refresh your
12   recollection about why the confederate
13   flag was removed from state capitol
14   grounds?
15 A   No, because I don't think that this bill
16   had anything to do with it being removed
17   from the capitol grounds.  This -- this
18   bill was in the legislative session of
19   2016, so that would have been March the
20   3rd of 2016 when it passed the Senate.
21   As I recall, the bill didn't pass the
22   House.  It simply passed the Senate.
23            There were -- when the governor

Page 171

1    removed the flag, there was a call to
2    remove other symbols from the capitol and
3    I -- I think that the call to remove the
4    additional symbols is what inspired this
5    bill even though it talked about
6    preserving civil rights and confederate,
7    it really was about confederate symbols,
8    not about civil rights symbols.
9  Q   Okay.  Senator, can you just look at the
10   last full paragraph of this article.  I
11   think it's the third page of the document
12   that I handed you at the very bottom.  Do
13   you see that?
14 A   Yes.
15 Q   Just briefly review that paragraph.
16 A   Yes.
17            (At which time, the
18            witness reviews the
19            exhibit.)
20 A   I've looked at it.
21 Q   Does that refresh your recollection of
22   why Governor Bentley removed the
23   confederate flag from the state capitol

Page 172

1    grounds?
2  A   Not really, because my recollection --
3    all of this happened afterwards but my --
4    my recollection is that -- that -- that
5    Google was about to open a plant up in --
6    up North Alabama at the time.  I think it
7    was Google.  And that the removal of the
8    confederate flag from the grounds had
9    more to do with Google than it did with
10   what was happening in South Carolina or
11   any of these other things.
12 Q   Okay.  And is it -- the bill that you
13   were sort of mentioning earlier and that
14   was talked about in this article, Senate
15   Bill 13, you were describing -- it was
16   called the Alabama Heritage Preservation
17   Act?
18 A   Yes.
19 Q   Do you recall who sponsored that act?
20 A   I thought it was Gerry Allen, Senator
21   Gerry Allen, I thought.
22 Q   Do you recall what the purpose of that
23   bill was?  I believe you've already sort

Page 173

1   of testified to it, but it was to protect
2   confederate monuments; is that right?
3   A   Yes.  That -- that certainly was my
4   understanding.
5   Q   Okay.  I have one final question for you,
6   Senator.  Do you recall who the lead
7   sponsor for the photo ID bill was in
8   2011 --
9   A   No.
10  Q   For the Senate?  Okay.  Do you --
11  Senator, did you support this Senate Bill
12  13 from 2016 about the Alabama Heritage
13  Preservation Act?  Did you support --
14  A   I was opposed to it.
15  Q   Okay.  And do you recall any efforts by
16  the Alabama legislative black caucus to
17  stop the bill from being passed?
18  A   I know that if I recall correctly that in
19  the Senate we were prepared to filibuster
20  it, but I think that they -- if I
21  remember correctly, they did one of those
22  speedy cloture petitions, so we didn't
23  get a chance to -- to debate it.  But the

Page 174

1   House -- the House black caucus took some
2   strong steps, I recall, to keep it from
3   passing the House.
4   Q   Okay.  So is it your understanding that
5   the bill did not pass out of the House?
6   A   That's my understanding, yeah.
7   Q   But it did pass out of the Senate; is
8   that correct?
9   A   Yes.
10  Q   Senator, have you ever introduced any
11  legislation designed to make it easier
12  for people to vote, just as an example,
13  same-day registration?
14  A   Yes.  I -- I -- I'm trying to pull it up.
15  I -- I recall introducing the bill, I
16  believe, that once somebody's term has
17  been served, then the right to vote would
18  be restored.  I recall -- I -- I believe
19  I introduced the same-day -- same-day
20  registration and voting bill.  I think I
21  introduced -- I think I reduced --
22  introduced some other bills, but I can't
23  pull them up at the moment.

Page 175

1   Q   The two bills that you were able to
2   mention for restoration of the right for
3   people with felony convictions and
4   same-day registration for voting, do you
5   recall if either of those bills passed
6   the legislature?
7   A   I recall that neither passed the
8   legislature, neither got out of
9   committees as I recall.
10         MR. ROSS:  All right.
11         I'll reserve my time, but turn
12         it over to the defendants for
13         now.
14         EXAMINATION
15  BY MS. MESSICK:
16  Q   Good afternoon, Senator Sanders.
17  A   Good afternoon to you.
18  Q   We've been going a long time and we've
19  been going for a long time without
20  breaks.  Just let me know if you need a
21  break and I'll be happy to stop as long
22  as there's not a question on the table.
23  A   Sure.

Page 176

1   Q   I wanted to start with some background.
2   You testified earlier that you have been
3   practicing law for around four decades, I
4   believe, has that all been here where we
5   are today?
6   A   No.  You mean in this building?
7   Q   I mean in this firm.
8   A   Yes.  Well, no.  When I graduated from
9   law school in 1970, I spent a year -- me
10  and my wife spent a year in Africa and
11  when we came back, we went to Huntsville
12  and we were -- we had fellowships and we
13  had Reginald -- Reginald Heber Smith
14  fellowship and we got attached to the
15  Madison County Legal Aid Society.  I
16  wasn't there very long before I came onto
17  Selma.
18  Q   And when you came here you and your wife
19  founded this firm with J.L. Chestnut?
20  A   Well, I came in the fall of 1971 and I
21  opened the firm January the 10th, 1972.
22  My wife stayed on in Huntsville until she
23  passed the bar and she took it in

Page 177

1  February.  I think she got her results in
2  April.  So about May the 1st, she came
3  down and a we together and then in July,
4  J.L. Chestnut joined us.
5  Q   And you went to Harvard Law School?
6  A   Yes.
7  Q   Mr. Ross has asked you several times
8  today about what a law means.  You agree,
9  don't you, that the law speaks for itself
10  and a court of law will decide what it
11  means, what it does?
12  A   I'm not sure that I agree that the law
13  speak for itself.  In my years of
14  practice, I have seen all kinds of
15  interpretations of the same law.  I've
16  seen lawyers argue about what the law
17  means.  I've seen judges argue about what
18  the law means.  So if it speaks for
19  itself, it speaks with many tongues.
20  Q   Would you agree that when you testify
21  about what a law means that that is
22  something that the court will ultimately
23  determine?

Page 178

1         MR. ROSS:  Objection.
2         Form.  Speculation.
3  A   I -- I -- I think that a court may
4  ultimately determine.
5  Q   You testified that you were a defense
6  attorney for the Marion 3.  Have you ever
7  handled any -- have you ever been
8  involved in criminal cases as a
9  prosecutor?
10  A   No, not that I recall.
11  Q   Have you ever handled any voting rights
12  cases other than the defense in the
13  Marion 3 case?
14  A   Voting rights cases, yes.
15  Q   Can you please tell me about that.
16  A   I -- I filed a redistricting case in
17  Monroe County so the county commission
18  would be run from districts instead of at
19  large.  I was part of a case that was
20  filed in Dallas County and -- let me try
21  to pull them up.  And I'm sure I've been
22  involved in some more.  I just can't pull
23  them up right at the moment.  That's what

Page 179

1  happens to you when you get in your 74th
2  year.
3  Q   Do you ever recall handling an election
4  contest?
5  A   Yes.
6  Q   Can you tell me about that -- well, how
7  many were there that you can recall at
8  this time?
9  A   I've been involved in multiple election
10  contests.  But it's hard to pull up
11  exactly which ones, but I know that I've
12  been involved in multiple election
13  contests.
14  Q   Did any of those cases involve
15  allegations of irregularities in the
16  election?
17  A   I can't recall right off, but I would --
18  I would assume that the -- there would
19  have been allegations of.  The statue
20  requires -- the statue, as I recall, says
21  that you must state that either there was
22  somebody received votes they shouldn't
23  have received or something to that effect

Page 180

1  or there was some irregularities of some
2  sort.  So I'm sure that that would have
3  been alleged in the election contest
4  because I -- I think I -- I think I've
5  been on both sides.
6  Q   That was my next question.  You've been
7  on both sides of those cases?
8  A   I think I've been on both sides of those
9  issues.
10  Q   Have you ever sued the state or a state
11  official before?  I guess I should
12  clarify that and say, as a plaintiff and
13  not as counsel?
14  A   I don't recall.  I know I've sued
15  counties and cities, but I can't recall
16  offhand of suing the state.  But if you
17  could refresh my memory, I will be glad.
18  Q   Actually, I'd like to move on and clarify
19  something.  The members of the Alabama
20  House and Alabama Senate are elected to
21  four-year terms; correct?
22  A   Yes.
23  Q   But they are not in session for the

Page 181

1  entire four years; correct?

2  A   They're not in session for the entire

3  four years.  Generally a session lasts a

4  hundred and -- I believe 105 days, 110

5  days, whatever.  And you meet within 30

6  days within that period of time and then

7  there are some special sessions that you

8  have from time to time.

9  Q   Thank you.

10      How would you describe the current

11  state of the Democratic party in Alabama?

12  A   I -- I would describe it as anemic

13  because nearly all of the whites have

14  left the Democratic party and gone to the

15  Republican party and the Republican party

16  is nearly all white.  So I would say the

17  majority of the Democratic party is now

18  African-American.

19  Q   Who is currently running the Democratic

20  party in Alabama?

21  A   Nancy Worley is the chair.

22  Q   And who is ostensibly second in command?

23  A   I don't know about second in command, but

Page 182

1  I know that Dr. Joe Reed has considerable

2  influence in the Democratic party.

3  Q   Do you know Senator Vivian Figures?

4  A   Yes, I know Senator Vivian Figures very

5  well.

6  Q   Are you aware Senator Figures publically

7  accused Dr. Reed of preventing whites

8  from having certain leadership positions

9  within the Alabama Democratic party?

10  A   No, I'm not aware of that.  I do recall

11  that at one recent session of the

12  Democratic party there was an attempt to

13  fill some position.  Some was filled and

14  there were others that was not filled and

15  I recall that she had some strong

16  objections and some choice words for

17  perhaps Dr. Reed, but I don't remember

18  that specifically.  I wasn't there.  I

19  just heard about it.

20  Q   Have there been public calls for a change

21  in leadership of the Alabama Democratic

22  party?

23  A   Well, I'm sure, yes.  Yeah.

Page 183

1  Q   Including by Craig Ford, who's in the

2  Alabama House, I believe?

3  A   Yes.  I -- I did read -- if I didn't read

4  it, someone told me that Craig Ford had

5  made some -- made -- made such a call.

6  Q   How many full-time staffers are there for

7  the Alabama Democratic party?

8  A   I have no idea.

9  Q   What was Justice Mark Kennedy's Alabama

10  Democratic Majority?

11  A   The -- Justice Mark Kennedy was the chair

12  of the Democratic party and then he left

13  and formed another organization.

14  Q   And that was the Alabama Democratic

15  Majority?

16  A   I don't remember the exact name, but I

17  know he formed another organization.

18  Q   Can you tell me what Empower Alabama is?

19  A   No.

20  Q   Did the Democratic party run a full slate

21  of candidates for the constitutional

22  offices on the Alabama ballot in 2014?

23  A   I don't think so.

Page 184

1  Q   Do you remember who the Democratic

2  candidate for governor was in 2014?

3  A   Yes.

4  Q   Was it Parker Griffith?

5  A   Yes.

6  Q   Was Parker Griffith a Democrat who became

7  a Republican who became a Democrat?

8  A   He was a Democrat and he -- he did become

9  a Republican and became a Democrat again,

10  yes.

11  Q   The 2014 election, was Governor Bentley

12  running for reelection that year?

13  A   Yes.

14  Q   Was Lieutenant Governor Kay Ivey running

15  for reelection that year?

16  A   Yes.

17  Q   Was Attorney General Luther Strange

18  running for reelection that year?

19  A   Yes.

20  Q   Was Treasurer Young Boozer running for

21  reelection that year?

22  A   I don't know if it was reelection, but he

23  was running.

Page 185

1 Q   And was the agriculture commissioner

2 running for reelection that year?

3 A   I know he was running.

4 Q   Did the Democratic party run a strong and

5 large contention of candidates for county

6 and local offices across the state in

7 2014?

8          MR. ROSS:  Objection to

9          form.

10 A   I don't know about across the state.

11 I -- I know that the Democratic party ran

12 strong contingents local and state in

13 2010.  But 2014 I -- I believe that there

14 were -- the circumstances had changed so

15 that a lot of people did not run in

16 various places from the local level and

17 some places in district level and some

18 places on the state level.

19 Q   In 2016, the election cycle we just had,

20 isn't it true that Kelli Wise and Tom

21 Parker both ran for reelection to the

22 Alabama Supreme Court without Democratic

23 opposition?

Page 186

1 A   I believe that's so.

2 Q   In your judgment, did Hillary Clinton

3 have more than a 20 percent chance of

4 carrying Alabama in the 2016 general

5 election for president?

6          MR. ROSS:  Objection.

7          Speculation.  Form.

8 A   Well, I certainly expected Candidate

9 Trump to carry Alabama, so the

10 expectation was certainly less than

11 50 percent.  I wouldn't say that it was

12 less than 20 percent.

13 Q   Is George Wallace dead?

14 A   Yes.

15 Q   You spoke with Mr. Ross --

16 A   George Wallace -- George Corley Wallace?

17 Q   Yes, the governor.

18 A   Senior or junior.  The old one is dead.

19 Q   Yes.

20 A   The young one might have died too.

21 Q   I think we've still got him.

22 A   Okay.  Okay.  I know -- I know the one

23 who became governor is dead, yeah.

Page 187

1 Q   You spoke with Mr. Ross earlier about

2 what former Governor Wallace's views were

3 at one point in time.  Isn't it true that

4 Governor Wallace changed his views before

5 his death about race relations, about

6 race?

7 A   I believe that Governor Wallace announced

8 different views to -- when he was running

9 again, I think it was in 1982.  I -- I

10 recall that he made some different

11 announcements about what his views were.

12 I don't know whether he changed his view,

13 but I know he announced something

14 differently.  He was trying to get the

15 black vote in that election.

16 Q   I believe you testified earlier that you

17 were not aware of whites in Alabama ever

18 electing a black man.  Isn't it true that

19 the white voters of Cullman County

20 elected James Fields to the Alabama

21 legislature?

22 A   No.  I thought I was talking about

23 currently that there's not one.

Page 188

1 Q   Okay.

2 A   But they -- they did elect James Fields

3 up in cull -- Cullman County back in 2006

4 and I think he was defeated in 2010, but

5 yeah.

6 Q   You also mentioned that black voters had

7 elected a white person to the Alabama

8 legislature.  Were you referring to

9 Patricia Todd?

10 A   I'm sorry?

11 Q   You previously mentioned in your

12 testimony that black voters had elected a

13 white person to the Alabama legislature?

14 A   Yeah.

15 Q   Were you referring to Patricia Todd?

16 A   Patricia Todd is one.  But also Senator

17 Beasley.  That's a majority black

18 district and he's been elected and

19 reelected.

20 Q   Okay.  With Representative Todd, what was

21 the public reaction of black leaders to

22 her election?

23 A   The public reaction?  I think --

Page 189

1  Q    The public reaction of black leaders --
2  A    I think --
3  Q    -- I don't want you to get inside their
4        heads but I want you to tell me what you
5        heard them say.
6  A    Most black leaders were fine with that.
7        I heard one black leader may have
8        publicly opposed it, but most black
9        leaders did not oppose it.
10 Q    Was that one black leader Dr. Joe Reed?
11 A    That's -- I didn't hear Dr. Reed say it
12       but I heard people said that he had taken
13       a strong position.  I -- I think it was a
14       contest, an election contest that was
15       involved in that and -- and I think he --
16       he was for one candidate and some others
17       in the Democratic party was for another
18       candidate.
19 Q    Do you remember who Dr. Reed and his
20       organization endorsed for president in
21       the 2008 primary?
22 A    Yes.  In the 2008 primary, the ADC
23       endorsed Hillary Clinton.

Page 190

1  Q    And is it true that Dr. Joe Reed and the
2        ADC endorsed Hillary Clinton for
3        president in 2008 against Barack Obama
4        because they believed that America was
5        not ready for a black president?
6  A    I don't think that that's --
7              MR. ROSS:  Objection.
8        Form.  Speculation.
9  A    I don't think that that's why they
10       endorsed Senator Hillary Clinton.  I
11       think at that point, one, that Hillary
12       Clinton had developed some strong
13       relationship with Dr. Reed and others and
14       had developed a strong relationship
15       with -- with NEA and AEA and I think that
16       that had a lot to do with ADC en --
17       endorsing Hillary Clinton.
18       Alabama New South with which I'm
19       associated with endorsed President Obama.
20       I do think -- there's one element there
21       that I do think that early on there were
22       some serious doubts about whether
23       President Obama could win the Democratic

Page 191

1        primary and, therefore, have a shot at
2        being president.
3  Q    Did Barack Obama and Hillary Clinton both
4        compete heavily for the -- for a win in
5        Alabama in the 2008 primary?
6  A    I -- I don't think that they competed
7        heavily because as I recall, I -- I don't
8        recall either one of them competing
9        heavily.  When -- when Alabama New South
10       did its endorsement, I don't think either
11       one of them showed up.  I -- I think when
12       ADC did its endorsement, I don't think
13       that either one of them showed up.  And I
14       don't think their appearances in Alabama
15       were substantially limited, but --
16 Q    Do you --
17 A    I think some -- I think some of us worked
18       hard for a president -- I mean Senator
19       Obama and I think some others worked hard
20       for Senator Clinton.
21 Q    Do you remember then Senator Obama having
22       a campaign office in Montgomery for the
23       primary?

Page 192

1  A    I don't recall a campaign office in
2        Montgomery.
3  Q    Do you remember former president Bill
4        Clinton coming to campaign on behalf of
5        his wife in advance of the primary over
6        at Fairfield College?
7  A    I think so, I don't remember that clearly
8        but I think he may have come.
9  Q    Do you remember --
10 A    I remember there was efforts -- there was
11       a lot of efforts to try to get Hillary
12       Clinton to come to Alabama and a lot of
13       efforts to try to get President Obama to
14       come to Alabama and I remember most of
15       those were fruitless.
16 Q    Was it your perception that following the
17       primaries neither Senator Obama nor
18       Candidate Clinton continued to compete in
19       Alabama in advance of the general
20       election?
21 A    I -- that's -- it's -- it's my perception
22       that -- that they did not consider
23       Alabama a contested state and therefore

Page 193

1    did not put time, effort, and resources
2    into Alabama.
3  Q    Senator, do you have a driver's license?
4  A    Yes.
5  Q    Is it a STAR ID?
6  A    No.  I don't think so.  You can -- you
7    can check it but I don't think it's a
8    STAR ID.  I think when they were doing
9    the STAR IDs I had some -- some emergency
10    and it wasn't there and -- a STAR ID
11    ought to have a star on it; right?
12  Q    That's right.
13  A    Mine has a little heart on it.  I see a
14    little heart down in the right-hand
15    corner.
16  Q    I think that makes you an organ donor?
17  A    Oh, okay.
18  Q    There's a sample of my colleague's with a
19    star in the corner?
20  A    No, I don't qualify.
21  Q    Do you know what the STAR ID is?
22  A    I think it has to do something with --
23    with some kind of limited security

Page 194

1    clearance.  That's what I assume but I
2    don't -- I don't -- to be honest, I
3    really don't know.  I know that they set
4    up an opportunity for legislators to do
5    it and I know I couldn't make it.
6  Q    When you say you couldn't make it, you
7    meant for a special opportunity for
8    legislators?
9  A    Yes.  They were doing something in the
10    capitol.  They had something set up in --
11    well, the Alabama Statehouse.
12  Q    Are you familiar with the Real ID Act?
13  A    No.
14  Q    Other than driving, what do you use your
15    driver's license for?
16  A    I use it each time I get on the plane.  I
17    use it when I go to vote.  I use it when
18    I'm in various commercial transactions.
19  Q    I'm --
20  A    Various commercial transactions.
21  Q    So to make certain purchases or certain
22    returns?
23  A    Yeah.

Page 195

1  Q    Do you use it to get in courthouses?
2  A    I have -- I use it to get into the
3    federal courthouse.  Generally most of
4    the state courthouses I go into they know
5    me and they wave me on through, but I
6    know I've had to use it in the federal
7    courthouse.
8  Q    Did you attend the Democratic National
9    Convention last year?
10  A    Yes.
11  Q    Were you required to show a photo ID to
12    get in there?
13  A    Yes.  Well, I was required to -- no.  I
14    was -- well, I was required to show a
15    badge.  We had badges and if you had your
16    badge on, they let you on in.
17  Q    Did -- how did you get your badge?
18  A    The state -- the leader of the state
19    delegation handed them out.
20  Q    Did the badge have a photo on it?
21  A    No.
22  Q    Did you have to show an ID to actually
23    vote at the convention?

Page 196

1  A    No.
2  Q    So if it was reported -- did a member of
3    the general public have to show a photo
4    ID to gets into the National Democratic
5    Convention?
6  A    I don't know that.  There was -- there
7    was a person with me who was not a
8    delegate and -- but we managed to get
9    badges for her and that's all they had to
10    show.
11  Q    I'd like to show you Defendant's Exhibit
12    1, which is a "Yellowhammer" article,
13    which represents that DNC delegates were
14    required to show photo ID in order to
15    vote.  Would you please review that
16    article for a moment.
17         (Defendant's Exhibit 1 was
18               marked for
19               identification.)
20  A    That didn't happen to me.
21  Q    Okay.
22  A    And didn't happen to any of the other
23    delegates I knew.  They would give the --

Page 197

1  whoever was your state or key -- key
2  person or chair of the delegation, they
3  would give the badges to them and they
4  would simply give them out.  This one --
5  I don't know what happened with others,
6  but there was no requirement to do that.
7  Q   Thank you.
8      Do you have other photo IDs that you
9  could use to vote besides your driver's
10 license?
11 A   No.  Well -- no, no, I don't.  I have a
12 Senate photo ID but it's not in the name
13 of Henry Sanders and they wouldn't let
14 me -- it's in the name of Hank Sanders
15 and I couldn't use that.
16 Q   How do you know you couldn't use that?
17 A   Because they told me.
18 Q   Who told you?
19 A   The voter registrars there.
20 Q   So is it your testimony that you are
21 registered to vote in the name Henry
22 Sanders?
23 A   Yes.

Page 198

1  Q   And your Senate ID card says Hank
2  Sanders?
3  A   That's right.  Said it's got to be in
4  Henry Sanders.
5  Q   And that was the board of registrars in
6  Dallas County that told you that?
7  A   Not the board of registrars, the election
8  officials.
9  Q   At the polls?
10 A   Yes.  Said you have to have to
11 identification in your birth name.
12 Q   Did you try to use your Senate ID to vote
13 and they refused to accept that ID?
14 A   No.  But I had a discussion with them
15 about it on one occasion.  I think I
16 accidentally -- I had them both in my
17 wallet and I accidentally pulled them
18 out.
19 Q   The Senate ID that you have, is that
20 same -- that same form of ID offered to
21 the Alabama Senate?
22 A   Yes.
23 Q   And do Alabama House members also have

Page 199

1  the opportunity to get an Alabama House
2  ID?
3  A   Yes.
4  Q   You made mention earlier of Senate
5  Sketches.  Is that a weekly article that
6  you write?
7  A   Yes.
8  Q   You've been doing that for 30 years?
9  A   1,546 straight weeks without a miss.
10 Q   And those Senate Sketches reflect your
11 views at the time that they're written?
12 A   Yes.
13 Q   You talked earlier with Mr. Ross about
14 the Marion Three case?
15 A   Yes.
16 Q   Were the alleged victims in that case
17 black?
18 A   Yes.
19 Q   Were -- I believe that you mentioned that
20 whites had complained and that that
21 prompted the prosecution.  Had any blacks
22 also complained?
23 A   No.  At that time, I didn't know of any

Page 200

1  blacks.  I have since in the last year or
2  two heard that somehow some blacks
3  have -- have complained but none of that
4  came up at that time.  I was -- I was
5  involved because they had complained to
6  me.  And so when local officials didn't
7  respond or state officials didn't
8  respond, we worked out for two of them to
9  go to Washington, DC, and they literally
10 met with the attorney general at that
11 time and I think that's Mr. Meese.
12 Q   You're saying that -- you're referring to
13 the time when black voters complained to
14 you about election fraud by whites --
15 A   Yes.
16 Q   -- and trying to get prosecution then?
17 A   Yes.
18 Q   Are you -- but did you also just say that
19 there were, in fact, blacks who testified
20 that they had been the victims of crimes
21 that were the subject of the Marion Three
22 trial?
23 A   I don't understand that question.

Page 201

1  Q    When the Marion Three were prosecuted,
2     were the sole -- are the -- were the
3     complaints that prompted the Marion Three
4     trial brought by whites and blacks?
5  A    I don't know of any blacks that brought.
6     What I said is that recently I -- I have
7     heard that somehow they said that there
8     was some blacks but at that time I know
9     it was whites who were complaining.
10 Q    Okay?
11 A    And -- but I also know that most of the
12    witnesses in that trial were black and I
13    know that they told the truth when they
14    were there to be cross-examined and the
15    jury -- their testimony was not the same
16    as it was in that attorney general's -- I
17    mean, in the -- in the grand jury because
18    we had copies of the grand jury
19    testimony.
20 Q    Was there enough evidence presented to go
21    to the jury?
22 A    There was -- most of the cases were
23    dismissed but that was by the judge.  I

Page 202

1     shouldn't say most.  Many of them were
2     dismissed by the judge but there was some
3     that went to the jury, yes.
4  Q    If there's a concern of voter fraud in
5     the black belt, aren't any many victims
6     of such fraud, if it's happening, likely
7     to be black?
8  A    There were some concerns in the black
9     belt.  In fact, there are concerns quite
10    a few places that are not in the black
11    belt but there are some concerns.  I have
12    registered some concern myself.  I --
13    I -- there was some things happening down
14    in Wilcox County and we complained to the
15    attorney general about them and I -- I
16    never heard of anything really coming of
17    that, but yes.
18 Q    I -- I believe your answer went to
19    whether concerns exist.  But if -- if
20    there were -- if there were to be
21    election fraud in the black belt,
22    wouldn't many of the victims of such a
23    fraud be black?

Page 203

1            MR. ROSS:  Objection.
2         Speculation.  Form.
3  A    If there were concerns in the black belt,
4     some of the victims certainly could be
5     black but some of the victims might also
6     be white.
7  Q    Okay.  You would agree, of course, that
8     it's not right for anyone to commit voter
9     fraud no matter what their color is?
10 A    I agree.
11           MR. ROSS:  Objection.
12        Speculation.  Form.
13 Q    Are you familiar with the prosecution of
14    Maggie Bozeman and Julia Wilder?
15 A    Yes.
16 Q    Are you aware that they were convicted of
17    absentee vote fraud?
18 A    Yes.
19           MR. ROSS:  Objection.
20        Speculation.  Form.
21 Q    Are you aware that Judge Hobbs granted
22    habeas relief to those defendants in
23    federal court based on closing arguments

Page 204

1     that have been made?
2  A    I don't remember details of it.  I just
3     remember that something was set aside.
4  Q    Are you aware after Judge Hobbs granted
5     habeas, the Alabama legislature made it
6     clear to the Attorney General's Office
7     that if the attorney general pursued an
8     appeal in that case then its funding
9     would be affected?
10 A    I never heard that before.
11 Q    Do you remember when Maggie Bozeman and
12    Julia Wilder were prosecuted?
13 A    It -- it -- I -- I think -- I think
14    either it was in the late '70s or the
15    early '80s.  I can't remember the exact
16    time.
17 Q    At that time, was the legislature led by
18    Democrats?
19 A    Yes.
20 Q    Are you aware that there have frequently
21    been allegations of various election
22    irregularities in Alabama?
23           MR. ROSS:  Objection.

Page 205

1   Speculation.  Form.
2  A   I -- I -- I am aware that there have been
3   allegations of election irregularities
4   but none that had to do with ID at the
5   polls.
6  Q   Can I refer you back to Plaintiff's
7   Exhibit 1.  I'd like to ask you to look
8   at the second page about halfway down.
9  A   The second page?
10  Q   Yes.
11  A   Halfway down?
12  Q   There's a paragraph there that begins:
13   The State Attorney General's Office and
14   federal investigators are looking into
15   allegations of absentee ballot fraud and
16   other voting irregularities.
17  A   Yes.
18  Q   Does that article report that there are
19   investigations at least in four Alabama
20   counties?
21  A   Yes, I see that.  I see that paragraph.
22  Q   Are you aware that there have been
23   convictions for election crimes in this

Page 206

1   state as recently as at least the 2013
2   elections?
3        MR. ROSS:  Objection.
4        Form.  Speculation.
5  A   No.  I don't know of any convictions in
6   the 2013 election.  I just know that --
7   that the -- that the allegations -- that
8   no legislation -- really to deal with the
9   real problems.  It is only to deal with
10   the photo ID which suppress the black
11   vote.
12  Q   I would ask you to please confine your
13   answers relative to my questions.
14  A   I think that went to your question.
15  Q   Well, I would disagree.
16  A   Okay.
17  Q   I'm going to hand you Defendant's Exhibit
18   2 and 3.
19        (Defendant's Exhibit 2 was
20        marked for
21        identification.)
22        (Defendant's Exhibit 3 was
23        marked for

Page 207

1        identification.)
2  Q   Defendant's Exhibit 2 is an article
3   entitled Appeals Court Upholds Dothan
4   Woman's Voter Fraud Conviction" and
5   Defendant's Exhibit 3 is "Alabama Woman
6   Found Guilty of 24 Counts of Felony Voter
7   Fraud."
8        Are you familiar with this case
9   involving the 2013 Dothan municipal
10   election?
11  A   No.
12  Q   Were you aware that one of the absentee
13   ballots cast in that case was cast by a
14   family member of an inmate using the
15   inmate's photo ID while the inmate was
16   incarcerated?
17  A   No.
18  Q   Were you aware that one of the absentee
19   ballots in that case was cast without the
20   voter's knowledge and that she testified
21   that she had only given her photo ID to
22   be used for voter registration purposes?
23  A   No.

Page 208

1  Q   I'm sorry.  Could you give that one to
2   him, please?  Thank you.
3        Let me give you now Defendant's
4   Exhibit 4.
5        (Defendant's Exhibit 4 was
6        marked for
7        identification.)
8  Q   I am going to give you Defendant's
9   Exhibit 4.  "Alabama Secretary of State:
10   Still no movement on voter fraud laws" is
11   the title of this article.
12        Do you see that in this article, the
13   secretary of state is expressing support
14   for a bill that would allow for the
15   removal of people who have won their
16   elections as a result of election fraud
17   as happened with the 2013 municipal
18   election in Dothan?
19  A   No, I'm not familiar with this.  This is
20   the first I've heard of that.
21  Q   I believe this article is actually dated,
22   yeah, two days ago?
23  A   No, I'm not familiar with it.

Page 209

1  Q   Do you see on the second page of the
2      exhibit where Amos Newsome defeated his
3      opponent by 14 votes after receiving 119
4      of the 124 absentee votes cast?
5  A   I see the paragraph that contains that,
6      yes.
7  Q   Okay.
8              MR. ROSS:  Objection.
9          Form.  Speculation.
10 Q   Of course, you see the next sentence that
11     says the trial found that 42 of the votes
12     had been fraudulently cast?
13             MR. ROSS:  Objection.
14         Form.  Speculation.
15 A   The next paragraph?
16 Q   The next sentence.
17 A   Yes, I see that.  This is the first time
18     I've seen that.
19 Q   Are you aware that one of the persons
20     convicted as a result of this election
21     was the long-time girlfriend of the
22     candidate Newsome?
23 A   No, not at all.

Page 210

1  Q   You testified here today that you're not
2      aware of any person -- voter fraud.  I'd
3      like to hand you Defendant's Exhibits 5
4      and 6 and ask you to take a look at them.
5              (Defendant's Exhibit 5 was
6                 marked for
7                 identification.)
8              (Defendant's Exhibit 6 was
9                 marked for
10                identification.)
11 Q   Five starts with an indictment of Shasta
12     Nicole Creighton, and 6 is a document
13     signed by the circuit judge relating to
14     the sentence of Ms. Creighton.  Do you
15     see on -- in count one of the indictment
16     on the first page, in the first paragraph
17     in Exhibit 5 that Shasta Nicole Creighton
18     was charged with illegally or
19     fraudulently voting using the name of
20     Angela Creighton?
21 A   Okay.  What's your question?
22 Q   My question was:  On the first page of
23     the indictment, which is Exhibit 5 in the

Page 211

1      first paragraph do you see that Shasta
2      Nicole Creighton was charged with
3      illegally or fraudulently voting using
4      the name Angela Creighton?
5  A   Yes.
6  Q   And do you see on page 3 of Exhibit 5 a
7      plea agreement that represents that
8      Shasta Nicole Creighton pled guilty to
9      that first count that we just discussed?
10 A   I do see a plea agreement.
11 Q   Do you understand the plea agreement to
12     say that she has pled guilty?
13 A   Yes.
14 Q   Does this change your view that there's
15     no such thing as voter impersonation in
16     Alabama?
17 A   Well, I don't think I said there was no
18     thing.  My position is that any instances
19     are extremely rare and they do not
20     justify at all voter ID and if I
21     recall -- let me see -- and I -- I think
22     what -- this is from 2002.  Somewhere in
23     2002.

Page 212

1  Q   It looks like it concerns the 2002
2      general election?
3  A   Yeah, yeah.
4  Q   I'm going to hand you Defendant's Exhibit
5      7, which is Senate Sketch 1425.
6              (Defendant's Exhibit 7 was
7                 marked for
8                 identification.)
9  Q   You wrote this?
10 A   Yes.
11 Q   Do you see on the second page where you
12     say -- let's see.  It is the third full
13     paragraph, the third sentence the bottom.
14     "There is simply no voter fraud by
15     persons pretending to be others to vote"?
16 A   The third -- the one that starts with "to
17     make matters worse"?
18 Q   Yes, that paragraph to the end.
19 A   To makes matters worse, there is
20     absolutely no need for voter ID.  It does
21     not prevent voter fraud and it prevents
22     hundreds of thousands from voting.
23 Q   Yes, sir.  That's the correct paragraph.

Page 213

1   Do you see the third paragraph from the
2   end where it says:  "There simply is no
3   voter fraud by persons pretending to be
4   others to vote"?
5   A   Yes.  I see that paragraph and I don't
6   consider one example to -- to nullify my
7   statement whatsoever.
8   Q   I'd like to show you now Defendant's
9   Exhibit Number 8.  "Baldwin man convicted
10  of fraud voted regularly under name of
11  U.S. citizen records show" is the name of
12  that article.
13          (Defendant's Exhibit 8 was
14          marked for
15          identification.)
16  Q   Could you please take a look at it for
17  me?
18  A   I've looked at it.
19  Q   Do you see that this article represents
20  that a man named Hernandez-Hernandez has
21  been prosecuted by the federal government
22  for social security fraud and theft of
23  government funds?

Page 214

1   A   Yes.
2   Q   All right.  I'd like to hand you
3   document, Defendant's Exhibit Number 9,
4   which is the docket sheet in that federal
5   case.
6          (Defendant's Exhibit 9 was
7          marked for
8          identification.)
9   Q   I'd like you to take a look at that and
10  confirm for me that he has, in fact, been
11  convicted of those or pled guilty to
12  those two crimes.
13          (At which time, the
14          witness reviews the
15          exhibit.)
16  A   Yes.  It appears -- it appears that he
17  was convicted of social security fraud
18  and theft of public money.
19  Q   Returning to Defendant's Exhibit Number
20  8, do you see that as the article
21  continues it says that he might have also
22  been charged with crimes related to voter
23  fraud?

Page 215

1   A   Yes, I -- I see they said he could have
2   been charged.  I don't see where he was
3   charged.
4   Q   Right.  Can we go off the record for just
5   a minute?
6          VIDEOGRAPHER:  Going off
7          the record at 4:10.
8          (At which time, a break
9          was held.)
10         VIDEOGRAPHER:  This begins
11         disk five.  Going back on the
12         record at 4:25.
13  BY MS. MESSICK:
14  Q   Senator Sanders, we were just looking at
15  Defendant's Exhibit Number 8 which is the
16  article concerning
17  Mr. Hernandez-Hernandez?
18  A   Yes.
19  Q   Do you see on page 2 of that article it
20  makes mention of the Secretary of State's
21  Office indicating that its records show
22  that Mr. Hernandez-Hernandez had voted in
23  five elections?  And, actually, let me

Page 216

1   back up.  I'm not sure if you've had a
2   chance to read the whole thing.  If
3   you'll look at the second paragraph of
4   Defendant's Exhibit 8.
5          Do you see that
6   Mr. Hernandez-Hernandez was living under
7   the name of Benavidez?
8   A   Yes, I see that.
9   Q   And then returning to page 2 of
10  Defendant's Exhibit 8, do you see that
11  the Secretary of State's Office is -- the
12  article reports that the Secretary of
13  State's Office said that Mr. Benavidez
14  had voted in five different elections?
15  A   Yes, I see that.
16  Q   All right.  I'm going to hand you
17  Defendant's Exhibit Number 10.  This
18  document is entitled "Individual Living
19  History Report."
20         (Defendant's Exhibit 10
21         was marked for
22         identification.)
23  Q   I will represent that this is a document

Page 217

1    from the Alabama Secretary of State's
2    Office which substantiates what is
3    reported in Exhibit 8. Do you see that
4    this report shows that Ms. -- a man
5    using -- I'm sorry.
6        Do you see that this report says
7    that Benavidez voted in the 1996 general
8    election, the 2002 primary election, a
9    2003 local election, the 2008 general
10   election, and a 2009 Perdido Beach
11   election?
12  A   I see that on this document.
13  Q   And do you see in the right -- on the
14   right-hand side of the document that for
15   each of these elections, the document
16   reflects that the voting took place at
17   the polling place?
18  A   Yes, I see that.
19  Q   Does this -- do Defendant's Exhibits 8,
20   9, and 10 change your mind about voter
21   impersonation crimes happening in
22   Alabama?
23  A   No. And the reason it doesn't, this is

Page 218

1    someone who wasn't impersonating somebody
2    to vote. He was impersonating somebody
3    generally and -- and he was voting as a
4    part of that. So he had assumed
5    somebody's identity generally. So I -- I
6    don't see that's where he was pretending
7    to be somebody else to vote. He was
8    pretending to be somebody else and he
9    voted in the process.
10       Second, it doesn't change my mind
11   because we've had millions of votes cast
12   in Alabama since 2000 or 2002 and a few
13   instances doesn't change that whatsoever.
14   To me, the real voter fraud is the -- is
15   voter ID that prevent hundreds of
16   thousands of people from vote not these
17   few examples.
18  Q   Again, I'd ask you to confine your
19   response to the question and I'm going to
20   object to that answer.
21  A   But you asked me if that changed my mind
22   and I just told you no it didn't and told
23   you why.

Page 219

1  Q   Okay. Are you aware that the Secretary
2    of State's Office received numerous
3    complaints of election irregularities
4    following the August 2016 municipal
5    elections?
6  A   No.
7        MR. ROSS: Objection.
8    Calls for speculation. You've
9    been saying absentee -- or
10   you've been saying voter fraud.
11   You've been saying
12   irregularities and you haven't
13   defined any of those terms.
14   I'm just going to have a
15   running objection every time
16   you say voter fraud and don't
17   say what you mean and when you
18   say irregularities and don't
19   say what you mean.
20  Q   Sir, I'm going to hand you Defendant's
21   Exhibit 11 entitled "Candidate Under
22   Investigation."
23       (Defendant's Exhibit 11

Page 220

1        was marked for
2        identification.)
3  Q   Do you see that this article reports that
4    a mayoral candidate is being investigated
5    for voter fraud after more than 80
6    absentee applications were mailed to his
7    home?
8  A   Yes.
9  Q   Okay. So I'm going to hand you
10   Defendant's Exhibit Number 12.
11       (Defendant's Exhibit 12
12       was marked for
13       identification.)
14  Q   Do you see that this article as well
15   deals with reports on a claim that
16   absentee voting in the Brighton municipal
17   election?
18  A   What was your question?
19  Q   Do you see that it -- Defendant's Exhibit
20   12 is another article talking about
21   possible voter fraud in Brighton?
22  A   Yeah. I -- I see an article entitled
23   "Complaint of Absentee Voting Filed with

Page 221

1    Secretary of State."
2  Q    Thank you.  I'm going to hand you
3    Defendant's Exhibit Number 13.
4             (Defendant's Exhibit 13
5             was marked for
6             identification.)
7  Q    Do you see that this is, yet, another
8    article about possible voter fraud under
9    investigation in Brighton?
10 A    Yes, I -- I see the article, Defendant's
11   Exhibit 13, yes.
12 Q    Thank you, sir.  I'll show you
13   Defendant's Exhibit 14, "Alabama election
14   officials inundated with Hundreds of
15   Complaints from the August 23rd Contest."
16            (Defendant's Exhibit 14
17            was marked for
18            identification.)
19 Q    I'd ask you to take a look at that and
20   tell me if that is, indeed, reporting on
21   hundreds of election-related contests and
22   that the election that they're talking
23   about is August of 2016?

Page 222

1  A    Yes, I see Exhibit 14, Alabama Election
2    Officials in Inundated of Hundreds of
3    Complaints from August 23rd Contest.
4  Q    Do you see in the fourth paragraph the
5    second sentence says that the Alabama
6    Secretary of State's Office in the week
7    after the municipal election is following
8    up on hundreds of election-related
9    complaints?
10            MR. ROSS:  Objection.
11            Speculation.  Form.  And same
12            objection that there's no
13            definition of what these
14            complaints are or what -- who
15            made them.  You're just asking
16            him to speculate on a news
17            article that he has no personal
18            knowledge on.
19            MS. MESSICK:  I'm asking
20            him to acknowledge that it's
21            being reported in the media
22            that there are hundreds of
23            election complaints as recently

Page 223

1             as August 2016.
2  Q    Do you see that's what the article does?
3  A    I -- I see that there is an article
4    concerning hundreds of complaints from
5    August of 23rd contest.
6  Q    And do you see that those are
7    election-related complaints?
8  A    Yes.
9  Q    Thank you.  The last one of these I'd
10   like to show you, Defendant's Exhibit
11   Number 15, entitled election "Complaints
12   Filed with Secretary of State."
13            (Defendant's Exhibit 15
14            was marked for
15            identification.)
16 Q    Do you see that this article is dated
17   October 2016 and deals with potential
18   voter fraud in recent elections including
19   right here in Selma?
20            MR. ROSS:  Objection.
21            Speculation.  Form.  Again,
22            you're asking him to testify
23            about an article that he has no

Page 224

1             basis for his own personal
2             knowledge about.  You're
3             talking about complaints.
4             You're talking about
5             indictments.  You're not
6             defining what voter fraud is.
7             MS. MESSICK:  So you
8             object to form?
9             MR. ROSS:  I object to
10            form.
11 Q    Senator Sanders, do you agree that this
12   is an article reporting about potential
13   voter fraud in recent elections in the
14   state of Alabama including right here in
15   Selma?
16 A    Well, I agree that -- that exhibit --
17   Defendant's Exhibit 16 is entitled
18   "Election Complaints Filed with Secretary
19   of State."  I agree that there was
20   complaints about absentee ballots fraud.
21 Q    Do you know who Dallas County District
22   Attorney Michael Jackson is?
23 A    Yes, I know him.

Page 225

1  Q   Do you see that he is quoted in this
2      article saying that allegations about
3      problems with elections are nothing new?
4  A   I see where he says these allegations are
5      nothing new; Jackson said they go on
6      every election.
7  Q   Jackson does go on to say that the
8      reports are rarely founded in his view;
9      correct?
10 A   Yes.
11 Q   Do these allegations change your mind?
12 A   Not at all.
13 Q   Would any number of allegations change
14     your mind?
15 A   Yes.
16 Q   How many?
17 A   If they were about impersonating somebody
18     at the poll where -- where somebody
19     was -- where voter ID was the issue.  All
20     of these are related to absentee voting.
21     Well, most of these are voted -- related
22     to absentee voting.  That's been a
23     problem for years.  It continues even

Page 226

1      after you have photo ID.  So I -- I have
2      been complaining about photo ID --
3      keeping people from voting and not --
4      from -- from voting and not stopping
5      people from fraudulently voting.  So it
6      doesn't change my mind one iota.
7  Q   Before we discuss all of -- or before we
8      looked at these articles with the
9      allegations from the recent elections we
10     looked at six instances of in-person
11     voter fraud.  We know that six is not
12     sufficient to change your mind.  How many
13     would it take?
14 A   I can't tell you how many would it take
15     but when you've got millions, six is
16     insignificant.  When you've got millions
17     people that have voted, six is
18     insignificant.
19 Q   You testified that you're not familiar
20     with the Dothan municipal election; is
21     that correct?
22 A   That's correct.
23 Q   Is it your position that the Alabama

Page 227

1      public should not be concerned about the
2      integrity of their elections?
3  A   That's not my position at all.  My
4      position is that the remedy ought to be
5      related to the problem and this remedy is
6      not related to the problem.  This
7      remedy -- this -- this remedy is a
8      problem.
9  Q   Can you name any Democrat in the Alabama
10     legislature who supports photo ID laws?
11 A   I can't name one.  No, I can't.  I can't
12     name one that does support voter photo
13     ID.  That doesn't mean that there are
14     none, but I can't name one at this point.
15 Q   Well, can you name any Democratic office
16     holder in the state of Alabama that
17     supports photo ID laws?
18 A   No, I can't name one.  It doesn't mean
19     that there are none, but I can't name
20     one.
21 Q   We talked early about -- earlier about
22     Artur Davis.  Do you remember that
23     discussion with Mr. Ross this morning?

Page 228

1  A   Yes.
2  Q   When he served in the United States
3      Congress as a representative from
4      Alabama, was that as a Democrat?
5  A   Yes.
6  Q   And when he ran for governor in 2010, was
7      that as a Democrat?
8  A   Yes.
9  Q   And did he subsequently become a
10     Republican?
11 A   Well, I saw him on national TV at the
12     Republican convention and I can only
13     assume he became a Republican, but I
14     don't know that.
15 Q   You testified earlier that
16     African-Americans supported Ron Sparks in
17     his gubernatorial race against Artur
18     Davis?
19 A   Yes.
20 Q   Why is that so?
21 A   Well, Artur Davis announced that he was
22     not going to come before any
23     predominantly black groups and ask for

Page 229

1   votes but he went before predominantly
2   white groups and asked for votes.  And we
3   decided if that was the attitude he would
4   take, he would not make a good person to
5   represent all of the people of Alabama
6   and we opposed him vigorously.
7  Q   The black groups that you're talking
8   about, are they groups that are formed
9   for the purpose of advancing the interest
10   of blacks in Alabama?
11  A   Well, Alabama New South is not formed for
12   advancing the interests of blacks in
13   Alabama, because it was formed to advance
14   progress in Alabama.  And it has white
15   members as well as blacks members,
16   Republicans as well as Democrats and
17   independent.  And some of the other
18   groups, I can't speak for them -- I know
19   ADC is essentially all black, but I can't
20   speak for the Jefferson County Citizen
21   Coalition and some of the other groups
22   around the state.
23  Q   The white groups that you said that he

Page 230

1   went to, were those groups that were
2   formed to support the advancement of
3   whites in this state?
4  A   I don't know whether they were or not.
5   I -- I think that anytime somebody
6   decides that they want black votes but
7   they're not going to come before any
8   black groups, it's something
9   fundamentally wrong with that.  He might
10   have said, well, I'm not going to come to
11   this group or that group but he stated
12   he's not going to come before any black
13   group and ask for votes and that's --
14   that's completely unacceptable to me.  I
15   could not in good conscious support him.
16   I could not in good conscious ask
17   somebody else to support him.  I -- I --
18   I really -- I don't know this, but I
19   really think that he thought that that
20   was going to cause him to get all the
21   white votes and -- and it just didn't
22   work.
23  Q   I'm going to need to object to the form

Page 231

1   of the answer there.
2  A   Okay.
3  Q   But thank you.  You testified earlier how
4   everybody it seems like who was on the
5   ballot in Alabama was running against
6   President Obama; correct?
7  A   Virtually.  Not everybody, but nearly
8   everybody.
9  Q   If we elected dogcatchers, there might
10   very well be one running against
11   President Obama?
12  A   Yes.
13  Q   You testified earlier --
14  A   In all my life I had never seen people at
15   local levels running against a president.
16  Q   You don't remember that happening with
17   President Carter?
18  A   No.  I don't remember that happening with
19   any -- in my 74 years, I don't remember
20   that ever happening like that with any
21   president.
22  Q   President Obama was very successful at
23   pushing through some major initiatives

Page 232

1   including the Affordable Care Act, wasn't
2   he?
3  A   Yes, he succeeded in pushing through the
4   Affordable Care Act and some other
5   initiatives.
6  Q   President Obama supported marriage rights
7   for gays and lesbians, didn't he?
8  A   Yes.
9  Q   Did President Obama have other
10   legislative and policy successes that
11   were primarily supported by persons on
12   the left end of the political spectrum?
13  A   I can't think of any in particular but I
14   believe that there probably were.  I know
15   that President Johnson supported civil
16   rights and -- and nobody was running
17   against him.  I was grown at the time and
18   he -- and civil rights was strongly
19   objectionable, but I don't remember any
20   local officials running against President
21   Johnson in '64.
22  Q   And is that --
23  A   And I don't remember any presidential --

Page 233

1    any -- any presidential candidate being
2    run against in that kind of way other
3    than President Obama.
4  Q   And is that your basis for believing that
5    so many people running against him was
6    because of race and not because they were
7    just politically opposed to his views?
8  A   Well, I think that race was a powerful
9    symbol, a powerful factor and that he
10   became a symbol of that.  I had never
11   seen any other president -- they all --
12   all 43 before him were white and I never
13   saw it happen.  He comes along, number
14   44, and he's black and it happens and I
15   don't think it was by accident.
16 Q   I want to return to Artur Davis for just
17   a moment.  I'm going to hand you
18   Defendant's Exhibit 16.
19        (Defendant's Exhibit 16
20         was marked for
21         identification.)
22 Q   This is an opinion piece in which
23   Mr. Davis says that he should have

Page 234

1    supported voter ID laws when he was in
2    office?
3  A   Is there anyway to tell when this was
4    written?
5        MR. ROSS:  In the corner
6        there.
7  A   At least 2015, I guess.
8  Q   Well, it was written while he was a
9    Republican.  We know that.  It was --
10       MR. ROSS:  I believe it's
11       in the upper left-hand corner.
12       MS. MESSICK:  October of
13       2011.
14       MR. ROSS:  Yeah.
15       MS. MESSICK:  Is that what
16       you read?
17       MR. ROSS:  It looks like
18       October of 2011, yeah.
19 Q   And you can see he is identified at the
20   bottom of the article as a former U.S.
21   congressman and if it was 2011 it would
22   have been after he had run for governor
23   in 2010 here in Alabama.

Page 235

1        I just want to ask you the first --
2    well, the second, third, and fourth
3    paragraphs.  Do you see that Mr. Davis
4    says that while he was in Congress he
5    encountered various activists who contend
6    that requiring photo identification to
7    vote is a suppression tactic and that he
8    then goes onto talk about the fact that
9    he, himself, is well aware of the, quote,
10   wholesale manufacture of ballots at the
11   polls and absentee voting in the black
12   belt?
13 A   I see where he says that.
14 Q   Okay.
15 A   That's the same man that refused to go
16   before black groups and now he's accusing
17   black people of wholesale voter fraud.
18   There's something wrong with that.
19 Q   Where do you see that he says who is
20   committing the fraud?
21 A   It's a suppression tactic aimed at
22   thwarting black voter participation.  In
23   a previous paragraph, suppression in the

Page 236

1    African-American community in the third
2    paragraph.
3  Q   Are you assuming that only whites can
4    suppress the votes of blacks?
5  A   No.  Blacks can certainly support the
6    votes of blacks but those who are in
7    power who pass laws to make it more
8    difficult to vote, they suppress hundreds
9    of thousands.  There may be blacks that
10   support -- that suppress a few here and
11   there or some here and there but that's a
12   whole different matter.
13 Q   Do you see in the fourth paragraph where
14   he says, "If you doubt it exists, I
15   don't.  I've heard the peddlers of these
16   ballots brag about it.  I've been asked
17   to provide funds for it.  I am confident
18   that it has changed at least a few close
19   local election results."
20       It's the end of the fourth
21   paragraph.
22 A   Well, I -- I -- I see that.
23 Q   I understand him to be making those

Page 237

1 representations based on his time as a
2 candidate and elected official.  You've
3 been serving since 1983.  Have you shared
4 this experience?  Have you seen what he
5 says he has seen?
6 A    No, I haven't and I've been on the
7 ground.  I've been campaign chairman.
8 I've been voter registration chairman.
9 I've been mobilization chairman and the
10 amount of irregularities I have found was
11 small compared to the huge number of
12 people who voted.
13 Q    Tell me about Ms. Amelia Boyton?
14 A    Ms. Amelia Boyton died recently at 110
15 years of age.  Ms. Boyton and her
16 husband, Samuel Boyton, started trying to
17 register blacks and get black folks to
18 buy land in the '30s and she continued in
19 an effort to try to get black folks
20 involved in the political process and the
21 economic process from the 1930s up until
22 the time she died a couple of years ago.
23 Q    Was Ms. Boyton black?

Page 238

1 A    Yes.
2 Q    When she died at the age of 110, did she
3 have a driver's license?
4 A    Yes.  I know she had a driver's license
5 because I went to the hospital to see her
6 and there was a debate going on about
7 whether she was 103 or 110 and we had
8 looked up her age in the census and knew
9 she was 110 and Bruce Boyton's wife, her
10 daughter-in-law -- either Bruce Boytin's
11 wife or the other lady who was there
12 pulled out her driver's license.  I don't
13 even -- to be honest with you, I don't
14 remember what the driver's license said
15 but I know they pulled out her driver's
16 license and I believe her driver's
17 license may have said she was 110 but we
18 had looked it up in the census, the U.S.
19 census.
20 Q    Okay.  Thank you.  I'd like to show you
21 two more exhibits.  These will be number
22 17 and 18.
23            (Defendant's Exhibit 17

Page 239

1 was marked for
2 identification.)
3            (Defendant's Exhibit 18
4 was marked for
5 identification.)
6 Q    Number 17 is "Two Detroit men busted in
7 Alabama with 177 stolen identities" and
8 Number 18 is Jeff -- "Jeff Co. Department
9 of Revenue clerk charged with selling
10 fake driver's licenses."
11       Do you agree that identity theft is
12 a problem today?
13 A    Yes.
14 Q    Are you familiar with the company
15 LifeLock?
16 A    I've heard the name.  I've heard the name
17 either on TV or radio or both.
18 Q    Okay.  Do you understand that that
19 company basically promotes a product of
20 trying to help prevent identity theft and
21 then should you suffer -- should your
22 identity be stolen to try and help you
23 restore it?

Page 240

1 A    I think I've heard them say that in ads.
2 Q    Are you aware of anything like LifeLock
3 existing in 1980?
4 A    No.
5 Q    I'd like to refer you back to Plaintiff's
6 Exhibit Number 1.  It was one of the news
7 articles that Mr. Ross started with.  The
8 second paragraph from the bottom, I put
9 an asterisk on my copy.  Senator Sanders,
10 do you see that in that paragraph you're
11 quoted as saying:  "We haven't had a
12 voter ID requirement for 178 years"?
13 A    Oh, okay.  Yes, I see that.
14 Q    Would you agree that identity theft was
15 not a problem 178 years ago or even 50
16 years ago --
17            MR. ROSS:  Objection.
18 Q    -- in the way that we deal with it now?
19            MR. ROSS:  Speculation.
20       Form.
21 A    Yes, I agree identity theft is a much
22 greater problem now than it was 178 years
23 or 50 years or even 20 years ago.  The

Page 241

1  problem is if -- if it's identity
2  theft -- if somebody's stealing your
3  identity having a driver's license
4  doesn't deal with it because they create
5  that identity and use it to be able to
6  vote.  So instead of cutting against
7  identity, what it does is -- when --
8  on -- on Exhibit 3 here -- no.
9       Exhibit 17 Detroit man busted, if
10  they got stolen identities, then that
11  doesn't, in any kind of way, make it more
12  difficult for them to vote.  They -- they
13  use the stolen identity to be able to
14  vote, just like driver's license or photo
15  ID or whatever ID it is.  I just don't
16  see where that, in any kind of way,
17  changes the role of photo ID that stops
18  hundreds of thousands of people from
19  voting.
20 Q   Thank you.  Could I get this exhibit
21  back, please?
22 A   Okay.  Yeah.
23 Q   Thank you.  Would you agree that one way

Page 242

1  identity theft is committed by persons
2  who steal important documents from the
3  trash of their victims?
4 A   Say what?
5       MR. ROSS:  Objection.
6       Speculation.  Form.
7 Q   Would you agree one way identity theft is
8  committed is by persons stealing
9  important documents from the trash of
10  their victims?
11       MR. ROSS:  Same objection.
12 A   I think that's possible.
13 Q   Do you think it's possible that somebody
14  could use your utility bill?
15       MR. ROSS:  Objection.
16       Speculation.
17 A   I think that's possible.
18 Q   I'd like to talk about the forms of photo
19  ID that are accepted under the law that's
20  being challenged here.  Your testimony is
21  made clear that you're aware a driver's
22  license or nondriver ID would be an
23  acceptable form of identification?

Page 243

1 A   Yes.
2 Q   Where do you go when you need to get your
3  driver's license renewed?
4 A   I go to the Dallas County Courthouse.
5 Q   What office do you go to at the Dallas
6  County Courthouse?
7 A   I go to the driver's license office.
8 Q   Is that a probate office, a revenue
9  commissioner, a license commissioner, or
10  an Alabama law enforcement agency office?
11 A   Alabama law enforcement agency office.
12 Q   Are you aware that you can renew your
13  license at a judge of probate office or a
14  revenue commissioner or a license
15  commissioner in any county in the state?
16 A   I have heard that recently but I
17  didn't -- I didn't hear that before.  The
18  whole issue came up about closing
19  driver's license offices.
20 Q   Are you aware that you can renew your
21  license online?
22 A   No.
23 Q   I don't want to get into the entire

Page 244

1  discussion of the so-called office
2  closures yet.
3 A   Okay.
4 Q   But is it your understanding that before
5  the, quote, office closures in the fall
6  of 2015 that those offices were opened
7  five days a week, eight hours a day?
8 A   No, that's not my understanding.  My
9  understanding is that it varied from
10  county to county.
11 Q   Were they generally open one or two days
12  a week or less?
13 A   My -- my understanding that -- that most,
14  if not all of them, were generally opened
15  at least a week, something weekly.
16 Q   Okay.
17 A   Within a week.  But I -- I don't know --
18  I don't know about the individual
19  offices.  I didn't -- I didn't -- I
20  didn't try to check to see what -- how
21  much they was open.  I was concerned that
22  they were closed altogether and then
23  whenever they made a change, it was once

Page 245

1  a month and either way that was a lot
2  less than it used to be.
3  Q   You've also talked here today about the
4  free Alabama photo voter ID card --
5           MR. ROSS:  Objection.
6       Form.  I'm sorry.
7  Q   You're shaking your head yes?
8  A   No, no.  I was waiting until you finished
9  your question.
10 Q   Okay.
11 A   I didn't think you had finished your
12 question.  I'm sorry.
13 Q   Well, I apologize for confusing
14 everybody.
15          MR. ROSS:  No.  I'm sorry.
16      I'm sorry.
17 Q   You're aware that the Alabama photo voter
18 ID card is an acceptable form of voter ID
19 for voters?
20 A   Yes.
21 Q   And you're aware you can get that card
22 from the board of registrars or from the
23 mobile units or from the Secretary of

Page 246

1  State's Office at the capitol?
2  A   Yes.
3  Q   You testified earlier today, if I
4  understood you correctly, that it is a
5  crime to have that card if you have
6  another form of photo identification?  Is
7  that your understanding?
8  A   That's my understanding.
9  Q   What is your basis for believing that?
10 A   When we were having analysis of it and
11 discussions of it, that's -- that's --
12 that's what it was based on.
13 Q   I'd like to show you Defendant's Exhibit
14 19, which is a copy of the statute that's
15 being challenged in this lawsuit.
16          (Defendant's Exhibit 19
17           was marked for
18           identification.)
19 A   Okay.
20 Q   And I'm going to ask you to take a look
21 at that and see if you can tell me where
22 the statue says that it was illegal to
23 possess the free photo ID card if you

Page 247

1  also possess another form of acceptable
2  ID.
3           MR. ROSS:  Objection.
4       Speculation.  Form.  Calls for
5       a legal conclusion.
6           Misty, do you want to
7       direct the Senator to a
8       portion?
9           MS. MESSICK:  Well, since
10      I don't believe it's there, I
11      think it would be awkward to
12      direct him to the paragraphs
13      that might possibly be
14      confusing him.
15          MR. ROSS:  Would you
16      object if I directed him to the
17      section that he may be thinking
18      about?
19          MS. MESSICK:  You go right
20      ahead.
21 A   Well, let me just say the provision -- it
22 started with provision G and I -- I may
23 be remembering the law before it was

Page 248

1  finally passed but I -- I know there
2  was -- at the time we were considering
3  there was something in there that
4  provided for some criminal penalties.  I
5  don't see it now.  I'm looking at it
6  quickly but there were definitely
7  provisions in there that had to do with
8  criminal penalties both for having a
9  second ID -- photo ID and for making
10 mistakes or providing information that
11 was incorrect.
12 Q   Well, with respect to a criminal penalty,
13 I do see mention of a class C felony at
14 subsection I on page 3.  Would you review
15 that and see if that might be the
16 provision that you're thinking of?
17 A   Yes, that's -- that's one provision, but
18 as I recall when the bill was being
19 considered, it was also included having
20 a -- a second identification card.  I
21 don't see it at this time, but --
22 Q   Do you understand --
23 A   Wait.  Wait a minute.  I'm sorry.

Page 249

1    I -- I don't see anything else.  Go
2  ahead.
3  Q   Do you understand that the free photo ID
4  card is free to the voter but that it
5  does, in fact, cost the state money to
6  produce that card?
7         MR. ROSS:  Object to the
8         form.
9  A   Yes, I do understand that you don't have
10  to pay when you go there but I don't
11  consider it free to the voter because
12  people have to pay folks to bring them
13  there and other kinds of costs involved.
14  So I don't consider it free, but I do
15  consider that you don't have to pay the
16  State of Alabama for it.
17  Q   And do you understand that the State of
18  Alabama does incur a cost to produce the
19  card?
20         MR. ROSS:  Objection.
21  A   I'm sure they do.
22  Q   And can you understand why the State of
23  Alabama would not want to pay for the

Page 250

1  production of cards when the person
2  seeking the card already has a form of
3  photo ID that is acceptable for voting?
4         MR. ROSS:  Objection to the
5         form.
6  A   I -- I can't understand with the shortage
7  of funds in Alabama why they would want
8  to have voter photo ID anyway and --
9  and -- when we don't have funds for all
10  kind of things, so I don't understand
11  why -- why they would spend money not
12  just on the card but on the whole
13  process.  So I -- I don't understand.
14  That's what I don't understand.
15  Q   I see how that's related.  But do you
16  understand that the state would not want
17  to spend money to produce photo ID cards
18  for the purposes of voting when the voter
19  already has an acceptable form of ID?
20         MR. ROSS:  Objection.
21  A   My experience with the State of Alabama
22  is that they spend money on whatever they
23  want and they let other needs go

Page 251

1  unmet, so I don't attribute that -- them
2  not spending money because you have other
3  forms of ID.  I don't attribute that to
4  that at all.  I just attribute that to
5  part of the whole scheme to suppress
6  African-American and other voters.
7  Q   If the Alabama law does not make it a
8  crime to possess the free photo ID and to
9  also possess a driver's license, do you
10  think it's helpful to voters for
11  organizations to promote the falsehood
12  that it is, in fact, a crime?
13         MR. ROSS:  Objection.
14  A   I think the fact that that's not in there
15  reduces things to some degree but the
16  possibility of putting in some
17  information that somebody would accuse
18  you that's false is still there and even
19  if it doesn't say it is a crime they say
20  if you have two you might be charged with
21  some form of voter fraud.  So I still
22  feel it's a dangerous situation and a lot
23  of people say, I'd rather have a driver's

Page 252

1  license.  And the people who have -- this
2  doesn't affect very much about people
3  that already have a driver's license.  It
4  always the new people, the young people
5  or some old people who haven't had -- or
6  somebody who get their card for the first
7  time.  Those are the people that are
8  affected most of all.
9  Q   You said earlier that you believed that
10  it was a crime for which intent need not
11  be proven to hold both free photo ID
12  law -- free photo ID card and another
13  photo ID acceptable under the law.
14  A   Yes, I said that.
15  Q   Do you have any basis as you sit here
16  today for believing that intent need not
17  be proven as an element of any such
18  prosecution?
19         MR. ROSS:  Objection.
20  A   Well, my experience has been in the
21  criminal law whenever they go after you,
22  the intent doesn't make a whole lot of
23  difference.

Page 253

1  Q    You've defended persons charged with
2  crimes?
3  A    Yes.  I've been charged -- defended
4  people charged with a crime and -- and --
5  and I've -- and -- and the intent is
6  always inferred.  If there's no
7  documented evidence of it, it's inferred.
8  So I don't -- I don't put a great deal of
9  weight on that, the fact that you've got
10 to prove intent.
11 Q    Are you aware that another form of
12 identification acceptable under Alabama's
13 photo ID law would be a valid
14 identification card issued by a branch,
15 department, agency, or entity of the
16 State of Alabama or any other state or
17 the United States so long as that branch,
18 department, agency, or entity was
19 authorized to issue personal
20 identification and that it contained a
21 photograph?
22        MR. ROSS:  Objection.
23 A    Re- -- repeat that.  That's a long one.

Page 254

1  Q    Let me refer you to Defendant's Exhibit
2  Number 19 and I'd ask you to look on page
3  1 at subsection A2.
4  A    Okay.
5  Q    Since you're looking at the language, let
6  me change my question to this.  Are you
7  aware that subsection A2 would include,
8  for instance, a photo ID issued by a
9  public university of any state in the
10 United States?
11        MR. ROSS:  Objection.
12        Speculation.  Form.  Legal
13        conclusion.
14 A    A2?
15 Q    Yes.
16 A    Yes, I've -- I've read A2 and the
17 question was?
18 Q    Do you see under A2 it would be
19 acceptable to provide a photo ID issued,
20 for example, by the University of Texas
21 which would be an entity of the State of
22 Texas?
23 A    I certainly didn't read that that way.

Page 255

1  Q    Do you see that under A3 a valid United
2  States passport is an acceptable form of
3  ID?
4  A    Yes.
5  Q    Do you see that under A4 employee
6  identification card with a photo ID --
7  A    Yes.
8  Q    -- is acceptable if issued by the United
9  States government, the State of Alabama,
10 or county, municipality or other entity
11 of this state?
12 A    Yes.
13 Q    Are you aware that many Alabama State
14 employees are issued photo IDs?
15 A    Yes.
16 Q    Are you aware of the racial demographics
17 of the state employees?
18 A    No.
19 Q    Do you see that under paragraph A5 a
20 valid student or employee identification
21 card with photo issued by any public or
22 private college, university, or
23 postgraduate, technical, or professional

Page 256

1  school located in the state of Alabama is
2  an acceptable form of ID?
3  A    Yes, I see that and -- and that conflicts
4  with the earlier thought about any
5  university, but that -- that's says
6  within the state of Alabama.
7  Q    Right.  This is accepting actually public
8  and private forms of -- entities of
9  higher education if they're in the state
10 of Alabama.  If you go outside the state
11 of Alabama only government-issued IDs,
12 those from public universities are
13 accepted.  Do you see that?
14 A    I can understand that interpretation.
15 That's not the interpretation I
16 previously had.  I don't think that's the
17 general interpretation out there among
18 the people.
19 Q    Does Alabama have historically black
20 colleges and universities?
21 A    Yes.
22 Q    Do you know how many?
23 A    No.

Page 257

1  Q   It just so happens I have a list.
2  A   Thank you.
3  Q   If I can name -- I'd like to name them
4      and ask that you confirm if you agree if
5      you do that each one is a historically
6      black college or university.
7  A   Yes.
8  Q   Alabama A&M University?
9  A   Yes.
10 Q   Alabama State University?
11 A   Yes.
12 Q   Bishop State Community College?
13 A   Yes.
14 Q   Concordia College in Selma?
15 A   Yes.
16 Q   Gadsden State Community College?
17 A   Yes.
18 Q   Trenholm State?
19 A   Yes, I guess so.
20 Q   JF Drake State Technical College?
21 A   Yes.
22 Q   Lawson State Community College in
23     Birmingham?

Page 258

1  A   Yes.
2  Q   Miles College?
3  A   Yes.
4  Q   Oakwood University?
5  A   Yes.
6  Q   Selma University?
7  A   Yes.
8  Q   Shelton State Community College?
9  A   I -- I've never considered Shelton State
10     Community College a historically black
11     college.
12 Q   Okay.
13 A   I don't think it is.
14 Q   So no to Shelton State?
15 A   Huh?
16 Q   Shelton State you say no?
17 A   I say no.
18 Q   Okay.  Stillman College?
19 A   Yes.
20 Q   Talladega College?
21 A   Yes.  I happened to graduate from
22     Talladega.  I'm sorry.  I didn't mean to
23     throw you off.

Page 259

1  Q   Talladega College has been in the news
2      lately, hasn't it?
3  A   Yes, it has.  I know you're not going to
4      ask me about.
5  Q   I think I am not going to.
6  A   Okay.
7  Q   Tuskegee University?
8  A   Yes.
9  Q   Okay.  Do you see -- returning to
10     Defendant's Exhibit 19 that subsection A6
11     provides that a valid United States
12     military identification card so long as
13     it contains a photograph is an acceptable
14     form of ID in Alabama?
15 A   Yes.
16 Q   And do you see A7 a travel identification
17     card containing a photograph is
18     acceptable?
19 A   Yes.
20 Q   Do you know what the -- returning to A6
21     in the U.S. military, do you know what
22     the makeup of the Alabama National Guard
23     is?

Page 260

1  A   No.
2  Q   Would you agree that Alabama is a state
3      that has been proud to serve in the
4      United States military?
5          MR. ROSS:  Objection.
6      Form.
7  A   Yes.  Let -- let -- let me -- if I may,
8      most college students would probably have
9      a driver's license anyway.  All -- all of
10     these things the way they impact, they
11     adversely impact the poor folks and
12     not -- not everybody's in college.  Not
13     most folks are in college.  They -- they
14     impact others.  Most of these -- a United
15     States passport, very few folks have
16     them.  People who have them are people
17     who intend to travel out of the country
18     or have traveled out of the country.  The
19     various college ones, that's a -- when
20     you look at everyone who has to go what
21     you have there is that they -- they
22     are -- they're a special class.  Many of
23     them would have had a driver's license

Page 261

1   anyway.  Most of these are for folks who
2   would have already had a driver's
3   license.
4        It's the other people that having
5   that great impact that I worry about and
6   they're not in college and they're not
7   employees of the government, any branch
8   of the government.
9   Q   People do go to college on scholarships
10      and with grants and loans?
11  A   Yes.
12  Q   And --
13  A   But -- but nearly every person I know who
14      has gone to college, nearly all of them
15      have some kind of a driver's license.
16  Q   How did you get to go to college?  You
17      said you grew up in a poor family but you
18      went to Talladega College and you went to
19      Harvard Law School?
20  A   What I did, when I graduated from college
21      I was out three years because I couldn't
22      go and I worked at a saw mill a year.  I
23      worked as a janitor.  I worked as an

Page 262

1   elevator operator.  I worked as a stock
2   boy, then a stock clerk, then a shipping
3   clerk.  I did all of that to try to go to
4   college and I was a little foolish
5   because when I got -- I had saved every
6   penny I could when I -- when I -- I
7   applied to Talladega College.  They wrote
8   me and told me that they think I would
9   have qualified for -- for student aid and
10  I wrote back like a fool and told them
11  that I had saved my money and I didn't
12  need any aid.
13       My money lasted until December and
14  so I had to find a way to -- to make it
15  on through.  And my second year I
16  couldn't go back and a white lady at
17  Talladega, Ms. -- Ms. Margaret -- I can't
18  think of her last name.  We all called
19  her Peg behind her back, but she asked
20  me -- she said, Sanders, I'm going to see
21  you.  I'll see you back in the fall.
22       I said I don't think so.  It took me
23  three years to save enough to go one

Page 263

1   semester here.  She said, well, I'll see
2   you back in the fall.  And she helped me
3   to win the Catherine Wardle award that
4   gave me full tuition, room and board as
5   the student who contributed most to
6   Talladega the previous year.  And my
7   third year I spent at Boston University
8   on a scholarship provided by the Old
9   South Church that she helped me also to
10  get.
11       I went to Harvard Law School on the
12  Felix Frankfurter scholarship, which was
13  a full scholarship and it was supposed to
14  be for poor young men who show great
15  promise.  I fulfilled the poor young men.
16  I don't know about the rest of it.  But I
17  had a lot of help along the way.  I
18  remember -- I'm talking too much but I
19  remember when I applied to Harvard and
20  wouldn't apply to anybody else and
21  Ms. Montgomery tried to get me to apply
22  to other places and I didn't.  And
23  eventually Ms. -- I got a -- a full

Page 264

1   scholarship from Notre Dame University
2   and I hadn't applied and I didn't
3   understand how I could get a full
4   scholarship offer and not apply.
5        Somebody told me that -- that she
6   had tried to help me with Notre Dame and
7   just to make sure I had an alternative.
8   I think it also has something to do with
9   that I made almost -- in the nearly
10  90 percent to upper 80 percent on the
11  LSAT.  So all of these things helped me
12  and -- and I don't feel like if I'm an
13  exception that others could do the same
14  thing because I had a lot of help from a
15  lot of different directions.
16       When you come from a family of 13
17  children and nobody ever went to college
18  before, it takes a lot of folks helping
19  you and that's -- that's why I'm so
20  concerned about people who didn't get the
21  breaks that I got.
22  Q   Thank you, Senator.
23       I'd like to ask you to look back to

Page 265

1    Defendant's Exhibit 7, which is one of
2    your Senate Sketches.  On page 2 of
3    Exhibit 7 you say that:  "Several studies
4    have indicated that voter photo ID
5    prevents some 400,000 Alabamians from
6    voting in elections."
7  A   Oh, defendant's exhibit, oh, I'm sorry.
8  Q   Yes.  We're looking for your Senate
9    Sketches, number 1425?
10  A   Okay.  I'm putting them in order.  14,
11    13, 12, 11.  Okay.  Number 7, yes.
12  Q   Yes, sir.
13  A   Okay.
14  Q   Would you look at page 2, the first full
15    paragraph.
16  A   "Let's take a closer look"?
17  Q   Yes.
18  A   Okay.
19  Q   You see where you say that several
20    studies have indicated that voter photo
21    ID prevents some 400,000 Alabamians from
22    voting in elections?
23  A   Yeah.

Page 266

1  Q   My question to you is:  Where did you get
2    that number?
3  A   I -- I -- I believe -- let me see what
4    foundation was it?  One foundation had
5    done that and I can't remember the name
6    of it and I can't remember any event,
7    but...
8  Q   Do you remember what form of IDs those
9    studies considered?
10  A   I'm sorry?
11  Q   Do you remember what forms of ID those
12    studies considered?  Do you know if it
13    limited to driver's license and all other
14    forms of IDs that Alabama accepts?
15  A   I don't remember the details of it.  I
16    just remember the numbers.
17  Q   Are you aware of the results of the
18    plaintiff's no match list in this case?
19  A   I saw something in one of these documents
20    today.
21  Q   We talked earlier -- you talked with
22    Mr. Ross about a cross check that the
23    Secretary of State had run?

Page 267

1  A   Yes.
2  Q   I want you to put that out of your mind.
3  A   Okay.
4  Q   The plaintiffs in this case have
5    undertaken an attempt to match Alabama
6    registered voters to acceptable forms of
7    photo ID.  Are you aware of the results
8    of those attempts to date?
9  A   No.
10  Q   Would you even know they were doing it?
11  A   It seems to me that I may have heard some
12    talk about it.
13  Q   Do you remember anything else that was
14    said about it?
15  A   Not -- not at the moment.
16  Q   I'd like to talk for a moment about the
17    positively identified provision, which I
18    believe you also spoke with Mr. Ross
19    about.
20  A   Which one?
21  Q   The positively identified provision of
22    the photo ID law.  Do you recall that
23    that's the provision that allows a person

Page 268

1    to vote without photo ID --
2  A   Yes.
3  Q   -- if two poll workers can identify that
4    person?
5  A   Yes, I recall.
6  Q   I believe you testified earlier that in
7    some places in Alabama folks know each
8    other; is that correct?
9  A   Yeah.
10  Q   When you go to the polls, people know
11    you?
12  A   Yeah.
13  Q   If you'd look at Plaintiff's Exhibit
14    Number 1 and, actually, I think this is
15    the one you couldn't find before so I'll
16    give you mine again.
17  A   Okay.
18         MS. MESSICK:  Actually,
19    does somebody else have a
20    plaintiff's?
21         MR. ROSS:  I've written on
22    mine too so if you're worried
23    about writing.

Page 269

1  Q   Well, okay.  I will share mine with you.
2  A   Okay.  Oh, I just --
3  Q   You found it?
4  A   Yeah.
5  Q   Okay.  If you'll look at the bottom of
6      page 1 and the top of page 2.  Do you see
7      that former state Senator E.B. McClain --
8  A   Yes.
9  Q   -- is quoted as saying that most of the
10     voting boxes are manned by people that
11     live in the precinct and they know the
12     people voting?
13 A   Yes, I see that.
14 Q   Okay.  And I believe you said something
15     similar earlier, that in some areas in
16     Alabama -- in some areas of Alabama
17     people do know each other?
18 A   Well, that's true.  But I think what I
19     said was that was still a problem because
20     many of them were manned by whites who
21     were not particularly prone to -- to do
22     about blacks.
23 Q   What evidence do you have?

Page 270

1  A   And I think I told you -- I told you
2      about the instance I couldn't -- I
3      couldn't -- personally couldn't vote in
4      spite of being an elected official for
5      30 -- nearly 30 years.
6  Q   Yeah.  And I didn't understand that.  I
7      want to talk about that some more.  The
8      positively identify provision exists to
9      help persons who don't have a photo ID
10     with them.
11 A   That's right.
12 Q   I understood that you had a photo --
13     well, I don't believe you said anything
14     about a photo ID.
15 A   I had a photo ID.
16 Q   The problems at the polls that day were
17     for some reason you were not on the poll
18     list?
19 A   That's right.
20 Q   They didn't have you listed as a voter?
21 A   That's right.
22 Q   It wasn't a problem with that photo ID?
23 A   Right.

Page 271

1  Q   Also, that positively identify provision,
2      that provision was in the 2003 voter ID
3      law, wasn't it?
4  A   I don't recall that.
5  Q   I'd like to talk with you about the
6      mobile units.
7  A   Okay.
8  Q   I'd like you to refer, please, to
9      Plaintiff's Exhibit Number 5.  This is
10     the e-mail chain between Deule Ross and
11     Jean Brown in which you --
12 A   Plaintiff's Exhibit Number 5?
13 Q   Yes.
14 A   Okay.  I found it.
15 Q   Okay.  You talked with Ms. --
16 A   I'm about to get organized.
17 Q   I'm sorry.  We've loaded you up with
18     paper today.
19         You see beginning on page 2 the list
20     of locations that Mr. Ross is asking that
21     the mobile unit be sent on behalf of the
22     various entities he's speaking for in
23     this e-mail dated October 1, 2014?

Page 272

1  A   Yes.
2  Q   I'd like you to look at that list,
3      please, and tell me if any of those
4      locations are in Senate district 23?
5  A   No.
6  Q   Did Secretary of State seek your input
7      where to put the unit within Senate
8      district 23?
9  A   I don't recall them seeking any input
10     from me on where to send them in district
11     23.  I remember several times I was
12     called the day before to say that they
13     would be somewhere in 20 -- Senate
14     district 23.
15 Q   On those occasions did you go to the
16     locations where the mobile unit was?
17 A   No.  Because when you call me the day
18     before, every day is already full.  If
19     it's -- if you really want me to come,
20     you've got to call me before the day
21     before.  There was no way to go to those
22     places being called the day before.
23 Q   This is an issue that you --

Page 273

1  A    And I -- I -- I asked them on one
2  occasion, why can't you just send out a
3  text -- I mean not a text -- an e-mail to
4  me earlier so I can then try to let folks
5  know.  Each time as I recall it was the
6  day before.
7  Q    Are you aware that the Secretary of
8  State's Office routinely issues press
9  releases about the locations that the
10  mobile unit will be visiting?
11  A    I assume they do.
12  Q    Are you on that mailing list?
13  A    No.  I don't get -- I don't get press
14  releases from them.
15  Q    Would you like to?
16  A    Not really.  And I'll tell you why.  I
17  considered the whole thing -- it's a
18  scheme.  It really doesn't accomplish
19  very much.
20  Q    I'd like to show you Defendant's Exhibit
21  Number 20.
22         (Defendant's Exhibit 20
23         was marked for

Page 274

1         identification.)
2  Q    This is an e-mail that was sent to you by
3  Clay Helms in the Alabama Secretary of
4  State's Office.  I'd like to give you an
5  opportunity to read it and then I'm going
6  to ask you if you've ever seen it.
7  A    No.  And, again, this goes to that Hank
8  Sanders@AlabamaSenate, which I don't get.
9  I haven't seen this.
10  Q    Is that e-mail address assigned to you by
11  the Alabama Senate?
12  A    It -- it may very well be, but I've never
13  received a single e-mail from there.
14  Q    Well, you don't check that address;
15  right?
16  A    I don't even have it on my phone.
17  Q    Okay.
18  A    All of my e-mail comes to my phone.  It's
19  not even on my phone.
20  Q    Does your legislative website provide an
21  e-mail address for you?
22  A    I don't know.  I've never seen my -- my
23  website.  I'm -- I'm not -- not that

Page 275

1  fluent.  I have a -- I have a Facebook
2  that I've never seen.  Somebody just
3  keeps it for me.
4  Q    Okay.  I'd like to turn now to what I'm
5  going to refer to for ease as the office
6  closures.
7  A    Okay.
8  Q    But that is not meant to be an admission
9  in anyway.
10  A    I promise you I won't treat it as one.
11  Q    It's not you I'm worried about, but thank
12  you.
13         What do you understand to be the
14  responsibilities of the Alabama Law
15  Enforcement Agency?
16  A    Well, to -- to prevent crimes, to
17  prosecute crimes, to prevent violations
18  of traffic and other ordinances.
19  Q    When you refer to traffic, are you
20  talking about the fact that the Alabama
21  State troopers are part of ALEA?
22  A    Yeah, yeah.  And --
23  Q    Are you --

Page 276

1  A    -- generally to protect the citizens of
2  Alabama.
3  Q    You talked earlier about the increase in
4  the driver's license fee.  What is your
5  understanding of the reason that the
6  Alabama Law Enforcement Agency increased
7  the driver's license fee?
8  A    To -- to help the agency.
9  Q    Financially?
10  A    Financially, yeah.
11  Q    Would you agree that at the time that
12  that was done ALEA was one of the many
13  state agencies that was suffering from
14  funding issues?
15  A    I believe that that would be a fair
16  statement that they were suffering from
17  funding issues and I was -- I was -- I
18  was one of those who interacted to some
19  about that.
20  Q    Did you --
21  A    And that's before that provision was put
22  in the budget that they were not to close
23  any offices because the legislature also

Page 277

1    makes some decisions about funding as
2    well as agencies.
3  Q   Well, isn't it that the legislature
4    actually determines what the funding will
5    be --
6  A   Yes.
7  Q   -- and the agencies do their best to
8    fulfill their responsibility within the
9    funds provided?
10 A   Yes.
11 Q   Did you fight to increase ALEA's budget?
12 A   I don't remember fighting to increase
13   ALEA's budget, but I've generally been
14   supported of law enforcement budgets.
15 Q   Did you support Governor Riley's
16   amendment 1?
17 A   Yes.  I -- I was a very aggressive
18   supporter.  I cut ads.  I wrote articles.
19   I was very aggressive in supporting that.
20   I probably was maybe the most aggressive
21   person in the state of Alabama in support
22   of it.
23 Q   Let's go ahead and take a break here for

Page 278

1    a few minutes.
2  A   Uh-huh, sure.
3  Q   Thank you.
4        VIDEOGRAPHER:  This
5        concludes tape five.  Going off
6        the record at 5:40.
7        (At which time, a break
8        was held.)
9        VIDEOGRAPHER:  This begins
10       disk six.  Going back on the
11       record at 6:04.
12 BY MS. MESSICK:
13 Q   Senator Sanders, I'm going to hand you
14   Defendant's Exhibit Number 21.
15       (Defendant's Exhibit 21
16       was marked for
17       identification.)
18 Q   This is a copy of Senate Bill 72 from
19   last year.  Would you look at that and
20   tell me if that's legislation that you
21   introduced?
22 A   Yes.  I -- I introduced this legislation.
23 Q   Does that legislation provide for any

Page 279

1    funding to support its mandate --
2  A   No.
3  Q   -- to -- thank you.
4        I'm going to show you now
5    Defendant's Exhibit 22.
6        (Defendant's Exhibit 22
7        was marked for
8        identification.)
9  Q   This is Senate Bill 23 for the upcoming
10   session.  Is this legislation that you
11   have introduced?
12 A   Yes.
13 Q   Does this bill also deal with the number
14   of days that the Alabama Law Enforcement
15   Agency shall be operational in each
16   county?
17 A   Yes.
18 Q   Does this bill contain any funding to
19   support its mandate?
20 A   No.
21 Q   When you developed Senate Bill 23, which
22   the legislature will have before it in
23   the next session, did you take into

Page 280

1    account the recent settlement between the
2    Alabama Law Enforcement Agency and the
3    United States Department of
4    Transportation in terms of the change in
5    hours that are a result of that
6    agreement?
7  A   I was aware of them but I felt like every
8    county ought to have at least one day a
9    week.  So regardless of what they may
10   have agreed to.
11 Q   Can the Alabama Law Enforcement Agency
12   unilaterally sign an agreement with the
13   United States government requiring that
14   the Alabama legislature provide the
15   Alabama Law Enforcement Agency additional
16   funding?
17 A   I -- I don't know.  I guess they can sign
18   such an agreement.  The question is, is
19   what impact it will have on the
20   legislature?
21 Q   You indicated earlier that you met with
22   representatives of the United States
23   Department of Transportation?

Page 281

1 A   Yes.

2 Q   Can you please tell me the substance of

3      those conversations?

4 A   If -- as best I recall, they -- they

5      asked about how -- how -- how this came

6      about and perhaps why it came about.  I

7      don't remember a lot of detail of what we

8      actually talked about but they asked the

9      questions and I tried to answer but it

10     was about why it came about, how it came

11     about, what was the impact of it, those

12     kinds of things.

13 Q   Besides representatives of the United

14     States Department of Transportation and

15     yourself, who else was involved in

16     those -- that conversation or those

17     conversations?

18 A   It seems like somebody sat in on a -- but

19     I can't pull up who it was.  It seems

20     like one person was there.  It seems like

21     they were already maybe in my office at

22     the time when they came by and I told

23     them, stay; you don't have to leave.  But

Page 282

1      I don't recall who that might have been.

2 Q   Was there just one conversation between

3      you and the United States Department of

4      Transportation?

5 A   I remember one clearly.  Seemed to be --

6      I just remember meeting with them one

7      time.  There may have been an attempt to

8      follow up but not make it.

9 Q   Are you aware of the substance of

10     other -- of conversations that other

11     people had with the United States

12     Department of Transportation regarding

13     the ALEA office closures?

14 A   No.

15          MR. ROSS:  Objection.

16          Form.

17 Q   Have you reviewed the Second Amended

18     Complaint that's been filed in this case?

19 A   No.

20 Q   Are you aware that the plaintiffs have

21     alleged that the photo ID law was

22     conceived as a purposeful device to

23     further racial discrimination and that's

Page 283

1      a paraphrases because there's some

2      ellipses in the quote?

3 A   I haven't looked at that in -- in the

4      complaint.

5 Q   Do you agree with the position that the

6      photo ID law was conceived to further

7      racial discrimination?

8 A   Yes.

9 Q   Do you understand a reference to the

10     conception of a law to refer to the

11     passage of the law by the legislature?

12 A   I don't understand the question.

13 Q   When you agreed with my -- when you

14     agreed with the plaintiff's statement

15     that the photo ID law was conceived to

16     discriminate, who do you understand to

17     be -- who do you understand to have

18     conceived the law?

19 A   Essentially white Republicans, some white

20     Republicans conceived it and they

21     continued to follow up on it over the

22     years.

23 Q   I'm going to provide you with Defendant's

Page 284

1      Exhibit Number 23.

2          (Defendant's Exhibit 23

3          was marked for

4          identification.)

5 Q   I'll represent to you that using

6      information available on the Alabama

7      legislature's website, this is my attempt

8      to list the names of all of the members

9      of the 2011 Alabama Senate and the 2011

10     Alabama House?

11          MR. ROSS:  Objection.

12          Plaintiff's -- this document is

13          just a list of names.  We have

14          no idea where it came from.

15          Ms. Messick is representing

16          that she made it.  We don't

17          know if it's accurate.  This

18          document was made by counsel

19          and we just have no idea

20          whether it's accurate, what

21          exactly it's representing to

22          be.

23 Q   Senator Sanders, do you see anybody

Page 285

1   listed on the first page of Exhibit 23
2   who you do not recognize to have served
3   in the Alabama legislature at some time?
4   A   No, I do not see any names that -- that I
5   don't recognize as having served in the
6   Alabama State Senate.
7   Q   Senator, I'm going to show you
8   Defendant's Exhibit Number 24, which is
9   the roll for the Senate vote number 1063
10  on House Bill 19 of the regular session,
11  2011.
12          (Defendant's Exhibit 24
13          was marked for
14          identification.)
15  Q   Was House Bill 19 in session 2011 the
16  photo ID law?
17  A   I don't recognize it just by the number.
18  I don't keep up with the numbers.
19  Q   That's fine. Will you please look at
20  Defendant's Exhibit Number 24 and tell me
21  which members of the Alabama Senate in
22  2011 intentionally -- which members of
23  the Alabama Senate passed or supported

Page 286

1   the photo ID law with the intention of
2   racially discriminating?
3          MR. ROSS:  Objection.
4          Form.
5   A   Well, first, I -- I can't speak to each
6   of these persons who voted for it. I
7   viewed it as a collective scheme for
8   racial discrimination. And earlier you
9   asked me who conceived it and as I recall
10  an organization called ALEC, A-L-E-C,
11  conceived these voter ID laws and spread
12  them across the country, as I -- as I
13  recall. And they were submitted not just
14  to Alabama but to a lot of other places.
15  And I can't address the intention of any
16  one legislator.
17  Q   Does that answer for the House as well?
18  If I were to provide you a list of House
19  members, would you be able to tell me who
20  you believe supported or voted for the
21  photo ID law in order to intentionally
22  discriminate against blacks?
23  A   I can't address the individual House

Page 287

1   members or the individual Senate members.
2   Q   When you spoke with Mr. Ross earlier you
3   talked about times when --
4   A   Talked about what?
5   Q   You talked about times when you believed
6   that the Republicans invoked cloture in
7   order to prevent debate by Democrats.
8   And you said it almost never happened
9   when the Democrats were in control. Did
10  the Democrats ever invoke cloture to
11  prevent debate in the time they
12  controlled the Alabama legislature in the
13  time that you served there?
14  A   Well, I -- I remember -- I remember one
15  time in specific. It was the end of the
16  session. We had a budget and the only
17  way we could pass the budget was to
18  invoke cloture but time was running out
19  in the legislative session. I remember
20  that one time clearly.
21  Q   Do you remember a jug incident that made
22  Lieutenant Governor Steve Windham?
23  A   Infamous or famous?

Page 288

1   Q   Yes.
2   A   I remember.
3   Q   Was that the Democrats trying to strip
4   him of power?
5          MR. ROSS:  Object.
6          Speculation. Form.
7   A   The Democrats were not trying to strip
8   him of power. In organizing in a Senate
9   you determine who has power. At that
10  point nobody had power. Previous -- just
11  because previous lieutenant governors had
12  power didn't mean you had it. At the
13  moment you organize, nobody has power
14  until you organize. So we weren't
15  stripping him, we were saying that the
16  power would be distributed differently.
17  Q   Okay. You talked about the immigration
18  law earlier. Do you remember that one of
19  the lawsuits against the immigration law
20  was brought by church leaders?
21  A   Vaguely.
22  Q   I believe you testified that the church
23  leaders were concerned that they would be

Page 289

1    prosecuted for helping people?

2  A   Yes.  Some church leaders was concerned

3    that they could be prosecuted.

4  Q   Are you aware that the federal court said

5    that those plaintiffs lack standing to

6    bring those claims because the law did

7    not operate the way they believed it did?

8  A   No, I'm not familiar with that.

9  Q   You talked earlier about a deal in 2003

10    to pass a bill to address felon

11    disenfranchisement simultaneous with the

12    voter ID bill?

13  A   Yes.

14  Q   What was the substance of the felon

15    voting bill?

16  A   I don't remember the details of it.  I

17    just remember that it would reduce the

18    number of people that would be

19    disenfranchised because of prior felon

20    convictions.

21  Q   Are you aware there's a constitution

22    amendment in this state that sets the

23    terms of whom is disenfranchised?

Page 290

1  A   I am aware that there is a constitutional

2    amendment.

3  Q   Okay.

4  A   But it is applied much different than

5    what's in the constitution, the

6    amendment.  I haven't looked at the

7    constitution amendment for some time but

8    when it called moral turpitude I think at

9    that time it meant something -- treason

10    and two or three other things.  Since

11    that time, it has been expanded more

12    broadly -- much more broadly.

13  Q   I'm going to object to the form of the

14    answer.

15       What, if anything, did you ask

16    former Secretary of State Jim Bennett to

17    do to ease what you perceived to be a

18    burden of the photo ID law and which he

19    declined to do?

20  A   I don't remember what I may have asked

21    individually or what we collectively

22    asked, but I remember that we were very

23    concerned about the impact of -- of -- of

Page 291

1    photo ID.  I think that there may have

2    been some questions about the regulations

3    and -- and they had already been

4    struggling with those.  I think that

5    there had been some requests about a way

6    to ensure that photo ID was more

7    accessible.  I don't really remember all

8    the details from that meeting.  That was

9    the general tone of it, I think.

10  Q   Have you asked current Secretary of State

11    John Merrill to do anything to ease what

12    you perceive to be the burden of the

13    photo ID law?

14  A   I -- I don't think I've asked him

15    anything about the voter ID.

16  Q   Okay.  You spoke with Mr. Ross earlier

17    about preclearance under section 5 of the

18    Voting Rights Act?

19  A   Yes.

20  Q   Did pre- -- did section 5 require the

21    state of Alabama or local officials to

22    get preclearance anytime a polling place

23    was moved?

Page 292

1  A   Yes.

2  Q   Was that true even if the polling place

3    was demolished by a tornado?

4  A   I don't know about -- I -- what I know

5    and I represented county commission that

6    whenever there was a -- they changed

7    polling places, it was precleared.  Now,

8    there was some emergency provisions

9    where -- where if some emergency come up,

10    we'd notify them and tell them that it's

11    too close to the election to do anything;

12    you've got an emergency.  And what we --

13    they intended to have it precleared but

14    they got an emergency.  So I would

15    imagine that with tornadoes, it may have

16    done it because I vaguely remember in the

17    back of my mind that things have happened

18    and they couldn't vote at a polling

19    place.  So they notified them and then

20    submitted a preclearing, but it was too

21    close to the election to go through the

22    process.

23  Q   Have you actually made preclearance

Page 293

1   submissions then?
2 A   Yes.
3 Q   What kinds of preclearance submissions
4     did you make other than those involving
5     moving polling places?
6 A   I remember one on a piece of local
7     legislation I submitted.  The attorney
8     general didn't do it.  I don't remember
9     what county it was for, but I remember
10    the attorney general told me that I
11    needed to submit it and I submitted it.
12    It seems to me that I've submitted some
13    dealing with redistricting of county
14    boards of education, county commission.
15 Q  Are all preclearance submissions the same
16    in terms of the amount of the time and
17    effort they take to complete?
18 A  No.  They vary widely.
19 Q  Did section 5 require preclearance of
20    changes that were favorable to blacks?
21 A  Yes.
22 Q  All changes had to be submitted?
23 A  All changes whether they were favorable

Page 294

1     or not favorable and the reason for that
2     was that you didn't know whether they
3     were favorable or not favorable and
4     therefore you submitted them so they
5     could look at it and determine.  Some
6     things on the surface may look like it's
7     favorable but in reality, it's
8     unfavorable.
9 Q   Are you familiar with every preclearance
10    submission that the State of Alabama has
11    ever made?
12 A  No.
13 Q   I believe you testified earlier that it's
14    your understanding that preclearance must
15    be secured before a law can be enact --
16    enforced; is that correct?
17 A  Before it can be implemented.
18 Q   Okay.  So it's not that there's some sort
19    of requirement immediately upon the
20    passage of the law that it be submitted.
21    It must be submitted and preclearance
22    achieved before a law can be implemented;
23    is that correct?

Page 295

1 A   We -- yes.  The law -- as I understand
2     it, you can pass a law but you can't
3     implement it if it's one that should be
4     submitted to preclearance -- precleared.
5 Q   You testified earlier that you believe
6     Alabama's photo ID law would not have
7     been precleared?
8 A   Yes.
9 Q   Is it your understanding that if
10    preclearance had been denied -- let me
11    start over.
12    If Alabama had submitted the photo
13    ID law for preclearance and if that
14    preclearance had been denied, do you
15    believe that Alabama would be prevented
16    from implementing the photo ID law after
17    the Shelby County V. Holder decision?
18 A   Well, first, I believe the law provides
19    if the Justice Department turned it down
20    I believe they can submit it to a
21    three-judge panel in Washington, DC.  So
22    that's a route they could have gone.
23 Q   Absolutely.  There are various ways to

Page 296

1     solve preclearance.  But for purposes of
2     my question, let's assume preclearance is
3     sought and denied and the United States
4     Supreme Court thereafter issues its
5     decision in Shelby County V Holder.
6     Would the denial of preclearance have any
7     effect at that point?
8         MR. ROSS:  Objection.
9         Calls for a legal --
10 A  I don't know the answer to that.
11         MR. ROSS:  -- legal
12         conclusion.
13 Q   I'd like to ask you to look at
14    Defendant's Exhibit Number 7, please.
15 A  Okay.  Now I'm organized.
16 Q   Okay.  On the first page in the third
17    paragraph, you allege that the Alabama
18    attorney general deliberately waited to
19    seek preclearance and that as a result
20    the primary was the first time the photo
21    ID was implemented and there were various
22    problems in how the law was applied.  Are
23    you saying simply that there were

Page 297

1  problems with the first implementation of
2  the law or are you saying that
3  preclearance somehow created problems
4  with the implementation?
5  A  Well, preclearance didn't create any
6  problems with implementation because it
7  wasn't precleared.
8  Q  Okay.  Thank you.
9     We talked earlier about Senator
10  Vivian Figures.  For the record, could
11  you tell me what race she is?
12  A  African-American.
13     MS. MESSICK:  Thank you.
14     I'm going to turn the
15     questioning over to counsel for
16     the defendant -- defendant
17     governor.
18
19     EXAMINATION
20  BY MR. NEIMAN:
21  Q  Okay, Senator Sanders.  I know it's late.
22  We're all weary.  I'll try and cut it
23  short.

Page 298

1  A  I'm sure I'm not the only one that would
2  appreciate that.
3  Q  Let me see if I can memorialize a
4  conversation we had with all counsel
5  present earlier today.  You are a lawyer;
6  correct?
7  A  Yes.
8  Q  That said, you're not being represented
9  by anybody else today; correct?
10  A  That's correct.
11  Q  You are aware of a doctrine called the
12  legislative privilege; correct?
13  A  Yes.
14  Q  When we discussed that earlier --
15  A  Legislative privilege?
16  Q  Under which a legislator might be able to
17  object to certain questions about his or
18  her activities?
19  A  Yes.
20  Q  When we discussed that doctrine earlier,
21  you suggested that it was your own to
22  either raise or waive; right?
23  A  That's correct.  My understanding is it's

Page 299

1  a privilege that the legislator can
2  invoke or waive and I waived it.
3  Q  Earlier today we looked at a document in
4  which the NAACP LDF made some requests
5  for documents from the State of Alabama.
6  Do you remember that document?
7  A  Yes.
8  Q  Okay.  That document purported to make
9  that request on your behalf; correct?
10  A  I believe on my half -- behalf and some
11  others, if I remember correctly.
12  Q  Did you have an attorney-client
13  relationship with the legal defense fund
14  for the purposes of that document
15  request?
16  A  No.
17  Q  Okay.  What did you do to prepare for
18  today's deposition?
19  A  Nothing really.  I -- I didn't know what
20  was going on and so I contacted Deule
21  Ross and he said he couldn't talk to me,
22  so I couldn't prepare.
23  Q  Okay.  Before you received the notice of

Page 300

1  deposition, had you had any contact with
2  any of the plaintiffs or the plaintiffs'
3  counsel about this litigation?
4  A  I don't know.  I -- I don't think I had
5  any -- I don't remember having any
6  individual conversations but there may
7  have been groups that we were in where
8  there was some conversation.
9  Q  Are you -- are you a member of the either
10  of the organizational plaintiffs in this
11  case?  And those two organizations I'll
12  represent to you are the Greater
13  Birmingham Ministries?
14  A  No.
15  Q  What about the Alabama Chapter of the
16  NAACP?
17  A  Not -- no.  No.  I have been a member of
18  the Alabama Chapter of the NAACP some
19  years ago, but I'm not a member of either
20  of those.
21  Q  Okay.  Have the plaintiffs in this case
22  asked you to provide them with the names
23  of any persons who have been unable to

Page 301

1   vote because of the voter ID law?
2   A   I don't -- I don't recall any specific
3   request to me, but there certainly have
4   been some discussions about it.  I --
5   I -- I don't have any specific request.
6   Q   Do you know the names of anyone who has
7   been unable to vote because of the photo
8   voter ID law in Alabama?
9   A   I -- I don't have any names I could
10  provide you.
11  Q   I think you said earlier -- and I don't
12  want to mischaracterize your testimony --
13  that you've had discussions with people
14  in the community about those persons'
15  either inability or unwillingness to
16  obtain an ID that would enable them to
17  vote.  Is that a fair --
18  A   Yeah.
19  Q   -- summary of what you said earlier?
20  A   I've been in -- been in meetings where
21  there was discussions about it and where
22  people have expressed their concerns
23  about it.

Page 302

1   Q   Do you have any recollection of a
2   specific date in which you had such a
3   meeting?
4   A   No.
5   Q   All right.  And do you have any
6   recollection of a specific name of
7   someone who you interacted with during
8   one of those meetings?
9   A   No.
10  Q   We've talked a little bit about the
11  changes to the ALEA offices in various
12  counties in Alabama.  You conducted a
13  protest on the steps of the Montgomery
14  capitol about this issue; correct?
15  A   Yes, I -- I participated in one.
16  Q   Earlier today I believe we discussed that
17  protest and you mentioned the slogan that
18  you used during the protest.  I'm
19  forgetting what the slogan was.  Can you
20  refresh my recollection?
21  A   Not just -- "Give us the ballot, not just
22  the bottle."
23  Q   Is it fair to say that the changes in

Page 303

1   ALEA office hours affected people in ways
2   that did not involve the ballot?
3   A   Yes.
4   Q   Changes in office hours, for example,
5   would have affected, perhaps, someone's
6   ability to drive legally?
7   A   That -- that's correct.
8   Q   Why did you choose to use the slogan
9   involving bottle and ballot but not
10  mention transportation, for example?
11         MR. ROSS:  Objection.
12         Form.  Speculation.
13  A   We -- we thought that -- that -- that --
14  that the state of Alabama saying that we
15  don't want people to have drive to the
16  next county to get a bottle but yet they
17  were making them drive to the next county
18  to get a driver's license and the best
19  way to handle that -- I mean to highlight
20  that was the B&B, "Give us the ballot,
21  not just the bottle."
22         So that -- that -- I think part of
23  it was the alliteration but it kept the

Page 304

1   spirit that we had of the feel of it
2   adversely impacting voting.
3   Q   Earlier -- or earlier in the day we
4   discussed various cases that you were
5   either aware of or involved in where
6   persons had been accused of voter fraud.
7   Did you say during that testimony that
8   you had at some point contacted
9   authorities and asked them to investigate
10  voter fraud by white persons?
11  A   No.  I said we, and I was talking about
12  working with Albert Turner and Robert
13  Turner and some others, yes.
14  Q   Okay.  Which incidents were you referring
15  to?
16  A   Oh, you may be talking about a different
17  thing.  You're not talking about back
18  with the Marion Three.
19  Q   I thought at some point today you had --
20  A   I mentioned down in Wilcox, the election
21  in 2016 -- no -- 2000 -- yeah, 2016.
22  Q   And were there concerns during that
23  election about fraud by white citizens of

Page 305

1   Alabama?
2           MR. ROSS:  Objection to
3       form.  You haven't defined
4       fraud.
5   A   There were concerns about fraud and about
6   black citizens.
7   Q   Okay.  So am I just misremembering when I
8   say I thought I heard you testify that
9   there were some concerns at some point
10  about some sort of the voter fraud or
11  irregularity conducted by white persons?
12  A   Yeah.  That -- that was back in the late
13  '70s or early -- early '80s that ended up
14  going with the indictment of the Marion
15  Three.  We -- we -- there had been a lot
16  of complaints.
17          Whites used the absentee ballots
18  during that period and blacks didn't.
19  There had been complaints made to law
20  enforcement about it.  They didn't do it.
21  Then Albert Turner and I believe Robert
22  Turner went with him up to Washington,
23  DC, and that -- that was a further

Page 306

1   complaint about it.
2           And they said, well, nothing we can
3   do about it, y'all just learn to use
4   absentee ballots yourself.  So when they
5   came back and told us that, I said to
6   them we have to find a way to do it
7   legally.  And so I held classes -- well,
8   maybe not classes -- I held sessions
9   where we went over the absentee law.
10  Q   Right.
11  A   So that they could do it legally.
12  Q   This is the same Robert Turner who still
13  practices law in Marion?
14  A   Yes.
15  Q   Do you have a recollection about the
16  specific incident that was involved in
17  those complaints?
18  A   No, no.  That's nearly 40 years ago.
19  Q   Okay.  In 2003, a voter ID bill passed.
20  There was testimony about that earlier
21  today.  What was your vote on that bill?
22  A   I don't remember.  I was trying to
23  remember that -- that earlier.  I -- I

Page 307

1   know we had worked out a deal where the
2   two bills were going to work together and
3   I don't recall exactly what my vote was.
4   Q   I -- I believe earlier today you
5   testified that you understood different
6   polling places to adopt different views
7   of which convicted felons were authorized
8   to vote?
9   A   Yes.
10  Q   Is that a fair characterization?
11  A   I think that's a fair statement.  We had
12  had complaints that one would include
13  certain things as a felon with moral
14  turpitude and others would excluded it.
15  It was just all that interpretation
16  there.
17  Q   Can you recall a specific incident in
18  which that occurred?
19  A   No.
20  Q   There's been some testimony today about
21  the racial composition of state
22  parties -- or political parties in
23  Alabama.  Do you know -- well, scratch

Page 308

1   that.
2           You have testified, for example,
3   that the majority of the Democratic party
4   is black?
5   A   Yes.
6   Q   When you refer to the Democratic party,
7   are you referring to people who hold
8   office?
9   A   No.  I'm talking about people who vote
10  Democratic.
11  Q   Are you referring to people who are not
12  members of the party formally?
13  A   Well, in Alabama the only people who are
14  formally members of the parry are
15  essentially elected officials.  There may
16  be people who work there but you don't
17  register as a Democrat in Alabama.  Your
18  don't register as a Republican.  So the
19  only formal people are generally the
20  candidates.
21  Q   Do you know what percentage of the voters
22  in Alabama who voted for Senator Hillary
23  Clinton for president were white?

Page 309

1  A   No.  No.  But I -- I forget the -- she
2      got 30-some percent as I -- as I recall
3      and there's no doubt in my mind that the
4      huge majority of those were
5      African-American.
6  Q   Why is there no doubt in your mind about
7      that?
8  A   Because there was not a lot of
9      African-Americans voting for President
10     Trump.
11 Q   Have you seen polling data on that --
12     the --
13 A   In Alabama?  Not in Alabama.  I haven't
14     seen any polling data on it.  I've seen
15     it nationally and it was, like, 8 percent
16     and 88 percent for Clinton.
17 Q   We've talked a bit about the voter
18     identification that is available at the
19     boards of registrars?
20 A   Yes.
21 Q   You have testified that you have had
22     conversations with people suggesting that
23     for various reasons they -- those persons

Page 310

1      do not want to get this identification
2      from the boards of registrars?
3  A   Yes.
4  Q   Do you have a specific recollection of
5      when you had a conversation in which
6      someone revealed that information to you?
7  A   No, because those would have been at
8      community meetings.  They were not
9      individuals that sought me out.  When we
10     would be at community meetings, we'd be
11     discussing the voter ID law.  It was
12     those kinds of situations.
13 Q   Do you have the names of any persons who
14     revealed that information to you at those
15     meetings?
16 A   No.
17 Q   Do you recall --
18 A   I can't recall any at this moment.
19 Q   Do you recall whether you responded to
20     those persons when they expressed those
21     concerns to you?
22 A   Well, I certainly responded in the
23     community when those concerns were --

Page 311

1      were expressed.
2  Q   Do you recall what you said?
3  A   I told them that I had concerns as well
4      and so -- so yeah.
5  Q   Did you encourage them to get the
6      identification from the boards of
7      registrars?
8  A   I encouraged them to get driver's
9      licenses or -- or get a nondriver's
10     license ID because they could use it for
11     more -- more things than just voting.
12 Q   At some point during your testimony today
13     you mentioned that you have been involved
14     in efforts to get African-Americans to
15     obtain voter IDs; is that correct?
16 A   I -- I don't know whether I've been --
17     I've -- I've been involved in activities
18     to get people to gets IDs so that they
19     could vote, not necessarily voter ID.  If
20     they could get a driver's license, they
21     could get nondriver's license ID but to
22     get an ID so that they could vote.
23 Q   What efforts are you referring to

Page 312

1      specifically?
2  A   I -- I attend various community meetings
3      and other kinds of things.  I -- I talk
4      about it.  I've talked about it over the
5      radio and various kinds of other ways.
6  Q   Earlier today did you testify that the
7      Shelby County decision has affected the
8      ability of incarcerated persons in
9      Alabama to vote?
10 A   I don't remember -- I don't remember
11     testifying to that.
12 Q   Did you testify that the Shelby County
13     decision has affected the ability of
14     convicted felons to vote?
15 A   I don't remember testifying to that.
16 Q   We had discussed some legislative
17     procedure today.  The word cloture had
18     been used.  You also discussed a
19     procedure whereby there was no debate
20     over particular bills.  Is cloture the
21     same thing as a procedure whereby there
22     is no debate over bills?
23 A   Well, cloture and a petition to cut off

Page 313

1  debate is the same.  And we used to have
2  a -- a -- sort of a situation where we
3  wouldn't cut off debate for at least two
4  hours so people could have a chance to
5  debate.  But a petition to cut off debate
6  and cloture are the same thing.  But what
7  would happen is when they got in they
8  changed the rule where they could cut off
9  debate within 20 -- 20 minutes.  But so
10 whoever introduced -- whoever was the
11 sponsor of the bill would -- the moment
12 the bill is called up, they'd come to the
13 podium and -- and take the -- the --
14 and -- and -- and take the mike and then
15 a petition would be filed by the rules
16 committee.
17       And so there was 20 minutes to be
18 able to talk on it but they wouldn't give
19 up the mike to Democrats or
20 African-Americans to be able to say a
21 word.  So you didn't get a chance to --
22 to -- to even debate during those 20
23 minutes because they held the mike and

Page 314

1  they were doing the debating those 20
2  minutes.  And after 20 minutes, you vote
3  on the petition to cut off debate.
4  Q   Are you aware of what happened on the
5      floor of the House when the voter ID
6      law -- the photo voter ID law, was being
7      considered?
8  A   No.
9  Q   Are you aware of what happened on the
10     floor of the House when the immigration
11     law, HB 56, was being considered?
12 A   No.
13 Q   There was some discussion earlier today
14     about the redistricting and the opinions
15     by the United States Supreme Court as
16     well as the three-judge district court on
17     remands.  Have you had an opportunity to
18     read the three-judge district court's
19     opinion on remand?
20 A   No.
21 Q   I have not either, not in full.  But are
22     you aware of the majority's ruling with
23     respect to your district, Senate district

Page 315

1      23 --
2  A   No.
3  Q   -- on remand?  Are you aware --
4  A   I didn't think that Senate district 23
5      was one of the ones that they decided.
6      No -- no, I haven't read it so -- at all.
7  Q   Are you aware that the court in that case
8      has discussed certain testimony that you
9      gave in 2011 here in Selma?
10 A   No, I have -- no, I'm not.  I had hoped
11     to testify at trial.  I wasn't called, so
12     I'm not aware that they discussed
13     something that I may have said.
14 Q   Do you remember a public hearing held on
15     redistricting in Selma on October 18th,
16     2011?
17 A   I don't remember the exact date, but one
18     was held in Selma.
19 Q   Is it your recollection that you spoke at
20     that hearing?
21 A   I did attend and did speak.
22 Q   Do you recall whether you said during
23     that time that the majority

Page 316

1      African-American the districts ought not
2      to be less than 52 percent
3      African-American?
4  A   I believe I may have said something to
5      like that.
6  Q   What was the basis of your statement to
7      that effect?
8  A   Well, one of the things that I was
9      concerned about is that with the number
10     of African-Americans who have a
11     conviction, the number of
12     African-Americans who are underage, and
13     various other reasons why they may not
14     vote, a district that's got 50 percent
15     African-American, 50 percent white is a
16     predominantly white district when it
17     comes to voting.  Those were the kind of
18     concerns that I have.
19 Q   Have you ever run for the United States
20     Congress?
21 A   Yes.
22 Q   When did you run?
23 A   '92.  And out of 75,000 votes, I came up

Page 317

1  about 500 votes short.
2  Q  That was in the Democratic primary?
3  A  Yes.
4  Q  Who was your opponent?
5  A  Earl Hilliard.
6  Q  Do you know of any irregularities with
7  respect to that election and the counting
8  of votes or otherwise?
9           MR. ROSS:  Objection.
10         Form.
11 A  Yeah.  There was some problem down in
12 Marengo County.  Marengo County was held
13 out un- -- until all the other votes was
14 in.  I had the same problem when I ran
15 for the state senate one time.  I
16 actually filed a contest on that but
17 didn't go all the way through on it.
18 Q  Which election did you file the contest
19 on?
20 A  The United States Congress.
21 Q  Is that the only time you have run for
22 federal office?
23 A  Yes.

Page 318

1  Q  Is that the only election --
2  A  Unless you consider running as a delegate
3  for a candidate that's federal in some
4  kind of way.
5  Q  Is that the only election you had ever
6  lost, by the way?
7  A  No.  I lost -- I ran in '82 and -- and it
8  seems like out of 35,000 -- 36,000 votes,
9  Marengo County held out until the end and
10 hours later it came in and I was sure I
11 had won and I ended up losing I think by
12 400 votes.  And then in '92 I thought I
13 had won and Marengo County came in hours
14 later and I had lost by 500 votes or so.
15 Q  Is it your position that having every
16 ALEA office in the state open one day per
17 week is sufficient to --
18 A  No.  A minimal of one day for week.  No.
19 Having every office one day a week is not
20 sufficient for various kinds of places.
21 I don't think it's sufficient in Dallas
22 County or Marengo County, certainly not
23 in Birmingham and Montgomery and other

Page 319

1  places.  But I -- it's a minimal of one
2  day.
3  Q  Did the ALEA clotures affect Dallas
4  County's ALEA office?
5  A  It would affect it because if people have
6  to come from Perry County or Lowndes
7  County or Wilcox County, it ends up
8  affecting Dallas County.
9  Q  Did the hours in Dallas County change as
10 a result of the closures?
11 A  I don't know.  I don't know for sure, but
12 I don't know of any change.
13 Q  Is it your position that the hours of
14 ALEA offices in Perry County need to be
15 the same as the hours in Dallas County?
16 A  No, that's not my position.  My position
17 is that Perry County needs to be at least
18 one day a week.  Dallas County probably
19 needs to be every day of the week.
20 Q  Why do the hours in Dallas County need to
21 be different than Perry County?
22 A  Because there's a lot more people in
23 Dallas County.  Dallas County is almost

Page 320

1  four times the size of Perry County.
2  Q  Are you aware of any data about the
3  number of transactions that are conducted
4  at various ALEA offices throughout the
5  state?
6  A  No, I don't have that data.
7  Q  Earlier today I believe that you
8  testified that in your view the ALEA
9  offices could have been funded such that
10 the closures would not have happened even
11 under the budget that was passed by the
12 legislature in 2014.  Do I have that
13 correct?
14 A  That's correct.
15 Q  Where do you believe the money could have
16 come from to fund the offices?
17 A  Well, when it was initially closed, they
18 said that they were going to save a
19 hundred thousand dollars.  Later they
20 came back and made in the next -- months
21 later making some huge amount.  But I
22 think it was so important that you have
23 driver's license in each county that --

Page 321

1  from the budget that they had they could
2  have found ways to keep them open at
3  least one day a week in every county.
4  Q   Do you recall any specific part of --
5  scratch that.
6      Do you recall a specific thing that
7  you believe should not have been funded
8  in order to fund the ALEA offices?
9  A   No.  But it has been my experience with
10  the Alabama government anything they
11  really want to fund they find a way to
12  fund it.  You take a little from here and
13  a little from there.  They find a way to
14  do it.  That has been my experience for
15  the 30-some years that I've been down
16  there and the things they don't want to
17  fund, they say it's because of the budget
18  or because of finance or something to
19  that way.  I think it's a matter of what
20  they want to do and don't want to do and
21  I think they wanted to close those
22  offices so funding was -- became an
23  excuse, not a reason.

Page 322

1  Q   Earlier today we discussed the removal of
2  the confederate flag from the monument in
3  front of the capitol --
4  A   Yeah.
5  Q   -- a couple of years ago.  I believe that
6  you testified that that action was
7  connected to Google's opening of a
8  facility in Alabama?
9  A   That's --
10  Q   Can you explain the basis for that
11  statement?
12  A   I was informed -- I was -- I was informed
13  that by people in the governmental
14  process that that was the real reason.
15  It didn't have anything to do with the --
16  the killing in Charleston, South
17  Carolina.
18  Q   Who gave you that information?
19  A   It was somebody in the economic
20  development process.  It was -- seems to
21  me like Google was supposed to make an
22  announcement the next week and there was
23  some concern about that by Google and it

Page 323

1  was my understanding the governor
2  responded to it by removing it.
3  Q   You said someone in the economic
4  development process gave you that
5  information.  Are you referring to a
6  particular state agency?
7  A   No, I'm not referring to a particular
8  state agency.  Let me -- let me just say
9  this.  I -- there was a -- in the -- in
10  the political process, people -- other
11  senators and other people are always
12  sharing information that they have
13  obtained.  And over the years, you learn
14  to make some judgment about where it come
15  from and whether it's just speculation or
16  whether there's something to it.  And --
17  and I felt like there was something --
18  something to that.
19  Q   I take it, though, that you're saying
20  that you do not remember the name of the
21  person who gave you that information.
22  A   I'm not saying that I don't remember the
23  name of the person that may have said it,

Page 324

1  but it was provided to me in confidence
2  and I -- I don't intend to reveal it.
3  Whatever actions y'all need to take,
4  y'all can take.  I'm not going to violate
5  that confidence.
6  Q   Okay.  So just to be clear you're
7  refusing to answer my question about the
8  name of the person?
9  A   I'm refusing to give you the name to be
10  clear, yeah.  I'm not refusing to answer
11  your question.  I'm refusing to give you
12  that name.
13  Q   Fair enough.
14  A   I don't want to lie under oath.
15  Q   In 2015, before the hours the ALEA
16  offices were changed, do you recall
17  Governor Bentley being involved in an
18  initiative to raise taxes in Alabama?
19  A   Yes.
20  Q   Did you interact with the governor's
21  office about that initiative?
22  A   I think somebody from the governor's
23  office may have had a conversation with

Page 325

1    me.
2  Q   Did you support the proposal to raise
3      taxes?
4  A   No.  I -- I said -- I told them I would
5      support it if they would expand Medicaid,
6      but if they don't -- didn't expand
7      Medicaid I was not going to support any
8      additional funding.  We had been fighting
9      and struggling for years and it was a
10     matter of life and death for a lot of
11     people and I said I'm not against the
12     taxes but unless you're going to find a
13     way to expand Medicaid, I'm not voting
14     for additional taxes.
15 Q   You mentioned earlier in your testimony
16     that in your view expanding Medicaid for
17     African-Americans in Alabama; correct?
18 A   It would have been good for
19     African-Americans, but it would have been
20     good for a whole lot of other people in
21     addition to African-Americans.
22 Q   Would rasing taxes have been good for
23     African-Americans in Alabama as well as

Page 326

1      other people in Alabama?
2  A   I guess that depends on what kind of
3      taxes it was.  If it was sales taxes,
4      then that might not have been good.  If
5      it was some property taxes or some other
6      kind of taxes, it might have been.  That
7      just depends on the kind of tax.
8              MR. NEIMAN:  I have no
9          further questions.  Thank you.
10 BY MR. ROSS:
11 Q   I'm going to have probably a few more
12     questions for you, Senator, if that's
13     okay?
14 A   Do I have a choice?
15 Q   Well, let's take a --
16 A   I really don't have a choice.
17 Q   Let's take a quick break, just five
18     minute us and then we'll go back.
19             VIDEOGRAPHER:  Going off
20         the record at 7:05.
21         (At which time, a break
22         was held.)
23             VIDEOGRAPHER:  This begins

Page 327

1      disk seven.  Going back on the
2      record at 7:07.
3          FURTHER EXAMINATION
4  BY MR. ROSS:
5  Q   Senator Sanders, I just have a few
6      follow-up questions and I'm going to try
7      to be brief.  When Ms. Messick handed you
8      a series of articles about alleged voter
9      fraud, did all of those articles involve
10     convictions?
11 A   No.
12 Q   Did some of them involve simply
13     allegations of what she said was voter
14     fraud?
15 A   Yes.
16 Q   Did she specify what kind of voter fraud
17     or do those articles always specify what
18     kind of voter fraud was alleged?
19 A   She didn't specify but a lot of them was
20     about absentee voting rather than voting
21     at the poll.
22 Q   Okay.  Do you recall -- did all of them
23     involve voter impersonation where one

Page 328

1      person says that they are pretending to
2      be another person?
3  A   I only recall one of them where there was
4      a voter impersonation.
5  Q   Prior to seeing to seeing those articles,
6      did you have any personal knowledge about
7      these convictions?
8  A   No.
9  Q   Ms. Messick mentioned an incident in
10     which someone in Dothan was convicted for
11     voter fraud; is that correct?  Do you
12     recall that article?
13 A   Yes, I recall the article.
14 Q   Do you recall if it took place in 2015?
15 A   No, I -- I don't recall.
16 Q   Let me look back at it, Senator.  I
17     believe it's Defendant's --
18 A   Okay.  Here's one, Exhibit 4, I think.
19 Q   4?  I probably skipped over it.
20 A   Exhibit 4.
21             MR. ROSS:  Do you know
22         which one was the Dothan one?
23             MS. MESSICK:  I think

Page 329

1    you're talking about
2    Defendant's 2 and 3.
3        MR. ROSS:  Sorry.  I
4    skipped over it.
5  Q  Can you take a look at Defendant's 2 for
6    me, please, Senator.
7  A  Okay.  Yes.  Defendant 2 --
8  Q  Okay.
9  A  -- said was involved in voter fraud in
10    the 2013 Dothan municipal election.
11  Q  Was that after the voter ID law passed,
12    Senator?
13  A  Yes.
14  Q  Was there a voter identification law in
15    place at that time?
16  A  I -- I -- I don't think that the voter ID
17    had been implemented.  Well, voter photo
18    ID had been implemented.  There was a
19    voter ID law in place.
20  Q  Okay.  Senator, do you know how the
21    absentee voter ID requirement works in
22    the Alabama's photo ID law?
23  A  Say what?

Page 330

1  Q  Do you know how the requirement for
2    absentee voters works -- well, strike
3    that.
4        Is it your understanding that
5    Alabama's photo ID law requires someone
6    to show photo ID if they vote absentee?
7  A  Generally, yes.
8  Q  Okay.  Senator, can you go to Defendant's
9    19 and look at just item B which is at
10    the very bottom of the first page.
11  A  Okay.
12  Q  Can you just review that provision there?
13  A  Yes.  Item --
14  Q  B.
15  A  -- B?
16  Q  Yes, sir.
17  A  Voters voting on absentee ballot shall
18    submit with the ballot a copy of one of
19    the forms of identification listed in
20    subsection A.
21  Q  So is it right when you're voting in
22    absentee in Alabama under the photo ID
23    law you're only required to send in a

Page 331

1    photocopy of a photo ID; is that correct?
2  A  That's correct.
3  Q  And given that, would it be possible for
4    someone to get ahold of another person's
5    photo ID and mail it in under that law?
6        MS. MESSICK:  Object to
7    the form.
8  A  It's possible.
9  Q  Okay.  Senator, Ms. Messick asked you --
10    well, strike that.
11        You mentioned earlier, Senator,
12    about the poll tax, described it.
13  A  Yes.
14  Q  Do you recall if the poll tax expressly
15    mentioned the race of the voter?
16  A  It absolutely did not.  Neither poll tax
17    or the literacy test mentioned race.
18  Q  And do you know whether courts ever found
19    those laws to be intentionally
20    discriminatory despite the fact that they
21    did not expressly mention race?
22  A  Yes.
23  Q  Here in Alabama?

Page 332

1  A  I don't know whether it was here in
2    Alabama but the federal courts determined
3    that they were intentional.  I don't know
4    whether it's an Alabama case or some
5    other place.
6  Q  So it's possible, Senator, for a law to
7    be passed with discriminatory intent even
8    if the law does not expressly mention
9    racial -- or race?
10        MS. MESSICK:  Object to
11    the form.
12  A  It's not just possible, it's often done.
13  Q  Senator, you mentioned you were elected
14    in 1983 after there was litigation under
15    the Voting Rights Act; is that correct?
16  A  Yes.
17  Q  And do you recall who was in power who
18    passed the reapportionment in the 1980s?
19  A  It was Democrat.
20  Q  Okay.  So did Democrats pass laws in
21    Alabama that were blocked under section
22    5?
23  A  Yes.

Page 333

1  Q    Okay.  Senator, we've been talking a lot
2      about sort of Alabama but we haven't
3      talked about sort of the demographics of
4      Alabama.  Is it fair to say that Alabama
5      is about 25 to 35 percent black?
6  A    Yes, about 26 -- 25 to 26 percent if I
7      recall.
8  Q    So given that, African-Americans are a
9      minority; is that right?
10 A    Yes.
11 Q    So when Mr. Neiman was talking about the
12     same percentage of people in Alabama
13     voted for Senator -- or Secretary of
14     State Clinton this past election, does
15     that sort of match the number of
16     African-Americans there are in the state?
17            MS. MESSICK:  Object to
18         the form.
19 A    Well, the minority vote was more than
20     25 percent, but as I recall it might have
21     been 36 percent or 34 percent or
22     something like that.
23 Q    Senator, you -- there was also talk about

Page 334

1      an African-American who was elected from
2      I believe Cullman County?
3  A    Cullman County, yeah.
4  Q    What was his name?
5  A    Representative -- as well as I know him,
6      I can't pull it up.
7  Q    It's okay, Senator.  There was a
8      discussion about how he was defeated in
9      an election in 2010?
10 A    Yes.  I recall he went down -- I think he
11     was elected in 2006 and defeated in 2010.
12 Q    Do you recall the race of the candidate
13     that defeated him in that election?
14 A    He was white.
15 Q    Senator, you also mentioned or you were
16     discussing Artur Davis and that he had
17     switched to becoming a Republican; is
18     that correct?
19 A    Yes.
20 Q    Do you know if he ever ran as a candidate
21     in Alabama as a Republican?
22 A    Not that I know of.  He ran for mayor but
23     mayors in Alabama are nonpartisan.

Page 335

1  Q    Did he win that election?  Well, mayor
2      for what city?
3  A    Montgomery.
4  Q    Did he win that election?
5  A    No.
6  Q    Is Montgomery a majority an
7      African-American city?
8  A    Yes.
9  Q    Senator, I'm going to show you a couple
10     of articles that I believe are
11     Plaintiff's 10 and 11.
12            I'm sorry.  We'll just do
13     Plaintiff's 10.  These articles are
14     largely the same, so we'll just do one of
15     them.
16            (Plaintiff's Exhibit 10
17            was marked for
18            identification.)
19            (At which time, the
20            witness reviews the
21            exhibit.)
22 A    Okay.
23 Q    Senator, I'm going to represent -- have

Page 336

1      you seen this article before today?
2  A    No, I have not.
3  Q    I'm going to represent to you this
4      article is from -- what's today's date --
5      yeah, today's date January 26th, 2017, it
6      is quoting Alabama Secretary of State
7      saying that he's not found any evidence
8      of voter fraud in Alabama.  Is that a
9      fair representation of what this article
10     says?
11            MS. MESSICK:  Object to
12         the form.
13 A    Well, he says that he has not found any
14     evidence of voting irregularities and he
15     goes on to say, "We always look into
16     allegations of impropriety, election
17     fraud, voter registration fraud, any kind
18     of campaign finance, reform and
19     suggestion, campaign finance allegation
20     or fraudulent activity."  And he says,
21     "We're confident the direction we're
22     going is where we need to be and we're
23     offering a safe, secure, and credible

Page 337

1    environment for all Alabamians when it
2    comes to the election process."
3    Q    That's it, Senator.
4         Senator, Ms. Messick read you a list
5    of HBCUs earlier; do you recall that?
6    A    Yes.
7    Q    Do you know whether any of those HBCUs
8    issue photo IDs to students?
9    A    No.
10   Q    Do you know whether -- okay.  Strike
11   that.
12        Do you -- is it that you don't know
13   whether HBCUs issue photo ID?
14   A    I do not know whether they do or not.
15   Q    Okay.  Senator, do you know who Scott
16   Beason is?
17   A    Yes.
18   Q    Do you know whether there were
19   allegations that Senator Beason engaged
20   in intentional discrimination in 2010?
21   A    Yes.
22   Q    Can you tell me about those allegations?
23        MS. MESSICK:  Object to

Page 338

1         the form.
2    A    Yes.  Senator Beason was caught on a tape
3    saying that if -- if you put gaming,
4    bingo on the ballot, then
5    African-Americans would come out in
6    droves and you don't want that to happen.
7    And so they ended up indicting a number
8    of people for various kinds of -- on
9    various kinds of criminal charges and all
10   of those who went to trial were found not
11   guilty.
12   Q    And Senator Beason's -- the recording of
13   that was in connection with the attempt
14   to get the convictions; is that correct?
15   A    Yes.
16   Q    And were there other Republicans caught
17   on tape adopting the same scheme that
18   you're describing for Senator Beason?
19   A    Yes.  There were some -- some others.  I
20   don't remember specifically which ones,
21   though.
22   Q    Do you recall if it was the leadership of
23   the Republican party?

Page 339

1    A    I don't recall.
2    Q    Okay.  Senator, you were also asked
3    about -- in Defendant's 1 about Democrats
4    requiring photo ID at the Democratic
5    National Convention; is that right?
6    A    Yes.
7    Q    And we talked about the kinds of people
8    who don't have photo ID earlier; is that
9    right?
10   A    Yes.
11   Q    And is it fair to say that you would
12   describe them as, you know, poor people,
13   fairly marginalized people in society; is
14   that right?
15   A    Yes.  Or young people or real old people.
16   Q    Do you think people who are poor in the
17   way that you're describing that don't
18   have photo ID do they usually go to the
19   airport and fly somewhere?
20        MR. NEIMAN:  Objection to
21        form.
22   A    They do not usually go to the airport.
23   They do not usually drive.  They do not

Page 340

1    usually even have an account often at the
2    bank and have that kind of transaction.
3    Q    Do they have access to the Internet?
4         MS. MESSICK:  Object to
5         the form.
6         MR. NEIMAN:  Object to the
7         form.
8    A    I would say most of them do not have
9    access to the Internet.
10   Q    Do they go to the Democratic National
11   Convention?
12        MS. MESSICK:  Objection.
13        MR. NEIMAN:  Objection.
14   A    No.
15   Q    From Alabama?
16   A    No.
17   Q    Where was the Democratic National
18   Convention this year?
19   A    It was in Philadelphia.
20   Q    Senator, you talked a little bit about
21   how -- strike that.
22        In close elections could people
23   being turned away from the polls affect

Page 341

1 the outcome of the result?

2 A  Absolutely.

3         MS. MESSICK:  Object to

4     the form.

5 Q  Because of the photo ID law?

6         MS. MESSICK:  Object to

7     the form.

8         MR. NEIMAN:  Object to the

9     form.

10 A  Yes.

11 Q  So just to make the record clear, is it

12 your testimony that the photo ID law

13 could turn people away in a close

14 election and therefore affect the outcome

15 of the election?

16         MS. MESSICK:  Object to

17     the form.

18         MR. NEIMAN:  Object to the

19     form.  Speculation.

20 A  It's my testimony that the photo ID law

21 will prevent many people from voting.

22 Q  Just A few more questions.  You mentioned

23 earlier that you were arrested around

Page 342

1 protest related to the confederate flag?

2 A  Yes.

3 Q  Why did you protest the confederate flag?

4 A  Because the confederate flag initially

5 was a symbol for people fighting to

6 maintain slavery and then the confederate

7 flag was revived when civil rights came

8 sort of on the front burner, that it was

9 a symbol of -- of oppression for black

10 people and I -- I felt like we needed to

11 do everything we could to remove it from

12 public places.  If people want to fly it,

13 they should fly it in private places

14 because symbols are very powerful because

15 people read into a symbol of what they

16 need to at the moment and -- and to me

17 that they were resisting voting rights.

18 They were resisting civil rights.  They

19 were resisting human rights.  Even though

20 they said, well, it's about -- it's about

21 our history.

22     Well, that history was at that time

23 about maintaining slavery and so I --

Page 343

1 I -- I'm against slavery now and I'm

2 against slavery for back at that time and

3 that's a symbol that I consider very

4 oppressive.

5 Q  Thank you, Senator.

6     I'm going to hand you what I've

7 marked as exhibit -- Plaintiff's

8 Exhibit 11, which is actually from the

9 defendant's production.  The Bates number

10 on it is GOV 19876.

11         (Defendant's Exhibit 11

12     was marked for

13     identification.)

14 Q  The copy that I've given you

15 unfortunately it is cut off but I'll

16 represent to you that is the Bates

17 number.  Will you review that?

18 A  Yes.

19 Q  And I'll also represent to you it comes

20 from the Secretary of State's

21 presentation that they were giving around

22 the state about how to vote under the

23 photo ID law.

Page 344

1 A  Yes.  And do you have a particular

2 question?

3 Q  Can you look for me at .3, that last

4 sentence in this?

5 A  Yes.  It says, "A voter must sign a form

6 under penalty of perjury that they do not

7 currently possess any of the valid forms

8 of ID in order to obtain the free photo

9 ID."

10 Q  So is that consistent with what your

11 understanding of how the photo ID law

12 worked?

13 A  Yes.

14 Q  Is it possible that other people may have

15 seen this presentation and understood the

16 photo ID law to work in that way?

17         MS. MESSICK:  Object to

18     the form.

19 A  Well, I -- I -- I want -- I perhaps

20 should have looked at the law more

21 careful because if it requires you to --

22 to -- to sign under oath, then of course

23 you could end up being prosecuted.  I --

Page 345

1   I'd like to -- I -- I just don't think --
2   think I was so far off on that, but...
3  Q   But reading this here and as I said I
4   will represent that it's from the
5   Secretary of State's Office, is it true
6   that the Secretary of State themselves
7   were interpreting the photo ID law the
8   way you described?
9           MR. NEIMAN:  Object to the
10      form of the question.
11          MS. MESSICK:  Object to
12      the form of the question.
13  A   It seems to me they were interpreting the
14   same way that I was interpreting.
15  Q   Thank you, Senator.  I am going to hand
16   you Plaintiff's Exhibit 12 which I will
17   represent you is the application for an
18   Alabama free photo ID card.  It is double
19   sided.
20          (Plaintiff's Exhibit 12
21      was marked for
22      identification.)
23  Q   If you can just view both sides of that

Page 346

1   for me, please.
2           (At which time, the
3       witness reviews the
4       exhibit.)
5  A   Okay.
6  Q   Okay.  So, Senator, I'm just going to
7   direct you back to Defendant's 20 on page
8   I there.  If you'll just put those two
9   documents side by side for me.
10  A   Defendant's 20?
11  Q   Oh, I have it as 20.
12          MS. MESSICK:  The statue.
13          MR. ROSS:  The statue.
14          MS. MESSICK:  It's 19.
15          MR. ROSS:  Oh, I may have
16      misnumbered mine.
17  A   Okay.
18  Q   Okay.  So looking at Defendant's 19 and
19   item I on page 3, does it say the
20   application for the voter ID card shall
21   be signed and sworn to by the applicant
22   and any falsification or fraud in making
23   of the application shall constitute a

Page 347

1   class C felony?
2  A   Yes.
3  Q   And looking again at Plaintiff's 12 --
4   looking at Plaintiff's 12 at the
5   instructions on the application form,
6   does it say, the third paragraph down,
7   that you can only receive a free Alabama
8   photo voter identification card if you
9   are registered to vote in Alabama and do
10   not have any of the photo ID listed out
11   there?
12  A   Yes.
13  Q   Okay.  So -- and then on the other side
14   of that same application, does it also
15   require you to swear under penalty of
16   perjury -- excuse me -- not under penalty
17   of perjury but to swear or affirm that
18   the information provided in the
19   application is true and correct?
20          MS. MESSICK:  Object to
21      the form.
22  Q   There at the bottom?
23  A   Yes.

Page 348

1  Q   Is it possible that a layperson or
2   anyone, really, could read this and
3   understand that the application was
4   inclusive of both that -- that direction
5   that you can only receive a free photo ID
6   if you don't have any other forms of ID?
7           MS. MESSICK:  Object to
8       the form.
9  A   Well, it's not only possible for a
10   layperson, it's possible for a lawyer.
11  Q   Thank you.
12  A   It was possible for me.
13  Q   Thank you, Senator.  Do you know whether
14   public housing photo IDs are acceptable
15   for voting under the Alabama?
16          MS. MESSICK:  Object to
17      the form.
18  A   I don't see anything in here that says it
19   would be.
20  Q   Do you know if African-Americans
21   disproportionately live in public housing
22   in Alabama?
23  A   Yes.

Page 349

1 Q   Yes, African-Americans do
2 disproportionately live in public housing
3 here?
4 A   That's correct.
5 Q   Okay.  Senator, have you ever heard of a
6 case called Harris v. Siegelman?
7 A   The name rings a bell, but I can't pull
8 up what it's about.
9 Q   Senator, do you recall if Alabama has
10 ever been sued for not hiring enough
11 African-American poll workers?
12 A   Yes.
13 Q   Okay.  Do you recall if Alabama, either
14 the state or counties in Alabama, have
15 ever been sued for white poll workers
16 harassing or discriminating against
17 African-American voters?
18 A   Yes.  It comes back to me.  Siegelman was
19 secretary of state at that time.  He
20 later became governor but I think he was
21 secretary of state at that time.
22 Q   Okay.  And he was -- it's your
23 understanding is that he was sued for

Page 350

1 not -- him as well as other officials for
2 not having enough African-American poll
3 workers; is that correct?
4 A   Yes.
5         MR. NEIMAN:  Object to the
6     form.
7 Q   Okay.  Is it possible there was
8 litigation around -- well, strike that.
9         You mentioned earlier and discussed
10 with Mr. Neiman that people who have
11 felony convictions may be told one thing
12 depending on which registrar they go to
13 whether they're eligible to vote; is that
14 correct?
15 A   Yes.
16 Q   Okay.  Do you know, is it possible that
17 there is litigation around that issue in
18 the past?
19         MR. NEIMAN:  Object to the
20     form.
21         MS. MESSICK:  Object to
22     the form.
23 A   I do believe there was some litigation

Page 351

1 around that issue.
2 Q   Okay.  Just a couple of more things,
3 Senator.  So if Alabama allowed people
4 who didn't have photo ID to sign an
5 affidavit saying that they had some
6 impediment to vote but still allowed them
7 to vote a regular ballot, do you think
8 that would be at least one potential way
9 of solving the problems with the voter ID
10 law?
11         MR. NEIMAN:  Object to the
12     form.
13         MS. MESSICK:  Object to
14     the form.
15 A   I don't understand.
16 Q   Well, let me repeat.  So, Senator, I'll
17 represent to you that in some states if
18 you go to the polls and do not have the
19 photo ID required to vote you can sign an
20 affidavit with your name and maybe some
21 additional information that allows you to
22 vote a regular ballot without having to
23 go through any additional hoops.  Okay?

Page 352

1 A   Yes.  I think that that would help some.
2 I don't think it would completely remedy
3 the problem.
4 Q   But it may help for some voters?
5 A   It would help.
6         MS. MESSICK:  Object to
7     the form.
8         MR. NEIMAN:  Object to the
9     form.
10 Q   Thank you, Senator.
11         Senator, when someone supports a
12 bill in the Alabama legislature, do you
13 believe that -- well, the statements made
14 by the sponsor of the bill does that
15 often inform why other legislators might
16 vote for it?
17         MS. MESSICK:  Object to
18     the form.
19 A   I believe that when -- when the sponsor
20 of a bill says what it's in it and say
21 whey it's important, I think that that
22 holds special significance because bills
23 can be interpreted all kinds of way, so I

Page 353

1  think what a sponsor says carries
2  considerable weight.  But sometimes
3  sponsors do mislead but it's splendid.
4      MR. ROSS:  Okay.  Thank
5  you, Senator.  That's it for
6  the plaintiffs.
7      MS. MESSICK:  Senator
8  Sanders, do you want to be done
9  or will you consent to a few
10  more questions.
11      THE WITNESS:  Do I have a
12  choice?
13      MS. MESSICK:  You
14  absolutely have a choice we are
15  out of time.  And I'm not going
16  to ask you any further
17  questions without your consent.
18  We've been here for a long time
19  so if you want to say we're
20  done, you can say we're done.
21      MR. NEIMAN:  I'll pledge
22  that I'm not going to ask
23  anymore questions.

Page 354

1      (Off-the-record
2      discussion)
3      MS. MESSICK:  I only have
4  two questions.
5      THE WITNESS:  Go ahead.
6  Anytime a lawyer says I only
7  have one more question.  I only
8  have two questions, it never
9  means one or two.  Maybe we're
10  going to make history right
11  here.  Let's see.
12      FURTHER EXAMINATION
13  BY MS. MESSICK:
14  Q    Senator, after the recorded comments that
15  you just discussed in your testimony in
16  response to questions by Mr. Ross?
17  A    I -- I recall the Senate pro tem
18  promising that he was going to be
19  stripped and -- and I don't -- I know he
20  made a promise but I don't recall whether
21  he was stripped of that position or not.
22  Q    Thank you.
23      You just looked at Plaintiff's

Page 355

1  Exhibit 11 and 12 and Defendant's Exhibit
2  19 with Mr. Ross.  Those were the
3  documents reflecting the photo ID law
4  that's being challenged, the application
5  for the free ID, and the PowerPoint
6  video.  Did you see anything in those
7  documents that said that it was illegal
8  for a person to obtain a driver's license
9  or other photo ID that is acceptable to
10  vote in Alabama at a point in time after
11  they have received the free photo ID?
12  A    Well, what I saw was that it said that
13  you must swear that you didn't and you
14  could -- if the information is incorrect,
15  you could be subject to a class C felony.
16  Q    Didn't what?
17  A    I'm sorry?
18  Q    Didn't what?  That you didn't what?  You
19  said that you had to swear that you
20  didn't, didn't what?
21  A    That you didn't have any other photo ID.
22  Q    But that's at the time that you get the
23  free photo ID?

Page 356

1  A    That's right.
2      MS. MESSICK:  Thank you.
3  Thank you for your time today,
4  Senator?
5      VIDEOGRAPHER:  This
6  concludes the deposition.
7  Going off the record at 7:41.
8  (At which time, the video
9  deposition concluded at
10  approximately 7:45 p.m.,
11  Central.)

1            REPORTER'S CERTIFICATE
2
3   STATE OF ALABAMA,
4   AUTAUGA COUNTY,
5
6       I, Shannon P. Yost, Certified Shorthand
7   Reporter and Commissioner for the State of
8   Alabama at Large, do certify that I reported
9   the video deposition of the aforementioned
10  deponent, who was first duly sworn by me to
11  speak the truth, the whole truth, and
12  nothing but the truth.
13
14      The foregoing computer-printed pages
15  contains a true and correct transcript of
16  the examination of said witness by counsel
17  for the parties set out herein.  The reading
18  and signing of same is hereby waived.
19
20      I further certify that I am neither of
21  kin nor of counsel to the parties to said
22  cause, nor in any manner interested in the
23  results thereof.

1
2       This 3rd day of February, 2017.
3
4
5
6       /s/Shannon P. Yost
7       Shannon P. Yost,
        Certified Shorthand Reporter
8       and Commissioner for the
        State of Alabama at Large
9       ACCR #:  158
10
11
12
13
14
15
16
17
18
19
20
21
22
23