FILED
2017 Nov-03  PM 10:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

# PXO-MM

```
 1                IN THE UNITED STATES DISTRICT COURT

 2               FOR THE MIDDLE DISTRICT OF ALABAMA

 3                        NORTHERN DIVISION

 4
   UNITED STATES OF AMERICA
 5
        vs.                    CASE NO.:  2:10cr186-MHT
 6
   MILTON E. MCGREGOR, et al.,
 7
            Defendants.
 8

 9                           VOLUME 4

10                  * * * * * * * * * * *

11                  JURY TRIAL PROCEEDINGS

12                  * * * * * * * * * * *

13         BEFORE THE HONORABLE MYRON H. THOMPSON, UNITED STATES

14   DISTRICT JUDGE, and a jury, at Montgomery, Alabama, on

15   Wednesday, June 15, 2011, commencing at 9:02 a.m.

16   APPEARANCES:

17   FOR THE GOVERNMENT:     Mr. Justin V. Shur
                             Ms. Brenda K. Morris
18                           Mr. Barak Cohen
                             Mr. Edward T. Kang
19                           Mr. Eric Olshan
                             Trial Attorneys
20                           U.S. DEPARTMENT OF JUSTICE
                             Public Integrity Section
21                           1400 New York Avenue, 12th Floor
                             Washington, D.C.  20005
22
                             Mr. Louis V. Franklin, Sr.
23                           Mr. Stephen P. Feaga
                             Assistant United States Attorneys
24                           OFFICE OF THE UNITED STATES ATTORNEY
                             131 Clayton Street
25                           Montgomery, Alabama  36104
```

PLSID_00002153

```
1    APPEARANCES, Continued:

2    FOR THE DEFENDANT          Mr. Joseph Cleodus Espy
     MCGREGOR:                  Mr. Benjamin Joseph Espy
3                               Mr. William Martin Espy
                                Attorneys at Law
4                               MELTON, ESPY & WILLIAMS
                                301 Adams Avenue
5                               Montgomery, Alabama  36104

6                               Mr. Fred D. Gray, Sr.
                                Mr. Walter Edward McGowan
7                               Attorneys at Law
                                GRAY, LANGFORD, SAPP, MCGOWAN,
8                               GRAY & NATHANSON
                                108 Fred Gray Street
9                               Tuskegee, Alabama  36083

10                              Mr. Robert David Segall
                                Ms. Shannon Lynn Holliday
11                              Ms. Ashley Nicole Penhale
                                Mr. Clayton Rushing Tartt
12                              Mr. James David Martin
                                Attorneys at Law
13                              COPELAND, FRANCO, SCREWS & GILL
                                444 South Perry Street
14                              Montgomery, Alabama  36104

15                              Mr. Samuel H. Heldman
                                Attorney at Law
16                              THE GARDNER FIRM
                                2805 31st Street NW
17                              Washington, D.C.  20008

18                              Ms. Ruth H. Whitney
                                Attorney at Law
19                              IN VERITAS
                                650 South Shackleford Road, Suite 305
20                              Little Rock, Arkansas  72211

21   FOR THE DEFENDANT          Mr. Stewart Davidson McKnight, III
     COKER:                     Mr. William Joseph Baxley
22                              Mr. Joel Evan Dillard
                                Attorneys at Law
23                              BAXLEY, DILLARD, DAUPHIN,
                                MCKNIGHT & JAMES
24                              2008 Third Avenue South
                                Birmingham, Alabama  35233

25
```

```
 1    APPEARANCES, Continued:

 2    FOR THE DEFENDANT        Mr. Samuel Holley Franklin
      GEDDIE:                  Mr. Jackson R. Sharman, III
 3                             Jeffrey P. Doss
                               Attorneys at Law
 4                             LIGHTFOOT, FRANKLIN & WHITE
                               400 20th Street North
 5                             Birmingham, Alabama 35203

 6                             Mr. James P. Judkins
                               Mr. Larry Dean Simpson
 7                             Attorneys at Law
                               JUDKINS, SIMPSON, HIGH & SCHULTE
 8                             1102 North Gadsden Street
                               Tallahassee, Florida  32303
 9
      FOR THE DEFENDANT        Mr. William N. Clark
10    MEANS:                   Mr. Stephen Wesley Shaw
                               Ms. Glory R. McLaughlin
11                             Mr. William Hayes Mills
                               Attorneys at Law
12                             REDDEN, MILLS & CLARK
                               505 North 20th Street, Suite 940
13                             Birmingham, Alabama  35203

14    FOR THE DEFENDANT        Mr. Ronald Wayne Wise
      PREUITT:                 Attorney at Law
15                             LAW OFFICE OF RONALD W. WISE
                               2000 Interstate Park Drive, Suite 105
16                             Montgomery, Alabama  36109

17    FOR THE DEFENDANT        Mr. Henry Lewis Gillis
      ROSS:                    Mr. Tyrone Carlton Means
18                             Attorneys at Law
                               THOMAS, MEANS, GILLIS & SEAY
19                             3121 Zelda Court
                               Montgomery, Alabama  36106
20
                               Mr. John Mark Englehart
21                             Attorney at Law
                               ENGLEHART LAW OFFICES
22                             9457 Alysbury Place
                               Montgomery, Alabama  36117-6005
23

24

25
```

PLSID_00002155

```
 1   APPEARANCES, Continued:

 2   FOR THE DEFENDANT        Mr. James Woodfin Parkman
     SMITH:                   Mr. William Calvin White
 3                            Mr. Richard Martin Adams
                              Mr. Joshua Logan McKeown
 4                            Attorneys at Law
                              PARKMAN, ADAMS & WHITE
 5                            505 20th Street North, Suite 825
                              Birmingham, Alabama   35203
 6
     FOR THE DEFENDANT        Ms. Susan Graham James
 7   WALKER:                  Ms. Denise Arden Simmons
                              Attorneys at Law
 8                            SUSAN G. JAMES & ASSOCIATES
                              600 South McDonough Street
 9                            Montgomery, Alabama   36104

10                            Mr. Jeffery Clyde Duffey
                              Attorney at Law
11                            LAW OFFICE OF JEFFERY C. DUFFEY
                              600 South McDonough Street
12                            Montgomery, Alabama   36104

13   FOR THE DEFENDANT        Mr. Thomas Martele Goggans
     CROSBY:                  Attorney at Law
14                            2030 East Second Street
                              Montgomery, Alabama   36106

15
              Proceedings reported stenographically;
16              transcript produced by computer.

17                   *  *  *  *  *  *  *  *  *  *

18                          VOLUME INDEX

19   SCOTT BEASON
         FURTHER CROSS BY MR. SEGALL              5
20       CROSS BY MR. PARKMAN                   101
         CROSS BY MR. BAXLEY                    216
21       CROSS BY MR. WISE                      232
         CROSS BY MS. JAMES                     244
22

23                   *  *  *  *  *  *  *  *  *  *

24

25
```

```
 1        (The following proceedings were heard before the Honorable
 2         Myron H. Thompson, United States District Judge, and a
 3         jury, at Montgomery, Alabama, on Wednesday, June 15, 2011,
 4         commencing at 9:02 a.m.:)
 5     (Call to Order of the Court)
 6          THE COURT:  Mr. Segall.
 7          MR. SEGALL:  Thank you, Your Honor.
 8                        SCOTT BEASON
 9          The witness, having been previously duly sworn,
10   resumed the stand and testified further, as follows:
11                    FURTHER CROSS-EXAMINATION
12   BY MR. SEGALL:
13   Q.  Good morning, Senator Beason.
14   A.  Good morning, Mr. Segall.
15   Q.  Hey, did you have an opportunity to review any further
16   documents overnight?
17   A.  No, sir, I did not.
18   Q.  Okay.  Tell me if I'm right about this, Senator Beason.  You
19   do not contend that Mr. Crosby, Ray Crosby, did anything with
20   respect to the bill you requested that the Legislative Reference
21   Service draft for you in January of 2010 other than his
22   understanding of exactly what you requested.  Is that true?
23   A.  That's all I would know about, yes, sir.
24   Q.  All right.  So you make absolutely no contention that
25   Mr. Crosby did anything at all contrary to what he understood
```

1  you requested, correct?

2  A.  I don't know what he understood.  I just know what I asked

3  to be done.  And how that worked out in the series of how it

4  works in their office, I don't -- I'm not sure about.

5  Q.  Whatever you say that Mr. Crosby did, you do not contend

6  that he did anything in connection with any bill you requested

7  for the purpose of assisting Mr. McGregor, do you?

8  A.  Could you repeat that question?

9  Q.  Yes, sir.

10 A.  I'm trying to understand what you're --

11 Q.  Yes, sir.  Whatever you say Mr. Crosby did with respect to

12 the bill that you requested to be drafted in January of 2010,

13 whatever Mr. Crosby did, it's not your contention that he did it

14 to assist Mr. McGregor in the least degree; is that correct?

15 A.  I have no idea what his opinions were.

16 Q.  Well, let me start a little bit earlier than 2010.  You have

17 been involved with legislation opposing gambling prior to 2010,

18 correct?

19 A.  Yes, sir, I'm sure I have.

20 Q.  Is it your understanding that the money in operations like

21 VictoryLand comes from electronic bingo?

22 A.  I don't know where all they get their money.  I think they

23 do some dog racing, too.

24 Q.  My question is, is it your understanding that the money --

25 even though they do dog racing, that the money overwhelming

1    comes from electronic bingo?

2          MR. FRANKLIN:  Objection to the form of the question.

3    It's not his understanding, Judge.  He can only testify to those

4    matters he has personal knowledge about with respect to

5    VictoryLand.  And I would ask --

6          THE COURT:  Depends on where the attorney is going.

7    His understanding may be relevant or it may not.  We have no

8    idea where he's going.

9          MR. FRANKLIN:  Judge, my objection was to the form of

10   the question, though, the way he asked his question.  His

11   understanding about where they get their money from.  And

12   there's no -- there's no foundation for which to answer that

13   question that has been put to this witness.

14         THE COURT:  As I said before, it may be that his

15   understanding is the issue, not what in fact is true.  I don't

16   know where Mr. Segall is going.

17   Q.  (Mr. Segall, continuing:)  Haven't you said on more than one

18   occasion that all the profit in facilities like VictoryLand is

19   in electronic bingo?  Haven't you said that on more than one

20   occasion?

21   A.  I don't recall having said that on more than one occasion.

22   Q.  Is it something you would have said?

23   A.  I think most -- a lot of their profit comes from -- from

24   electronic bingo, but I don't know how much money they make off

25   dog racing.

1   Q.  Well, let me ask you if you've ever said this.  I
2   can't imagine -- well, let me -- let me ask you if you said
3   this:  I can't imagine that there's 3 percent of the people in
4   the state that even go to a dog track anymore.  They're all
5   going belly-up.  That's what I've always been told.
6        Do you deny saying that in those words?
7   A.  I have said something similar to that, yes, sir.
8   Q.  And the reason you said that, that the dog racing was going
9   belly-up, is because it's always been your understanding that
10  the money in places like VictoryLand was electronic bingo,
11  correct?
12  A.  I would imagine the majority of it is.  Yes, sir.
13  Q.  Well, in fact, in the exhibit that has been introduced by
14  the government, joint -- and you call electronic bingo --
15  sometimes you call it slot machines, don't you?
16  A.  Yes, sir.
17  Q.  Do you recall saying in the exhibit in evidence, Exhibit 9,
18  page 43, lines 31 through 32, that that's where all the profit
19  is?
20  A.  I would have to see it, but I don't recall it.
21  Q.  Do you want me to show it to you?
22          MR. SEGALL:  And since that's in evidence already, Your
23  Honor, I'd ask Michael to put up Exhibit 9, page 43, lines 31
24  through 32.
25          May I approach, Your Honor?

```
 1            THE COURT:  Yes.
 2   Q.  Let -- let's read the highlighted part.  This is a
 3   discussion between you and Massey, correct?
 4   A.  That's what -- that's what it appears to be.
 5   Q.  And tell me if I'm reading this correctly when you say --
 6   A.  We can read the whole thing.
 7   Q.  Well, I'm going to let you read whatever you want.  I'm
 8   going to let the government ask you whatever it wants.
 9   A.  Yes, sir.
10   Q.  But right now, I'm just asking whether or not you said, with
11   respect to what you call slot machines, that's where all the
12   profit is anyway.  Shoot.
13        Is that you who said that?
14   A.  Yes, I said that sentence, but there's a sentence before
15   that.
16            THE WITNESS:  Can I read the sentence before that,
17   Judge?
18            THE COURT:  Yes.
19   Q.  Yeah.  The sentence before that is, that's right, and, you
20   know.
21   A.  Jarrod Massey says, that's right, and, you know.  And then I
22   say --
23   Q.  Nobody -- excuse me.  Excuse me, Senator Beason.
24            THE COURT:  Excuse me, Counsel.  Now, yes, Mr. Segall?
25            MR. SEGALL:  All I'm saying is let him read it to
```

1    himself, Your Honor.  And then if there's something that changes
2    what he has said about that being where all the profit is, then
3    we can talk about it.
4         THE COURT:  Read it to yourself first.  I agree.
5        (Brief pause)
6    Q.  Nothing further to report, Senator Beason, correct?
7    A.  We're talking about --
8    Q.  Just answer my question.  Nothing else about where all the
9    profit is, correct?
10   A.  We're talking about casinos.
11   Q.  Yes, sir.  Yes, sir.
12   A.  And him wanting casino games someday in the future.  We're
13   not talking about dog tracks and bingo parlors.
14   Q.  All right.  Well, then, were you talking about dog tracks --
15        MR. SEGALL:  And have you got 533?
16   Q.  Let me show you --
17        MR. SEGALL:  Let me see the whole thing.
18   Q.  -- Exhibit 533, page 13, lines 3 through 21.
19        MR. SEGALL:  Do you want me to wait for a minute?
20        MR. FRANKLIN:  Please.
21       (Brief pause)
22   Q.  Let me ask you whether or not, in talking about your own
23   legislation where you want to get rid of everything -- your 2010
24   bill, I think -- read -- read along with me and tell me whether
25   I'm reading this correctly.

 1    This is you:  Nobody would.  I think most people would get
 2  rid of dog tracks, too.  I just -- I think some people have
 3  this, you know, real quick reaction to say now you're getting
 4  rid of everything, even the dog tracks.  And in parentheses
 5  says, uh-huh.
 6    And then you say, well, psh, I don't -- I mean I don't
 7  know.  It just makes it -- people have said that over and over,
 8  and I don't really know why.  I mean, I can't imagine there's 3
 9  percent of the people in the state that even go to a dog track
10  anymore.  They're all going belly-up.
11    Did I read that correctly?
12  A.  Yes, sir, you did.
13  Q.  Was that truly your belief at the time you said it?
14  A.  Yes, sir.  I have been told that.
15  Q.  So it was your belief and understanding, correct?
16  A.  Yes, sir.
17  Q.  All right.  And that's been true for a good while, correct?
18  A.  I was told -- I was told that by the people who own the dog
19  tracks.
20  Q.  And that -- that's been true for a good while with respect
21  to VictoryLand, since 2004, correct?
22  A.  I don't know what their finances are at VictoryLand, but --
23  Q.  But that would have been your understanding during that
24  period of time, correct?
25  A.  From what -- from what I was told by their representative,

PLSID_00002163

1  yes.

2  Q.  Okay.  You would not -- well, hold on.  You don't believe

3  that a facility like VictoryLand could survive on paper bingo.

4  You don't believe that, do you?

5  A.  I don't know if they could or not.

6  Q.  Well, are you aware of a paper bingo operation in Lowndes

7  County that they tried to start that stayed open about two weeks

8  before it had to close --

9  A.  No, sir.

10  Q.  -- because it couldn't do any business?

11  A.  I'm not aware of that.

12  Q.  All right.  At least by 2006, you were offering proposed

13  constitutional amendments designed to prohibit gambling,

14  correct?

15  A.  That's probably true.  I'm surprised I didn't do it before

16  that.

17  Q.  The bill in 2006 was designed to -- to put people like

18  Mr. McGregor out of business, correct?

19  A.  I don't believe that's the design, no, sir.  It's to -- if

20  it's an antigambling bill, it's to limit gambling in the state.

21  Q.  Well, the effect of your bill in 2006, do you agree, would

22  have been to hurt VictoryLand and other gaming operations like

23  VictoryLand dramatically?

24  A.  The purpose would be to make gambling illegal in the state.

25  Q.  I didn't ask you the purpose, Senator Beason.  That was the

PLSID_00002164

1   question before.  What I just asked you was, would you agree

2   that the effect of the legislation you offered would be to

3   dramatically impact adversely the finances of VictoryLand and

4   other such places?

5   A.  Yes.

6   Q.  Okay.  I want to show you what's been marked as Exhibit

7   2301.

8           MR. SEGALL:  May I approach, Your Honor?

9           THE COURT:  Yes.

10  Q.  And all I'm asking you right now is if you recognize this as

11  a bill you sponsored in 2006.

12  A.  Can I look at it just a second?

13  Q.  Of course.  Of course, you can.

14      (Brief pause)

15  A.  Yes, sir.  It looks correct.

16  Q.  All right.

17          MR. SEGALL:  Your Honor, we offer 2301.

18          THE COURT:  Admitted.

19          MR. SEGALL:  Michael, would you put page 5, please, on

20  the screen?  And highlight, please, part five, the -- well,

21  first -- yeah, let's start here.

22  Q.  And read along with me, Senator Beason, and tell me --

23          THE CLERK:  Mr. Segall.

24          MR. SEGALL:  Yes.  Pardon me?

25          THE CLERK:  You can see it?

1      JUROR:  Yes.

2  Q.  Tell me if I read it wrong.

3      No constitutional amendment currently in effect -- now, you

4  understand currently in effect means every constitutional

5  amendment existing, correct?

6  A.  That's correct.

7  Q.  That's what you intended by that, right?

8  A.  That's correct.

9  Q.  You understood that in 2006, VictoryLand had a

10 constitutional amendment currently in effect, correct?

11 A.  For dog racing or for bingo?

12 Q.  For bingo.

13 A.  For paper bingo is what I understand.

14 Q.  Well, they had -- their contention was they had one for

15 electronic bingo, correct?

16 A.  Right.  And my -- my contention was it was paper bingo.

17 Q.  But they were playing electronic bingo, correct?

18 A.  I have never been to VictoryLand, so I don't -- I mean, I

19 would take it you're telling me the truth.

20 Q.  And you don't have to take it from me.  You knew very well

21 in 2006, as you do today, that they were playing electronic

22 bingo at VictoryLand.  You knew that, didn't you?

23 A.  That doesn't mean that they were supposed to be.

24 Q.  I'm not asking you --

25 A.  Okay.  That's fine.

1  Q.  -- anything about supposed to be.

2  A.  You're just -- I'm just telling you what I know for sure,

3  that I've seen and I've heard and I know.  I can't say --

4  speculate what all they do.  They could have been doing both,

5  for all I know.

6  Q.  Of course.  But as far as you understood it at the time you

7  were drafting legislation --

8  A.  Yes, sir.

9  Q.  -- at VictoryLand, they were playing electronic bingo,

10  correct?

11  A.  Yes, sir.

12  Q.  All right.  It doesn't have to be that hard.

13      (Reading)  No constitutional amendment currently in effect

14  or subsequently ratified shall authorize any person or entity to

15  use an electronic device to engage in bingo or any other

16  gambling activity.  Correct?

17  A.  Correct.

18  Q.  And with that -- and you tell me if this is what you

19  intended by that.  You intended that any form of electronic

20  gambling, including electronic bingo, would be unlawful in the

21  state of Alabama.

22  A.  Yes, that's my intent.

23  Q.  Okay.  And -- and right below that where it says, nothing in

24  this section shall be construed as repealing the following to

25  the extent that they allow nonelectric versions of gambling.

1  And then it cites a bunch of constitutional amendments, correct?

2  A.  That's correct.

3  Q.  And are you aware that 744 is the constitutional amendment

4  that allows bingo in Macon County?

5  A.  No, sir.  I didn't know the number of the amendment, no,

6  sir.

7  Q.  But your -- your intent was to name every constitutional

8  amendment that allowed bingo in the state of Alabama, correct?

9  A.  That would be what I requested, yes, sir.

10  Q.  All right.  And I'll -- I'll represent to you and ask you to

11  assume that amendment 744 is in fact the amendment that

12  authorizes bingo in Macon County.

13  A.  Yes, sir.

14  Q.  Will you accept that?

15  A.  I'll accept that, yes, sir.

16  Q.  All right.  All right.  And I think you've already said it;

17  but you would agree that this legislation, if passed, would have

18  had the effect of dramatically impacting VictoryLand, correct?

19  A.  Yes, sir.

20  Q.  Okay.  There was nothing about this legislation that was

21  designed to help VictoryLand or Mr. McGregor, was there?

22  A.  No, sir.

23  Q.  Okay.  Do you know who at the Legislative Reference Service,

24  where Ray Crosby works, drafted this bill?

25  A.  No, sir, I do not.

PLSID_00002168

1  Q.  You, yesterday --

2          MR. SEGALL:  May I approach, Your Honor?

3          THE COURT:  Yes.

4  Q.  You, yesterday, correctly, when trying to see who drafted

5  something at the Legislative Reference Service, looked at the

6  initials.

7  A.  Yes, sir.

8  Q.  Do you remember that?  And let me ask you if the initials on

9  that are not M. F.

10 A.  They are, yes, sir.

11 Q.  Did you know someone at the Legislative Reference Service

12 named Monty Feld?

13 A.  Yes, sir.

14 Q.  And did you go --

15 A.  I remember the name.  I didn't talk to him very often.

16 Q.  All right.  But you remember --

17 A.  I remember there is a Monty Feld, yes, sir.

18 Q.  Did you know that he was assistant director?

19 A.  No, sir.

20 Q.  In other words, above Mr. Crosby.  Were you aware of that?

21 A.  No, sir.

22 Q.  Just so we don't let this get -- I don't want to get this

23 confused; so I want to write down what we know about 2006 and

24 see if you agree with this, that you introduced that bill in

25 2006 to eliminate all gambling using electronic devices,

```
 1    correct?
 2    A.  Yes, sir.
 3    Q.  And Monty Feld drafted it.  And it had a big impact on
 4    VictoryLand, correct?
 5    A.  No, sir, it did not have a big impact on VictoryLand.
 6    Q.  Or would have, had it passed.
 7    A.  It would have if it had been adopted by the people of the
 8    state, yes, sir.
 9    Q.  And I -- I'm writing it out just so we can remember what
10    we've said about it.
11       (Brief pause)
12           MR. SEGALL:  Your Honor, may I show this on the screen
13    to make sure that it's accurate?
14           THE COURT:  Is it admitted?
15           MR. SEGALL:  No, sir.  It's just a chart that I'm
16    making.
17           THE COURT:  A chart that you're making?
18           MR. SEGALL:  Yes.
19           THE COURT:  Objection, Mr. Franklin?
20           Why don't you let Mr. Franklin see your chart.
21           MR. SEGALL:  Sure.
22       (Brief pause)
23           THE COURT:  Is this the first entry on the chart, and
24    there are going to be other entries?
25           MR. SEGALL:  Yes.  Yes, Your Honor.  May I show this?
```

```
 1            THE COURT:  Very good.  Now, I'm going to mark it as an
 2   exhibit but not to go to the jury, just so the record is clear.
 3            MR. SEGALL:  Do you want me to give it a number, Your
 4   Honor?
 5            THE COURT:  Yes.
 6            MR. SEGALL:  Your Honor, I'm marking it as McGregor
 7   Exhibit 2280.
 8            THE COURT:  2280?
 9            MR. SEGALL:  Yes, sir.
10            THE COURT:  It can be shown to the jury.
11       But it will not be available for your deliberations,
12   because it's not really evidence in itself.  It's just
13   demonstrative.
14   Q.  (Mr. Segall, continuing:)  And Senator Beason, all I'm
15   asking you is -- can you see it, Senator Beason?  It says,
16   Beason introduces bill to eliminate all gambling using
17   electronic devices; LRS's Monty Feld drafted; big impact on
18   VictoryLand.  Correct?
19   A.  You could add, if passed by the people.
20   Q.  If passed.  Okay.
21   A.  You could put by the people, too, because it is a
22   constitutional amendment.
23   Q.  If passed by the people.
24   A.  Yes, sir.
25   Q.  Are we okay now?
```

```
 1   A.  Yes, sir, we are.  Thank you.
 2   Q.  Thank you.  Do you recall that in January of 2009, you
 3   requested the Legislative Reference Service draft another
 4   gambling bill for you?
 5   A.  Yes, sir.  It might have been in late 2008.
 6   Q.  Well, I'm going to show you what's been marked as Exhibit
 7   2302 and ask you --
 8          MR. SEGALL:  Oh, Your Honor.  I'm sorry.  May I
 9   approach?
10          THE COURT:  Yes.
11          MR. SEGALL:  I apologize.
12   Q.  Beginning on the second page of that exhibit, I'm asking you
13   if that is the bill that you requested LRS to draft in January
14   of 2009.
15      (Brief pause)
16   A.  It's definitely an antigambling bill, but I don't recall if
17   that's what I requested or not.  It says brought in by Michael
18   Ciamarra.
19   Q.  Well, yes, it does.
20          MR. SEGALL:  Well, Your Honor, this is an exhibit that
21   is certified as authentic from the Legislative Reference
22   Service.  And we would move for its admission.
23          MR. FRANKLIN:  No objection, Your Honor.
24          THE COURT:  It's admitted.  What's the number?
25          MR. SEGALL:  Two --
```

```
 1              THE WITNESS:  302.
 2              MR. SEGALL:  2302, Your Honor.
 3  Q.  The first page of this exhibit, Senator, is what's called a
 4  Project Tracking Report; is that correct?
 5  A.  That -- yes, sir.
 6  Q.  And that's a document prepared by the Legislative Reference
 7  Service, correct?
 8  A.  Yes, sir.
 9  Q.  And you've seen those before?
10  A.  If I have, it's only been once or twice.  I don't -- I don't
11  see those very often.
12  Q.  All right.  It indicates that this bill was requested by
13  Senator Scott Beason, does it not?
14  A.  That's right.  Under my -- my name.
15  Q.  Right.  And under secured notes --
16  A.  That's right.
17  Q.  -- and secured notes includes instructions from the
18  legislator who wants the bill drafted.  It says brought in by
19  Michael Ciamarra.  It gives a telephone number.
20  A.  Right.
21  Q.  And it says put up front for Michael Ciamarra.
22  A.  That's right.
23  Q.  Is Michael Ciamarra someone who you authorized to deal with
24  Legislative Reference Service on your behalf?
25  A.  Yes, sir, at times, on certain issues.
```

1  Q.  Well, how about in January of 2009 in connection with

2  gambling?  Did you authorize Mr. Ciamarra to act on your behalf?

3  A.  I don't remember if I did, but it is -- it is possible.

4  Yes, sir.

5  Q.  Does this appear --

6  A.  It appears to be, yes, sir.  I'm not arguing that point.

7  Q.  No?  Okay.  So just so the record is clear --

8  A.  Right.

9  Q.  -- it appears from Exhibit 2302 that you authorized Ciamarra

10  to be your authorized agent to deal with the Legislative

11  Reference Service with respect to this gambling bill, correct?

12  A.  Yes, sir, it appears that way.

13  Q.  Do you recall whether -- and Ciamarra is not someone who you

14  authorized to deal with all of your bills.  Only on certain

15  bills.  Is that what you just testified to?

16  A.  Yes, sir.

17  Q.  And do you recall whether you authorized Mr. Ciamarra in

18  writing or orally?

19  A.  Orally would be my guess.

20  Q.  Not unusual at all for legislators to authorize folks

21  orally, correct?

22  A.  No, sir.

23  Q.  Okay.  And do you see where it indicates who the request was

24  taken by?  See that?

25  A.  L. Raby.  Is that right?

1  Q.  L. Raby.  Did you know a man -- that is a man.  His name is

2  Larry Raby.  Did you know him at the Legislative Reference

3  Service?

4  A.  Yes, sir, I believe so.

5  Q.  All right.  You didn't -- through Ciamarra, you didn't tell

6  Ciamarra to request Larry Raby; he just happened to be the

7  intake person who the request was made to, correct?

8  A.  That's the way it usually works.

9  Q.  And can you look at this exhibit and see who drafted it?

10  A.  It's the initials M. F.

11  Q.  That would be Monty Feld, correct?

12  A.  That's -- yes, sir, unless there's another M. F.  And I

13  don't know who that would be.

14  Q.  I don't either.  Let me ask you to look at part five --

15          MR. SEGALL:  Michael.

16  Q.  -- of this proposed legislation and ask you whether or not

17  this bill is not the same one as you had introduced in the year

18  2006.

19  A.  Yes, sir.  It looks like the same bill.

20  Q.  Okay.  And this is another bill that you proposed -- or that

21  you asked LRS to draft --

22  A.  Yes, sir.

23  Q.  -- that would have made illegal all electronic gambling,

24  correct?

25  A.  Yes, sir.

1  Q.  Again, had it been passed by the people of Alabama, dramatic
2  financial impact on VictoryLand, correct?
3  A.  Yes, sir.
4  Q.  Let me write down something about this bill.  Let me tell
5  you what I'm going to write down, okay, and make sure, before I
6  write it, that you agree with it.  That Senator Beason requests
7  that LRS, in January of 2009, draft a bill to eliminate all
8  gaming using electronic devices.  That's correct, right?
9  A.  Actually, in the spring of '09, I was requesting a bill to
10 eliminate all gambling.
11 Q.  In January 2009?
12 A.  No.  That would have been 2010.  You're right.  I'm sorry.
13 Got my years mixed up.  2009.
14 Q.  But in January 2009, this is the bill you requested.
15 A.  Yes, sir.
16 Q.  All right, sir.  And before I write something down, let
17 me -- let me ask you this.  Do you recall that you did not in
18 fact introduce that bill in 2009?
19 A.  No, sir.  I don't recall if I did or not.
20 Q.  Okay.
21 A.  I knew --
22 Q.  Do you recall that it was introduced by another senator,
23 Senator Hank Erwin?  Do you recall that?
24 A.  I knew that he had an antigambling bill, but I didn't know
25 if it was the exact same one as mine.

1   Q.  Let me show you what's been marked as Exhibit 2304.

2           MR. SEGALL:  Your Honor, may I approach?

3           THE COURT:  Yes.

4   Q.  And all I'm really asking you to do is see if that's not the

5   same bill that you introduced in 2006, requested LRS to draft in

6   January of 2009, and that it appears that Senator Erwin

7   introduced it in 2009.  Well, first, let's get that.

8   A.  It looks very similar, without comparing them word for word;

9   but it looks like the overall purpose is the same.

10  Q.  Okay.  And that's the -- it outlaws electronic gaming of all

11  kinds, correct?  Part five.

12  A.  That's how it appears at a quick review, yes, sir.

13  Q.  Now, again, a dramatic impact, if passed by the people of

14  Alabama, on VictoryLand, correct?

15  A.  Yes, sir.

16  Q.  And now let me -- let me see.  And do you know -- tell me

17  whether this would be correct.  Senator Beason requests, in

18  January 2009, that Legislative Reference Service draft a bill to

19  eliminate all gaming using electronic devices; Senator Erwin

20  introduced the bill; would have had a dramatic adverse impact on

21  VictoryLand if passed by the people of Alabama.

22  A.  Yes, sir.

23  Q.  Let me just get that down so we don't have any confusion

24  about it.

25          MR. FRANKLIN:  Judge Thompson, I have an objection, but

```
 1  if there is a connection between the Senator -- he's saying that
 2  Senator Beason introduced this bill or asked somebody to
 3  introduce it on his behalf?  Because if he didn't, I would
 4  object to that on relevance grounds if it was introduced by
 5  somebody else without Senator Beason having a role in that.
 6          THE COURT:  Mr. Segall?
 7          MR. SEGALL:  All I'm demonstrating, Your Honor, is
 8  that -- that Senator Beason requested a bill, although he didn't
 9  get it introduced; it got introduced by someone else.  We're
10  going to tie it all up, Your Honor.
11          MR. FRANKLIN:  I would object to the relevance, Judge.
12          THE COURT:  Let's see where he's going first.
13  Overruled.
14  Q.  (Mr. Segall, continuing:)  Just on the off chance that -- to
15  avoid having to rewrite this, I'll leave off my chart that
16  Senator Erwin introduced it and just say that Senator Beason
17  requests that the LRS draft a bill to eliminate all gaming using
18  electronic devices; dramatic adverse impact on VictoryLand if
19  passed by people of Alabama.  Correct?
20  A.  I would like to see it just so I could agree.
21  Q.  I'm going to put it up --
22          THE COURT:  Why don't you show it -- show it to him
23  first.  Then you may put it up on the screen.
24          MR. SEGALL:  May I approach, Your Honor?
25          THE COURT:  Yes.
```

1        (Brief pause)

2   Q.  You find me about as trustworthy as Mr. Massey, don't you?

3            THE COURT:  That's not a question.

4   A.  I assume that's not a question you want me to answer.

5            THE COURT:  And I'll sustain the objection that's about

6   to be made.

7   A.  You might note that it was -- I didn't put it in that year,

8   but that's accurate.

9   Q.  This is accurate?  Do you want me to put on there Beason did

10  not introduce?

11  A.  I think it's fine.

12  Q.  The way it is?

13  A.  Yes, sir.

14  Q.  All right, sir.

15           MR. SEGALL:  May I put it on the screen, Judge?

16           THE COURT:  Yes.

17       (Brief pause)

18  Q.  Can you see it on your screen, Senator Beason?

19  A.  Just a second.  Yes, sir, I can.

20  Q.  Now, later in 2009, in October, you requested another

21  constitutional amendment related to gambling.  Do you recall

22  that?

23  A.  I did request one the fall of '09, yes, sir.

24  Q.  And that was a bill that you requested outlawing gambling,

25  period, correct?

```
 1   A.  Yes, sir.

 2   Q.  And do you recall that you requested that that bill be

 3   drafted on an expedited basis?

 4   A.  I don't recall that, but that is possible, yes, sir.  That

 5   would be fine.

 6   Q.  Do you recall that you requested it -- I'm going to show you

 7   something to help you, but do you recall that you requested it

 8   on October 23 and you wanted it the week of October 26?

 9   A.  I don't -- I don't recall that request, but I'm sure I said

10   I need it as quickly as I can or something like that.  That

11   usually gets them to -- if you don't say that, it takes a while.

12           MR. SEGALL:  All right.  Your Honor, may I approach?

13           THE COURT:  Yes.

14           MR. SEGALL:  2321.

15   Q.  Let me ask you to look at this exhibit and see if that's

16   not -- the first page reflects your request, and then I think

17   the bill is attached.  And I'd like for you to identify that.

18       (Brief pause)

19           MR. FRANKLIN:  Excuse me.  Mr. Segall, I don't have

20   that one in my stack.

21           MR. SEGALL:  I apologize, Mr. Franklin.

22           MR. FRANKLIN:  Thank you.

23   Q.  Do you recognize it, Senator Beason?

24   A.  I'm sure it looks like -- I mean it looks like something I

25   would have drafted, yes, sir.
```

1  Q.  It outlaws all gaming, doesn't it?

2  A.  Well, I'd have to go through one -- line by line, but it

3  looks like it does, yes, sir.

4        MR. SEGALL:  Okay.  And, Your Honor, we offer it, 2321.

5        THE COURT:  Admitted.

6  Q.  And it -- does it appear from the first page of the exhibit,

7  the project tracking report, that the request was made on

8  October 23, correct?

9  A.  That's what it says, yes, sir.

10  Q.  And the request, the intake person was someone named D.

11  Anthony, correct?

12  A.  Yes, sir, that's what it says.

13  Q.  Do you know D. Anthony?

14  A.  I probably know the person by face, but I don't know him or

15  her by name.

16  Q.  You did not request that D. Anthony deal with you, did you?

17  That was not a special request by you?

18  A.  No, sir.

19  Q.  D. Anthony was just the intake person, correct?

20  A.  As far as I know, yes, sir.

21  Q.  Okay.  And do you see where it says, request taken by; and

22  it says D. Anthony in two places, correct?

23  A.  I see that, yes, sir.

24  Q.  All right.  And you requested -- you said this bill was

25  time-sensitive.  Do you see that?

1  A.  Yes, sir.

2  Q.  And these are the instructions -- I'm sorry.

3       MR. SEGALL:  Can -- can you put up the first page?

4  There's one good reason you can't.

5       (Brief pause)

6  Q.  It says that you -- in the secured notes, the instructions

7  from the legislator, would you have said this is time-sensitive?

8  A.  I probably would have said I need it in a hurry.

9  Q.  And -- and he, referring to Senator Beason, said that it was

10  important to him to get this request as soon as possible,

11  correct?

12  A.  Yes, sir.  That's what it says.

13  Q.  Okay.  And it appears that this bill was released to you,

14  according to the exhibit, on October 27, correct?

15  A.  Yes, sir.  That's what it says.

16  Q.  You had said you needed it the week of October 26, correct?

17  A.  That's what it says, yes, sir.

18  Q.  And this bill, then, was prepared in a timely fashion,

19  strictly in accordance with your request, correct?

20  A.  That's what it appears to be.

21  Q.  And can you tell who drafted -- well, let me ask you this

22  first.  This bill not only would have had a dramatically adverse

23  impact on VictoryLand and Mr. McGregor, it would have flat

24  closed the doors, correct?

25  A.  Yes, sir.  All gambling.

1   Q.  All gambling.  Now, this is October 2009, in the midst of

2   what the government claims to have been some conspiracy.  Tell

3   me who drafted the legislation shutting VictoryLand flat down.

4   Tell me who drafted it.

5   A.  The -- the initials are J. R. C.

6   Q.  J. R. C., as you testified to yesterday, that fellow sitting

7   right over there, Mr. Ray Crosby, correct?

8   A.  That's the way I understand it.

9   Q.  At your request.  Not made, by the way, directly to him;

10  made to the intake person, right?

11  A.  Yes, sir.

12  Q.  Who you understand -- this is a question.  But you

13  understand conveys the question -- or the request made by the

14  legislator on through channels, correct?

15  A.  Yes, sir.

16  Q.  All right.  And -- and so the request you made to put

17  Mr. McGregor entirely out of business in October of 2009, when

18  some conspiracy supposedly started much earlier in 2009, was not

19  only drafted exactly like you requested it by Mr. Crosby, but in

20  the expedited fashion that you requested it, correct?

21  A.  Could you repeat your question?

22  Q.  Yes, sir.  Isn't it true -- I'll just shorten it.  Isn't it

23  true that Mr. Crosby drafted this legislation putting

24  Mr. McGregor out of business, if it passes by the people of

25  Alabama, exactly the way you wanted it and in a timely fashion,

1  as you requested it?

2  A.  He drafted legislation that would make all gambling illegal

3  in the state, if adopted by the people, the way I asked.

4  Q.  And you understand that because you did not communicate what

5  you wanted directly to Mr. Crosby, he had to rely on what was on

6  this paper to tell him what you wanted, correct?  Or somebody

7  had to tell him.

8  A.  Somebody had to tell him.

9  Q.  Did you -- you didn't offer this in 2009, did you?

10  A.  I don't recall that I did, but I -- I would have put in a

11  number of bills.

12  Q.  Well, this is --

13  A.  I believe I had a new one, different one.

14  Q.  This is October of 2009.

15  A.  Yes, sir.

16  Q.  Were you in session?

17  A.  No, sir.

18  Q.  And -- and, you know, yesterday you testified -- I just want

19  to clear this up.  You testified that the Legislature is in

20  session for 105 days.  Wasn't that your testimony?

21  A.  That's the official time period, yes, sir.

22  Q.  And it's 105 days; but the Legislature, as a body, does not

23  meet any 105 days, does it?

24  A.  It's some -- you have to meet -- you have 30 days to vote

25  over 105 days of session.  And it's up to the Legislature to

1  decide, you know, is it three days a week, two days a week, when
2  committee meetings are, and all that kind of stuff.
3  Q.  So all I'm saying is that despite that it lasts a hundred --
4  a session lasts 105 days, all of those are not meeting days.
5  A.  No, sir, they're not.
6  Q.  Okay.  In fact, how many meeting days are required for the
7  body?  Did you say 30?
8  A.  Thirty -- 30 voting days.
9  Q.  You've got to have 30 voting days within that 105 days; is
10 that correct?
11 A.  Right.  And you could have as many committee meeting days or
12 hearing days as -- as is necessary.
13 Q.  All right.  Let me -- let me get down on paper this October
14 bill.  And tell me whether this is fair before I write it.
15 Senator Beason requests that LRS, Legislative Reference Service,
16 draft a bill making illegal all gambling.  Ray Crosby drafts it
17 correctly and in an expedited manner.  And the effect would be
18 to wipe out VictoryLand and others, correct, if passed by the
19 people of Alabama?
20 A.  Yes, sir.
21     (Brief pause)
22 Q.  It's fair to say, isn't it, that you did not introduce that
23 bill in 2009?
24 A.  I couldn't say for sure without seeing my list, but I don't
25 recall it.

PLSID_00002185

1  Q.  Do you know whether there was any special session in October

2  of 2009?  Do you recall?

3  A.  I don't recall.

4  Q.  All right.  Does that mean you don't remember, or you don't

5  believe there was one?

6  A.  I don't remember if there was.

7       MR. SEGALL:  May I approach, Your Honor, to show the

8  witness what I've written?

9       THE COURT:  Yes.

10 Q.  Just please, Senator Beason, tell me if I've accurately

11 written what you've testified to and whether I've written

12 enough.

13 A.  I think you've written enough.

14 Q.  Thank you.

15    (Brief pause)

16 Q.  Now, Senator Beason, I want to talk to you about the year

17 2010.  That's the year about which you made some allegation that

18 ended up in the indictment in this case; is that correct?

19       MR. FRANKLIN:  Objection, Your Honor.  No foundation

20 for this question.  He hasn't established whether or not the

21 witness has ever seen the indictment.

22       THE COURT:  Do you know -- first of all, what are you

23 talking about?  What allegation?  And secondly, is there any

24 basis that this witness would know that that allegation ended up

25 in the indictment?

1         MR. SEGALL:  Well, I'm asking him if he knows.  That's

2  why I asked him, Judge.  The indictment has been well reported

3  in the newspaper.

4         THE COURT:  Have you read the indictment?

5         THE WITNESS:  Yes, sir, I read it.

6         THE COURT:  Go ahead, then.

7         MR. SEGALL:  All right.

8  Q.  (Mr. Segall, continuing:)  Well, am I correct that 2010 is

9  the year about which you've made an allegation related to

10  Mr. Crosby?  The reason I'm asking you about Mr. Crosby is

11  there's a contention that whatever he did was to assist

12  Mr. McGregor.  That's my interest in it, by the way.  And so my

13  question to you is, isn't 2010 the year about which you made

14  some allegation that you got the wrong bill?

15         MR. FRANKLIN:  I'm going to object, Judge.  Again, I'm

16  objecting to the form of the question.  If it's an allegation,

17  Judge, Mr. Beason doesn't draft the indictments.

18         THE COURT:  I understand, but that doesn't mean that

19  there's anything wrong with the inquiry.

20         MR. FRANKLIN:  Well, but I'm not --

21         THE COURT:  I'm not sure what the allegation is.  I

22  can't respond to the objection without knowing what the

23  allegation that's at issue is.

24         MR. FRANKLIN:  I promise you one thing, Judge.  By the

25  time we get the objection out, the bad information will be in

PLSID_00002187