**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| GREATER BIRMINGHAM MINISTRIES, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | 2:15-cv-02193-LSC |
| | ) | |
| JOHN MERRILL, *in his official capacity as the Alabama Secretary of State*, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OF OPINION**

## I.   INTRODUCTION

This case addresses the voting rights claims of Plaintiffs Greater Birmingham Ministries, the Alabama State Conference of the National Association for the Advancement of Colored People ("the Alabama NAACP"), Giovana Ambrosio, Shameka Harris, and Elizabeth Ware, against John Merrill in his official capacity as Alabama's Secretary of State ("Secretary Merrill"). In this action, Plaintiffs challenge Alabama's Photo Voter Identification Law, House Bill 19 of 2011, codified at Ala. Code § 17-9-30 (1975) ("the Photo ID Law"), which requires absentee and in-person voters to show photo identification in order to cast a regular

ballot, subject to some exceptions. Plaintiffs allege that the law has a racially discriminatory purpose and effect that violates the Voting Rights Act and the United States Constitution. Specifically, Plaintiffs allege that the Photo ID Law violates Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, Section 201 of the Voting Rights Act, 52 U.S.C. § 10501, and the Fourteenth and Fifteenth Amendments. Based on their claims, Plaintiffs seek declaratory and injunctive relief to prevent the enforcement of the Photo ID Law. Secretary Merrill denies Plaintiffs' allegations and contends that the law was passed for valid and non-discriminatory purposes, that nearly every eligible voter in Alabama has an acceptable photo ID, and that anyone who does not have an acceptable photo ID can easily obtain one.

Presently before the Court are cross motions for summary judgment filed by all parties. Specifically, Secretary Merrill has filed a Motion for Summary Judgment seeking the dismissal of all of Plaintiffs' claims. (Doc. 236.) Plaintiffs have filed a Motion for Partial Summary Judgment seeking a judgment in their favor on one of their claims and on one discrete issue. (Doc. 234.) For the reasons

that follow, Secretary Merrill's motion is due to be granted and this action dismissed in its entirety.[1]

## II.     FACTS[2]

### A.     Historical and Contemporaneous Background

Penalties for voter fraud have existed in Alabama since the 1850s. While cases of proven in-person voter fraud in Alabama are extremely rare, there are some documented cases of absentee voter fraud in Alabama in recent history. For example, a July 1996 article in The Birmingham News discussed the types of voter fraud allegedly occurring in Alabama: "Since 1994, affidavits and courtroom testimony have established the following abuses: (1) absentee ballots cast in the names of dead people and people who have long since moved out of the county; (2) absentee ballots mailed to unregistered voters; (3) voter brokers following mail trucks and removing absentee ballots from mailboxes; (4) intimidation of poor and elderly voters who are made to fear a cutoff of their governmental assistance from

---

[1]      Also pending are three "Motions *in Limine*" filed by Secretary Merrill seeking to limit or exclude the scope of anticipated expert testimony by three of Plaintiffs' experts. (Docs. 215, 216, & 217.) For reasons contained herein, these motions are due to be denied as moot.

[2]      These facts are taken from the parties' "Undisputed Material Facts" section of their Joint Status Report, which was filed on December 22, 2017. (Doc. 265.) While the parties dispute the relevance and materiality of some of the facts contained herein, they agree that they are undisputed. The Court views the facts in the light most favorable to the non-moving party on each summary judgment motion. *Chavez v. Mercantil Commercebank, N.A.*, 701 F.3d 896, 899 (11th Cir. 2012).

local politicians if they do not cooperate by handing over their absentee ballots; (5) pressuring and solicitation of nursing home patients; (6) vote buying at $5 and $10 a piece; (7) bulk mailing of hundreds of absentee ballots by just a few individuals in some counties . . . ." The State and federal governments worked together to investigate and prosecute voter fraud in absentee voting in places like Greene and Wilcox counties. Various citizen groups formed to spread the word about the need for a photo ID law to combat voter fraud, such as the bi-racial Honest Elections Coalition.

In 1995, the National Voter Registration Act of 1993 went into effect, allowing persons to register to vote at motor vehicle and public welfare agencies or by mailing in easily-available voter registration forms. *See* 52 U.S.C. § 20501 *et seq.* The Act led to 180,000 new, disproportionately Black and low-income people becoming registered voters in 1995 in Alabama.

Although some in the Legislature tried, voter ID bills failed in the Legislature in the nineties. In 1998, Governor Fob James, Attorney General Bill Pryor, and Secretary of State Jim Bennett were unified in fighting for a voter ID law. An article reported that then-Attorney General Bill Pryor "believes honest elections would restore voter confidence and increase turnout. He said critics who claim there's no vote fraud need to check the record. State and federal prosecutors have won

convictions in several counties against officials and citizens who illegally cast ballots."

By 2000, fourteen other states requested some kind of ID in order to vote. In 2003, Alabama passed a voter ID law that allowed the use of both photo and non-photo ID. *See* Ala. Act No. 2003-381. The law was the result of a deal that Democrat Legislators would support the bill as long as Republican Legislators would support a bill that would restore the voting rights of certain felons once they were released from prison and paid their fines. Acceptable forms of identification under the 2003 law included (1) a copy of a utility bill, bank statement, government check, paycheck, or other document with the voter's address, (2) a valid Alabama hunting or fishing license, (3) a valid Alabama concealed carry permit, (4) a valid pilot's license issued by the Federal Aviation Administration, (5) a certified birth certificate, (6) a valid social security card, (7) certified naturalization documentation, (8) a certified copy of court records showing adoption or name change, (9) a valid Medicare, Medicaid, or electronic benefits transfer card, and (10) a valid voter registration card. In addition, a voter could cast a ballot if he or she was "positively identified by two election officials." At that time, the Voting Rights Act required Alabama to seek preclearance for any change in voting requirements from either the U.S. Attorney General or a three-judge court in the

United States District Court for the District of Columbia. *See Shelby Cty. v. Holder*, 133 S. Ct. 2612, 2620 (2013). The U.S. Attorney General precleared Alabama's 2003 voter ID law, including the positively identify provision, and the law remained in effect until 2014.

In 2005, the Commission on Federal Election Reform, chaired by former President Jimmy Carter and former U.S. Secretary of State James Baker, issued a report encouraging States to move towards requiring voters to present photo IDs before being allowed to cast a ballot. *See* Report of the Commission on Federal Election Reform, Building Confidence in U.S. Elections § 2.5 (Sept. 2005) ("the Carter-Baker Report"). The Carter-Baker Report found that even in the absence of extensive voter fraud, the use of photo IDs would inspire public confidence in the voting process and act as a deterrent to fraud. *See id.* ("In the old days and in small towns where everyone knows each other, voters did not need to identify themselves. But in the United States, where 40 million people move each year, and in urban areas where some people do not even know the people living in their own apartment building let alone their precinct, some form of identification is needed. . . . Photo IDs currently are needed to board a plane, enter federal buildings, and cash a check. Voting is equally important.").

In 2008, Indiana's photo ID law was challenged, and it was upheld by the United States Supreme Court. *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181 (2008). The next year, the Eleventh Circuit upheld Georgia's photo ID law. *Common Cause/Georgia v. Billups*, 554 F.3d 1340 (11th Cir. 2009).

Between 1995 and 2011, Black legislators and other individuals in Alabama argued at length about how requiring photo ID would disfranchise voters who lack access to vehicles and specifically about the anticipated effect of such requirements on Black voters. In the 2008 presidential election, Black voter turnout and political engagement increased significantly as compared to prior elections. However, the 2010 elections produced a Republican landslide and supermajorities in both the Alabama House and Senate, for the first time in 136 years. There was racially polarized voting in both the 2008 and 2010 elections. White Republicans' defeat of white Democrats led to a partisan divide in the Alabama Legislature. Prior to the 2010 election, the House had 60 Democrats, 34 of them white and 26 Black. After the 2010 election, there were 36 Democrats—ten white, 26 Black. In the Senate, the number of Black Democrats remained seven; white Democrats fell from 13 to four. There were no non-white Republicans. Thus, after 2010, 67% of the remaining Democrats were Black Legislators who represented Black districts.

In 2011, one of the priorities of the newly elected Alabama Legislature was the enactment of a bill that required photo ID to vote either in-person or absentee. House Bill 19 was pre-filed in the Alabama House of Representatives for the 2011 Legislative Session on February 25, 2011. The bill was considered by the House Standing Committee on Constitution, Campaigns, and Elections, which acted favorably on it and recommended a substitute and an amendment. On March 22, 2011, the House considered whether to approve the substitute and the amendment; the substitute was adopted and the amendment was rejected. The House passed House Bill 19 by a largely party-line vote of 64-31. Some Black Legislators were vocal in their warnings that it would allegedly suppress voting by seniors and poor people who don't have easy access to transportation and decried it as "a step back to the days of poll taxes and literacy tests."

The Senate's Rules Committee added House Bill 19 to the "special order" calendar for June 9, 2011, the last day of the 2011 Legislative Session. On June 9, the Senate invoked cloture, a procedure used by the majority in a legislative assembly for ending debate and taking a vote, and passed the bill on a straight party-line vote. All Black Senators who were present voted against the bill. The Senate used cloture more frequently in 2011, 36 cloture votes in fact, once the Republicans had a supermajority allowing them to utilize it.

Governor Robert Bentley signed House Bill 19 into law on June 15, 2011. At that time, Alabama was still a "covered" State under Section 5 of the Voting Rights Act and thus could not enforce the law without first obtaining preclearance from the U.S. Department of Justice or a federal three-judge court. By its terms, the Photo ID Law was not to become operative until the first statewide primary in June 2014. Republican Representative Kerry Rich was quoted as anticipating a "lengthy court battle and review by the U.S. Justice Department to see if the legislation complies with the 1965 Voting Rights Act."

In the 2011 Legislative Session, Republican Senator Scott Beason was the chair of the Senate Rules Committee and had influence over setting the legislative agenda. On June 17, 2011, just after the 2011 Legislative session concluded, Senator Beason's comments referring to Black voters as "aborigines" became publicly known through the trial testimony in *United States v. McGregor. See* 824 F. Supp. 2d 1339, 1345 (M.D. Ala. Oct. 20, 2011). His comment was made in conversations unrelated to the Photo ID Law that were recorded by the Federal Bureau of Investigation in its efforts to obtain evidence of legislative bribery. On November 15, 2011, Senator Beason was stripped of his position on the Senate Rules Committee before the 2012 Legislative Session.

From the 1990s until his retirement in 2010, Republican Senator Larry Dixon sponsored photo ID bills like House Bill 19. In 1996 he made a comment to the effect that Alabama's lack of a photo ID law was "beneficial to the Black power structure" and "benefits Black elected leaders." In 2011, comments he made referring to Black voters as "illiterates," during the same recorded conversations that Senator Beason was involved in, also became publicly known through the trial testimony in *United States v. McGregor*. Senator Dixon was not in the Legislature when House Bill 19 was passed in 2011.

Several days before the Photo ID Law was passed, the same Legislature passed House Bill 56, a wide-ranging anti-immigration bill. Many of the same Legislators sponsored both bills. Black Legislators voted overwhelmingly in opposition to the anti-immigration bill. It contained a proof of citizenship requirement for voter registration. Anyone already registered was not required to provide proof of citizenship. Several of the Republican Legislators made prejudiced comments conflating Latinos with illegal immigrants in connection with promoting the bill, including Rep. Rich and Sen. Beason. Much of House Bill 56 was later invalidated by Federal courts. *See*, *e.g., United States v. Alabama*, 691 F.3d 1269 (11th Cir. 2012).

In 2012, the same Legislature that passed the Photo ID Law passed a state legislative redistricting plan. In 2017, a three-judge court ruled that twelve majority-Black districts violated federal law and that the Legislature's redistricting was predominately motivated by race. *Ala. Legis. Black Caucus v. Alabama*, 231 F. Supp. 3d 1026, 1033 (M.D. Ala. 2017).

Alabama's Secretary of State, then Jim Bennett, did not issue administrative rules, educate the public, train election officials, issue photo ID cards, or otherwise implement the Photo ID Law before June 25, 2013. Taking some of those actions before that date would have violated Section 5 of the Voting Rights Act.

On June 25, 2013, the Supreme Court issued its opinion in *Shelby County*, declaring unconstitutional Section 4(b) of the Voting Rights Act, which is the coverage provision of Section 5 of the Act. 133 S. Ct. at 2622-28. The *Shelby County* decision resulted in Alabama no longer being subject to preclearance before implementing a change such as that contained in the Photo ID Law. Thus, on June 29, 2013, Secretary Bennett issued proposed administrative rules for implementation of the Photo ID Law, and on October 22, 2013, issued final administrative rules for the law generally. On April 16, 2014, Secretary Bennett issued supplemental emergency administrative rules governing the positively identify provision of the law at the urging of some of the plaintiffs and their counsel

and others. When those groups then objected to the rules that were promulgated because they believed the rules did not address the concerns raised in their objections, Secretary Bennett allowed the emergency administrative rules to expire without replacing them.

## B.    Alabama's Photo ID Law—Its Provisions and Operation

Alabama's Photo ID Law requires voters to present a valid photo ID to vote. Ala. Code § 17-9-30(a). It applies to in-person and absentee voters. *Id.* § 17-9-30(b). Voters voting absentee are required to include a photocopy of their photo IDs, in a separate envelope, when they mail in their absentee ballots. *Id.* Pursuant to the positively identify provision of the Photo ID Law, an in-person voter without the required photo ID can still cast a regular ballot if two election officials present at the polling place positively identify that person as a person who is eligible to vote and they each sign a sworn affidavit so stating. *Id.* § 17-9-30(e). Voters without the required photo ID can also cast a provisional ballot. *Id.* § 17-9-30(d). Law already in effect at the time of the Photo ID Law's passage states that a provisional ballot for an in-person voter is counted if the voter returns to the appropriate Board of Registrars with the required photo ID by the deadline, generally the Friday after Election Day. Voters entitled to vote absentee by federal law, including the Uniformed and Overseas Citizens Absentee Voting Act, 52 U.S.C. § 20301 *et seq.*,

and provisions concerning voting accessibility for elderly and/or handicapped voters, are not required to show or provide a copy of photo ID to vote. Ala. Code § 17-9-30(c).

The Photo ID Law lists seven specific categories of valid photo ID:

(1) A valid Alabama driver's license or nondriver identification card which was properly issued by the appropriate state or county department or agency.

(2) A valid Alabama photo voter identification card issued under subsection (f) or other valid identification card issued by a branch, department, agency, or entity of the State of Alabama, any other state, or the United States authorized by law to issue personal identification, provided that such identification card contains a photograph of the elector.

(3) A valid United States passport.

(4) A valid employee identification card containing the photograph of the elector and issued by any branch, department, agency, or entity of the United States government, this state, or any county, municipality, board, authority, or other entity of this state.

(5) A valid student or employee identification card issued by a public or private college, university, or postgraduate technical or professional school located within the state, provided that such identification card contains a photograph of the elector.

(6) A valid United States military identification card, provided that such identification card contains a photograph of the elector.

(7) A valid tribal identification card containing a photograph of the elector.

*Id.* § 17-9-30(a).

In addition to Alabama driver's licenses and nondriver IDs, Alabama allows voters to use driver's licenses and nondriver IDs issued by other States. The Alabama Law Enforcement Agency ("ALEA"), formerly the Alabama Department of Public Safety, handles initial issuances of driver's licenses and nondriver IDs, but renewals and duplicates are available in every county in Alabama from a Judge of Probate, a License Commissioner, or a Revenue Commissioner. Renewals and duplicates are also available from Self-Service Kiosks or the Alabama Online Driver License Issuance System. A grace period of 60 days after expiration of a driver's license exists for the purpose of driver's license renewal and the driver's license remains valid during that time. Under certain conditions, a driver's license that has been expired for three years or less can be renewed without going to an ALEA office. Persons 62 and older may obtain a "lifetime" nondriver ID that does not expire. There is a fee to obtain a driver's license. In addition to paying a fee for the driver's license, a person must present various forms of documentation to receive a driver's license, and some of those have fees.

ALEA also requires documentation to obtain a nondriver ID, such as birth and marriage certificates. However, and although not required by the Photo ID Law, Secretary Merrill has entered into a Memorandum of Understanding ("MOU") with ALEA, whereby if a person seeks an ALEA nondriver ID for the

purposes of voting, the fee for the nondriver ID will be paid by the Secretary. As of the fall of 2017, ALEA had invoiced the Secretary for 33 voters who requested a nondriver ID for voting purposes. Another MOU was reached between the Secretary and the State's Department of Public Health ("ADPH") whereby the ADPH will perform searches for birth and marriage certificates for ALEA when a person requests a nondriver ID to vote but does not have a copy of the necessary underlying documentation and bill the Secretary for the search.

The Photo ID Law also provides for the Secretary to issue free photo voter ID cards specifically for the purposes of voting. Ala. Code § 17-9-30(f). Because they cost money to print, these cards are only meant for registered voters who do not have one of the other forms of photo ID accepted under the Photo ID Law. *See id.* § 17-9-30(g). To obtain a photo voter ID card, voters must sign a form, under penalty of perjury, that they do not currently possess any form of valid photo ID. *Id.* § 17-9-30(i). Any falsification or fraud in making the application is a Class C felony. *Id.* These photo voter ID cards may be obtained at Board of Registrars' offices located in every Alabama county, the Secretary of State's office at the State Capitol in Montgomery, or from the Secretary of State's mobile ID unit. The Board of Registrars for each county is responsible for maintaining voter rolls. Most

counties have one office for the Board of Registrars, but a few have more than one office.

In order to obtain a free photo voter ID card, the voter must present

(1) A photo identity document, except that a non-photo identity document is acceptable if the document includes both the person's full legal name and date of birth.

(2) Documentation showing the person's date of birth.

(3) Documentation showing the person is registered to vote in this state.

(4) Documentation showing the person's name and address as reflected in the voter registration record.

*Id.* § 7-9-30(j). While there is no existing list of all forms of documents that could be used to get a photo voter ID card, non-photo ID documents that can be used include a birth certificate, social security document, hospital or nursing home record, marriage record, census record, military record, Medicare or Medicaid document, certificate of citizenship, official school record or transcript, and a selective service card or documentation. Indeed, the mobile ID unit has issued free photo voter ID cards based upon the presentation of a wide variety of documents, including voter registration forms, registration update forms, arrest records, bank documents, Birmingham Housing Authority ID cards, expired county employee IDs, court paternity documents, fishing licenses, EBT cards, pay stubs, Sam's Club

cards, and a ticket issued by a municipality. There may be fees to obtain documents that may be used to obtain a photo voter ID card. For example, a birth certificate and a marriage license, both documents that would confirm a voter's name and date of birth, cost $15.00 each. However, the Secretary of State has entered into another MOU with the ADPH providing that an official issuing a photo voter ID card can request a copy of a voter's Alabama birth or marriage certificate, for purposes of issuing the ID, at no cost to the voter. Pursuant to the MOUs, the ADPH processed 164 requests for free birth or marriage certificates between March 2014 and September 2014; 87 in Fiscal Year 2015 (October 2014 through September 2015); 89 in Fiscal Year 2016; and 78 for October 2016 through July 2017.

Another way for a voter to meet the requirements to obtain a photo voter ID card is simply to complete a voter registration form or a voter registration update form and sign the same in front of an election official under penalty of perjury. Persons already registered to vote may submit a voter registration update form, even if nothing needs updating, and prove their identity with that update form alone. Voters in Alabama are currently required to update their registration when they move. Voter registration cuts off on the fifteenth day before each election, but the Boards of Registrars offices are required to stay open during the 14-day period

leading to each election and on Election Days. Photo voter IDs are available to the voter at the Boards of Registrars' offices on Election Days, but are not available at polling places on Election Days.

Secretary Merrill contracted with Police & Sheriff's Press, Inc. ("PASP") to produce the photo voter ID cards at $8.00 each. When a voter applies for a photo voter ID card, a temporary card is issued on the spot at no cost to the voter. The permanent card is mailed to the voter, normally within ten business days. PASP began printing Alabama photo voter ID cards in February 2014. PASP printed 5,294 Alabama photo voter ID cards in 2014, another 2,316 cards in 2015, another 4,429 in 2016, and 1,403 in 2017 (through June 30). As of June 30, 2017, Alabama had issued 13,442 free photo voter ID cards to voters, and the Secretary of State had paid more than $280,000 to PASP for card-printing and other services and equipment related to the photo voter ID program.

In 2014, then-Secretary of State Bennett first implemented the mobile ID unit program, the schedule for which was developed after contacting every mayor's office in the State. While he was Secretary of State, the mobile ID unit went to every county in the State, and it went to some counties more than once. It was stationed at a variety of locations, including churches, libraries, and malls. Secretary of State Merrill continued with the mobile ID unit when he was elected

in 2015. He solicited input on the mobile ID unit's schedule from the Judges of Probate, as well as from members of the Alabama House and Senate. Secretary Merrill issued press releases informing voters about the photo ID requirement and announcing the mobile ID unit's upcoming locations. Poverty, household wealth, and racial demographics were not factors considered when scheduling locations for mobile ID unit visits. Secretary Merrill has said he tries to get the mobile ID unit to festivals and events throughout the State that are high traffic areas, and he tries not to have the unit go to the same places every year. For instance, the mobile ID unit has been to the Chilton County Peach Festival in Clanton, the Peanut Butter Festival in Brundidge in Pike County, the Peanut Festival in Dothan in Houston County, the Magic City Classic in Birmingham where Alabama State and Alabama A&M play football every year, the Tomato Festival in Slocomb in Geneva County, and the Rattlesnake Rodeo in Opp in Covington County. The mobile ID unit has made more than 350 visits across the State since 2014 and issued more than 850 photo voter IDs. As of April 12, 2017, 85% of mobile ID unit locations were more than a mile from a Board of Registrars' office. As of April 12, 2017, on average, mobile ID unit locations were open for 3.6 hours a day.

Voters may also request, through the Secretary of State's website, that the mobile ID unit come to their home or group to issue a photo voter ID card. The

number of home visits actually made to date is fewer than ten. One of the mobile unit home visits came about from a member of the Legislature contacting Secretary Merrill to assist a constituent. Another was made for a plaintiff in this litigation. The Secretary has implemented a protocol whereby the voter is asked questions about his or her transportation options before a home visit is scheduled. Nonetheless, Secretary Merrill has made clear that if the voter says he has no one to give him a ride, the voter is taken at his word: "Now, if they choose not to be honest, then we'll accept it." He emphasized that "we're not going to—nobody is ever going to be denied a voter ID."

As noted, a voter without a photo ID may also cast a regular ballot if two election officials positively identify him or, if not, a provisional ballot. There are at least four election officials at each polling place, and sometimes more than four. For election officials to positively identify a voter, they must be personally acquainted with the voter. Under the Secretary's interpretation, there is no requirement that the poll workers affirmatively inform voters about the positively identify provision. However, a sign posted in polling places lists examples of the valid forms of photo ID, and states, "If you do not have any of the above listed forms of identification, you will be permitted to vote by either of the following two ways: . . . 2. The Voter is positively identified by two election officials as a voter on

the poll list and the election officials sign an Affidavit for Identifying Elector." The Secretary instructs poll officials not to positively identify voters whom they do not personally know.

In 2014, Jerome Gray, a member of Plaintiff Alabama NAACP, assisted two Black voters who lacked an acceptable photo ID, but knew two of their poll officials. However, the white chief inspector (who is the head of the polling place) refused to let them vote at all and insisted that everyone had to show photo ID. In response, Mr. Gray called the Secretary's office. The Secretary's office instructed this chief inspector that people could use the positively identify provision to vote. These individuals were allowed to vote.

Former plaintiff Edna Williams, who is Black and lacked the required photo ID, voted by using the positively identify provision. Jewel Castophney is a Black voter who regularly votes using the positively identify provision. She stated that she knows all of her poll workers, they are always the same people (though one died this year), and they are all Black. Ms. Castophney was not issued a photo voter ID card at a mobile ID unit visit because the Secretary of State erroneously believed that she already possessed a nondriver ID that could be used for voting. In any event, Ms. Castophney applied again for a free photo voter ID on November 1, 2017, and her application was pending at the time of her deposition. She also

testified that she did not want it to vote and did not realize it was intended for this purpose only; she routinely uses the positively identify provision to vote. She wanted a State-issued ID for other purposes and she testified that she would not have applied for one if she had understood that it was only for voting.

Josh Wahl is a white registered voter who, for religious reasons, lacks an acceptable photo ID. In the 2014 primary and runoff and 2016 general elections, Mr. Wahl was able to vote a regular ballot because two poll officials, including a longtime neighbor, positively identified him. However, in the 2014 general and 2016 primary and runoff elections, Mr. Wahl and four of his family members were denied the right to vote because those same poll officials refused to positively identify them again. However, Secretary Merrill personally intervened and worked out a situation where Mr. Wahl and his family members could vote.

Secretary Bennett's Deputy Secretary of State, Emily T. Marsal, testified that his office met with citizens and groups to explain the requirements and implementation of the Photo ID Law and "spent substantial time and resources" on an education program that included billboards and radio and television advertisements. After taking office, Secretary Merrill determined to budget roughly $350,000 for advertising per election, which represented a cut to approximately one third of previous administration's expenditures. Nonetheless, between

October 2013 and January 2017, the Secretary of State's office has spent more than $2.6 million advertising the Photo ID Law. For example, in January 2017, Secretary Merrill mailed a postcard to the address on file for every registered voter. In part, the post card said: "Remember, you need a valid photo ID to vote, unless exempt by law. If you do not have one, you may obtain a free photo voter ID at any Board of Registrars' office. To learn more, please visit our website at alabamavoterid.com, or contact your registrars."

Secretary Merrill has not offered any advertisements or publications related to the Photo ID Law in Spanish. However, he has provided Spanish translation of some materials upon request. Secretary Merrill's chief of staff is Mexican-American and speaks Spanish, and his mother has translated some of the materials for voters.

On September 30, 2015, the Governor and the Secretary of ALEA announced that ALEA would permanently close 31 part-time ALEA driver's license-issuing offices, including offices in eight of eleven contiguous counties in the so-called "Black belt"—a string of counties where more than 130,000 eligible voters reside, nearly half of whom are Black, and where the Black poverty rate is 41%. On October 2, 2015, Plaintiffs Greater Birmingham Ministries and the Alabama NAACP wrote to notify the Governor, Secretary of ALEA, and the

Secretary of State that they believed that "[b]y closing the[ ] [ALEA] offices, the State will drastically reduce the number of sites where potential voters can obtain photo ID, creating a substantial and disproportionate burden on African Americans' ability to participate in the political process in Alabama." The Governor announced on October 16, 2015, that, rather than close completely, the 31 affected ALEA offices would remain open one day per month. Secretary Merrill publicly denied that any change in office hours prevented any person from voting. The hours of the offices of the Boards of Registrars, where voters may obtain a free photo ID for voting, were not affected by changes in ALEA office hours.

## C.     The Parties

### 1.     *Plaintiff Greater Birmingham Ministries*

Plaintiff Greater Birmingham Ministries, founded in 1969, is a multi-faith, multi-racial organization that provides emergency services for people in need in the greater Birmingham, Alabama area. A central goal of Greater Birmingham Ministries is the pursuit of social justice in the governance of Alabama. Greater Birmingham Ministries actively opposes state laws, policies, and practices that it believes result in the exclusion of vulnerable groups or individuals from the democratic process. Toward that end, Greater Birmingham Ministries regularly engages in efforts to register, educate, and increase turnout among Black and

Latino voters, as well as low-income voters in general. Greater Birmingham Ministries has participated in lawsuits intended to vindicate these principles.

### 2. *Plaintiff Alabama NAACP*

Plaintiff Alabama NAACP is a state subsidiary of the National Association for the Advancement of Colored People, Inc. The Alabama NAACP is the oldest and one of the most significant civil rights organizations in Alabama, and it works to ensure the political, educational, social, and economic equality of Black citizens and all citizens. Two central goals of the Alabama NAACP are to eliminate racial discrimination in the democratic process and to enforce federal laws and constitutional provisions securing voting rights. Toward those ends, the Alabama NAACP has participated in numerous lawsuits intended to protect the right to vote, regularly engages in efforts to register and educate Black voters, and encourages Black citizens to engage in the political process by turning out to vote on Election Day.

### 3. *Plaintiff Giovana Ambrosio*

Giovana Ambrosio is a lawfully registered Latina voter, U.S. citizen, and resident of Franklin County, Alabama. Ms. Ambrosio was a high school senior when she became a plaintiff. She rode the bus to school and several days a week stayed after school for extracurricular activities. She also worked during the

summer while off of school. Ms. Ambrosio was registered to vote prior to the March 1, 2016 primary, but Secretary Merrill maintains that she was not registered in time to vote in that election. Ms. Ambrosio went to the polls for the March 1, 2016 primary. She was not personally acquainted with the election officials at her polling place that day, nor did she possess any of the types of photo ID required to vote.

For the entirety of 2016, the closest driver's license-issuing ALEA office to Ms. Ambrosio's home was only open one day per month, during the hours that Ms. Ambrosio typically spent in classes or in school-sponsored and school-supervised extracurricular activities. The next closest ALEA office to Ms. Ambrosio is located in Sheffield, which is an approximately 45-mile drive roundtrip. The Sheffield office is open from 8:00 am to 4:30 pm on weekdays. At the time of her August 2016 deposition, Ms. Ambrosio did not own a car or know how to drive one. Although her parents have access to vehicles, both parents work full-time and were unable to drive her to Sheffield during the ALEA office's normal hours. For example, her father leaves for work as early as 4:00 am and works up to twelve hours or more per day. Ms. Ambrosio's mother begins her work shift at 4:00 pm and also works until late in the evening. To the best of Ms. Ambrosio's knowledge, there is no public transportation from Franklin County to Sheffield. However, the

Board of Registrars' office at the Franklin County courthouse is approximately one mile from Ms. Ambrosio's home.

Ms. Ambrosio started classes at Northwest Shoals Community College in the fall of 2016. Before classes begin, students register and pay for classes at the cashier's office. They are told then to go across the hall to the Student Success Center to get their picture taken for their student ID. The college sends new student information to the vendor to print and mail the student ID. If the picture has been taken, it should appear on the student ID. Otherwise, the card will come without a picture on it and a message that reads "needs photo see ID office." In late August 2016, Ms. Ambrosio had her picture taken for her student ID, but the ID was delayed in arriving, and eventually it arrived without a photo. Shortly before the November 2016 general election, Ms. Ambrosio's sister drove her to the courthouse to get a photo voter ID card from the Board of Registrars' office; she left with a temporary paper ID and she received a permanent ID in the mail a few weeks later. Ms. Ambrosio used the temporary photo voter ID to vote in the November 2016 general election. Ms. Ambrosio followed up with Northwest Shoals Community College and got a student ID with a photo. That ID is also accepted under the Photo ID Law. Ms. Ambrosio also knew about the mobile ID unit.

### 4.    *Plaintiff Shameka Harris*

Plaintiff Shameka Harris is a 33-year-old lawfully registered Black voter, U.S. citizen, and resident of Sumter County, Alabama. Although Ms. Harris has previously voted in-person using a photo or non-photo ID under Alabama's previous 2003 voter ID law, her unexpired ALEA nondriver photo ID was stolen, along with her wallet, in 2014. Ms. Harris does not own a car. She pays private individuals to drive her anywhere that is not within the immediate walking distance of her home. Ms. Harris lives with her boyfriend. In early 2017, he bought a car. He uses the car to drive to his two jobs. Ms. Harris does not drive his car. Ms. Harris lives on a fixed income.

In 2016, Ms. Harris possessed an expired nondriver photo ID, which she could not use to vote. Ms. Harris did not attempt to vote in November 2016 because she knew that voters needed to have a photo ID and she did not have one at the time.

Before her March 2017 deposition, and after the November 2016 election, Ms. Harris was told by a case worker that she needed to get a photo ID in order to receive food stamps. About two days later, she went to Livingston to update her voter registration and then took that to the ALEA office and got a new nondriver ID. She had to pay for the ride to Livingston.

Ms. Harris has a copy of her birth certificate. Ms. Harris has a smart phone with Internet access. She must pay for data to use the Internet.

Even though her Medicaid card was stolen, Ms. Harris believes that it should be sufficient proof of her identity to vote. The Medicaid card does not have a photo on it.

### 5. *Former Plaintiff Debra Silvers*

Former Plaintiff Debra M. Silvers passed away in January 2017. At the time she passed, she was a plaintiff in this lawsuit and her deposition had been taken. Ms. Silvers was a 37-year-old lawfully registered Black voter, U.S. citizen, and resident of Greene County, Alabama. Ms. Silvers had previously voted in person using her ALEA-issued nondriver photo ID. In September 2015, Ms. Silvers' ALEA-issued nondriver photo ID was destroyed in a house fire, along with her home, birth certificate, social security card, other identity documents, and nearly all of her possessions. Ms. Silvers attempted to get a new nondriver ID two months after the fire but did not have the necessary forms of identification. Over the course of several months and numerous visits to the Alabama Health Department and Department of Human Resources in Eutaw, a 20-mile roundtrip drive from her home, and to the Social Security Administration office in Tuscaloosa, a 90-mile roundtrip drive from her home, Ms. Silvers acquired new birth certificates and

social security cards for herself and her children. She would have tried to obtain a photo ID even if she did not need it to vote because she needed it for other things. Ms. Silvers was required to spend money on fees and transportation.

Prior to March 1, 2016, Ms. Silvers had obtained photocopies of her nondriver ID but not a new nondriver ID. Ms. Silvers paid a private individual to drive her to the nearest driver's license-issuing ALEA office, which is a 20-mile roundtrip drive from her home, to obtain a replacement nondriver photo ID. Ms. Silvers received a hard copy of her nondriver ID between one and two months after receiving the temporary copy. Ms. Silvers attempted to vote in the March 2016 primary election, but her expired ID was not a valid photo ID and the poll worker "couldn't see the picture" on the temporary new ID. Poll workers told her that she could not vote because she lacked the required photo ID and no one was personally acquainted with her. She was not told about a provisional ballot. Ms. Silvers voted in the November 2016 general election. Ms. Silvers was not asked to present a photo ID when she voted in November 2016, but she did have one. Ms. Silvers had a smart phone with Internet access.

### 6. *Plaintiff Elizabeth Ware*

Plaintiff Elizabeth Ware is a sixty year-old, lawfully registered Black voter, U.S. citizen, and resident of Mobile County, Alabama. Ms. Ware's nondriver

photo ID was stolen in 2014. Ms. Ware lives in Prichard. The License Commission in Mobile County issues renewals and duplicates of driver's licenses and nondriver IDs at five locations in Mobile County, including one in Prichard. The Prichard office is open 7 a.m. to 5 p.m. Mondays, Tuesdays, Thursdays, and Fridays. Ms. Ware has a Medicaid card and a social security card. Ms. Ware testified that she tried to get a photo voter ID from the Mobile County Board of Registrars' office and was turned away because she had previously held a nondriver ID.

Ms. Ware lives on a fixed income, does not have reliable access to transportation, and does not own a vehicle. Her health limits her ability to walk to the nearest bus stop, though she has walked to a polling place near her home. Although members of Ms. Ware's family can sometimes provide her with rides, their work schedules often prevent her family members from giving her rides during the day. Ms. Ware did not have a photo ID at the time of the March 1, 2016 primary election and the November 2016 general election.

At her deposition, Ms. Ware expressed interest in arranging for the mobile unit to come to her home. On March 10, 2017, two employees of the Secretary of State's office traveled more than 150 miles one-way to Ms. Ware's residence to issue her a photo ID. Ms. Ware was unaware of the mobile ID unit home visit until her deposition.

### 7.    *Defendant Secretary Merrill*

Defendant John H. Merrill is being sued in his official capacity as the Secretary of State of Alabama. The Secretary of State is Alabama's chief election official. He is charged with issuing photo voter ID cards and informing the public about the Photo ID Law's requirements. *See* Ala. Code § 17-9-30(f), (l), (n). Secretary Merrill also has authority to promulgate administrative rules to implement the Photo ID Law. *Id.* § 17-9-30(o).

### D.    **Statistical Data and Expert Testimony**

According to the 2010 Census, Alabama's total population of roughly 4.7 million people is 67% white, 26% Black, and 3% Latino. According to the 2014 American Community Survey ("ACS"), Alabama's voting age population ("VAP") of 3.6 million people is 69% white, 26% Black, and 1% Latino. According to a U.S. Census survey of Alabamians from November 2014, 41.5% of the Latino citizen VAP, 64.6% of the Black citizen VAP, and 65.8% of the white citizen VAP were registered to vote in Alabama. Based on the information contained in the voter file for all active and inactive registered voters as of July 6, 2016, Black people make up approximately 26.8% of Alabama's registered voter population, Hispanics make up approximately 0.8% of Alabama's registered voter population, and whites make up approximately 70.1% of Alabama's registered voter population.

According to the 2009-2013 ACS, eleven of Alabama's 67 counties have a majority-Black population. Each of these counties has a higher Black-alone population than the State as a whole: Macon County (81.2%), Greene County (80.8%), Lowndes County (74.0%), Sumter County (73.1%), Wilcox County (72.9%), Bullock County (70.9%), Dallas County (68.8%), Perry County (68.3%), Hale County (59.1%), Montgomery County (55.2%), and Marengo County (52.1%). According to the 2009-2013 ACS, none of Alabama's 67 counties has a majority Latino population.

According to the 2015 ACS one-year estimates, statewide, 27.1% of Black and 23.6% of Hispanic households do not have a computer at home and 41.8% of Black households and 41.2% of Hispanic households do not have a high-speed Internet subscription. This compares to 16.2% of white households which do not have a computer at home and 27.7% of white households without a high-speed Internet subscription. According to the 2015 ACS one-Year Estimates, 12.9% of Latino Alabamians, 16.4% of Black Alabamians and 26.9% of white Alabamians have received a bachelor's degree or higher.

Alabama does not provide state funding of public transit. Student and government employee photo IDs are disproportionately held by racial minorities in Alabama.

Plaintiffs' expert, Dr. Bernard Siskin, analyzed whether there is a racial disparity between white voters and voters of color in photo ID possession rates in Alabama. To conduct his analyses, Dr. Siskin first calculated the rates at which registered Alabama voters lack photo ID based on a comparison of voter data available in the Secretary's voter registration database to Alabama's driver's license and non-driver ID database as of July 6, 2016. He also relied on matches between the voter registration database and certain federal ID databases identified by the Department of State, Department of Defense, and Veterans Administration after these federal agencies were provided with the relevant portions of the voter database. In his first analysis, Dr. Siskin considered a voter to "possess" acceptable photo ID even if some of the voter's personal information (e.g., name, age) in the voter registration database did not perfectly match that voter's information in an ID database. Under this analysis, he determined that 1.37% of white, 2.44% of Black, and 2.29% of Hispanic registered voters lack any form of acceptable photo ID.

Dr. Siskin further refined his analysis in light of a survey conducted by Dr. David Marker, another of Plaintiffs' experts. Dr. Marker surveyed a subset of those voters who could not be matched in the ID databases to ask whether they possessed any form of acceptable photo ID, as well as other questions. Of the responses that Dr. Marker received in his survey, 80 respondents indicated that the person to

whom the survey was addressed is deceased. In addition, 1,933 questionnaires were returned as undeliverable, and an additional 784 persons to whom the survey was addressed were considered ineligible because they no longer lived at the sampled address. In any event, Dr. Marker concluded that 84.0% of white voters, 82.0% of Black voters, and 86.3% of Hispanic voters on the no-match list have photo IDs.

Thus, in Dr. Siskin's second analysis, he considered whether a photo ID would be "contestable," i.e., "potentially susceptible to rejection" by election officials. For example, Dr. Siskin identified numerous photo IDs where both the first and last name on the ID did not match the name in the voter registration database. Under this approach, and applying Dr. Marker's survey conclusions, Dr. Siskin determined that the percentages could actually be higher: that 3.33% of white, 5.49% of Black, and 6.98% of Hispanic registered voters have lack adequate photo ID that could be used to vote. In the end, however, Dr. Siskin, expressed an opinion that an estimated 50,106 (1.67%) registered voters in Alabama have no valid photo ID that is accepted under the photo ID law, which comes out to 29,491 whites (1.37%), 20,087 Blacks (2.44%), and 528 Hispanics (2.29%). He continued to estimate, however, that an additional 68,046 voters have IDs that have material name discrepancies such that they may be contested at the polls.

The Secretary's expert, Dr. M.V. Hood III, found that 0.87% of white, 1.44% of Black, and 1.26% of Hispanic registered voters lack photo ID.

Dr. Siskin also performed an analysis of how far voters on the no-match list live from ALEA offices and Boards of Registrars' offices. According to Dr. Siskin's April 24, 2017 report, 69,704 voters without a useable photo ID live at least five miles from an ID-issuing office. Of these voters, 20,863 (29.93%) are Black, 992 (1.42%) are Hispanic, and 47,848 (68.65%) are white. Excluding "contestable" IDs from the analysis, the results total 27,941 registered voters who live more than five miles away from either an ALEA office or a registrars' office of which 17,933 (64.18%) are white, 9,672 (34.61%) are Black, and 336 (1.20%) are Hispanic.

Dr. Hood, the Secretary's expert, took Dr. Siskin's numbers and demonstrated that, according to Dr. Siskin's own data, Black and Hispanic voters without photo IDs are actually more likely than white voters without photo IDs to live within five miles of a Board of Registrars' office, which offers the easiest-to-obtain, and free, photo ID. Forty-four percent of Black voters, 28.1% of Hispanic voters, and 24.0% of white voters live within five miles of a Board of Registrars' office.

In Dr. Hood's May 16, 2017 declaration, he removed additional categories of voters from the no-match list, including those exempted from having to show photo

ID to vote for various reasons, such as living in a nursing home and being disabled. While Dr. Siskin did not agree with the removals, he conducted an additional analysis, providing the "benefit of the doubt" to Dr. Hood regarding some (but not all) of Dr. Hood's assumptions, regarding who should be removed from the no-match list and/or the study population. With those registered voters removed, Dr. Siskin estimated that 47,997 voters without a usable photo ID live at least five miles from either an ALEA office or a registrars' office. Of these voters, 33,010 are white, 14,281 are Black, and 706 are Hispanic.

Estimates were also made concerning voters who neither owned a vehicle nor had access to a vehicle. An estimate, using census tract data, indicates that 6.1% of households in Alabama have zero vehicles in the household, 8.19% of voters without a usable photo ID have no vehicle nor live in a household with a vehicle, and 12.08% of Black voters without a useable photo ID have no vehicle nor live in a household with a vehicle, compared to 5.71% of whites. The data also indicates that 2,028 white (53.6%), 1,717 Black (45.3%), and 42 Hispanic (1.1%) voters without a usable photo ID live more than five miles from either an ALEA office or a registrars' office and have no vehicle or live in a household without a vehicle. Dr. Siskin also calculated these figures excluding "contestable" IDs from the analysis. The results total 1,597 registered voters who live more than five miles away from

either an ALEA office or a Board of Registrars' office of which 776 are white, 807 are Black, and 14 are Hispanic. When certain registered voters identified by Dr. Hood are removed, Dr. Siskin found 1,403 white (54%), 1,168 Black (44.9%), and 29 Hispanic (1.1%) voters without a useable photo ID, who live at least five miles from either an ALEA office or a registrars' office and have no vehicle nor live in a household with a vehicle.[3]

## III.   STANDARD OF REVIEW

The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion, but simply requires a determination of whether either of the parties deserves judgment as a matter of law on the facts that are not disputed. *Am. Bankers Ins. Group v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005). The Court must consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration. *Id.* A motion for summary judgment is due to be granted upon a showing that "no genuine dispute as to any material fact" remains

---

[3] The parties have offered many other facts concerning topics such as the history of voter fraud in Alabama, findings of discriminatory intent in other laws passed in Alabama over the past fifty years, and the 2011 Legislature's anti-immigration bill and redistricting plan, to name just a few. The Court has not included all of the facts offered by the parties in this Memorandum of Opinion, but it has included what it believes to be the facts that are actually relevant to the legal issues in this case, along with other facts whose relevance is more tangential but which serve to provide context.

to be decided in the action and "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material "if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259 (11th Cir. 2004). A genuine dispute as to a material fact exists where "the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001).

## IV.  DISCUSSION

### A.  Alabama's Photo ID Law Does Not Violate the Fourteenth and Fifteenth Amendments to the U.S. Constitution

Plaintiffs claim in Counts Three and Four of the Second Amended Complaint that the Photo ID Law violates the Fourteenth and Fifteenth Amendments to the United States Constitution. The Fourteenth Amendment prohibits a State from denying any person the "equal protection of the laws." U.S. Const. Amend. XIV. The Fifteenth Amendment, ratified in the wake of the Civil War, provides that "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." U.S. Const. Amend. XV.

To prevail on both their Fourteenth and Fifteenth Amendment claims, Plaintiffs must show that the Alabama Legislature passed the Photo ID Law with a

racially discriminatory intent or for a racially discriminatory purpose. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1997) ("Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."), citing *Washington v. Davis*, 426 U.S. 229 (1976) (holding that official action will not be held unconstitutional solely because it results in a racially disproportionate impact); *Thornburg v. Gingles*, 478 U.S 30, 35 (1986) ("to establish a violation . . . of the Fourteenth or Fifteenth Amendments, minority voters must prove that a contested electoral mechanism was intentionally adopted or maintained by state officials for a discriminatory purpose"); *City of Mobile v. Bolden*, 446 U.S. 55, 62 (1980) (noting that the Supreme Court's decisions "confirm the principle that racially discriminatory motivation is a necessary ingredient of a Fifteenth Amendment violation"), *superseded by statute on other grounds as stated in Thornburg*, 478 U.S. at 35.

This is not to say, however, that Plaintiffs are absolved from any burden to show that the Photo ID Law also *actually discriminates* on the basis of race. The Supreme Court has held that an allegation of a defendant's intent or motivation to discriminate, standing alone, is not sufficient to state a claim under the Equal Protection Clause of the Fourteenth Amendment. *Palmer v. Thompson*, 403 U.S. 217, 224 (1971) ("[N]o case in this Court has held that a legislative act may violate

equal protection solely because of the motivations of the men who voted for it."),

relying upon *Fletcher v. Peck*, 6 Cranch 87 (1810). *See also Bolden*, 446 U.S. at 65

(holding that the electoral system of voting in Mobile did not violate the rights of

the city's Black voters in contravention of the Fifteenth Amendment, since Black

voters in Mobile "register and vote without hindrance" and thus their "freedom to

vote has not been denied or abridged by anyone"), *superseded by statute on other

grounds as stated in Thornburg*, 478 U.S. at 35.

The Court first turns to the task of "[p]roving discriminatory motivation

behind official action," which the Supreme Court has described as "a problematic

undertaking." *Hunter v. Underwood*, 471 U.S. 222, 228 (1985); *see also Edwards v.

Aguillard*, 482 U.S. 578, 636-37 (1987) ("[D]iscerning the subjective motivation of

those enacting the statute is, to be honest, almost always an impossible task. The

number of possible motivations, to begin with, is not binary, or indeed even

finite. . . . To look for the sole purpose of even a single legislator is probably to look

for something that does not exist.") (Scalia, J., dissenting). Despite these

difficulties, Plaintiffs need only prove that racial discrimination was one

"motivating" factor in the enactment of the Photo ID Law, and they may rely upon

various types of direct or circumstantial evidence in order to do so. *Arlington

Heights*, 429 U.S. at 265-67. "[A]n important starting point" is "[t]he impact of

the official action whether it bears more heavily on one race than another." *Id.* at 266. In rare cases, "a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face." *Id.* But absent such a clear pattern, courts must look to other direct or circumstantial evidence of intent, including "[t]he historical background of the decision," "[t]he specific sequence of events leading up [to] the challenged decision," "[d]epartures from the normal procedural sequence," and "contemporary statements by members of the [Legislature], minutes of its meetings, or reports." *Id.* at 267-68. In addition, "a strong state policy in favor of [the challenged practice], for reasons other than race, is evidence that the [practice] does not have a discriminatory intent. On the other hand, a tenuous explanation for [the practice] is circumstantial evidence that the system is motivated by discriminatory purposes." *United States v. Marengo Cty. Comm'n*, 731 F.2d 1546, 1571 (11th Cir. 1984).

In support of their contention that the Alabama Legislature enacted the Photo ID Law with the intent to discriminate against racial minorities, Plaintiffs cite many things, among them: a history of voter discrimination in Alabama; racist statements (referring to Black voters as "illiterates" and "aborigines") made by several Legislators during recorded conversations contemporaneous to the passage

of the Photo ID Law but that did not involve the Photo ID Law; the fact that the same Legislature that passed the Photo ID Law passed an anti-immigration bill and a redistricting plan, parts of both which were later invalidated by courts; that the Legislator who sponsored both the Photo ID Law and the anti-immigration bill made various prejudiced comments about Latino citizens during his speech introducing the anti-immigration bill; that the Legislature's efforts to pass a photo voter ID bill coincided with a rising increase in Black people becoming registered voters in 1995 under the National Voter Registration Act, which allowed people to register at motor vehicle and public welfare agencies; that the Legislature's passage of a 2003 voter ID law, which allowed various forms of non-photo ID to vote, was the result of a negotiation between the Black Caucus and white Republicans in which, in exchange for Republicans agreeing to not block a re-enfranchisement bill for people with felonies, the Black Caucus would agree not to block a voter ID bill; statements made in 1996 to the effect that Alabama's lack of a photo ID law was "beneficial to the Black power structure" and "benefits Black elected leaders" by a Legislator who retired before the 2011 passage of the Photo ID Law; that the law's sponsor expected a "lengthy court battle" with the Department of Justice regarding whether it would be precleared under Section 5 of the Voting Rights Act; the fact that the Legislature invoked cloture and truncated debate during the

passage of the law; that there was no voter education or release of administrative rules with respect to the law until after the Supreme Court issued its decision in *Shelby County* rendering the preclearance requirement null and void; and that there is a lack of evidence of any significant in-person voter fraud in Alabama that would be prevented by the Photo ID Law.

In response, Secretary Merrill argues that the Photo ID Law was not passed with a discriminatory purpose but was passed to combat voter fraud, increase voter confidence, and to modernize elections, all policies held by the Supreme Court to be legitimate and furthered by a photo ID law. *See Crawford*, 553 U.S. at 192-97. In further support, he cites as evidence the following: that Alabama did not act on its own, but joined a growing national trend, in first passing a voter identification law and later a photo ID law; that documented cases of voter fraud do exist in Alabama, and grass-roots movements, concerned about evidence of voter fraud, engaged in efforts to educate the public about voter fraud and to lobby for a voter identification law; that there were publicized absentee-voter fraud prosecutions in Greene County and Hale County in the mid-1990s; that public officials, including former Secretary of State Jim Bennett and Attorney General Bill Pryor, pushed for voter identification laws in the 1990s and early 2000s; that there was nothing unusual in the way that the photo ID law was passed, including the use of cloture, and that

while the Legislature may have heard warnings by some of an alleged discriminatory impact, there is no evidence that Legislators supporting the law believed that the law would have such an impact, particularly when accepting so many forms of ID, including those disproportionately held by minorities.

In other election law cases, it has been appropriate for the trier of fact to engage in the delicate and highly fact-sensitive consideration of the kinds of testimony and historical facts that are summarized above. *See Prejean v. Foster*, 227 F.3d 504, 509 (5th Cir. 2000) ("Legislative motivation or intent is a paradigmatic fact question.") (citing *Hunt v. Cromartie*, 526 U.S. 541, 549 (1999)). However, such an undertaking is not necessary in this case. This is because, as noted, Plaintiffs are also required to show that the law in fact discriminates. *See Bolden*, 446 U.S. at 65 (actual discrimination required to show a violation of the Fifteenth Amendment), *superseded by statute on other grounds as stated in Thornburg*, 478 U.S. at 35; *Arlington Heights*, 429 U.S. at 266 (discriminatory impact is "a good starting point" of the discriminatory intent analysis); *Palmer*, 403 U.S. at 224-26 (actual discrimination is required to show a violation of the Equal Protection Clause of the

Fourteenth Amendment).[4] In this case, the Photo ID Law *does not in fact* discriminate on the basis of race.

Plaintiffs' expert Dr. Bernard Siskin says there are around 50,000 registered voters in Alabama (or 1.67% of the registered voter population) who may not have any of the forms of photo ID that may be used for voting.[5] This means that nearly the entire population of registered voters in Alabama already possesses a photo ID that can be used for voting. Perhaps one reason that the law affects so few voters is the variety of photo IDs that the Alabama Legislature decided to allow. North Carolina and Texas's election laws were each criticized for not accepting student IDs, military IDs, and government employee IDs that are disproportionately held

---

[4]     The *Palmer* Court explained that racially motivated legislation violates the Equal Protection Clause only when the challenged legislation "affect[s] blacks differently from whites." 403 U.S. at 225. The Supreme Court has since acknowledged that this holding may seem contrary to the requirement that a plaintiff prove discriminatory intent or motive to succeed on an equal protection claim. *See Arlington Heights*, 429 U.S. at 265 & n.10; *Washington*, 426 U.S. at 242-44. However, the Supreme Court has never invalidated *Palmer* and indeed, has continued to require actual discrimination to be shown in equal protection cases. *See, e.g., Washington*, 426 U.S. at 238 ("The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct *discriminating* on the basis of race.") (emphasis added).

[5]     Dr. Siskin also estimated that an additional 68,046 voters have what he called "contestable" photo IDs, or IDs that have material discrepancies between the name or other identifying information on the voter roll such that they may be contested at the polls. In total then, Dr. Siskin estimated that 118,152 registered voters have either no photo ID or have a "contestable" photo ID. Secretary Merrill filed a motion *in limine* to exclude Dr. Siskin's testimony concerning "contestable" IDs on the ground that Dr. Siskin is not qualified to express an opinion about what photo IDs a poll worker would accept. (Doc. 215.) The motion is hereby **DENIED AS MOOT**, because, as explained herein, even considering as true that Dr. Siskin's additional 68,046 voters have "contestable" IDs, Secretary Merrill is still entitled to a ruling in his favor.

by minorities. *See N.C. State Conf. of the NAACP v. McCrory*, 831 F.3d 204, 236 (4th Cir. 2016); *Veasey v. Abbott*, 830 F.3d 216, 262 (5th Cir. 2016) (en banc). Alabama accepts those IDs.

Also according to Dr. Siskin, 1.37% of white registered voters, 2.44% of Black registered voters, and 2.29% of Hispanic registered voters may not currently have an acceptable photo ID. Frankly, the discrepancy in photo ID possession rates among white, Black, and Hispanic registered voters in Alabama is miniscule. In other words, it appears that very few registrants of *any* racial group may presently be affected by the Photo ID Law. Nonetheless, the numbers show that Black and Latino registered voters are almost twice as likely as white voters to lack an acceptable photo ID for voting. Although Secretary Merrill's expert's numbers differ somewhat (Dr. Hood estimated that .87% of white, 1.44% of Black, and 1.26% of Hispanic registered voters lack photo ID), Secretary Merrill does not dispute that registered voters of color in Alabama are statistically more likely than white voters to lack the required photo ID. It is worth noting that any conclusions reached from this evidence must be qualified by the fact that the studies were completed in July 2016, and the actual possession rates are certainly in flux as voters who want them obtain photo IDs. Indeed, since the analyses were done, there has been a Presidential election and a special election to choose Alabama's

U.S. Senator. Many people who may not have had ID more than a year ago could have gotten one since, particularly if they wanted to participate in those elections.

But in the end, Dr. Siskin's estimate does not matter. This is because a person who does not have a photo ID today is not prevented from voting if he or she can easily get one, and it is so easy to get a photo ID in Alabama, *no one* is prevented from voting.[6]

Anyone without a photo ID can obtain one for the sole purpose of voting, free of charge. These IDs can be obtained at Secretary Merrill's office at the State Capitol Building in Montgomery, any Board of Registrars' office, located in each county and open during daily business hours, or to an event where the Secretary's mobile ID unit is visiting. Since 2014, the Secretary's mobile unit has appeared in each county in Alabama at least once each year, and at various locations throughout the county. While polling places do not offer the free voter photo IDs on Election Day, if a person shows up to the polls on Election Day without a qualifying photo ID, he or she may still cast a provisional ballot, obtain a free voter photo ID within the next several days (they are available at the other locations on Election Days and

---

[6] To that end, and as more fully explained herein, Plaintiffs' request for summary judgment in their favor on this discrete issue, i.e., that Black and Hispanic voters are statistically less likely than white voters to possess one of the required forms of photo ID to vote in Alabama (*see* doc. 234), is due to be denied because issuing such a ruling would be superfluous to the Court's holding.

in the days thereafter, such as at each Board of Registrar's office, and a temporary ID is issued immediately), and return to cure the ballot. The Supreme Court and the Eleventh Circuit have held that an inconvenience of this type is not a substantial burden on the right to vote. *Crawford*, 553 U.S. at 198 ("For most voters who need them, the inconvenience of making a trip to the BMV, gathering the required documents, and posing for a photograph surely does not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting."); *Common Cause/Georgia*, 554 F.3d at 1354-55 ("The ordinary burdens of producing a photo identification to vote, which the Supreme Court described as 'arising from life's vagaries,' do not 'raise any question about the constitutionality of' the Georgia statute."), quoting *Crawford*, 553 U.S. at 197. [7]

To get a free voter photo ID, a voter must establish the following information:

---

[7] The challengers in *Crawford* and *Common Cause/Georgia* did not allege intentional race discrimination. Rather, they mounted facial attacks on photo ID requirements as unduly burdensome on the right to vote generally under the First and Fourteenth Amendments. The *Crawford* Court conducted the flexible *Anderson–Burdick* analysis, balancing the burden of having to show a photo ID to vote in person against Indiana's interests in deterring and detecting voter fraud, correcting maladministration of the voter rolls, and safeguarding voter confidence, concluding that the photo ID requirement "impose[d] only a limited burden on voters' rights." 553 U.S. at 202-03 (citing *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983) and *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)). The Eleventh Circuit in *Common Cause/Georgia* held similarly.

(1)     A photo identity document, except that a non-photo identity document is acceptable if the document includes both the person's full legal name and date of birth.

(2)     Documentation showing the person's date of birth.

(3)     Documentation showing the person is registered to vote in this state.

(4)     Documentation showing the person's name and address as reflected in the voter registration record.

Ala. Code § 17-9-30(j). A voter can satisfy these requirements by presenting, for example, a birth or marriage certificate and something with the voter's name and address on it, such as a utility bill or a pay stub.[8] If the voter does not have a copy of her birth or marriage certificate, the registrar can get a copy at no charge to the voter, due to Secretary Merrill's contracting with the ADPH to pay for ADHP to perform the search.

Another, even simpler, way to satisfy the statute's requirement is by signing a voter registration form (which requests all of the information required above) or updating an existing voter registration form (even if nothing needs updating), under oath, in front of an election official, thereby confirming the voter's identity. The

---

[8]     Indeed, the mobile ID unit has issued free photo voter ID cards based upon the presentation of a wide variety of documents, including voter registration forms, registration update forms, arrest records, bank documents, Birmingham Housing Authority ID cards, expired county employee IDs, court paternity documents, fishing licenses, EBT cards, pay stubs, Sam's Club cards, and a ticket issued by a municipality.

availability of this option establishes that every single registered voter in Alabama, or potential registered voter, can obtain a photo ID in this fashion at no charge. If someone was never issued a birth certificate, she still can get a photo ID by attesting to her identity through a registration form or update form.

Additionally, if a voter cannot get to a registrar's office or to an event where the mobile ID unit is temporarily stationed, Secretary Merrill will bring the mobile unit to the voter's home and issue a photo ID, also at no cost to the voter. That means that the only way the photo ID law could prevent a person from voting is if that person is unable or unwilling to request a home visit from the mobile unit. Plaintiffs point out that the record shows fewer than ten home visits made by the mobile unit, one of which required a state Legislator to personally contact the Secretary to request the visit for a constituent, and another for a plaintiff in this case, and that while a person can request a home visit through the Secretary's website, such a request does not necessarily guarantee that a representative from the Secretary's office will make a home visit because the Secretary has implemented a protocol whereby the voter is asked questions about his or her transportation options. Nonetheless, Secretary Merrill has made clear that if the voter says he has no one to give him a ride, the voter is taken at his word: ("Now, if they choose not to be honest, then we'll accept it."). He emphasized that "we're

not going to—nobody is ever going to be denied a voter ID." Thus, Plaintiffs have not disputed that a voter who truly needs a home visit can get one. This fact, plus the fact that all it takes is signing a voter registration form or update form, means that any Alabama voter who wants one can get a photo ID.

Plaintiffs also cite to the declaration of Jewel Castophney, a Black registered voter who was denied a free voter ID by a representative of Secretary Merrill's office at a mobile unit event because of the erroneous belief that she already had an acceptable ID and therefore did not need one. Due to the cost incurred by the State in printing the free voter ID cards, they are intended for use only by individuals who do not already have some other form of qualifying photo ID that can be used for voting. In any event, Ms. Castophney applied again for a free voter ID on November 1, 2017, and her application was pending during her deposition. She also testified that she did not want it to vote and did not realize it was intended for this purpose only; she routinely uses the positively identify provision to vote. She wanted a State-issued ID for other purposes and she testified that she would not have applied for one if she had understood that it was only for voting. Plaintiffs also cite Plaintiff Elizabeth Ware, who says she was told that she could not get a free voter photo ID card because in the past she had possessed an ALEA-issued ID. If she was told that, the Secretary of State assures that the registrar was mistaken, and

the Secretary has issued guidance instructing registrars that people who used to have an ID, who had lost an ID, or whose ID was expired, are still eligible to receive a free ID for voting purposes. Moreover, Ms. Ware has since received a free ID. That is, at most, several mistakes due to human error and not the law itself, and in fact, as of June 30, 2017, Alabama had issued 13,442 free voter photo IDs to voters (and, at $8 per card, paid more than $280,000 to the vendor for card printing and other services and equipment related to the free ID program).

Moreover, the individual plaintiffs' situations demonstrate that people who want a photo ID can get one. Giovanna Ambrosio could participate in after-school activities, go to work every day in the summer, and make a 25-30 minute trip to go to college classes, but says she could not get to a registrars' office that was a mile from her house. Before the 2016 general election, she managed to make the one-mile trip and got her ID. She also knew about the mobile unit and the offer to visit any day of the week. Debra Silvers (now deceased) had an ALEA nondriver ID but lost it in a fire. When she needed an ID for purposes other than voting, she got a replacement ID. Shameka Harris had an ALEA nondriver ID that was stolen. When she was told she needed an ID for certain government benefits, she got it replaced. Elizabeth Ware had an ALEA non-driver ID and lost it. When she

requested it, the mobile unit traveled over 150 miles one way to her home and issued a photo ID.[9]

In sum, the "impact" of the law should not be measured by how many people lack a given ID at a given point in time, but by whether someone without an ID can easily get one. In Alabama, the law has no discriminatory impact because it does not prevent anyone from voting, not when free IDs are issued in every county, or at home, under conditions that any registered voter can meet.

One test for whether the Alabama Legislature intended to discriminate is whether it did, in fact, discriminate. As discussed above, it did not. It would serve no purpose for this Court to further consider the other *Arlington Heights* factors (the historical background of the law, contemporaneous statements made by Legislators, departures from normal legislative procedures, etc., *see* 429 U.S. at 267-68) when even a ruling in Plaintiffs' favor would do no more than hold that the Alabama Legislature intended to discriminate in enacting the Photo ID Law, but failed.[10]

---

[9] Although Plaintiffs introduced the issue of religious objections to photo IDs in the facts section of their Motion for Partial Summary Judgment, through the anecdotal evidence concerning Joshua Wahl, they do not bring an equal protection claim of discrimination based on religion.

[10] The Court thus need not consider Secretary Merrill's motion *in limine* to exclude the testimony of Plaintiffs' proposed expert, Morgan Kousser, Ph.D., a historian, whose opinion

Two additional points remain. First, the Court finds that Alabama had "important regulatory interests" in enacting a photo ID requirement, namely, to combat voter fraud, increase confidence in elections, and modernize election procedures. *See, e.g., Common Cause/Georgia*, 554 F.3d at 1352. The Eleventh Circuit, adhering to Supreme Court precedent, has held that these policies are legitimate. *See id.* at 1352-53, citing *Crawford*, 553 U.S. at 192-97. The undisputed facts show that voter fraud, albeit almost entirely in the context of absentee voting, did exist in Alabama prior to the law's enactment. In any event, the Supreme Court has held that deterring voter fraud is a legitimate policy for a State even in the absence of any record evidence of voter fraud occurring. *Crawford*, 553 U.S. at 195 (no record evidence of voter fraud in Indiana). Thus, Secretary Merrill is not required to prove that voter fraud exists (although he has done so), that the Photo ID Law helps deter voter fraud, or that the law increases confidence in elections. Supreme Court precedent mandates that Alabama's justifications for the law are valid. *See id.* at 192-97.[11]

---

concerned the Alabama Legislature's intent in passing the Photo ID Law. (Doc. 216.) The motion is hereby **DENIED AS MOOT**.

[11]     To that end, the Court need not consider the opinion of Plaintiffs' proposed expert, Dr. Lonna Rae Atkeson, that photo ID laws do not increase voter confidence. Secretary Merrill filed a separate motion *in limine* to exclude her testimony. (Doc. 217.) The motion is hereby **DENIED as MOOT**.

Second, the Court notes that the record in this case is very different than the evidence before the Fourth Circuit when it held that North Carolina's photo ID law was passed with discriminatory intent. In *McCrory*, the Fourth Circuit concluded that the North Carolina process targeted Black voters with "almost surgical precision." 831 F.3d at 214. For example, the court explained that, on the day after the Supreme Court eliminated Section 5 of the Voting Rights Act's preclearance obligations in *Shelby County*, under which North Carolina had previously been covered, the Republican Chairman of the Senate Rules Committee, whose party had been rarely supported by Black voters, announced the intention of enacting a new "omnibus" election law. *Id.* at 214, 216. After the announcement but before the enactment of any law, the Legislature requested data "on the use, by race, of a number of voting practices." *Id.* at 214. And based on the data, the Legislature, acting "swiftly," enacted legislation "that restricted voting and registration in five different ways, all of which disproportionately affected African Americans." *Id.* at 214, 216. Specifically, the omnibus election law not only excluded many of the alternative photo IDs disproportionately used by Black voters and retained only the kinds of photo IDs that whites were more likely to possess, but also eliminated certain voting procedures that the data the Legislature had just

collected showed were disproportionately used by Black voters. *Id.* at 214. For example, early voting in North Carolina allowed any registered voter to complete an absentee application and ballot at the same time, in person, for a two-week period in advance of Election Day. *Id.* at 216-17. The new law eliminated the first week of early voting, resulting in the elimination of one of the two "Souls to the Polls" Sundays in which Black churches provided transportation to voters. *Id.* at 217. Same-day voting was a procedure allowing eligible persons to register in person at an early voting site at the same time as casting their ballots, and which historically provided an easy avenue to re-register for those who moved frequently, and which allowed those with low literacy skills to receive personal assistance from poll workers in completing a registration form. *Id.* Provisional voting, including out-of-precinct voting, required the Board of Elections in each county to count the provisional ballot of an Election Day voter who appeared at the wrong precinct, but in the correct county. *Id.* This provision assisted those who moved frequently, or who mistook a voting site as being in their correct precinct. *Id.* Preregistration permitted 16 and 17-year-olds, when obtaining driver's licenses or attending mandatory high school registration drives, to identify themselves and indicate their intent to vote. *Id.* at 217-18. This allowed County Boards of Elections to verify eligibility and automatically register eligible citizens once they reached eighteen. *Id.*

Preregistration increased turnout among young adult voters. *Id.* All of these procedures were used disproportionately by Black voters, according to the Legislature's data, and all were eliminated by the new law. *Id.* at 214-18. Moreover, the Fourth Circuit found that the Legislature offered "only meager justifications" for the new provisions. *Id.* at 214. Equally telling, in its efforts to "rush" the omnibus bill through the legislative process, the Legislature engaged in "unusual procedures." *Id.* at 228. As the court concluded, "the State took away minority voters' opportunity because they were about to exercise it . . . . [T]his bears the mark of intentional discrimination." *Id.* at 215. Here, there is no evidence that the Alabama Legislature believed that a photo ID law would disadvantage minority voters, particularly after providing means for people without an ID to receive one free of charge.

For all of the foregoing reasons, Secretary Merrill is entitled to summary judgment in his favor on Plaintiffs' constitutional claims.

### B. Alabama's Photo ID Law Does Not Violate Section 2 of the Voting Rights Act

Plaintiffs claim in Count One of the Second Amended Complaint that the Photo ID Law violates Section 2 of the Voting Rights Act. Subsection (a) of Section 2 forbids any "standard, practice, or procedure" that "results in the denial or abridgement of the right of any citizen of the United States to vote on account of

race or color." 52 U.S.C. § 10301(a). Subsection (b)—added in 1982—explains that a violation of subsection (a) is established if "based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id*. § 10301(b). Consistent with the statute's focus on the "results" of a challenged voting practice, it is well established that a violation of Section 2 can be established by proof of "discriminatory results alone." *Chisom v. Roemer*, 501 U.S. 380, 404 (1991). In other words, no showing of discriminatory intent or purpose is required.

The "structure or practice" identified by Plaintiffs is the Photo ID Law's requirement that every voter provide a photo ID either at the time of voting or within several days thereafter. Plaintiffs argue that, because Black and Latino voters are less likely to possess photo ID, the requirement imposes a disparate burden that has the effect of denying them the equal opportunity to vote. The Secretary responds that there is no evidence that *any* voter will be denied an equal opportunity to vote because the law makes it so easy to obtain the necessary photo ID. The Court agrees. The undisputed facts show that Alabama has sufficiently

advertised the need for a photo ID and how to get one, and the law has been used in elections in Alabama since 2014 (so that no person can reasonably claim ignorance of the law's provisions). To get a photo ID at no cost, a voter need only get to a registrar's office with a birth or marriage certificate. If he does not have a copy of his birth certificate, the registrar will look it up, or, even easier, the voter can simply sign a registration form or update form under oath. If someone truly has no access to transportation, the Secretary of State will come to the voter's home and issue an ID. There is no person who is qualified to register to vote who cannot also get a photo ID.

Thus, just as in *Lee v. Virginia State Board of Elections*, "[a] complex § 2 analysis is not necessary to resolve this issue because the plaintiffs have simply failed to provide evidence that members of the protected class have less of an opportunity than others to participate in the political process." 843 F.3d 592, 600 (4th Cir. 2016). In Virginia (as in Alabama), a voter can get a free photo ID without presenting additional documentation. *See id.* at 594. And in Virginia, as in Alabama, a person who shows up at the polls without a photo ID can cast a provisional ballot that may be cured by later presenting a photo ID. *Id.* Under those circumstances, the Fourth Circuit rejected the plaintiffs' claim that "as long as there is disparity in the rates at which different groups possess acceptable identification, § 2 is

violated." *Id.* at 600. "Disparate inconveniences," the court held, are not the same thing as "the denial or abridgment of the right to vote" required for an actionable Section 2 claim. *Id.* at 601. The court explained:

> Every decision that a State makes in regulating its elections will, inevitably, result in somewhat more inconvenience for some voters than for others. For example, every polling place will, by necessity, be located closer to some voters than to others. To interpret § 2 as prohibiting any regulation that imposes a disparate inconvenience would mean that every polling place would need to be precisely located such that no group had to spend more time traveling to vote than did any other. Similarly, motor-voter registration would be found to be invalid as members of the protected class were less likely to possess a driver's license. Yet, courts have also correctly rejected that hypothetical. *See Frank v. Walker*, 768 F.3d 744, 754 (7th Cir. 2014), cert. denied, --- U.S. ----, 135 S. Ct. 1551 (2015).

We conclude that § 2 does not sweep away all election rules that result in a disparity in the convenience of voting. As we noted in *North Carolina State Conference of NAACP v. McCrory*, 831 F.3d 204, 241 (4th Cir. 2016), "it cannot be that states must forever tip-toe around certain voting provisions" that would have more effect on the voting patterns of one group than another. Rather, § 2 asks us to evaluate whether the Virginia process has diminished the opportunity of the protected class to participate in the electoral process. If Virginia had required voters to present identifications without accommodating citizens who lacked them, the rule might arguably deprive some voters of an equal opportunity to vote. But where, as here, Virginia allows everyone to vote and provides free photo IDs to persons without them, we conclude that SB 1256 provides every voter an equal opportunity to vote and thus does not violate § 2 of the Voting Rights Act.

*Id.* at 600–01.[12]

The same is true here. The issue is not who has or does not have a photo ID at present. The issue is whether the Photo ID Law denies members of a minority group the opportunity to reasonably get one, assuming they want one. "[A] § 2 challenge based purely on a showing of some relevant statistical disparity between minorities and whites, without any evidence that the challenged voting qualification causes that disparity, will be rejected." *Gonzales v. Arizona*, 677 F.3d 383, 405 (9th Cir. 2012) (en banc) (quotation marks and citation omitted); *see also Frank v. Walker*, 768 F.3d 744, 753 (7th Cir. 2014) ("Although [facts showing that minority voters are less likely than white voters to possess photo ID] document a disparate outcome, they do not show a 'denial' of anything by Wisconsin, as § 2(a) requires; unless Wisconsin makes it *needlessly* hard to get photo ID, it has not denied anything to any voter."); *id.* at 754 ("It is better to understand § 2(b) as an equal-treatment requirement (which is how it reads) than as an equal-outcome command . . . .").

---

[12]    Plaintiffs' attempts to distinguish *Lee* from this case fall flat. They contend that the fact that Alabama advises applicants for a free voter ID card that they are subject to felony perjury in swearing that they do not possess an alternate form of ID makes Alabama's process to obtain the free voter photo ID somehow more burdensome than Virginia's. They also note that *Lee* was decided after a trial on the merits, not at summary judgment, but the Court's independent review of the *Lee* docket reveals that Virginia did not seek a summary judgment ruling in its favor on the plaintiffs' Section 2 claim.

Minorities do not have less opportunity to vote under Alabama's Photo ID law, because everyone has the same opportunity to obtain an ID. Black, Hispanic, and white voters are equally able to sign a voter registration form or registration form update. They have the same opportunity to get to a registrar's office, and to the extent there is a difference in convenience, they have the same opportunity to request a home visit. Insofar as it is less convenient for the poor to get an ID than it is for those who have greater means, that is as true for poor whites as it is for poor minority voters. A Black voter and a white voter of equal means who each lack ID and a birth certificate, and who each live an equal distance away from the registrar's office, are in the exact same position: They can each get a photo ID at no charge by signing a simple form, and if they have no transportation, the mobile unit will come to them. In sum, there cannot be a discriminatory impact on voting when the law does not prevent anyone from voting. Secretary Merrill is entitled to summary judgment on Plaintiffs' Section 2 claim.[13]

---

[13] The Court also notes that although Plaintiffs do not bring a separate claim for violation of 52 U.S.C. § 10503, the Voting Rights Act's bilingual election requirements, they do complain that certain election materials are not available in Spanish. The bilingual requirements of the Voting Rights Act are triggered when a language minority comprises five percent or more of the state's citizens of voting age. 52 U.S.C. § 10503(b)(2). Plaintiffs have not claimed that Spanish speakers have reached that threshold in Alabama. In any event, Secretary Merrill's Hispanic Chief of Staff testified that when it is requested, Secretary Merrill provides Spanish language translations of elections materials, even though it is not required.

### C. The Positively Identify Provision of Alabama's Photo ID Law Does Not Violate Section 201 of the Voting Rights Act

In Count Two of the Second Amended Complaint, Plaintiffs attacked the Photo ID Law's exemption for those voters who can be "positively identified" by two election officials. *See* Ala. Code § 17-9-30(e). There is no statutory or other definition of "positively identif[y]," but the Secretary interprets the phrase to mean that a voter who lacks photo ID may cast a regular ballot if two poll officials will attest to the voter's identity based solely on the poll officials' personal acquaintance with the voter. Plaintiffs claimed that this exemption constitutes an illegal test or device—an outlawed "voucher" requirement—in violation of Section 201 of the Voting Rights Act, 52 U.S.C. § 10501(a).

Section 201 categorically prohibits the use of "any test or device" as a voting qualification, stating that "[n]o citizen shall be denied, because of his failure to comply with any test or device, the right to vote in any Federal, State, or local election conducted in any State or political subdivision of a State." 52 U.S.C. § 10501(a). "All literacy tests and similar voting qualifications were abolished" by the Voting Rights Act because, "[a]lthough such tests may have been facially neutral, they were easily manipulated to keep blacks from voting." *N.W. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 198 (2009). Section 201 defines the phrase "test or device" as including "any *requirement* that a person as a

prerequisite for voting . . . prove his qualifications by the voucher of registered voters or members of any other class." 52 U.S.C. § 10501(b)(4) (emphasis added). This *per se* ban on tests and devices removed the burden of demonstrating the discriminatory application of a test that had been required under prior law. *See Briscoe v. Bell*, 432 U.S. 404, 410 n.9 (1977) ("The Act suspends the operation of all 'tests and devices' . . . ."); *Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320, 338 (2000) (stating that the Voting Rights Act now "bars certain types of voting tests and devices altogether").

Earlier in this litigation this Court denied Plaintiffs' request for a preliminary injunction to enjoin application of the positively identify provision, reasoning that Plaintiffs were not likely to succeed on their Count Two claim because the positively identify provision is not a requirement that must be met before voting. *Greater Birmingham Ministries v. Alabama*, 161 F. Supp. 3d 1104, 1116 (N.D. Ala. 2016). This Court explained that "obtaining a photo ID provides an objective, guaranteed option of proving one's identity that pre-[Voting Rights Act] voter laws with tests and devices lacked. Alabama voters can always present a photo ID and avoid reliance on the positively identify provision." *Id.*

Nonetheless, Plaintiffs now seek, as part of their Motion for Partial Summary Judgment, a legal ruling that the positively identify provision is a prohibited test or

device within the meaning of Section 201. (*See* doc. 234.) They continue to argue that the thousands of registered voters in Alabama who lack a photo ID are "required" to use the positively identify provision as their sole means of voting. That is simply not true: the voter can instead go to the Board of Registrars' office or schedule a home visit to get one.

The facts discussed in the previous two sections above related to the ease of obtaining a photo ID show that no one in Alabama is "required" to rely on the positively identify provision because they have the option of acquiring a photo ID with little to no effort and no cost. Far from an outlawed voucher requirement, the positively identify provision of the Photo ID Law offers an additional option that allows more individuals to vote than would be able to absent the provision. Before the Voting Rights Act was passed, Alabama and other states used literacy tests, poll taxes, and "good morals" requirements to discriminate against minorities. In some cases, voters were not permitted to cast a ballot unless they got a "voucher" from one or more other voters (and when almost all registered voters were white, Black voters were usually unable to find anyone to "vouch" for them). *See generally United States v. Logue*, 344 F.2d 290 (5th Cir. 1965). Far from those schemes, the positively identify provision was designed as a "fail-safe" means that allows a person to vote if they would prefer not to vote a provisional ballot and come back

later with a photo ID. It was part of the 2003 voter ID law, was precleared as a "fail-safe" provision by the Department of Justice, and has been used in elections for more than 14 years. Plaintiffs still maintain that all "alternative provisions for qualifying to vote" are outlawed by Section 201, but the "alternative provisions" Congress was targeting were themselves discriminatory devices, when a state, for example, had a literacy test but allowed white voters to get around it through a "voucher."

Because the provision is not a requirement that must be met before voting, the Court need not determine whether it is being used in an improper manner.[14] But the Court notes that the evidence on this record shows that it is not. Indeed, former Plaintiff Edna Williams, a Black registered voter, testified that she used the positively identify provision, and Jewel Castophney, a Black declarant for Plaintiffs, stated that she had always used it to vote, that she knows all of her poll workers, they were always the same people (although one died this year), and that they are all Black. The evidence also shows that during an incident in 2014 when two Black voters were not allowed to vote using the positively identify provision because the poll worker mistakenly believed that a photo ID was still required, Secretary Merrill

_____

[14] To that end, the Court need not consider the opinion of Plaintiffs' proposed expert, Dr. Atkeson, about how many voters know their "check-in poll worker." Secretary Merrill's separately-filed motion *in limine* also sought to exclude this opinion. (Doc. 217.) As noted previously, the motion is moot.

got involved and insisted that the poll worker follow the law and allow the voters to cast regular ballots under the positively identify provision. The Secretary also intervened when poll workers in Limestone County declined to positively identify Josh Wahl, a white registered voter who, for religious reasons, lacks a photo ID, even though they had done so in the past, saying that they said they could not be certain whether he in fact had no photo ID with him. The Secretary personally intervened and helped work out a solution so that Mr. Wahl could vote. The problems in those circumstances was not with the law, but were mistakes or human error of local officials. In addition, evidence undisputed by Plaintiffs shows that some Black election officials support the positively identify provision, that at least some election officials strive to ensure that the race of poll workers reflects the race of voters in a precinct, that there are in fact many Black poll workers in Alabama, particularly in heavily Black areas, and that minority voters are as able to use the positively identify option as white voters.

The undisputed evidence thus confirms the Court's previous conclusion that the positively identify provision is not an illegal test or device within the meaning of Section 201 of the Voting Rights Act. Accordingly, Plaintiffs' Motion for Partial Summary Judgment insofar as it seeks a legal ruling to the contrary (*see*

doc. 234) is due to be denied and Secretary Merrill is entitled to summary judgment on this claim.

## V.     CONCLUSION

For the reasons stated above, Plaintiffs' Motion for Partial Summary Judgment (doc. 234) is due to be denied and Secretary Merrill's Motion for Summary Judgment (doc. 236) is due to be granted and this action dismissed in its entirety. A separate order consistent with this opinion will be entered contemporaneously herewith.

**DONE** AND **ORDERED** ON JANUARY 10, 2018.

L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE

160704